1                    IN THE COURT OF COMMON PLEAS

2                       TRUMBULL COUNTY, OHIO

3

4     State of Ohio,              : CASE NO:  2017-CR-403

5          Plaintiff,            :

6                                 :

7     -vs-                        : <u>TRANSCRIPT OF PROCEEDINGS</u>

8     Austin Taylor Burke,        :

9          Defendant.            :    VOLUME I - JURY TRIAL

10

11

12          Be it remembered, that at the Jury Trial of the

13    above-entitled cause, in the Court of Common Pleas, Trumbull

14    County, Ohio, beginning on the 5th day of March, 2018, and

15    continuing thereafter, as hereinafter noted, before the

16    Honorable Andrew D. Logan, the following proceedings were had:

17

18

19

20

21

22

23    Official Court Reporter:  Lori J. Rittwage


                      OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

2

1                        A P P E A R A N C E S:

2

3

On behalf of the State of Ohio:

4

5        Atty. Christopher D. Becker
         Trumbull County Prosecutor's Office
6        160 High Street
         Warren, OH  44481
7        Phone:  (330) 675-2426
         Email:  psbecker@trumbull.co.oh.us

8

9    On behalf of the Defendant:

10       Atty. Bradley G. Olson
         Dimeo Olson Law Group, LLC
11       28 North Mill Street
         New Castle, PA  16101
12       Phone:  (330) 318-3453
         Email:  brad_olson_jr@yahoo.com

13
         Mr. Edward Hartwig
14       120 Marwood Circle
         PO Box 3965
15       Boardman, OH 44513
         Phone:   (330) 718-9499

16

17

18

19

20

21

22

23

# I N D E X

## V O I R   D I R E

|  | Page | Line |
|---|---|---|
| Voir Dire of the Potential Jurors | 6 | 18 |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

4

1          March 5, 2018

2          THE COURT:  Again, the Court calls case

3    2017-CR-403, which is state of Ohio versus Austin Burke.  This

4    matter is set for jury trial today.  The state is in court

5    through Assistant Prosecutor Christopher Becker.  The

6    defendant is in court along with his attorneys, Mr. Olson and

7    Mr. Hartwig.

8          We're here prior to the jury being summoned up in

9    court for any last-minute items but in particular to indicate

10   whether there had been any settlement negotiations between the

11   parties and the nature and extent of those.

12          Mr. Becker, did the state make an offer regarding a

13   resolution of this matter?

14          MR. BECKER:  Your Honor, yes, it's been

15   awhile, and it was rejected by the defense.  The state had

16   proposed amending the aggravated murder charge in Count 1 to

17   murder with a firearm specification which carries a potential

18   penalty of 18 years to life in prison with a three-year

19   firearm specification, running the other charges concurrently.

20   And that was rejected.  So I think that's why we're here

21   today.

22          THE COURT:  Right.  And, Mr. Olson, you

23   don't mind if I talk to your client?

5

1          MR. OLSON:  I do not, Your Honor.

2          THE COURT:  Mr. Burke, you understand that

3    the serious nature of these charges would result in, if you

4    were convicted of just charge one, not even all the rest of

5    the charges, the potential sentence could be life without

6    possibility of parole; you understand that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  All right.  That's -- and if

9    you were convicted of a lesser offense still there's a

10   possibility that the Court could add 11 years as to both the

11   robbery charges with the firearm spec and additional time for

12   the other charges.

13        So even if they didn't convict you of this aggravated

14   murder, but a lesser murder, you could still get 50 some years

15   in prison; do you understand that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  All right.  You are rejecting

18   that at this point in time?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  You want to go forward?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  You've discussed this with your

23   attorneys?

6

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you have any questions to

3    the Court?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  All right.  I just wanted to

6    make sure that this was on the record so in the event you're

7    convicted you can't come back and say your attorneys were

8    ineffective in not discussing this issue with you.

9      All right.  Anything else at this time, Mr. Olson?

10          MR. OLSON:  Nothing further, Your Honor.

11          THE COURT:  Mr. Becker, we're through until

12    the jury?

13          MR. BECKER:  Yes, Your Honor.

14          THE COURT:  Okay.

15          (Whereupon, the following proceedings were

16    had with the prospective jurors present.)

17                    *   *   *

18          VOIR DIRE OF THE POTENTIAL JURORS

19          THE COURT:  Good morning, Ladies and

20    Gentlemen.  Welcome back to Courtroom Number 1.  I'm Judge

21    Logan.  I will be presiding over the case for which you've

22    been summoned.  You've met my bailiff, Ms. Camuso.  My court

23    reporter is Ms. Rittwage.  If there is anything we can do to

make your stay here a little bit more comfortable, please make

sure we're aware of that.  It's our intention that your

service as jurors be as rewarding as possible.  It's obviously

not monetarily rewarding, but it will be rewarding in the

sense that you'll better under our American system of justice.

Ladies and Gentlemen, you've been summoned this date

for a criminal case that is styled on the court's docket as

case 2017-CR-403, State of Ohio versus Austin Burke.  This is

a serious criminal case involving allegations of murder and

robbery.

Now, I'm going to read from the indictment as to a

couple of the counts just to refresh your memory as to whether

or not you know anything about this particular case because

we'll go into that a little later.

It indicates that on or about the 12th day of June,

2017, and in Trumbull County, Ohio, Austin Burke did purposely

cause the death of another, one Kenneth Brandon Hayes Sample,

while committing or attempting to commit, or while fleeing

immediately after committing or attempting to commit,

kidnapping, rape, aggravated arson, arson, aggravated robbery,

robbery, aggravated burglary, burglary, trespass in a

habitation when a person is present or likely to be present,

or escape, with a specification regarding a firearm.

8

1      There is a robbery count relative thereto, tampering

2   with weapons, having guns while under disability, and then the

3   final count is, again, an aggravated robbery.  That on or

4   about the 20th day of June, 2017, the defendant did, in

5   attempting or committing a theft offense, or in fleeing

6   immediately after the attempt or offense, did have a deadly

7   weapon on or about his person, or displayed the weapon,

8   brandished it, indicated he possessed it, or used it.  Again,

9   with a firearm specification.

10      Again, I'm just reading those to give you a sense of

11   the charge because we will ask a little later on if you know

12   anything about this particular case.

13      Now, I want to introduce the parties that will be

14   presenting this case.  At the table at my left, which is

15   state's table, is Assistant Prosecutor Christopher Becker.  He

16   represents the state in this matter.  At the table toward my

17   right are Attorneys Edward Hartwig and Bradley Olson, along

18   with the defendant, Austin Burke.

19      Now, jury service may be somewhat strange to you so a

20   short explanation would be in order.  Those who participate in

21   trial do so in accordance with certain established rules.

22   That is true of the witnesses, the lawyers, the judge, and you

23   as jurors.  The lawyers present the evidence in accordance

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

9

1    with these rules.  The judge enforces these rules and

2    determines what evidence will be admitted.  You will be the

3    sole judges as to the facts, the credibility of the witnesses,

4    and the weight to give to any of the testimony.

5            Now, the state of Ohio and the defendant are entitled

6    to jurors who will approach this case with open minds and

7    agree to keep them open until a verdict can be reached.

8    Jurors must be as free as humanly possible from any bias,

9    sympathy or prejudice, and you must not be influenced by any

10   preconceived notions either as to the facts or as to the law.

11           Now, although you may be qualified to serve as a

12   juror in a general sense, there may be something that would

13   make it inappropriate for you to serve in this particular

14   case.  That is why the first part of each juror -- or first

15   part of each trial is the questioning of the jurors, again, in

16   order that we can make sure that you would be fair and

17   impartial when this case is presented.  It's an important part

18   of the case, and it's necessary that you be sworn in before we

19   can ask you any questions.

20           Ms. Camuso.

21               (Whereupon, the venire was administered the

22   oath.)

23               THE COURT:  All right.  At this time, the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

10

1   Court and then counsel will ask you some questions.  These

2   questions are not designed to pry into your personal affairs,

3   but to discover if you have any knowledge of this particular

4   case, if you have any preconceived opinions you cannot lay

5   aside, or if you have any experience that might cause you to

6   identify with one side or the other in this particular case.

7           Now, if at any point in time the Court or counsel ask

8   you a question that would be uncomfortable for you to answer

9   in open court, just make sure we're aware of that.  You can

10  approach the bench and give the answer in the privacy of the

11  sidebar solely with the Court and counsel.

12          All right.  As we begin, I will ask you questions as

13  a group.  If you are silent in your answer, we will consider

14  that a negative answer.  If your answer is other than the

15  negative, please raise your hand and we'll go into it a little

16  further.  If we are addressing a question or an answer that

17  you have, we'll ask you what your juror number is, so beware

18  of that as we go along.

19          First of all, have any of you been subpoenaed in good

20  faith to testify as a witness in this case?

21          Do any of you have any physical defects that might

22  prevent you from serving as a juror in this case?

23          Are any of you not residents of Trumbull County?  Has

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   anyone moved out of the county?

2           Do any of you have an interest in the outcome of this

3   case in any fashion?

4           Have any of you, to the best of your recollection,

5   read or heard anything about this particular case?  That's why

6   I mentioned the nature of it.  All right.  I'm going to have

7   you come to the bench one at a time.

8           Counsel, if you'll approach.  And Ms. Camuso, if

9   you'll bring the jurors ahead one at a time.

10                  BAILIFF JODI CAMUSO:  156.

11                  THE COURT:  156?  That's Miss Alberini?

12                  JUROR NO. 156*:*  Yes.

13                  THE COURT:  All right.  Miss Alberini, what

14   do you know about this case?

15                  JUROR NO. 156:  I was --

16                  THE COURT:  This is for the court reporter.

17                  JUROR NO. 156:  Oh, okay.  I was Brandon's

18   8th grade teacher at Howland Middle School and my daughter is

19   a good friend of Brandon's -- was a good friend of Brandon's.

20                  THE COURT:  That was the deceased?

21                  JUROR NO. 156:  Yes.

22                  THE COURT:  Okay.  Any questions,

23   Mr. Becker?

12

1             MR. BECKER:  Well, with that in mind, do

2     you think you're too close?

3             JUROR NO. 156:  I'm sorry?

4             MR. BECKER:  With that in mind, do you feel

5     that you're too close to this case or would you be able to

6     separate that out?

7             JUROR NO. 156:  I don't think I can

8     separate it.  Only because all of my daughter's friends were

9     Brandon's friends.

10            MR. BECKER:  Okay.  So you think that you

11    would be influenced by the fact that you knew him and you have

12    children that are his friends?  You couldn't give the

13    defendant the benefit of the doubt?

14            JUROR NO. 156:  Yeah.  I don't think I

15    could.

16            THE COURT:  Do you have any questions?

17            JUROR NO. 156:  I'm going to be honest.

18            MR. OLSON:  I don't have any questions.

19            THE COURT:  You're excused.  Thank you very

20    much.

21            JUROR NO. 156:  Thank you.

22            BAILIFF, JODI CAMUSO:  Juror Number 148.

23            THE COURT:  You are Dawn Adams?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

13

1                    JUROR NO. 148:  Yes, I am.

2                    THE COURT:  What do you know about this

3      case?

4                    JUROR NO. 148:  I don't really remember a

5      lot.  I just remember reading in the newspaper a story about

6      the criminal act and, you know --

7                    THE COURT:  You don't have any particular

8      individual involvement in this?

9                    JUROR NO. 148:  No.

10                   THE COURT:  But you read it in the paper?

11     You watch the news?

12                   JUROR NO. 148:  Yeah.  Pretty much.  He

13     does look familiar, so I don't know if he went to my school or

14     not.  I teach at the TCTC, but I don't know him, I don't

15     think.

16                   THE COURT:  You haven't prejudged this case

17     in any fashion?

18                   JUROR NO. 148:  No.

19                   THE COURT:  You understand what's in the

20     newspapers and what's in the news could be --

21                   JUROR NO. 148:  Right.  Could be biased.

22                   THE COURT:  And that all the evidence would

23     have to be presented in this case?

14

1                    JUROR NO. 148:  Sure.

2                    THE COURT:  And you could disregard

3    everything else that you've heard?

4                    JUROR NO. 148:  Sure.

5                    THE COURT:  And you could be fair to

6    everybody?

7                    JUROR NO. 148:  Yes.

8                    THE COURT:  Any questions?

9                    MR. BECKER:  I'm going to follow up just

10   with what the Judge said.

11                   JUROR NO. 148:  Uh-huh.

12                   MR. BECKER:  Obviously we want people in

13   our forum that read the newspaper, that watch the news.  The

14   question here is, though, can you put aside anything you've

15   heard and decide this case solely on what you hear in the

16   courtroom?

17                   JUROR NO. 148:  Yes.

18                   MR. BECKER:  Okay.  So you wouldn't let

19   those outside media influences make the decision for you?  You

20   could just base it on the courtroom?

21                   JUROR NO. 148:  No.

22                   MR. BECKER:  Okay.  Thank you, ma'am.

23                   MR. HARTWIG:  Couple questions.  I'm sorry,

                          OFFICIAL COURT REPORTER
                      TRUMBULL COUNTY * WARREN, OHIO

1   ma'am.

2           Do you recall any of the specifics that were in the

3   newspaper or on television about the case prior to coming in

4   today and hearing the summary from Your Honor?

5                   JUROR NO. 148:  No.  Basically just what he

6   said.  Just what I read about, you know, that there was a

7   murder.  But I don't know that he did it.

8                   MR. HARTWIG:  Is there anything at the time

9   or now -- is there anything about what you read or saw that

10  makes you so uncomfortable that you wouldn't want to serve on

11  the jury?

12                  JUROR NO. 148:  No.

13                  MR. HARTWIG:  Okay.

14                  THE COURT:  Thank you very much.

15                  BAILIFF JODI CAMUSO:  284.

16                  THE COURT:  You are Donna Gleydura?

17                  JUROR NO. 284:  Yes.

18                  THE COURT:  All right.  Miss Gleydura,

19  please tell us what you remember about this case.

20                  JUROR NO. 284:  I read it in the paper.

21                  THE COURT:  Right.

22                  JUROR NO. 284:  And my neighbor's name was

23  Sample, so that's what caught my attention.  And I really

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

16

1    don't remember a whole lot.  I mean, other than the fact of

2    what happened.

3                THE COURT:  You say your neighbor's name is

4    Sample?

5                JUROR NO. 284:  Uh-huh.

6                THE COURT:  Do you know if they're related?

7                JUROR NO. 284:  I don't think so.  I mean,

8    I didn't ask.

9                THE COURT:  But that kind of rang a bell

10    for you and you thought you better come up and talk to me?

11                JUROR NO. 284:  Yeah.  Just in case.

12                THE COURT:  Now, you understand anything

13    that might be in the paper or on TV isn't necessarily

14    accurate?  And you understand if you're in the courtroom you

15    have to rely only on the evidence that we present in the

16    courtroom to make any decisions?  Can you disregard everything

17    that you've read and heard and rely only on the evidence that

18    you see and hear in this courtroom?

19                JUROR NO. 284:  Yeah.  I imagine I can.

20    You know.

21                THE COURT:  And, again, you hadn't

22    indicated to me that there was something that you really are

23    committed to that you've heard or read about.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

17

1          So you can rely -- you know, again, you have to kind

2     of disregard anything you might have read.  All the evidence

3     will be presented from the witness stand.

4                    JUROR NO. 284:  Well, at my age, I

5     disregard a lot.  So, you know.  I might nap, you know, if you

6     pick me.

7                    THE COURT:  All right.  But you can do your

8     best to set aside everything and rely only on the evidence

9     that's presented by the state and the defense in this case?

10                    JUROR NO. 284:  I think so.

11                    THE COURT:  All right.  Mr. Becker, any

12    questions?

13                    MR. BECKER:  No questions, Your Honor.

14                    THE COURT:  Mr. Hartwig, any questions?

15                    MR. HARTWIG:  No questions, Your Honor.

16                    THE COURT:  You may have a seat.

17                    BAILIFF JODI CAMUSO:  Juror Number 255 just

18    came in.  She wasn't in for any of the orientation and I

19    haven't sworn her in yet.  Do you want me to swear her in?

20                    THE COURT:  Yes, swear her in.

21                    BAILIFF JODI CAMUSO:  It's going to have to

22    go on record, I assume.

23                    THE COURT:  Let's work with the rest of

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

18

1    them first.

2                    BAILIFF, JODI CAMUSO:  Okay.

3          Number 211.

4                    THE COURT:  You are Megan Smith-Vincent?

5                    JUROR NO. 211:  Yes, sir.

6                    THE COURT:  What do you know about this

7    case?

8                    JUROR NO. 211:  I'm a student driver

9    instructor and I've had a few kids that were friends with

10   Mr. Brandon Sample.

11                   THE COURT:  You know some of the kids that

12   knew him?  Have they talked about it?

13                   JUROR NO. 211:  We just -- I mean, I

14   haven't read anything about it, but they just mentioned, like,

15   that they lost somebody.  So I knew a little bit about the

16   case, but I haven't read.

17                   THE COURT:  And understanding what you

18   might have read or heard from one of these people might not be

19   accurate --

20                   JUROR NO. 211:  Correct.

21                   THE COURT:  -- can you disregard that stuff

22   and rely only on the evidence that we hear and see in this

23   case?

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

19

```
 1                          JUROR NO. 211:  Yes, sir.
 2                          THE COURT:  That's all you can rely upon in
 3     this case; you can do that for us?
 4                          JUROR NO. 211:  Yes, sir.
 5                          THE COURT:  Mr. Becker, any questions?
 6                          MR. BECKER:  No.  Thank you.
 7                          THE COURT:  Mr. Hartwig, any questions?
 8                          MR. HARTWIG:  Just a few questions.  Did
 9     you read anything on social media?
10                          JUROR NO. 211:  I have no social media.
11     Just Snapchat.
12                          MR. HARTWIG:  That's unusual.
13                          JUROR NO. 211:  Right.
14                          MR. HARTWIG:  Do you recall anything being
15     said specifically about Mr. Burke?  Austin Burke?
16                          JUROR NO. 211:  Negative.
17                          THE COURT:  All right.  Thank you.
18                          BAILIFF, JODI CAMUSO:  241.
19                          THE COURT:  You are Darlene Frantz?
20                          JUROR NO. 241:  Yes.
21                          THE COURT:  All right.  Darlene, tell me
22     what you know about this case.
23                          JUROR NO. 241:  I don't.  I just know I get
```

20

1   the paper.  I remember seeing his picture, but I don't

2   remember any of the details.

3                   THE COURT:  Right.  And again, the

4   newspapers are out there.  They may not be accurate in what

5   they put in there, but you don't remember any of the

6   specifics?

7                   JUROR NO. 241:  No, I don't.

8                   THE COURT:  You just knew this was going

9   on?

10                  JUROR NO. 241:  Right.

11                  THE COURT:  You can disregard anything you

12  might have read or heard and rely only on the evidence that

13  you hear in this case?

14                  JUROR NO. 241:  Yes.  Yes, I can.

15                  THE COURT:  Any questions, Mr. Becker?

16                  MR. BECKER:  No, Your Honor.

17                  THE COURT:  Mr. Hartwig?

18                  MR. HARTWIG:  No questions.

19                  THE COURT:  Have a seat.

20                  JUROR NO. 241:  Okay.

21                  BAILIFF, JODI CAMUSO:  168.

22                  THE COURT:  You are Mr. DiTommaso?

23                  JUROR NO. 168:  Yes.

21

1              THE COURT:  What do you know about this

2    case?

3              JUROR NO. 168:  Not a lot.  I just remember

4    seeing it on the news.

5              THE COURT:  You saw some type of news

6    report on this?

7              JUROR NO. 168:  (Nods head.)

8              THE COURT:  All right.  And you understand

9    that in a trial the only evidence that can be relied upon is

10   the evidence as presented from the witness stand because we

11   don't know about the reliability of anything you might have

12   read or heard in the news.  Can you disregard everything that

13   you read and heard in the news and rely only on the evidence

14   we present in this case?

15             JUROR NO. 168:  Yes.

16             THE COURT:  All right.  Any questions,

17   Mr. Becker?

18             MR. BECKER:  No, Your Honor.

19             THE COURT:  Any questions, Mr. Hartwig?

20             MR. HARTWIG:  Yes.  Do you know -- did you

21   know the decedent Brandon Sample in any way?

22             JUROR NO. 168:  No.

23             MR. HARTWIG:  Or the defendant Austin

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

22

1   Burke?

2                   JUROR NO. 168:  No.

3                   MR. HARTWIG:  Do you recall any specifics

4   from reading the articles, or just general?

5                   JUROR NO. 168:  General.

6                   MR. HARTWIG:  No further questions.

7                   THE COURT:  Have a seat.

8                   BAILIFF, JODI CAMUSO:  199.

9                   THE COURT:  You are Anita Pace?

10                  JUROR NO. 199:  Yes.

11                  THE COURT:  And, Anita, tell us what you

12  know about this case.

13                  JUROR NO. 199:  I remember reading it in

14  the paper.

15                  THE COURT:  All right.

16                  JUROR NO. 199:  And I honestly -- it's been

17  so long I don't remember all the details.  It would probably

18  come back to me if I heard details, but --

19                  THE COURT:  All right.  Well, that's what

20  we're all about here is getting you the details.

21                  JUROR NO. 199:  Yes.

22                  THE COURT:  But you can't rely upon

23  anything that was in the paper.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

23

1                          JUROR NO. 199:  Right.

2                          THE COURT:  Or anything in the news as

3     being reliable.

4                          JUROR NO. 199:  Right.  Yeah.  I just

5     remember the case, but not --

6                          THE COURT:  So you'd have to be able to

7     disregard everything you read and heard.

8                          JUROR NO. 199:  Uh-huh.

9                          THE COURT:  And rely only on the evidence

10    that you hear in this case.

11                         JUROR NO. 199:  Yes.

12                         THE COURT:  And you don't know either of

13    the parties?

14                         JUROR NO. 199:  No.

15                         THE COURT:  The defendant or the decedent

16    in this case?

17                         JUROR NO. 199:  No.

18                         THE COURT:  And you can listen to the

19    evidence and be fair and impartial?

20                         JUROR NO. 199:  Yes.

21                         THE COURT:  Mr. Becker, any questions?

22                         MR. BECKER:  Yeah.  Just briefly.

23            You said you read some things in the paper.  Is that

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

24

1    where you got your information?

2                    JUROR NO. 199:  Yeah.  Whenever this case

3    was at the time.

4                    MR. BECKER:  Okay.  You don't remember any

5    of the details, though, of what you read?

6                    JUROR NO. 199:  No.  No.  Not --

7                    MR. BECKER:  Okay.  Not a whole lot?

8                    JUROR NO. 199:  No.

9                    MR. BECKER:  And even if you did, you

10   understand that there's not been a trial.  There's been no

11   evidence or testimony.  No one has heard the evidence yet.

12                   JUROR NO. 199:  Right.

13                   MR. BECKER:  Not the judge, not the

14   attorneys.  No one has actually heard.  So whatever the

15   newspaper put in there may or may not be incorrect, and you

16   can set that aside; right?

17                   JUROR NO. 199:  Yes.

18                   MR. BECKER:  Okay.  Thank you.

19                   THE COURT:  Mr. Hartwig.

20                   MR. HARTWIG:  Yes, ma'am.  Do you recall

21   when you did read the newspaper whether or not you prejudged

22   the case at that point in time?

23                   JUROR NO. 199:  I can't really say because

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

25

1   it seems like it leaned one way.  You know.  You didn't hear

2   both sides or anything like that.

3                   THE COURT:  Okay.  That's the nature of

4   most cases.

5                   JUROR NO. 199:  Yeah.

6                   MR. HARTWIG:  Thank you, Your Honor.

7                   THE COURT:  Have a seat.  Thank you.

8                   JUROR NO. 199:  Uh-huh.

9                   BAILIFF, JODI CAMUSO:  Anybody else need to

10  speak to the Judge?

11        Judge, do you want to bring up Number 255 --

12                  THE COURT:  Yes.

13                  BAILIFF, JODI CAMUSO:  -- that came in late

14  and then just kind of explain to her what the charges are?

15                  THE COURT:  Right.  Go ahead and swear her

16  in.

17        For the record, this is Juror Number 255 who came in

18  late.  She is being sworn in by bailiff Camuso.

19                  (Whereupon, Juror Number 255 was sworn in

20  by the bailiff.)

21                  THE COURT:  Step forward.  And, again, you

22  are 255?

23                  JUROR NO. 255:  Uh-huh.

26

| | |
|---|---|
| 1 | THE COURT:  So that would be Miss Rogers? |
| 2 | JUROR NO. 255:  Yes. |
| 3 | THE COURT:  All right.  Ms. Rogers, again, |
| 4 | we've just gotten to the part of this case where -- you |
| 5 | understand it's serious charges.  It's aggravated murder and |
| 6 | robbery with gun specifications.  The serious nature of these |
| 7 | regarding an incident that happened back last year, on or |
| 8 | about June 12, 2017, in Trumbull County, Ohio.  And it's |
| 9 | alleged that the defendant did purposely cause the death of |
| 10 | one Kenneth Brandon Hayes Sample, age 22, while committing or |
| 11 | attempting to commit, or in fleeing immediately after |
| 12 | committing or attempting to commit kidnapping, rape, |
| 13 | aggravated arson, arson, aggravated robbery, robbery, |
| 14 | aggravated burglary, burglary, trespass in a habitation when a |
| 15 | person is present or likely to be present.  That's just to |
| 16 | give you an idea.  Do you know the defendant, Austin Burke? |
| 17 | JUROR NO. 255:  Huh-uh. |
| 18 | THE COURT:  Do you know the decedent, |
| 19 | Kenneth Hayes? |
| 20 | JUROR NO. 255:  No. |
| 21 | THE COURT:  All right. |
| 22 | JUROR NO. 255:  At least not by name, but |
| 23 | maybe the face.  But neither one of them sound familiar to me. |

1          THE COURT:  And you don't remember reading

2     or hearing anything about this case --

3          JUROR NO. 255:  Huh-uh.

4          THE COURT:  -- at any point in time?

5          If called upon, then, you could listen to the

6     evidence they put on the witness stand and be fair and

7     impartial in your decision?

8          JUROR NO. 255:  Yes, sir.

9          THE COURT:  Any questions, Mr. Becker?

10          MR. BECKER:  No.  Thank you very much.

11          THE COURT:  Any questions, Mr. Hartwig?

12          MR. HARTWIG:  No questions, Your Honor.

13          THE COURT:  All right.  We're through that

14     part of it.

15          Now, have any of the prospective jurors formed or

16     expressed an opinion as to the guilt or innocence of the

17     defendant in this case?  Now, it's highly inappropriate to do

18     that.  We haven't heard any of the evidence yet.  But it's

19     important that you don't even in jest suggest something.

20     Someone might overhear it.  It might cause problems with the

21     verdict when it finally comes down.  Withhold any expression

22     of an opinion until you're in the jury room.

23          Do any of you have an action pending between you and

28

1   any of the parties to this cause of action?

2         Do you or any members of your family have a lawsuit

3   pending in which any of the attorneys in this case is an

4   attorney for you or against you?

5         Do any of you know or are you related to any of the

6   parties to this cause of action or the attorneys who represent

7   them?

8         Now, the Court will instruct you concerning the law

9   as it applies in this case.  Is there any one of you who

10   cannot accept the law as explained to you by the Court and

11   apply it to the facts as you find them in this case?

12         Now, the Court will instruct the jury as to the

13   degree of proof required to prove the issues in this case.  Is

14   there any one of you who cannot follow the instructions of the

15   Court in that respect?

16         Now, in arriving at your verdict, is there any one of

17   you who cannot lay aside such matters as race, religion or

18   sympathy, as none of these are to have any effect upon your

19   deliberations?

20         Now, is there any one of you who cannot base the

21   verdict solely on the facts as testified to by the witnesses,

22   the exhibits that are admitted into evidence, and the law

23   given to you by the Court?

1          Is there any reason why you cannot serve on this jury

2    and render a fair and impartial decision when the case is

3    finally submitted to you?

4          Now, it is the duty of the jury to decide whether or

5    not the defendant is guilty or not guilty of the crime

6    charged.  If he is found guilty, it then becomes the duty of

7    the Court to determine any sentence.  The Court makes this

8    decision with the benefit of an investigation that gives the

9    Court a large amount of information that is not available to

10    you as jurors.  So my question is this:  Is there any one of

11    you who cannot perform your duty in determining the guilt or

12    innocence of the defendant without concerning yourself with

13    any potential sentence?

14          Seeing no answers in the affirmative, if you'll

15    please call 12 jurors into the jury box.

16          BAILIFF, JODI CAMUSO:  Number 1, Kathleen

17    Hollenbank; Number 2, Dawn Adams; Number 3, Anna Shargo;

18    Number 4, Kellie Bordner; Number 5, Mark Stimpert; Number 6,

19    Michelle Pattinson; Number 7, Melvin West; Number 8, Eric

20    Mikesell; Number 9, Tindoro Fuda; Number 10, Dominic

21    DiTommaso; Number 11, Gerald Wills; and Number 12, Kevin

22    Williamson.

23          THE COURT:  Now, at this time, the Court

30

1   and then counsel will address their questions to the jurors

2   who are in the jury box, but I ask everyone to listen to these

3   questions.  They may be asked of you if you are at any point

4   in time in the jury box.  It may facilitate the selection of

5   the jury if you can volunteer something you know is important

6   to the Court or counsel.

7           I know the parties have all received the

8   questionnaires, so we're not going to try to be redundant

9   here.  But, in general, have any of you in the jury ever been

10  involved in any criminal event as a victim or a witness or in

11  any fashion?  If you do, please raise your hand.

12          All right.  Juror Number 4, can you tell us a little

13  bit about that?

14                  JUROR NO. 4:  I've been in a jury for

15  almost 25 years, so...

16                  THE COURT:  All right.  Okay.  You're an

17  attorney in this case.  So you know people that are involved

18  in the criminal system?

19                  JUROR NO. 4:  Yes.

20                  THE COURT:  Would that affect your ability

21  to be fair and impartial?

22                  JUROR NO. 4:  Not at all.

23                  THE COURT:  And the second one was Juror

31

1    Number 11.  That's Mr. Wills.

2                          JUROR NO. 11:  Yes.

3                          THE COURT:  What happened to you?

4                          JUROR NO. 11:  I'm a victim of domestic

5    violence.

6                          THE COURT:  All right.  And would that

7    affect your ability to be fair and impartial in this case?

8                          JUROR NO. 11:  It shouldn't, no.

9                          THE COURT:  Should not?  Doesn't have

10   anything to do with this case.

11        Do any of you have -- oh, yes, ma'am.  Juror Number

12   3, Miss Shargo?

13                         JUROR NO. 3:  Yes.  I was called for -- as

14   a witness to listen to a grand jury case to see if they were

15   going to be indicted.  I don't know if that applies or not.

16                         THE COURT:  Okay.  What was the charge?

17                         JUROR NO. 3:  What was the charge?

18                         THE COURT:  Yeah.

19                         JUROR NO. 3:  It had to do with the county.

20                         THE COURT:  With the county?

21                         JUROR NO. 3:  Yes.

22                         THE COURT:  But you can disregard anything

23   that happened there and rely only on the evidence here in this

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  case?

2              JUROR NO. 3:  Oh, yes.

3              THE COURT:  Do any of you on the jury have

4  relatives or close friends in law enforcement?  Raise your

5  hand.  And again, my only thing there is most people know some

6  people in law enforcement.  There will be people from law

7  enforcement on the stand.  And my instruction to you is

8  everyone must be held to the same standard when they are in

9  the jury box.  And so you can't immediately give more

10 credibility to someone in law enforcement than a lay witness.

11 It's you that has to determine everyone's credibility when

12 they're in the jury box.

13         All right.  Have any of you been in court as a

14 plaintiff or a defendant in a civil lawsuit?  Any hands?

15 Counsel.  All right.

16         And is there anything -- I guess I'll ask you, have

17 any of you ever been on a petit jury before?  Raise your hand.

18 Juror Number 5, what was the case?  Criminal or civil?

19              JUROR NO. 5:  Criminal.

20              THE COURT:  Criminal?  In this courtroom --

21 or courthouse?

22              JUROR NO. 5:  In this courthouse, yes.

23              THE COURT:  All right.  How long ago?

33

1              JUROR NO. 5:  I want to say about two years

2     ago.

3              THE COURT:  Okay.  And the charge?

4              JUROR NO. 5:  Breaking and entering and --

5     with a firearm.

6              THE COURT:  Okay.  And you sat on the jury?

7              JUROR NO. 5:  Yes.

8              THE COURT:  And came to a verdict?

9              JUROR NO. 5:  Yes.

10             THE COURT:  And what was the verdict?

11    Guilty or not guilty?

12             JUROR NO. 5:  Not guilty.

13             THE COURT:  Very well.  And would that

14    affect your ability to be fair and impartial in this case?

15             JUROR NO. 5:  No.

16             THE COURT:  All right.  Now, in general,

17    can any of you think of anything in your past that would cause

18    you to identify more with the state or more with the defendant

19    with these type of charges?  Yes, sir?  Juror Number 8.  That

20    would be Mr. Mikesell?

21             JUROR NO. 8:  Yes, sir.

22             THE COURT:  All right.

23             JUROR NO. 8:  I've been on the criminal

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

34

```
 1   side of it.  I served a little bit of time, so I know what
 2   it's like to be behind bars.
 3                   THE COURT:  Right.
 4                   JUROR NO. 8:  And I don't know if --
 5                   THE COURT:  Would you come up to the bench,
 6   please?
 7                   JUROR NO. 8:  Sure.
 8                   (Whereupon, the following sidebar
 9   discussion was had.)
10                   THE COURT:  Mr. Mikesell.
11                   JUROR NO. 8:  I've been charged with quite
12   a few crimes in my life.  I've been found not guilty on most
13   of 'em, but I have served time.  And I can see myself siding
14   one way or the other very quickly.
15                   THE COURT:  Okay.  You can't set that
16   aside?  You think that it might affect your ability to
17   deliberate in this case?
18                   JUROR NO. 8:  Maybe.
19                   THE COURT:  Any questions, Mr. Becker?
20                   MR. BECKER:  Just briefly.  You say you've
21   been -- I don't want to embarrass you, but you have served
22   some time for a felony?
23                   JUROR NO. 8:  I was charged on quite a few
```

35

1    felonies, found innocent on those, and got charged on the

2    lesser.

3                    MR. BECKER:  Okay.  So you've only served

4    time on misdemeanors?

5                    JUROR NO. 8:  Yeah.

6                    MR. BECKER:  But you feel because of your

7    past and your personal experience it would be easier to find

8    against the state?

9                    JUROR NO. 8:  Yeah.

10                   THE COURT:  Any questions, Mr. Hartwig?

11                   MR. HARTWIG:  No.

12                   THE COURT:  Thank you very much.  You're

13   excused.

14                   (End of sidebar discussion.)

15                   BAILIFF, JODI CAMUSO:  David Zatvarnicky.

16                   THE COURT:  Mr. Zatvarnicky, you've heard

17   all the questions we've asked in general here.  Obviously you

18   know a lot of people that are in law enforcement?

19                   JUROR NO. 8:  Yes, sir, I do.

20                   THE COURT:  Again, the fact that you're in

21   law enforcement, would that affect your ability to be fair and

22   impartial in this case?

23                   JUROR NO. 8:  No, sir.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1           THE COURT:  You can listen to the evidence

2    and make a call based on the evidence that you see before you?

3           JUROR NO. 8:  Yes, sir.

4           THE COURT:  Any other questions that I've

5    asked of this jury that you think you need to respond to?

6           JUROR NO. 8:  No, sir.

7           THE COURT:  Very well.  Mr. Becker, you may

8    inquire.

9           MR. BECKER:  Thank you, Your Honor.

10          May it please the Court, Mr. Hartwig, Mr. Olson, and

11   the defendant and, most of all, Ladies and Gentlemen of this

12   prospective jury.

13          First of all, I want to take my time, take a moment

14   here to thank all of you for your participation here today,

15   your service to our community.  As the Court has indicated,

16   the 12 jurors that are already seated are most likely to be

17   the bulk of our jurors in this case.  However, those of you

18   that are in the back of the courtroom that do get called,

19   please keep in mind any answers that you feel would be

20   relevant.  So I'll try to direct my attention mostly to the 12

21   jurors in the box.

22          With that said, I do want to thank each and every one

23   of you for your service today.  This is really the most

1    important part of the case in terms of your service in this

2    case.  Because it's really the only time in this proceeding

3    that not only do we get to talk to you as lawyers, but it's

4    also the only time that you folks get to talk to us as jurors.

5    If you are seated and selected as jurors in this case, we will

6    not be able to have that interaction.  For instance, if we're

7    here on Tuesday or Wednesday and I see you in the hallway I

8    can't stop and chitchat with you about the case and say, "Hey,

9    how do you think things are going?"  Or, "Should I ask this?"

10   Or, "Should I ask that?"  Obviously that's inappropriate.  So

11   the only time we'll be able to speak to you from this point

12   forward will be here in the four walls of the courtroom.  It's

13   not that we're rude.  It's not that we don't want to speak to

14   you or talk to you.  It's just that the rules prohibit that.

15   And obviously that would look as if we're trying to influence

16   you outside of the four walls of this courtroom.  And that's

17   certainly something that no one wants to have happen.

18          As the Court has indicated to you, if you have -- and

19   we've already had a few people come up for a sidebar -- if

20   there is something that you feel is sensitive in nature, by

21   all means, we'll take you up to the bench there and we'll have

22   a discussion out of the earshot of everyone else in the

23   courtroom.

38

1       The Court has indicated -- and I don't mean to be

2   redundant, but this case will probably last all week into

3   Friday.  I think at the latest it would go until Monday, but

4   hopefully it will only go until Friday.  Is there anyone that

5   has any issue with that timeframe; work schedule,

6   baby-sitters, parents, trips, anything like that?  Okay.

7       In Ohio, criminal cases are prosecuted in the name of

8   the state of Ohio.  And criminal cases are brought forth by

9   the local county prosecutor's office that represents the state

10  of Ohio.  So there's 88 counties.  We obviously live in

11  Trumbull County.  And criminal cases that occur within this

12  jurisdiction that are violations of state law are styled State

13  of Ohio versus whoever the named defendant is.  And, in this

14  case, it's Austin Taylor Burke.

15      Now, with that understanding -- and I know I'm going

16  to get a couple of answers because I know we have two people

17  on this prospective jury that actually work for the county.

18  Is there anyone here familiar with Trumbull County Prosecutor

19  Dennis Watkins or any of the assistants?  Or anyone that works

20  in the office.  And I know obviously we have two.  Okay,

21  three.  We have three because you have a relationship working

22  with our office, probably on civil matters; correct?

23               JUROR NO. 4:  Yes, sir.


                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

39

1          MR. BECKER:  Okay.  Would there be anything

2     that would prohibit any -- is there anybody else other than

3     these three?  No one else know the prosecutors?

4          JUROR NO. 9:  I played golf with him.

5          MR. BECKER:  Okay.  You golfed with Dennis?

6     You're related to Frank somehow?

7          JUROR NO. 9:  Yeah.  He is my brother.

8          MR. BECKER:  Right.  And I think I may have

9     actually met you a couple of times.  But you probably have met

10    Dennis and some of the other people.  That wouldn't be a

11    problem for you to sit as a fair and impartial --

12          JUROR NO. 9:  No.

13          MR. BECKER:  Okay.  I'll just go right down

14    the list.  Wouldn't be a problem?

15          JUROR NO. 1:  (Shakes head.)

16          MR. BECKER:  Ann Marie, I know you're

17    retired now, but you used to work with our office sometimes as

18    the auditor's office; correct?  Not gonna be a problem for

19    you?

20          JUROR NO. 3:  No.

21          MR. BECKER:  Okay.  And you've probably

22    worked with, what, Lynn, or maybe Bill Danso?

23          JUROR NO. 4:  Yes, Bill.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1              MR. BECKER:  Okay.  Bill.  And he's on the

2    civil side of our office.

3              JUROR NO. 4:  Right.

4              MR. BECKER:  But that wouldn't create a

5    problem for you to sit as a fair and impartial juror?

6              JUROR NO. 4:  No, sir, not at all.

7              MR. BECKER:  All right.  The defendant in

8    this case is obviously represented by Mr. Olson and

9    Mr. Hartwig.  Is anyone familiar with either of those two

10   gentlemen?

11             JUROR NO. 8:  I'm familiar with Mr. Hartwig

12   through other proceedings that I've been involved with with my

13   occupation.  But nonetheless, I've had the opportunity to meet

14   him.

15             MR. BECKER:  Right.  You just know him

16   because he's done some defense work in the past?

17             JUROR NO. 8:  That's correct.

18             MR. BECKER:  You wouldn't hold that against

19   him or hold that against, more importantly, his client?

20             JUROR NO. 8:  Not at all.

21             MR. BECKER:  Is anyone here familiar with

22   the defendant?  He is 19 years old.  He is from Bristolville,

23   Ohio.  Anyone familiar with either the defendant or his

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  family?  I believe his mother's name is Jamie Sell.  Is anyone

2  familiar with any of those people?  You look like you --

3            JUROR NO. 2:  I'm not positive.

4            MR. BECKER:  You think maybe he was a

5  student?

6            JUROR NO. 2:  A student.

7            MR. BECKER:  At TCTC at one point?

8            JUROR NO. 2:  I think.  I am not positive.

9  He looks very familiar.

10            MR. BECKER:  All right.  Would that play

11  any role in your decision-making here?

12            JUROR NO. 2:  No.

13            MR. BECKER:  Okay.  You wouldn't go out of

14  your way to say, well, boy, he might have done all of this,

15  I'm really convinced the state proved their case, but he was

16  such a good student that I can't --

17            JUROR NO. 2:  No.

18            MR. BECKER:  You wouldn't do that; right?

19  And conversely, the other way is you wouldn't say, boy, he was

20  an awful student -- I don't think the state proved his case,

21  but he was awful and I'm going to find him guilty.

22            JUROR NO. 2:  No.

23            MR. BECKER:  Okay.  I'm going to read a

42

1      list of witnesses here that will be testifying and -- or

2      potential witnesses.  They may or may not testify.  And if

3      we -- I'll read the list.  And if you hear any names, just

4      keep that in your memory banks there and then we'll ask you if

5      you recall any of them.

6            The state anticipates calling Detective Wayne Mackey,

7      Detective John Greaver, both of the Warren Police Department,

8      a Rickey Roupe, Haley Roupe, Deidre Keener, Jessica Simms,

9      Josh White, Meredith Loges, Melanie Engle, Nathan Moats,

10      Officer Nick Mancini of Cortland, Dr. Humphrey Germaniuk the

11      Trumbull County Coroner, William T. Moskal of the Bureau of

12      Criminal Investigation or BCI, Tim Cook, Jamie Sell, Stephanie

13      Taylor, Dave Morris of the Cortland Police Department, Britni

14      Williams, Jamie Hillard, Shawn Marx, Donavon Bunner, John

15      Weston of the Cortland Police Department, a Leah Smith,

16      Kimberly Pistilli, that's P-i-s-t-i-l-l-i, Justin Borawiec,

17      that's B-o-r-a-w-i-e-c, Stacie Cassidy, Mike Roberts from BCI,

18      Joanne Gibb from BCI, Brittani Merten, Chris Mannella of Niles

19      Police, Lynda Eveleth of BCI, William Prince, Brandon Rice,

20      Ken Sample, Dan Lester who works in the Trumbull County Jail,

21      and Stephanie Kerstetter, K-e-r-s-t-e-t-t-e-r.

22            Is anyone familiar with any of those individuals?

23      Okay.  I'll take it by your silence that none of you are.

1         Well, let's talk about criminal cases.  As I

2    indicated to you, criminal cases are brought to court by the

3    local county prosecutor's office in the name of the state of

4    Ohio.  And almost exclusively -- there are some exceptions --

5    those cases are investigated by some type of law enforcement

6    agency.  And this case is no different.  In fact, this case

7    was investigated primarily by the Cortland Police Department

8    and the Warren City Police Department.  There are actually two

9    different dates that are involved here.  There are basically

10   two separate events that led to crimes on June 12th, and the

11   allegation is that there were some events that occurred on

12   June 20th that led to some crimes being allegedly committed on

13   June 20th of 2017.

14        The crimes involving June 12th would involve the

15   Warren Police Department, and the crimes that are alleged to

16   have occurred on June 20th involved the Cortland Police

17   Department.

18        Now, does anyone have any feelings or any thoughts

19   about either of those police departments?  And it could be as

20   simple as someone got a ticket and "I don't like Warren

21   Police" or "Cortland police didn't do this for me," or "They

22   stopped me one day when I was in a hurry and, you know, they

23   gave me a seatbelt ticket."  Anybody like that?  Anybody have

44

1    any experience with any of those departments?

2            All right.  Now, the meat of this case, like most

3    cases in a criminal setting, is there are two very, very

4    important concepts.  And the way it works is -- I think we

5    have had some people that have served on prior jury duty.  And

6    it's a concept we hear all the time.  You've probably read it

7    in newspapers.  Some of you have studied it actually.  But the

8    concept of reasonable doubt -- and the Court will instruct you

9    later on on what reasonable doubt is.

10           And essentially, though -- I'm going to try and give

11   you a silly -- a couple silly examples.  And they're not

12   really silly because I think they're very basic examples of

13   what I'm trying to tell you and what we're trying to get

14   across.

15           The defendant in this case does not have to present

16   one witness.  The defendant in any case never has to present

17   one witness.  And that is because he is presumed innocent

18   unless and until the state can prove his guilt beyond a

19   reasonable doubt.

20           Now we're going to talk about beyond a reasonable

21   doubt in a minute.  But if the Court were to say to myself and

22   say, "Well, Mr. Becker, go ahead and have a seat.  I'm just

23   going to tell the jury what the instructions are and give you

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

45

1   the instructions relating to the elements of the crimes and

2   what your duty is and then say, okay, the jury room is back

3   here through this door, go back and vote."  Mr. Fuda, what

4   would your verdict have to be if you had to vote right now.

5                    JUROR NO. 9:  I don't know.

6                    MR. BECKER:  Anybody have an idea?

7                    JUROR NO. 1:  Innocent.

8                    MR. BECKER:  Right.  You'd have to note not

9   guilty or innocent.  Correct.  Because you've not heard one

10  bit of evidence or testimony in this case; correct?  And it

11  remains that way unless and until the state can prove to you

12  beyond a reasonable doubt that this defendant is guilty of the

13  crimes charged.  Or we'll discuss later you can find him

14  guilty of some, all, or none of the charges.  But unless we

15  meet our burden of proof you cannot find him guilty.

16           Is there anyone who is unfamiliar with that concept?

17  I assume we're all familiar, whether through movies or novels

18  or just reading the newspaper what I'm talking about.

19           Now, along with that -- and really what that is is

20  it's the presumption of innocence.  He is presumed innocent

21  unless and until the state can prove his guilt beyond a

22  reasonable doubt.  So he has what's called, sometimes they

23  refer to it as a cloak or a blanket of innocence that covers

46

1    him and protects him throughout these proceedings.  And,

2    again, unless and until the state presents to you evidence

3    that proves his guilt beyond a reasonable doubt.

4              Now, I use this as a little bit of a silly example

5    sometimes.  But is it Mr. -- am I pronouncing it right,

6    Mr. Stimpert?

7                        JUROR NO. 5:  Yes.

8                        MR. BECKER:  Okay.  Mr. Stimpert, I see on

9    your left hand you have a gold band; is that correct?

10                       JUROR NO. 5:  Yes.

11                       MR. BECKER:  And I don't know if the jurors

12   in the back can see, but if you hold your hand up they can see

13   that you have a wedding ring on; correct?

14                       JUROR NO. 5:  Yeah.

15                       MR. BECKER:  All right.  Let me ask some of

16   the other jurors.  Mr. Williamson, I see you back there in the

17   back.  You see Mr. Stimpert, he has a gold band on his finger.

18   Is that proof to you beyond a reasonable doubt that he is

19   married?

20                       JUROR NO. 12:  Yeah.

21                       MR. BECKER:  That's proof beyond a

22   reasonable doubt?  You don't need any more?

23                       JUROR NO. 12:  I see his ring.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1            MR. BECKER:  Okay.  Is there anybody who

2  thinks differently?  Okay.  Go ahead.

3            JUROR NO. 1:  He might just like the ring.

4            MR. BECKER:  Excuse me?

5            JUROR NO. 1:  He might just like the ring,

6  right.

7            MR. BECKER:  So you might need some more

8  evidence; correct?

9            JUROR NO. 1:  (Nods head.)

10            MR. BECKER:  Okay.  And what kind of

11  evidence would you want me to present to you to show that he's

12  married?

13            JUROR NO. 1:  A marriage certificate, proof

14  that he hasn't been divorced.

15            MR. BECKER:  Okay.  Would you like some

16  people -- anybody else?  Any other thoughts?  What evidence

17  you'd like.

18            JUROR NO. 8:  Testimony.

19            MR. BECKER:  Testimony.  Right.  From who?

20            JUROR NO. 8:  From the wife.

21            MR. BECKER:  That's always a good one.

22  Sometimes that's not good testimony.  But, yeah.  Maybe the

23  preacher who married them.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

48

1          JUROR NO. 8:  Right.

2          MR. BECKER:  Or whoever officiated.

3    Whether it be a civil union or done by a mayor or something.

4    Maybe some of the witnesses?  Maybe some photographs; right?

5    Maybe a video?  All right.

6          Mr. Stimpert, how long have you been married?

7          JUROR NO. 5:  20 -- 26 years.

8          MR. BECKER:  She won't get a copy of this.

9    Don't worry.  Were you married in a large ceremony or a --

10          JUROR NO. 5:  A large ceremony.

11          MR. BECKER:  So you probably had, what, 200

12    people, 300 people?

13          JUROR NO. 5:  Probably about 200.

14          MR. BECKER:  200 people?  You would agree

15    with me that probably a number of those people are not around

16    anymore?

17          JUROR NO. 5:  Correct.

18          MR. BECKER:  Unfortunately, some of them

19    have passed or maybe they've just moved on in your life.  So

20    it would be impossible for me to get all 200 witnesses here to

21    that event?

22          JUROR NO. 5:  Correct.

23          MR. BECKER:  Do you know where your

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

49

1    marriage license is?

2                        JUROR NO. 5:  Yes.

3                        MR. BECKER:  Okay.  Do you have the video

4    of the wedding?

5                        JUROR NO. 5:  Yes.

6                        MR. BECKER:  Okay.  DVD or VHS?

7                        JUROR NO. 5:  Beta.

8                        MR. BECKER:  Right.

9                        JUROR NO. 5:  VHS.

10                       MR. BECKER:  VHS.  Okay.  Has it been

11   played in awhile?

12                       JUROR NO. 5:  Not in a long time.

13                       MR. BECKER:  Okay.  It hasn't been

14   converted to a DVD or digital; right?

15                       JUROR NO. 5:  No.

16                       MR. BECKER:  Have some photographs?

17   Probably have a wedding album; right?

18                       JUROR NO. 5:  Yes.

19                       MR. BECKER:  All of you agree that at some

20   point, even Mr. Williamson, you can see the point I was trying

21   to make is the fact that he has a ring on his finger doesn't

22   necessarily mean he's guilty of the crime of marriage; right?

23                       JUROR NO. 12:  (Nods head.)

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1      MR. BECKER:  Okay.  So you, too, would like

2  to see some evidence of him being married.  You would agree

3  you'd like to maybe hear from the spouse or hear from some of

4  the people or see some physical evidence that he was married;

5  correct?

6      JUROR NO. 12:  Right.

7      MR. BECKER:  Okay.  So let me ask you this.

8  What if we couldn't get all 200 witnesses that were at that

9  wedding?  Would that be enough to cause you to think that he's

10  not guilty?  No?  Okay.  Because you understand people move.

11  Sometimes people die.  Sometimes people don't remember things.

12  I mean, there might be people that you know that were at your

13  wedding and you might have pictures of them and they would

14  say, "Boy, I don't remember being at that wedding 22 years

15  ago"; right?  It's a common event in human life; right?

16      So, with that said, let's talk about another issue

17  that is going to be a theme in this case or something that

18  would be important to you.  The Court is going to tell you

19  that to determine reasonable doubt, it's not proof beyond all

20  possible doubt because, just like in Mr. Stimpert's marriage

21  example, you would agree that sometimes people move or maybe

22  they have water damage in their house.  Their wedding book may

23  have been damaged or lost or stolen or something?

51

1                    JUROR NO. 5:  Yes, sir.

2                    MR. BECKER:  Sometimes it's hard to get all

3     of the evidence together, for whatever reasons; correct?

4                    JUROR NO. 5:  Correct.

5                    MR. BECKER:  Do all of you agree with that?

6          And the Court is going to instruct you at some point

7     that reasonable doubt is a doubt based on reason and common

8     sense and would you rely on it in the most important of your

9     affairs.  And there are some things that are important, and

10    there are some things that are not important.

11         Mr. West, do you own your own house?

12                   JUROR NO. 7:  No.

13                   MR. BECKER:  You rent?

14                   JUROR NO. 7:  Yes.

15                   MR. BECKER:  Okay.  Let me get back to you.

16         Miss Adams, do you own your own home?

17                   JUROR NO. 2:  Yes.

18                   MR. BECKER:  Okay.  How long have you lived

19    there?

20                   JUROR NO. 2:  40 years.

21                   MR. BECKER:  All right.  When you purchased

22    that house, what were some of the things that you thought were

23    important when you purchased that house?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

52

1          JUROR NO. 2:  The neighborhood, the school

2    system.

3          MR. BECKER:  Okay.  And everyone agrees

4    those are some important things you might want to put on your

5    checklist?  Was there a certain style of house you looked for?

6          JUROR NO. 2:  I guess.

7          MR. BECKER:  Okay.  Ranch or two-level,

8    split level?

9          JUROR NO. 2:  Two-story.

10          MR. BECKER:  Okay.  You wanted a two-story?

11    Did you worry about -- was it a new house?  Did you build it

12    or did you buy it used?

13          JUROR NO. 2:  Nope.  It was older.

14          MR. BECKER:  Okay.  Did you worry about or

15    have the roof examined and the hot water heater and the

16    furnace and those type of things?

17          JUROR NO. 2:  We were 19.

18          MR. BECKER:  But those were things like if

19    you had gone in there and seen big holes in the roof, you'd

20    say, "Oh, my goodness.  This probably is not for us"; right?

21          JUROR NO. 2:  Well, yeah.

22          MR. BECKER:  So those were reasonable

23    things to put on your checklist --

53

1                    JUROR NO. 2:  Sure.

2                    MR. BECKER:  -- in making that purchase

3     which is probably the most important or largest purchase

4     you've ever made.  Most people's home is their biggest

5     purchase.

6                    JUROR NO. 2:  Sure.

7                    MR. BECKER:  And did you worry about how

8     many hurricanes had gone by your house at the time?

9                    JUROR NO. 2:  No.  We live in Ohio.

10                   MR. BECKER:  It's not really a concern here

11    in Ohio.  It might be a concern in a different case or in a

12    different situation if you were moving to Florida or North

13    Carolina, but obviously earthquakes and hurricanes are not the

14    kind of things we worry about in Ohio.

15         So you can see how each situation in each case has

16    different things that are important.  Everyone agree with that

17    basic concept and what I'm saying?  Okay.

18         Now, each and every one of you, I believe, was here

19    in this very courtroom last week for juror orientation; is

20    that correct?  Okay.  And, Mr. Wills, you were here last week

21    as well in this courtroom and Judge McKay got up on the bench

22    and kind of gave you the general rules about serving as a

23    juror; correct?

54

1          JUROR NO. 11:  Yeah.

2          MR. BECKER:  Now, without -- I want you to

3    think about this, but don't say it out loud.  How old did you

4    think Judge McKay was?  And just hold your thought right

5    there, how old you thought he was.  Is it Mrs. Pattinson?

6          JUROR NO. 6:  Yes.  Pattinson.

7          MR. BECKER:  Mrs. Pattinson, you were here

8    as well?

9          JUROR NO. 6:  Correct.

10          MR. BECKER:  What number -- I just want you

11    to think of how old you thought Judge McKay was, all right,

12    when he was up here on the bench and maybe how tall he was

13    too.  And both of you can tell me how tall he was.

14      All right.  Mr. Wills, how old do you think Judge

15    McKay was?

16          JUROR NO. 11:  62.

17          MR. BECKER:  All right.  Mrs. Pattinson?

18          JUROR NO. 6:  56.

19          MR. BECKER:  Wow.  He's looking young.

20    He's a lot older.  You guys are giving him the benefit of the

21    doubt.

22      How tall do you think he was?

23          JUROR NO. 6:  Oh, 5'9".

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

55

1                      MR. BECKER:  Okay.

2                      JUROR NO. 11:  5'10".

3                      MR. BECKER:  Do you remember what color tie

4    he had on?

5                      JUROR NO. 6:  (Shakes head.)

6                      JUROR NO. 11:  I do not.

7                      MR. BECKER:  Now, the reason I used that

8    little example is because, do you agree that you were both in

9    the same room together; correct?

10                      JUROR NO. 6:  Correct.

11                      MR. BECKER:  You two don't know each other,

12   yet you gave a pretty big swing of ages here, fifty something

13   and sixty something.  You're pretty close on the height.  You

14   couldn't remember his tie; right?  But you know you were here

15   and you got oriented as a juror; correct?  Okay.  So my point

16   is -- and does everyone on this jury understand that sometimes

17   events happen and you may not pay attention to every detail,

18   but you know it happened; correct?  And you remember the

19   important things.  You remember you were here.  You remember

20   there was a judge here in a robe and got on the bench; right?

21   And he told you some of the rules.  I'm sure you probably

22   couldn't remember verbatim.  If I asked you how long it

23   lasted, Miss Pattinson, how long would you say it lasted?

56

1          JUROR NO. 6:  I don't know.  Three hours.

2   I don't know.

3          MR. BECKER:  Three hours?  Okay.  Anybody

4   have a different time that was here?

5          JUROR NO. 2:  I think we were out of here

6   by 10:30.

7          MR. BECKER:  10:30?  Okay.  So you got

8   here, what, about 8:30?  An hour and a half?  So now we have a

9   pretty big discrepancy there.  Miss Adams and Miss Pattinson,

10  one of you said three hours, one of you said an hour and a

11  half.  That's an hour and a half time difference.  Does that

12  mean you're lying about being here for jury orientation?

13         JUROR NO. 2:  I hope not.

14         MR. BECKER:  Does that mean she's lying

15  about being here?

16         JUROR NO. 2:  No.

17         MR. BECKER:  In fact, the fact that she

18  gave a different answer, does that influence you and think

19  that she's lying if she wasn't here?

20         JUROR NO. 6:  (Shakes head.)

21         MR. BECKER:  Okay.  Now, if she said

22  something totally crazy like we did it outside in the gazebo

23  and the Judge passed out candy bars afterward, that would be a

little something that you would say, wait a minute, that
didn't happen outside.  It was February.  It was probably
raining that day, if I know Ohio.

So you have to look at the totality of what was said
and the totality of what was taken; correct?

Do each and every one of you feel that you can do
that with witnesses as they come in here and testify?  And
would it surprise you if some witnesses in some cases come in
and say, "Well, this happened at 2 in the morning" and someone
else says, "Well, no, it was really 3 in the morning"?  Would
that surprise you?

Would it surprise you if some jurors said -- or I'm
sorry -- some witnesses came into the courtroom and said, "I
think he was 5'10"" and another one comes in and says, "You
know, I think he was 5'7".  Is that the kind of thing that
would surprise you?  Okay.

So you realize there are sometimes -- now, it might
be very important if they both said they measured him with a
tape measure, correct, and they got two different
measurements?  But you can understand -- and you as jurors are
going to have to figure out what's important and what's not
important to believe and disbelieve witnesses.  You may
believe all of a witness's testimony.  You can believe some of

1   it, all of it, or none of it.  And that's really your job here

2   in the courtroom.

3          Now, would you agree -- and let me ask you, is there

4   anybody here who is feeling a little uncomfortable with all

5   these questions at 'em?  Anybody who's like I don't want to be

6   here or scared or didn't know what to expect; right?  What if

7   you were on the witness stand and being cross-examined under

8   oath?  Would that change anybody's opinion?  Someone might not

9   want to be here, particularly in a case like this.  If they

10  had information, maybe they'd be scared?  Anybody feel that

11  sometimes a witness can be scared?  Go ahead.

12          JUROR NO. 1:  Sure.  Facing the people in

13  court might be intimidating.

14          MR. BECKER:  Sure.  This isn't a type of

15  case like this, but if we had a drug dealer -- and he's not

16  charged with anything to do with drugs -- but if we had a drug

17  dealer and he had brought drugs in from Detroit and sold them

18  to let's say a confidential informant, and now the

19  confidential informant is charged and says, "Well, yeah, I got

20  the drugs from this guy," you can imagine that would be scary.

21          JUROR NO. 1:  Terrifying.  Terrifying.

22          MR. BECKER:  Right.  Okay.  Let's ask you

23  this.  We have -- every case has witnesses in it.  And every

59

1   case gets witnesses based upon an investigation or when they

2   come forward.  Sometimes witnesses don't come forward.  We

3   have lots of unsolved crimes.  Homicides.  Sometimes we've all

4   heard, unfortunately, of cases where there's been rape or

5   incest or molestation and the victim doesn't come forward or

6   doesn't come forward for years.  Are you all familiar with

7   that?  Okay.

8           Mr. Stimpert, I'll go back to you.  You certainly are

9   probably aware of cases like that where a victim maybe was

10  hesitant to come forward because a stepfather may have raped

11  the victim; correct?

12                  JUROR NO. 5:  Correct.

13                  MR. BECKER:  You can imagine the fear that

14  that victim may have in coming into a courtroom and

15  testifying; correct?

16                  JUROR NO. 5:  Correct.

17                  MR. BECKER:  And there's other cases where

18  witnesses may be hesitant or may have been afraid to come

19  forward and may not have said anything.  Let me ask you this.

20  Would it surprise you?  What would you have to look at to see

21  if that person was telling the truth?  What if the police had

22  been called, say, to an investigation of a 7-year-old that

23  alleged that they were molested and told their mother and they

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    said, "No, it didn't happen," but then two, three years later

2    the mother and father get divorced and the daughter brings it

3    up again and says, "Well, it really did happen, but I was

4    afraid because I lived with my dad"?  Is that something you

5    would evaluate and look at?

6                    JUROR NO. 5:  Yes.

7                    MR. BECKER:  Is that something that every

8    juror here would look at and evaluate?  And those are the kind

9    of things that you would look at and try to evaluate in terms

10   of whether or not the witness was telling the truth; is that

11   correct?  So all times that a witness doesn't say everything

12   or maybe even lie about something happening doesn't mean that

13   it didn't happen; correct?  Each and every one of you agree

14   with that?  Okay.

15            Sometimes there is evidence that a person leaves that

16   sort of links them to a crime.  And there's things that we see

17   that they forgot or that they know or acknowledge.  And

18   sometimes it's harder to find those, and sometimes we never

19   find those.  But all of you are open to the possibility that

20   the police did the best job they could?  Okay.  And law

21   enforcement?  I mean, they can only do as best they could.

22            Now, I'm going to follow that up with a question that

23   I like to ask.  And is it Mrs. Bordner?

61

1          JUROR NO. 4:  Yes, sir.

2          MR. BECKER:  Okay.  Mrs. Bordner, let me

3   ask you.  I know you have a background as an attorney, so I'm

4   going to ask you this.  How are the witnesses chosen?  Whether

5   it is a civil or criminal case, how are the witnesses chosen?

6          JUROR NO. 4:  Based on whether or not they

7   have any information relative to a particular case.

8          MR. BECKER:  Right.  And it's -- the

9   witnesses -- I'm sure that you've had cases in your practice

10  where you've wanted maybe better witnesses or different

11  witnesses, but they're a product of whatever the facts were;

12  right?

13         JUROR NO. 4:  Yes, sir.

14         MR. BECKER:  Okay.  So you've handled cases

15  that -- maybe some auto accidents?

16         JUROR NO. 4:  Yes, sir.

17         MR. BECKER:  And you may have had some

18  witnesses that weren't maybe the best witnesses, the

19  eyewitnesses?

20         JUROR NO. 4:  Yes, sir.

21         MR. BECKER:  You didn't actually pick them

22  yourselves; right?  I mean, they were the product of what

23  happened and where the crime happened or where the accident

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   happened at; correct?

2               JUROR NO. 4:  That's correct.

3               MR. BECKER:  And that applies to the

4   criminal side as well.  For instance -- this isn't the case,

5   but if this was an allegation of Austin Burke running a

6   dogfighting operation, we'd expect to find certain witnesses

7   there; correct?

8               JUROR NO. 4:  Correct.

9               MR. BECKER:  We'd probably have some people

10  that owned the dogs; correct?

11              JUROR NO. 4:  Correct.

12              MR. BECKER:  We might have some people

13  there that were gambling since that's what they like to do

14  there.

15      I would hope we wouldn't find Father Kish from

16  St. Roberts up in Cortland or someone like that.  I hope we

17  wouldn't find any local police officers there; correct?

18              JUROR NO. 4:  We would hope not.

19              MR. BECKER:  Does everyone agree, though,

20  that the witnesses aren't really picked by either side?

21  They're sort of a by-product of what happened.  So if

22  Mr. Burke was running a dogfighting operation, we'd expect the

23  witnesses to be the people that he invited there or the people

63

1  that he trusted to bring their dogs to fight and ones that he

2  wanted to gamble; right?  It wouldn't necessarily be people I

3  wanted; right?  So in some ways, would you agree that in

4  criminal cases the witnesses are sort of chosen by who the

5  victims are, who the defendant associates with, who the

6  defendant shows things and does things and tells things to;

7  correct?

8           JUROR NO. 4:  Correct.

9           MR. BECKER:  Otherwise, you know, I'd call

10  in the pastor up here at the Methodist church and have him

11  testify to every case and say, "Boy, isn't he a great witness?

12  He's a pastor.  He's a family man.  He's been at the church

13  for 40 years."  But that's not always the case; correct?

14           JUROR NO. 4:  Correct.

15           MR. BECKER:  Would you expect anything

16  different?  I mean, that's basically how we get the witnesses;

17  correct?  Does everyone agree with that?

18       All right.  Is it Mr. DiTommaso?

19           JUROR NO. 10:  DiTommaso.

20           MR. BECKER:  DiTommaso.  I'm sorry.  I

21  mispronounced your name there.  Mr. DiTommaso, let me ask you.

22  One of the things in a case is direct and circumstantial

23  evidence.  And I know we hear that a lot and the Court is

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  going to explain that.  What is -- do you know the difference

2  between direct and circumstantial evidence?  Or do you think

3  you do?

4                  JUROR NO. 10:  I think I do.

5                  MR. BECKER:  Okay.  What do you think it

6  is?

7                  JUROR NO. 10:  Circumstantial is like, like

8  theoretical almost.

9                  MR. BECKER:  Well, circumstantial

10  evidence -- and I'll tell you, the Court is going to tell you,

11  circumstantial evidence is a fact that you can infer other

12  facts from.  For instance, I've been standing here and I've

13  put my hands on the podium.  And it's probably not a conducive

14  surface to leave fingerprints.  And there won't be any

15  fingerprint evidence in this case.  But I may have left some

16  DNA on here.  And it's possible there could have been.  But

17  evidence that my hands were on this podium -- let's just

18  assume they got DNA off this podium.  And there was a crime

19  committed in this courtroom and they were trying to charge

20  Chris Becker with it.  And they came here and they swabbed

21  these handles and they found some of my DNA from my skin

22  cells.  Now, it's also possible that I couldn't leave anything

23  here.  They might not find anything.  But let's assume they

1  found some skin cells here, some skin cells that had my DNA in

2  it.  Would that mean that I committed the crime?

3                    JUROR NO. 10:  Huh-uh.

4                    MR. BECKER:  Might put me there; right?

5                    JUROR NO. 10:  (Nods head.)

6                    MR. BECKER:  What if they found DNA from,

7  say, another lawyer?  Let's say they didn't find any of my

8  DNA.  You would agree there's probably been a lot of people

9  that have probably touched this podium over the years; right?

10                    JUROR NO. 10:  Uh-huh.

11                    MR. BECKER:  Okay.  That's circumstantial

12  evidence.  It's on there, but it doesn't mean I did it.

13              Direct evidence, though, is either someone that has

14  direct knowledge, either they saw something or heard

15  something; correct?  So if someone was, let's say, looking in

16  through the crack of the door there and saw me steal the court

17  reporter's computer here and stuff it in my box and leave,

18  that's direct evidence; right?

19              Now my question is, the charge is I'm charged with

20  stealing the laptop.  They may question how good the person's

21  eyesight was, maybe any motive they'd have to testify against

22  me.  But generally, direct evidence is evidence that someone

23  either saw or heard something; correct?  And the evidence that

66

1    we think sometimes the greatest is DNA and fingerprints.

2    That's not direct evidence.  That's circumstantial evidence.

3    Is there anyone who disagrees with me on that or has a

4    different opinion?

5             Okay.  So -- and the Court is going to tell you

6    direct and circumstantial evidence have the same weight.  And

7    you can make inferences from that fact that my DNA was either

8    on or not on this podium.  And you use that to fit into the

9    rest of the evidence.

10            Now, speaking about evidence -- and particularly

11   witnesses -- I think it's Mr. Wills?  Mr. Wills, you have

12   three children that are adults now; is that correct?

13            JUROR NO. 11:  Yes.

14            MR. BECKER:  Okay.  And I imagine you had

15   the same issues that I had growing up sometimes.  Close in

16   age, sometimes a fight would break out or an argument or

17   something would happen.  Maybe your kids weren't as bad as

18   mine?

19            JUROR NO. 11:  They were.

20            MR. BECKER:  Okay.  And oftentimes did you

21   find yourself having to settle a dispute or figure out who did

22   what or how something got broke or how somebody got hit with a

23   whiffle ball bat or something?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1                    JUROR NO. 11:  Yes.

2                    MR. BECKER:  Okay.  And when those kind of

3      incidences happened at your home, I realize it's probably like

4      my house, there was no presumption of innocence in my house.

5      They were all guilty until they're innocent.  But it's not

6      like that.  What are some of the things that you would look

7      for?  For instance, if there was a dispute about who broke

8      something or who hit somebody, how something got started, did

9      you delve into it and try to find out, hey, something is wrong

10     here.  Somebody is not telling me the truth here?

11                   JUROR NO. 11:  Yeah.

12                   MR. BECKER:  And did sometimes you find,

13     like I did, that, yeah, this person wasn't really telling the

14     truth?  What they were telling me wasn't jibing.  One of my

15     kids was not telling me exactly how it happened.  And then you

16     settled the dispute that way; correct?

17                   JUROR NO. 11:  Yes.

18                   MR. BECKER:  Anybody have those kind of

19     experiences in real life either with their own siblings, their

20     own children?  Sometimes it happens at work.  Well, that's

21     kind of what you're going to have to do here.  Because

22     obviously at one point, one side, that's this side, is saying

23     that this defendant, and throughout the case, committed these

                         OFFICIAL COURT REPORTER
                      TRUMBULL COUNTY * WARREN, OHIO

1   crimes beyond a reasonable doubt.  And even though he doesn't

2   have to present any witnesses, or even take the witness stand

3   himself, they are going to try and attack the witnesses.  And

4   some of them will be -- they'll tell you they didn't come

5   forward right away.  Or they added on or embellished the story

6   or had additional information later on.  Sort of like the

7   incident where we talked about with the 7-year-old who was

8   molested and then when dad moved out and got divorced and then

9   all of a sudden they came forward and said, "Well, yeah, he

10  really did."  And you find out there is some physical evidence

11  that corroborates that story.  Will all of you be open to that

12  kind of testimony?  And you'll evaluate it?

13         And there are going to be other witnesses that were

14  honest right from the very beginning and that said, "This is

15  what I know," and, "This is what I said," and, "This is what I

16  saw."  Does that surprise you that different people -- that

17  different people would be involved and different witnesses

18  would have different recollections of things?  Just like the

19  example of jury orientation.  No?  Okay.

20         All right.  I'm almost done here.  I'm going to ask

21  you just a few more questions here.  The Court is going to

22  instruct you on what the law is for these various crimes.  The

23  Court doesn't make the law.  That job is up to our state

1  representatives and our state senators down in Columbus.  They

2  create the laws for the state of Ohio.  And one of the things

3  we always worry about is sometimes jurors say, "Well, that

4  shouldn't be the law.  I don't think that's how it should be."

5  So, Mr. West, having heard that, are you the kind of person

6  that's going to follow the law?

7                    JUROR NO. 7:  Yeah.

8                    MR. BECKER:  Okay.  You'll follow the law

9  as the Court instructs you and not create your own idea of

10  what you think it should be?

11                    JUROR NO. 7:  Correct.

12                    MR. BECKER:  Okay.  Each and every one of

13  you promise to do that?

14        All right.  Is there anyone who has ever heard of

15  Ginseng?  Anyone know what Ginseng is?  It's a root that grows

16  in the ground.  You're familiar with it?

17                    JUROR NO. 1:  The tea?

18                    MR. BECKER:  Right.  It grows out in the

19  wild.  And I'm going to tell you, there's an actual law in the

20  state of Ohio, and it says no person shall dig, harvest, cut,

21  root up, gather or otherwise collect wild Ginseng from its

22  natural habitat, except from September 1st to December 31st.

23  And I don't know if that's because the Ginseng can, you know,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   is dormant at that time and it's not, you know, flowering or

2   mushrooming or doing whatever it needs to do.  But that's the

3   only time you can take it in the state of Ohio.  So you can go

4   out and you can find it in your backyard or one of the parks

5   or something and dig it up.  But you can only do it from

6   September 1st to the end of the year, December 31st.  So what

7   if the testimony was August 31st at about 10 p.m. up at

8   Mosquito Lake Park the forest ranger who has his watch on goes

9   out and he checks to make sure that no one is cutting Ginseng

10  up or digging it up early.  And there's no question about the

11  time.  There's no question about the defendant is digging it

12  up.  Are you going to be the type of juror -- or any of you --

13  to say, "Oh, come on, Becker.  What's the big deal?  It's

14  10:00 on August 31st.  Cut the guy a break.  Let's get out of

15  here"?  Or are you going to say, "Well no, the law is the

16  law"?

17                  JUROR NO. 1:  The law is the law.

18                  MR. BECKER:  Does everyone agree with that?

19          Okay.  Now, the Court has already talked a little bit

20  about sympathy.  And I'm not going to touch upon that.  But I

21  do want to touch upon sometimes crazy facts that happen and

22  things that sometimes people want to know why.  Why did this

23  happen?  Why did this have to happen this way?  Or why did

1    this go down this way or happen?

2         And one of the things that the Court is going to tell

3    you is the state doesn't have to prove motive.  It might be

4    one of those things that comes into play, but the state

5    doesn't have to prove motive.  Does that surprise you?  Do you

6    think -- you might say, well, they have to prove why they did

7    it.  We just have to prove they did it; correct?  Okay.

8         So the state has to still meet its burden of proof of

9    beyond a reasonable doubt, which is the highest standard of

10   proof, but it is not all possible doubt.  Just like

11   Mr. Stimpert's example when we were trying to prove that he

12   was married.  Some of you, in your minds, may reach the

13   conclusion that he was married if you saw his ring, a woman

14   came in and claimed his spouse under oath and said, "Yeah, we

15   are married," and you had the wedding certificate.  Some of

16   you might want a little more.  Some of you may want to see

17   some photographs in a wedding and his wife in a bridal gown.

18   Some of you may want to see a VHS or that beta that he has at

19   home; right?  But each and every one of you has to determine

20   this case and each and every charge that you're satisfied

21   yourself that the state has proved the case beyond a

22   reasonable doubt.  And then you have to talk with your fellow

23   jurors to see if they're convinced.  Because in a criminal

1    case, and in this case, it takes each and every one of you to

2    find the defendant guilty.  Each and every one of you has to

3    sign off on that verdict form.  So you have to believe it

4    yourself and you have to have your other 11 jurors believe it

5    their self too.

6         So I'm going to go right down the line and ask.  And

7    it doesn't matter if the state -- if you don't believe we

8    proved the case or you believe we proved the case.  But if

9    you're the type of juror and each one of you individually

10   believes, either way, that the state has not proved beyond a

11   reasonable doubt its case, or has proved beyond a reasonable

12   doubt its case, are you going to stick to your guns and

13   listen, but stay firm in your convictions?  Whatever your

14   belief is.  Whether it's not guilty or guilty.  But being open

15   to the other possibility that you might be wrong; correct?

16                    JUROR NO. 1:  Correct.

17                    THE COURT:  Okay.

18                    JUROR NO. 2:  Yes.

19                    JUROR NO. 3:  (Nods head.)

20                    JUROR NO. 4:  Yes.

21                    JUROR NO. 5:  (Nods head.)

22                    JUROR NO. 6:  (Nods head.)

23                    JUROR NO. 12:  (Nods head.)


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

73

1           JUROR NO. 11:  (Nods head.)

2           JUROR NO. 10:  (Nods head.)

3           JUROR NO. 9:  Yes.

4           JUROR NO. 8:  (Nods head.)

5           JUROR NO. 7: (Nods head.)

6           MR. BECKER:  And you all would stick to

7    your convictions; correct?  And that's regardless of whether

8    you believe he's guilty or innocent once you've heard the

9    evidence back in there; correct?  Okay.

10          Who here on our jury owns firearms?  Who has firearms

11   in their home?  I'm going to go right down the list here.

12   What kinds of firearms do you have?

13          JUROR NO. 1:  A small pistol.

14          MR. BECKER:  Do you know the caliber?

15          JUROR NO. 1:  No.  My husband bought it.

16          MR. BECKER:  Okay.  Have you fired it

17   before?

18          JUROR NO. 1:  Yes.

19          MR. BECKER:  Okay.  No?

20          JUROR NO. 3:  Rifles.

21          MR. BECKER:  Okay.  And have you fired

22   those before?

23          JUROR NO. 3:  When I was young.  They're

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   unloaded.  Nothing --

2                    JUROR NO. 4:  Ruger .22.

3                    MR. BECKER:  Ruger .22.  Okay.

4                    JUROR NO. 5:  .22 and a 12-gauge.

5                    MR. BECKER:  And I assume you both have

6   fired those?

7                    JUROR NO. 4:  (Nods head.)

8                    JUROR NO. 6:  (Shakes head.)

9                    MR. BECKER:  What do you have, sir?

10                   JUROR NO. 10:  I have a 20-gauge, a

11  12-gauge, .380, 9-millimeter, and a .22.

12                   MR. BECKER:  Okay.  And you've fired all of

13  those?

14                   JUROR NO. 10:  Yes.

15                   MR. BECKER:  Okay.

16                   JUROR NO. 9:  .410.

17                   MR. BECKER:  .410?

18                   JUROR NO. 8:  .40-caliber SIG Sauer.

19                   JUROR NO. 7:  No.

20                   MR. BECKER:  Okay.  Well, at this time, I

21  think I'm going to thank each and every one of you for your

22  service.  We may take a break because we're getting close to

23  11:00.  Of course Mr. Burke's attorneys are going to ask you

1  some questions about what they feel are important issues in

2  this case.  And I do want to take this time and thank each and

3  every one of you.  I have a son who's currently serving in

4  Iraq right now, and short of serving your country in the

5  military, I can't think of a more important duty that we have

6  in this country other than serving as jurors in these matters.

7  Because, honestly, without you folks, there's no jury system.

8  There's no justice.  You folks speak for justice.  You folks

9  are going to determine this case.  And you will determine this

10  case and the disputes and the facts in this case.  And at the

11  end of the day, Mr. Burke and the state of Ohio can go home

12  next week or at the end of this week and say, well, we

13  received a fair trial from 12 jurors who were open-minded, who

14  were not influenced by anything outside of that courtroom.  We

15  got to talk to them, they talked to us, and they determined

16  this case.  So I'm going to thank you.  They'll ask you some

17  questions.  We may take a break though.

18          THE COURT:  I think Mr. Becker had a good

19  idea.  Let's take a short break at this point in time.  We'll

20  take 15 minutes.

21          The jurors who are in the jury box, come back into

22  those same seats here.  Don't speculate on this case and don't

23  discuss it with anyone.

76

1          Take 15 minutes, and we'll come right back.

2                    (Whereupon, a recess was had commencing at

3     10:55 a.m. and concluding at 11:13 a.m.)

4                    THE COURT:  Mr. Hartwig, you may inquire.

5                    MR. HARTWIG:  Thank you, Your Honor.

6          Mr. Becker.  Good morning, Ladies and Gentlemen.  I'm

7     going to do my best not to repeat things that Your Honor has

8     indicated and Mr. Becker, how he summarized it.

9          But in short, we appreciate you and the sacrifice

10    you're making to be away from your families for one week.  And

11    that's on behalf of myself, Mr. Olson and my client.

12         So on that note, we try not to pry into your personal

13    lives.  We have you do questionnaires.  They don't ask you too

14    much, but we get to learn some things about you.  So in all

15    fairness, you learned some things about Mr. Becker.

16    Personally, I'm born and raised in Mahoning County.  I've been

17    practicing for just shy of 20 years.  I'm married.  I have

18    three kids.  I'm not wearing a wedding ring.  We'll get into

19    that here in a couple minutes.  I do criminal defense work,

20    like Mr. Olson does.  And I've been doing that for many years.

21    And I do it because I appreciate the jury system, just like

22    Mr. Becker does.  It's one of the most honorable service

23    things you can do in your lifetime.  So I, like Mr. Becker,

1    thank you for that.

2          Just a couple preliminary matters.  I must have drawn

3    the short straw or something, but my back is to you here at

4    the table.  I'm trying to do my best to take notes and look at

5    you at the same time.  So I mean no disrespect if something is

6    going on and I'm a little busy there.

7          So like Mr. Becker indicated, this process is the

8    only time you get to talk to us.  And we need to talk to you.

9    Not just to ask you questions and have you shake your head.

10   We need to know what your thoughts and feelings are.  We all

11   have life experiences, good or bad.  All the biases,

12   prejudices, opinions, whatever it might be.  There are no

13   right or wrong answers if we ask you questions.  So don't be

14   embarrassed.  We're not going to pry, but it's important that

15   you be honest with us.  You may be good for one particular

16   kind of case but not for another.  That serves well for

17   everyone involved.  The state and the defense.  So our goal is

18   to get fair and impartial jurors.

19         So let's talk a little bit about how the case gets

20   started, just in case some people aren't familiar.  Does

21   anybody know what an indictment is?  Can you raise your hand?

22   All right.  I would expect Miss Bordner and Mr. Zatvarnicky.

23   Go ahead, trooper, tell me what that is.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1          JUROR NO. 8:  It's basically where an

2    officer or police department would present their findings to

3    what would be a panel of grand jury members and then present

4    those findings and then they would make a ruling whether it

5    would be a true bill or not on the -- those specific charges.

6          MR. HARTWIG:  So would you agree with me

7    that what the decision is is their probable cause that

8    somebody may have committed a crime; right?

9          JUROR NO. 8:  Yes, sir.

10          MR. HARTWIG:  And then they issue, like you

11   said, a true bill, but an indictment.  It is just a piece of

12   paper that says so and so is charged with a crime; correct?

13      Now, would you also agree with me that that's a

14   secret proceeding?

15          JUROR NO. 8:  That's correct.

16          MR. HARTWIG:  And that it's a one-sided

17   presentation of supposed facts?

18          JUROR NO. 8:  Correct.

19          MR. HARTWIG:  So the defense doesn't get to

20   go.  They don't call witnesses; correct?

21          JUROR NO. 8:  Correct.

22          MR. HARTWIG:  Does anyone here believe that

23   if a person is indicted and they're charged they must have

1   done something wrong?  Miss Hollenbank?

2                    JUROR NO. 1:  I wasn't there to hear what

3   happened, so I would have to go by their words.  So I'd have

4   to hear it myself.

5                    MR. HARTWIG:  Okay.  Miss Adams?

6                    JUROR NO. 2:  I agree.

7                    MR. HARTWIG:  Miss Bordner, I know you're a

8   practicing attorney.  And you've done defense work in the

9   past?

10                   JUROR NO. 4:  Yes.

11                   MR. HARTWIG:  Would you agree with me that

12  it has no impact whatsoever on the guilt or innocence of any

13  particular thing?

14                   JUROR NO. 4:  Not whatsoever.

15                   MR. HARTWIG:  Much less Mr. Burke.

16       Okay.  Does everyone agree with that?  And if you

17  don't, can you raise your hand and we can have a discussion

18  about it?

19       Miss Shargo?

20                   JUROR NO. 3:  Repeat that question so I can

21  understand it a little more clearly.

22                   MR. HARTWIG:  Okay.  Very good.  I

23  appreciate you asking me that.

1          So if someone is charged with a crime --

2                          JUROR NO. 3:  Uh-huh.

3                          MR. HARTWIG:  -- by way of a piece of

4     paper.

5                          JUROR NO. 3:  Uh-huh.

6                          MR. HARTWIG:  And they've done something

7     that the police and the prosecutor believe they did, do you in

8     any way in your mind think automatically they must have done

9     something?

10                         JUROR NO. 3:  No.

11                         MR. HARTWIG:  Okay.  Which dovetails into

12    the concept that Mr. Becker discusses, the presumption of

13    innocence; correct?

14                         JUROR NO. 3:  Correct.

15                         MR. HARTWIG:  So despite a grand jury

16    charging someone, do we all agree that the presumption of

17    innocence still follows any particular defendant?  And you're

18    shaking your head.  Mr. Fuda?

19                         JUROR NO. 9:  Yes.

20                         MR. HARTWIG:  And why do you think that's

21    important?  Let's ask Mr. Stimpert.  Why do you think that

22    concept of presumption of innocence is so important in the

23    United States of America?

81

1              JUROR NO. 5:  It's the constitutional

2      right.  They have to be found guilty beyond a reasonable doubt

3      for any criminal or crime.

4              MR. HARTWIG:  Sure.  Now sometimes, whether

5      you're watching television or talking with friends, those seem

6      like buzz words sometimes.  Like beyond a reasonable doubt.

7      Right?  And Your Honor will be the one who gives you the law.

8      But, you know, I expect that he would tell you that's the

9      highest burden in the United States of America.  Okay?

10             And Mr. DiTommaso, why do you think beyond a

11     reasonable doubt is required in a criminal case?

12             JUROR NO. 10:  Because it's worse to send

13     an innocent man away.

14             MR. HARTWIG:  Right.  Because, Mr. Fuda, we

15     agree that someone's liberty is at stake; correct?  It's not

16     beyond all doubt, but it is an extremely high burden for an

17     important reason.  Miss Adams, do you agree?

18             JUROR NO. 2:  Yes, I do.

19             MR. HARTWIG:  Has anybody served on a civil

20     trial?  So in a civil trial -- let's say you're in a car

21     accident and they dispute maybe who caused the accident, there

22     is a much different burden.  It's called preponderance of the

23     evidence.  Okay?  And that's basically like a 50.1 percent.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1   If you tip the scale, then you win.  So and so caused the

2   accident.  So it's a big difference in burden; would you agree

3   with me, ma'am?  Miss Pattinson?

4                    JUROR NO. 6:  (Nods head.)

5                    MR. HARTWIG:  Right.  And why do you think

6   it's so different?  Do you think it's property versus life?

7   Do you think that's the reason we have such a high burden in a

8   criminal case?

9                    JUROR NO. 6:  Yeah.

10                   MR. HARTWIG:  And do you agree with that,

11  disagree with it?

12                   JUROR NO. 6:  I agree.

13                   MR. HARTWIG:  Are you comfortable with it?

14  Let's say that.

15                   JUROR NO. 6:  I'm comfortable with it.

16                   MR. HARTWIG:  Okay.  So you could require

17  that the state, as instructed by the Judge, require the state

18  to prove all elements of each particular charge beyond a

19  reasonable doubt?

20                   JUROR NO. 6:  Uh-huh.

21                   MR. HARTWIG:  Okay.  And if the state

22  couldn't, would you be comfortable rendering a not guilty

23  verdict?

1              JUROR NO. 6:  Can you repeat that again?

2              MR. HARTWIG:  Okay.  If you didn't feel in

3    your mind, and after discussing it with fellow jurors if you

4    were a juror, you didn't feel the state proved beyond a

5    reasonable doubt every element of every charge, could you find

6    a verdict of not guilty on any particular charge?

7              JUROR NO. 6:  Uh-huh.

8              MR. HARTWIG:  You think you could?

9              JUROR NO. 6:  Probably not.

10             MR. HARTWIG:  Probably not?  Okay.  I want

11   to make sure I understand your answer.  Would you feel

12   comfortable saying someone is not guilty in a case?

13             JUROR NO. 6:  No.

14             MR. HARTWIG:  Why?

15             JUROR NO. 6:  Because -- I don't know.

16             MR. HARTWIG:  Well, it's okay.  Like I

17   said, there's no right or wrong answers.  Go ahead and try to

18   tell me, you know, what's the reasoning behind that.

19             JUROR NO. 6:  I don't know.

20             MR. HARTWIG:  Okay.  Let me ask you a

21   different question.  If you really felt that the state didn't

22   do its job, okay, based on the law, and all 11 other jurors

23   think they did, would you be able to maintain your opinions in

1   deliberation and stick to your opinion of not guilty?

2                   JUROR NO. 6:  No.

3                   MR. HARTWIG:  You would feel some pressure?

4                   JUROR NO. 6:  Uh-huh.

5                   MR. HARTWIG:  Okay.  All right.  We'll hop

6   around a little bit.  Okay?  I don't want to stay on you and

7   make you uncomfortable, but we'll talk a little bit more about

8   that.  Okay?

9           So let's say, Mr. Wills, you had a friend, very good

10  friend, that was accused of a crime.  And you weren't judging

11  him as a juror, judging him as a friend, how would you want

12  the testimony or the evidence presented to you before you

13  found that your friend was actually guilty?  What type of

14  quality of evidence would you want?

15                  JUROR NO. 11:  I'd want a lot of evidence.

16  I'd want facts.  Facts that I would believe.

17                  MR. HARTWIG:  In order to convince you in

18  your mind beyond a reasonable doubt your friend was, in fact,

19  guilty.  Yes?

20                  JUROR NO. 11:  Yeah.

21                  MR. HARTWIG:  Right.  So when we talk about

22  quality of evidence versus quantity of evidence, if somebody

23  just presented 20 witnesses to you and they were all average

1   or worse, would that mean anything to you, that there were 20

2   of them?

3                   JUROR NO. 11:  No.

4                   MR. HARTWIG:  Okay.  And if there were one

5   good one, you would be -- you would have to consider that as

6   well?

7                   JUROR NO. 11:  One good one beyond a

8   reasonable doubt, yeah.

9                   MR. HARTWIG:  Okay.  Okay.  Mr. West, how

10   do you feel about that?

11                  JUROR NO. 7:  About the same.  I would, you

12   know.

13                  MR. HARTWIG:  Okay.  What if -- what if you

14   were judging your friend and found out that testimony or

15   evidence that could have been presented to you --

16                  JUROR NO. 7:  Uh-huh.

17                  MR. HARTWIG:  -- wasn't.

18                  JUROR NO. 7:  I think I would be upset

19   about it.

20                  MR. HARTWIG:  Okay.  And would you agree

21   that you would be upset because you would want all

22   available --

23                  JUROR NO. 7:  Evidence.

1            MR. HARTWIG:  -- easily available evidence

2    or information that could go to that finding; right?

3            JUROR NO. 7:  Right.

4            MR. HARTWIG:  You would agree with that?

5            JUROR NO. 7:  Yes.

6            MR. HARTWIG:  Mr. DiTommaso, I see you

7    shaking your head.  What are your thoughts?

8            JUROR NO. 10:  I would want as much

9    evidence as possible so you could make a decision based on

10   very accurate circumstances.

11           MR. HARTWIG:  Okay.  Right.  Now, we've all

12   watched CSI or First 48.  And I think those who do this work,

13   we understand that that's television; right?  It's not always

14   things that are available in a criminal case.  So in a case

15   where you're saying, oh, we wanted, you know, satellite images

16   of something and that wasn't sought by a detective so we're

17   going to hold it against the detective, that would be

18   unreasonable; would we agree?  Would we all agree,

19   Miss Shargo?

20           But what if something could have been important like

21   following up on a witness who was in town or interviewing a

22   witness.  If that's not done in an aggravated murder case,

23   Miss Shargo, do you think that's important?

1              JUROR NO. 3:  That -- that you follow up?

2              MR. HARTWIG:  Right.  Or did not follow up

3    on easily available information.

4              JUROR NO. 3:  Oh, easy, yes.  You should

5    follow up.

6              MR. HARTWIG:  Okay.  And easy or just --

7    it's available.  It's there.  It could have been done.  To

8    rule something in or rule something out.  Would you agree?

9              JUROR NO. 3:  (Nods head.)

10             MR. HARTWIG:  And why do you think that's

11   important?  And I think I'm asking an obvious question, but

12   you tell me.

13             JUROR NO. 3:  Well, you have to -- in order

14   to find reasonable doubt, you have to -- you have to know.  It

15   would have to come forward if somebody was available.

16             MR. HARTWIG:  It would be hard for you to

17   reach a conclusion beyond a reasonable doubt without that

18   information?

19             JUROR NO. 3:  If I had it?

20             MR. HARTWIG:  If you had it, it would be

21   easier?

22             JUROR NO. 3:  Right.

23             MR. HARTWIG:  Correct?  And if you didn't

1    have it, then you would be questioning why.

2                        JUROR NO. 3:  Because somebody's life could

3    be at stake.

4                        MR. HARTWIG:  Okay.  Miss Bordner, do you

5    agree?

6                        JUROR NO. 4:  Oh, absolutely.

7                        MR. HARTWIG:  Okay.  Let's go to this

8    example that Mr. Becker used.  I thought that was good.  And

9    by the way, everyone in this courtroom that's working on this

10   case understands the seriousness of the charges and the

11   gravity of it.  But there will be times when there's some

12   levity, even with Your Honor and counsel and you about a joke.

13   It's okay if we smile or laugh on something like that.  But we

14   all understand why we're here.  Okay?

15        So the example was the wedding ring.  And we had

16   Mr. Stimpert who showed his gold band and then we talked about

17   whether or not that's proof beyond a reasonable doubt he's

18   married.  Okay?

19        So, Miss Adams, I'm not wearing a wedding ring;

20   correct?  Is that proof beyond a reasonable doubt I'm not

21   married?

22                        JUROR NO. 2:  No.  My husband has never

23   worn a ring.

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

89

1              MR. HARTWIG:  Right.  Okay.  A lot of men

2    are like that.  It doesn't fit right or something.  In my

3    particular case, I've lost it twice in 20 years.  Most

4    recently on a ski trip.  Got one on back order.  Okay?

5              So if somebody saw me at a bar and I'm talking to a

6    woman and I don't have a wedding ring on, right, people may

7    assume I'm not married; correct?  All right.  What if, then,

8    on top of that someone comes up and says, "Yeah, I heard that,

9    I heard that guy, he's not married."  Okay?  Is that proof

10   beyond a reasonable doubt?

11             JUROR NO. 2:  No.

12             MR. HARTWIG:  Okay.  Before you would

13   conclude and go tell people this guy is there talking with

14   another woman, doesn't have his wedding ring on, would you

15   want more information before you go making that conclusion?

16             JUROR NO. 2:  Yes.

17             MR. HARTWIG:  All right.  That could affect

18   my true relationship with my wife; correct?  My three

19   children; right?

20             So sometimes in cases people say things or they heard

21   it from other people.  All right.  Would you want to know how

22   they heard it or what the tests of truthfulness are with

23   regard to witnesses?

90

1                      JUROR NO. 2:  Yes.

2                      MR. HARTWIG:  Okay.  I think, yeah, we all

3     would on a case like this.

4           Now, there's an important concept that Mr. Becker

5     didn't touch upon that's going to come up here.  Mr. Burke has

6     a constitutional right not to testify.  We all do; right?

7     That means nobody can make him get on the stand and say

8     whatever they'd like him to say or anything.  Does anybody

9     have a problem with that?

10          Mr. Williamson, if Mr. Burke did not get on the

11    witness stand and testify, would you be -- would you feel like

12    you want to hold that against him?

13                     JUROR NO. 12:  No.

14                     MR. HARTWIG:  All right.  Because Your

15    Honor is going to explain and it's part of the law that if he

16    didn't that can't be used in any way against him.  You would

17    be fine if he did not?

18                     JUROR NO. 12:  Right.

19                     MR. HARTWIG:  Okay.  Now, I think with

20    everybody it's natural sometimes to say I'd like to hear two

21    sides to the story.  Mr. DiTommaso, how do you feel about

22    that?

23                     JUROR NO. 10:  I agree with it.

1          MR. HARTWIG:  You agree that people would

2     like to hear both sides?  Or?

3          JUROR NO. 10:  Well, yeah, I agree with

4     people want to hear both sides of the story, but I also agree

5     that it's his right if he doesn't want to.

6          MR. HARTWIG:  Okay.  Miss Shargo, how do

7     you feel?

8          JUROR NO. 3:  Same way.

9          MR. HARTWIG:  Mr. Zatvarnicky, how do you

10    feel?

11         JUROR NO. 8:  I believe that the evidence

12    has to be documented properly to have an investigation so that

13    it -- so that the investigation itself speaks for the true

14    circumstances of whatever happened.  It has to be followed up

15    accordingly.

16         MR. HARTWIG:  Okay.  And especially in your

17    job.  If you pull somebody over for OVI, drunk driving, and

18    they say, "With all due respect, Trooper, I'm not answering

19    any questions," you can't hold that against them; correct?

20         JUROR NO. 8:  That's correct.

21         MR. HARTWIG:  So you base your

22    investigation on whatever else you have; correct?

23         JUROR NO. 8:  Correct.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

92

1              MR. HARTWIG:  But personally you're in

2      agreement with that constitutional right?

3              JUROR NO. 8:  Absolutely.

4              MR. HARTWIG:  Okay.  So from a defense

5      perspective, Mr. Becker indicated and we all understand that

6      the defense never has anything to prove; right?  We can choose

7      not to call any witnesses.  We could call ten witnesses if we

8      wanted or found that it was appropriate.  That it's solely

9      their burden of proof; right?

10         Miss Pattinson, how do you feel about that?  If we

11     presented no evidence whatsoever, would you be okay with that?

12              JUROR NO. 6:  No, not really.

13              MR. HARTWIG:  You would want us to present

14     evidence?

15              JUROR NO. 6:  Exactly.

16              MR. HARTWIG:  Okay.  And if we didn't,

17     again, that would make you somehow uncomfortable or unwilling

18     to be fair and impartial?

19              JUROR NO. 6:  Uh-huh.

20              MR. HARTWIG:  Okay.  All right.

21     Mr. Stimpert, how do you feel about that, and her response?

22              JUROR NO. 5:  I would -- it doesn't matter

23     to me whether you present witnesses or not.  It would depend

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   if the state proved its case beyond a reasonable doubt.

2                   MR. HARTWIG:  Okay.  Miss Adams?

3                   JUROR NO. 2:  That's me.

4                   MR. HARTWIG:  I'm sorry.  I'm getting Miss

5   Hollenbank and Miss Adams confused.

6                   JUROR NO. 2:  I don't know.  I mean, I

7   guess if the state can prove -- sometimes I think maybe

8   hearing something from the other side would be helpful.

9                   MR. HARTWIG:  Okay.  That's a fair answer.

10  But if the Judge says that's not required --

11                  JUROR NO. 2:  Right.

12                  MR. HARTWIG:  Could you still say, "Well, I

13  have to follow the law"?

14                  JUROR NO. 2:  I would have to.

15                  MR. HARTWIG:  Mr. Fuda, how do you feel

16  about that?

17                  JUROR NO. 9:  If you don't have to present

18  any evidence, I'm okay with it.

19                  MR. HARTWIG:  Okay.  Aside from presenting

20  evidence, from a defense perspective, we have to ask state's

21  witnesses questions.  We call that cross examination.  Okay?

22  If I happen to be particularly tough on a certain witness

23  within the confines of the rules from Your Honor, would

94

1   anybody hold that against Mr. Burke?

2          Miss Bordner?

3                    JUROR NO. 4:  No, sir.

4                    MR. HARTWIG:  All right.  You understand

5   that that's part of the practice?

6                    JUROR NO. 4:  Correct.

7                    MR. HARTWIG:  All right.  To demand certain

8   answers, honest answers, from potential witnesses; correct?

9                    JUROR NO. 4:  Absolutely.

10                   MR. HARTWIG:  Never degrading a witness or

11  never making fun of a witness, but seeking the truth?

12                   JUROR NO. 4:  Absolutely.

13                   MR. HARTWIG:  All right.  And you would not

14  hold that against my client if I or Mr. Olson happen to be

15  particularly tough?

16                   JUROR NO. 4:  Not at all.

17                   MR. HARTWIG:  Okay.  You wouldn't find that

18  unprofessional or anything like that?  Miss Hollenbank?

19                   JUROR NO. 1:  No.  That's your job, I

20  believe.

21                   MR. HARTWIG:  Okay.  Does everybody agree

22  that that would be okay?

23          Miss Pattinson, how do you feel about that?

1               JUROR NO. 6:  (Nods head.)

2               MR. HARTWIG:  Okay.  So, in our ordinary

3   lives, I think, like I said, we all have life experiences and

4   opinions.  And whether we like it or not, people judge people

5   by the way they look, by the way they act, how they're brought

6   up, even nationality, race, gender.  That's just, I think,

7   natural with some people or most people in different varying

8   degrees.

9         So, Miss Adams, would you judge somebody just by the

10  way they looked?

11              JUROR NO. 2:  No.

12              MR. HARTWIG:  Okay.  If somebody has

13  tattoos, does that indicate to you one way or another what the

14  character of that person is?

15              JUROR NO. 2:  No.

16              MR. HARTWIG:  No?  It seems like more

17  people today, younger people, have tattoos than 50 years ago;

18  correct?

19              JUROR NO. 2:  Right.

20              MR. HARTWIG:  Right?  And sometimes more

21  visible tattoos than we've ever seen; correct?

22        As Mr. Zatvarnicky understands, if you had to guess a

23  percentage on a young person these days, what do you think?

1  How many have tattoos?

2                    JUROR NO. 8:  It's very high.

3                    MR. HARTWIG:  It's very high; right?  Do

4  you feel that having a tattoo in any way is a reason to

5  prejudge a person?

6                    JUROR NO. 8:  Not at all.

7                    MR. HARTWIG:  Okay.  Now, does anybody feel

8  differently about tattoos?  All right.  Mr. DiTommaso?

9                    JUROR NO. 10:  If the tattoo has a specific

10  meaning.

11                    MR. HARTWIG:  Okay.  Whether -- like words?

12                    JUROR NO. 10:  Or symbols.

13                    MR. HARTWIG:  Symbols.  Now, do you feel

14  it's common knowledge on certain symbols that certain things

15  mean certain things?

16                    JUROR NO. 10:  Not common.

17                    MR. HARTWIG:  I'm sorry.  Can you speak up?

18                    JUROR NO. 10:  Not common knowledge.

19                    MR. HARTWIG:  Not common knowledge.  Do you

20  have any experience in understanding tattoo meanings?

21                    JUROR NO. 10:  A little bit.  Not much.

22                    MR. HARTWIG:  Okay.  Does anybody else feel

23  the same way, that there are sometimes meanings to tattoos?

1   Trooper?

2               JUROR NO. 8:  Yes, sir.

3               MR. HARTWIG:  You have experience in that?

4               JUROR NO. 8:  I've had trainings as to

5   some, as to what some things could mean, but I'm not an expert

6   by any stretch.

7               MR. HARTWIG:  Even if somebody has a tattoo

8   that has a supposed meaning, does that mean it's true?

9               JUROR NO. 8:  No, it does not.

10              MR. HARTWIG:  All right.  And in your

11  experience, has it been that, in fact, if somebody has one and

12  it's not true?

13              JUROR NO. 8:  That is correct.  It often

14  doesn't reflect who the person is or anything they've ever

15  done.

16              MR. HARTWIG:  Okay.  I mean, some people

17  put tattoos on themselves about God or whatever and it may be

18  that they have no faith at all; correct?

19              JUROR NO. 8:  Correct.

20              MR. HARTWIG:  But for some reason they put

21  a tattoo on their body.

22          Okay.  Miss Bordner, how do you feel about that?

23              JUROR NO. 4:  Doesn't bother me at all.  I

98

1   have younger family members, younger nieces, that have a lot

2   of tattoos.

3                    MR. HARTWIG:  Okay.  How much defense work

4   did you do in your practice?

5                    JUROR NO. 4:  If I had to put a percentage

6   on it, I would say it was maybe 25 percent.

7                    MR. HARTWIG:  Okay.  Did you handle

8   misdemeanors and felonies?

9                    JUROR NO. 4:  Yes, sir.

10                    MR. OLSON:  From the defense side, we're

11   talking?

12                    JUROR NO. 4:  Yes.

13                    MR. OLSON:  Did you also do it from the

14   state side?

15                    JUROR NO. 4:  No, I did not.

16                    MR. HARTWIG:  All right.

17        Mr. Stimpert, let me ask you a little bit about your

18   jury service.  You were on a criminal trial; correct?

19                    JUROR NO. 5:  Yes.

20                    MR. HARTWIG:  Were you the foreman?

21                    JUROR NO. 5:  No.

22                    MR. HARTWIG:  It was a felony case?

23                    JUROR NO. 5:  (Nods head.)

99

1             MR. HARTWIG:  Yes.  You deliberated with 11
2    others and came up with a not guilty verdict?
3             JUROR NO. 5:  Correct.
4             MR. HARTWIG:  How was your experience?
5             JUROR NO. 5:  I'm sorry?
6             MR. HARTWIG:  What was your experience
7    like?  Was it a good experience?  Not so good?
8             JUROR NO. 5:  It was a good experience.
9             MR. HARTWIG:  Okay.  Were there any
10   holdouts at the time, or did you reach a unanimous verdict
11   immediately or after deliberation?
12            JUROR NO. 5:  There were three holdouts
13   before.
14            MR. HARTWIG:  Okay.  How did you resolve
15   that?
16            JUROR NO. 5:  Just going through the
17   evidence.
18            MR. HARTWIG:  Took your time, discussed
19   things with one another?
20            JUROR NO. 5:  Correct.
21            MR. HARTWIG:  Everybody stayed open-minded?
22            JUROR NO. 5:  Yes.
23            MR. HARTWIG:  Okay.  All right.  Were you

100

1    one of the holdouts initially?

2                        JUROR NO. 5:  No.

3                        MR. HARTWIG:  Okay.  Mr. Fuda, some things

4    came up initially that you were -- you golfed with

5    Mr. Watkins?

6                        JUROR NO. 9:  (Nods head.)

7                        MR. HARTWIG:  Okay.  Are you friends with

8    him?

9                        JUROR NO. 9:  Not really.

10                        MR. HARTWIG:  Okay.  Where do you golf at?

11                        JUROR NO. 9:  Avalon.  Old Avalon.

12                        MR. HARTWIG:  Old Avalon?  Okay.  Now, when

13   you say you golfed with him, do you golf in his foursome?

14                        JUROR NO. 9:  Well, yeah, it was a

15   scramble.

16                        MR. HARTWIG:  Okay.  Was it one time?

17                        JUROR NO. 9:  Yeah.  One time.

18                        MR. HARTWIG:  Okay.  How do you know

19   Mr. Watkins?

20                        JUROR NO. 9:  Just I met him there.

21   Through my brother.

22                        MR. HARTWIG:  Is your brother friends with

23   him?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

101

1              JUROR NO. 9:  He is a commissioner, yeah,

2     so I got to meet him through him.

3              MR. HARTWIG:  I see.  Okay.  Does he

4     socialize with him?

5              JUROR NO. 9:  I don't know.  I don't know

6     if he does or not.

7              MR. HARTWIG:  Have you socialized with

8     Mr. Watkins?

9              JUROR NO. 9:  No.

10              MR. HARTWIG:  So you golfed with him one

11    time at a scramble?

12              JUROR NO. 9:  One time.  That was it.

13              MR. HARTWIG:  Is he a good golfer?

14              JUROR NO. 9:  Yeah.  Decent.

15              MR. HARTWIG:  How about yourself?

16              JUROR NO. 9:  Yeah.

17              MR. HARTWIG:  Yeah?  Good.

18         Okay.  Miss Hollenbank, you work for the county?

19              JUROR NO. 1:  Correct.

20              MR. HARTWIG:  Do you feel in any way

21    because you're paid by the county, just like Mr. Becker is,

22    that that inherently would affect your ability to be fair and

23    impartial on a case?

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

102

1                    JUROR NO. 1:  No.  I don't work with him or
2     for his office.
3                    MR. HARTWIG:  Okay.  But, you know, the
4     county pays you?
5                    JUROR NO. 1:  Correct.
6                    MR. HARTWIG:  Right.  And so that doesn't
7     make you uncomfortable or anything like that?
8                    JUROR NO. 1:  No, not at all.
9                    MR. HARTWIG:  And, Miss Shargo, you are
10    retired from the county?
11                   JUROR NO. 3:  Yes.
12                   MR. HARTWIG:  Do you feel loyalty to the
13    county or to any friends that may still be employed?
14                   JUROR NO. 3:  Do I have friends that are
15    employed there?
16                   MR. HARTWIG:  Yes.  Do you?
17                   JUROR NO. 3:  Yes.
18                   MR. HARTWIG:  Do you feel any loyalty to
19    them, being that you're retired from the county and -- you
20    wouldn't feel like you need to be on the team here with
21    Mr. Becker in any way?
22                   JUROR NO. 3:  Oh, no.
23                   MR. HARTWIG:  No?  Okay.

                          OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1        Mr. Wills, let me ask you briefly.  You had indicated

2  you were a victim of domestic violence?

3                JUROR NO. 11:  Correct.

4                MR. HARTWIG:  All right.  Did that case get

5  prosecuted?

6                JUROR NO. 11:  Yes.

7                MR. HARTWIG:  All right.  Did it go to

8  trial or end in a plea agreement?

9                JUROR NO. 11:  A plea.

10              MR. HARTWIG:  And how was your experience

11  as a victim in the case?

12              JUROR NO. 11:  It was unpleasant because it

13  was my family.

14              MR. HARTWIG:  Okay.  I'm sure that was hard

15  to go through.  Did it resolve like you wanted it?

16              JUROR NO. 11:  Yes.

17              MR. HARTWIG:  Did they include you in the

18  process?

19              JUROR NO. 11:  Yes.

20              MR. HARTWIG:  Listened to what you wanted?

21              JUROR NO. 11:  Yes.

22              MR. HARTWIG:  Mr. DiTommaso, do you have

23  family members that are police officers?

1           JUROR NO. 10:  Yes.

2           MR. HARTWIG:  All right.  And who are they?

3           JUROR NO. 10:  I have a cousin who is

4    actually a border patrol and I have another distant cousin

5    that's a state trooper.

6           MR. HARTWIG:  Do you feel that the

7    testimony of a police officer would be more credible than from

8    what we call a lay person, just somebody off the street?

9           JUROR NO. 10:  No.

10           MR. HARTWIG:  I mean, they're trained to be

11   police officers, but you don't find that automatically they

12   are more believable than other people?

13           JUROR NO. 10:  No.

14           MR. HARTWIG:  Would you agree with me that

15   there are good officers and some that are not so good?

16           JUROR NO. 10:  Yes.

17           MR. HARTWIG:  I'm not saying like

18   personally.  You know, like they're liars or something.  But

19   would you agree with me that just like in any profession some

20   people do their jobs better than others?

21           JUROR NO. 10:  Yes.

22           MR. HARTWIG:  So if they were criticized

23   for maybe not doing the best they could do, would you hold

105

1    that against us?

2                    JUROR NO. 10:  (Shakes head.)

3                    MR. HARTWIG:  No?  All right.

4        Would anybody hold that against us?  Even, trooper,

5    would you?

6                    JUROR NO. 8:  I'm an internal affairs

7    officer.

8                    MR. HARTWIG:  Okay.

9                    JUROR NO. 8:  So I see all spectrums, if

10   you will.  So I would hold no ill will towards you if need be,

11   if you have to.  You have to do your job.

12                   MR. HARTWIG:  And, in fact, would you hold

13   officers to a higher standard for doing their job, saying this

14   is what you're trained to do?  You should go out and do it the

15   best you can do it?

16                   JUROR NO. 8:  Yes, sir.

17                   MR. HARTWIG:  So there was an example of a

18   7-year-old who later disclosed to someone that she had been

19   raped after their parents split up.  So you have a young girl

20   who makes a serious accusation against her father; right?  No

21   other physical evidence.  And they would ask you to make a

22   conclusion beyond a reasonable doubt that that happened.

23   Okay?  That was the example.

1          Now, let me add something to that hypothetical.  If

2     you knew that during that two years she was taken to

3     counseling.  Okay?  And the prosecutor knew that.  The

4     detectives knew that.  But they did not go and get the

5     counseling records.  All right?  Does anybody find that that

6     would be a problem before reaching a conclusion?  Miss

7     Hollenbank?

8                    JUROR NO. 1:  That we didn't have the

9     evidence from the counselor?

10                    MR. HARTWIG:  Right.

11                    JUROR NO. 1:  Are we allowed to have that

12     evidence?

13                    MR. HARTWIG:  If you could.  If it was

14     available.

15                    JUROR NO. 1:  If it was a doctor/patient

16     confidentiality --

17                    MR. HARTWIG:  Well, that would be up to the

18     Judge.  Let's assume for the hypothetical that the Judge says

19     yes, it could have been provided.

20                    JUROR NO. 1:  Then it would have been nice

21     to have it.

22                    MR. HARTWIG:  When you say "nice to have

23     it," would it be fatal in your mind to say we don't know what

1   she would have told this counselor about her father?

2                    JUROR NO. 1:  It can't be fatal.  I'd have

3   to hear all the other evidence.

4                    MR. HARTWIG:  Okay.  Miss Shargo, how do

5   you feel?

6                    JUROR NO. 3:  I feel differently.

7                    MR. HARTWIG:  Tell me how.

8                    JUROR NO. 3:  If the Judge let the evidence

9   come in and the counselors -- no, I would feel that it should

10  have been there.

11                   MR. HARTWIG:  That you would have wanted to

12  have seen what she told the counselor?

13                   JUROR NO. 3:  Yes.

14                   MR. HARTWIG:  Mr. Fuda, how do you feel

15  about that?

16                   JUROR NO. 9:  Pretty tough.  I'd have to

17  see the evidence.

18                   MR. HARTWIG:  But if you couldn't -- when

19  you say "see the evidence," you would hear from the 7-year-old

20  girl, and that would be it.  What you wouldn't see are the

21  counseling records.  So how would that make you feel?

22                   JUROR NO. 9:  I'd have to believe her.

23                   MR. HARTWIG:  You would have to believe

1   her?  Because she's a 7-year-old girl?

2                        JUROR NO. 9:  I don't think she would lie.

3                        MR. HARTWIG:  All right.  What if her

4   father was a state trooper, a great guy, and just never -- no

5   record at all?

6                        JUROR NO. 9:  That don't make no

7   difference.

8                        MR. HARTWIG:  You would side with the

9   little girl.  Interesting.  All right.

10          Mr. DiTommaso, how do you feel about that?

11                       JUROR NO. 10:  I would need to see the

12  records.

13                       MR. HARTWIG:  Miss Bordner?

14                       JUROR NO. 4:  Yeah.  I mean, I would need

15  to see the record.  I would need to see her, hear more, you

16  know, because there would be, for me, in my mind, the

17  possibility that she could have been coached, that she could

18  have, you know, overheard things and wanted to please someone

19  and wanted to speak in a certain way.  It's just --

20                       MR. HARTWIG:  Miss Adams, how do you feel

21  about that?

22                       JUROR NO. 2:  I would need that evidence

23  too.

1              MR. HARTWIG:  Because let's all face it.

2    The elephant in the room in a case like that is why would a

3    7-year-old girl come in and say that about her dad; right?

4    Those cases are always very difficult.  But also makes it more

5    challenging if you don't have everything that could have been

6    produced.  Would you agree, Mr. Wills?

7              JUROR NO. 11:  Yeah.

8              MR. HARTWIG:  But, Mr. Fuda, that would be

9    enough for you?

10              JUROR NO. 9:  (No response).

11              MR. HARTWIG:  I know this is a hard

12   hypothetical.

13              JUROR NO. 9:  I'm saying it would be tough.

14   It would be tough.

15              MR. HARTWIG:  Okay.  I appreciate your

16   honesty.

17         So we talked a little bit about direct and

18   circumstantial evidence.  And it's just easier for me to use

19   Mr. Becker's examples and then tie something into it.  So --

20   well, I'll change it up a little bit.  I have three kids.  And

21   we've all had these stories.  But let's just assume that my

22   son says he didn't eat the cookies downstairs.  My oldest

23   daughter says he did.  My middle daughter -- we all know

110

1    middle children -- she comes down, you know, and says, "I

2    heard Nick.  Nick says he ate the cookies.  He ate all 30 of

3    'em, dad."  Okay?  Would you agree with me that if my son said

4    he did and my oldest daughter said he didn't, that would be a

5    difficult conclusion to reach beyond a reasonable doubt that

6    he did it and she's not telling the truth?  You're shaking

7    your head, trooper?

8                    JUROR NO. 8:  It would be difficult to come

9    to a definitive answer.

10                    MR. HARTWIG:  Okay.  Now, if he had

11   chocolate all over his face, that might help you make the

12   decision; right?

13                    JUROR NO. 8:  Sure.

14                    MR. HARTWIG:  Okay.  Now, if you determined

15   that my middle daughter and son don't get along at all, all

16   right, and we know that all 30 cookies weren't eaten, only

17   one, would you be tending to believe my middle daughter, Miss

18   Shargo?

19                    JUROR NO. 3:  Huh?

20                    MR. HARTWIG:  I know for a fact that 30

21   cookies weren't eaten.  So what does that say about what she's

22   telling?

23                    JUROR NO. 3:  She's not telling the truth.

1          MR. HARTWIG:  Yeah, because I know for a

2     fact that he didn't eat 30 cookies; right?  Now, there's one

3     missing.  So is she lying to get him in trouble?

4          Miss Adams, do you think that's what she's doing?

5               JUROR NO. 2:  Maybe.

6               MR. HARTWIG:  Maybe.  Or maybe he did eat a

7     cookie.  Right?  Just one.  And now she's saying he ate 30

8     because he's really gonna get in trouble.  But I know that's

9     not true.  So what am I going to do?  So do you think that's

10    proof beyond a reasonable doubt in that hypothetical?  Even

11    with a witness, a supposed witness.  Trooper?

12               JUROR NO. 8:  No, sir.

13               MR. HARTWIG:  Okay.  All right.  Miss

14    Bordner, how do you feel about that?

15               JUROR NO. 4:  I would think she had some

16    sort of other reason for trying to get him in trouble or

17    something like that.

18               MR. HARTWIG:  Right.  I'm almost done.  Let

19    me just double check some things.

20          Your Honor, could I have one moment, please, with

21    co-counsel?

22               THE COURT:  You may.

23               MR. HARTWIG:  Thank you.


OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1        Ladies and Gentlemen, listen, again, I thank you for

2   your time.  Is there anything I didn't touch upon or that you

3   had thoughts on but I didn't individually call it out and you

4   would want to say something about it?  Does anybody want to

5   raise your hand?

6                    JUROR NO. 3:  I do.

7                    MR. HARTWIG:  Miss Shargo, thank you.

8                    JUROR NO. 3:  When you were talking about

9   tattoos, I know nothing about really tattoos.

10                   MR. HARTWIG:  Okay.

11                   JUROR NO. 3:  But there is one tattoo that

12  probably, if --

13                   MR. HARTWIG:  Can I stop you there for a

14  second?  Okay.  Your Honor, may we approach?

15                   THE COURT:  Would you approach the bench,

16  ma'am?

17                   (At sidebar:)

18                   THE COURT:  I didn't want you to say

19  something that might taint the jury.

20                   JUROR NO. 3:  I was going to say --

21                   MR. HARTWIG:  Just keep your voice down.

22                   JUROR NO. 3:  Can you hear me?  If

23  somebody, a witness or somebody came on that stand that had a

113

1   Nazi tattoo on them, I'm afraid that --

2                   THE COURT:  Again, I understand exactly

3   what you're saying.  Anybody have a followup question?  I

4   think we all agree.

5                   MR. BECKER:  I have no questions.

6                   MR. HARTWIG:  No further questions.  Thank

7   you.

8                   THE COURT:  Thank you very much.

9                   (End of sidebar discussion.)

10                  MR. HARTWIG:  Just a few questions, Your

11  Honor.

12                  THE COURT:  All right.

13                  MR. HARTWIG:  Miss Shargo, thank you for

14  explaining that to us.

15       Let me just ask you a couple questions.  And in no

16  way meant to embarrass you or anything.  These are just what

17  you had indicated.  You had said that if a particular witness

18  had a Nazi symbol somewhere on their body that would bother

19  you?

20                  JUROR NO. 3:  Did you say would it bother

21  me?

22                  MR. HARTWIG:  Yes.

23                  JUROR NO. 3:  Yes.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

114

1          MR. HARTWIG:  Okay.  And that's what you
2  were meaning about that before I stopped you?
3          JUROR NO. 3:  Yes.
4          MR. HARTWIG:  Okay.  All right.  I
5  appreciate that.
6          Is there anyone else who has any issues like that
7  that I didn't bring up that they would want to get into
8  further?
9          Does everybody here feel that they're comfortable now
10  with possibly being a juror if left on?  All right.
11          Miss Pattinson?  Okay.  We'll get into here I think
12  in just a minute.  Okay.
13          Your Honor, there will no further questions.  Thank
14  you.
15          THE COURT:  All right.  Ladies and
16  Gentlemen, there are two different ways you might be excused
17  from the jury at this time.  One is by matter of legal cause.
18  There is a reason that you shouldn't be on this jury; you're
19  related to one of the parties or you've indicated you can't
20  follow the instructions of the Court.  The Court makes that
21  decision, but I allow the attorneys to suggest something I am
22  not aware of.
23          Mr. Becker, pass for cause?

1          MR. BECKER:  Yes, sir, Your Honor.

2          THE COURT:  Mr. Hartwig, pass for cause?

3          MR. HARTWIG:  Your Honor, may we approach?

4          THE COURT:  You may.

5          (At sidebar:)

6          MR. HARTWIG:  Your Honor, based on the

7    responses from Juror Number 6, Miss Pattinson, we don't feel

8    that she could be fair and impartial in this case.

9          THE COURT:  Mr. Becker.

10         MR. BECKER:  I think the Court may want to

11   clean that up a little bit.  I think it was a little bit

12   confusing.

13         THE COURT:  I didn't hear very well.  I

14   will ask a few questions.  I will take that under

15   consideration and inquire.

16         MR. HARTWIG:  Thank you, Your Honor.

17         (End of sidebar.)

18         THE COURT:  Ms. Pattinson, when you

19   answered some of the questions -- and you're a very light

20   speaker.  I wasn't sure that I heard all your answers.  So I

21   want to make sure I'm fully aware of what your answers were.

22   Defense counsel had asked you -- my instruction in general

23   would be the state has the burden of proving the case beyond a

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   reasonable doubt.  If they proved the case beyond a reasonable

2   doubt, your finding should be in favor of the state.  If they

3   fail to prove beyond a reasonable doubt their case then it

4   should be a defense verdict.  Is that what your testimony is?

5                   JUROR NO. 6:  Uh-huh, yes.

6                   THE COURT:  Okay.  I thought you said that

7   you would have a difficult time even if the state failed to

8   prove beyond a reasonable doubt finding for the defendant; is

9   that what you said?

10                  JUROR NO. 6:  Right.

11                  THE COURT:  Okay.  Thank you very much,

12  Miss Pattinson.  I think I'm going to excuse you.  I don't

13  think you would be able to quite follow the instructions of

14  the Court.  You're free to go.

15                  JUROR NO. 6:  Okay.

16                  THE COURT:  Anita Pace.

17                  (Whereupon, a discussion was held off the

18  record.)

19                  THE COURT:  Ms. Pace, you've heard all the

20  questions that I've asked everyone.  And you've heard the

21  plaintiff and the defendant.  Have you anything to offer in

22  response to any of the questions that we've asked in general?

23                  JUROR NO. 6:  Not that I can think of, no.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1            THE COURT:  Mr. Becker, any specific

2    questions for Miss Pace?

3            MR. BECKER:  Miss Pace, I think there has

4    been some discussion here, and I want to go back to an easy

5    example that I can use.  And the wedding example is a good

6    example.  Obviously the police have a job to do.  And they can

7    go so far and talk to so many people and do so many things.

8    Just like Mr. Stimpert.  You recall my wedding example about

9    whether he's married or not?  You can only go so far and find

10   so many people that were at the wedding.  You can only have so

11   many photographs.  For instance, if the trial was Mr. Stimpert

12   being married, I'm assuming the police could go and find maybe

13   150 people that were at the wedding that were there, ask them

14   for their photographs, ask them if they had any videos, ask

15   them to write statements, but do you feel that there becomes a

16   point where you've got enough?

17           JUROR NO. 6:  Yes.

18           MR. BECKER:  Okay.  And just like in

19   life -- and in that example -- and in hindsight it's always

20   great.  We can always do more; right?  That doesn't mean that

21   someone hasn't done their job.  That doesn't mean that someone

22   is not being truthful; correct?

23           JUROR NO. 6:  Right.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

118

1           MR. BECKER:  And that doesn't mean that the

2    state hasn't met its burden; correct?

3           JUROR NO. 6:  Right.

4           MR. BECKER:  Okay.  Was there anything else

5    that you heard or anything that you thought -- I know you had

6    some pretrial publicity, but that has not affected your

7    ability to serve as a fair and impartial juror; correct?

8           JUROR NO. 4:  Correct.

9           MR. BECKER:  Okay.  I want to thank you for

10   your time.

11           THE COURT:  Mr. Hartwig.

12           MR. HARTWIG:  Thank you, Your Honor.

13        Morning, Miss Pace.  Can you hear me okay?

14           JUROR NO. 6:  Yes.

15           MR. HARTWIG:  Okay.  Were you able to hear

16   everything that I was asking earlier?

17           JUROR NO. 6:  Yes.

18           MR. HARTWIG:  You didn't have any trouble

19   hearing back there?

20           JUROR NO. 6:  No.

21           MR. HARTWIG:  Okay.  I was trying to keep

22   my voice up.  Was there anything in particular that I

23   discussed that you found interesting or one way or another you

1  would have contributed to had you been sitting up here?

2                    JUROR NO. 6:  No.

3                    MR. HARTWIG:  Okay.  So we talked about, at

4  least initially, presumption of innocence.  And you heard

5  that, like Mr. Becker said, our client is cloaked in, right,

6  innocence?  That unless and until that's removed beyond a

7  reasonable doubt that he would be found not guilty?

8                    JUROR NO. 6:  Correct.

9                    MR. HARTWIG:  Are you comfortable with that

10  concept?

11                    JUROR NO. 6:  Yes.

12                    MR. HARTWIG:  Okay.  So if you had to make

13  a decision right now, how would you have to find the defendant

14  if you had to rule right now?

15                    JUROR NO. 6:  Right now?  I don't know

16  anything about him.

17                    MR. HARTWIG:  Okay.

18                    JUROR NO. 6:  So I wouldn't have an

19  opinion.

20                    MR. HARTWIG:  Okay.  But the Judge would

21  say he's not guilty as he sits here unless and until the state

22  can prove beyond a reasonable doubt what their charges are;

23  right?

120

1                    JUROR NO. 6:  Right.

2                    MR. HARTWIG:  So he's not guilty.  Are you

3     comfortable with that?

4                    JUROR NO. 6:  Yes.

5                    MR. HARTWIG:  As he sits here?

6                    JUROR NO. 6:  Yes.

7                    MR. HARTWIG:  We talked about the highest

8     burden in our land, beyond a reasonable doubt.

9                    JUROR NO. 6:  What's that?

10                   MR. HARTWIG:  The burden of proof.

11                   JUROR NO. 6:  Yes.

12                   MR. HARTWIG:  Beyond a reasonable doubt.

13                   JUROR NO. 6:  Uh-huh.

14                   MR. HARTWIG:  It's the highest burden in

15    our country.  And there's a reason why.  And some of the

16    potential jurors had indicated because somebody's liberty is

17    at stake; correct?

18                   JUROR NO. 6:  Correct.

19                   MR. HARTWIG:  And are you comfortable with

20    that level of burden being put on the state?

21                   JUROR NO. 6:  Yes.

22                   MR. HARTWIG:  Do you think there's a good

23    reason for that?

1              JUROR NO. 6:  Yes.

2              MR. HARTWIG:  Okay.  And you could follow

3     the law and be fair and impartial and make them do that?

4              JUROR NO. 6:  Uh-huh.

5              MR. HARTWIG:  Yes?  Okay.  And we talked

6     about our client perhaps not testifying?

7              JUROR NO. 6:  Right.

8              MR. HARTWIG:  If he did not, would you be

9     okay with that?

10              JUROR NO. 6:  Yes.

11              MR. HARTWIG:  Okay.  And if the Judge

12     instructed you that that's the law, that you can't use that

13     against him, that would be okay?

14              JUROR NO. 6:  Right.

15              MR. HARTWIG:  Okay.  And you also heard us

16     talk about that we have no burden of proof, which means we

17     don't have to present any witnesses.  If we didn't -- and I'm

18     not saying we wouldn't -- but if we didn't, would you hold

19     that against us?

20              JUROR NO. 6:  (No response.)

21              MR. HARTWIG:  If we didn't call any

22     witnesses on our side, would you be okay with that?

23              JUROR NO. 6:  (No response.)

122

1                         MR. HARTWIG:  It's okay.  Go ahead.

2                         JUROR NO. 6:  Well, you have to have

3     witnesses.

4                         MR. HARTWIG:  Well, the state does, for

5     sure.  We don't.

6                         JUROR NO. 6:  Oh, okay.  I see what

7     you're --

8                         MR. HARTWIG:  It just happens to be the

9     rules of this process.

10                        JUROR NO. 6:  Yes.  That would be fine.

11                        MR. HARTWIG:  You would be okay with that?

12                        JUROR NO. 6:  Yes.

13                        MR. HARTWIG:  You seem to have some

14    reservations.  And that's okay.  Because this is all new.

15                        JUROR NO. 6:  Right.

16                        MR. HARTWIG:  Do you think you could follow

17    the law and say that's okay, they don't need to prove

18    anything?

19                        JUROR NO. 6:  Yes.

20                        MR. HARTWIG:  Okay.  What about the issue

21    of tattoos?  Does that bother you at all?

22                        JUROR NO. 6:  No.  My kids have 'em.

23                        MR. HARTWIG:  Okay.  Most do; right?

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

1                        JUROR NO. 6:  Some they wish they didn't

2      have after a time period.

3                        MR. HARTWIG:  But you love your grandkids

4      and your kids and everybody who has them?

5                        JUROR NO. 6:  Oh, yeah.  Oh, absolutely.

6                        MR. HARTWIG:  Okay.  Do you think you would

7      feel comfortable sitting on this jury and deciding this case?

8                        JUROR NO. 6:  Yes.

9                        MR. HARTWIG:  Okay.  Do you want to be a

10     juror?

11                       JUROR NO. 6:  Yes.

12                       MR. HARTWIG:  Okay.  All right.

13                       JUROR NO. 6:  I think.

14                       MR. HARTWIG:  All right.  Thank you, ma'am.

15                       THE COURT:  All right.  Mr. Becker, pass

16     for cause?

17                       MR. BECKER:  Yes, pass for cause for this

18     jury, Your Honor.

19                       THE COURT:  Mr. Hartwig, pass for cause?

20                       MR. HARTWIG:  Pass for cause.

21                       THE COURT:  The second manner in which you

22     might be released from this jury is by a peremptory challenge.

23     Each side has a limited number of peremptory challenges.  They

124

1    can request that a juror be excused.  They don't have to give

2    the Court a reason.  It's their part of the jury selection

3    process.  Don't take offense if you're released by a

4    peremptory challenge.

5            Mr. Becker, does the state have a peremptory

6    challenge?

7                    MR. BECKER:  Yes.  We would thank and

8    excuse Mrs. Bordner.

9                    THE COURT:  Mrs. Bordner, thank you very

10   much.  You're excused.  Please call back in after 4:30

11   tomorrow for additional instructions.

12                    JUROR NO. 4:  Thank you.

13                    THE COURT:  Cheryl Falatic.  All right.

14   Miss Falatic, you heard all the questions I asked in general

15   and the questions from the state and defense counsel.

16   Anything that you think you have to respond to any particular

17   of those questions?

18                    JUROR NO. 4:  No.

19                    THE COURT:  And Mr. Becker and Mr. Hartwig

20   are going to be very short with the following up then.

21         Go ahead, Mr. Becker.

22                    MR. BECKER:  I have no questions, Your

23   Honor.

1           THE COURT:  Mr. Hartwig.

2           MR. HARTWIG:  Thank you, Your Honor.

3           THE COURT:  Your Honor -- Miss Falatic, is

4    it your daughter that works for Trumbull Family Court?

5           JUROR NO. 4:  Yes.

6           MR. HARTWIG:  And what does she do?

7           JUROR NO. 4:  She works in I think -- okay.

8    I think she works -- I think she works in the file room.  And,

9    and see, her husband, he is a probation officer.

10          MR. HARTWIG:  Okay.  Was there anything

11   that made you uncomfortable about the questions that

12   Mr. Becker and I asked the jury?

13          JUROR NO. 4:  No.

14          MR. HARTWIG:  Would you feel comfortable

15   sitting on this jury?

16          JUROR NO. 4:  I think so, yes.

17          MR. HARTWIG:  Okay.  Did you agree with

18   what we had indicated regarding burden of proof and all of

19   those things?

20          JUROR NO. 4:  Yes.

21          MR. HARTWIG:  Okay.  No further questions,

22   Your Honor.

23          THE COURT:  Pass for cause, Mr. Becker?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

126

1          MR. BECKER:  Yes, Your Honor.

2          THE COURT:  Mr. Hartwig?

3          MR. HARTWIG:  Pass for cause.

4          THE COURT:  Mr. Hartwig, does defense have

5    a peremptory challenge?

6          MR. HARTWIG:  We do, Your Honor.  We would

7    like to thank but excuse Juror Number 10.

8          THE COURT:  All right.  Mr. DiTommaso,

9    thank you very much.  You're excused.  Please call back in

10   tomorrow after 4:30 for additional instructions.

11        Megan Smith-Vincent.  Miss Smith-Vincent, you've

12   heard all the questions the Court asked and the state and

13   defense counsel?

14        Anything specific to answer to any of those

15   questions?

16          JUROR NO. 10:  No.

17          THE COURT:  Mr. Becker.

18          MR. BECKER:  Nothing, Your Honor.

19          THE COURT:  Mr. Hartwig?

20          MR. HARTWIG:  Just still good morning.

21   Okay?  So just briefly.  You've heard us talk about a variety

22   of topics; right?

23          JUROR NO. 10:  Yes, sir.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1              MR. HARTWIG:  Was there anything that you

2     had a strong opinion on one way or another?

3              JUROR NO. 10:  The only thing I was

4     thinking about was, I agree with her.  Some tattoos have

5     symbologies that have certain meanings why people would wear

6     them.

7              MR. HARTWIG:  Okay.  And is that just from

8     like your general life experience, or do you have any training

9     in that?

10             JUROR NO. 10:  I have no training, no, sir.

11    I have a sister that has went through court and jail and a

12    bunch of stuff and I've learned a lot of things.  When she

13    spoke, different groups with tattoos like could be gang

14    related or Nazi symbols.  I mean, if there were certain

15    tattoos that would have -- like I don't know how to word it

16    properly.

17             MR. HARTWIG:  Would -- well, you heard

18    Mr. Zatvarnicky indicate that in his experience as a trooper

19    sometimes it's true, sometimes it's not true, what people put

20    on their bodies?

21             JUROR NO. 10:  People do change,

22    absolutely.

23             MR. HARTWIG:  Or change, absolutely.  And

128

1  don't get it removed.  Would it influence you in some way if
2  you saw a witness with a particular tattoo or the defendant in
3  this case?

4              JUROR NO. 10:  Not personally.  I mean, I
5  have tattoos myself.  So, I mean, I like them.  So I wouldn't
6  hold anyone accountable for it.

7              MR. HARTWIG:  Would you be able to
8  disregard how somebody looks as far as judging their
9  credibility as a witness or whatever they're used for?

10             JUROR NO. 10:  I could.  I could -- do you
11 want to reword that question?  I'm sorry.

12             MR. HARTWIG:  Would the fact that a person
13 has tattoos that's involved in this case, whether it is a
14 witness or the defendant, would that influence how you judge
15 the evidence in this case?

16             JUROR NO. 10:  Negative.

17             MR. HARTWIG:  All right.  Meaning you could
18 be fair and impartial?

19             JUROR NO. 10:  Absolutely.

20             MR. HARTWIG:  And that would have nothing
21 to do with it?

22             JUROR NO. 10:  Yes, sir.

23             MR. HARTWIG:  All right.  And as far as our

1    concept of proof beyond a reasonable doubt and presumption of

2    innocence, that's okay with you?

3                JUROR NO. 10:  Yes.

4                MR. HARTWIG:  You understand it?

5                JUROR NO. 10:  Yes.

6                MR. HARTWIG:  You would follow the law?

7                JUROR NO. 10:  Yes.

8                MR. HARTWIG:  No further questions.  Thank

9    you.

10              THE COURT:  Mr. Becker, pass for cause?

11              MR. BECKER:  Yes, Your Honor, state would

12    pass for cause.

13              THE COURT:  Mr. Hartwig, for cause?

14              MR. HARTWIG:  Pass for cause.

15              THE COURT:  Mr. Becker, does the state have

16    a peremptory challenge?

17              MR. BECKER:  State would pass, Your Honor.

18              THE COURT:  All right.  Mr. Hartwig, does

19    the defense have a peremptory challenge?

20              MR. HARTWIG:  One moment, Your Honor.  Your

21    Honor, we would thank but excuse Juror Number 1.

22              THE COURT:  Miss Hollenbank, thank you very

23    much.  You're excused.  Please call back after 4:30 tomorrow

130

1   for additional instructions.

2          Larry Ayers.  Mr. Ayers, you've had a chance to

3   listen to all the questions of the Court and state counsel and

4   defense counsel.  Anything jump out at you that you think you

5   need to answer?

6                       JUROR NO. 1:  No, sir.

7                       THE COURT:  All right.  Mr. Becker.

8                       MR. BECKER:  No questions.  Thank you,

9   Mr. Ayers.

10                      THE COURT:  Mr. Hartwig.

11                      MR. HARTWIG:  No questions, Your Honor.

12                      THE COURT:  Very well.  Pass for cause,

13  Mr. Becker?

14                      MR. BECKER:  Yes, sir, Your Honor.

15                      THE COURT:  Pass for cause, Mr. Hartwig?

16                      MR. HARTWIG:  Pass, Your Honor.

17                      THE COURT:  All right.  Then we're back to

18  the state.  Does the state have another peremptory challenge,

19  Mr. Becker?

20                      MR. BECKER:  State would pass, Your Honor.

21                      THE COURT:  All right.  Mr. Hartwig, does

22  the defense have a peremptory?

23                      MR. HARTWIG:  Your Honor, we would thank

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  | but excuse Juror Number 9.

2  | THE COURT:  Mr. Zatvarnicky -- or no.

3  | That's 8.  Mr. Fuda, you're excused.  Thank you very much.

4  | Please call back in after 4:30 tomorrow for additional

5  | instructions.

6  | Mark Smolinsky.  Mr. Smolinsky.  You've heard all the

7  | questions of the Court --

8  | JUROR NO. 9:  Yes, I have.

9  | THE COURT:  -- and state's counsel and

10 | defense counsel.  Anything that jumps out at you that you

11 | think you have to answer?

12 | JUROR NO. 9:  The only thing that I have is

13 | I was the victim of a crime years ago.

14 | THE COURT:  All right.

15 | JUROR NO. 9:  And, to be honest, I think

16 | that might have some influence.

17 | THE COURT:  We need to get into that.  I

18 | appreciate you bringing that up to me.  Was anyone ever

19 | prosecuted for it?

20 | JUROR NO. 9:  No.

21 | THE COURT:  So, again, that would be one

22 | thing that, number one, you might hold it against the state

23 | for not prosecuting, but you also might hold it against the

132

1   defendant because he's the defendant?

2                   JUROR NO. 9:  Exactly.

3                   THE COURT:  You think that you couldn't set

4   that aside and listen to the evidence in this case?

5                   JUROR NO. 9:  I think I would have a hard

6   time.

7                   THE COURT:  All right.  Any questions,

8   Mr. Becker?

9                   MR. BECKER:  No, Your Honor.

10                  THE COURT:  Mr. Hartwig?

11                  MR. HARTWIG:  Just a few, Your Honor.  So

12  Mr. Smolinsky, when you say you think you would have a hard

13  time, do you think you would be more swayed in favor of the

14  prosecution or the defense?

15                  JUROR NO. 9:  The prosecution.

16                  MR. HARTWIG:  So you would -- in favor of

17  the prosecution?

18                  JUROR NO. 9:  Yes.

19                  MR. HARTWIG:  More likely to find against a

20  defendant just because of your personal experiences?

21                  JUROR NO. 9:  Yes.

22                  MR. HARTWIG:  So despite the instructions

23  of law, despite you trying to be fair and impartial, listening

133

1   to other jurors, you think you could not do it?

2              JUROR NO. 9:  I think I would have some

3   difficulty with it.

4              MR. HARTWIG:  Okay.  Have you served as a

5   juror before?

6              JUROR NO. 9:  No, I haven't.

7              MR. HARTWIG:  Okay.  And what was it about

8   the experience that bothered you so much?

9              JUROR NO. 9:  It kind of doesn't feel good

10  when a crime is committed against you and it's kind of hard to

11  forget about it.

12             MR. HARTWIG:  Sure.  Did you know anything

13  about the alleged perpetrator?

14             JUROR NO. 9:  No.

15             MR. HARTWIG:  All right.  So there wasn't

16  an identification?  Couldn't put the case together?

17             JUROR NO. 9:  No.  They never found any

18  information about any of it.

19             MR. HARTWIG:  Okay.  Did they try?

20             JUROR NO. 9:  Yes.

21             MR. HARTWIG:  All right.  So you don't

22  fault the police for not trying?

23             JUROR NO. 9:  No.

134

1            MR. HARTWIG:  You're just -- based on that

2    experience, it's a tough thing to live with?

3            JUROR NO. 9:  Yes.  It was a traumatic

4    experience.

5            MR. HARTWIG:  Thank you very much.

6            THE COURT:  Mr. Smolinsky, thank you very

7    much.  You're excused for cause.

8        Greg Robertshaw.  Mr. Robertshaw, again, you heard

9    the questions of the Court and the state and defense counsel.

10   Anything that jumps out at you that you think you have to

11   answer?

12           JUROR NO. 9:  No, sir.

13           THE COURT:  Mr. Becker, any questions?

14           MR. BECKER:  No, Your Honor.

15           THE COURT:  Mr. Hartwig, any questions?

16           MR. HARTWIG:  No questions, Your Honor.

17           THE COURT:  Mr. Becker, pass for cause?

18           MR. BECKER:  Yes, Your Honor.

19           THE COURT:  Mr. Hartwig, for cause?

20           MR. HARTWIG:  Yes.

21           THE COURT:  Does the state have a

22   peremptory challenge?

23           MR. BECKER:  State would pass, Your Honor.

1          THE COURT:  Mr. Hartwig, does the defense
2    have a peremptory challenge?
3          MR. HARTWIG:  One moment, Your Honor.  Your
4    Honor, we would thank and excuse Juror Number 1, Mr. Ayers.
5          THE COURT:  Mr. Ayers, thank you very much.
6    You're excused.  Please call back in after 4:30 tomorrow for
7    additional instructions.
8        Todd Jones.  Mr. Jones, you heard all the questions
9    of the Court and the state and defense counsel.  Anything that
10   jumps out at you that you think you need to answer?
11         JUROR NO. 1:  No.
12         THE COURT:  Mr. Becker, any questions?
13         MR. BECKER:  Yeah.  Just briefly.
14      Mr. Jones, I have a few questions for you.  You own
15   any firearms?
16         JUROR NO. 1:  Yes.
17         MR. BECKER:  What do you have?
18         JUROR NO. 1:  Couple of shotguns and a .380
19   pistol.
20         MR. BECKER:  Okay.  And I also see you have
21   some teen-age children, looks like twins?
22         JUROR NO. 1:  Yes.
23         MR. BECKER:  I hope I got that right.  And

136

1   a 16-year-old?  You were able to hear some of the questions

2   that I asked about, you know, kids and sometimes -- and

3   Mr. Hartwig as well -- about trying to sort through some

4   issues with your kids?

5                   JUROR NO. 1:  Yes.

6                   MR. BECKER:  You feel you can perform that

7   duty here as a juror in this case?

8                   JUROR NO. 1:  Yes.

9                   MR. BECKER:  All right.  Thank you very

10  much for your time, Mr. Jones.

11          Mr. Hartwig.

12                  MR. HARTWIG:  Thank you.  Mr. Jones, good

13  morning.  Now you heard us talk a little bit about tattoos and

14  that?

15                  JUROR NO. 1:  Yeah.

16                  MR. HARTWIG:  Right?  You work as a

17  laborer?

18                  JUROR NO. 1:  Yes.

19                  MR. HARTWIG:  You work with people with

20  tattoos?

21                  JUROR NO. 1:  Yes.

22                  MR. HARTWIG:  You know anything about the

23  supposed meanings of tattoos?

137

1          JUROR NO. 1:  Just basics.  I mean, you see

2    like the people were saying earlier.  I mean but --

3          MR. HARTWIG:  You wouldn't judge a witness

4    or the defendant if they had a tattoo?

5          JUROR NO. 1:  No, I have some myself.

6          MR. HARTWIG:  You have tattoos?

7          JUROR NO. 1:  Yes.

8          MR. HARTWIG:  Okay.  If you would learn

9    during the course of being a juror whether a witness or a

10   defendant had done something criminal in the past, would that

11   lead you to judge him differently based on future conduct or,

12   you know?

13         JUROR NO. 1:  No.

14         MR. HARTWIG:  So because somebody did

15   something before, are they more likely in your mind to have

16   done something again?

17         JUROR NO. 1:  No.  People change.  I mean,

18   people do stuff when they're kids and get in trouble and then

19   never get in trouble again.

20         MR. HARTWIG:  Okay.  So in this case, if

21   you were a juror, you could judge the defendant, for example,

22   based on just the evidence related to this particular case?

23         JUROR NO. 1:  Yes.

138

1            MR. HARTWIG:  Wouldn't have any problem

2    with that?

3            JUROR NO. 1:  No.

4            MR. HARTWIG:  Wouldn't be looking on the

5    outside?

6            JUROR NO. 1:  No.

7            MR. HARTWIG:  Anything else that we talked

8    about that you would have jumped in and said, hey, I feel

9    strongly about this or that?

10           JUROR NO. 1:  No.

11           MR. HARTWIG:  Would you like to be a juror

12   on this case if you had to choose?

13           JUROR NO. 1:  Yeah.

14           MR. HARTWIG:  Okay.  Thank you.

15           THE COURT:  Mr. Becker, pass for cause?

16           MR. BECKER:  Pass for cause, Your Honor.

17           THE COURT:  Mr. Hartwig, pass for cause?

18           MR. HARTWIG:  Pass for cause, Your Honor.

19           THE COURT:  All right.  Let's see.  Scott

20   Hardval and Darlene Frantz, if you you'll come forward.

21           And at this time Mr. Hardval will be Alternate Number

22   1 and Ms. Frantz Alternate Number 2.  This is a criminal

23   trial.  In order to have a verdict, we must have a unanimous

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    verdict of 12; can't be 11, can't be 10.  So every trial

2    that's going to take more than part of a day we need to have

3    alternates in case some illness or injury befalls one of the

4    other jurors.  We rely on our alternates on a regular basis.

5    So your duty is the same as the other jurors; to listen to all

6    of the evidence and be ready and willing, if called upon, to

7    step in as a relief type of operation here.

8            You've heard all the questions that the Court has

9    asked throughout this process and the state and the defendant.

10   Anything that you think has to be added or responded to?

11   Mr. Hardval first.

12                    ALTERNATE NUMBER 1:  No, sir.

13                    THE COURT:  Miss Frantz, anything?

14                    ALTERNATE NO. 2:  The only thing that

15   bothered me was when the defendant asked, you know, would I

16   have a problem if they didn't call any witnesses.

17                    THE COURT:  Again, the fact is the state

18   has the burden of proving the case.

19                    ALTERNATE NO. 2:  Right.

20                    THE COURT:  The defense does not have a

21   burden.  So if the state doesn't make their burden, the

22   defense doesn't have to.  That doesn't mean they won't call

23   witnesses.  That means they're not obligated to.

140

1               JUROR NO. 2:  Okay.

2               THE COURT:  Do you understand that?  All

3     right.  Very well.  Any other questions?

4               ALTERNATE NO. 2:  No.

5               THE COURT:  Mr. Becker, you may inquire.

6               MR. BECKER:  Okay.  Let's start with the

7     easy one first.  Mr. Hardval, I see your son is an attorney?

8               ALTERNATE NO. 1:  Yes, sir.

9               MR. BECKER:  Where at?

10              ALTERNATE NO. 1:  Pendleton, Oregon.

11              MR. BECKER:  Oregon.  That's what I

12    thought.  Okay.  Do you know what kind of law he practices?

13              ALTERNATE NO. 1:  General practice.

14    Whatever comes through his door.

15              MR. BECKER:  I hear ya.

16         And, Miss Frantz, you brought up -- and I just want

17    to be sure we're clear on this.  They don't have to present

18    one witness.  They may get up at the end of this case on

19    Friday and I may do such a terrible job and the witnesses may

20    be so awful and the evidence so lacking that they say, "Hey,

21    you know what, we got this in the bag.  Forget about it."  And

22    you 12 jurors, if you're an alternate and you somehow get on

23    there, you may say, "Boy, that Becker and their case is awful.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    They stink."  And you might render a verdict in 10 or

2    15 minutes.  So there is a lot of reasons they may not even

3    present evidence or testimony.  So you wouldn't hold that

4    against them if they didn't; correct?

5                 ALTERNATE NO. 2:  No.

6                 MR. BECKER:  Okay.  I just wanted to be

7    clear because you had mentioned that.  So you feel you could

8    be a fair and impartial juror in this case; correct?

9                 ALTERNATE NO. 2:  Yes.

10               MR. BECKER:  And I hate to tell you this,

11    but I'm gonna tell you this anyway for both of you.  The

12    reasons we put the alternates so close to the witnesses and so

13    close to the action is because there's obviously a chance you

14    won't serve on this jury and you won't get to deliberate.  But

15    I think the Court and probably the attorneys will speak, it's

16    been more often than not, particularly in cases such as this

17    where there's high stakes, a homicide and death involved,

18    where something -- and I hope it doesn't happen to one of our

19    regular jurors -- but sometimes something happens where they

20    might have a sick child or spouse or something at home or they

21    may themselves get sick.  I know we are in terrible flu season

22    now.  So that's why we put you folks here.  So it can be

23    disappointing in the fact that you may get all the way through

1   the trial and not get to serve and deliberate.  But it's just

2   as important that you folks pay attention, knowing that

3   there's that possibility you might not be able to get in and

4   go in the jury room to deliberate.  Both of you are up for

5   that task?

6                    ALTERNATE NO. 1:  Yes.

7                    ALTERNATE NO. 2:  Yes.

8                    MR. BECKER:  Thank you very much for your

9   time and your service.

10                   THE COURT:  Mr. Hartwig.

11                   MR. HARTWIG:  Thank you, Your Honor.

12        Good afternoon.  Mr. Hardval?

13                   ALTERNATE NO. 1:  Yes, sir.

14                   MR. HARTWIG:  Does your son do any criminal

15  defense work?

16                   ALTERNATE NO. 1:  What's that?

17                   MR. HARTWIG:  Does your son do any criminal

18  defense work?

19                   ALTERNATE NO. 1:  No.  He's been practicing

20  for two years.

21                   MR. HARTWIG:  Okay.  All right.  I saw you

22  were -- you or your family member were the victim of a home

23  robbery?

143

1                    ALTERNATE NO. 1:  Yes.

2                    MR. HARTWIG:  How long ago was that?

3                    ALTERNATE NO. 1:  33 years.  Actually

4      married one year, so I know.

5                    MR. HARTWIG:  Do you have feelings about

6      that one way or another?

7                    ALTERNATE NO. 1:  I wish I could have got

8      my stuff back.  That's it.

9                    MR. HARTWIG:  Was it prosecuted?

10                   ALTERNATE NO. 1:  No.

11                   MR. HARTWIG:  Never found the guy?

12                   ALTERNATE NO. 1:  No.

13                   MR. HARTWIG:  Miss Frantz, likewise, you

14     were the victim of a home robbery?

15                   ALTERNATE NO. 2:  Yes.

16                   MR. HARTWIG:  You personally?

17                   ALTERNATE NO. 2:  Yes.

18                   MR. HARTWIG:  Yes?  How long ago was that?

19                   ALTERNATE NO. 2:  Oh, geez, 30 some years

20     ago.

21                   MR. HARTWIG:  Okay.  And was it the same

22     experience or did they catch that guy or girl?

23                   ALTERNATE NO. 2:  They found out who it

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

144

1   was.

2                   MR. HARTWIG:  All right.  And did the

3   prosecution go forward?

4                   ALTERNATE NO. 2:  No.

5                   MR. HARTWIG:  All right.  Do you have

6   feelings about that then?

7                   ALTERNATE NO. 2:  No.

8                   MR. HARTWIG:  You're not frustrated --

9                   ALTERNATE NO. 2:  No.

10                  MR. HARTWIG:  -- with the police or with --

11  like we had another potential juror that said, "Hey, I can't

12  be fair and impartial because of that.  I just have a bad

13  experience."

14                  ALTERNATE NO. 2:  No.

15                  MR. HARTWIG:  You could be fair and

16  impartial in the case?

17                  ALTERNATE NO. 2:  Yes.

18                  MR. HARTWIG:  Okay.  You know, I respect

19  Mr. Becker as a prosecutor.  He is an excellent lawyer.  I

20  also respect Lebron James.  Okay?  Sometimes Lebron James

21  doesn't do everything he can; right?  Doesn't hustle.  Maybe

22  misses foul shots.  Commits unnecessary fouls.  And they may

23  lose a game.  Doesn't mean I don't respect him anymore.

1  Likewise, the state of Ohio is not infallible.  Just because

2  they bring a case, like an indictment, doesn't mean that

3  everybody is guilty.  Do you agree with that?

4              ALTERNATE NO. 2:  Yes.

5              MR. HARTWIG:  That they have the highest

6  burden and that must be maintained for all of us.

7              ALTERNATE NO. 2:  Yes.

8              MR. HARTWIG:  And you're okay with that?

9              ALTERNATE NO. 2:  Yes.

10             MR. HARTWIG:  Thank you.

11             THE COURT:  Mr. Becker, pass for cause?

12             MR. BECKER:  Yes, Your Honor, we would pass

13  for cause.

14             MR. HARTWIG:  Pass for cause.

15             THE COURT:  Mr. Becker, peremptory as to

16  the alternates?

17             MR. BECKER:  State would pass.

18             THE COURT:  Mr. Hartwig?

19             MR. HARTWIG:  Likewise.  We'll pass.

20             THE COURT:  Parties are satisfied with the

21  jury and alternates.  The remaining prospective jurors, it

22  will not be necessary for you to serve in this case.  You can

23  see by the nature of the selection process, it's obviously

1    necessary that we have a lot more jurors than less when we

2    start.  Your service will not be required in this case.  You

3    are excused, with directions to call back in after -- tomorrow

4    after 4:30 for additional instructions.  Thank you very much.

5    You're excused.

6              Now, members of the jury, we swore you in before we

7    asked you any questions.  Now it's necessary to swear you in

8    as the official jury in this case.  If you'll please stand and

9    raise your right hand.

10             Do you swear or affirm that you will diligently

11   inquire into and carefully deliberate all matters between the

12   State of Ohio and the defendant Austin Taylor Burke?  Please

13   answer, "I will."

14                       ALL JURORS:  I will.

15                       THE COURT:  Do you swear or affirm you will

16   do this to the best of your skill and understanding, without

17   bias or prejudice, so help you god?  Please answer, "I will."

18                       ALL JURORS:  I will.

19                       THE COURT:  You may be seated.

20             Now, we are going to do a jury view that's scheduled

21   this afternoon so I'm going to give you some preliminary

22   instructions before we go to lunch and then we'll go to lunch

23   and then we'll do the jury view.  That will have to be how we

147

1   have it set up.

2          Now, it is important that you be fair and attentive

3   throughout the trial.  Do not discuss this case among

4   yourselves, nor with anyone else.  Do not permit anyone to

5   discuss it with you or in your presence.  Do not form or

6   express an opinion in this case until it is finally submitted

7   to you.

8          You will receive the opening statements, the

9   evidence, the arguments, and the law in that order.  It would

10  be unfair to discuss this case among yourselves before you

11  have everything necessary for your decision.  You must explain

12  this rule prohibiting discussion of this case with your family

13  and friends.  When trial is over, you will then be released

14  from this instruction and at that time you may, but are not

15  required, to discuss this case and your experiences as a

16  juror.  Until that moment, you must control your natural

17  desire to discuss this case both here and at home.

18         Now, the Court instructs you not to converse with the

19  attorneys, parties, or witnesses during the trial.  Likewise,

20  the other participants in the trial must not converse with

21  you.  If anyone should attempt to discuss this case with you,

22  report that incident immediately to the Court by reporting it

23  to my bailiff.

1          You may not investigate or attempt to obtain

2     additional information about this case outside of the

3     courtroom.  Now, there's been a new twist in this.  Everyone

4     has a smart phone now.  You have the whole world at your

5     fingertips.  We've had mistrials throughout the state because

6     people go on just to get a definition or a description.  You

7     are not allowed to do that.  Stay away from social media.

8     Stay away from your smart phones.  Do not try to investigate

9     anything about this case.  All the evidence must come from the

10    witness stand.

11         All right.  Now, the procedure for trial is

12    controlled by statute.  First, counsel for the state, the

13    prosecutor, outlines what he expects his evidence will be.

14    Then counsel for the defendant may state what their evidence

15    will be.  These opening statements are not evidence.  They are

16    a preview of the claims of each party designed to help you

17    follow the evidence and understand the case as it is

18    presented.

19         In the presentation of the evidence, the state

20    proceeds first; thereafter, the defendant may offer evidence;

21    and the state may offer rebuttal evidence.  The trial itself

22    concludes with the arguments of counsel and instructions of

23    law by the Court and thereafter you will deliberate upon your

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    verdict.

2          Now, before we hear the opening statements of counsel

3    and begin to take evidence, I believe it would be helpful if

4    you were to have some preliminary instructions to follow in

5    listening to and considering the evidence which you will hear

6    in this case.  Later, after you've heard all of the evidence

7    and closing arguments of counsel, I will give you further

8    instructions covering additional law which you are required to

9    follow in this case.  It is the duty of the Judge to instruct

10   you on the law, and it is your duty to follow the law as I

11   give it to you both now and at the conclusion of the evidence.

12         First of all, it is your exclusive duty to decide all

13   questions of fact submitted to you.  In connection with this

14   duty, you must determine the effect and value of the evidence.

15   You must not be influenced in your decision by sympathy,

16   prejudice or passion toward any party, witness, or attorney in

17   this case.

18         Now, if in these instructions or in the instructions

19   I will give you at the conclusion of the evidence any

20   principle or idea is repeated or stated in varying ways, no

21   emphasis thereon is intended and none is to be inferred by

22   you.  Therefore, you must not single out any particular

23   sentence or individual point or instruction and ignore the

1   others; but, rather, you are to consider all of the

2   instructions as a whole and consider each instruction in

3   relation to the other instructions.

4           Now, the fact that I give you some of the

5   instructions now and some at the conclusion of the evidence

6   has no significance as to their relatives importance, nor does

7   the order in which I give the instructions.

8           Now, the attorneys for the parties will, of course,

9   have active roles in the trial.  They will make opening

10  statements to you, question witnesses, make objections, and

11  finally will argue the case as the last step before you hear

12  my final instructions and commence your deliberations.

13          Now remember, the attorneys are not witnesses.  And

14  since it is your duty to decide this case solely on the

15  evidence which you see and hear in this case, you must not

16  consider as evidence any statement made by any attorney during

17  the trial.  There is, of course, an exception.  And that is if

18  the attorneys agree upon a fact.  Such agreement, stipulation,

19  or admission of fact would be brought to your attention and

20  you may then regard that fact as being conclusively proved

21  without the necessity of further evidence as to that fact.

22          Now, if a question is asked and an objection to that

23  question is sustained, you will then not hear the answer and

you must not speculate as to what the answer might have been
or the reason for the objection.  If an answer is given to a
question and the Court then grants a motion to strike the
answer, you are to completely disregard such question and
answer and not consider them for any purpose.  A question, in
and of itself, is not evidence and may be considered by you
only as it supplies meaning to the answer.

Now, any fact in this case may be proven by either
direct or circumstantial evidence.  Direct evidence means
exactly what that name implies.  That is, evidence which
directly proves a fact without having to infer that fact from
some other fact.  Direct evidence is usually the testimony
given by a witness who has seen or heard the facts to which he
or she testifies, and it includes the exhibits admitted into
evidence during the trial.

Now, circumstantial evidence, on the other hand, is
proof by facts -- proof of facts by direct evidence from which
you may infer a fact in question.  The law makes no
distinction between direct and circumstantial evidence as to
the degree of proof required, and facts may be proven by
either type of evidence or a combination of them.  Each is
accepted as a reasonable method of proof, and each is
respected for such convincing force as it may carry.

1          Now, as jurors, you have the sole and exclusive duty

2     to decide the credibility of the witnesses who will testify in

3     this case, which simply means that it is you who must decide

4     whether to believe or disbelieve a particular witness and how

5     much weight, if any, to give to the testimony of each witness.

6          In determining these questions, you will apply the

7     tests of truthfulness which you apply in your daily lives.

8     These tests include the appearance of each witness on the

9     stand; his or her manner of testifying; the reasonableness of

10    the testimony; the opportunity that witness had to see, hear,

11    or know the things concerning which he or she testified;

12    accuracy of memory; frankness or lack of it; intelligence;

13    interest and bias, if any; together with all the facts and

14    circumstances surrounding the testimony.  Applying these

15    tests, you will apply to the testimony of each witness such

16    weight as you deem proper.  You are not required to believe

17    the testimony of any witness simply because he or she is under

18    oath.  You may believe or disbelieve all or any part of the

19    testimony of any witness.  You should not decide any issue of

20    fact merely on the basis of the number of witnesses who

21    testify on each side of an issue.  Rather, the final test in

22    judging evidence would be the force and weight of the

23    evidence, regardless of the number of witnesses.  The

1    testimony of one witness, if believed by you, is sufficient to
2    prove any fact.

3          Also, discrepancies in a witness's testimony, or
4    between that testimony and others, does not necessarily mean
5    you should disbelieve the witness, as people commonly forget
6    facts or recollect them erroneously after the passage of time.
7    You are all certainly aware of the fact that two persons who
8    witnessed the same incident may often see or hear it
9    differently.  In considering a discrepancy in a witness's
10   testimony, you should consider whether the discrepancy
11   concerns an important fact or a trivial one.

12         Now, if you conclude that a witness has willfully
13   lied in his or her testimony as to a material fact, you may
14   then distrust all of that witness's testimony, and you would
15   have the right to reject all of that witness's testimony
16   unless from all of the evidence you believe that the
17   probability of truth favors that testimony in other
18   particulars.

19         Now, this concludes my preliminary instructions.
20   Again, I may instruct you during the trial and you will
21   receive final instructions prior to your deliberations.

22         Now, the next matter on the agenda is a jury view.
23   You will be taken to various locations involved in this case.

154

1   You will remain together under the supervision of my bailiff

2   until you return to the courtroom.  Counsel may accompany you,

3   but they may not discuss this case or demonstrate anything

4   relating to it.  The bailiff may call your attention to

5   certain areas or objects previously requested by counsel.

6           Now, what you observe at the scene is not evidence.

7   The conditions may have changed since the time of the events

8   in this case.  The evidence as to the physical appearance of

9   the scene must come from the witness stand.  The sole purpose

10  of this view is to help you understand the evidence as it is

11  presented during the trial.

12          Now, we're going to release you to lunch now.  It's

13  almost 12:30 so we'll release you until 1:30.  I'm going to

14  have you come back to the petit jury room at that time.  I see

15  no reason to reconvene in court unless counsel requests that,

16  but I don't hear anything from Mr. Becker or Mr. Hartwig.

17  Report down to the petit jury room.  My bailiff will, at that

18  point in time, get you organized and take you on a jury view.

19  When you've completed that, you'll come back to the court and

20  we'll continue with the case.

21          Have a pleasant lunch.  Back at 1:30 in the jury

22  room.

23                  (Whereupon, the jury was excused for its

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

155

1    luncheon recess at 12:31 p.m.)

2                    (Whereupon, the following proceedings

3    occurred in open court, out of the presence of the jury, at

4    12:32 p.m.)

5                    THE COURT:  Back on the record.

6    Mr. Hartwig and Mr. Olson, it's my understanding you're going

7    to waive your client to go on the jury view?

8                    MR. HARTWIG:  That is correct, Your Honor.

9                    THE COURT:  All right.  And again, I'll

10   indicate to the jury when they come back that that was, you

11   know, your intention to do that; that he wasn't trying to

12   disregard or insult his presence.  But that's your intention.

13   So we will not bring him back over, then, until the jury

14   returns from the jury view then.

15                   MR. OLSON:  Yes, Your Honor.

16                   THE COURT:  Keep him over there until we

17   get a hold of you.

18                   (Whereupon, a luncheon recess was had

19   commencing at 12:33 p.m.)

20                   (Whereupon, the jury was excused to view

21   multiple scenes, commencing at 1:40 p.m. and concluding at

22   4:56 p.m.)

23                   (Whereupon, the following proceedings

156

1   occurred in open court at 4:56 p.m.)

2                   THE COURT:  That will obviously conclude

3   today's presentations.  Tomorrow I have some matters I have to

4   deal with in the morning, so we will not start until 1:00.  I

5   ask you to report to the petit jury room prior to 1:00.  We'll

6   try to get you right up and start moving at that point in

7   time.

8               From now on until the end of the trial at any time I

9   advise you that we're going to take a break, take your break

10  and then go back down to the petit jury room so that you're

11  not interacting with any of the witnesses or parties that

12  might be up on the third floor here.

13              Now, the news media was in here today.  There may be

14  some things on TV.  There may be things in the paper.  There

15  may be things on the internet.  Again, avoid all news, because

16  we're only limited to what's going to come from the witness

17  stand here.  So don't watch the news and don't read the paper

18  regarding anything that has to do with this trial.

19              So I admonish you now, and I will every time, do not

20  discuss this case among yourselves, nor with anyone else.  Do

21  not form or express an opinion.  Have a pleasant day.  I will

22  see you tomorrow.

23                  (Whereupon, the jury was excused at 4:57

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

157

1   p.m.)

2                       (Whereupon, the following proceedings

3   occurred out of the presence of the jury.)

4                       THE COURT:  Mr. Olson, for purposes of the

5   record, it was my understanding as we proceeded that you had

6   waived the necessity of your client being present just for the

7   release of the jury today?

8                       MR. OLSON:  That is correct, Your Honor.

9                       THE COURT:  We did not bring him over, but

10  he'll be over tomorrow morning when we start again.

11          Anything further we need to deal with today,

12  Mr. Olson?

13                      MR. OLSON:  Nothing further, Your Honor.

14                      THE COURT:  Mr. Becker, anything?

15                      MR. BECKER:  Just, Your Honor, there was a

16  disc that I forgot to get a copy to Mr. Olson.  I will have

17  that here.  It's a security video from one of the locations

18  near the bike path.  I don't think there's anything

19  significant on it, but we do have that.  I will get that to

20  him.  We just got him a fresh copy of what I believe the

21  up-to-the-minute notes of Detective Greaver.  And earlier

22  today I provided defense counsel, it was a cell phone mapping,

23  but it was a changed mapping because we extracted -- all the

158

1    calls were basically layered on top of each other.  So we've

2    extracted them out one by one so now they're about 80 to 100

3    pages.  So I think with that said we have everything done and

4    we'll see you at 1:00.

5                        THE COURT:  1:00 for opening statements.

6                        MR. OLSON:  Thank you.

7                        MR. BECKER:  Thank you.  Your Honor.

8                        (Whereupon, court was adjourned to Tuesday,

9    March 6, 2018.)

10                       (Note:  For further proceedings in this

11   matter, please refer to Volume II.)

12                                * * *

13

14

15

16

17

18

19

20

21

22

23

                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1               IN THE COURT OF COMMON PLEAS

2                TRUMBULL COUNTY, OHIO

3

4   State of Ohio,           : CASE NO:  2017-CR-403

5      Plaintiff,         :

6                          :

7   -vs-                 : <u>TRANSCRIPT OF PROCEEDINGS</u>

8   Austin Taylor Burke,     :

9      Defendant.         :   VOLUME II - JURY TRIAL

10

11

12        Be it remembered, that at the Jury Trial of the

13  above-entitled cause, in the Court of Common Pleas, Trumbull

14  County, Ohio, beginning on the 5th day of March, 2018, and

15  continuing thereafter, as hereinafter noted, before the

16  Honorable Andrew D. Logan, the following proceedings were had:

17

18

19

20

21

22

23  Official Court Reporter:  Lori J. Rittwage

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

159

1                          A P P E A R A N C E S:

2

3

     On behalf of the State of Ohio:

4

5          Atty. Christopher D. Becker
           Trumbull County Prosecutor's Office
           160 High Street
6          Warren, OH  44481
           Phone:  (330) 675-2426
7          Email:  psbecker@trumbull.co.oh.us

8

9

10   On behalf of the Defendant:

11         Atty. Bradley G. Olson
           Dimeo Olson Law Group, LLC
12         28 North Mill Street
           New Castle, PA  16101
13         Phone:  (330) 318-3453
           Email:  brad_olson_jr@yahoo.com

14

15         Mr. Edward Hartwig
           120 Marwood Circle
           PO Box 3965
16         Boardman, OH 44513
           Phone:   (330) 718-9499

17

18

19

20

21

22

23

                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

160

<u>**I N D E X**</u>

<u>**O P E N I N G   S T A T E M E N T S**</u>

|                | <u>Page</u> | <u>Line</u> |
|----------------|------|------|
| Mr. Becker     | 160  | 13   |
| Mr. Olson      | 184  | 10   |

<u>**E X A M I N A T I O N S**</u>

| <u>WITNESS</u> | <u>Page</u> | <u>Line</u> |
|----------------|------|------|
| **JOSHUA C. WHITE** | | |
| Direct Examination By Mr. Becker | 191 | 13 |
| Cross Examination By Mr. Hartwig | 199 | 2 |
| Redirect Examination By Mr. Becker | 206 | 6 |
| Recross Examination By Mr. Hartwig | 208 | 3 |
| **MEREDITH LOGES** | | |
| Direct Examination By Mr. Becker | 209 | 15 |
| Cross Examination By Mr. Olson | 224 | 19 |
| **BRITTANI MERTEN** | | |
| Direct Examination By Mr. Becker | 231 | 15 |
| Cross Examination By Mr. Olson | 243 | 9 |
| **NATHAN MOATS** | | |
| Direct Examination By Mr. Becker | 247 | 14 |
| Cross Examination By Mr. Hartwig | 255 | 13 |
| **RICKEY JOHN THOMAS ROUPE** | | |
| Direct Examination By Mr. Becker | 266 | 5 |
| Cross Examination By Mr. Hartwig | 276 | 4 |
| Redirect Examination By Mr. Becker | 285 | 10 |
| Recross Examination By Mr. Hartwig | 288 | 5 |
| **DEIDRE KEENER** | | |
| Direct Examination By Mr. Becker | 290 | 6 |
| Cross Examination By Mr. Olson | 305 | 12 |

<u>**E X H I B I T S**</u>

| <u>Exhibit</u> | <u>Description</u> | <u>Page</u> | <u>Line</u> |
|----------------|------|------|------|
| State's Exhibit Nos. 43-46 | Photos | 195 | 8 |
| State's Exhibit No. 1 | Gun | 215 | 2 |
| State's Exhibit 11 | Photo | 217 | 7 |
| State's Exhibit 13 | Photo | 218 | 3 |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

161

1   State's Exhibit 13A          Photo            218    12
    State's Exhibit 12           Video            223     2
2   State's Exhibit 24           Photos           298    20
    State's Exhibit No. 52       Screenshot       303    18
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

162

1          **MARCH 6, 2018**

2                    THE COURT:  Good afternoon, Ladies and

3      Gentlemen.  We continue with the case today.  You saw the jury

4      view and you had my initial instructions yesterday.  Now it's

5      the opportunity for opening statements of counsel.

6                    Opening statements are a concise and orderly

7      description of each side's claims and defenses and the

8      evidence counsel expect to produce to support those claims or

9      defenses.  Each side will address you once during opening

10     statements.  The state will address you first.

11                   Mr. Becker, you may proceed.

12                   MR. BECKER:  Thank you, Your Honor.

13                   <u>OPENING STATEMENT</u>

14                   MR. BECKER:  May it please the Court,

15     Mr. Olson, Mr. Hartwig, the defendant in this case, and most

16     importantly, thank you Ladies and Gentlemen of this Jury.  I

17     want to thank you, first of all, for your time, your patience

18     and your service to this community.  As I indicated to you

19     yesterday, probably short of serving in the military there is

20     no greater service that you can provide this community than

21     serving as a juror on jury duty.  You can see the process that

22     we went through to get just you 12 jurors.  It took about a

23     half a day.  Sometimes it takes even longer.  And both parties

                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1  ask you to do your job diligently, and I'm sure you Ladies and

2  Gentlemen will do that and pay attention and really put your

3  efforts into this case.

4  So when we went through that process yesterday, one

5  of the things that I mentioned and will be in the jury

6  instructions is reasonable doubt.  And as you can pretty well

7  clearly see from the questioning from both sides, we just want

8  jurors who use their reason and common sense.  The same kind

9  of reason and common sense that you would use in your daily

10  lives.  Because reasonable doubt is just that.  It's a doubt

11  based on reason and common sense.  That's why I went through

12  the examples about buying a house.  And I know Mr. Stimpert, I

13  used the example of being married with the wedding ring and

14  those kind of examples to see what you folks would look for in

15  a particular case.  You're going to use the same tools,

16  though, and the Court is going to tell you you're going to use

17  the same tools that you use in your daily lives.  Whether it

18  is a dispute at work or a dispute between your children and

19  siblings.  Just like you do in your daily lives.  And just

20  like buying a car or buying a home or dealing with coworkers

21  or dealing with your children, you're going to use those same

22  skills here in the courtroom and when you go back to

23  deliberate in this case.

164

1          So let's get to the heart of this case.  Let's talk

2     about why we're here in March of 2018.  On June 11th in the

3     late evening hours or leading into the early morning hours of

4     June 12, 2017, 22-year-old Kenneth Brandon Hayes Sample -- who

5     went by the name of Brandon -- was in Warren with some friends

6     of his.  You will hear testimony from an individual named Josh

7     White.  Josh will tell you he had known Brandon since they

8     were probably 11 or 12 years old.  They were very good

9     friends.  Josh and Brandon, in the evening of June 11th, about

10    6, 7, 8:00 at night, mowed Brandon's grandmother's yard and

11    then they went swimming at a friend's home.

12          Josh White, at the time, did not drive.  He didn't

13    have a car.  And he was living over on the east side of Akron

14    in the Ellet area.  I don't know if anyone is familiar with

15    that area of Akron, but it's this side of Akron.  Brandon

16    drove Josh White home to Akron in the late hours of June 11th

17    or early morning of June 12th.  Brandon and Josh told --

18    Brandon told Josh, rather, that he was gonna hang out with

19    Austin, and Austin was gonna give him a thousand dollars.

20          Now, in statements to Detective Greaver, this

21    gentleman seated here beside me, the lead detective in this

22    case, this defendant stated he was with Brandon and the kid

23    from Akron on the evening of June 11, 2017.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

165

1          Josh White will say he was not with Austin.  He was

2     not with him and they were not there.  Now, Josh White will

3     testify that he never saw Brandon -- or I'm sorry, the

4     defendant in this case -- on that evening.  Never saw him.

5     Wasn't with him.

6          Now, before we get into a lot of things, I want you

7     to understand that there was a search warrant later on about a

8     week after this time period when this defendant was arrested

9     and his cell phone was searched.  Police got a search warrant.

10    They searched it and found the contents.  There is a crime lab

11    in the state of Ohio called the Bureau of Criminal

12    Investigation.  You will hear that referred to a lot in this

13    case as BCI, but it's the Bureau of Criminal Investigation.

14    And they have all kinds of experts.  They have fingerprint

15    experts, they have firearms experts, and they have computer

16    experts.  And people that analyze phones go into the phones,

17    look what's in there, get the contents and give copies.

18         Well, a search of this defendant's cell phone found

19    that he had received a message from Brandon Sample.  And it's

20    listed on his cell phone as "B Samps."  And it was stated that

21    Brandon had to take J White back to Akron in a bit, but do you

22    still want to link up when I get back?  And the defendant

23    responded he would be on the west side of Warren.

1          Now, I'll tell you a little bit about those text

2    messages in a minute, but they were located by the forensic

3    expert by the name of JoAnn Gibb from BCI when she opened that

4    phone and made copies of it.

5          Those text messages about this defendant meeting

6    B Samps, or Brandon Sample -- and the numbers show up so the

7    phone numbers are Brandon Sample's and this defendant's phone

8    number -- were deleted from the phone.  However, JoAnn Gibb,

9    because she can do this, was able to pull those deleted text

10   messages off the defendant's phone.  And she will testify in a

11   couple days, probably tomorrow in this case, as to how she did

12   that.  And you'll have copies of those text messages,

13   including the deleted text messages.

14         So on June 12, 2017 at about 12:15 a.m., Brandon

15   dropped off his friend Josh White in Akron, and Brandon,

16   whether -- or, I'm sorry, Josh will take the witness stand and

17   tell you it's about 12:15.  It was a Sunday night.  He had to

18   work the next day.  He was working, I believe, at a heating

19   and air conditioning place in Akron, Ohio.

20         The defendant, also on his cell phone, there was a

21   text from a girl named Brittani Merten.  Brittani Merten will

22   come into this courtroom and testify.  And there will be

23   copies of the messages from this defendant and Brittani

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Merten.  This defendant was on his phone at 12:08 in the

2    morning on June 12th and he stated that he was "out in Niles"

3    with a W.  He mistyped it, misprinted it, whatever.  But

4    Niles.

5            This is actually on June 12th.  I'm sorry.  I have

6    the wrong date here.  This should be June 12th.  Around 3 to 4

7    a.m. on June 12th the defendant was with Brandon Sample in

8    Brandon Sample's white Chevy Malibu.  That Chevy Malibu was at

9    713 Mason Street which if you recall was our last stop on our

10   quite lengthy jury view yesterday.  It was the house we went

11   to after we went to the bathroom and to the bike trail.

12           Nathan Moats, Deidre Keener and Jessica Simms and

13   Hayle Roupe were at 713 Mason Street in Niles and saw this

14   defendant with Brandon Sample and that white Chevy Malibu

15   about 3 to 4 a.m.

16           The defendant was with Brandon, as I said.  He had a

17   Chevy Malibu.  And out of the presence and out of the hearing

18   of Brandon, he told these people in the house that he was

19   going to rob Brandon.  Now this is at 713 Mason Street.

20           We also have another expert coming from BCI named

21   Bill Moskal.  Bill Moskal took the phone records from this

22   defendant's cell phone.  And when your cell phone is in use

23   it's constantly making use with cell phone towers and giving a

168

longitude and latitude about where this handset it.  Where it
is.

     The defendant's cell phone was using towers to make
calls in the area of 713 Mason Street in the morning of June
12th at approximately 3 to 4 a.m. And you will have a map that
Bill Moskal -- basically all he does is he takes the longitude
and latitude from the times and puts them on a map.  And
you'll see the map that Mr. Moskal put together.

     Those cell phone tower records will show this
defendant's phone usage was using cell phone towers in Niles
on June 12, 2017 from about 2:08 a.m. through 3:07 a.m.  And,
again, Deidre Keener, Hayle Roupe, Jessica Simms, Nathan Moats
will all confirm that he was at 713 Mason Street with Brandon
Sample and Brandon Sample's white Chevy Malibu.

     This defendant gave two statements to Detective John
Greaver when he was questioned after he came up as a suspect.
This defendant told this detective "I was home in
Bristolville, Ohio all night on June 12th, early morning hours
of June 12th."  And you'll actually hear a recorded
conversation with this detective.

     The cell phone towers that Bill Moskal -- or the cell
phone records that Bill Moskal mapped and put on a map he did
page by page by page.  And you will see that at 3:46 a.m. on

169

1    June 12th the defendant's cell phone records will show him

2    using towers in the Warren, Ohio, area.

3            At approximately 4:40 a.m. on June 12th, 2017,

4    Brandon Sample sent a text message.  And you will have his

5    cell phone records that he sent a message to his father Ken

6    Sample who will testify probably tomorrow morning.  Ken will

7    say he stated to his son, "Hey, when are you coming home?"

8    And Brandon said, "I'm on my way home now."  That's the last

9    time anyone heard from Brandon Sample's cell phone ever.

10           Ken Sample will testify then that he made numerous

11   calls to his son that went directly to voicemail after 4:40

12   a.m. on June 12th.

13           Cell phone tower records, again, will show -- and

14   Bill Moskal will have a map -- that this defendant's phone was

15   used very close to where Brandon Sample's body was found which

16   was that location we went to out in the mud.  And god bless

17   you folks who got off the bus because I didn't get out of the

18   car.  But in that area which is known as Hatchet Man Road,

19   that's where his body was found.  And the records will show

20   that even though the defendant lives up there in Bristolville

21   that at about 4:51 and past 5:00 a.m. his cell phone was using

22   cell phone towers in that area.

23           The cell phone towers will show the defendant using

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    towers near State Route 46 and 422 at approximately 5:45 a.m.

2    on June 12th.

3              The defendant's cell phone was, again, using towers

4    in the Niles area in the same location where 713 was then at

5    9:57 a.m. on June 12th.

6              At approximately 7:36 a.m., Niles Police received a

7    call of a bicycle off the bike path.  You were there yesterday

8    and you saw that embankment that goes down to the river.  I'm

9    pretty sure that's the Mahoning River there.  They went out

10   and you will hear from officers who found -- oops -- who found

11   the white Chevy Malibu in the woods off the bike path in

12   Niles, Trumbull County, Ohio.  They ran that registration and

13   determined that the vehicle did, in fact, belong to Brandon

14   Sample.

15             Now, this is at 7:36 in the morning.  Brandon was not

16   really reported missing -- you'll hear testimony as to when he

17   was reported missing later that day.  But you know where that

18   bike path location was and where Brandon Samples's car was in

19   relationship to 713 Mason Street.  Not very far.  I know it

20   took awhile to get there on the bus, but as the crow flies

21   it's about .7 miles from the bike path to 713 Mason Street.

22             You will see photos of that car.  It is in the

23   bushes, basically.  There were a lot of trees there, and it's

1    basically wedged between some trees and some logs there.  And

2    as I indicated to you, that location is about 7-tenths of a

3    mile from 713 Mason Street.

4          Witnesses will testify, then, that they saw the

5    defendant back at 713 Mason Street in the morning hours of

6    June 12th, 2017.  And the defendant told some of those

7    witnesses that he put Brandon's white Chevy Malibu off the

8    bike path right where the Niles Police found it earlier that

9    morning.  Witnesses will tell you that.  Cell phone records

10   will show you that the defendant's phone was used in the

11   morning hours, as I said to you -- I think it's 9:56 -- near

12   713 Mason Street.

13         The defendant's cell phone, again, I want you to

14   remember that some of those text messages to Brandon's -- or

15   I'm sorry -- to Brandon Sample were deleted up until those

16   last phone calls.  There's also a phone call from the

17   defendant to the victim at about 1:18 a.m. on June 12th.  The

18   deleted text messages show Brandon Sample asking to pick up

19   the defendant on the evening of June 11th, 2017.  The

20   defendant stated he would be on the west side of Warren.  And

21   you will have those deleted text messages that were pulled out

22   by JoAnn Gibb from BCI.

23         There's also a phone call, as I indicated, made from

172

1    the defendant to Brandon Sample at around 1:18 a.m. on

2    June 12th, 2017.  Those records are confirmed by both the

3    defendant's cell phone records and the victim's cell phone

4    records.  They matched.  There was definitely a call made at

5    1:18 a.m.  Now, remember all the deleted text messages that

6    were recovered from his phone.

7         Now the evidence is going to show from this

8    defendant's phone on June 13, 2017, after dumping Brandon

9    Sample's car on the bike path and admitting to killing him to

10   witnesses, he began texting Brandon Samples's phone.  These

11   messages were not deleted.  By June 13th, it was publicly

12   known that Brandon Sample was missing.  His family had

13   reported him missing in the evening hours of June 12th.  The

14   Warren Police were out looking for him.  It was on Facebook.

15   It was on the news.  There was concern as to where Brandon

16   Sample was since he had told his father in the early morning

17   hours of June 12th that he would be home at 4:40 a.m., that he

18   was on his way.

19        So the first text message that's not deleted from

20   this defendant's phone to Brandon Sample after the deleted

21   texts I told you about on June 11th, the one that he didn't

22   delete or someone didn't delete, says, "Yo, is you straight

23   nigga?  You're all over Facebook.  WTF," which means what the

1   fuck?  "HMU," which means hit me up, call me.

2          At approximately 6 p.m. on June 12th is when Kenneth

3   Sample had reported his son missing.  And Ken Sample will take

4   the witness stand and tell you that he reported him missing.

5   That's a whole day before this defendant starts texting

6   Brandon Samples's phone.  And the messages aren't deleted.

7          As Mr. Sample will testify, he had not heard from his

8   son until 4:40 a.m. earlier that day.

9          Detective Greaver was assigned to the case when they

10  determined that Brandon Sample was a missing person.  And

11  basically from June 12th through June 15th Warren Police began

12  obtaining information that the victim may have been killed on

13  Hatchet Man Road.  And you'll hear witnesses that will take

14  this witness stand and tell you that out of the words of this

15  defendant he told them he killed Brandon, he made him get on

16  his knees and shot him in the head on Hatchet Man Road.

17         Now, are there problems in this investigation?  Sure.

18  There's always problems.  I'll tell you some of them right

19  now.  First of all, Brandon's phone, cell phone, was never

20  recovered.  Don't know where it is.  We also have tried

21  repeatedly to get -- and Detective Greaver will testify --

22  that the phone company has not given us Brandon Sample's phone

23  records, despite a grand jury subpoena.  There were fragments

1    recovered at the autopsy which ended up not even being metal

2    fragments.  And you'll hear from the individual here.  We'll

3    have the coroner testify.  There's unknown DNA on the magazine

4    of a gun that's recovered in this case.  And we'll talk about

5    this gun in a moment.  And we'll have a DNA expert come in and

6    we'll ask her some questions.

7          So let's go back to what the defendant told the

8    police.  He told the police that he was with Brandon Sample

9    and in Brandon Sample's car on June 11th.  Of course Josh

10   White says he wasn't with them when they were mowing yards and

11   swimming and when he went back to Akron.

12         However, the defendant was seen by other individuals

13   with Brandon Sample when the cell phone tower records and

14   calls were being made and the text message saying he was in

15   Niles, N-i-l-e-w.  He was seen with Brandon Sample in Brandon

16   Sample's car.

17         Now, the defendant made numerous statements to

18   witnesses that he had shot Brandon in his head on Hatchet Man

19   Road.  And that information was given to this detective.  The

20   defendant stated he put Brandon's car in the bike path.  And

21   you will hear evidence and testimony from witnesses who will

22   have told -- will tell you that from this witness stand and

23   say that this defendant told them that.

1      So on the morning of June 15, 2017, this Detective

2  and other investigators began searching Hatchet Man Road.  The

3  area where you were located at.  This officer located

4  Brandon's body on Hatchet Man Road which is the area that we

5  went on the jury view yesterday.

6      Now, you're going to see that that area is a very

7  different place on June 15th, 2017.  Obviously there's no

8  snow.  There is a huge amount of overgrowth.  And you will see

9  photographs depicting that area.  There was an active logging

10  area going on there.  And you'll see pictures of stacks of

11  wood that were apparently being cut or milled or something

12  there.

13      In any event, these officers found Brandon's body

14  four days later.  And you can imagine the state of that body

15  being out in a June month in Ohio for about four days out in

16  the woods.  And you will see, unfortunately, photographs of

17  that body as it was recovered.

18      Now, there's an individual named Rickey Roupe.  And

19  Rickey Roupe and this defendant's girlfriend, Meredith Loges,

20  are going to come into this courtroom and testify that just a

21  few weeks prior to all of these events this defendant was with

22  them at Nelson Ledges Parks and asked them if they wanted to

23  see a scary place and took them to a place called Hatchet Man

176

1    Road in the dark.

2           Meredith will testify that she took this defendant

3    and Rickey Roupe to that area and it was dark and that's where

4    they went.

5           That area, Hatchet Man Road, is near the defendant's

6    home in Bristolville which is 5106 Miller South Road.  This

7    detective went there in order to speak to him on one occasion.

8           You will hear the testimony of Trumbull County

9    Coroner Dr. Humphrey Germaniuk.  He is a forensic pathologist.

10   He will testify that -- and you will see his autopsy report

11   and hear his testimony.  Brandon Sample was shot one time in

12   the head.  There were fragments in his head on an x-ray.

13   Dr. Germaniuk did not retrieve those.  He'll explain why on

14   the witness stand, why he could not basically get those

15   fragments.  He will testify and hopefully he will bring the

16   x-rays of Brandon Sample's head and the bullet fragments.

17   Shouldn't say "hopefully."  He will.  And you will see the

18   gunshot wound to his head in autopsy photos.

19          Dr. Germaniuk will testify that his expert opinion as

20   the forensic pathologist and the duly elected coroner of

21   Trumbull County, Ohio, that a firearm was used to kill Brandon

22   Sample, and it was most likely a smaller caliber handgun.

23          The evidence and testimony then will show this

177

1    defendant in possession of a .22-caliber handgun. It's a very

2    unique .22-caliber handgun. It's a very small handgun,

3    probably fits in the palm of your hand, and it has a marbled

4    type handle. Some pictures it looks blue. When you see it

5    here when we present it in evidence it's blue, brown. It's

6    marble. You can clearly see it's marble.

7            Witnesses will take the witness stand and testify

8    that they saw this defendant with that firearm. On this

9    defendant's cell phone are photographs with this defendant

10   with that firearm. And that will be presented to you as

11   evidence.

12           Meredith Loges, this defendant's girlfriend, has on

13   her cell phone a video that she made on June 8, 2017 of this

14   defendant shooting what appears to be that marble-handled .22.

15   And you will see that video.

16           One of the pictures recovered from the defendant's

17   phone shows him with two guns on his lap and the statement in

18   quotes, "My two baddest bitches. And they loyal." Witnesses

19   will identify the gun that's in that photograph and this

20   defendant as the person whose lap they are seated on. And

21   you'll see it's a partial -- you'll see probably half his

22   face.

23           Now, there's going to be testimony on June 20th, 2017

178

there was a robbery at Pizza Joe's.  An armed robbery.  You'll
see a video of it.  You'll see a person go in with a mask,
hoodie, handgun.  You will see a small caliber handgun in the
person's hand.  Very small.  That same marble-handled .22
firearm was later recovered after the aggravated robbery of
Pizza Joe's on June 20th, 2017.  So I don't want to confuse
you.  But we've got the murder, the aggravated robbery and the
crimes related to the death of Brandon Sample.  And then on
June 20th, about eight days later, we have the robbery at
Pizza Joe's where we went also on the jury view.

        The firearm recovered after Pizza Joe's robbery was
registered to an individual named Jamie Sell.  Guess what the
evidence and testimony will show who Jamie Sell is in relation
to this defendant?  It's his mother.  And that gun that was
recovered after the Pizza Joe's robbery, marble-handled .22,
was recovered in the apartment across the street from Pizza
Joe's and registered to none other than defendant's mother.

        This defendant is prohibited by law -- and you're
going to hear two counts -- from having a firearm because he's
been adjudicated a delinquent due to an aggravated burglary
charge when he was a juvenile.  By Ohio law he is not
permitted to have a firearm.  That charge is actually called
weapons under disability.  It doesn't mean he's disabled.

179

1   It's the disability of having a prior conviction or an

2   adjudication that makes it that crime.  Under Ohio law, he's

3   prohibited.  So there will be a charge both for the June 11th

4   and 12th dates and the June 20th date of the robbery at Pizza

5   Joe's.

6           You will have a recorded jail phone call.  And you

7   will hear from a corrections officer at the Trumbull County

8   Jail all of the jail phone calls are recorded except, of

9   course, with their attorneys.  We're not allowed to record

10  those.  You will hear the call.  You will hear, "This is a

11  recorded phone call."  It was made on June 27th, 2017.  The

12  defendant's mother asked the defendant if the gun was

13  registered.  And he stated "No, I don't think so."  As they

14  continued to talk the defendant told his mother, "You're

15  talking too much about the case."

16          So let's go to June 20th and how we got that

17  marble-handled .22 and the robbery at Pizza Joe's.

18          There is a group of teenagers who will testify that

19  they were swimming at Willow Lake.  They all eventually ended

20  at Melanie Engle's apartment which is located at 241 West Main

21  Street, Apartment C.  You'll recall that from the jury view.

22  We walked around the house by the music store.  You had to go

23  around the house and there was that gate and you saw

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

180

1     Apartment C.

2          At one point in the evening Melanie Engle's cat got

3     out and people started to look for it.  The defendant stated

4     basically he was gonna go do something.

5          At approximately 10:08 p.m., a man with a hoodie and

6     gray sweat pants and a gun robbed the Pizza Joe's in downtown

7     Cortland.  The robber got approximately $760.  Security video

8     will show basically a person running from that apartment

9     complex.  You'll see the Pizza Joe's security video.  And

10    you'll see someone running from that direction to the

11    apartment.  Then they run basically the same direction and

12    they go around the music store there in Cortland.  The person

13    was wearing gray sweat pants and gray Nike tennis shoes.

14         The defendant was seen by an individual named Shawn

15    Marx who was outside of his apartment and down the street from

16    Pizza Joe's, saw -- I'm sorry.  Shawn saw the person run

17    around the back of Daybreak Music.

18         After the robbery, Cortland Police learned from the

19    Warren Police Department that they were receiving pings --

20    because they were already trying to find this defendant in

21    relation to the murder back on June 12th for Brandon Sample --

22    and they were pinging his phone in that area.  The Warren --

23    I'm sorry, the Cortland Police then went to that apartment.

1   They saw some movement in there and went to that apartment.

2   And when they arrived at 241 West Main Street, Apartment C,

3   that apartment around the house there, they contacted this

4   defendant.  And he said, "My name is Nathan Novicky."  And he

5   gave them a date of birth and a social for Nathan Novicky.

6        Well, the Cortland Police then were able to obtain a

7   photograph of this defendant and they went back in because

8   they knew he was wanted for aggravated murder at that point.

9   And when they compared them they said, "Hey, you're Austin

10  Burke.  You're not Nathan Novicky."

11       Witnesses will testify the defendant had on gray

12  sweat pants.  In fact, you'll see a picture taken that

13  afternoon.  And this defendant's wearing gray sweat pants.

14  Witnesses in the apartment will say that the defendant had a

15  large sum of money just before the police arrived.

16       The defendant also called Deidre Keener, the

17  people that -- one of the people that he had seen back in

18  Niles on June 11th and 12th.  And you will have a phone call

19  from Deidre Keener showing that just before he was arrested he

20  had called them and said, "Hey, I came into a large sum of

21  money."

22       That apartment was quite messy.  You'll see

23  photographs from the Cortland Police.  There was clothes

182

1    everywhere.  Bags of clothes.  A disaster.  Cortland Police,

2    however, were able to find a pair of gray sweat pants and a

3    pair of gray Nike tennis shoes.  They, unfortunately, never

4    found the gray -- or I'm sorry -- the black hooded sweatshirt.

5        I will tell you something about these gray Nike

6    tennis shoes though.  In additional photographs that this

7    defendant had on his phone of him holding that marble-handled

8    .22, he took a -- well, someone took a picture looking down.

9    That same marble-handled .22 is in his hand with a pair of

10   gray Nike tennis shoes on.

11       Now, the next day, June 21st, Melanie Engle, whose

12   apartment it was there at 241C in Cortland, Stephanie Taylor

13   was at the apartment to help her daughter move out.  She said

14   "Hey, listen, this is too much.  You've got to move out.

15   You've got to move back home.  Get out of here."

16       And as they were cleaning the apartment, that's when

17   they found the .22-caliber marble-handled firearm in a vase of

18   artificial flowers.  You'll see photographs of that, and you

19   will see the very gun Cortland Police found.  It is the same

20   marble-handled handgun that witnesses testified they had seen

21   the defendant with leading up to and during the course of

22   these events.

23       It's the same .22 marble-handled handgun, the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1 evidence and testimony will show, that this defendant had

2 pictures of, including the one picture with that same gun

3 saying, "My two baddest bitches.  And they loyal."

4       The same .22 marble-handled handgun that is

5 registered with the Alcohol, Tobacco and Firearms.  And you

6 will hear from an expert and you will have certified copies of

7 their records showing that that gun, which we have, with the

8 same serial number is registered to none other than Jamie

9 Sell, the defendant's mother.

10       You will hear the phone call from the defendant while

11 he was in jail asking if his mother -- or his mother asking if

12 the gun was registered.  He was saying, "No, I don't think

13 so."  You'll have that in evidence.

14       Now, the police did find $545 the next day in a hair

15 dye box in the trash.  Now, the owner of the Pizza Joe's is

16 going to say there was about 750, 760.  Where the other $200

17 went, no one knows.

18       You'll also hear testimony from an individual by the

19 name of Tim Cook.  Tim Cook was an inmate at the Trumbull

20 County Jail.  And he overheard this defendant admit to others

21 that he had killed Brandon Sample.  Tim Cook will take the

22 witness stand and testify to that.  Tim Cook got no

23 consideration from the state of Ohio.  He wasn't released from

1    jail.  He didn't get a plea deal.  He didn't get out of jail

2    that day.  And he came and he told this detective in a

3    recorded statement that's what he heard.  In fact, we wouldn't

4    have even known about Tim Cook until he called this detective.

5          So let's review the charges.  We are going to have on

6    June 12th the aggravated murder of Brandon Sample with the

7    firearm, the aggravated robbery and the firearm specification

8    of Brandon Sample, taking the white Chevy Malibu and the cell

9    phone which was never recovered.  You'll have tampering with

10   evidence since we never found Brandon Sample's cell phone.

11   Having weapons under disability which, of course, he was

12   adjudicated as a delinquent for an aggravated burglary not

13   permitted to have a firearm.

14         The charges on June 20th are related to the

15   aggravated robbery with a specification of the robbery at

16   Pizza Joe's with a firearm.  And then, again, having weapons

17   under disability because, again, he's not allowed to have a

18   firearm because of that felony adjudication in juvenile court.

19         Ladies and Gentlemen, that's going to be the evidence

20   and testimony in this case.  I'm sure you're going to see a

21   bunch of teenagers up here and there will certainly be

22   teenagers up here.  Some of them are 14, 15 years old when

23   this happened.  Some of them are going to be scared.  Some of

185

them didn't quite tell the police all the story when they first talked to them.  Some of them came back in later and said, "Hey this is what I heard.  I was scared."  You're going to get to evaluate all of them.  And you're going to have to determine is it reasonable for a 14- or 15-year-old to be scared of this guy.  Somebody who told them he killed somebody.  That's what your job is here today.  And all the other things; the cell phone records, the phone, the phone records, the deleted text messages.  All of this evidence will be presented to you.  And most importantly, the firearm that this defendant has photographs with him of that this defendant's mother has registered to her with the Alcohol, Tobacco and Firearms.

Ladies and Gentlemen, at the close of this case, we feel that that presumption of innocence that we talked about the other day, yesterday, will be gone and you will have no other choice but to find this defendant guilty as charged.

Now, when these witnesses take the witness stand, I'm sure -- these two gentlemen are fine attorneys.  They're going to cross-examine them.  They're going to have all kinds of good questions.  They may even stumble on a few of these teenagers, 14-, 15-, 18-, 19-year-olds.  But remember the facts.  And remember the one thing that I told you yesterday

186

1    is I didn't pick these people.  He did.  These are the people

2    he went to and associated with.  Not me.

3           Ladies and Gentlemen, I'm sure Mr. Olson or

4    Mr. Hartwig is going to speak to you at this point.  I want to

5    thank you for your time, your patience, and, again, for your

6    duty, citizenship here in Trumbull County, Ohio.

7                    THE COURT:  Mr. Olson.

8                    MR. OLSON:  Thank you, Your Honor.

9                    OPENING STATEMENT

10                   MR. OLSON:  May it please the Court,

11   Mr. Becker, Ladies and Gentlemen of the Jury.  First, I would

12   like to thank you for your service.  I agree with Mr. Becker

13   that one of the most important functions that we have in this

14   country is to serve on jury duty because it is you that

15   prevent tyranny from being in our country.  It is you that

16   prevent tyranny from happening in this country.  We're not

17   like North Korea where when the state says you did something,

18   you're automatically guilty and the case is closed and we move

19   on.  Instead, we have to demand that our government proves the

20   case against us.  And as the Judge explained to us very early

21   on when we were doing voir dire, the statement of counsel is

22   not the evidence.  So while Mr. Becker, who is an expert in

23   his field -- Mr. Becker has been a prosecutor for a long time.

1   Mr. Becker knows how to clean up evidence to present it in a
2   nice fashion that seems convincing when we're standing up
3   here.  Mr. Becker wants to pull out the positives of his
4   testimony that is going to be on this stand and try to get you
5   in the mindset right away that Austin Burke committed these
6   crimes.

7          However, what Mr. Becker does not tell you are all
8   the negatives.  When we went through this voir dire process
9   yesterday, many questions were asked of you.  And if you look
10  back, the questions that were asked by both the prosecution
11  and the defense didn't focus on mainstream topics such as what
12  your race is, what your religion is, what your political
13  affiliation is, what's your profession is.  That's not what's
14  important here.  What's important is your ability to remain
15  fair and impartial and your ability to avoid sympathy in this
16  case.  Because we all recognize in this room a tragic event
17  happened.  There's no denying that.  There was a tragedy that
18  happened.  But sympathy does not fit into our justice system.
19  Because sympathy allows people to become prejudiced and see
20  facts in a different light when maybe that fact doesn't exist.
21          Speculation.  We made sure that there would be no
22  speculation; that you would hold the state to its burden to
23  demonstrate the facts that would prove beyond a reasonable

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

188

1   doubt.  We asked of you, what would you demand in important
2   matters that affect your own personal life, what evidence do
3   you want to see?  Because, Ladies and Gentlemen, they can make
4   all the excuses that they want.  "We couldn't get Brandon
5   Sample's phone records.  We subpoenaed them, but we never
6   received them."  Well, you see, the important matter is,
7   Brandon Sample's phone would show you where Brandon Sample
8   was.  Because while the state wants to sit here and they want
9   to say that Brandon Sample was with Austin Burke on the night
10  of June 11th through June 12th, they have no evidence of this.
11  They will not be able to show you that.
12          They will not be able to show you with convincing
13  evidence -- yes, they will bring in some teenage kids that
14  will walk through this door, get up on this stand and testify.
15  But listen to the details of their testimony.  Because we're
16  not listening to details that have minor deviations.  If you
17  recall back in voir dire, the jury selection process,
18  Mr. Becker was saying, "Well, you wouldn't hold it against us
19  if there was a minor deviation such as one witness said 2:00
20  and the other one said 2:30?"  Of course not.  That's not what
21  we're looking at.  We're looking at major deviations in the
22  story.  Who was present.  What time they were present.  Was
23  Brandon Sample at this house?  Or was he not?  Because you're

189

going to hear different variations of all these stories.  And
what it comes down to is they are stories.  They are not
truths.  They are lies.  They are not truths.

The evidence will show that in the early afternoon
Brandon -- Austin Burke, like he told the police, went to
Willow Lake.  And I don't know if you saw it yesterday when we
went on the jury view as we were leaving Peck Leach Road,
which they are referencing as Hatchet Man Road, as we were
driving down 46 through Bristolville you saw Willow Lake Park
up on the right-hand side.  Austin Burke told the police, "I
was there until about 7:30.  At 7:30 on Route 46, Brandon
Sample, who I've known from my past, pulled up behind me and
gave me a ride home."  He didn't tell the investigators, "I
don't know who Brandon Sample is.  I've never had contact with
him.  I don't know what you're talking about.  I was never in
that car."  He told them, "Yes, I was with him at 7:30.  He
gave me a ride home.  He told me that he had to bring his
buddy Josh or something like that back to Akron."

So they want you to believe that when Josh White
comes in here, Josh White is going to tell you, "Well, I never
met Austin Burke in my life.  He was never in that car."  So
magically Austin Burke knew his name, knew what he looked
like, and knew where he lived.  Magically.  They can't give

190

1    you an explanation.  You know why?  Because they never

2    followed up on Josh White's story.

3         The only thing that they confirmed about Josh White

4    is at 11:00 p.m. that he was, in fact, with Austin Burke

5    swimming at a friend's house in Warren, Ohio.  That friend did

6    confirm that Brandon Sample was required or asked to bring

7    Josh White back to Akron to give him a ride home.

8         Josh White in his interview tells the investigator,

9    "I had to call my brother at 12:15 because I don't have a lock

10   to the latch."  When Josh White was giving that interview, his

11   brother, father, and his mother, all of whom through this

12   interview he indicated he had contact with, were all there.

13   All they had to do was bring these individuals in to the room

14   and ask them, confirm the story.  Did they do that?  No, they

15   did not.

16        These individuals -- and, again, Josh White

17   admittedly was with Austin Burke on the night of June 11th --

18   or excuse me -- with Brandon Sample on the night of June 11th.

19   Did they pull his phone records and confirm Josh White made it

20   back to Akron at the time he said?  That he did not travel

21   back to this area?  They did not.

22        They were able to -- they were able to get Austin

23   Burke's phone records.  They weren't able to get Brandon

1   Sample's phone records.  They weren't able to get Josh White's

2   phone records.  They didn't execute any search warrants.  They

3   don't have a weapon.  They don't have a bullet.  They have

4   nothing but accusations that are made by some teenage kids and

5   maybe somebody else that has a deceitful motive as to why he

6   wants to say he never saw Brandon Sample -- or Austin Burke

7   with Brandon Sample.

8        So, again, Ladies and Gentlemen, when we take all of

9   the evidence -- that's the evidence that these witnesses will

10  testify to, not what the prosecution will tell you it is --

11  it's up to you to determine what that evidence is.

12       We will get into a robbery of the Pizza Joe's in

13  Cortland that occurred several days later.  And, again, when

14  we look at this evidence, they're again not giving you the

15  full details up here.  See, what they didn't tell you, yes,

16  Austin Burke was located at an apartment that was across the

17  street from the Pizza Joe's that was robbed.  But there was an

18  individual there that left very shortly before the robbery

19  occurred at the Pizza Joe's across the street.

20       The girl that was renting the apartment left to go

21  pick him up after she receives a text message from her friend

22  at approximately 10:00 p.m. that says, "Hey, why this

23  individual in here looking like a crackhead?"

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1          That individual, while he gave some statements on the

2     phone to the police officers saying, "Yeah, I was there that

3     night.  I left before the robbery occurred."  When the police

4     asked him to go in, he refused.

5          The money.  Again, they're indicating that

6     approximately 700 and some odd dollars was stolen from the

7     Pizza Joe's.  When the Cortland Police release a crime scene

8     back to a family to clean out the apartment and the girl that

9     left to go and pick up the other individual that left that

10    evening was able to go in there, outside the supervision of

11    any police officer, and begin cleaning the apartment, all of a

12    sudden some evidence pops up; a firearm and $500 in cash.

13    They told you, they can't explain where $200 went.  Well,

14    Austin Burke was arrested when they identified him and he had

15    no money on him.

16          They can't explain the missing pieces to the puzzle.

17    And that is reasonable doubt.  They can't explain why they

18    can't get evidence to come in here and show you how Austin

19    Burke is linked to these crimes.  That is reasonable doubt.

20    Anybody can put facts up into a vacuum and summarize them in a

21    light most favorable to their side.  But it, again, is you who

22    will have to sit here and listen to each individual witness,

23    listen to their testimony, compare that testimony to the

193

1   testimony of the others, and I will show you that the state

2   cannot meet its burden, and the only verdict that you can

3   return with is a verdict of not guilty.

4           Thank you, Ladies and Gentlemen.

5                   THE COURT:  Mr. Becker, you may call your

6   first witness.

7                   MR. BECKER:  Thank you, Your Honor.

8           Your Honor, the state would call Josh White.

9

10                          *   *   *

11                  JOSHUA C. WHITE,

12  having been duly sworn, was examined and testified as follows:

13                  <u>DIRECT EXAMINATION</u>

14  BY MR. BECKER:

15  Q       Would you introduce yourself to the jury, please?

16  A       My name is Josh White.  I was Brandon's like best

17  friend for a very long time.

18  Q       Okay.  Josh, we're going to get into that.

19  A       Okay.

20  Q       I want to slow you down a little bit here.  Where do

21  you live at right now?

22  A       I live in Hubbard.  I live on 6975 Stewart Sharon

23  Road.

194

1    Q        Okay.  I want to direct your attention back to June

2    of 2017.  Where were you living at in June of 2017?

3    A        I was living in Akron at my mom's house.

4    Q        Okay.  Do you know where that was located at?

5    A        I don't know the exact address, but I know it was on

6    Shelburn Avenue.

7    Q        And would that -- where would that be in relation to

8    like downtown Akron, if you know?

9    A        I guess it would be about 10 minutes, 15 minutes from

10   downtown Akron.

11   Q        Would that be on this side of Akron, closer to

12   Warren, or on the other side of Akron?

13   A        I'm not sure, honestly.

14   Q        Okay.  All right.  That's okay.  Now, you said you

15   were familiar with Brandon Sample.  How did you know Brandon

16   Sample?

17   A        I knew Brandon Sample because when I was like 12 I

18   moved to Howland and I like moved right down the street from

19   him.

20   Q        So you had known him since you were about 12 years

21   old?

22   A        Yeah, correct.

23   Q        Went to school with him?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

195

1   A       Yes.

2   Q       All right.  And how old are you today?

3   A       I'm 22 years old.

4   Q       And was Brandon in the same grade with you?

5   A       Yeah.  He was a grade above me.

6   Q       All right.  So he would have been a year older than

7   you.  When is your birthday?

8   A       My birthday is January 26, 1996.

9   Q       So you just turned 22?

10  A       Yes.

11  Q       All right.  Now, can you describe what your

12  relationship was with Brandon?

13  A       Yeah.  He was my best friend.  He was like a big

14  brother to me.

15  Q       And I want to direct your attention now to June 11th

16  of 2017.  That would have been a Sunday.  Do you recall being

17  in the Warren area on June 11, 2017?

18  A       Yes.

19  Q       Okay.  Did you -- were you driving or did you have a

20  car at the time?

21  A       No, I did not.

22  Q       All right.  You did didn't have a car and you didn't

23  drive?  Or both?

196

1    A        No, I -- both.

2    Q        Okay.  So you didn't have a driver's license and you

3    didn't have a car?

4    A        Yeah, correct.

5    Q        So somehow you got to Warren, Ohio.  Do you remember

6    how you got to Warren, Ohio?

7    A        Yeah.  Like my mom brought me down.

8    Q        Your mom that you were living with at the time in

9    Akron?

10   A        Yeah.

11   Q        All right.  So what did you do on June 11th, 2017?

12   A        Was that the Sunday?

13   Q        Yeah.

14   A        I hung out at my friend Jake's house for a little bit

15   in Niles.

16   Q        Okay.

17   A        And that's when like probably at 5:00 Brandon had

18   contacted me to hang out.  And he picked me up and we went to

19   his grandma's house.

20   Q        Okay.  I want to slow you down a little bit there.

21   Do you remember approximately what time Brandon picked you up

22   on Sunday, June 11th?

23   A        Probably about 5:00, 5:30.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  Q      And on June 11, 2017, do you know what kind of car he

2  had?

3  A      Yeah.  He had a white Malibu.

4  Q      Okay.  I'm going to show you photographs that have

5  been marked for purposes of identification as State's

6  Exhibits 43, 44, 45 and 46.

7                      (Whereupon, State's Exhibit Nos. 43-46,

8  Photos, were introduced for identification.)

9          And can you look at those photographs and tell me if

10 you recognize that vehicle, and is that similar to the vehicle

11 that Brandon had?

12 A      Yes.

13 Q      Okay.  Give me one second here.  All right.  So you

14 say he picked you up in that vehicle about 5:30 p.m?

15 A      Correct.

16 Q      And that's when you were at your friend's house in

17 Niles?

18 A      Correct.

19 Q      All right.  Where did you guys go from there?

20 A      We went to his grandma's in Bristol.

21 Q      And what did you do at his grandmother's house in

22 Bristol?

23 A      We mowed her grass.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    Q       Now, are you familiar where Willow Lake is?

2    A       No.

3    Q       No?  Okay.  On the way going to mow his grandmother's

4    grass, did you pick up anybody?

5    A       No.

6    Q       All right.  After you mowed his grandmother's

7    grass -- well, first of all, do you remember what kind of day

8    it was?  Was it cold?  Hot?  Rainy?

9    A       It was a hot humid day.

10   Q       All right.  And did you help Josh -- or I'm sorry --

11   did you help Brandon mow the yard at his grandmother's?

12   A       Yes, I did.

13   Q       All right.  Do you remember approximately how long

14   that took?

15   A       We were there for probably about an hour, an hour and

16   a half.

17   Q       And from there where did you go?

18   A       We went to -- on Bruce Drive to this girl's house

19   that I know to go swimming.

20   Q       Okay.  Do you know what city Bruce Drive is in?

21   A       It's in -- it's by the glass McDonald's.  It may be

22   in Niles.

23   Q       Okay.  And what did you do when you got to this house

1    on Bruce Drive?

2    A        We just got there and we went swimming and we hung

3    out there for a little bit.

4    Q        All right.  And did you know the people that own that

5    house?

6    A        Yes.

7    Q        Okay.  Who were -- what were their names?

8    A        I know the girl who lives there.  Her name is Billie

9    Holness.

10   Q        All right.  How long were you at Billie Holness's

11   house?

12   A        We were there until probably until like almost

13   11:00 at night.

14   Q        And what did you do then?

15   A        He took me back to Akron.

16   Q        Okay.  And why did you have to go back to Akron?

17   A        Because I worked in the morning at 6.

18   Q        Now, do you recall approximately what time you got

19   back to Akron, Ohio?

20   A        About 12:30.

21   Q        All right.  And on the way going back to Akron, did

22   your friend Brandon tell you about meeting up with anybody

23   later that night?

200

1   A       Yes, he did.

2   Q       What did he tell you?

3   A       He told me that somebody had offered him some money

4   to do something.  And he wouldn't specify what it was that he

5   had to do.

6   Q       And did he tell you who the person was?

7   A       Yeah.

8   Q       Who did he say it was?

9   A       He said it was Austin.

10  Q       Had you ever met Austin?

11  A       No.

12  Q       Okay.  You had just known him through what Brandon

13  had told you?

14  A       Correct.

15  Q       All right.  So he dropped you off at about 12:30 in

16  Akron?

17  A       Correct.

18  Q       And is that the last time you ever spoke to Brandon?

19  A       That was the last time I ever spoke to Brandon.

20              MR. BECKER:  Your Honor, I have no further

21  questions.

22              THE COURT:  Mr. Hartwig.

23              MR. HARTWIG:  Thank you, Your Honor.

1                              * * *

2                        CROSS EXAMINATION

3    BY MR. HARTWIG:

4    Q       Good afternoon, Mr. White.

5    A       Good afternoon.

6    Q       Back on June 12th, 2017, did you have a beard?

7    A       A beard?

8    Q       Yes, a beard.

9    A       Yeah, but not like thick.  It was just stubble.

10   Q       Okay.  Did you shave it off on the morning of June

11   13th, June 14th before you spoke to police?

12   A       No.

13   Q       Did you see your interview?  You're clean shaven.

14   A       Well then, yeah, I shaved, but --

15   Q       I'm just asking you whether you shaved off your beard

16   before you spoke to police?  That's all.

17   A       Yeah.  I just cleaned it up.  I always keep it pretty

18   clean.

19   Q       I looked at your Facebook page.  You have a Facebook

20   page; right?

21   A       Correct.

22   Q       You post a lot on there; correct?

23   A       Yeah.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

202

1   Q       You have a friend named Carlos Rodriguez?

2   A       Yeah.  That's my cousin.

3   Q       Okay.  And your cousin contacted you after this

4   investigation started on June 15th and June 20th.  Do you

5   recall that?

6   A       Yes.

7   Q       All right.  And he was saying, "Hey, man, people are

8   saying that you're the one that was responsible for Brandon

9   Sample's death"; do you recall that?

10  A       No.

11  Q       You don't recall him saying that and you saying,

12  "Yeah, that shit's crazy.  I know"?

13  A       No.

14  Q       Okay.  Do you do drugs?

15  A       I do not.

16  Q       All right.  And you said your buddy Brandon Sample

17  didn't do drugs.  He never would do heroin; correct?

18  A       No, he would never do heroin.

19  Q       All right.  There were witnesses who told the police

20  they witnessed him doing heroin on the night this happened;

21  are you aware of that?

22  A       I am not.  I have never seen him use heroin.

23  Q       All right.  But you say, hey, you've known him your

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    whole life.  He wouldn't do that; right?

2    A       Correct.

3    Q       Isn't it possible maybe you didn't know him the way

4    you thought?

5    A       I mean, he might have.  He might have battled with

6    something that I didn't know of, but I was with him all the

7    time.  So I --

8    Q       You were with him all the time?

9    A       Yeah, and I had never seen him use heroin.

10   Q       And you were very close with him?  He confide in you

11   with a lot of things?

12   A       Yeah.

13   Q       All right.  So on the ride home he brings up somebody

14   he had never met before that day; correct?

15   A       Correct.

16   Q       And he just says some guy says, "Hey, do something

17   for me for a thousand bucks"; right?

18   A       Yeah.

19   Q       That's your story, but yet your best friend isn't

20   going to tell you what that is when it's just the two of you

21   in the car; is that what you're saying?

22   A       Yeah.

23   Q       All right.  Does he have a nickname?

204

1    A       B Samp?

2    Q       Yeah.

3    A       Yeah.  His nickname is B Samp.

4    Q       All right.  Who gave him that nickname?

5    A       I don't know.  That's just what he's been called for

6   awhile.

7    Q       Okay.  And he claims he told you he had never been

8   with Austin Burke before that day; correct?

9    A       Correct.  I think he said that he met him at DYS.

10   Q       All right.  Now, you were with Brandon the entire

11  time, and you claim that you never picked up Austin Burke in

12  Brandon's car that day; correct?

13  A       That is correct.

14  Q       All right.  But somehow or another on the way home

15  your best friend says Austin Burke, who you've never heard of,

16  he claims he didn't ever meet him before, all of a sudden is

17  gonna give him a thousand dollars that day; right?

18  A       Yeah.

19  Q       Right.  Somehow or another Austin Burke, when

20  investigated, tells the police, gives a full description of

21  you.  Name.  What you look like.  You've got a beard.  Are you

22  aware of that?

23  A       No, I was not.

205

 1   Q        All right.  How would he know what you looked like if

 2   he had never met you before and you had never seen him?

 3   A        Probably how you knew.  Through Facebook.  Facebook

 4   is very public.

 5   Q        All right.  Did you look up Austin on Facebook?

 6   A        Yes, I did.

 7   Q        And what name did you look him up under?

 8   A        Austin Burke.

 9   Q        All right.  Are you aware that his Facebook is not

10   under Austin Burke?

11   A        No, not really.  It was sent to me from a friend to

12   look at his profile.

13   Q        On your Facebook pages, is there any reason you would

14   say, "Crackers took my 40 so I'm gonna buy a Draco"?

15   A        Yeah.  That's Kodak Black lyrics.

16   Q        Okay.  And "Sellin' dope getting money like I should.

17   Shit is second nature"?

18   A        Yeah.  That's also lyrics from Retch.

19   Q        Okay.  "Whippin' hoopties tryna boost raw chronic"?

20   A        That's Earl Sweatshirt.

21   Q        "I just put Xan in my codeine.  I might rob you for

22   it."

23                    (Court reporter requests clarification.)


                    OFFICIAL COURT REPORTER
               TRUMBULL COUNTY * WARREN, OHIO

206

1          MR. HARTWIG:  Go ahead.

2    A       That's Earl Sweatshirt.  It's a song called Earl

3    called Earl.  So those are all lyrics, song lyrics.

4    Q       Okay.  "I put Xan in my Codeine.  I might rob you for

5    it"?

6    A       Yeah.  That's Future.

7    Q       Okay.  "Two dope boys in the Cadillac strap."  Are

8    you into the gang scene or the gangster scene?

9    A       No.  I listen to that type of music.  But that's

10   Vince Staples.  I post lyrics on my Facebook.  So...

11   Q       Are you aware that your friend had called somebody

12   back in Akron after -- at some point later, in the late

13   evening hours?

14   A       No.

15   Q       Okay.  So when the police came to talk to you on

16   June 15th, would you agree with me that you had a cut on your

17   hand?

18   A       Yeah.  I had a cut on my hand.

19   Q       Okay.  You also indicated on your knuckles that you

20   had markings that you had claimed you had punched a bed post;

21   correct?

22   A       Yeah.

23   Q       All right.  The police never came and checked your

207

1    phone; correct?

2    A        Correct.

3    Q        All right.  You claim you had muddy clothes that were

4    still in Brandon Sample's vehicle; correct?

5    A        Muddy clothes?

6    Q        Yes.  Muddy clothes.

7    A        No, I have those shorts.

8    Q        Camo shorts full of mud, that you swam in basketball

9    shorts, two pairs of pants in the trunk.  You guys left -- you

10   left 'em there?

11   A        Well, yeah, I had pants in the trunk, but I have

12   those shorts.

13   Q        Were those pants -- were those trunks ever recovered?

14   A        The pants that -- the shorts?

15   Q        The ones you left in the vehicle?

16   A        No.

17                      MR. HARTWIG:  Just one moment, Your Honor.

18   BY MR. HARTWIG:

19   Q        You were contacted by police on -- by phone, I

20   believe, right after June -- on June 13th, I believe; correct?

21   A        Correct.

22   Q        Right.  And did you not make a statement to the

23   detective that says, "I would check the woods behind his

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

208

1   grandma's home"?

2   A        Yes, I did say that.

3                   MR. HARTWIG:  All right.  No further

4   questions, Your Honor.

5                   THE COURT:  Redirect.

6                   REDIRECT EXAMINATION

7   BY MR. BECKER:

8   Q        Did you kill Brandon Sample?

9   A        I did not.

10  Q        Why would you tell the police, then, to check the

11  woods behind his grandma's house?

12  A        I just had a bad feeling.  It's a heavy wooded area

13  and I heard that's where he was from and I was just trying to

14  help out.

15  Q        Okay.  You heard that's where who was from?

16  A        Austin Burke.

17  Q        Okay.  And you knew a little bit more about Austin

18  Burke from your friend?  You knew that he had met him in DYS;

19  right?

20  A        Correct.

21  Q        What's DYS?

22  A        Detention Youth Center.  I don't know what it stands

23  for.  It's the Indian River like -- it's like the kid prison

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

209

1    or wherever where B Samps worked at.

2    Q       Okay.  So your friend Brandon Sample worked there for

3    awhile?

4    A       Yeah.

5    Q       And that's how he knew this defendant; right?

6    A       Yes.

7    Q       Okay.  You had never met this defendant; right?

8    A       Correct.

9    Q       Okay.  And you cooperated with the police; right?

10   A       Correct.

11   Q       You came down and gave 'em a statement?

12   A       Correct.

13   Q       And how did you get those cuts on your hands?

14   A       This one that's a scar on my pinky, I got that from a

15   glass bottle.  I opened it -- I opened a beer bottle with a

16   wrench and it broke and I cut my hand open.

17           And then this on my hand, that's because I did punch

18   my bed post when I found out that my friend had passed away.

19   I was very upset.

20   Q       All right.  And the police asked you about that and

21   you were honest with 'em?

22   A       Correct.

23                   MR. BECKER:  I have nothing further.


                     OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

210

1          THE COURT:  Recross.

2          MR. HARTWIG:  Thank you, Your Honor.

3                  <u>RECROSS EXAMINATION</u>

4    BY MR. HARTWIG:

5    Q      So at the time that the -- excuse me.  At the time

6    the police had called you the next morning, obviously you

7    hadn't spoke to Brandon Sample; correct?

8    A      Correct.

9    Q      Right?  You had never met Josh White you claim;

10   correct?

11   A      Excuse me?

12   Q      Or excuse me.  You had never met Austin Burke before;

13   correct?

14   A      Correct.

15   Q      Right?  You would have no way of knowing where he

16   lived; correct?  Because you don't know him?

17   A      Correct.

18   Q      All you know is your friend said he met him at DYS

19   for the very -- and he's bringing him up for the very first

20   time; correct?

21   A      Correct.

22   Q      All right.  But by the next morning, you tell the

23   police where to go look for the body, and it happens to be now

211

1    where you claim you knew where Austin Burke was from; correct?

2    A       It wasn't -- it wasn't exactly when I had woken up.

3    I had spoken to his sister and other people previously before

4    the detectives had contacted me.  And that's where I had

5    gathered all my information from because everyone already knew

6    who he was.  So...

7                     MR. HARTWIG:  All right.  Thank you.

8                     THE COURT:  You may step down.

9            Mr. Becker, you may call your next witness.

10                    MR. BECKER:  Thank you, Your Honor.  State

11   would call Meredith Loges.

12                            *   *   *

13                     MEREDITH LOGES,

14   having been duly sworn, was examined and testified as follows:

15                     DIRECT EXAMINATION

16   BY MR. BECKER:

17   Q       Would you please state your name for the record?

18   A       Meredith Loges.

19   Q       And Meredith, how old are you?

20   A       18.

21   Q       Meredith, where do you live at right now?

22   A       Warren, Ohio.

23   Q       All right.  And you are a student somewhere; is that

212

1    correct?

2    A      Correct.

3    Q      Where are you a student at?

4    A      Miami University.

5    Q      Okay.  And how old are you?

6    A      18.

7    Q      Now, you know an individual by the name of Austin

8    Taylor Burke; is that correct?

9    A      Correct.

10   Q      How did you know -- meet Austin?

11   A      I met him at church.

12   Q      All right.  And Austin Taylor Burke, when did you

13   meet him?

14   A      About four years ago.

15   Q      All right.  And what's your current relationship with

16   him?

17   A      We're dating.

18   Q      You're dating?

19   A      Correct.

20   Q      You're in Miami down in Oxford, Ohio?

21   A      Correct.

22   Q      You're a full-time student?

23   A      Yes.

1    Q      Okay.  How long have you been dating Austin Taylor

2   Burke?

3    A      Since last summer.

4    Q      The summer of 2017?

5    A      Yes, sir.

6    Q      And when did you start dating him?

7    A      I don't know.  Between like June and August.

8    Q      Between June and August?

9    A      Yeah.

10   Q      All right.  Now, first of all, I want to direct your

11  attention -- was there at some point a day that you were with

12  Austin Taylor Burke at Nelson Ledges park swimming or hanging

13  out?

14   A      Yeah.  We hung out there once.

15   Q      Was anybody else with you?

16   A      Yes.

17   Q      Do you remember who that was?

18   A      No.  I don't know.

19   Q      Does the name Rickey Roupe sound familiar?

20   A      Yeah.  I think he was there one time.

21   Q      All right.  And was there a time sometime in June

22  that you drove your car and Austin and that other individual

23  to somewhere in Trumbull County, Ohio, someplace where he said

214

1    he knew there was something scary?

2    A        Yes.

3    Q        Okay.  Who told you it was a scary place to go see?

4    A        I think Austin and Rickey.  I'm not sure which one.

5    Q        Well, who told you how to get to this location?

6    A        Austin.

7    Q        All right.  You drove your car, and Austin told you

8    how to get there; right?

9    A        Correct.

10   Q        Did you go in the daytime or the nighttime?

11   A        Nighttime.

12   Q        Do you remember what the name of that location was?

13   A        Hatchet Man Road.

14   Q        All right.  And what did you guys do when you got to

15   Hatchet Man Road?

16   A        We tried finding a house, but we turned back.

17   Q        Now, had you ever seen that individual that was there

18   with you before?  Did you ever see him again?

19   A        I only saw him like twice.  Rickey?  Or Austin?

20   Q        You saw him twice?

21   A        Rickey?

22   Q        Yeah.

23   A        Yeah.  I saw him like two times.  Twice.

215

1   Q       You're going to have to speak up a little bit.  Pull
2   that microphone there.
3           So the one time you saw him, Austin directed you to
4   go to -- how to get to Hatchet Man Road; right?
5   A       Yes.
6   Q       All right.  And when did you see Rickey Roupe the
7   other time?
8   A       We were just at Austin's house.
9   Q       And where would that be at?
10  A       Bristolville.
11  Q       All right.  And who lives in Bristolville?
12  A       Austin.
13  Q       All right.  Had you been to Austin's house?
14  A       Yes.
15  Q       All right.  So is it fair to say that Rickey Roupe
16  was your friend or Rickey Roupe was Austin Burke's friend?
17  A       Austin Burke's friend.
18  Q       All right.  Now, you started dating Austin, you said,
19  in about June of 2017?
20  A       Around that time.
21  Q       All right.  And I believe you were out of the country
22  for awhile sometime in June; is that correct?
23  A       Correct.

216

```
1    Q        What did you do that you were out of the country?

2    A        I went on a cruise.

3    Q        All right.  And where did your cruise go?

4    A        Bermuda.

5    Q        Do you recall what days you were out of the country?

6    A        I believe June 9th through the 14th.

7    Q        All right.  Now, had you ever seen Austin Burke with

8    a gun?

9    A        Yeah.

10                        MR. OLSON:  Objection.

11                        THE COURT:  Overruled.

12   A        Yes.

13   BY MR. BECKER:

14   Q        Can you describe that gun?

15   A        It was silver.

16   Q        Okay.  Can you tell us anything about the handles?

17   A        It had some like markings on the handle that were

18   kind of marbled.

19   Q        All right.  And was it a big gun or little gun or a

20   rifle?  What kind of gun was it?

21   A        It was a smaller gun.

22   Q        All right.  I'm going to show you what's been marked

23   for purposes of identification as State's Exhibit Number 1 and
```

1    ask if you recognize State's Exhibit Number 1?

2                        (Whereupon, State's Exhibit No. 1, Gun, was

3    introduced for identification.)

4    A       I don't -- I don't know.

5    Q       This doesn't look like the gun you saw?

6    A       It looks similar, but I don't know if it's the same

7    one.

8    Q       Okay.  You're still dating him; right?

9    A       Uh-huh.

10   Q       This gun, does this look familiar to you?

11   A       I don't know.  It looked a little similar.

12   Q       I'm going to show you what's been marked for purposes

13   of identification as State's Exhibits 11, 13, and 13A.

14                        MR. OLSON:  Your Honor, may we approach?

15                        THE COURT:  You may.

16                        (At sidebar:)

17                        MR. OLSON:  I'm presenting an objection to

18   State's Exhibit 11.  There's no relevance.  This is an attempt

19   to paint my client with bad character evidence.  So I don't

20   believe that it's relevant or admissible at this point.

21                        THE COURT:  Whether it's admissible is a

22   different thing, but right now I'm thinking he wants to

23   show -- trying to identify the gun, I think.

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

218

1          MR. BECKER:  Yeah.  Your Honor.  These

2  pictures were taken from the defendant's gun -- phone rather.

3  They will be testified to by JoAnn Gibb when she comes.  They

4  clearly show that firearm or a similar looking firearm.  There

5  will be lots of testimony.  The one picture is clearly him.

6  And there's tattoos on his hand that witnesses are going to

7  identify that show that gun in his hands.

8          MR. OLSON:  So, again, I would say this is

9  cumulative then.  They can present one.  She can identify the

10  tattoos on my client's hands and the firearm that's in the

11  picture.

12          THE COURT:  Your objections are noted.  I

13  am going to overrule them and let you proceed.

14          MR. OLSON:  Thank you, Your Honor.

15          MR. BECKER:  Thank you, Your Honor.

16          (End of sidebar.)

17  BY MR. BECKER:

18  Q      Meredith, I'm going to show you State's Exhibits 11,

19  13 and 13A and ask if you recognize those photographs?  Do you

20  recognize those?

21  A      Yes.

22  Q      Okay.  And what are State's Exhibits --

23          MR. BECKER:  Well, if I may, I'd like to

219

1    publish these for the jury.

2                      THE COURT:  Yes, you may.

3    BY MR. BECKER:

4    Q       This is State's Exhibit 11.  Do you recognize State's

5    Exhibit 11?

6    A       Yes, vaguely.

7          (Whereupon, State's Exhibit 11, Photo, was introduced for

8    identification.)

9    Q       All right.  You just saw it up there; right?

10   A       Uh-huh.

11   Q       Okay.  Who is the individual in that photograph?  Who

12   is that individual there?

13   A       Austin Burke.

14   Q       All right.  And do you recognize either one of those

15   firearms?

16   A       I don't know.  I've seen the picture.  I don't know

17   if I've seen them in person.

18   Q       But you've seen him with a gun; correct?

19   A       Correct.

20   Q       Okay.  Did you see him with those guns?

21   A       I don't know.  I don't remember.

22   Q       Okay.  I'm going to show you State's Exhibit

23   Number 13.  I'm sorry.  Yeah, Number 13.  Do you recognize

220

1   State's Exhibit Number 13?

2   A       Yes.

3       (Whereupon, State's Exhibit 13, Photo, was introduced for

4   identification.)

5   Q       Do you recognize whose hands those are with the

6   tattoos?

7   A       Yes.

8   Q       Whose hands are those?

9   A       Austin Burke.

10  Q       And this is a close-up.  This is State's Exhibit 13A.

11  Do you recognize State's Exhibit 13A?

12      (Whereupon, State's Exhibit 13A, Photo, was introduced

13  for identification.)

14  A       Yes.

15  Q       And again, how do you recognize it?  What's

16  distinctive about those tattoos?

17  A       They're Austin's.

18  Q       Okay.  You've seen them, being his girlfriend?

19  A       Yes.

20  Q       And you can identify them as Austin Burke?

21      I'm going to show you what's been marked for purposes

22  of identification as State's Exhibit 14 and ask if you

23  recognize State's Exhibit --

221

1          BAILIFF, JODI CAMUSO:  Chris, do you want

2  me to turn down the lights?

3          MR. BECKER:  No, no.  I can lighten it up.

4  BY MR. BECKER:

5  Q     Do you recognize the individual in State's

6  Exhibit 14?

7  A     Yeah.

8  Q     Who is that?

9  A     Austin.

10 Q     All right.  Do you recognize the girl beside him?

11 A     Yeah.

12 Q     Who is that?

13 A     Her name is Melanie.

14 Q     Do you know her last name?

15 A     Engle, I think.

16 Q     Had you ever met her before?

17 A     Once.

18 Q     How did you meet her?

19 A     Through a mutual friend.

20 Q     Had you ever been to her apartment?

21 A     No.

22 Q     Do you recognize the individual in the -- the other

23 male in the picture?

222

1    A       Yes.

2    Q       Who is that?

3    A       Donavon.

4    Q       Do you know his last name?

5    A       No.  I can't remember.

6    Q       Had you ever met him?

7    A       Yes.

8    Q       Okay.  How did you meet him?

9    A       Through another mutual friend.

10   Q       Who would the mutual friend be?

11   A       Justin Borawiec.

12   Q       And do you recognize the woman at the end there?

13   A       I believe that might be Leah.

14   Q       All right.  Do you know Leah's last name?

15   A       Smith, maybe.

16   Q       And how do you know Leah?

17   A       Through Austin.  I never met her.

18   Q       Okay.  So you know her through Austin.  Is it fair to

19   say these were Austin's friends and not your friends?

20   A       They're not my friends, correct.

21   Q       Melanie, I'm going to show you a video that has been

22   marked for purposes of identification as State's Exhibit

23   Number 12.

223

 1                    MR. OLSON:  Your Honor, I would note an

 2     objection.

 3                    THE COURT:  Approach.

 4                    (At sidebar:)

 5                    THE COURT:  I'm not aware of what's in the

 6     video so I don't know what's being objected to.

 7                    MR. OLSON:  I'm assuming this is the video

 8     that will show him shooting this firearm.  Again, I don't know

 9     what the date of this video is.  I'm objecting on the grounds

10     of relevance.  There's no relevance to this testimony at this

11     juncture.  Unless it's the date of these incidents, I don't

12     know what the relevance of him possessing a gun prior to.

13                    MR. BECKER:  Well, yeah, Your Honor, first

14     of all, the Court will recall there was a motion to suppress

15     the photograph -- I'm sorry, the video that was taken from her

16     phone.  The Court overruled that previously.  This is

17     certainly circumstantial evidence.  I'm going to show it to

18     her.  It was recorded by her on her phone of him shooting what

19     appears to be the .22 gun in this case.

20          The Court obviously is aware that this was June 8th.

21     It's circumstantial evidence that he had possession of a

22     gun --

23                    THE COURT:  The date was June 8th?

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

224

1              MR. BECKER:  Yeah.

2              MR. OLSON:  And just for the record, again,

3     the Court overruled the motion to suppress and held that it

4     would be reconsidered at the time of trial.

5              THE COURT:  Overruled again.

6              MR. BECKER:  Thank you, Your Honor.

7              MR. OLSON:  I would ask for a sequestration

8     of the witnesses and separation of witnesses.

9              MR. BECKER:  Oh, yeah.

10             MR. OLSON:  I'm sorry I didn't --

11             THE COURT:  I assumed you already took care

12    of that.

13             MR. BECKER:  For the record, we have.  I

14    don't think at this point anybody has been in here.  And I've

15    told all of my witnesses.

16             THE COURT:  Do you need the lights off,

17    Mr. Becker?

18             MR. BECKER:  Your Honor, let me see.  I

19    thing I might be able to play this.

20             (End of sidebar.)

21    BY MR. BECKER:

22    Q     I'm going to show you what's been marked for purposes

23    of identification as State's Exhibit Number 30.  I'm sorry.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1   Not State's Exhibit 30.  State's Exhibit 12.  I'm sorry.

2          (Whereupon, State's Exhibit 12, Video, was introduced for

3   identification.)

4                          (State's Exhibit 12 played for the Jury.)

5   Q       And were you able to see that video?

6   A       Yes.

7   Q       Okay.  Who made that video?

8   A       I did.

9   Q       And do you recall when you made that video?

10  A       Early June.

11  Q       Do you remember the exact date in June?

12  A       I don't remember, no.

13  Q       It would have been before you went on your trip,

14  though, to Jamaica; correct?

15  A       I believe.

16  Q       All right.  How did you take that video?

17  A       My phone.

18  Q       And who was shooting the gun in that video?

19  A       Austin.

20  Q       And do you recall what that gun looked like?

21  A       It was silver with a marbled handle.

22  Q       It had a marbled handle?

23  A       Uh-huh.

226

```
1   Q       The individual that was shooting that gun and who
2   you've identified in those pictures and you've said you've
3   previously seen him with a gun; correct?
4   A       Correct.
5   Q       Is he here in the courtroom?
6   A       Yes.
7   Q       Can you please identify him?
8   A       Austin Burke.
9   Q       Can you point at him?
10  A       (Witness indicates.)
11  Q       He's the defendant in this case?
12  A       (Witness nods head.)
13  Q       And he's your boyfriend?
14  A       Correct.
15               MR. BECKER:  I have nothing further, Your
16  Honor.
17               THE COURT:  Mr. Olson.
18               MR. OLSON:  Thank you, Your Honor.
19                    CROSS EXAMINATION
20  BY MR. OLSON:
21  Q       Good afternoon, Meredith.
22  A       Good afternoon.
23  Q       Meredith, you indicated that you met Austin
```

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

227

1    approximately four years ago; is that correct?

2    A       Correct.

3    Q       And you met him at church?

4    A       Yes.

5    Q       What church was that?

6    A       Believer's Church.

7    Q       And is that a church that you continue to attend?

8    A       No, not anymore.

9    Q       Okay.  Do you know if Austin continues to attend that

10   church?

11   A       I'm not sure.

12   Q       Now, you indicated that you didn't start dating him

13   until 2017; is that correct?

14   A       That's correct.

15   Q       But you knew him since 2014?

16   A       Yeah, on and off.

17   Q       How often would you interact with Austin between 2014

18   and 2017 before you started dating?

19   A       I didn't talk to him for about three years.

20   Q       Okay.

21   A       After I first met him.

22   Q       And so at some point in time after you didn't see him

23   at church anymore and you didn't really interact with him,

228

1    there came a time that you met up with Austin again; is that

2    correct?

3    A        Correct.

4    Q        And when was that?

5    A        That was May 2017.

6    Q        Okay.  And how did you meet up with him again?

7    A        We had a mutual friend.

8    Q        Okay.  And what's that friend's name?

9    A        Clinton Ewing.

10   Q        And do you recall where you met up with him at?

11   A        First time, I think it was at Howland Park.

12   Q        Okay.  And from there did you start interacting with

13   Austin more often?

14   A        Uh-huh, yes.

15   Q        Okay.  And during that period of time, did you see

16   Austin carrying around a gun on a regular occasion?

17   A        Not very many times.

18   Q        Okay.  We saw a video of Austin holding a gun out in

19   the middle of the woods; is that correct?

20   A        (Witness nods head.)

21   Q        That one you just identified?

22   A        Correct.

23   Q        And you don't remember when that was?

229

1    A        No, not the exact date.

2    Q        Do you remember if it was before or after June 11th?

3    A        It was -- I don't remember.  I believe it was before.

4    Q        You believe it was before June 11th?

5    A        (Witness nods head.)

6    Q        So if we assume that that is correct, do you recall

7    seeing that gun anytime after that video was taken?

8    A        I don't remember.  I don't think so.

9    Q        Okay.  Now, there was also a picture that we looked

10   at where Austin was sitting on a couch with some other

11   individuals you identified as Melanie Engle, Donavon and Leah

12   Smith?

13   A        Correct.

14   Q        And you indicated that those are Austin's friends; is

15   that correct?

16   A        Yes, sir.

17   Q        Do you know how long Austin would have known Melanie,

18   Donavon and Leah?

19   A        I know he knew Donavon for awhile, but I don't know

20   about the other two.

21   Q        Okay.  Do you know when that picture was taken that

22   was put up there on the board?

23   A        Not the exact date, no.

1   Q      Okay.  And you weren't in that picture; is that

2   correct?

3   A      Correct.

4   Q      Were you there when that picture was taken?

5   A      No.

6   Q      We heard some testimony about one day you were at

7   Nelson Ledges with Austin and Rickey and Austin said, "Hey,

8   you want to see a scary place," that ended up being what was

9   called Hatchet Man Road.  What do you know about Hatchet Man

10   Road?

11   A      I don't know much.  I know it's been abandoned for

12   awhile.  That's all I know.

13   Q      Is there a background story to that place, like an

14   old legend of what was going on?

15   A      Yeah.  I think a man killed some people there with a

16   hatchet.

17   Q      And is this like a popular thing for people to go out

18   there up in the Bristol area and -- like a scary night?

19   A      Yeah, I believe so.

20   Q      Is Austin the one that told you about the background

21   of what was going on there?

22   A      Yes.

23   Q      Now, after -- what was the dates that you went to --

231

1    on your cruise?

2    A      It was either June 8th or 9th to the 14th.

3    Q      Okay.  So from June 8th or 9th to the 14th, during

4    that period of time, did you have any contact or communication

5    with Austin?

6    A      Very little.

7    Q      And how were you communicating with him?

8    A      Through Messenger on Facebook.

9    Q      Okay.  At any point in time, did Austin mention about

10   anything of having a bad interaction with a person or talking

11   about shooting a person or anything like that?

12   A      No.

13   Q      Now, you had been dating him for a few weeks then?

14   A      Not quite at that point, I don't think.

15   Q      Not at that point?

16   A      Can you repeat the question?

17   Q      Did Austin ever mention to you the name Brandon

18   Sample before you went on a -- your cruise?

19   A      No.

20   Q      Did you ever meet Brandon Sample?

21   A      No.

22   Q      When you got back from your cruise, did Austin

23   mention anything about hanging out with a Brandon Sample?

232

1          MR. BECKER:  I'm going to object.  That's

2     hearsay.

3          THE COURT:  I'm going to overrule that.  Go

4     ahead.

5     A          He sent me an article that -- and he said that he was

6     with Brandon Sample at one point.  But that's it.

7     Q          Did he say where he was with Brandon at?

8     A          No.

9     Q          Okay.  Now, again, the question previously was did

10    Austin ever send you any text message or indicate in any way

11    through Messenger systems whether he had any bad interactions

12    with Brandon.  Did he ever tell you in person that, "Hey, I

13    shot this kid"?

14    A          No, sir.

15          MR. BECKER:  I'm going to object to that.

16          THE COURT:  Asked and answered.  Let's go

17    on.

18          MR. OLSON:  I have no further questions.

19          THE COURT:  Redirect.

20          MR. BECKER:  No, Your Honor.

21          THE COURT:  You may step down.

22     Ladies and Gentlemen of the Jury, we'll take this

23     opportunity for our mid-afternoon break.  We'll take

233

```
 1   15 minutes.  Again, when you're done with your break, go down
 2   to the petit jury room.
 3           Do not discuss this case among yourselves, nor with
 4   anyone else.  Do not form or express an opinion.  I'll see you
 5   in 15 minutes.
 6                   (Whereupon, a recess was had commencing at
 7   2:40 p.m. and concluding at 2:58 p.m.)
 8                   THE COURT:  Mr. Becker, you may call your
 9   next witness.
10                   MR. BECKER:  Thank you, Your Honor.  State
11   would call Brittani Merten.
12                       *   *   *
13                   BRITTANI MERTEN,
14   having been duly sworn, was examined and testified as follows:
15                   DIRECT EXAMINATION
16   BY MR. BECKER:
17   Q       Will you tell us your name, please?
18   A       Brittani Merten.
19   Q       And Brittani, where do you live at?
20   A       On Leslie Drive.
21   Q       Where is that located at?
22   A       In Champion now.
23   Q       Okay.
```

234

1    A        But --

2    Q        Go ahead.

3    A        -- I lived in Newton Falls.  I don't know like if

4    you're asking that or --

5    Q        Okay.  Just where you live now.

6    A        Okay.  Yeah.

7    Q        And how old are you?

8    A        18.

9    Q        When is your birthday?

10   A        December 30th.

11   Q        So you were 17 in June of last year?

12   A        Yeah.

13   Q        All right.  Now, do you have a brother?  Or a half

14   brother?

15   A        Yes.

16   Q        What's his name?

17   A        Nathan Moats.  And I have a older one.

18   Q        Okay.  Now, are you familiar with -- I'm going to ask

19   you some individuals, and I'm going to ask you if you're

20   familiar with them and if you are how you are familiar with

21   them.  Are you familiar with Rickey Roupe?

22   A        Yes.  That's my brother's best friend.

23   Q        I'm sorry.  Say that again.

```
 1   A        It's my brother's best friend.

 2   Q        All right.  Are you familiar with Jessica Simms?

 3   A        I know of her.  I've never talked to her.  I seen her

 4   out there, but --

 5   Q        You're not friends with her, don't socialize with

 6   her?

 7   A        No.

 8   Q        Are you familiar with Hayle Roupe?

 9   A        Yeah.

10   Q        How are you familiar with Hayle?

11   A        Through Rickey.

12   Q        All right.  They're cousins, I believe?

13   A        Yeah.

14   Q        And are you familiar with a Deidre Keener?

15   A        Yes.

16   Q        How are you familiar with Deidre?

17   A        Through Rickey.

18   Q        Okay.  Now, I want to direct your attention back to

19   June of 2017.  Was there a time that you knew an individual by

20   the name of Austin Taylor Burke?

21   A        Yes.

22   Q        How did you know Austin Taylor Burke?

23   A        Through Rickey.
```

1  Q       And was it fair to say that that was his friend?

2  A       Yeah.

3  Q       You weren't friends with Austin Taylor Burke?

4  A       No.  I met him through Rickey and little Nate.

5  Q       Did there come a time when you saw Austin Taylor

6  Burke with a firearm?

7  A       Yes.

8  Q       Can you describe the kind of firearm he had?

9  A       I say it's blue like marble.  I don't know.

10 Q       Okay.

11 A       It's little.

12 Q       Was it big one, was it small?

13 A       Little.

14 Q       All right.  I'm going to hand you what's been marked

15 for purposes of identification as State's Exhibit Number 1 and

16 ask if you recognize State's Exhibit Number 1?

17 A       Yeah.

18 Q       Okay.  This would be the same or similar type of gun

19 you saw him with?

20 A       Yes.

21 Q       Okay.  And tell us how and where you saw him with

22 this gun.

23 A       At my apartment in Newton Falls.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

237

1    Q        At your place?

2    A        Uh-huh.

3    Q        Okay.  So how is it that he was at your place in

4    Newton Falls?

5    A        Rickey brought him over one day.  Like Rickey came

6    with him.  So that's the night that I met him too.

7    Q        All right.  Do you recall what time of year this was,

8    what month it was?

9    A        It was June.

10   Q        June of 2017?

11   A        Yeah.

12   Q        All right.  And Newton Falls, do you know what county

13   that is in?

14   A        Trumbull.  Should be.

15   Q        All right.  And that's where you saw the gun?

16   A        Yeah.

17   Q        Now, there came a time when you sort of became closer

18   or more friendly to Austin Burke; is that correct?

19   A        Yeah.

20   Q        All right.  How did that come about?

21   A        I didn't have sex with him.  Like --

22   Q        No.  I'm not asking --

23   A        I know you guys keep asking me that.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1   Q       There was some point where you had a relationship
2   with him or were trying to get a relationship?
3   A       Yeah.  We got drunk and then we kissed, but that's
4   it.
5   Q       Okay.  And there was some text message talking about
6   that; correct?
7   A       Yeah.
8   Q       All right.  Do you recall what your cell phone number
9   was back then?
10  A       (330) 937-1376.
11  Q       And do you recall Austin Burke's cell phone?
12  A       No.
13  Q       Okay.  But you're certain you had talked to him;
14  correct?
15  A       Yeah.
16  Q       All right.  And at one point in June of 2017 you were
17  talking to him by text message; is that correct?
18  A       Yeah.
19  Q       Now I'm going to hand you what's been marked for
20  purpose of identification as State's Exhibit Number 48.  It's
21  a two-page document.  And I'm going to hand you this.  I'm
22  going to have you look at those phone records.  Those are text
23  messages that were taken from the defendant's cell phone

239

1    records.  And I'm going to ask you if you see your number on

2    those cell phone records?

3    A       Yeah.

4    Q       All right.  I'm going to ask you to look down at line

5    31 of that document.

6    A       Uh-huh.

7    Q       And was there a text message that you received from

8    Austin Burke on June 11, 2017 late in the evening?  Or maybe

9    it was June 12th.

10   A       It says June 12th.

11   Q       It was just after midnight then; right?

12   A       I don't see a time on here.

13   Q       Well, we'll look at it.  But it's June 12th?

14   A       Yeah.  It says June 12th.

15   Q       And what did Austin Burke text you?

16   A       "See if my clip for the 9-millimeter is there."

17   Q       And where were you at?

18   A       I was at Nick's.

19   Q       And who is Nick?

20   A       Just my friend.

21   Q       All right.  And --

22   A       That's the night that we went there.  We got drunk.

23   Q       All right.  And was Austin Burke there earlier that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

240

1   night?

2   A       It wasn't this exact night that we went there.

3   Q       He had been there some other night?

4   A       Yeah.  We all went there.

5   Q       And he had a 9-millimeter clip?

6   A       Yeah.  Rickey was playing with it.  It was Rickey or

7   little Nate.  I don't know.  We were all drunk.  One of 'em

8   was playing with it and they lost the clip to it.

9   Q       They had a gun too?

10  A       Yeah.  It was Austin's, but they lost the clip.

11  Q       Okay.

12  A       So I don't know whatever happened to it.

13  Q       What did that gun look like?

14  A       It was a little bigger than the other one.  It was

15  silver.

16  Q       Okay.  Now, if you go down to the next page up at the

17  top --

18  A       Uh-huh.

19  Q       -- there's a text message at about 2 a.m., 2:08 a.m.

20  on June 12th; do you see that?  It should be line 33, I think.

21  A       No, 37.

22  Q       I'm sorry.  37.  Yes.

23  A       Uh-huh.

241

1    Q        And what was that text message sent to you?

2    A        "Out in Niles."  Oh, what day?  6-12.  It says at

3    2:08, but I don't know if that's the time.

4    Q        Okay.  Well, it says 2:08; right?

5    A        Uh-huh.

6    Q        Okay.  It says June 12th?

7    A        Yeah.

8    Q        And it's a text message from who?

9    A        It's outgoing from his -- it don't say.

10   Q        Okay.

11   A        It's just outgoing into my phone.

12   Q        Into your phone; right?

13   A        Yeah.

14   Q        And it says, "I'm out at Nile"  with a "W"?

15   A        Yeah.  It says, "Out in Nile."

16   Q        Okay.  Do you recall receiving those text messages

17   from Austin Burke?

18   A        Yes.

19   Q        All right.  I'm going to show you what has been

20   marked for purposes of identification as State's Exhibit 11

21   and ask if you recognize State's Exhibit 11?

22   A        Yeah.  You want me to hold it?

23   Q        Yeah.  You can hold it.  Okay.  What is State's

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

242

1    Exhibit 11?

2    A        It's just a picture of him holding guns.

3    Q        All right.  Do those look like the two guns that you

4    had seen him with?

5    A        Yeah.

6    Q        And when you say "he," who are you referring to?

7    A        Austin.

8    Q        All right.  Does the one gun look like the

9    marble-handled gun you described?

10   A        Yeah.

11   Q        And does the other one look like the 9-millimeter

12   gun?

13   A        Uh-huh.

14   Q        They were playing around with the clip on -- and he

15   asked you about where the clip was?

16   A        Yeah.  They lost it at the farmhouse.

17   Q        I'm going to publish for the jury just so we know

18   what we're talking about here on the text messages.

19            Brittani, you testified to line thirty --

20   A        One.

21   Q        -- one.  Right.  Can you read that?  Is that big

22   enough for you or can you see that?  If you have to step down

23   to see.

243

1   A        I can see it.  "See if my clip for the 9-millimeter

2   is out there."

3   Q        And did you respond to that?

4   A        Yeah.  I said, "I don't see it anywhere."

5   Q        All right.  You say that you see the dates here.

6   These were on June 12, 2017, and --

7   A        It just says "41."

8   Q        Can you read the time there?

9   A        It just says "41."

10  Q        Yeah.  So 041 would be -- if we started the day at --

11  12, that would be like 12:41 in the morning; right?

12  A        Okay.

13  Q        Okay.  And you recall having those text conversations

14  with the defendant; correct?

15  A        Yeah.

16  Q        And then you testified on line 37, which is right

17  here, at June 12, 2017 at 2:08 a.m., did he tell -- did he say

18  where he was?

19  A        Out in Niles.

20  Q        Niles.  Okay.  And, again, those are text messages

21  that you recall receiving from him?

22  A        Yeah.

23  Q        Now the individual -- and there's also the last text

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

244

1    message here.  It has this little picture here, it's a little

2    like a thumbnail picture.  Do you recall sending a picture to

3    him the next -- later in the morning on June 12th?

4    A        Yeah.

5    Q        Okay.  What did you send him a picture of?

6    A        It's just like a bathing suit.  I was going swimming

7    at the farmhouse.

8    Q        Okay.  So you would have sent that picture to Austin

9    Taylor Burke?

10   A        Yeah.

11   Q        Okay.  Now, Brittani, the individual that you saw

12   with those guns and who you identified in the photograph, is

13   he here in the courtroom today?

14   A        Yes.

15   Q        Would you please identify him?

16   A        He's right there.

17   Q        And that's the individual you know as Austin Taylor

18   Burke?

19   A        Yes.

20   Q        And he's the individual that you saw with those two

21   firearms?

22   A        Yes.

23   Q        He's the individual that asked you where his

1  9-millimeter clip was?

2  A      Yes.

3  Q      All right.  And he's the individual who told you he

4  was at Niles on June 12th at 2:08 a.m.?

5  A      Yes.

6              MR. BECKER:  I have nothing further, Your

7  Honor.

8              THE COURT:  Cross?

9                   CROSS EXAMINATION

10 BY MR. OLSON:

11 Q      Good afternoon, Brittani.

12 A      Hi.

13 Q      You indicated you're 18 years old; is that correct?

14 A      Yes.

15 Q      And you stated that you met Rick -- Austin through

16 Rickey?

17 A      Yes.

18 Q      Do you recall when that was?

19 A      No.  It was in June.

20 Q      June of 2017?

21 A      Yes.

22 Q      So you've known him approximately nine months?

23 A      We counted it.  It was like 19 days before he went to

246

1    jail.

2    Q        Okay.

3    A        Yeah.

4    Q        You indicated that during one of the interactions

5    that you had with Rickey -- excuse me, with Austin -- you saw

6    him in possession of a gun with a marble type handle; is that

7    correct?

8    A        Yes.

9    Q        Do you recall when that was?

10   A        It was the same night I met him.

11   Q        And that was early in June?

12   A        Yeah.

13   Q        That was before June 11th?

14   A        Yes.

15   Q        And June 12th obviously.

16   A        Yeah.

17   Q        Now, we went over some messages that were exchanged

18   between you and Austin on June 11th into the 12th; is that

19   correct?

20   A        Yeah.

21   Q        And the one indicated that he was looking for a clip

22   to a 9-millimeter?

23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

247

1 Q  Now that 9-millimeter, you indicated you saw him with

2 it that night that you were at Nick's house drinking; is that

3 correct?

4 A  Yes.  But I saw it the same night like I met him.

5 Q  Okay.  And, again, that's before June 11th and

6 June 12th?

7 A  Yes.

8 Q  You told him that the clip wasn't at the location

9 where you were; is that correct?

10 A  No.  We couldn't find it.  We looked in the pond and

11 it wasn't in there.

12 Q  Okay.  And you would agree with me that there was no

13 message that Austin ever sent back to you that said, "Hey, I

14 found the clip"?

15 A  Yes.  There was no message.  He never found it.

16 Q  Did Austin ever come out to the place or location

17 where you were?

18 A  No.  Not looking for it or anything.  We just

19 couldn't find it.  We gave up.

20 Q  On June 11th or June 12th, did you see Austin at all?

21 A  No.

22 Q  Now, there was also a message that came up at

23 approximately 2:00 in the morning, is that correct, that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   said --

2   A       The 2:08 one?

3   Q       Yeah, 2:08.  Out in Nile with a "W"?

4   A       A "W," uh-huh.

5   Q       Obviously he was indicating out in Niles; is that

6   correct?

7   A       Yes.

8   Q       During any period of time did Austin tell you that he

9   was with your brother Nate?

10  A       No.

11  Q       At any point in time did Austin tell you that he was

12  with Rickey Roupe?

13  A       No.

14  Q       At any point in time did Austin tell you that he was

15  with Deidre Keener?

16  A       No.

17  Q       At any point in time did Austin tell you that he was

18  with Hayle Roupe?

19  A       No.

20  Q       At any point in time did Austin tell you that he was

21  with Jessica Simms?

22  A       No.

23  Q       At any point in time did Austin tell you that he was

1    with Brandon Sample?

2    A       No.

3    Q       Did he ever mention Brandon Sample to you?

4    A       No.  I never met him or heard about him.

5                    MR. OLSON:  I have no further questions.

6                    THE COURT:  Redirect?

7                    MR. BECKER:  Nothing further, Your Honor.

8                    THE COURT:  You may step down.  Thank you.

9         Call your next witness.

10                   MR. BECKER:  State would call Nathan Moats.

11                           *   *   *

12                       NATHAN MOATS,

13   having been duly sworn, was examined and testified as follows:

14                      <u>DIRECT EXAMINATION</u>

15   BY MR. BECKER:

16   Q       Please state your name for the record.

17   A       Nathan Moats.

18   Q       All right.  Nathan, how old are you?

19   A       16 years old.

20   Q       When is your birthday?

21   A       6-19-01.

22   Q       Okay.  You don't have to hold it.

23   A       Oh, just talk like this?  Okay.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

250

1    Q       So you would have been 15 back around June 11th and

2    12th of last year; correct?

3    A       Correct.

4    Q       All right.  Now, I'm going to ask you some questions

5    here.  Where were you living at back in June of 2017?

6    A       Newton Falls.

7    Q       All right.  And were you familiar with an individual

8    by the name of Austin Taylor Burke?

9    A       Yes.

10   Q       How did you know Austin Taylor Burke?

11   A       From one of my buddies.

12   Q       All right.  And had you known him for a long time in

13   June?

14   A       No.

15   Q       All right.  Now, was there a time when you saw Austin

16   Taylor Burke with a gun?

17   A       Yes.

18   Q       Did you see him with more than one gun?

19   A       Yes.

20   Q       Okay.  Can you describe the guns you saw him with?

21   A       One was, had like a marble type of grip to it.  It

22   was like plastic almost.  And then the other one was just

23   black.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

251

1   Q      Okay.  Now, I want to direct your attention to

2   State's Exhibit Number 1.  I'm going to have you look at

3   State's Exhibit Number 1 and ask if you recognize this item.

4   Do you recognize State's Exhibit Number 1?

5   A      Yes, I do.

6   Q      What is State's Exhibit Number 1?

7   A      It's the gun that I seen.

8   Q      That you saw Austin Burke with?

9   A      Yes, I saw Austin Burke with.

10   Q      Okay.  Now, I want to direct your attention to

11   Sunday, June 11th of 2017, and into the morning, early morning

12   hours of Monday, June 12th, 2017.  Are you familiar with

13   Rickey Roupe?

14   A      Yes, I am.

15   Q      How are you familiar with Rickey Roupe?

16   A      Everybody from -- I went to school with him awhile.

17   Grew up.

18   Q      Were you familiar with Jessica Simms?

19   A      Yes.

20   Q      How did you know Jessica?

21   A      Through Rickey.

22   Q      And did you know Deidre Keener?

23   A      Yes.

252

1    Q        How long did you know Deidre Keener?

2    A        I didn't know her for too long until I started

3    hanging out in Niles is when I met Deidre.

4    Q        And were you familiar with a Hayle Roupe?

5    A        Yes.  That's Rickey's cousin.

6    Q        All right.  Now, on June 11th and June 12th of 2017,

7    did you know where Rickey Roupe lived at?

8    A        Yes.

9    Q        Where did he live at?

10   A        It was in Niles.  I can't think of the street name.

11   Mason.

12   Q        All right.  Mason Street?

13   A        Mason Street.

14   Q        All right.  And were you over there that evening when

15   Austin Taylor Burke came over?

16   A        Yes, I was.

17   Q        Tell us what happened when Austin Taylor Burke showed

18   up at that street on Mason Street.

19   A        He showed up for a little while and then he left a

20   little while after that.

21   Q        Okay.  And that would have been -- would it have been

22   dark out?

23   A        Evening time.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        Okay.

2    A        Getting close.  Later.

3    Q        Later?

4    A        Yeah.

5    Q        All right.  You don't know the exact time?

6    A        Not the exact time.  But if I had to say a time, it

7    would be around 2:00 -- or about 1, 2:00.  In there.

8    Q        And was he with anybody at around 2:00, 1:00?  You're

9    talking about in the morning, like early morning?

10   A        Yes.

11   Q        Okay.  So it would be dark out?

12   A        Yeah.

13   Q        All right.  And was he with anybody when he came

14   over?

15   A        Yes.

16   Q        Do you remember who that individual was?

17   A        It was Brandon.

18   Q        Brandon, did you know his last name?

19   A        I didn't know his last name.

20   Q        Had you ever met Brandon before?

21   A        No.

22   Q        Did you see the car that they came in that day?

23   A        No.


OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

254

1    Q        You didn't see the car?

2    A        (Witness shakes head.)

3    Q        Okay.  Did they come into the house for awhile?

4    A        Not awhile.  It was -- Brandon didn't really come in.

5    Q        He did not come in?

6    A        Not -- like he stepped in the doorway.  It wasn't --

7    Q        And at some point did Austin say something that he

8    was going to do?

9    A        Not that night.

10   Q        Okay.  He didn't say anything that night?

11   A        No.

12   Q        And did he and this Brandon individual leave at

13   around 2 in the morning?

14   A        Yes.

15   Q        Now, a couple days later -- or maybe later that

16   day -- at some point you saw Austin Burke again; correct?

17   A        Correct.

18   Q        All right.  Tell us how you saw him and where you saw

19   him at.

20   A        He was at Rickey Roupe's house and I woke up and he

21   was there.  I'm not sure how he got there or when.

22   Q        That would have been like later --

23   A        Early morning.  You know.

255

1   Q      Was the sun out then when he came back?

2   A      Yes.

3   Q      All right.  You don't remember the time, though?

4   A      No.

5   Q      And what happened when he came back in the morning,

6  and what did he say?

7   A      He just told us that he -- I don't know what to say.

8  Like --

9   Q      Well, tell us what he said.

10  A      He didn't really say much.  Just that, you know, he

11  started -- he was telling everybody that he killed Brandon

12  Sample.

13  Q      And did he tell you details about where and how he

14  did that?

15  A      No.

16  Q      Well, did he tell you something about where he shot

17  Brandon or how he killed him?

18  A      He said he shot him in the head.

19  Q      All right.  And did he tell you what he did before he

20  shot him?

21  A      No.

22  Q      Okay.  Did he tell you where he shot him at?

23  A      Yes.

256

1    Q       And where did he say he shot him at?

2    A       In the head.

3    Q       No.  I mean where location-wise?

4    A       Hatchet Man Road.

5    Q       All right.  Are you familiar with Hatchet Man Road?

6    A       No.  I'm not too familiar with it.

7    Q       Had you ever been there?

8    A       I'm sure I've been there.

9    Q       All right.  And do you know roughly where it is?

10   A       I know it's a natural resource park thing.

11   Q       Who had you been there with?  When you went there,

12   who had you gone there with?

13   A       My buddies from Leavittsburg.

14   Q       Okay.  Now -- and do you remember, then, anything

15   else that Austin told you about shooting Brandon Sample?

16   A       (Witness shakes head.)

17   Q       No?

18   A       (No response.)

19   Q       Do you remember anything else he told you?

20   A       Just that he shot him and he left him there.  That's

21   all.

22   Q       And it was at Hatchet Man Road?

23   A       Yes, yes.

257

```
1    Q       Okay.  Now, the person that told you this and who you
2    saw with Brandon Sample and told you he shot him, is he here
3    in the courtroom today?
4    A       Yes.
5    Q       Can you please point to him?
6    A       (Indicating.)
7    Q       And you're pointing at the defendant in this case,
8    Austin Taylor Burke; correct?
9    A       Correct.
10   Q       Okay.  Nathan, these gentlemen are going to ask you
11   some questions now, but I'm done asking you questions.  Okay?
12   Thank you.
13                        CROSS EXAMINATION
14   BY MR. HARTWIG:
15   Q       Hi, Nathan.
16   A       Hello.
17   Q       I just want to clear a few things up.  Okay?
18   A       Okay.
19   Q       All right.  So on June 11th or 12th, you went over to
20   Rickey Roupe's house; correct?
21   A       Yes.
22   Q       All right.  Did you go alone?
23   A       Yes.
```

258

1    Q        All right.  Do you drive?

2    A        No.

3    Q        All right.  How did you get there?

4    A        I got dropped off by my mother.

5    Q        Okay.  And about what time did you get dropped off at

6    that house?

7    A        I'm not sure around what time it was.

8    Q        Okay.  Was it light out?

9    A        I don't recall if it was or wasn't.

10   Q        So whether it was dark or light, you can't recall

11   that?

12   A        No.  It was that day though.

13   Q        Which day?

14   A        It was the 11th.

15   Q        It was on the 11th?  You just don't recall?

16   A        I don't know, like, you know.

17   Q        I'm sorry.  Speak up a little bit.

18   A        I'm not sure when I got there because --

19   Q        Okay.  When you got there, who was there?

20   A        Rickey was.

21   Q        Just Rickey?

22   A        It was just Rickey and Deidre.

23   Q        So Rickey and Deidre were there when you arrived?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Yes.

2    Q        Okay.  Now, were you guys doing any drugs there at

3    the house at any point?

4    A        No.

5    Q        Okay.  All right.  Now, you were interviewed two

6    times by police in this case; correct?

7    A        Correct.

8    Q        All right.  Do you recall being interviewed on

9    June 27th for the first time?

10   A        Yes.

11   Q        All right.  And at that point you gave what they

12   wanted you to give which was truthful testimony; correct?

13   A        Correct.

14   Q        All right.  And then one month later, about one

15   month, on July 17th, they interviewed you again; correct?

16   A        Correct.

17   Q        All right.  And you gave a lot more information at

18   that point; would you agree with me?

19   A        I agree.

20   Q        Okay.  In your first interview, would you agree that

21   you said you just met Austin Burke through Rickey Roupe?

22   That's how you eventually met him; correct?

23   A        Yes, correct.

260

| | |
|---|---|
| 1 | Q        You indicated that Austin arrived at Rickey Roupe's |
| 2 | house, which would be on June 12th at around 1 or 2:00 in the |
| 3 | morning; do you recall that? |
| 4 | A        I recall. |
| 5 | Q        All right.  What were you doing at 1 or 2:00 in the |
| 6 | morning at that point? |
| 7 | A        Just hanging out with Rickey and Deidre. |
| 8 | Q        All right.  They were still awake? |
| 9 | A        They were there, yeah. |
| 10 | Q        They were up at that point? |
| 11 | A        (Witness nods head.) |
| 12 | Q        All right.  And you had indicated in your first |
| 13 | interview that Brandon Sample was with Austin; do you recall |
| 14 | that? |
| 15 | A        I recall. |
| 16 | Q        All right.  You had indicated you observed Brandon |
| 17 | Sample snorting heroin or fentanyl; correct? |
| 18 | A        Correct. |
| 19 | Q        All right.  And you had indicated to the detective |
| 20 | that you believed that he got that from a friend that he had |
| 21 | from Akron? |
| 22 | A        Well, he -- that's what Brandon Sample had said.  He |
| 23 | said that his buddy left it in the car. |

261

```
 1    Q       All right.  Indicating his buddy also does drugs?
 2    A       That's -- that's what I would say.
 3    Q       All right.  Did you also get the impression that his
 4    buddy does drugs?
 5    A       Yes.
 6    Q       Did he indicate that his buddy was Josh White?
 7    A       No.
 8    Q       All right.  Didn't give a name?
 9    A       No.
10    Q       All right.  Was he indicating a friend from Akron
11    from that same day that he had been with?
12    A       I don't recall.
13    Q       Okay.  Now, you had indicated to the detective that
14    Brandon and Austin left the house around 3:30 or 4 in the
15    morning; correct?
16    A       Correct.
17    Q       So that would indicate maybe on the long side they
18    were there from 1 to 4, approximately three hours; does that
19    seem right?
20    A       Yeah.
21    Q       Okay.  So when you had testified that they stayed a
22    little while, three hours is a little while?
23    A       I mean, yeah.  It's --
```

262

1    Q        Okay.  And as far as your observations of Brandon

2    Sample doing heroin or fentanyl, how much did you see him do?

3    A        I don't know how much they would have been -- I

4    don't --

5    Q        Okay.  How frequently did you see him do it?

6    A        I only seen him snort a little bit of the powder.

7    That was all.

8    Q        Okay.  Now, you had indicated to the detective that

9    when they left both Rickey and Nate were awake.  So you and

10   Rickey were awake?

11   A        Rickey was sleeping when they left.

12   Q        Okay.  But you told detectives in your first

13   interview that Rickey was awake; do you recall that?

14   A        Well, Rickey and Deidre were laying in Rickey's bed

15   -- Rickey's grandma's bed.

16   Q        Okay.

17   A        They weren't, you know, fully asleep but pretty much

18   sleeping.

19   Q        Okay.  Pretty much, but awake?

20   A        Yeah, but --

21   Q        All right.  Now, you then -- you had said, though --

22   you had said further in that interview Deidre had left before

23   Austin and Brandon left; do you recall that?

263

1   A       I don't recall.  I recall.

2   Q       I'm sorry?

3   A       I do recall.

4   Q       Okay.  So you're indicating today, as you did in your

5   first interview, that Deidre left before Austin and Brandon

6   left the house; correct?

7   A       Correct.

8   Q       So when she's gone, it's now Rickey, you, Brandon and

9   Austin; correct?

10  A       Correct.

11  Q       All right.  And for how long did Brandon -- well,

12  strike that.  Let me rephrase that.  Okay?  Little confusing.

13          How long was Deidre gone?  How long was Deidre gone

14  before Austin and Brandon supposedly left?

15  A       How long was she gone?

16  Q       Yeah.  How long was she out of the house, gone,

17  before they left?

18  A       I don't --

19  Q       Okay.  You don't recall?

20  A       No, I don't recall.

21  Q       All right.  Now, you indicated in your first

22  interview that Austin came back to Rickey's house around

23  6:00 in the morning; correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

264

1   A        Early morning, yes.

2   Q        Well, you had indicated in the interview about 6; is

3   that your testimony?

4   A        If I had to say a time.

5   Q        Okay.  Were you awake at that point?

6   A        I was just waking -- I was sleeping and then I woke

7   up.  I'm not sure what time it was, but it was early morning.

8   Q        Was everybody else sleeping?

9   A        Yeah.  Not Rickey.  Rickey was up.

10  Q        Rickey was up.  You were up.  And Austin comes in?

11  A        Yes.

12  Q        All right.  And did you go back to sleep?

13  A        Yes.

14  Q        Did you have a conversation with Austin before you

15  went back to sleep?

16  A        Yes.

17  Q        Okay.  You had testified just earlier that when he

18  came back he told everybody --

19  A        Yes.

20  Q        -- what had happened?

21  A        What he had did, yes.

22  Q        When you say "everybody," you and Rickey?

23  A        Me and Rickey, yes.

265

1    Q       Nobody else was up?

2    A       No.  Just me and Rickey.

3    Q       Okay.  Now, in your second interview on July 17th,

4    you then indicated -- well, let me go back.  In your first

5    interview, would you agree with me you didn't tell the police

6    anything about what Austin supposedly told you?

7    A       I did.  But I did it in a -- not like I should have.

8    I was scared to say that Austin had told me.  At the first

9    interview, I was scared to say that Austin had told me what he

10   told me.  And then my second interview is when I let

11   Mr. Greaver know that that's what he said.

12   Q       Okay.  And much of the news stories had been out in

13   the month between your first interview and second interview;

14   correct?

15   A       Correct.

16   Q       And would you also agree with me, you and your

17   friends all had discussion about this case?

18   A       Yes.

19   Q       During that period of time; correct?

20   A       Correct.

21   Q       You had indicated some details like Austin buried the

22   body; correct?

23   A       Rickey did.  As far as I know.  I don't know --

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

266

1   Q       You're saying he told you that?

2   A       Austin -- as far as I know, Austin had said that he

3   buried the body, along with the gun.

4   Q       You don't indicate -- well, I take it back.  You

5   indicate to the detectives that when Austin came back he

6   didn't have any bloody clothes; correct?

7   A       No.

8   Q       Right.  He didn't have a gun at that point; correct?

9   A       No.

10  Q       Right.  He just showed back up at the house and told

11  you a story; correct?

12  A       Correct.

13  Q       And Rickey was in the house the whole time; correct?

14  A       Correct.

15  Q       Right?

16  A       Correct.

17  Q       And you're sure that Deidre had left the house prior

18  to Austin and Brandon leaving; correct?

19  A       Yes.

20              MR. HARTWIG:  Just one moment, Your Honor.

21          Just a couple questions, Your Honor.

22  BY MR. HARTWIG:

23  Q       You had indicated in your first interview that at

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

267

| | |
|---|---|
| 1 | some point, I believe it was Deidre was in the bedroom |
| 2 | listening to rap music?  Or somebody was listening to rap |
| 3 | music outside?  Do you recall saying that? |
| 4 | A       Yeah.  I was listening to music. |
| 5 | Q       Who was listening to music, and who was in the |
| 6 | bedroom?  Who was where during that period of time? |
| 7 | A       It was me, Deidre and Rickey who was listening to |
| 8 | music. |
| 9 | Q       In the kitchen? |
| 10 | A       Yeah.  We were sitting at the dining room table. |
| 11 | Q       Okay.  And that was during the period that you guys |
| 12 | were just hanging out? |
| 13 | A       Yes. |
| 14 | Q       Before Austin and Brandon came? |
| 15 | A       Yes. |
| 16 | MR. HARTWIG:  No further questions.  Thank |
| 17 | you. |
| 18 | THE COURT:  Redirect? |
| 19 | MR. BECKER:  No, Your Honor. |
| 20 | THE COURT:  All right.  You may step down. |
| 21 | Thank you. |
| 22 | THE WITNESS:  Thank you. |
| 23 | THE COURT:  Call your next witness. |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

268

1          MR. BECKER:  Call Rickey Roupe.

2                    *  *  *

3          RICKEY JOHN THOMAS ROUPE,

4   having been duly sworn, was examined and testified as follows:

5                  <u>DIRECT EXAMINATION</u>

6   BY MR. BECKER:

7   Q      Would you tell your name to the jury, please?

8   A      My name is Rickey Roupe.

9   Q      All right.  Rickey, how old are you?

10  A      15, sir.

11  Q      All right.  When did you turn 15?  When is your

12  birthday?

13  A      September 7, 2002.

14  Q      So back in June of 2017, you would have been 14?

15  A      Yes, sir.

16  Q      All right.  I want to direct your attention back to

17  June of 2017.  Where were you living at in June of 2017?

18  A      713 Mason Street, Niles, Ohio.

19  Q      All right.  Do you happen to know what county that's

20  in?

21  A      Trumbull County.

22  Q      All right.  Now, were you familiar with an individual

23  by the name of Austin Taylor Burke?

269

1    A        Yes, sir.

2    Q        How did you know Austin Taylor Burke?

3    A        I grew up with him.  He was a friend of the family.

4    And him and my cousin Makayla, they used to be like -- they

5    used to be like boyfriend and girlfriend.

6    Q        All right.  And did you know Jessica Simms?

7    A        Yes, sir.

8    Q        How do you know Jessica Simms?

9    A        That's my cousin Hayle Roupe's girlfriend.

10   Q        All right.  How do you know Hayle Roupe?

11   A        She is my cousin.

12   Q        All right.  And do you know a Nathan Moats?

13   A        Yes, sir.

14   Q        How do you know Nathan Moats?

15   A        I grew up with him and he is my second cousin.

16   Q        All right.  And are you familiar with a Deidre

17   Keener?

18   A        Yes, sir.

19   Q        How do you know Deidre?

20   A        I met Deidre through my cousin Hayle.

21   Q        I want to direct your attention to June 11th, which

22   was a Sunday, and June 12th, 2017 when you were at that Mason

23   Street address.  First of all, before that date, had you ever

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    gone to a place called Hatchet Man Road?

2    A       Yes, sir.

3    Q       Who took you to Hatchet Man Road?

4    A       Meredith and Austin Burke.

5    Q       All right.  And who is Meredith?

6    A       I'm not sure what her last name is, but I just know

7    that her and Austin were like talking.

8    Q       All right.  And this would have been before the night

9    of the events we're going to talk about?

10   A       Yes, sir.

11   Q       All right.  And did you know how to get there?

12   A       I don't know how to get there personally, sir.

13   Q       Did Meredith know how to get there?

14   A       I'm not sure.  I just know that she was driving.

15   Q       All right.

16   A       So I'm assuming.

17   Q       Did Austin give directions to her on where to turn?

18   A       Yes, sir.

19   Q       All right.  And when you went there, what kind of day

20   was it?  Or what was it day?  Night?  What was it?

21   A       It was night.

22   Q       All right.

23   A       Well, it was like the evening.

271

1   Q        And why did you guys go there?

2   A        We was just walking around.  We heard the road was

3   haunted and we was just wanting something to do.

4   Q        All right.  So now I want to go back to June 11th and

5   June 12th of 2017.  Was there a time when you were at your

6   house at 713 Mason and some people were over there?

7   A        Yes, sir.

8   Q        Okay.  Can you tell this jury who was at your house?

9   A        Hayle Roupe, Jess Simms, Austin Burke, Jess Simms'

10  little sister -- I forget her name, sir -- Nathan Moats and

11  me.

12  Q        All right.  And at some point you went to bed; is

13  that correct?

14  A        Yes, sir.

15  Q        Do you recall approximately what time you went to

16  bed?

17  A        It was around 11:00, midnight, sir.

18  Q        All right.  And at that point you slept the whole

19  night through until the morning?

20  A        Yes, sir.

21  Q        All right.

22  A        I slept until Austin woke me up at 9 to get his

23  clothes and stuff.

272

1  Q       All right.  So that would have been the next morning,
2  which would have been June 12th?
3  A       Yes, sir.
4  Q       And when he woke you up, did he tell you anything?
5  A       No, sir.
6  Q       All right.
7  A       He just told me that he needed his clothes and he was
8  going home.
9  Q       All right.  And that was around, you think, around
10  9:00 on the 12th?
11  A       Yeah.  Somewhere early in the morning, like 9.
12  Q       All right.  Now, as the days went past, or later on
13  even that day, did you hear Austin Taylor Burke tell you
14  something about something he did?
15  A       Yes, sir.
16  Q       All right.  How did that come about?  First of all,
17  tell me where it happened and, if you recall, when it
18  happened?
19  A       Well, I seen everything on Facebook about Brandon
20  Sample's murder and then I seen that Austin -- that he was
21  getting blamed for it.  So I asked him if it was true and he
22  told me yes.  And then he told me how he did it and
23  everything.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

273

1    Q       All right.  So let's talk about that.  How did he

2    tell you he did it?

3    A       He told me that they went to Hatchet Man Road.  He

4    told him to get out of the car and get on his knees and Austin

5    pulled the trigger.

6    Q       Did he tell you where he shot Brandon Sample at?

7    A       He told me he shot him here and then he shot him here

8    (indicating).

9    Q       And did he tell you how he then left Hatchet Man

10   Road?

11   A       He did not speak how he left.

12   Q       Did he ever tell you about a car that was on the bike

13   trail?

14   A       Yes.

15   Q       All right.  What did he tell you about the car that

16   was on the bike trail?

17   A       Well, like I knew it was Brandon's car at the time

18   so, like, when he, like -- I know -- like we both knew it was

19   Brandon's car.

20   Q       All right.  He never told you he left it there?

21   A       No.

22   Q       How did you know that was Brandon's car?

23   A       Because it was on the news and stuff and I seen it.

274

1   Q       All right.  Now, had you ever seen Austin Taylor
2   Burke with a gun before?
3   A       Yes, sir.
4   Q       Can you describe for the jury what that gun looked
5   like?
6   A       It was a .22 gun.  It was like this big.  It had like
7   a marble casing on the handle.
8   Q       All right.  I'm going to show you what's been marked
9   for purpose of identification as State's Exhibit 1.  Do you
10  recognize this item?
11  A       Yes, sir.
12  Q       Okay.  And what is State's Exhibit 1?
13  A       I'm sorry?
14  Q       What is it?
15  A       This is -- it's a .25 -- it's a 25/22 is what I was
16  told.
17  Q       Okay.  And is this the gun you would have seen Austin
18  Taylor Burke with?
19  A       Yes, sir.
20  Q       All right.  Now, I'm going to show you what's been
21  marked for purpose of identification as State's Exhibit 13 and
22  13A and 11.
23          I'm going to show you State's Exhibit 11.  Do you

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

275

1  recognize State's Exhibit 11?

2  A       Yes, sir.

3  Q       What is State's Exhibit 11?

4  A       That is Austin Burke holding two pistols.

5  Q       Did you ever see Austin Burke with -- well, first of

6  all, the one pistol in there, is that similar to the one you

7  described?

8  A       Yes, sir.  The one that he's not holding that's just

9  sitting there is the pistol you just showed me, sir.

10  Q       Did you ever see him with any other guns?

11  A       No, sir.

12  Q       You just saw him with the one gun?

13  A       Yes, sir.

14  Q       I'm going to show you what's been marked for purposes

15  of identification as State's Exhibit 13.  Do you recognize

16  that?

17  A       Yes, sir.

18  Q       What is State's Exhibit 13?

19  A       I recognize the tattoos and the gun.

20       (Whereupon, State's Exhibit 13, Photo, was introduced for

21  identification.)

22  Q       All right.  So you recognize both the gun and the

23  tattoos?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

276

1    A       Yes, sir.

2    Q       And then the detail of those tattoos, do you know

3    what kind of tattoos Austin has on his, I guess it would be on

4    his left hand between his thumb and forefinger?

5    A       I don't -- like I don't know every tattoo that he

6    got, sir, but I know there's three tear drops there and then

7    the stars that's right there.

8    Q       All right.  So I'm going to show you what's been

9    marked for purpose of identification as State's Exhibit 13A.

10   Do you recognize the left hand of that individual?

11   A       Yes, sir.

12   Q       And whose left hand is that?

13   A       Austin Burke, sir.

14   Q       All right.  So just for the record here, you

15   identified State's Exhibit 13 and you identified that

16   marble-handled gun and the left hand of Austin Taylor Burke?

17   A       Yes, sir.

18   Q       All right.  You identified State's Exhibit 11 as,

19   again, that -- that individual in that picture, you recognize

20   who that is?

21   A       Yes, sir.

22   Q       Okay.  And you recognize the firearm that's in

23   State's Exhibit 1 that I previously showed you?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Yes, sir.  The one that's sitting on his chest, not

2    the one that he's holding, sir.

3    Q        You never saw the other one?

4    A        No, sir.

5    Q        And State's Exhibit 13A, you recognize some of the

6    tattoos on the left hand of that individual; is that correct?

7    A        Yes, sir.  I recognize the stars.  But like --

8    Q        What do you recognize in that photo?

9    A        Yes, sir.  I recognize these stars, and then like

10   somewhere right in here I know he has three tear drops.

11   Q        Okay.  And you know those to be the tattoos of who?

12   A        Austin Burke.

13   Q        All right.  Now, the individual you know as Austin

14   Taylor Burke and who you've identified in these photographs,

15   is he here in this courtroom today?

16   A        Yes, sir.

17   Q        And could you please show -- point him out to the

18   jury?

19   A        Right there, sir.  (Witness indicates.)

20   Q        And he's the individual who told you that he had shot

21   Brandon Sample on Hatchet Man Road?

22   A        Yes, sir.

23                    MR. BECKER:  I have nothing further, Your

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Honor.

2                        THE COURT:  Cross.

3                        MR. HARTWIG:  Thank you, Your Honor.

4                        <u>CROSS EXAMINATION</u>

5    BY MR. HARTWIG:

6    Q        How you doing, Nathan?

7    A        I'm sorry.  Did you say Nathan?

8    Q        Oh, I'm sorry.  Rickey.

9    A        I'm good.  How you doing?

10   Q        Good.  I just heard from your second cousin before

11   you came in.

12   A        Yes.

13   Q        Were you aware of that?

14   A        Yes.

15   Q        So your cousin came in, sat there, under oath, told

16   us everything he recalls?

17   A        Yes, sir.

18   Q        From June 11th to June 12th.  Okay.  So let me ask

19   you some questions.  As a result of all of this, this

20   investigation, you were called in by the detective to give an

21   interview; correct?

22   A        Yes, sir.

23   Q        All right.  Your first interview was on June 16th; do

1   you recall that?

2   A       Yes, sir.

3   Q       All right.  Your second interview was a week later,

4   on June 23rd?

5   A       Yes, sir.

6   Q       Is that right?  Okay.  So when you came in for your

7   first interview they said, "Hey, tell us the truth"; right?

8   This is a serious investigation into a missing person;

9   correct?

10  A       Yes, sir.

11  Q       A murder case; correct?

12  A       Yes, sir.

13  Q       All right.  And you understood that; right?

14  A       Yes, sir.

15  Q       This wasn't about a theft at Wal-Mart, for example;

16  right?

17  A       Yes, sir.

18  Q       All right.  So you went in alone and lied to the

19  police; correct?

20  A       Yes, sir.

21  Q       All right.  I just wanted to make that clear; that

22  you went in and did not tell them what you're telling today.

23  A       Yes, sir.

280

1   Q        What you did tell them is that Austin came to your

2   grandmother's house at around 3 p.m. that day; correct?

3   A        Yes.

4   Q        By himself?

5   A        Yes, sir.

6   Q        All right.  He didn't have a gun; correct?  That's

7   what you told the police?

8   A        Yes.

9   Q        That you went to bed at 11:00 p.m?

10  A        Yes, sir.

11  Q        You said that Austin was at your house the entire

12  night?

13  A        Yes, sir.

14  Q        You said Austin woke you up in the morning, left at

15  around 8 or 9 a.m.; correct?

16  A        Yes, sir.

17  Q        Wasn't 6:00 in the morning; correct?

18  A        No, sir.

19  Q        At least that's what you told police.  He wasn't with

20  Nate at that point; correct?

21  A        Well, yes, sir, we were.

22  Q        Okay.

23  A        I fell asleep in my grandma's bed in the living room

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

281

1    and then -- because that's just where I fell asleep.  Like I
2    dozed off.  I thought Nate and Austin left.  I guess Nate fell
3    asleep in my bedroom.  I thought he left.  That was my
4    mistake, sir.

5    Q        Oh, because you said you told -- I mean, you did tell
6    the police --

7    A        Yeah.

8    Q        -- Nate and Austin left?

9    A        Yes.

10   Q        All right.  You never gave anything about a story
11   that Austin told you at 8 or 9:00 in the morning; correct?

12   A        I'm sorry?

13   Q        You didn't tell the police that Austin told you
14   anything?

15   A        Oh, no, sir.  Not the first time.

16   Q        Not the first time.  All right.  The detective
17   thought you were lying; correct?

18   A        Yes, sir.

19   Q        And you were on probation at the time; correct?

20   A        Yes, sir.

21   Q        What were you on probation for?

22   A        I was on probation for felonious assault.

23   Q        All right.  And why would you be worried that you

282

1    would be in trouble?  Why would that --

2    A      I wasn't worried about being in trouble.  I was

3    worried for my life.

4    Q      Okay.  So you also texted Austin Burke on the 16th;

5    do you recall that?

6    A      Most likely, sir.  I don't remember exactly our

7    conversation that day, but I'm sure we talked.

8    Q      Do you recall asking him about what happened?

9    A      Yes, sir.

10   Q      And him denying it, saying "I didn't do that"?

11   A      Oh, he told me he did, sir.

12   Q      Well, I know you're saying he told you that in

13   person; correct?

14   A      Yes, sir.

15   Q      But I'm saying on the text when you asked him, he

16   said, if you recall, "I ain't do shit, bro.  These niggas

17   lame"?

18   A      Yes, sir.

19   Q      All right.  So he denied when you first -- is that

20   the first contact you had with him, those texts?

21   A      Yes.  We texted and then he came over later that day,

22   sir.

23   Q      All right.  So, second interview, you said Austin

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    came to the house between 6 p.m. and 8 p.m.; correct?

2    A        Yes, sir.

3    Q        You said you fell asleep between 11:30 and 12;

4    correct?

5    A        Yes, sir.

6    Q        All right.  Then you say -- this is in the second

7    interview.  You say Austin and Nate leave your house after you

8    go to sleep between 12 and 1?

9    A        Yes, sir.  I got confused because I thought Nate left

10   with Austin, but he was sleeping in my bedroom.  I was

11   sleeping on my grandma's bed because she wasn't there.  Like I

12   was laying there watching TV and I fell asleep.  It was my

13   mistake that I said Nate left.  I wasn't sure.

14   Q        Okay.  This was -- this interview was after the grand

15   jury; correct?

16   A        Yes, sir.

17   Q        All right.  And you had testified at the grand jury?

18   A        Yes, sir.

19   Q        After meeting with police, but before your second

20   interview?

21   A        I know when we went -- when I talked to the jury,

22   sir, that's when I went in and fixed my story and I told them

23   everything.  Nothing but the truth.

284

```
1    Q       And you indicate in your second interview that Austin
2    gave you details of how it happened; correct?
3    A       Yes, sir.
4    Q       All right.  Like that he shot Brandon in the
5    forehead; correct?
6    A       Yes, sir.
7    Q       Are you aware that that did not happen?
8    A       Well, from the sounds of it, I believe that he did
9    commit this.
10   Q       I'm not asking what you believe he did.  I'm saying
11   he told you, according to your story, that he shot him in the
12   forehead?
13   A       Yes, sir.
14   Q       And I'm asking you now, are you aware that that did
15   not happen?
16   A       No.  I -- he told me that day.  That's just -- that's
17   when I found out.
18   Q       All right.  Did he also indicate to you, based on
19   your second interview and your story, that he burned the body?
20   A       Yeah.  No, sir.  No, sir.
21   Q       Based on our reading of your interview, it indicates
22   after he shoots him he burns the body and buries it; do you
23   recall saying that?
```

285

1    A      I don't recall him being burned.  I remember he told

2    me that he buried him after he shot him.  I don't remember him

3    telling me he burned him, sir.

4    Q      If that is contained in your interview, that you said

5    that, that would surprise you?

6    A      Yes, sir.  Repeat, please.  I didn't hear it.

7    Q      If you told the police that's what Austin told you,

8    would that be a lie or a mistake or what?

9    A      A mistake, sir, because I didn't say that he

10    burned -- I mean, Austin didn't burn him.  I never said that.

11    Q      Do you have a Facebook page?

12    A      Yes, sir.

13    Q      Do you recall conversation with Makayla Stone?

14    A      Makayla who?

15    Q      Is it Makayla Stone?

16    A      I don't know no Makayla Stone.

17    Q      How about a Billie Morrow?

18    A      I know Billie Morrow by just -- I don't, like, know

19    him personally, but I've heard of him.

20    Q      Do you recall text messages going back and forth

21    between you and Billie Morrow regarding this case?

22    A      No, sir.  I've never talked to Billie in my life.  I

23    just know of him.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

286

```
1    Q        Okay.  Do you recall ever posting on your Facebook
2    page, "I felt better when Brandon got his head blew back"?
3    A        Yes, sir, I did.  But that was because of the story
4    that I heard.  To me, my -- I felt that he deserved it, but
5    that was -- I feel wrong for thinking that.  I'm sorry about
6    that.
7    Q        And Brandon Sample, you've never met?
8    A        No, sir.
9    Q        And you're saying he never was at your house?
10   A        No, sir.
11   Q        And he wasn't at your house snorting heroin?
12   A        No.  I've never seen him, sir.
13   Q        Or doing fentanyl?
14   A        No.
15   Q        For three, four hours?
16   A        No, sir.
17   Q        On June -- the night of June 11th going into
18   June 12th?
19   A        No, sir.
20                 MR. HARTWIG:  Just one moment, Your Honor.
21   BY MR. HARTWIG:
22   Q        So Rickey, according to your story in your second
23   interview, you had indicated that Austin told you that he
```

1    shoots him in the forehead and that because he shot right

2    square in the forehead he was twitching and that's why he shot

3    him a second time; correct?

4    A       Yes, sir.  I'm sorry.  I didn't remember that until

5    you said it and it came back to me.  This was awhile ago, sir.

6    I'm sorry.

7                    MR. HARTWIG:  Nothing further, Your Honor.

8                    THE COURT:  Redirect.

9                    MR. BECKER:  Yes.

10                   REDIRECT EXAMINATION

11   BY MR. BECKER:

12   Q       Rickey, you said under cross examination that the

13   reason you didn't tell the truth the first time when you spoke

14   to this detective was you were "worried for your life"?

15   A       Yes, sir.

16   Q       Can you explain that.

17   A       Well, I know Austin is in the gangs and stuff.  He

18   told me he was in the 38 Boys when he was in DYS.  And from

19   the looks -- he's got tear drops and stuff -- I believed it.

20   I didn't want to put mine and my grandma's life in danger.

21   Q       You're 14 years old?

22   A       Yes, sir.  I was 14 years old at the time.

23   Q       All right.  And you said something -- he asked you

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

288

1    about some kind of post that you put Austin, or I'm sorry,
2    Brandon deserved it?
3    A       Yes, sir.
4    Q       Okay.  And you said from what you knew.  Did somebody
5    tell you something that they said Austin did?
6                        MR. HARTWIG:  Objection.
7                        THE COURT:  Sustained.
8    BY MR. BECKER:
9    Q       Did the defendant tell you why he shot --
10   A       Yes, sir.
11   Q       -- Brandon Sample?
12   A       Yes, sir.
13   Q       Okay.  Why did the defendant tell you he shot Brandon
14   Sample?
15   A       He told me that Brandon Sample raped a little boy.  I
16   can't remember if he said it was his cousin or his friend's
17   cousin.  I'm not fully sure.  My memory is a little bad, but
18   that is what he said, sir.
19   Q       So your Facebook post, or whatever this was about he
20   deserved it, was because the defendant told you he had
21   molested some little kid and you felt, well, he's a child
22   molester, he deserved it?
23   A       Well, I don't wish death upon anybody.  From what I

289

1    heard, I feel that no little boy should have to go through

2    something like that and then somebody still be walking free.

3    Q        You don't know whether that's true or not?

4    A        No, sir.  But I believed it at the time because me

5    and Austin has been close growing up.  And then after we got

6    through this I realized that none of this is worth it anymore.

7    Q        So you'd agree as a 14-year-old boy you made some bad

8    decisions?

9    A        Yes, sir.  Initially, sir.

10   Q        Now, you were also asked if Brandon Sample had been

11   at your house; right?

12   A        Yes, sir.

13   Q        But you were asleep from 11 or so until 8, 9, 7,

14   whatever, the next morning?

15   A        Yes, 9:00, sir.

16   Q        So if Brandon Sample came to your house when you were

17   asleep, you would not have seen him?

18   A        No, sir.  So I wouldn't have known if he was there

19   while I was sleeping.  When I was up, I did not see Brandon

20   Sample.

21   Q        So fair answer, you don't know what happens when

22   you're sleeping; right?

23   A        Yes, sir.


                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

290

1          MR. BECKER:  I have nothing further, Your

2    Honor.

3          THE COURT:  Recross?

4          MR. HARTWIG:  Thank you, Your Honor.

5                    <u>RECROSS EXAMINATION</u>

6    BY MR. HARTWIG:

7    Q     When did you come to the revelation that you just

8    didn't want to do this anymore with him?

9    A     Well, when the detectives talked to me and stuff,

10   they -- I believed them that I was safe, that they said they

11   was gonna protect me and make sure that nothing would happen

12   to me.  And I figured -- I did it.  I didn't want to have to

13   be here anymore worrying about this stuff.

14   Q     Right.  You weren't scared of him before?

15   A     Well, no, I wasn't scared of him because I wasn't

16   trying to put him in prison for something that he did.  I grew

17   up --

18   Q     I'm saying before June 11th you were hanging out with

19   him all the time?

20   A     Yes, sir, because we grew up --

21   Q     You weren't scared of him for any reason, is my

22   point?

23   A     No, sir.

291

1    Q        But after the allegations you became scared and said,
2    "I'm not going to do this anymore.  I lied for him, but I'm
3    not going to do this anymore"?
4    A        Yes, sir.  I was scared for my life because if he's
5    in gangs and stuff and he murdered somebody I'm aware,
6    somebody snitching on somebody, they don't like that.
7    Q        So your first interview was on June 16th, and that's
8    when you said, "That's it for me"; right?
9    A        Yes, sir.
10   Q        Except you continued to text him after that; right?
11   A        Yes, sir.
12   Q        Because you're so scared you want to -- you want to
13   distance yourself from him?
14   A        Well, I grew up with Austin my whole life.  No matter
15   what, I'm gonna have love for him.  He was like a brother to
16   me.  But what he did wrong, yes, sir.  I know that.
17   Q        You just continued your relationship with him by
18   text, though; correct?
19   A        Well, I didn't talk -- like, I didn't see him or
20   nothing, but I talked to him, yes, sir.
21                  MR. HARTWIG:  Okay.  Thank you.
22                  THE COURT:  You may step down.  Thank you.
23           Call your next witness.

292

1              MR. BECKER:  Thank you, Your Honor.  State

2       would call Deidre Keener.

3                            *   *   *

4                         DEIDRE KEENER,

5       having been duly sworn, was examined and testified as follows:

6                      DIRECT EXAMINATION

7       BY MR. BECKER:

8       Q       Would you state your name for the record, please?

9       A       Deidre Keener.

10      Q       All right.  Deidre, how old are you?

11      A       I'm 19.

12      Q       All right.  And when is your birthday?

13      A       June 18th, 1998.

14      Q       All right.  Deidre, I want to direct your attention

15      to June of 2017.  In June of 2017, were you familiar with an

16      individual by the name of Austin Taylor Burke?

17      A       Yes.

18      Q       How did you know him?

19      A       My best friend -- it's my best friend's cousin's

20      ex-boyfriend.

21      Q       Would you give us names and explain how that works?

22      A       My best friend Hayle Roupe.

23      Q       Okay.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

293

1   A        It's her cousin Makayla Egbert's ex-boyfriend.

2   Q        All right.  So at one point Austin Taylor Burke and

3   Makayla Egbert were dating?

4   A        Yeah, but I think it was a while ago.

5   Q        All right.

6   A        I think they were exes, like, when this happened

7   still.

8   Q        Okay.

9   A        Like they weren't together.

10  Q        And her cousin, Makayla Egbert, is Jessica Simms --

11  or I'm sorry -- is Hayle Roupe; right?

12  A        Wait.  Repeat that.

13  Q        Who is -- I'm sorry.  Wait a minute.  You got me

14  confused.  Or I got myself confused.

15           Makayla Egbert used to date Austin --

16  A        Yes.

17  Q        -- Taylor Burke?

18  A        Yeah.

19  Q        And you're friends with?

20  A        Hayle and Jess.

21  Q        Hayle Roupe?

22  A        Yes.

23  Q        Who is related to Makayla Egbert?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

294

1    A        Yes.

2    Q        Okay.  So that's kind of how you got to know Austin

3    Taylor Burke?

4    A        Uh-huh.

5    Q        And they had been broken up for awhile before any of

6    this happened?

7    A        Yeah.

8    Q        All right.  So I want to direct your attention to

9    June 12th and June 11th of 2017.  It would have been a Sunday

10   and Monday.  And there's a house located at 713 Mason Street.

11   Who was living in 713 Mason Street, Niles, Trumbull County,

12   Ohio back in June?

13   A        That would have been Hayle's grandma.

14   Q        All right.

15   A        It was her house.

16   Q        And did anybody else live there with Hayle's

17   grandmother?

18   A        Rickey lived there.

19   Q        All right.  And Rickey is Rickey Roupe?

20   A        Yes.

21   Q        Okay.  So I want to direct your attention to sometime

22   in the evening hours.  Do you recall seeing Austin Burke

23   take -- Austin Taylor Burke there?

1   A        Yes.

2   Q        All right.  How did that come about and where did you

3   see him at?

4   A        I've seen him at Hayle's grandma's a couple times.

5   Q        All right.  And then this particular night when he

6   came over with another individual that you had never seen

7   before?

8   A        Yeah.

9   Q        All right.  What time approximately was it that you

10  had seen him?  If you remember.

11  A        Like three a.m.-ish.

12  Q        Three a.m.-ish?

13  A        4 a.m. Yeah.

14  Q        Okay.  Now, had you seen him earlier?

15  A        In the day, yeah.

16  Q        You had seen him earlier that Sunday?

17  A        Yeah.

18  Q        Where did you see him earlier in the day at?

19  A        We were all at Hayle's grandma's hanging out.

20  Q        At 713 Mason?

21  A        Yes.

22  Q        Okay.  Now when he came to the house around 3:00 in

23  the morning, was he with anybody?

296

1    A        Yes.

2    Q        Do you know who he was with?

3    A        Brandon.

4    Q        All right.  Did you know Brandon at the time?

5    A        No, I didn't know of him.

6    Q        And were you able to see the vehicle that they

7    arrived in?

8    A        Yeah.  The --

9    Q        I'm going to show you what's been marked for purposes

10   of identification as State's Exhibits, I believe it's 43

11   through 46, and ask if you recognize that vehicle.  You can

12   just go ahead and look at those.

13   A        Yeah.  That's the vehicle.

14   Q        Okay.  That's the vehicle you saw.  Do you know who

15   was driving that vehicle?

16   A        He was.  Brandon was.

17   Q        Brandon was?

18   A        Yeah.

19   Q        Okay.  And when they came to the house at 713 Mason

20   Street, was there any discussion that you heard Austin Taylor

21   Burke talk about?

22   A        He said he was gonna rob somebody, but that was

23   before they came back to the house.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

297

1    Q       Okay.  You can put those pictures up on the rail

2    there.  Oh, I'm sorry.  You already did.

3    A       Okay.

4    Q       So Austin Taylor Burke told you he was going to rob

5    somebody?

6    A       Yes.

7    Q       Did he say who?

8    A       No, he didn't give me any names.

9    Q       Did he say where he was gonna go do it at?

10   A       No.

11   Q       Now, had you ever seen Austin Taylor Burke with a

12   firearm?

13   A       Yes.

14   Q       Can you describe that firearm?

15   A       It was kind of small and it had like marble on the

16   side.

17   Q       All right.  When and how did you come to see that

18   firearm?

19   A       He had it on him at Hayle's grandma's.

20   Q       The very night you were there that night?

21   A       I think that was a couple days before.

22   Q       Couple days before June 11th?

23   A       Yes.

298

```
1    Q       Okay.  I'm going to show you State's Exhibit Number 1
2    and ask you, does this look like the gun he had?
3    A       Yeah.
4    Q       Okay.  And you saw it in his hands?
5    A       Yes.
6    Q       Okay.  Now, had you ever seen any photographs of him
7    with any guns?
8    A       I think on Facebook, yeah.  Like on his Facebook.
9    Q       All right.  And sometime after the morning on
10   June 12th, after you saw him at 3 in the morning, did you see
11   Austin Taylor Burke again?
12   A       Yeah.  He was over at Hayle's grandma's the next day.
13   Q       All right.  Do you recall approximately what time it
14   was?
15   A       I had work that next morning.  I left at -- Hayle's
16   grandma's at like 7 and I got off at 4, so it would have had
17   to have been after that, but I don't remember the time.
18   Q       So it would have been in the afternoon of the day
19   that you saw him in the morning?
20   A       Yeah.
21   Q       Later in the afternoon?
22   A       Yeah.
23   Q       All right.  And you saw him at 713 Mason?
```

1    A       Yes.

2    Q       And did he start talking about anything or did you

3    hear him say anything?

4    A       Yeah.

5    Q       What did he talk about?

6    A       He had mentioned putting the car on a bike trail.

7    And I had seen it on Facebook, so I kind of put 2 and 2

8    together.

9    Q       Okay.  Did he say what car it was?

10   A       No, he didn't say the car, like what it was.

11   Q       And did he start talking about what happened to

12   Brandon?

13   A       Yeah, a little bit.

14   Q       What did he start saying about Brandon?

15   A       I don't recall actually.  I don't recall all of it.

16   Q       Okay.  Later on, did he say more?

17   A       Yeah.  The next day.  I'm pretty sure.

18   Q       Next day, then, what did he tell you about Brandon?

19   A       I had brought my friend Makayla over who had never

20   met him.  And he was kind of just openly talking about, "Oh,

21   wonder who killed that guy."  And just like sarcasm.  And she

22   kind of looked at me funny like, you know, like putting 2 and

23   2 together.

300

1    Q       And did he tell you some more?

2    A       Other than that, I think that's about it.

3    Q       Okay.  Did he ever tell you where he had shot him at?

4    A       On Hatchet Man Road.

5    Q       Okay.  Are you familiar with Hatchet Man Road?

6    A       No.  I'm not from there.

7    Q       Had you ever been to Hatchet Man Road?

8    A       I've never even been to Bristol.

9    Q       All right.  And did you know or did he tell you

10   anything about where he physically shot him at in his body?

11   A       No.

12   Q       Okay.  But eventually the police came to you and you

13   gave a statement and they asked you to fill out what we call a

14   photographic lineup; is that correct?

15   A       Uh-huh.

16   Q       All right.  I'm going to show you what's been marked

17   for purpose of identification as State's Exhibit 24.  Do you

18   recognize State's Exhibit 24?

19   A       You want me to --

20           (Whereupon, State's Exhibit 24, Photos, was introduced

21   for identification.)

22   Q       I just want you to tell me if you recognize it?

23   A       Yeah.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

301

1    Q        Is your signature on there?

2    A        Yes.

3    Q        And your handwriting?

4    A        Yes.

5    Q        Okay.  And it's basically six photographs?

6    A        Uh-huh.

7    Q        And one of them is circled?

8    A        Yes.

9    Q        And you identified that person -- you hand wrote

10   something at the bottom there.  What did you hand write?

11   A        Like on this part?

12   Q        Yeah.  What did you write?  What did you say about --

13   you circled, I think, number four?

14   A        Yeah.

15   Q        And what did you say about that person?

16   A        You want me to read off like down here?

17   Q        Yeah.  What did you hand write in there?  You hand

18   wrote something in there; correct?

19   A        Yeah.  It says to be -- "The subject who said he was

20   going to rob Brandon."

21   Q        All right.  So when you wrote that --

22   A        Uh-huh.

23   Q        -- you had told the police that the person you

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    circled as number four --

2    A        Yeah.

3    Q        -- was the person who said he was gonna rob Brandon?

4    A        Yes.

5    Q        So did the person say they were going to rob Brandon?

6    A        They didn't give a name.

7    Q        Okay.  But why did you write "Brandon" in there?

8    A        Because I knew who it was.

9    Q        At that point you knew?

10   A        At that point, yes.

11   Q        So you heard that he was going to rob somebody.  Did

12   he say what he was going to rob him for or what he had to rob

13   him for?

14   A        He said he was going to rob him for heroin.

15   Q        Heroin?

16   A        Yeah.

17   Q        Now, I'm going to put this -- publish this for the

18   jury.  This is State's Exhibit 24.  The individual that you

19   circled, is he here in the courtroom today?

20   A        Yes.

21   Q        Okay.  And this is your signature on here.  Your

22   signature, "Deidre Keener," is there; is that correct?

23   A        Yes.

303

1    Q       And that's on June 18th at about 12:30?  And you've

2    got your address there.  You were living in McDonald at the

3    time?

4    A       Yes.

5    Q       And you wrote, "Said he was going to rob Brandon"?

6    A       Uh-huh.

7    Q       When you filled that out, you knew the individual's

8    name was Brandon.  At the time when you heard him say it, he

9    didn't say who it was going to be?

10   A       Yes.

11   Q       All right.  And this is a fair and accurate copy of

12   the one you signed?

13   A       Yes.

14   Q       Okay.  Now, Deidre, the person who you saw with the

15   gun --

16   A       Uh-huh.

17   Q       -- and told you he was gonna rob somebody, is he here

18   in the courtroom today?

19   A       Yes, he is.

20   Q       Okay.  Could you please point him out?

21   A       (Witness indicates.)

22                   MR. BECKER:  And allow the record to

23   reflect that the witness is identifying the defendant in this

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

304

1   case.

2   Q       Deidre, I want to direct your attention, then, to, I

3   believe, June 20th of 2017.  You had maintained contact with

4   Austin Taylor Burke; is that correct?

5   A       A little bit, yeah.

6   Q       You had texted him some things and he had texted and

7   called and stuff; right?

8   A       Yeah.

9   Q       Now on June 20, 2017, you got a Facebook message from

10  him that he was trying to get ahold of you or call?

11  A       Yeah.  I had a missed call and then I called him

12  back.

13  Q       All right.  You had a missed call from Austin Taylor

14  Burke and then you called him back?

15  A       Yeah.

16  Q       Okay.  What did Austin Taylor Burke tell you in that

17  phone call when you called him back?

18  A       I had him on speaker and he said that he came up on a

19  bunch of money.

20  Q       He said he came up on a bunch of money?

21  A       Yeah.  He asked if he could come over to Hayle's

22  grandma's, but she said no.

23  Q       All right.  Who was with you on the phone call when

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

305

1    you had the call on speaker?

2    A        Hayle Roupe.

3    Q        Hayle Roupe was?

4    A        Yes.

5    Q        And you guys were at 713 Mason again?

6    A        Yes.

7    Q        And -- he wanted to come there?

8    A        Yes.

9    Q        And you guys said, "No, you probably shouldn't"?

10   A        Yeah.

11   Q        Because at that point this information was out there?

12   A        Yeah.

13   Q        All right.  Deidre, I'm going to show you what we're

14   going to mark as State's Exhibit 52.

15            I'm going to hand you what's been marked as State's

16   Exhibit 52.  And do you recognize State's Exhibit 52?

17                      (Whereupon, State's Exhibit No. 52,

18   Screenshot, was introduced for identification.)

19   A        Yes.

20   Q        What's State's Exhibit 52?

21   A        This is where I missed the phone call.  I asked him

22   if he meant to call.  He said yeah, and that's when I called

23   him back.

1    Q       Does it say what date that happened?

2    A       6-20-2017 at 10:50 p.m.

3    Q       At 10 what time?

4    A       10:50 p.m.  The call lasted exactly one minute.

5    Q       All right.  And that picture, that State's

6    Exhibit 52, is that what we call a screenshot?  You just sort

7    of take a picture on your phone and then you send it to

8    somebody?

9    A       Yes.

10   Q       Okay.  I'm going to publish that for the jury.  How

11   do you know that's Austin Burke?

12   A       It's his Facebook.

13   Q       Okay.  And that's how he contacted you?  He went by

14   Austin Taylor?

15   A       Yeah.

16   Q       All right.  So this is State's Exhibit 52.  You

17   missed a call from Austin on June 20th at 10:47 p.m?

18   A       Uh-huh.

19   Q       And then it says "call back" and it says you called

20   Austin for one minute at June 20th, 2017, at 10:50 p.m.;

21   correct?

22   A       Yes.

23   Q       Okay.  And this little picture here, do you know who

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

307

1    that is?

2    A       Yes.

3    Q       And who is that?

4    A       That's Austin.

5    Q       That's the same individual you identified earlier in

6    the courtroom; correct?

7    A       Yes.

8                    MR. BECKER:  All right.  Your Honor, I have

9    nothing further of this witness.

10                   THE COURT:  Cross.

11                   MR. OLSON:  Thank you, Your Honor.

12                       <u>CROSS EXAMINATION</u>

13   BY MR. OLSON:

14   Q       Good afternoon, Deidre.

15   A       Good afternoon.

16   Q       Deidre, we're going to go back to June 18th of 2017.

17   Do you recall meeting with the police officer, Detective

18   Greaver, that day?

19   A       Yes.

20   Q       Okay.  And this is when you gave your statement

21   regarding the investigation into Brandon Sample; is that

22   correct?

23   A       Yes.

308

1   Q       All right.  On June 18th of 2017, you told Detective
2   Greaver that around 6:00 p.m. --
3   A       Uh-huh.
4   Q       -- you, Rickey, Pamela who is Rickey's grandmother,
5   Austin, Nate, Hayle and Jess were all hanging out at the Roupe
6   house; is that correct?
7   A       Yes.  And Jess's little sister.
8   Q       And Jess's little sister?
9   A       Yes.
10  Q       You agree that you told them Brandon Sample was not
11  present?
12  A       Yes.
13  Q       Okay.  You were all hanging out in the kitchen; is
14  that correct?
15  A       Yeah.  We were outside and in the kitchen.  It's kind
16  of like -- we were all in and out.
17  Q       And at that point in time you agree that you did not
18  see Austin in the possession of any firearms?
19  A       At that point, no.
20  Q       Okay.  You indicated that your knowledge of Austin
21  was very limited.  You only had met him about six times; is
22  that correct?
23  A       Yeah.

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

309

1   Q       At some point in time you tell the detective Austin
2   left; correct?
3   A       Yes.
4   Q       You didn't know how he left?
5   A       No.
6   Q       You did not know who he left with?
7   A       No.
8   Q       Do you recall what time it was that he left?
9   A       I don't recall.
10  Q       Okay.  Was it still daylight out?  Was it dark?
11  A       I think it was getting dark, yeah.
12  Q       Getting dark.  So maybe 9:00?
13  A       Yeah.  Somewhere around there.
14  Q       Did he say where he was going?
15  A       No.
16  Q       And he didn't say who he was going with?
17  A       No.
18  Q       Never mentioned anything about Brandon Sample at that
19  point in time; you would agree?
20  A       Not Brandon, no.
21  Q       Okay.  Around midnight you indicated that Jess and
22  Hayle left with Jess's little sister; is that correct?
23  A       Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

310

| | |
|---|---|
| 1 | Q        So you further informed the detective that at that |
| 2 | point in time the only people left at the house was you -- |
| 3 | A        Uh-huh. |
| 4 | Q        -- Rickey and Pam; is that correct? |
| 5 | A        Nate was there. |
| 6 | Q        You didn't tell the detective that Nate was there; is |
| 7 | that correct? |
| 8 | A        I don't recall. |
| 9 | Q        Okay.  Do you recall that you told Detective Greaver |
| 10 | that at 3:00 in the morning when Austin supposedly came back |
| 11 | to the house and you heard knocking on the door that you were |
| 12 | the only one up in the house and Pam and Rickey were sleeping? |
| 13 | A        Yes.  Pam wasn't there.  At that point, she wasn't |
| 14 | there. |
| 15 | Q        Okay.  So you're now saying Pam wasn't sleeping at |
| 16 | that point in time.  It was just you and Rickey in the house? |
| 17 | A        I never said she was there at that point.  She had |
| 18 | left earlier than that. |
| 19 | Q        What time did Pam leave? |
| 20 | A        Couldn't tell you. |
| 21 | Q        Did she leave before or after Austin? |
| 22 | A        Before. |
| 23 | Q        Okay.  So your testimony today is that you and Rickey |

311

1     were sleeping in the house.  You couldn't sleep, Rickey was

2     asleep; is that correct?

3     A     Yes.

4     Q     You were playing on your phone?

5     A     Yes.

6     Q     And at approximately 3 or 4:00 in the morning you

7     hear a knock on the door?

8     A     Yes.

9     Q     Okay.  You go to the door and it's Austin; is that

10    correct?

11    A     Yes.

12    Q     You indicate the way that the house is set up that

13    there is a window that you can see into the driveway; is that

14    correct?

15    A     Yes.  The driveway comes up this way and there's the

16    kitchen window right here.  So if you walk right here, that's

17    the back door.

18    Q     Okay.  You indicate that you look out that window and

19    you see a white car?

20    A     Yes.

21    Q     And you were 95 percent sure that it was Brandon

22    Sample in the driver's seat?

23    A     At the time I did not know who it was.  And then

312

1   after that, after I saw his pictures on Facebook, I could

2   identify him.

3   Q       Okay.  But, again, on June 18th of 2017 when you met

4   with Detective Greaver --

5   A       Yes.

6   Q       -- you had already seen Brandon's face on Facebook;

7   is that correct?

8   A       Yes.

9   Q       You already saw all the publications on the news and

10  all that other stuff with Brandon Sample's face?

11  A       Yes.  But I could recognize the face.

12  Q       Okay.  So -- but when you met on June 18th of 2017,

13  you told Detective Greaver then you were about 95 percent

14  sure?

15  A       Yeah.

16  Q       Okay.  And you would agree with me that at the time

17  that Brandon is sitting in this car in the driveway you had

18  never met Brandon Sample before?

19  A       No.

20  Q       It's dark outside?

21  A       Yeah.  There's a light that shines down though.

22  Q       Were the headlights on the vehicle on?

23  A       Yes.

313

1   Q       So the headlights on the vehicle were on and there's
2   an overhead light shining down on the car?
3   A       Yes.
4   Q       And it's your testimony today that you were able to
5   look out a window in a house at 4:00 in the morning with a
6   headlight shining forward towards the door; is that correct?
7   A       It would have been like towards the garage.
8   Q       Towards the garage.  You're looking at an angle?
9   A       I'm looking directly from the side.
10  Q       Okay.  And you were able to positively identify a
11  person that you've never met in your life?  That's what you're
12  telling this jury?
13  A       At the time I didn't know who he was, but after I saw
14  his face, I seen his face that night.  So, yeah, I could
15  identify him after I seen that.
16  Q       Again, the question was, at 4:00 in the morning with
17  lights shining, dark outside, an overhead light shining down
18  on top of a car, you were able to look out a window and
19  100 percent -- 95 percent -- identify who the driver of that
20  vehicle was?
21  A       Yeah.
22  Q       Did you tell Detective Greaver at the time of your
23  interview the type of vehicle that was being driven?

314

1    A        Yes.

2    Q        You did?  You identified that car?

3    A        Yes.

4    Q        Okay.  Now, again, this person that you met maybe six

5    times --

6    A        Uh-huh.

7    Q        -- comes to the door and says, "I need to talk with

8    Rickey"; is that correct?

9    A        Yes.

10   Q        And you say, "You can't.  He's sleeping"?

11   A        Yes.

12   Q        So he says, "I need to talk to you then"?

13   A        No.

14   Q        He doesn't say that?

15   A        No.

16   Q        So he doesn't come to you and say, "Hey, I got a guy

17   in the car, got a lot of heroin in the trunk, and I'm gonna

18   rob him"?

19   A        That was before that.

20   Q        That was before when?

21   A        I don't know.  I don't know what you mean.

22   Q        Did you have an interview with Detective Greaver?

23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  Q       Did you tell Detective Greaver that on the night

2  around 3 or 4:00 in the morning that Austin Burke came into

3  the house and told you that he was going to bring Brandon to

4  Hatchet Man Road and rob him for heroin that was in the trunk

5  of the car?

6  A       He didn't give a name, but all the rest, yes.

7  Q       So he did tell you, "Hey, I got a guy in the car"?

8  A       Yeah, he said he was gonna rob somebody.

9  Q       "I'm gonna take him to Hatchet Man Road"?

10 A       At that point, he did not say anything about Hatchet

11 Man Road.  He told me about that after.

12 Q       So this person that you've met six times tells you

13 that he's gonna commit this crime, he's gonna rob somebody,

14 and what did you do?

15 A       Was I supposed to believe him?

16 Q       Did you go back and lay back down?

17 A       Yeah.

18 Q       Okay.  Did you call an adult?

19 A       No.

20 Q       Did you wake Rickey up and say, "Hey, your buddy

21 stopped here, said he's gonna rob some guy for heroin"?

22 A       No.  Because how am I supposed to stop that?

23 Q       Did you call the police?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

316

1   A        No.

2   Q        Did you say, "Hey, I saw a car in the driveway and

3   this guy came to the house and said he was gonna rob him"?

4   A        Well, when something like that happens, it might

5   scare someone and they wouldn't want to tell the police at

6   first.

7   Q        Okay.  So you further tell Detective Greaver that you

8   woke up around 7:00 in the morning on Monday morning and you

9   leave; is that correct?

10  A        Yes.  I had work.

11  Q        Right.  You said you told Rickey, "I really couldn't

12  sleep, I got work, I'm gonna go"?

13  A        Yeah.

14  Q        And you informed him that at that point in time

15  Austin wasn't there?

16  A        No.

17  Q        Austin was not at the house at 6:00 in the morning;

18  is that correct?

19  A        No.

20  Q        Austin was not at that house at 7 a.m. when you left?

21  A        No.

22  Q        Now, you indicated that on the next day, on -- I

23  would assume still the 12th, Monday -- you went back to the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Roupe household?

2    A      Yes.

3    Q      And you indicated that you were in the kitchen

4    talking.  And who was there?

5    A      Me, Hayle, Austin, Jess, Rickey.  I'm pretty sure

6    that's it.

7    Q      Nate wasn't there?

8    A      No.

9    Q      Okay.  So you, Hayle, Jess and Rickey were sitting

10   around.  Was Austin there?

11   A      Yes.

12   Q      And he, you indicate, starts dropping hints that he

13   dropped a car off on the bike trail; is that correct?

14   A      Yeah.  He was like making jokes about it.

15   Q      He was making jokes about it?

16   A      Yeah.  Like sarcastically.

17   Q      But your initial statement to Detective Greaver was

18   he was dropping hints and then later on you saw the news and

19   saw that there was a car dropped off and you started putting 2

20   and 2 together; is that correct?

21   A      Yes.

22   Q      But then as the interview went on, then you said he

23   was making jokes about it?  He was bragging about it?

1    A        Yeah.  He was dropping hints, jokes.

2    Q        Oh, hints or jokes?

3    A        I mean, it's the same thing.  He was dropping hints

4    but being sarcastic about it.

5    Q        Now this person that came to the house at 3 or 4 in

6    the morning and tells you that he's gonna rob a guy for

7    heroin, later on you find out that Brandon Sample is dead; is

8    that correct?

9    A        Yeah.

10   Q        When did you find out that Brandon was no longer

11   living?

12   A        A couple days later.

13   Q        So, 14th?

14   A        I don't recall.

15   Q        Okay.  Was it before or after your interview with

16   Detective Greaver?

17   A        After.

18   Q        So after you meet with Detective Greaver, you find

19   out that Brandon Sample is no longer living?

20   A        Well, no.  That would have been before.

21   Q        So before?

22   A        Yeah.

23   Q        And you met with him on the 18th.  So somewhere

1   between the 12th and the 18th you learned that Brandon Sample
2   was no longer living?

3   A        Yes.

4   Q        But you continued to have regular contact with Austin
5   Burke; isn't that correct?

6   A        It was not regular.

7   Q        You would agree with me that you had at least 62
8   conversations either by telephone or text message between June
9   12th and June 21st?

10  A        I don't know how many messages there were, but there
11  were some messages.

12  Q        And you would agree with me that on a number of these
13  messages between you and Austin Burke you were asking him to
14  buy you marijuana?

15  A        I didn't ask him to buy it off of him.

16  Q        You were asking him to get it for you?

17  A        I asked if he knew anyone that had it, yeah.

18  Q        Okay.  And actually that message that we saw get
19  posted up on the board earlier, after that phone conversation,
20  you actually sent some messages to Austin; isn't that correct?

21  A        I do not recall.

22  Q        Told him that you wanted to go to Willow the next
23  day?

320

1    A       Yeah.  I didn't go though.

2    Q       And Willow is Willow Lake?

3    A       Yes.

4    Q       Is that a place that you knew Austin to frequent

5    often?

6    A       I haven't been there in years.

7    Q       What about Austin?  Did he go there on occasion that

8    you knew of?

9    A       I don't know.

10                   MR. OLSON:  May I have one moment, Your

11   Honor?

12   BY MR. OLSON:

13   Q       So on June 12th, it's your testimony that only Austin

14   came into the Roupe house; is that correct?

15   A       He didn't come into it.  He was just at the door.

16   Q       Oh, okay.  So he just stayed at the door.  He never

17   came in?

18   A       No.

19   Q       Didn't talk to anybody inside the residence?

20   A       No.

21   Q       Brandon Sample never got out of the car?

22   A       No.

23   Q       So you never saw Brandon use any drugs or doing

321

1   anything like that?

2   A       No.

3   Q       On the 20th when you received a phone call from

4   Austin, you would agree with me that there was no text

5   messages between the two of you saying, "Hey, I came into a

6   lot of cash"?  It was all by phone?

7   A       No, it was on a call.

8   Q       It was on a call?  That's what I mean.  All by

9   telephone, regular conversation?

10  A       Yeah.

11  Q       He didn't tell you how much cash?

12  A       No.

13  Q       He didn't tell you where he got it from?

14  A       No.

15  Q       And the only person -- the only people that heard

16  this were you and Hayle?

17  A       Yes.

18  Q       Okay.  And you were at the Roupe house?

19  A       Yes.

20  Q       Rickey wasn't there?

21  A       No.  He was in the other room.

22  Q       Okay.  Nate wasn't there?

23  A       No.

322

1    Q        What about Jess?

2    A        Yeah, but she was in the other room too.

3    Q        Okay.  So none of them heard this conversation?

4    A        I don't believe so, no.

5    Q        At any point in time, did Austin ever make mention of

6    the name Brandon Sample to you before June 12th?

7    A        No.

8                        MR. OLSON:  I have no further questions.

9                        THE COURT:  Redirect?

10                       MR. BECKER:  Nothing further, Your Honor.

11                       THE COURT:  All right.  You may step down.

12   Thank you.

13            Counsel, approach.

14                       (At sidebar:)

15                       THE COURT:  I'm assuming you don't have any

16   other witnesses?

17                       MR. BECKER:  I do not.

18                       THE COURT:  All right.

19                       (End of sidebar.)

20                       THE COURT:  Ladies and Gentlemen, we have

21   gotten right to about closing time which is 4:30 so we are

22   going to conclude for this afternoon.  We'll start up tomorrow

23   at 9:00.  Again, report down to the petit jury room early.


                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

323

1   We've been very timely so far and we're moving right along in

2   pretty good shape here right now.

3        Again, avoid reading the news, avoid reading a paper

4   or Facebook or anything relative to this case.  Do not discuss

5   this case among yourselves, nor with anyone else.  Do not form

6   or express an opinion.  I'll see you tomorrow at 9.

7                         (At 4:30 p.m., court was adjourned to

8   Wednesday, March 7, 2018.)

9                         (Note:  For further proceedings in this

10  matter, please refer to Volume III.)

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    IN THE COURT OF COMMON PLEAS

2                       TRUMBULL COUNTY, OHIO

3

4      State of Ohio,              : CASE NO:  2017-CR-403

5          Plaintiff,              :

6                                  :

7      -vs-                        : <u>TRANSCRIPT OF PROCEEDINGS</u>

8      Austin Taylor Burke,        :

9          Defendant.              :    VOLUME III - JURY TRIAL

10

11

12           Be it remembered, that at the Jury Trial of the

13    above-entitled cause, in the Court of Common Pleas, Trumbull

14    County, Ohio, beginning on the 5th day of March, 2018, and

15    continuing thereafter, as hereinafter noted, before the

16    Honorable Andrew D. Logan, the following proceedings were had:

17

18

19

20

21

22

23    Official Court Reporter:  Lori J. Rittwage

                          OFFICIAL COURT REPORTER
                      TRUMBULL COUNTY * WARREN, OHIO

324

1                          A P P E A R A N C E S:

2


3
        On behalf of the State of Ohio:
4
            Atty. Christopher D. Becker
5           Trumbull County Prosecutor's Office
            160 High Street
6           Warren, OH  44481
            Phone:  (330) 675-2426
7           Email:  psbecker@trumbull.co.oh.us

8


9       On behalf of the Defendant:

10          Atty. Bradley G. Olson
            Dimeo Olson Law Group, LLC
11          28 North Mill Street
            New Castle, PA  16101
12          Phone:  (330) 318-3453
            Email:  brad_olson_jr@yahoo.com
13
            Mr. Edward Hartwig
14          120 Marwood Circle
            PO Box 3965
15          Boardman, OH 44513
            Phone:  (330) 718-9499
16

17

18

19

20

21

22

23


                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

325

# I N D E X

## E X A M I N A T I O N S

| WITNESS | Page | Line |
|---------|------|------|
| **OFFICER CHRIS MANNELLA** | | |
| Direct Examination By Mr. Becker | 327 | 12 |
| Cross Examination By Mr. Olson | 333 | 17 |
| Redirect Examination By Mr. Becker | 339 | 16 |
| **KENNETH SAMPLE** | | |
| Direct Examination By Mr. Becker | 341 | 15 |
| Cross Examination By Mr. Olson | 351 | 8 |
| **DETECTIVE DAVID MORRIS** | | |
| Direct Examination By Mr. Becker | 357 | 9 |
| Cross Examination By Mr. Hartwig | 375 | 18 |
| Redirect Examination By Mr. Becker | 389 | 12 |
| Recross Examination By Mr. Hartwig | 394 | 3 |
| **HAYLE ROUPE** | | |
| Direct Examination By Mr. Becker | 398 | 12 |
| Cross Examination By Mr. Hartwig | 412 | 17 |
| Redirect Examination By Mr. Becker | 419 | 1 |
| Recross Examination By Mr. Hartwig | 421 | 7 |
| **JESSICA SIMMS** | | |
| Direct Examination By Mr. Becker | 423 | 20 |
| Cross Examination By Mr. Olson | 434 | 9 |
| Redirect Examination By Mr. Becker | 446 | 17 |
| Recross Examination By Mr. Olson | 451 | 3 |
| **JOANN GIBB** | | |
| Direct Examination By Mr. Becker | 452 | 21 |
| Cross Examination By Mr. Olson | 468 | 19 |
| Redirect Examination By Mr. Becker | 476 | 2 |
| Recross Examination By Mr. Olson | 479 | 4 |
| **TIMOTHY COOK** | | |
| Direct Examination By Mr. Becker | 483 | 1 |
| Cross Examination By Mr. Hartwig | 485 | 17 |
| **WILLIAM MOSKAL** | | |
| Direct Examination By Mr. Becker | 487 | 21 |
| Cross Examination By Mr. Olson | 507 | 1 |
| Redirect Examination By Mr. Becker | 515 | 23 |
| **MICHAEL A. ROBERTS** | | |
| Direct Examination By Mr. Becker | 518 | 9 |
| Cross Examination By Mr. Hartwig | 525 | 18 |
| **LYNDA EVELETH** | | |
| Direct Examination By Mr. Becker | 528 | 6 |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

326

```
Cross Examination By Mr. Olson                    535   15
              DAN LESTER, JR.
Direct Examination By Mr. Becker                  539    1
          DETECTIVE JOHN GREAVER
Direct Examination By Mr. Becker                  545   13
Cross Examination By Mr. Olson                    571    1
```

## E X H I B I T S

| Exhibit | Description | Page | Line |
|---|---|---|---|
| State's Exhibit No. 23 | Phone records | 348 | 8 |
| State's Exhibit Nos. 49, 15-18 | Photos | 360 | 23 |
| State's Exhibit No. 39 | Photos | 371 | 6 |
| State's Exhibit No. 40 | Photos | 371 | 16 |
| State's Exhibit No. 5 | Black Pouch | 374 | 20 |
| State's Exhibit No. 25 | Photo Lineup | 408 | 11 |
| State's Exhibit No. 26 | Photo Lineup | 431 | 16 |
| State's Exhibit No. 3 | Samsung Phone | 454 | 21 |
| State's Exhibit No. 47 | Extraction Report | 457 | 11 |
| State's Exhibit No. 48 | Extraction Report | 464 | 4 |
| Defendant's Exhibit A | Extraction Report | 469 | 13 |
| State's Exhibits 50-51 | Phone Call Analysis Reports | 490 | 14 |
| State's Exhibit 22 | Cell Phone Records | 491 | 4 |
| State's Exhibit 2 | Projectile | 519 | 23 |
| State's Exhibit 41 | BCI Report | 524 | 3 |
| State's Exhibit 42 | BCI Report | 531 | 1 |
| State's Exhibit 29 | Recorded Jail Phone Calls | 542 | 23 |
| State's Exhibit 21 | Adjudication | 556 | 15 |
| State's Exhibit 27 | Constitutional Rights Form | 564 | 18 |
| State's Exhibit 28 | Defendant's Statement | 567 | 14 |
| Defendant's Exhibit B | Missing Persons Entry | 575 | 5 |
| Defendant's Exhibit C | Narrative Supplement | 624 | 9 |

327

1          March 7, 2018

2          THE COURT:  Good morning, Ladies and

3   Gentlemen.  I appreciate everyone being timely as we continue

4   today.

5          Mr. Becker, you may call your next witness.

6          MR. BECKER:  Thank you, Your Honor.  State

7   would call Officer Chris Mannella of the Niles Police

8   Department.

9                          *   *   *

10          OFFICER CHRIS MANNELLA,

11  having been duly sworn, was examined and testified as follows:

12                    <u>DIRECT EXAMINATION</u>

13  BY MR. BECKER:

14  Q      Okay.  Would you state your name for the record,

15  please?

16  A      Sure.  It's Chris Mannella.

17  Q      And, Chris, where are you employed at?

18  A      City of Niles Police Department.

19  Q      And how long have you been there?

20  A      28 years.

21  Q      All right.  I want to direct your attention to

22  June 12, 2017.  Were you on duty that morning?

23  A      Yes, I was.  I was on day shift.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

328

```
1    Q        All right.  And what does day shift usually start
2    with?
3    A        6:45 until 3:15 p.m.
4    Q        All right.  And at some point did the Niles Police
5    Department get information that they needed to be dispatched
6    to the bike trail in Niles?
7    A        That's correct.
8    Q        Okay.  Do you know exactly where that location was?
9    A        Yes.  The actual trailhead for our bike path is on
10   State and Robbins.  It's right next to a retirement home.
11   Q        And is there anything else that is at that location
12   such as like a room or facilities there?
13   A        Correct.  There is a pavilion with restrooms, water.
14   Q        All right.  Do you know what the reference to the
15   call was, what it was for?
16   A        Somebody using the bike path had discovered a white
17   four-door Chevy abandoned on the bike trail.
18   Q        And you and other officers went to that location?
19   A        Correct.  Actually, our whole shift had just broke
20   roll call and we were curious to see how a vehicle got on the
21   bike path.
22   Q        And did you actually go to that location?
23   A        Yes, I did.
```

329

1    Q       And what did you observe?

2    A       Actually, we ended up going to the trailhead.  We

3    walked, it would have been a southeasterly direction from the

4    trailhead maybe 100, 150 yards, and there was a white

5    four-door vehicle abandoned on the bike path.

6    Q       And on that bike path there is a bridge a little bit

7    further down.  This was not across it -- or was this before or

8    after the bridge?

9    A       This was after the bridge.

10   Q       Oh, it was after the bridge?

11   A       The bridge runs between Robbins Avenue and Park.

12   Q       Okay.  I was --

13   A       And it is wide enough for a vehicle to go over.

14   Q       I was under the impression it was before the bridge.

15   It was actually after the bridge?

16   A       The bike path bridge, the vehicle was after it,

17   correct.

18   Q       Okay.  Okay.  Well, we had the jury looking at the

19   wrong location then.  That was my fault.

20           However, needless to say, you were there and observed

21   the scene; correct?

22   A       Yes.

23   Q       At approximately what time was this that you were out

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

330

1   there?

2   A       I want to say between 7:20 and 7:30.

3   Q       All right.  I'm going to show you what have been

4   marked for purposes of identification as State's Exhibits 43

5   through 46 and ask if you recognize these photographs.

6   A       Yes, I do.

7   Q       All right.  Do those photographs fairly and

8   accurately depict the vehicle you observed on June 12, 2017,

9   on the Niles bike path?

10  A       Yes, it is.

11  Q       And is that location -- do you know what county that

12  location is in?

13  A       Trumbull County.

14  Q       Officer, the photographs have a date and time stamp.

15  Would you agree the time stamp is incorrect?

16  A       That's correct.  The officer that took the

17  photographs let us know that at the time he did not reset it

18  from the time change for daylight savings.

19  Q       All right.  And so it had not moved the clock ahead

20  an hour?

21  A       Correct.  One hour.

22  Q       All right.  And are you aware who that vehicle

23  ultimately was determined to belong to?

1   A      At the time, we did run the plate through L.E.A.D.S.

2   through dispatch and a name was given. I can't recall the

3   name at this point.

4   Q      All right. But that individual had not been reported

5   missing or anything at that point?

6   A      That's correct. At the time that we found the car it

7   was just an abandoned vehicle.

8   Q      All right. Do you know if any attempts were made to

9   locate the owner of that vehicle?

10   A      Yes. Actually, we called the 911 center to find out

11   where the actual residence was and sent either an officer or

12   had the 911 center make a phone call.

13   Q      But you never heard back from anyone?

14   A      That's correct.

15   Q      Did you look in the area around the vehicle to see --

16   A      Yes. We searched in the area, excuse me, just in

17   case the driver became disoriented, either medical reasons,

18   alcohol, drugs, to see if they may have fallen down a hill.

19   Checked the wooded area. No one was found.

20   Q      And were you able to at least make a determination,

21   maybe through tracks in the grass or anywhere, how that

22   vehicle got from that trailhead where that parking --

23   A      Yes. It would have entered off of East Park, which

332

1    is -- there's a bike trail exit between Dynasol and Home for

2    Kids, and it would have traveled north on the bike path

3    towards the trailhead.

4    Q        Because in the parking lot I know that there were

5    posts?

6    A        Yes.

7    Q        There's no posts at that other location?

8    A        They have been broken off in the past.

9    Q        I'm going to publish these for the jury and ask you

10   to identify each and every one of them for the jury by number.

11   I'm going to show you what's been marked for purposes of

12   identification as State's Exhibit Number 46.  Do you recognize

13   State's Exhibit 46?

14   A        Yes.

15   Q        Okay.  And that vehicle appears to have basically

16   been lodged between a log or --

17   A        Correct.  It was wedged between an actual tree and a

18   tree that's been felled.

19   Q        That's State's Exhibit 46, State's Exhibit 45?

20   A        Yes.

21   Q        All right.  State's Exhibit 44?

22   A        Yes.

23   Q        And I'll brighten this up a little bit.  We can see

333

1   this is just basically a different angle of the log we saw

2   from the rear?

3   A      Yes.

4   Q      And then State's Exhibit 43?

5   A      Yes.

6   Q      And on the passenger side it appears that you said

7   there were trees that --

8   A      Correct.

9   Q      That were still alive?

10   A      Correct.

11   Q      And all these photographs fairly and accurately

12   depict the scene as you observed it on June 12, 2017?

13   A      Yes, they do.

14            MR. BECKER:  Thank you, Your Honor.  I have

15   nothing further.

16            THE COURT:  Cross?

17            CROSS EXAMINATION

18   BY MR. OLSON:

19   Q      Morning, Officer.

20   A      Morning.

21   Q      Officer Mannella, you indicated that you reported to

22   work at 6:45?

23   A      Correct.

334

1    Q       On the 12th; is that correct?

2    A       Correct.

3    Q       And you indicated that during the morning roll call

4    was when you were notified that there was a car on the bike

5    path?

6    A       Correct.

7    Q       Do you know what time that call came in?

8    A       I'd have to check a log.  It would have had to have

9    been between 7:15 and 7:20.

10   Q       So it came in after you had already reported to work?

11   A       Correct.

12   Q       And the person that reported in to work -- reported

13   in to the station, they didn't indicate that they saw the

14   person dropping off the car; is that correct?

15   A       Correct.  Correct.

16   Q       You indicated that after morning roll call breaks you

17   head towards the Niles bike path?

18   A       Correct.

19   Q       How many officers went?

20   A       At least four of us.

21   Q       So there was four officers that attended.  Do you

22   know who they were?

23   A       I'd have to check the log.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        All right.

2    A        Because our shifts change, but the person that took

3    the photographs was Officer Meyers.

4    Q        Okay.

5    A        So I know he was there.

6    Q        But off the top of your head you don't remember the

7    other two or if there were even two others?

8    A        Well, it would have been a supervisor at the time,

9    that was Captain Miketa.  And I believe one other officer was

10   Officer Marhulik.

11   Q        Okay.  So your indication was that the car pulled

12   into the bike path from the end where the Dynasol Plastics --

13   A        Correct.

14   Q        -- would be right behind you?

15   A        Correct.

16   Q        Did you go to Dynasol Plastics and ask for video

17   there?

18   A        My supervisor did.

19   Q        Okay.  Did you ever review that video?

20   A        No.  Absolutely not.

21   Q        Did you discuss this case with your supervisor?

22   A        Prior to coming here, no.

23   Q        Okay.  Did you learn if anybody ever identified

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

336

1   anybody bringing that car to the bike path?

2   A       No.

3   Q       You obviously were the one that observed this car;

4   correct?

5   A       Correct.

6   Q       You saw the pictures that were just posted --

7   A       Correct.

8   Q       -- for the jury?  You would agree with me that you

9   didn't see any mud on the tires; correct?

10  A       I don't -- I don't believe so.  I mean, grass.

11  Q       And you didn't note in any of your reports that there

12  was mud on the tires?

13  A       No.

14  Q       Mud on the interior?

15  A       No.

16  Q       Mud all over the outside of the vehicle?  Did you

17  identify any fingerprints in this vehicle?

18  A       I did not.

19  Q       Did anybody print it?

20  A       I don't know if the car was processed later or not.

21  Q       Okay.

22  A       I don't have -- that's above me.

23  Q       Okay.  Did you tow the vehicle from the scene?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Yes, we did.

2    Q        What time did you tow it?

3    A        I'd say within 45 minutes the wrecker came.  So a

4    little before 8:00.

5    Q        Okay.  Where did you tow it to?

6    A        To our impound lot, city impound.

7    Q        Now, you also indicated that when you went to the

8    vehicle you called it in to 911; is that correct?

9    A        We called -- our dispatcher --

10   Q        Oh, you called --

11   A        We have our own dispatch.

12   Q        Okay.

13   A        The information from that, in order to contact

14   someone that owns it, was out of our jurisdiction.  Everybody

15   that uses the 911 center was in that jurisdiction.  So the 911

16   center was called by our dispatch to try to make contact.

17   Q        Do you know if contact was made?

18   A        No, I do not.

19   Q        Do you know if somebody was sent out to the home

20   or --

21   A        No, I do not.

22                    BY MR. OLSON:  Your Honor, may I have one

23   moment?

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

338

BY MR. OLSON:

Q       Officer Mannella, you indicated that you've been an
officer for quite some time; is that correct?

A       Yes.

Q       You're familiar with what gunshot residue is?

A       Yes.

Q       Did you see any evidence of any gunshot residue in
this vehicle or was it tested that you're aware of?

A       I don't know if it was tested or not.  But I --
basically the interior of the vehicle was checked for a body
and the trunk was checked for a body so that we wouldn't be
that department that failed to look.

Q       Okay.  So --

A       But as far as evidence, gunshot residue, no.

Q       Okay.  When you checked the interior of the vehicle,
were you able to just open up the door, or was it locked?

A       We couldn't do anything until the vehicle was pulled
from the two trees.  The doors were wedged.

Q       Okay.

A       Once the wrecker driver pulled the vehicle, you could
look inside at the time that the vehicle was wedged between
the trees.  And once it was pulled out you could open the
doors and open the trunk.

339

1    Q        Okay.  So they were unlocked then?

2    A        Correct.

3    Q        Okay.  Did you see any blood in the vehicle?

4    A        No.

5    Q        Did you see any evidence of any drugs?

6    A        No.

7    Q        Did you take pictures of the interior of the vehicle?

8    A        I did not.

9    Q        How about the trunk?  Do you know if they were taken?

10   A        I do not recall.  I don't.  I didn't.  I'm not the

11   photographer.

12                    MR. OLSON:  Okay.  Nothing further, Your

13   Honor.

14                    THE COURT:  Redirect.

15                    MR. BECKER:  Yes.

16                    REDIRECT EXAMINATION

17   BY MR. BECKER:

18   Q        Were any keys found to that vehicle?

19   A        I do not believe they were.

20   Q        You were asked on cross examination about any mud.

21   Was this a muddy day?  Was this --

22   A        No, it was not.

23   Q        All right.  And that bike path, are you familiar with

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

340

1    it?  Does it get quite wet in the spring or when it rains?

2    A       It usually doesn't because the way it's designed, the

3    runoff, and there's all grass on each side.  And it is

4    asphalt.

5    Q       But where this vehicle was, it was not on blacktop;

6    right?

7    A       Correct.  It was off the side into the grassy area,

8    but it did not get that far off of the road because of the two

9    trees.

10   Q       And it didn't sink in the ground or anything?

11   A       No.

12   Q       I'm going to show you what's been marked for

13   purposes -- you were asked about mud.  I'm going to show you

14   State's Exhibit 46.  Can you see the rear driver's side tire?

15   A       Correct.

16   Q       In that photograph?

17   A       Correct.

18   Q       What does that appear to be?

19   A       Dirt and mud.

20   Q       Mud.  Okay.  And I'm going to hand you a laser

21   pointer.

22   A       Okay.

23   Q       And this is the photograph, State's Exhibit 46, we're

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

341

1    referring to.  I'll keep moving it.  Hold on.  Okay.  So you'd

2    agree there's mud on that tire?

3    A       Correct.

4                    MR. BECKER:  All right.  I have nothing

5    further, Your Honor.

6                    THE COURT:  Recross.

7                    MR. OLSON:  Nothing further, Your Honor.

8                    THE COURT:  You may step down.  Thank you.

9         Call your next witness.

10                   MR. BECKER:  State would call Kenneth

11   Sample.

12                         *   *   *

13                     KENNETH SAMPLE,

14   having been duly sworn, was examined and testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. BECKER:

17   Q       All right.  Would you please state your name for the

18   record?  You can pull that microphone up closer to you.

19   A       Kenneth Sample.

20   Q       And Kenneth, how old are you?

21   A       I'm 50.

22   Q       Do you have any children?

23   A       Yes.

                    OFFICIAL COURT REPORTER
               TRUMBULL COUNTY * WARREN, OHIO

342

1    Q        What are their names and ages?

2    A        Brittany, she is 28.  Brandon who is deceased was 22.

3    And my youngest is Haley, 21.

4    Q        All right.  I want to direct your attention to

5    June 11th and June 12th, 2017.  Where was Brandon living at at

6    that time?

7    A        At our house.

8    Q        And where is your house located at?

9    A        261 Garfield Drive Northeast, Warren, Ohio.

10   Q        And do you know what county that's in?

11   A        Trumbull.

12   Q        All right.  Now, Mr. Sample, where is it that you

13   work at?

14   A        I work at the Ohio State Penitentiary.

15   Q        And how long have you worked there?

16   A        I've been employed with the Department of Corrections

17   for 25 years.

18   Q        And was there a time when your son got a job with the

19   Department of Corrections?

20   A        Department of Youth Services, yes.

21   Q        Department of Youth Services, yes.  And what is the

22   difference between the Department of Corrections where you

23   work and the Department of Youth Services?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

343

1    A        Youth Services is with juvenile offenders.
2    Department of Corrections is with adult offenders.
3    Q        So adult offenders go to an institution where you
4    work at, and where Brandon was working at would be youth
5    offenders, it would be under 18?
6    A        Yes, generally.
7    Q        Some could be over 18 but for the most part they're
8    juveniles?
9    A        Depending on when they were placed there, yes.
10   Q        Right.  Okay.  And do you know approximately when
11   Brandon worked there?
12   A        Yes.  He started September of 2016 and then finished
13   approximately February, mid February of 2017.
14   Q        All right.  And what facility did he work at?
15   A        Indian Rivers.
16   Q        Do you know where Indian Rivers is?
17   A        Near Massillon in Stark County.
18   Q        Would he drive down there every day?
19   A        Yes.
20   Q        All right.  Now, I want to direct your attention back
21   to June 11th and June 12th of 2017.  You say Brandon was
22   living with you here in Warren, Ohio?
23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

344

1   Q       All right.  And at some point -- well, let me ask you

2   this.  What type of vehicle did Brandon drive at that time?

3   A       It was a 2009 Chevy Malibu, white.

4   Q       I'm going to show you State's Exhibits 43, 44, 45 and

5   46 and ask if you recognize that vehicle?

6   A       Yes.  Brandon's car.

7   Q       Mr. Sample, at some point late in the evening of

8   June 11th, 2017, did you have a chance to see Brandon?

9   A       Yes.

10  Q       How did that come about?  Tell the jury what happened

11  and how long he was there or what happened.

12  A       He had been gone to his grandmother's cutting the

13  yard most of the day.  About 11 o'clock that night on Sunday,

14  the 11th, I was just getting ready to go to bed.  I heard

15  somebody out in the kitchen.  I went to see.  It was him.  He

16  was putting some food away, he said.  And then he said he was

17  taking Josh back to Akron.

18  Q       All right.

19  A       Or actually he said he was taking Josh home.

20  Q       All right.  And you knew Josh to live in Akron at

21  that point or not?

22  A       I didn't know Josh lived in Akron at that point.

23  Q       All right.  Now, you had further contact with -- and

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   that was the last time you saw your son alive; correct?

2   A       Yes.

3   Q       Now, you had further contact with Brandon into the

4   early morning hours of June 12th; is that correct?

5   A       Yes.

6   Q       Explain to the jury how that contact came about.

7   A       I got up to go to work at 4:30 in the morning on

8   Monday, June 12th.  About 4:40, I noticed he wasn't home.  I

9   texted him and I got a text back, said, "I'm on my way home,

10  bro."

11  Q       All right.  At some point, did you try and call that

12  phone after 4:40 a.m?

13  A       Yes.  When I left to drive to work, it was about

14  4:50.  I tried calling.  It went straight to voicemail.

15  Q       Did you call numerous times?

16  A       On the way to work, yes.

17  Q       All right.  And how long was your shift on June 12th?

18  A       I was there until about 3:30 that afternoon.

19  Q       And still had not heard from your son?

20  A       No.  I had a break around 10, 10:15 in the morning.

21  I tried calling his cell phone.  It went straight to

22  voicemail.  Then I called home and spoke to my wife.

23  Q       And what was the reason you called your wife?

346

1   A        I was just concerned.  Wanted to make sure that he

2   wasn't -- didn't oversleep or miss work that night.

3   Q        Where was he working at at that time?

4   A        Kraftmaid.

5   Q        Now, you got home later in the evening or afternoon

6   hours of June 12th.  Were you aware that Brandon's car had

7   been found in Niles at that point?

8   A        No.

9   Q        So at some point, then, you became concerned and felt

10  that you needed to contact the Warren Police Department; is

11  that correct?

12  A        Yes.

13  Q        Tell us approximately when you did that and what you

14  did to contact the Warren Police Department?

15  A        He was supposed to meet me at Grace Church at 5:30.

16  Q        That's on June 12th?

17  A        Yes.

18  Q        All right.

19  A        When he didn't, between 5:30 and 5:50 I contacted the

20  Warren Police Department, spoke with the dispatch, inquired as

21  to how long somebody needed to be missing.  And she asked me

22  to explain what was going on and stuff.  And she said she

23  would send an officer over to the house.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Q       All right.  And you then spoke to an officer after
2   6:00, I assume, that night?
3   A       My wife did.
4   Q       Okay.  Now, did you make any efforts to go look or
5   see where he was at?
6   A       Yes.
7   Q       And what did you do?
8   A       While she was at home waiting for the officer to
9   arrive, I drove to Middlefield, checked the parking lot of
10  Kraftmaid, and I waited until his shift was supposed to start
11  at 8:00 to see if he showed up.
12  Q       All right.  Now, at some point, then, officers
13  contacted you, I believe would have been the next day.  This
14  detective, John Greaver, made contact with you and your
15  family?
16  A       Yes.
17  Q       And you provided him -- you were able somehow to get
18  onto Brandon's cell phone account or it was a joint account?
19  A       It was his account.  He had given me his password to
20  be able to get on and make payments for him sometimes when he
21  didn't have the money to make the cell phone payment.
22  Q       When you were accessing that account, were you able
23  to get call and text details from his account?

348

1    A        Yes.  There's a section that provided a list of

2    ingoing, outgoing calls and text numbers that it went to and

3    numbers received.

4    Q        All right.  I'm going to show you what's been marked

5    for purposes of identification as State's Exhibit 23.  I

6    realize you gave a long list of calls.  Do you recognize

7    State's Exhibit 23?  It's a two-page document.

8                    (Whereupon, State's Exhibit No. 23, Phone

9    records, was introduced for identification.)

10   A        Yes.

11   Q        Okay.  What is that?

12   A        That's the printout that I sent to Detective Greaver

13   after I had downloaded the information.

14   Q        So did you print that out or did you just e-mail it

15   to him?

16   A        I saved it as an Excel document and then sent it to

17   him.

18   Q        All right.  I'm going to show you -- well, first of

19   all, do you see on that first page -- do you see your cell

20   phone number?

21   A        Yes.

22   Q        What was your cell phone number?

23   A        (330) 646-5695.

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

349

| | |
|---|---|
| 1 | Q       And do you see Brandon's cell phone number? |
| 2 | A       Yes. |
| 3 | Q       All right.  And on the second page there's some call |
| 4 | information; is that correct? |
| 5 | A       On the second page? |
| 6 | Q       Yeah. |
| 7 | A       Yes. |
| 8 | Q       All right.  So let's start with the first page of |
| 9 | State's Exhibit 23.  And I'll publish this for the jury so |
| 10 | they know what we're talking about.  You have a laser pointer |
| 11 | in front of you.  The yellow button will -- yep, there you go. |
| 12 | A       Okay. |
| 13 | Q       All right.  I'm going to put up here State's |
| 14 | Exhibit 23.  All right.  The very last -- or top of this page |
| 15 | lists -- on the right side you'll see the type of message. |
| 16 | They're all texts; correct? |
| 17 | A       Uh-huh. |
| 18 | Q       Do you see the last text message that you sent and |
| 19 | received between you and Brandon? |
| 20 | A       Yes.  At 6:40 was the last one that I sent. |
| 21 | Q       4:40 you mean? |
| 22 | A       I mean 4:40.  I apologize. |
| 23 | Q       And that's on June 12th? |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

350

1    A       Yes.

2    Q       All right.  And there was a series of text messages.

3    Was that the last text message that came or was received by

4    Brandon's phone that -- when you printed those out?

5    A       Yes.

6    Q       Okay.  Now, I'm also going to show you the second

7    page of that document which is State's Exhibit 23.  And these

8    are telephone calls.  They were also text messages and

9    telephone calls; correct?

10   A       Yes.

11   Q       Do you see the call that came in on June 12th, 2017

12   at 1:18 a.m?  It says, "Incoming call."

13   A       Yes.

14   Q       And could you tell the jury what number that is?

15   A       (330) 891-7261.

16   Q       Are you familiar with whose number that is?

17   A       No, I am not.

18   Q       All right.  But there was definitely a call,

19   according to Brandon's records, that came to his cell phone on

20   June 11th, 2017 from 891-7261; correct?  The 1:18 call.

21   A       1:18?  On June 12th?

22   Q       Yeah.

23   A       Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

351

1    Q        Okay.  State's Exhibit 23 is a fair and accurate copy

2    of the telephone records that you printed off of your son's

3    account that you were able to access June 12th or June 13th?

4    A        Yes.  Straight from Verizon's website.

5    Q        Okay.  Thank you.

6                   MR. BECKER:  I have no further questions.

7                   THE COURT:  Cross?

8                         CROSS EXAMINATION

9    BY MR. OLSON:

10   Q        Good morning Mr. Sample.

11   A        Morning.

12   Q        Mr. Sample, you indicated that your son was working

13   at Indian River from September of '16 through February of '17;

14   is that correct?

15   A        Yes.

16   Q        At any point in time during that period, did he ever

17   come to you and mention Austin Burke or identify that he had

18   any issues with an Austin Burke?

19   A        No.  He never mentioned him by name.

20   Q        You never heard that name ever?

21   A        No.

22   Q        Even after he left employment with Indian River, he

23   never came to you and said, "Hey, there's this old inmate that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

352

1    I used to work with and he's been causing me problems or

2    calling me" or anything like that?

3    A       No.

4    Q       You indicated that on June 11th you saw Brandon at

5    11:00 at night at your residence; is that correct?

6    A       Yes.

7    Q       I mean, there was some news reports that came out

8    during this period of time when your son went missing; is that

9    correct?

10   A       You mean after June 12th?

11   Q       Correct.

12   A       Some news reports, yes.

13   Q       And you met with some news reporters?

14   A       Yes.

15   Q       And I'm not here to nitpick.  It's just -- at any

16   point in time, did you tell them that it might have been

17   12:15, later at night?

18   A       No.

19   Q       Okay.  So if there was any reports or newscasts that

20   indicated it was 12:15, that would have been inaccurate?

21   A       Yes.

22   Q       Okay.  Now, you also went in and said that at 4:30 in

23   the morning when you had not heard or seen Brandon you began

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    sending him text messages; is that correct?

2    A       Yes.  As soon as I woke up at 4:30.

3    Q       Okay.  Do you know if Brandon's telephone was

4    password protected where you had to put in a code or something

5    to be able to access to send out text messages?

6    A       I do not.

7    Q       Okay.  So you indicated that you did receive a

8    response back; is that correct?

9    A       Yes.

10   Q       But anybody that would have had his device, to the

11   best of your knowledge, could have responded; is that correct?

12   A       It's possible.

13   Q       Right.  And you would not have known who was actually

14   sending that response?

15   A       The text message that I received was indicative of

16   his usual responses.

17   Q       Okay.  Also, during that period of time, you

18   indicated that 11:00 he says, "I'm going to bring Josh back to

19   Akron"?

20   A       No.  He said he was going to take Josh home.

21   Q       Okay.  And what did you understand that to mean?

22   A       He was gonna take Josh home.

23   Q       Did you know where Josh lived?

354

1    A        No, I didn't know until after.

2    Q        Okay.  So he didn't indicate if he was going to go to

3    any other places or anything of that nature; is that correct?

4    A        He just stated he was taking Josh home.

5    Q        All right.  You also indicated that you had made a

6    few phone calls that went straight to voicemail; is that

7    correct?

8    A        Yes.

9    Q        Those calls were made after the text messages or

10   before?

11   A        After.

12   Q        Now, you were asked on direct examination about a

13   phone number that was incoming at 1:18 a.m. from a

14   (330) 891-7261 phone number.  You indicated that you did not

15   know whose number that was; is that correct?

16   A        Correct.

17   Q        Did you also see on those exhibits two phone calls

18   that came in subsequent to -- or went out subsequent to that

19   1:18 phone call to a (330) 573-8234 number?

20   A        I'm not sure.  I was looking at the 1:18 that the

21   prosecutor asked me to focus on.

22                    MR. OLSON:  May I approach the witness,

23   Your Honor?

1          THE COURT:  You may.

2     BY MR. OLSON:

3     Q      I'm going to show you what's previously been marked

4     as State's Exhibit 23.  If you look above the incoming call at

5     1:18 a.m., do you see two telephone calls that were outgoing

6     at that time?

7     A      I see text messages.  12:57 there's a text sent.

8     12:56 there's a text received.

9     Q      May I see the exhibit, just to help you out?

10          I'm going to refer you now to the second page of that

11    same document.  The very top of that page.  Does it indicate

12    that there are two telephone calls outgoing at 2:14 and 2:15

13    a.m. to a destination that is listed as "Akron"?

14    A      Yes.

15    Q      And it has the same number, (330) 573-8234?

16    A      Yes.

17    Q      Are you familiar with that number?

18    A      No.

19              MR. OLSON:  Your Honor may I have one

20    moment?

21              THE COURT:  You may.

22    BY MR. OLSON:

23    Q      Mr. Sample, you indicated that earlier in the day

356

1   Brandon had gone to his grandmother's to cut grass; is that
2   correct?

3   A       On Sunday the 11th, yes.

4   Q       Do you know what time he got there?

5   A       Not sure what time he got there.  He left our house
6   maybe somewhere between 10:30 and 12.

7   Q       In the morning?

8   A       Yes.

9   Q       Okay.  And when he left at 10:30 -- between 10:30 and
10  12, was it his intention to go directly to his grandmother's
11  to cut grass?

12  A       As far as I know, yes.

13  Q       Okay.  At any point in time, do you know if grandma
14  was home?

15  A       No, she wasn't.

16  Q       Okay.  Did he message you or reference to you or
17  confirm with you that, "Yes, I did go up to grandma's and cut
18  her grass"?

19  A       I called him later that afternoon, about maybe 4 or
20  5, spoke to him on the phone and ask him if he finished.  He
21  said he was still there doing it.

22                  MR. OLSON:  Thank you.  Oh, I'm sorry.

23              Your Honor, I have no further questions.


                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

357

1          THE COURT:  Redirect.

2          MR. BECKER:  No, Your Honor.

3          THE COURT:  You may step down.  Thank you.

4     Call your next witness.

5          MR. BECKER:  Detective Dave Morris.

6                    *  *  *

7          DETECTIVE DAVID MORRIS,

8  having been duly sworn, was examined and testified as follows:

9                 <u>DIRECT EXAMINATION</u>

10 BY MR. BECKER:

11 Q     Okay.  Would you please state your name for the

12 record?

13 A     David Morris.

14 Q     And what is your occupation?

15 A     I'm a police officer with the City of Cortland Police

16 Department.

17 Q     And how long have you been a police officer with the

18 city of Cortland?

19 A     20 years.

20 Q     All right.  Is there any specialized training or

21 education that you've had to prepare you for your current

22 position?

23 A     Yes.

358

1    Q        And what would that be?

2    A        Through the OPOTA, the Ohio Peace Officer Training

3    Academy.  I'm a master criminal investigator, also a master

4    evidence technician.

5    Q        And what does that mean?

6    A        You take a series of courses that certify you in

7    either of those areas, either criminal investigations or

8    evidence collection, scene processing.

9    Q        And you have taken both of those courses?

10   A        They're a series of courses, yes.

11   Q        You have reached a point where they call you a master

12   investigator?

13   A        Yes.

14   Q        All right.  As part of your duties, are you part of

15   the Trumbull County Homicide Task Force?

16   A        Yes.

17   Q        What is the Homicide County-- I'm sorry -- the

18   Trumbull County Homicide Task Force?

19   A        We assist other agencies in investigating homicide,

20   smaller agencies or agencies that need more resources.

21   Homicides take quite a bit of human resources to investigate,

22   and most smaller departments cannot handle them on their own.

23   So we have a team, a task force, and we are the same folks

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

359

1    that work on it all the time.

2    Q        Okay.  Now, I want to direct your attention to on or

3    about June 15 of 2017.  On that date, were you called to

4    assist another department?  Not in your duties as a Cortland

5    Police Officer but as part of that Trumbull County Homicide

6    Task Force?

7    A        I was.

8    Q        And do you recall what the nature of the call was and

9    where you went?

10   A        It was in North Bloomfield.  There was -- in a wooded

11   area there was a body found.  And they had called me to assist

12   in the scene -- well, in processing the scene.

13   Q        And what were your duties in processing that scene?

14   A        It was to photograph the scene.

15   Q        Okay.  And did you also make a diagram or document

16   the location and where that was?

17   A        That was not my role that day.

18   Q        Okay.

19   A        All I did was photograph that day.

20   Q        All right.  You just did the photographing?

21   A        And I collected one piece of evidence.

22   Q        All right.  Do you recall the evidence you collected?

23   A        It was a shoe.

360

1   Q       All right.  Do you recall whether that matched a shoe

2   that was found on the victim?

3   A       It was the same brand and color of shoe, yes.

4   Q       Okay.  Now, the location you went to, do you know

5   what county that was in?

6   A       Trumbull County.

7   Q       All right.  And could you describe the conditions

8   that this body was found at.  What was it like that day?  What

9   was the temperature?  Was it wet? Muddy? Raining? Snowing?

10  A       It was very hot that day.  I believe it was

11  80 degrees according to my -- I looked at my cell phone at the

12  temperature.  I believe it was 80 degrees that day.

13  Q       All right.  I'm going to show you what has been

14  marked for purposes of identification as State's Exhibits 49,

15  15, 16, 17, and 18.  I'm going to ask if you recognize these

16  photographs?

17                   MR. OLSON:  Chris, can I see those first?

18                   MR. BECKER:  Oh, I'm sorry.

19  BY MR. BECKER:

20  Q       Would you please review those photographs and when

21  you're done reviewing them please refer to the exhibit number?

22                   (Whereupon, State's Exhibit Nos. 49, 15-18,

23  Photos, were introduced for identification.)


                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

361

1    A       Okay.

2    Q       All right.  With respect to State's Exhibit 49, can

3    you tell the jury what State's Exhibit 49 is?

4    A       It is a photograph of the logging road, I'll call it,

5    near the wooded area where the body was found.

6    Q       And based on the depiction in that photograph, does

7    that appear to be a really muddy area?  Is it wet there?

8    A       At times, yes.  Certain areas were very muddy.

9    Certain areas were --

10   Q       But the road actually in the photograph, you don't

11   see any puddles or anything there; right?

12   A       No.

13   Q       Pretty dried out?

14   A       Yes.

15   Q       All right.  So it's one of those places where you can

16   imagine if it rains or gets wet it could be very muddy, but on

17   that date when you were there it looks fairly dry?

18   A       Yes, absolutely.

19   Q       Okay.  Now I'm going to publish that for the jury.

20   That's State's Exhibit 49.  And off of this photograph, do you

21   recall where the body was found or located?

22   A       I believe it was -- you'll see like a -- right where

23   my thumb is there.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

362

1    Q        All right.  And I'll have you use the laser pointer

2    right here with the yellow button when I publish this for the

3    jury.

4    A        Okay.

5    Q        Okay.  We're looking at a photograph which has been

6    marked for purposes of identification as State's Exhibit 49.

7    On that photograph, approximately what area was the body

8    located?

9    A        It was right about in this area right here.

10   Q        There is like an opening there; is that what you're

11   describing?

12   A        Yes.  Right there, yes.

13   Q        The next photograph you have is -- well, actually,

14   yeah.  This one.

15   A        This one?

16   Q        What exhibit is that?

17   A        This is Exhibit 15.

18   Q        And what is significant about State's Exhibit 15 or

19   what is that?

20   A        This is showing the area leading into that -- this is

21   a more close-up shot of that particular area.

22   Q        All right.  Allow me to publish this for the jury.

23   And we'll put State's Exhibit 15 up on the board.  All right.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

363

1    And this is a close-up of what we're looking at in State's

2    Exhibit 49?

3    A        Correct.

4    Q        And again, what area on this photograph was the body

5    found?

6    A        This is kind of a hill right here.  You go up a

7    little hill and then it goes down on the back side of that.

8    So that's the area that we're at right there.

9    Q        Okay.  You're looking at now State's Exhibit 16?

10   A        Yes.

11   Q        All right.  What is State's Exhibit 16?

12   A        We're even a little bit closer.  You'll see that tarp

13   right there.

14   Q        Right.

15   A        To the right of that tarp is where I found the shoe.

16   Q        Okay.

17   A        That I referenced earlier.

18   Q        Right.

19   A        And then also it's getting us a little bit closer to

20   where the body was discovered.

21   Q        And I'm going to publish this for the jury.  This is

22   State's Exhibit 16.  And explain to the jury again exactly

23   what we're looking at here?

364

1    A       The body would be back in this area.

2    Q       All right.

3    A       Over the hill.  This is the shoe where the evidence

4    marker number 1 is.  That is the shoe that was similar to what

5    was on the body.

6    Q       And the body only had one shoe, one blue shoe?

7    A       Correct.

8    Q       And this blue shoe was found on the other side of

9    that hill?

10   A       Correct.

11   Q       Okay.  We see the blue tarp to the left?

12   A       Correct.

13   Q       All right.  The next photograph.  Okay.  That is

14   State's Exhibit --

15   A       That would be 17.

16   Q       -- 17.  All right.  And in this photograph do you see

17   the other shoe on the victim?  I believe it's the left shoe?

18   A       Yes.

19   Q       All right.  I'm going to publish this photograph for

20   the jury.  And this is State's Exhibit -- this is State's

21   Exhibit 17, I think we said?

22   A       Yes.

23   Q       And what are we seeing in this photograph?

1   A       This is an actual photograph of the body.  There --

2   this would be the existing shoe that was on the body.

3   Q       All right.  And which way -- which direction, down or

4   up, would be the location where the body was -- that other

5   shoe was found?

6   A       It would be on the other side.  This photograph, I

7   don't have the orientation of it, but it would be on the other

8   side of that hill.

9   Q       Okay.

10  A       From where that shoe was found.

11  Q       Up on the top?

12  A       Well, it went up -- you went up a little hill and

13  then down a little.  I mean, we're talking a very short little

14  hill here.  Just like a pile of dirt basically.

15  Q       But it was on the other side of that hill?

16  A       It was on the other side of that hill.

17  Q       And can you describe the condition of the body as you

18  saw it on June 15th?

19  A       I would call it in a state of decomposition.

20  Q       All right.

21  A       A lot of -- a lot of, yeah, a state of decomposition

22  would be the best way to describe it.

23  Q       Were you there and were you able to make a

1    determination as to where most of that decomposition was

2    taking place at?

3    A        It appeared to be right there.

4    Q        And where on the body was the most decomposed?  Or

5    was part of it more decomposed than the other?

6    A        It was all pretty decomposed.

7    Q        Now, it appears as if -- is there a shirt over the

8    victim's head?

9    A        Yes.  It was pulled over, pulled over his head, yes.

10   Q        All right.  Now, you have the last photograph in

11   front of you?

12   A        Yes.

13   Q        Which is State's Exhibit --

14   A        18.

15   Q        -- 18.  And this is a close-up showing the

16   infestation of maggots basically; correct?

17   A        Yes, correct.

18   Q        I'm going to show you State's Exhibit 18.  And this

19   is what?  What portion of the body are we looking at here?

20   A        I believe we're looking at the back right there.

21   Q        And off to the bottom left there, that would be the

22   arm and the shoulder?

23   A        Correct.

1   Q        And the head, we can sort of see that black tee shirt

2   that you're referring to?

3   A        Correct.

4   Q        All right.  These photographs fairly and accurately

5   depict the scene as you photographed them on June 15th, 2017?

6   A        They do.

7   Q        Now, let me ask you, Detective, when you were in that

8   location and where that body was found, if you were in that

9   first photograph, State's Exhibit 49 where the logging area

10  was, would you be able to see the body?

11  A        No.

12  Q        All right.  And there was quite a bit of overgrowth

13  and plant growth there?

14  A        A lot of vegetation, yes, trees.

15  Q        Okay.  Now, Detective -- now, I want to direct your

16  attention to June 20th of 2017.  On that date, you were

17  obviously still employed as an employee of the Cortland Police

18  Department?

19  A        Correct.

20  Q        And the city of Cortland had a robbery that occurred

21  sometime after 10 p.m. on June 20th, 2017; is that correct?

22  A        Correct.

23  Q        Were you on duty at that time?

368

1   A        No, I was not.

2   Q        Did you get called out?

3   A        I did.

4   Q        And what did you do when you went out on June 20th,

5   2017?

6   A        I responded to the area of Pizza Joe's which was

7   where the robbery occurred.  And also to a location where I

8   was told that there was possibly some evidence connected to

9   the robbery.

10  Q        And that would be 241C West Main Street in Cortland?

11  A        Correct.

12  Q        And again, these locations, Pizza Joe's and 241C West

13  Main Street, do you know what county they're located in?

14  A        Trumbull County.

15  Q        All right.  Now, you obtained, I believe, written

16  consent from the apartment leaseholder, a Melanie Engle, that

17  night to search the apartment; correct?

18  A        That's correct.

19  Q        She wasn't very difficult with you?

20  A        No, she was very cooperative with us.

21  Q        And she said, "Fine, search whatever you want to

22  search in the apartment"?

23  A        Yes.

369

1    Q       Did you go into the apartment?

2    A       I did.

3    Q       Can you describe the condition of the apartment?

4    A       It was in quite a bit of disarray.

5    Q       When you say "disarray," what do you mean?

6    A       Very cluttered.  Lots of clothing and items strewn

7    throughout.

8    Q       All right.  Kind of like how my teenager keeps his

9    bedroom?

10   A       That would be --

11   Q       So you then left the scene.  There were other

12   officers taking care of it.  You did what you felt you had to

13   do.  You obtained consent to search her apartment.  She freely

14   permitted you to do that.  Did you engage in any of the search

15   yourself?

16   A       Briefly, but not extensively that night.

17   Q       And other officers were basically in charge of that?

18   A       Correct.

19   Q       Now, the next day, on June 21st, 2017, did you get a

20   call or have an occasion to go back to 241C West Main Street?

21   A       Yes.  We had searched -- continued to search the next

22   day.

23   Q       All right.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

370

1    A        Throughout the day.

2    Q        And what happened on the -- on the next day, the

3    21st?

4    A        Well, the 21st we continued to search the apartment.

5    We were looking for evidence in connection with the robbery

6    that we believed was there.  It was just we were not

7    finding it.  There were several different officers, including

8    myself, that went through different parts of the apartment.  I

9    left and then very shortly after got called back to the

10   apartment.

11   Q        And what did you get called back in reference to?

12   A        I was told that the gun that we were looking for had

13   been found in a vase by the -- by Melanie Engle's mother.  And

14   so we -- I was called back to collect the gun.

15   Q        All right.  And is that the only piece of evidence

16   you collected at that time?

17   A        Yeah.  That and the two -- there was two vases that

18   it was in.  We collected the two vases at the time.  Myself

19   and Officer Orslene worked together.

20   Q        All right.  And then the other vase, do you recall

21   something else being in the other vase?

22   A        There was a small black pouch that contained

23   ammunition.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Q       All right.  Now, I'm going to show you what have been

2   marked for purposes of identification as State's Exhibits 39

3   and 40.  I'm going to show you State's Exhibit 39 first.  It's

4   actually a page with four photographs on it.

5   A       Okay.

6                   (Whereupon, State's Exhibit No. 39, Photos,

7   was introduced for identification.)

8   Q       All right.  I'm going to ask if you recognize that?

9   A       Yes.

10  Q       How do you recognize that?

11  A       That's the -- the first one, 39, Exhibit 39 shows the

12  two vases as they were found with the wooden roses in them.

13          And then the two vases with the roses removed.  And

14  you can see the handgun and the black pouch in it.

15  Q       All right.  And then State's Exhibit 40?

16                  (Whereupon, State's Exhibit No. 40, Photos,

17  was introduced for identification.)

18  A       State's Exhibit 40 is, again, another picture of the

19  vase with the black pouch and then an actual photograph of the

20  handgun itself.

21  Q       Those are -- on both of those pages there's four

22  pictures each; correct?

23  A       Correct.

372

1   Q        I'm going to publish those for the jury.  And, again,

2   if you could use the laser pointer.

3            And these are the two -- these are the two flowerpots

4   that you were referring to?

5   A        Correct.

6   Q        And when you lifted these flowerpots out and you

7   found inside there these two photographs?

8   A        Correct.  Well, the two items.

9   Q        The two items?

10  A        Yes.

11  Q        Yes.  And I'm trying to lighten them up a little bit

12  here.

13           And I'm going to show you State's Exhibit 40.

14  Probably a little bit better picture.  This is the handgun and

15  the pouch with the ammunition you referred to?

16  A        Correct.

17  Q        And we see at the bottom there, there are two

18  photographs of a small caliber handgun; is that correct?

19  A        Correct.

20  Q        Do you recall what caliber of handgun it was?

21  A        I believe it was a .22.  I can look at my notes and

22  confirm that for you.

23  Q        Okay.

1    A        But I believe it was a .22.

2    Q        Well, let me ask you this.  We'll do it this way.

3    I'm going to hand you what's been marked for purposes of

4    identification as State's Exhibit Number 1.  It's an evidence

5    box containing -- it's loose because we had to take it out the

6    other day.

7    A        Okay.

8    Q        Do you recognize the box marked as State's Exhibit 1?

9    A        Yes.

10   Q        How do you recognize that box?

11   A        When I seal the box, I put my initials on it.

12   Q        All right.  And there's an evidence tag on there with

13   your name?

14   A        And I completed that evidence tag, yes.

15   Q        And that indicates that you recovered at 241C

16   Cortland on June 21st?

17   A        Correct.

18   Q        And inside of there, there was a gun.  Do you

19   recognize that gun?

20   A        Yes.

21   Q        All right.  And is that the gun you recovered?

22   A        Yes.

23   Q        And this gun has been cleared and it's got the action

                    OFFICIAL COURT REPORTER
              TRUMBULL COUNTY * WARREN, OHIO

374

1    open and the magazine has been removed; correct?

2    A        Correct.

3    Q        But when you found it, the magazine was inside of the

4    handle?

5    A        Correct.

6    Q        And the magazine is in this box; correct?

7    A        Correct.

8    Q        This firearm was then turned over to another agency?

9    A        Correct.

10   Q        What agency was it turned over to?

11   A        I believe it was turned over to the Warren Police

12   Department.

13   Q        Now, I'm going to hand you -- is this item in the

14   same or substantially the same condition as when you found it

15   on June 21st?

16   A        Yes.

17   Q        Now I'm going to hand you what's been marked for

18   purposes of identification as State's Exhibit Number 5 and ask

19   if you recognize State's Exhibit Number 5?

20                    (Whereupon, State's Exhibit No. 5, Black

21   Pouch, was introduced for identification.)

22   A        Yes.  That's the evidence bag for the small pouch,

23   the black pouch that was in the other vase.

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1   Q       Okay.  I'm going to, with the Court's permission,

2   open this bag.  The contents of State's Exhibit Number 5 is a

3   black pouch; is that correct?

4   A       Correct.

5   Q       And inside of that black pouch is ammunition?

6   A       Correct.

7   Q       All right.  And this pouch and the ammunition are in

8   the same or substantially the same condition as when you

9   recovered it?

10  A       Appear to be, yes.

11  Q       And this is the item that was in the photographs that

12  we saw in the bottom of one of those flower vases?

13  A       Correct.

14          MR. BECKER:  Thank you, Your Honor.  I have

15  no further questions.

16          THE COURT:  Cross.

17          MR. HARTWIG:  Thank you.

18          CROSS EXAMINATION

19  BY MR. HARTWIG:

20  Q       Good morning.

21  A       Good morning.

22  Q       Okay.  Let's talk first about your investigation that

23  started on June 15th, okay?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Okay.

2    Q        We'll just go in chronological order here.  So your

3    only duties that day was as an investigator --

4    A        Uh-huh.

5    Q        -- master investigator was to take photographs?

6    A        Right.

7    Q        And you collected the one piece of evidence, the

8    shoe?

9    A        Correct.

10   Q        What time did you arrive at the scene?

11   A        I can look at my notes and tell you.

12   Q        Please.

13   A        I arrived at 11:03.

14   Q        11:03 a.m.  And it was approximately 80 degrees out

15   at that point; correct?

16   A        Correct.

17   Q        Had you noticed many potholes in the road leading you

18   up to the scene?

19   A        It was not a smooth road.  Yeah, I don't recall

20   specific potholes, but it was not a smooth road.

21   Q        Okay.  And despite the conditions on the flat

22   surfaces showing it to be relatively dry, did you observe

23   potholes filled with water or muddy areas?

1    A      It could have been, yeah.  I don't -- again, apart

2    from looking at my photographs, I don't -- it was pretty dry

3    on parts of the street.

4    Q      Okay.

5    A      On parts of the road I'll call it.  There was some

6    muddier areas.

7    Q      You sort of went over probably maybe five, six, seven

8    pictures, correct, today?

9    A      Yes.

10    Q      How many pictures did you take in total?

11    A      Again, I can count them.

12    Q      Approximately.

13    A      I don't know.  I take quite a few photographs.

14    Q      All right.  So the ones that you saw today that were

15    published to the jury, that's not nearly all of them?

16    A      No.

17    Q      Okay.  You had to have many more photos of the scene,

18    of the body, etcetera?

19    A      Correct.

20    Q      Okay.  Would you agree with me that the clothes on

21    Brandon Sample were soaking wet?

22    A      They were -- yeah, I would say they were probably

23    wet.

378

1    Q        I'm sorry?

2    A        They were probably wet just because of the nature of

3    a decomposing body.  They were probably wet.

4    Q        You're assuming that --

5    A        I did not touch the body that day, but I would assume

6    that it was wet just by nature of the body decomposing.

7    Q        All right.  But the shorts, for example, the white

8    shorts that he had on, were soaking wet?

9    A        Yeah.  I didn't touch them, so I can't tell you.

10   Q        Okay.  Did you observe them to be wet?

11   A        Again, I mean, what you saw in the photographs, they

12   were -- decomposing bodies tend to have wet clothes.

13   Q        Okay.  Approximately how many feet was Brandon

14   Sample's body in from the roadway?

15   A        I didn't do the diagram that day.  There's officers

16   that did that can tell you an exact measurement.  I cannot

17   tell you the exact measurement.

18   Q        Okay.  The shoe that you collected?

19   A        Uh-huh.

20   Q        Would you agree with me that it was facing opposite

21   of the body towards the road?

22   A        I believe so, yes.  Based on that photograph.  We can

23   look at that photograph again and I can confirm that, but I do

379

1    believe it was facing the toe towards the road.

2    Q       Do you have that photo with you?

3    A       I have a lot of photos with me.

4    Q       So, Detective, I'm going to show you State's

5    Exhibit 16.  Okay?

6    A       Okay.

7    Q       Can you see that?

8    A       There you go.

9    Q       Is it there?

10   A       Yes.

11   Q       All right.  And so the shoe is facing the roadway;

12   correct?

13   A       Correct.

14   Q       And it's lodged under a board; correct?

15   A       Correct.

16   Q       That's how you found it?

17   A       That is exactly -- where you see it there is how I

18   found it.

19   Q       Do you have any way of knowing how that shoe would

20   have ended up there in that position?

21   A       No.

22   Q       It would be mere speculation; correct?

23   A       That would be mere speculation.  I have no idea.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1   Q       All right.  As part of your duties when you collected

2   that shoe, did you use gloves?

3   A       Yes.

4   Q       Were any prints, you know, any attempts to take

5   prints off the shoe?

6   A       I collected it.  I did not process it.

7   Q       Okay.  All right.  Did you observe any tire tracks in

8   the roadway relative to the scene?

9   A       There was a lot of vehicles there when I arrived.  So

10  I couldn't tell you what -- there was tire tracks, I'm sure,

11  but nothing that stood out because there were so many police

12  vehicles and --

13  Q       All right.  So no pictures were taken prior to the

14  vehicles coming in close to the scene of the roadway as far as

15  you know?

16  A       When I got there, there were police vehicles there.

17  So, therefore, I just took the scene -- photographs of the

18  scene as I found it.

19  Q       Did you observe any blood on the roadway approaching

20  the body?

21  A       No.

22  Q       Any blood on the foliage going in to where the body

23  was?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

381

1    A       No.

2    Q       Any pictures of blood on the body?

3    A       No.  In its decomposing state is how I photographed

4    it.

5    Q       All right.  But of the photos that you did take, you

6    didn't zero in on certain blood spatter or anything like that?

7    A       No, I didn't see anything like that.

8    Q       All right.  And no blood around the body that you

9    observed?

10   A       No.  Again, a lot of decomposition.

11   Q       Okay.  Now, what color was the shirt that was pulled

12   over Brandon's head?

13   A       I believe it was a dark-colored shirt.

14   Q       And his body was laying face down; correct?

15   A       Correct.

16   Q       So was the shirt pulled up from -- let's say from the

17   back over the front of the head?

18   A       That would be -- yes, that would be how I would

19   describe it.

20   Q       Okay.  And were you able to observe the shirt as he's

21   laying face down?

22   A       Just what you see in the photographs.

23   Q       Okay.


                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

382

1    A        It was -- where the body was was a very difficult

2    spot to get to.

3    Q        It wasn't a path?

4    A        No, it was not a path.  So it was not an easy spot to

5    get to.

6    Q        You can't say whether or not he was shot there;

7    correct?

8    A        No.

9    Q        You can't say whether he was shot, if he was shot,

10   somewhere else and then transported there; correct?

11   A        No.

12   Q        You can't say when he was shot, if he was shot, and

13   killed there; correct?

14   A        No.

15   Q        Okay.  Did you notice any footprints, any particular

16   footprints leading up into the area where the body was?

17   A        The grass and the foliage was knocked down, but I

18   can't say that there was any like identifiable prints that we

19   would -- or footprints or shoe prints -- that we would take

20   photographs of for comparison.  It was just that you could

21   tell that the grass had been knocked down or the weeds had

22   been knocked down a little bit.

23   Q        Would you agree with me that it's impossible to say

                          OFFICIAL COURT REPORTER
                       TRUMBULL COUNTY * WARREN, OHIO

383

1    how those were knocked down because you had officers going in

2    to observe the body?

3    A      Yes.

4    Q      Okay.  Did you take any particular close-up photos of

5    the shirt around where what appears to be the bullet hole in

6    Brandon's -- the back of his head?

7    A      No, I don't believe I ever saw the back of his head.

8    We wouldn't have removed the shirt.  We would have -- as the

9    body would have been transported out of there, it would have

10   remained as we found it.  And we would not have removed the

11   shirt to try to take photographs of it.  We would leave that

12   up to the coroner's office.

13   Q      So you wouldn't have been in charge of taking the

14   shirt, processing it, doing gunshot residue on it or analyzing

15   it for blood or holes or anything like that?

16   A      No.

17   Q      All right.  Do you know if the shirt still exists?

18   A      I have no idea.

19   Q      Okay.  Let's turn to June 20th.

20   A      Okay.

21   Q      So you did arrive at the apartment on that day;

22   correct?

23   A      Uh-huh.

384

1    Q        Had a conversation with Miss Engle?

2    A        Correct.

3    Q        All right.  You searched the apartment at that point?

4    A        Parts of it.  We had multiple officers there that

5    searched different areas.

6    Q        Okay.  Was evidence collected that day?

7    A        Not by myself.

8    Q        By other officers?

9    A        Other officers, yes.

10   Q        Okay.  And you would describe the apartment as, let's

11   call it, filthy?

12   A        I would say it was definitely in disarray.  A lot of

13   clutter.

14   Q        Okay.  Who was at the apartment at that point besides

15   officers?

16   A        I don't know.  I was not in charge of keeping track

17   of the scene log of who all was there.

18   Q        Were there a lot of people in and out?

19   A        There was a lot of people there.  They were not just

20   going freely in and out.  They were -- we had an officer that

21   was with whoever -- any citizens or civilians that were there.

22   We had an officer that was standing there with them.

23   Q        So when you returned the next day, June 21st?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

385

1    A        Uh-huh.

2    Q        That's when you were told that a gun was found by

3    Melanie Engle; correct?

4    A        Well, I had conducted a search.  Myself and several

5    other officers had conducted a search of that apartment

6    looking for the gun.  We believed that it was in there.  And

7    we did not find it after going through a lot of it.

8            When we went to leave, Miss Engle's mother had

9    indicated that they were going to be cleaning up the

10   apartment.  We said, "If you come across anything, please call

11   us."  And, again, it was very cluttered.  So it was very -- it

12   was a very difficult apartment to search.

13           I wasn't gone for I want to say minutes and I got

14   called back to the apartment because as they started to clean,

15   they had discovered the gun and the bullets in the two vases.

16   And so I got called back to collect the gun.

17   Q        Were the vases preserved and dusted for prints, do

18   you know?

19   A        We collected the vases.  I left the gun in place in

20   the vase and I collected it at the scene.  I transported it

21   back to the police station.  I knew that we would want the gun

22   collected for -- probably processed for touch DNA.  And so I

23   wanted to handle the gun very carefully by just leaving it in

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

386

1    the vase.  I wasn't going to risk putting my own DNA on the

2    gun.  And, therefore, I sealed it up, took it back to the

3    station.  And that's when we -- I actually spoke to a forensic

4    scientist at BCI to find out exactly how they wanted us to

5    collect it so that it was done in compliance with how the

6    state would want it.  And that's the procedure I followed to

7    box the gun up then and remove it from the vase.

8    Q      Okay.

9    A      And then the vase was packaged separately from the

10   gun.

11   Q      Would you agree with me the person that put the gun

12   in the vase would have touched the vase in order to do that?

13   A      Not necessarily.  They would have had to touch the

14   roses, the wooden rose.  They would not necessarily have had

15   to touch the vase.

16   Q      Not necessarily, but --

17   A      Possibly.

18   Q      All right.  Did you preserve the vase itself like

19   with gloves and say, "Hey, we're going to examine this for

20   touch DNA also"?

21   A      Anything I collect.  We switched out gloves between

22   items.  Everything is done with a process to ensure that we

23   don't put my own DNA on it, my own fingerprints, or cross

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

```
 1   contamination from any other item that I would have touched.
 2   Q       All right.
 3   A       I switch out gloves frequently when I do the scenes
 4   like that.
 5   Q       All right.  So you preserved the gun and sent it off
 6   for touch DNA analysis; correct?
 7   A       I believe our agency turned the gun over to the
 8   Warren Police Department.  I did not send the gun off.
 9   Q       Were the vases also sent the same way?
10   A       I don't know.  Once I entered it into evidence, I'm
11   not sure what happened with the vases after that.
12   Q       Okay.  You have interviewed, at least by phone, a
13   person named Nick Goett?
14   A       I didn't hear you.
15   Q       Nicholas Goett, did you interview him by phone?
16   A       Yes.
17   Q       He was a person that was at the apartment on the day
18   of the robbery; correct?
19   A       I believe so, yes.
20   Q       All right.  And through your interview you found that
21   he left prior to the robbery; correct?
22   A       I can refer to my notes if you'd like.
23   Q       If you need to.
```

388

1    A       Yes, he said he left prior to the robbery and claimed

2    he was unaware of anything -- unaware anything was going to

3    happen.

4    Q       All right.  And so he indicates he just went and got

5    something to eat?

6    A       Correct.

7    Q       And that was it; correct?

8    A       Correct.

9    Q       All right.  Did you get video from the place he went

10   to go eat?

11   A       I requested video from Burger King.  They -- they did

12   not turn it over to me at the time.  They said they were going

13   to acquire that video and get it to us.  I changed assignments

14   shortly after that.  The officer that assumed control of the

15   assignment and was actually the officer that was leading the

16   investigation into the robbery, he was told about -- to go get

17   the video.  I'm not sure if that was ever done or not.

18   Q       All right.  Were you aware that Austin Burke's prints

19   were not found on the gun?

20   A       I'm not aware of what the results were from the lab.

21   Q       So you wouldn't be aware that an unknown male's DNA

22   was found on the magazine of the gun; correct?

23   A       I have not seen a copy of the report from BCI on what

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

389

1   was found on the gun.

2   Q       Would you also agree with me that Nick Goett said,

3   "I'm not going to come in and give a written statement, and

4   I'm not going to come in to be interviewed"?

5   A       He did decline to come in and give a written

6   statement to me, yes.

7   Q       And so we don't have his prints for comparison;

8   correct?

9   A       I do not know.

10                      THE COURT:  Redirect.

11                      MR. BECKER:  Yeah.

12                      REDIRECT EXAMINATION

13  BY MR. BECKER:

14  Q       Detective Morris, you took a whole series of

15  photographs; correct?

16  A       Correct.

17  Q       Did you put those on a digital disc?

18  A       Correct.

19  Q       I'm going to show you -- since apparently it's become

20  an issue with all the photographs -- let's go through all of

21  the photographs you took --

22  A       Okay.

23  Q       -- on June 15th.  I'm going to mark this disc as

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

390

1    State's Exhibit 52.  Detective, we are looking at photographs.

2    Would you agree this is a fair and accurate copy of the

3    photographs you took?

4                        (Whereupon, State's Exhibit No. 52, Disk

5    containing Photographs, was introduced for identification.)

6    A       Yes.

7    Q       All right.  And this is a shot a little bit further

8    down the road.  Any mud puddles, any water on this road?

9    A       No.

10   Q       Okay.  There's another overview of the photograph --

11   or the photographs you took?

12   A       Correct.

13   Q       Again, any standing water or mud puddles on this

14   road?

15   A       No.

16   Q       Here's a view even further back.  Again, no mud

17   puddles, no water?

18   A       Correct.

19   Q       This is the area -- and I believe this is one of our

20   exhibits here -- this is where the body was found under this

21   blue tarp; right?

22   A       Correct.

23   Q       Again, a large overview here.  This is all dry;

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    correct?

2    A       Correct.

3    Q       I believe we've already seen this.  Was there --

4    appear to be some logging activity?

5    A       Yes, it appeared to be a logging area.

6    Q       There's another overview.  It looks like maybe you

7    climbed on top?

8    A       I got on top of those logs and took an overview from

9    the top.

10   Q       Again, this is pretty dry ground here; right?

11   A       Yes.

12   Q       Here's an overview looking back towards, I believe

13   this is State Route 45 way back here?

14   A       I don't know.

15   Q       Okay.  The body was found down here; right?

16   A       Yeah.  The body was in that lower left corner.

17   Q       All right.

18   A       I don't know where that other road lead to.

19   Q       Well, we're going to zoom in here a little bit.  Oh,

20   I'm sorry.  I'm sorry.  This is another road.  And, again, we

21   see evidence of logging activity; is that correct?

22   A       Correct.

23   Q       Any puddles or mud puddles along this road?

392

1    A        I don't see any in that photograph, no.

2    Q        Any standing water, mud puddles?

3    A        I don't see any.

4    Q        Little bit of water here past the location; correct?

5    A        Correct.

6    Q        So the body -- the other direction you were looking

7    would have been the one direction.  Here we see some mud

8    puddles, but this is past where the body was; correct?

9    A        Correct.  I was standing on top of those logs where

10   I'm taking that photograph from.

11   Q        Okay.  There's some more photos of these mud puddles,

12   but they're further down the road.  They're going deeper into

13   the woods?

14   A        Correct.

15   Q        Again, this is an overview from where you were at?

16   This is the blue tarp; correct?

17   A        Correct.

18   Q        And again, this area, no mud puddles or anything?

19   These are all fair and accurate copies of the photographs you

20   took on that date?

21   A        Yes.

22   Q        This is the log pile that you climbed up on?

23   A        Correct.  And I'm on that road that you asked me

1    where it lead to that I wasn't aware of.  I'm standing there

2    now looking back at the log pile.

3    Q       Okay.  And these cars here were police officers'

4    cars, other detectives?

5    A       Those are law enforcement vehicles.

6    Q       And they drove their cars back there.  Do you see a

7    lot of mud on those cars?

8    A       No.

9    Q       This is, again, the blue tarp.

10            And, again, more photos of the body.

11            I believe we've already covered most of those.  So

12   with respect to what I have now marked as State's Exhibit 52

13   which is a disc, would you agree that those are all of the

14   photographs that you took on that date?

15   A       Whatever is on that disc, yes, would have been put

16   on -- that would have been included on that disc.

17   Q       And each and every one of those photographs is a fair

18   and accurate copy of the scene as you observed it on

19   June 15th, 2017?

20   A       Correct.

21                   MR. BECKER:  Okay.  I have nothing further.

22                   THE COURT:  Recross.

23                   MR. HARTWIG:  Just a few followup

                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    questions.

2                    THE WITNESS:  Yes, sir.

3                    RECROSS EXAMINATION

4    BY MR. HARTWIG:

5    Q       Do you know the size of Brandon Sample's body?

6    Height and weight?

7    A       I do not.

8    Q       Was the tarp collected?

9    A       It was not.

10   Q       All right.  Is there a reason why?

11   A       No.

12   Q       Did you find any shell casings?

13   A       I did not, no.

14   Q       If the weapon that was used was a semiautomatic, you

15   would expect a shell casing to be discharged; correct?

16   A       A shell casing would be discharged from a

17   semiautomatic weapon; correct.

18   Q       All right.  But you didn't find one?

19   A       No.  As a matter of fact, another -- another person

20   from wildlife, I believe, used a metal detector around the

21   area where the body was found.

22   Q       Do you have any way of knowing how long Brandon

23   Sample's body had been there?

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    A        No.

2    Q        Do you have any way of knowing which direction his

3    body would have entered the woods, whether he was alive or

4    deceased?

5    A        No.

6    Q        So just the fact that you're walking in from the road

7    based on the photograph you took does not mean that's the

8    direction that his body entered; correct?

9    A        That's the way his body was found by myself when I

10   processed the scene.

11   Q        Okay.  Mr. Becker -- Mr. Becker did show you some

12   photographs.  Mr. Becker did show you some photographs, at

13   least in part, of a roadway close to the body that had

14   multiple potholes; correct?

15   A        Correct.

16   Q        And those were filled with water; correct?

17   A        Right.  If you were to go from the road that I

18   entered into the scene, which is, if you saw that black pickup

19   truck, I came in from what would be behind that black pickup

20   truck.  If that black pickup truck would have continued to go

21   forward -- and I know he kind of started to make the bend onto

22   that road, but if he would have gone straight, it would have

23   been past those logs that I stood on up in that area.

1    Q        And where does that lead to?

2    A        I don't know.  I did not walk down.

3    Q        Okay.

4    A        Other folks did, but I did not.

5    Q        Do you know what the weather pattern -- excuse me --

6    the weather pattern was in the day before you were out taking

7    photos two days before, three days before?

8    A        No.  I simply knew the temperature because I looked

9    it up when I was at the scene.

10   Q        All right.  So being as hot as it was, the fact that

11   there was still standing water in potholes is indicative of

12   rain in the near past future -- or excuse me -- near past.

13   A        Yeah.  I don't know.

14   Q        Right?

15   A        Yeah.  I don't know what the weather was prior to me

16   being there.

17                     MR. HARTWIG:  One moment, Your Honor.

18   BY MR. HARTWIG:

19   Q        As far as that normal protocol, do you have like a

20   log that you -- shows when you got there, when you signed in,

21   when you left?

22   A        Whoever would be controlling the scene.  I was not

23   controlling the scene.  I would simply -- I document my times

397

1   of the things that I do.  I don't document what other folks do

2   if I'm not in charge of a crime scene log.

3   Q       Okay.  When you arrived, was it marked off like with

4   yellow tape?

5   A       No.  There was no yellow tape that I saw.

6   Q       All right.  So it was just police officers combing

7   the area?

8   A       Correct.  The yellow tape is designed to keep

9   bystanders out.  We were out in the middle of nowhere

10  basically is the way I would describe it.  It wasn't like when

11  we're in a residential area where we're trying to cordon it

12  off from spectators or civilians that are at their homes.  We

13  were out in the middle of -- well, you can see from the

14  photographs where we were.

15                  MR. HARTWIG:  Thank you.  No further

16  questions.

17                  THE COURT:  You may step down.  Thank you.

18                  THE WITNESS:  Thank you, Your Honor.

19                  THE COURT:  Counsel, approach.

20                  (Whereupon, a discussion was held off the

21  record.)

22                  THE COURT:  Ladies and Gentlemen, we'll

23  take this opportunity for your midmorning break.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

398

1         Do not discuss this case among yourselves, nor with

2    anyone else.  Do not form or express an opinion.  Report to

3    the petit jury room when you're done with your break.

4                   (Whereupon, a recess was had commencing at

5    10:25 a.m. and concluding at 10:44 a.m.)

6                   THE COURT:  Mr. Becker, you may call your

7    next witness.

8                   MR. BECKER:  State would call Hayle Roupe.

9                        *  *  *

10                  HAYLE ROUPE,

11   having been duly sworn, was examined and testified as follows:

12                   <u>DIRECT EXAMINATION</u>

13   BY MR. BECKER:

14   Q      Hayle, could you just pull that microphone toward

15   you?  Would you state your name for the record?

16   A      Hayle Roupe.

17   Q      All right.  Hayle, how old are you?

18   A      I'm 17.

19   Q      And when is your birthday?

20   A      August 14th, 2000.

21   Q      So in June of 2017 you would have been 17 -- I'm

22   sorry -- 16?

23   A      Yes.

399

1   Q        All right.  Now, I want to direct your attention to

2   some individuals and some things that happened back in June of

3   2017.  Back in June of 2017, where were you living at?

4   A        With my mother on -- in Niles on 408 Cherry Avenue.

5   Q        How far was that location from 713 Mason Street?

6   A        About four streets over.

7   Q        And at the time, in June of 2017, did you know

8   anybody that lived at 713 Mason Street?

9   A        My grandma and my little cousin Rickey lived there.

10  Q        Now, at some point -- and I'm going to ask you if you

11  are familiar with some of these people.  When you say your

12  little cousin, you're referring to Rickey Roupe?

13  A        Uh-huh.

14  Q        Do you know Jessica Simms?

15  A        Yes.

16  Q        How do you know Jessica?

17  A        That's my girlfriend.

18  Q        Do you know Nathan Moats?

19  A        Yes.

20  Q        How do you know Nathan Moats?

21  A        He is a friend of Rickey.

22  Q        In Niles there?

23  A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

400

1   Q       Do you know Deidre Keener?

2   A       I do.

3   Q       How do you know Deidre?

4   A       I've been friends with her for about three years.

5   Q       Now, I want to direct your attention to June 12,

6   2017.  Around that time, did you also meet an individual by

7   the name of Austin Taylor Burke?

8   A       Yes.

9   Q       And how did you meet Austin Taylor Burke?

10  A       My cousin Makayla Egbert and Rickey Roupe.

11  Q       All right.  You have a cousin named Makayla Egbert?

12  A       Yes.

13  Q       And she had a relationship with Austin Burke?

14  A       Yes.

15  Q       And I think we heard some testimony yesterday that in

16  June of 2017 they weren't dating anymore; correct?

17  A       No.

18  Q       But Austin was still coming over to the house at 713

19  Mason?

20  A       Yes.  For about three weeks straight.

21  Q       And you would see him there?

22  A       Yes.

23  Q       At any point in June of 2017 did you see Austin

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Taylor Burke with a handgun?

2    A      Yes.

3    Q      Can you describe to the jury that handgun?

4    A      It's a little silver gun and it has a marble handle

5    on it.

6    Q      All right.  I'm going to show you what's been marked

7    for purposes of identification as State's Exhibit Number 1 and

8    ask if you recognize State's Exhibit Number 1?

9    A      I do.

10   Q      All right.  What is State's Exhibit Number 1?

11   A      The marbled gun.

12   Q      This appears to be the gun that he would have?

13   A      Yes.

14   Q      Okay.

15   A      I actually took that report down to Niles Police

16   Station when I had seen the gun and had more information about

17   it.

18   Q      Okay.  Well, hold on.  We're going to get to that

19   point.

20   A      Okay.

21   Q      So Sunday, June 11th of 2017, there was -- a bunch of

22   you were over at 713 Mason Street; is that correct?

23   A      Yes.

402

1    Q        Do you recall who was at 713 Mason Street on Sunday,
2    June 11th?
3    A        It was me, my cousin Rickey, my girlfriend, Makayla,
4    and Austin was there.
5    Q        Now, do you recall approximately what time it was?
6    A        On the 11th?
7    Q        Yeah.  Sunday.  Would it have been close to midnight,
8    after midnight, into the 12th?
9    A        He was there from -- he was there basically all day
10   on the 11th, I believe it was.  And then I think around 10:00
11   that night we were riding around with Deidre.  And I have
12   videos of that also.
13   Q        And you had videos on your phone of Austin Burke?
14   A        Yes.
15   Q        Okay.  And we didn't ask you -- you have your phone
16   with you?
17   A        No, I don't.
18   Q        Okay.  We didn't ask you to copy those, but you had
19   confirmed that he was with you?
20   A        Yes.  I actually e-mailed them to Greaver.  I don't
21   know if he received them or not.
22   Q        But suffice it to say you didn't know exactly what
23   time it was?  You just were with him?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

403

1    A       Yeah.  I was with him, but I don't remember exactly
2    what time it was.
3    Q       Now, you didn't see him later on that night, did you,
4    when he came back to the house?
5    A       No.  Huh-uh.
6    Q       You weren't there though; right?
7    A       No, I was not.  We had left I think it was around
8    midnight because we were having a bonfire out back.
9    Q       Okay.
10   A       It was me and Jessica, and we had to take her little
11   sister home because she had school the next day.
12   Q       Jessica's little sister?
13   A       Yes.
14   Q       So you guys left?
15   A       Uh-huh.
16   Q       Now, the next day or the next couple days you would
17   have seen Austin Burke again; is that correct?
18   A       Yes.
19   Q       How did that come about that you saw him again?
20   A       He just kept continuously coming over.  And after so
21   long of knowing what was going on with my statements and stuff
22   like that, we weren't allowing him at the house no more.  And
23   he still continued to try to come over and come over.  And

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    after I think it was like four days, four or five days, he was

2    no longer allowed over there.

3    Q      But before he wasn't allowed over there, he had been

4    over there; correct?

5    A      Yes, yes.

6    Q      And this would have been after June 11th and

7    June 12th, that Sunday and Monday?

8    A      I --

9    Q      Well, let's go back to this.

10   A      Okay.

11   Q      At some point, did Austin tell you about something he

12   did to a guy named Brandon Sample?

13   A      Yes.

14   Q      Okay.  What did Austin Burke tell you he did to

15   Brandon Sample?

16   A      Full sentence?  Everything?

17   Q      Yeah.  Tell me what he said.

18   A      Okay.  We were sitting at my grandma's table and

19   Austin was surrounded -- we were surrounded around the table

20   and --

21   Q      Now, who all was there?

22   A      It was me, Rickey, Makayla -- no.  Makayla wasn't

23   there.  It was me, Rickey, Austin and Jessica.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Q       All right.

2   A       He came back to the table and he was like bribing

3   about the situation.  That he had shot somebody in the back of

4   the head and he had taken him down Hatchet Man Road and left

5   his body there.  He told me that he got him out in the front

6   of the car and he put him on his knees and he told us that

7   Brandon had looked at him and said, "Please don't do this.  I

8   have a family.  I have -- I have a life in front of me."  And

9   he said that he couldn't -- he couldn't just sit there and

10  look at him no more, time was over, he had to do it.  So he

11  shot him.  And he said that the car -- he took the car from

12  Hatchet Man Road and that it was running out of gas.  He had

13  nowhere else to put it.  And that's when he had left it on the

14  Niles bike trail.  And then he returned back to my grandma's

15  house earlier that morning and he had woken up Rickey, and he

16  had blood on his clothes and he had a pack of cigarettes.

17  Q       That's what he's telling you?

18  A       Yes.  That's what Rickey had told me; Austin had woke

19  him up.

20  Q       No, no, no.  I don't want to know what Rickey told

21  you.  I want to know what Austin told you.

22  A       Okay.  Well, Austin had finished the story by saying

23  that he put the car on Hatchet Man Road -- or on the Niles

1    bike trail and that he shot him in the back of the head.

2    Q       All right.

3    A       And immediately after knowing all of that, that's

4    when me and Jessica went down to the Niles police station.

5    Q       All right.  So he was telling you guys this.  Was he

6    upset about it?

7    A       No.  He was bribing about it.  He was not upset about

8    it.  There was not one tear coming from his eye.  He was

9    bribing about it.  He wasn't upset about any of this, anything

10   that happened.  He didn't care.

11   Q       Now, you and Jessica were there when he told this

12   story; correct?

13   A       Yes.

14   Q       And you went to the Niles Police Department; is that

15   correct?

16   A       Yes, we both did.

17   Q       All right.  And you -- I'm going to show you a

18   document here.  Do you remember what date that was?

19   A       I don't remember exactly what date we -- I think it

20   might have been the 15th.

21   Q       Okay.

22   A       We were down there like 2 in the morning, I think it

23   was.  Around that time.

1  Q      And this is a report from the Niles Police

2  Department.  Do you see the incident date and time there?

3  A      Yes.

4  Q      Do you see what date that says?

5  A      The 15th of June.

6  Q      And what time does that say?

7  A      2:30 in the morning.

8  Q      And it lists -- whose names are on that report?

9  A      Hayle Roupe, Austin Burke and Jessica Simms.

10  Q      All right.  And would that refresh your memory?  Is

11  that when you would have gone to the Niles Police Department

12  on the 15th?

13  A      Yes, sir.

14  Q      Okay.  Now, the individual you know as Austin Taylor

15  Burke and who told you he had killed and shot the guy on

16  Hatchet Man Road and left the car on the Niles bike path, is

17  he here in the courtroom today?

18  A      Yes.

19  Q      Could you please point him out?

20  A      (Witness indicates.)

21              MR. BECKER:  Please allow the record to

22  reflect she has identified the defendant.

23  BY MR. BECKER:

408

1    Q       Now, there was a time a little bit later when you had

2    to go to the Warren Police Department and you gave a

3    statement?

4    A       Yes.

5    Q       All right.  And you were able to pick him out of the

6    photo lineup?

7    A       Yes.

8    Q       All right.  I'm going to hand you what's been marked

9    for purpose of identification as State's Exhibit 25.  Do you

10   recognize that?

11                   (Whereupon, State's Exhibit No. 25, Photo

12   Lineup, was introduced for identification.)

13   A       I do.

14   Q       Okay.  What is State's Exhibit 25?

15   A       Austin Burke.

16   Q       Okay.  You picked him out of six individuals?

17   A       Yes.

18   Q       And your signature is on there?

19   A       Yes, sir.  And my address.

20   Q       All right.  Now, there came a time a couple days

21   later, specifically I believe June 20th, and you were at your

22   grandma's house at 713 Mason Street with Deidre Keener; is

23   that correct?

409

1    A        Yes, sir.

2    Q        And Deidre received a phone call at about 10:50 p.m.?

3    A        Yes, sir.

4    Q        From Austin Burke?

5    A        Yes, sir.

6    Q        And you recognized the voice on the phone?

7    A        Yes.  I was standing next to her.  I had made her put

8    him on speaker because at that time we didn't know what he was

9    calling for, but we knew that he wasn't allowed over.  And

10   then when he had got on the phone is when we heard everything

11   and told that he wasn't allowed over.

12   Q        And what did Austin Burke tell you and Deidre at

13   10:50 when he was on the speaker?

14   A        He got on the phone and he said hello.  And we said

15   hello.  At first we didn't know who it was because she didn't

16   have his phone number.  Maybe it was on Facebook -- it was on

17   Facebook, yeah.  And she was like, "Who is this?"  He said,

18   "It's Austin."  He said, "I just came upon a bunch of money.

19   Where are you guys at?"  And we said, "We're over at

20   grandma's, but you're not allowed over here."  And he just

21   said, "Okay" and hung up the phone.

22   Q        And the person, you recognized that voice as Austin

23   Taylor Burke?

                          OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

410

1   A       Yes, sir.

2   Q       And he's the same person that you previously

3   identified here?

4   A       Yes, sir.

5   Q       Okay.  Hayle, I'm going to show you what have been

6   marked for purposes of identification as State's Exhibits 11,

7   13, and 13A.  Do you recognize State's Exhibit 11?

8   A       I do.

9   Q       Do you recognize the person in that?

10  A       Yes.

11  Q       Do you see the gun that you previously identified?

12  A       Yes.

13  Q       Okay.  That's the gun that you had previously seen

14  Austin Burke with?

15  A       Yes.

16  Q       I'm going to hand you State's Exhibit 13.  Do you

17  recognize State's Exhibit 13?

18  A       Yes.  It's the same gun.

19  Q       And State's Exhibit 13A?

20  A       It's the same gun.

21  Q       Okay.  I'm going to publish these to the jury as soon

22  as this fires up here.

23          And in State's Exhibit 11, the person in that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    photograph, do you recognize who that is?

2    A      Yes.

3    Q      Who is it?

4    A      Austin Burke.

5    Q      And he's the same person you previously identified

6    here in court?

7    A      Yes.

8    Q      And the firearm -- the firearm you previously

9    described and identified, do you see that in this photograph?

10    A      Yes, sir.

11    Q      And it's basically laying on his chest?

12    A      Yeah.  It's the one his hand is not touching.

13    Q      State's Exhibit 13, do you recognize that handgun?

14    A      Yes, sir.

15    Q      Do you recognize those tattoos?

16    A      Yes.

17    Q      Whose tattoos are those?

18    A      Austin's.  And those are the same shoes that he had

19    on when he was hanging out with us as well.

20    Q      Oh, those shoes?

21    A      Yes.

22    Q      You recognize those?

23    A      Yes.

1    Q       They're -- what color are they?

2    A       I think they're gray.  Gray or white.

3    Q       They look kind of grayish?

4    A       Yeah.  And they were Jordan's, I believe.

5    Q       That's Nike?

6    A       Yeah.  It's a name brand of shoes.

7    Q       And this is a close-up.  This is State's Exhibit 13A.

8    And, again, these are the same tattoos and the same shoes that

9    you said?

10   A       Yes.

11   Q       And you'd seen him wear those shoes before?

12   A       Yes.

13           MR. BECKER:  Your Honor, I have no further

14   questions of this witness.

15           THE COURT:  Cross.

16           MR. HARTWIG:  Thank you.

17                      CROSS EXAMINATION

18   BY MR. HARTWIG:

19   Q       Good morning, Hayle.

20   A       Good morning.

21   Q       So Jessica Simms is your girlfriend?

22   A       Yes, sir.

23   Q       She was your girlfriend at the time and still is?

1    A        Yes, sir.

2    Q        You were interviewed by police on June 18th; do you

3    recall that?

4    A        Yes.

5    Q        At that time you told police that prior to June 11th

6    you had never known Austin Burke?

7    A        No, I did not.

8    Q        You did not say that to the officer?

9    A        No, I didn't know like who he was.

10   Q        Okay.

11   A        He was just in a relationship with my cousin Makayla

12   and brought him around to the house.  I had never met him

13   personally before that.

14   Q        Okay.  So he was really a total stranger --

15   A        Stranger.

16   Q        -- to you?

17   A        Yeah.

18   Q        All right.  And on June 11th your testimony is that

19   he hung out with you guys all day?

20   A        Uh-huh.

21   Q        Do you recall what time it started, like 9 in the

22   morning or 10 in the morning?

23   A        I honestly couldn't recall about a time because he

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

414

1    kept leaving and coming back, leaving and coming back.  So I

2    mean, like the timing could vary, but it was about all day.

3    But, again, he kept leaving and coming, leaving and coming

4    back.

5    Q        By himself or with others?

6    A        He would leave and he would have cars like pick him

7    up down the road.  Like we weren't allowed to know which cars

8    and who was picking him up.  Or he would go around the corner

9    or like people that would pick him up would park at the end of

10   the driveway.  Because our door was located in the back of the

11   house.  We didn't have a front door.  It was a duplex.  So the

12   cars would park out front to pick him up.  So, no, I don't see

13   anybody picking him up or anything like that.

14   Q        At any point were you with Brandon Sample that day?

15   A        No.

16   Q        Do you know Brandon Sample?

17   A        I do not.

18   Q        Was there any discussion about Brandon Sample during

19   the time that you were hanging out with Austin?

20   A        Not until after he had told us what happened, what he

21   did.

22   Q        Okay.  So in all of the time that you were hanging

23   out with him on the 11th, that name never came up?

1    A       No.

2    Q       Okay.  What did you guys do when were you hanging out

3    all day?

4    A       Like always or just that day?

5    Q       On June 11th only.

6    A       Okay.

7    Q       And during the day, in particular.

8    A       I couldn't remember.  I mean, honestly, we just sat

9    in my grandma's house, played cards.  We went out back, we had

10   the fire that he was not at.  I don't know.

11   Q       Okay.

12   A       We just sat in the house, played cards, listened to

13   music.  We would leave.  We would go to the Ledges.  We'd go

14   down to the park.

15   Q       Okay.  So you did -- you stayed at the house and you

16   also drove around as a group?

17   A       No.  We didn't drive around as a group.  Because the

18   park was right down the road.  So we would either go down to

19   the park or like, I don't know, we just, I don't know, we'd

20   hang out.  Never went like anywhere out of Niles with him

21   though.  We were always around the area.

22   Q       All right.  He didn't have a gun with him that day

23   when you were driving around or walking around?

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

1   A       As far as I know, he didn't have like --

2   Q       All I want is what you know.

3   A       Okay.  Yeah, as far as I know he didn't have it as of

4   what I seen, but he did have it on him.  Whether it was in his

5   bag, it was in his pants.  He had it on him.  I know that he

6   had it on him because he told me.  But, no, I didn't like see

7   it hanging out of his pocket while he was walking around doing

8   this and that, but he did have it on him.

9   Q       Okay.  You said you left at midnight?

10  A       Yes.  We left at midnight.  It was around midnight.

11  Q       Now, you had indicated to the police in your

12  interview almost initially, you said he had indicated that he

13  put Brandon's car on the bike path?

14  A       I'm sorry.  You said what?

15  Q       You had indicated to the police in your interview

16  that Austin had said he put Brandon's car on the bike path?

17  A       Yes, yes.

18  Q       And so what you told the police was you didn't put 2

19  and 2 together at that point?

20  A       Uh-huh.

21  Q       That your girlfriend figured it out?

22  A       Yeah.  We didn't put 2 and 2 together like thinking

23  exactly what was going on until we went down to the police and

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   I had told them, like, "Listen, he has a gun in the house.

2   That's my grandma's house.  My cousin is living there.  He's

3   only 14 years old."  Like it's a bad influence on a

4   14-year-old?  You know what I'm saying?  Like, no.  And then

5   we didn't put 2 and 2 together.  And by that time, once we had

6   talked to the police, they went over there.  They said that

7   they couldn't find any gun, or Austin wasn't there.  Rickey

8   was sleeping.  Stuff like that.  That's when we put it

9   together.  And I'm like, all right, we've got to go forward

10  with this because it's not fair to anybody at all.

11  Q       Okay.  It wasn't easy to figure out right away?

12  A       No, not at all.  Not at all.

13  Q       Okay.  So what's confusing to me is when you sat down

14  around the table all together and he tells you the entire

15  story --

16  A       Right.

17  Q       -- that, "I killed him.  Here's how I killed him."

18  A       Well, he didn't --

19  Q       Let me finish the question.  I would think at that

20  point it was pretty clear in your mind, you'd say, hey,

21  listen, there's nothing to put together.  Something bad took

22  place so I'm going to report it?

23  A       Okay.  But when we went down to the police, he did

418

1    not tell us by that time that he had killed to us.  He had

2    told us -- I knew that he had a gun in the house.  That's what

3    I went down to Niles for.  I did not tell Niles that he killed

4    him.  I went down to Niles and told him, "Austin has a gun in

5    my grandma's house."  They had told us that we had to go to

6    Warren and take it farther from there.  That's when that had

7    happened.

8    Q       And Rickey had told you that there was blood all over

9    him?

10   A       Yes.

11   Q       The whole story.

12   A       Yeah.

13   Q       He had blood all over him which would have come on

14   him after he killed Brandon Sample?

15   A       Leaving the car at the bike trail early in the

16   morning and coming back to my grandma's at 10:00 in the

17   morning, yes.

18   Q       All right.  So if that were true, we would expect to

19   see blood in the vehicle; would you agree?

20   A       I mean, yeah.

21                   MR. HARTWIG:  All right.  No further

22   questions.  Thank you.

23                   THE COURT:  Redirect.


                       OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

419

1                          <u>REDIRECT EXAMINATION</u>

2       BY MR. BECKER:

3       Q        Just to clarify, he told you about killing him at

4       Hatchet Man Road?

5       A        He told me everything.  He told me that he shot him

6       in the back of the head.  He told me that he put the car on

7       the bike trail.  It is not fair to these families out here.

8       We have so many unsolved murders in Warren.

9                             MR. HARTWIG:  Objection, Your Honor.

10                            MR. BECKER:  Hold on.

11                            THE COURT:  Just take a breath and just

12      answer the question.

13                            MR. BECKER:  Take a second, Hayle.  Let's

14      go back.

15      BY MR. BECKER:

16      Q        You're 17 years old; right?

17      A        Yeah.

18      Q        Okay.  Had anyone ever told you to this point that

19      they had killed somebody?

20      A        Nobody but Austin.

21      Q        But, I mean, you've never had anybody else in your

22      life say, "Hey, I killed someone"?

23      A        No.  Nobody is gonna be -- no.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1   Q       And Hayle, you have no reason to come in here and be
2   dishonest; correct?
3   A       Not at all, no.  He was a stranger before I knew him.
4   Why would I -- no.
5   Q       There was no reward money that was given for solving
6   this crime?
7   A       No.  I have no reason to come in here and lie at all.
8   Q       Okay.  And when these events were happening, when he
9   was hanging out there and you guys were having your bonfire,
10  you're not keeping notes and keeping track of what you're
11  doing that day; right?
12  A       No.
13  Q       You had no idea at that time that you'd ever even be
14  coming into a courtroom --
15  A       Not at all.
16  Q       -- nine months later and testifying?
17  A       Not at all.
18  Q       All right.  So you're trying to remember as best you
19  can for a 17-, 18-year old girl?
20  A       16 at the time.
21  Q       16.  Right.  And you're here, though, to tell the
22  truth; correct?
23  A       Nothing but the truth.

421

```
1    Q       And it's your testimony that this defendant told you
2    he shot this kid in the head on Hatchet Man Road and left the
3    car on the Niles bike path?
4    A       Yes, sir.
5                        MR. BECKER:  Okay.  Thank you, Hayle.
6                        THE COURT:  Recross.
7                        RECROSS EXAMINATION
8    BY MR. HARTWIG:
9    Q       Hayle, you had indicated to police that the so-called
10   motive behind this was because Brandon had 6 to 7 pounds of
11   heroin; correct?
12   A       You said what?
13   Q       The motive, like the reason, the reason Austin
14   presumably did this, he told you, was because Brandon --
15   A       Yes.
16   Q       Brandon Sample had 6 to 7 pounds of heroin; correct?
17   A       No.  It would -- never heard about 6 to 7 pounds of
18   heroin.
19   Q       All right.  What did you tell the detective, then, in
20   your interview?
21   A       He -- Austin had told us that he had known Brandon
22   from DYS.  Austin was part of the 82s, and Brandon was part of
23   a Heartless Felon.  Brandon was a CO officer.  And I guess he
```

422

1    had snitched on Brandon -- or Austin when he was in DYS or

2    something like that.  And Austin had told us that when he was

3    walking down the road he had seen Brandon, asked for a ride.

4    Brandon said he had to go drop somebody off.  That he had

5    gotten Austin, and that he wanted to rob him for what he had.

6    And I believe it was only like 4 or 5 pounds of heroin.  And

7    that's even if so.  I don't know.

8    Q      But you did tell the police that that's what your

9    recollection was?

10    A      Yes.

11    Q      There was a part about drugs?

12    A      Yes.

13    Q      But he also indicated that he met up with Brandon

14    Sample earlier that day while Brandon was with somebody else;

15    right?

16    A      Okay.  I don't recall anything like that.  I know

17    that he was with somebody else with Brandon, but I don't

18    know -- like I don't know if he got dropped off.  I don't --

19    that's --

20    Q      Okay.  I understand.  I just want to be clear.

21    A      Okay.

22    Q      He did indicate that Brandon Sample was with somebody

23    else and drove by him and stopped and had a conversation?

423

1    A        Yes.

2    Q        Right?

3    A        Yes.

4    Q        And did he indicate whether he gave him a ride at

5    that point?

6    A        No.  I'm not sure.  I just know that he said he

7    needed to drop somebody off, is what he said.

8    Q        Did the name Josh White ever come up?

9    A        I know the name Josh White, but I don't recall.  I

10   don't ever remember Austin saying that his friend's name was

11   Josh.  He never told me who his friend was.

12             MR. HARTWIG:  Okay.  No further questions.

13   Thank you.

14             THE COURT:  You may step down now.  Thank

15   you.

16             MR. BECKER:  Jessica Simms.

17                         *   *   *

18             JESSICA SIMMS,

19   having been duly sworn, was examined and testified as follows:

20             DIRECT EXAMINATION

21   BY MR. BECKER:

22   Q        Okay.  Would you state your name for the record?

23   A        Jessica Simms.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

424

```
1    Q        All right.  Jessica, how old are you?

2    A        23.

3    Q        Jessica, where do you live at?

4    A        322 Sheridan, Niles, Ohio.

5    Q        All right.  And Jessica, are you familiar with Hayle

6    Roupe?

7    A        Yes.

8    Q        Are you familiar with Rickey Roupe?

9    A        Yes.

10   Q        How are you familiar with those two?

11   A        Hayle is my girlfriend.  Rickey is her cousin.

12   Q        You're familiar with Pam Roupe and where she was

13   living at?

14   A        Yes.

15   Q        And that would have been at 713 Mason Street in

16   Niles?

17   A        Yes, sir.

18   Q        All right.  And are you familiar with Nathan Moats?

19   A        Yes.

20   Q        How do you know Nathan?

21   A        He hung out with Rickey a lot.

22   Q        And are you familiar with Deidre Keener?

23   A        Yes.
```

1    Q        How do you know Deidre?

2    A        That's Hayle's best friend.

3    Q        I want to direct your attention to June 11th which

4    was a Sunday, and June 12th, 2017.  Was there a time that you

5    were hanging out at 713 Mason Street?

6    A        Yes.

7    Q        Was there an individual there by the name of Austin

8    Taylor Burke?

9    A        Yes.

10   Q        How did you know Austin Taylor Burke?

11   A        He was one of Rickey's friends.

12   Q        Had you ever met him before, then, or seen him or

13   known of him?

14   A        No.

15   Q        Did you know of a relationship he may have had with a

16   Makayla Egbert?

17   A        Yes.

18   Q        And you just knew that he had a relationship with

19   Makayla Egbert, not that he -- you had never met him?

20   A        Right.  I've talked -- like -- when I was with

21   Rickey, like Rickey would always talk about him.  And I seen

22   pictures Makayla would post about him.  But when Rickey first

23   brought him around, no, I didn't know him.  But we hung out

1    with him a couple months after that, yeah.

2    Q       All right.  So you actually had seen him before

3    June 11th?

4    A       Yes.

5    Q       You physically had met him and knew who he was?

6    A       Yes.

7    Q       You met him through Rickey?

8    A       Yes.

9    Q       All right.  So Makayla Egbert, she is related to

10   Rickey and Makayla?

11   A       Hayle?  Rickey and Hayle?

12   Q       I'm sorry.  Hayle?

13   A       Yeah.  That's their cousin, yes.

14   Q       And she had a relationship with Austin Taylor Burke?

15   A       Yes.

16   Q       And that relationship was over when these events

17   happened?

18   A       Yes.

19   Q       Okay.  So he still was friends with the family and

20   particularly Rickey Roupe?

21   A       Yes.

22   Q       Now on June 11th, which was a Sunday, you were at 713

23   Mason Street in Niles; is that correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

427

1    A       Yes, sir.

2    Q       And do you recall Austin Burke being around during

3    that day or at some point?

4    A       Yes.

5    Q       Had you ever seen Austin Burke with a firearm?

6    A       Yes, sir.

7    Q       Okay.  How -- explain how you saw him with a firearm.

8    A       Like the gun?  Or how we seen him with it?

9    Q       Yeah, first the gun.

10   A       The gun is silver.  It had a little marble -- bluish

11   marble hand like holder to it.

12   Q       All right.  And that gun, had you ever seen it in his

13   hands before?

14   A       Yes.

15   Q       And that would have been that day, or when would you

16   have seen it?

17   A       Yeah, it was that day.

18   Q       June 11th?

19   A       Yeah.  He was always like playing with it, cleaning

20   it, carrying it with him.

21   Q       I'm going to show you what's been marked for purposes

22   of identification as State's Exhibit Number 1.  Does this

23   appear to be the gun?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

428

1    A        Yes, sir.

2    Q        And this is the marble -- blue marble handle?  Or

3    sometimes in the light sometimes it changes to a gray or

4    something.  But this is the gun?

5    A        Yes, sir.

6    Q        Okay.  Now, after June 11th -- or, I'm sorry, on

7    June 11th, you had to leave because you have a little sister?

8    A        Yes.

9    Q        And she had to be in school on that Monday?

10   A        Yes.

11   Q        And who did you leave the house with?

12   A        It was me, my two little sisters and Hayle.

13   Q        Oh, your two little sisters?

14   A        Yes.

15   Q        Okay.

16   A        We were having a fire and it started to get late and

17   I needed to get 'em home for school so I left.

18   Q        All right.  Who left with you?

19   A        Me, my two little sisters, and Hayle.

20   Q        And there came a time over the next couple of days

21   that you had contact with Austin Taylor Burke again; is that

22   correct?

23   A        Yes, sir.

429

1   Q       Explain where you met him at or where he was at and
2   where you guys were at.
3   A       713 Mason.
4   Q       And who else was present with you when Austin Taylor
5   Burke was there?
6   A       Rickey, Nate, Hayle, Deidre, and grandma.  That was
7   about it.  Which would be Pam.
8   Q       Now, your grandma doesn't hear very well; correct?
9   A       No.  It's not my grandma.  It's Hayle's grandma.
10  Q       Yeah.  Their grandma doesn't hear very well?
11  A       Yeah, she has a hearing aid.
12  Q       So there was a point where Austin Taylor Burke told
13  you some things about the crimes?
14  A       Yes, sir.
15  Q       Please tell this jury what Austin Taylor Burke told
16  you about these crimes.
17  A       Well, at first he said that he was gonna rob Brandon
18  and kill him.
19  Q       Well, when did he say that?
20  A       It was the day before June 11th.  We were all sitting
21  around the table.  And after he had did it, he came back, you
22  know, bragging about it.  We thought he was just playing
23  around.  You know.  And as the article came about his car and

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    as he was missing and stuff, I told Hayle, I'm like, "I have

2    to go to the police.  You know.  I have to.  It's the right

3    thing to do."

4           But he had said that he was riding with him and that

5    he took him to Hatchet Man Road.  I'm not exactly sure what

6    they were going to do, but, you know -- Brandon started

7    apologizing to him about an incident that happened while he

8    was in juvey detention.  And Austin told him, you know,

9    "There's no need to apologize.  Pull over."  You know.  Austin

10   said he took him out of the car and he told him to be quiet,

11   get on his knees.  And he told him, you know, excuse my

12   language, he said, "Fucking look at me," and when he looked at

13   him he had shot him.

14   Q       Okay.  Did he say where he shot him at?

15   A       At first he said he only shot him once and then he

16   said twice.  But he said right here and in the head.

17   Q       So one time he told you it was once and then another

18   time he told you twice?

19   A       Yes, sir.

20   Q       All right.  And had you ever been to this Hatchet Man

21   Road?

22   A       No, sir.

23   Q       Do you know where Hatchet Man Road is?

431

1   A       No.

2   Q       And what did he tell you about Brandon's car?

3   A       He -- he said he didn't know what to do with it.  He

4   was running out of gas.  So he had just left it on the bike

5   trail.

6   Q       And the bike trail is not too far from 713 Mason

7   Street?

8   A       No, sir.  Less than a mile.

9   Q       All right.  Now, at some point you went to the police

10  and they asked you to pick out the individual through a

11  photographic lineup; is that correct?

12  A       Yes.

13  Q       I'm going to hand you what's been marked for purpose

14  of identification as State's Exhibit Number 26 and ask if you

15  recognize that?

16                  (Whereupon, State's Exhibit No. 26, Photo

17  Lineup, was introduced for identification.)

18  A       Yes, sir.

19  Q       Is your signature on that?

20  A       Yes, sir.

21  Q       And you hand wrote in some things there?

22  A       Yeah.

23  Q       Okay.  I'm going to show this to the -- this is a

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

432

1    fair and accurate copy of the photo lineup you looked at?

2    A      Yeah.

3    Q      And who did you pick out?

4    A      Number four.

5    Q      All right.  So we're going to show this to the jury

6    here.  You picked out State's Exhibit Number 4; correct?

7    A      Yes.

8    Q      That was you that circled that?

9    A      Yes, sir.

10    Q      And Jessica, do you see your signature on there?

11    A      Yes, sir.

12    Q      And you would have signed that form?

13    A      Yes.

14    Q      What date did you do that on?

15    A      The 18th.

16    Q      And you wrote in as the subject who what?

17    A      Killed Brandon.

18    Q      All right.  Jessica, did -- wait a minute.  Strike

19    that.

20           I'm going to show you what's been marked for purposes

21    of identification as State's Exhibit 11 and ask if you

22    recognize State's Exhibit 11?

23    A      Yes, sir.

433

1   Q        Do you recognize the person in that photograph?

2   A        Yes, sir.

3   Q        And do you recognize either one of those guns?

4   A        The one on his chest.

5   Q        Okay.  I'm going to publish this to the jury.

6   State's Exhibit Number 11.  Okay.  The individual depicted in

7   that photograph, do you recognize him?

8   A        Yes, sir.

9   Q        Who is that individual?

10  A        Austin Burke.

11  Q        And the gun that's on his chest, is that the same gun

12  that you had previously seen Austin Taylor Burke with?

13  A        Yes, sir.

14  Q        It's the same one I showed you here as State's

15  Exhibit 1?

16  A        Yes.

17  Q        Okay.  The person that you've talked to, who told you

18  that he killed Brandon and made him get on his knees because

19  of an incident at DYS that he had with him?

20  A        Yes.

21  Q        And who told you that he left the car on the bike

22  path and who is depicted in that picture, do you see him here

23  in the courtroom today?

434

1    A        Yes, sir.

2    Q        Could you please point to him?

3    A        (Witness indicates.)

4              MR. BECKER:  Okay.  Please allow the record

5    to reflect she has identified the defendant.

6              I have no further questions, Your Honor.

7              THE COURT:  Cross.

8              MR. OLSON:  Thank you, Your Honor.

9                    CROSS EXAMINATION

10   BY MR. OLSON:

11   Q        Good morning, Miss Simms.

12   A        Good morning.

13   Q        Miss Simms, you indicated that you are dating Hayle

14   Roupe?

15   A        Yes.

16   Q        Is that correct?

17   A        Yes, sir.

18   Q        And that is Rickey Roupe's cousin?

19   A        Yes, sir.

20   Q        And Pam Roupe's granddaughter?

21   A        Yeah.

22   Q        Okay.  When did you begin dating Hayle?

23   A        Two years ago.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        So in 2016?

2    A        Yes.

3    Q        And it was at that time that you began going over Pam

4    Roupe's house; is that correct?

5    A        Yes.

6    Q        And when you'd go to Pam Roupe's house, you wouldn't

7    go alone?  You'd always go with Hayle?

8    A        Yes, sir.

9    Q        And the people that were at Pam Roupe's house, you

10   had also -- Hayle would have met the same people you did; is

11   that correct?

12   A        Yes.

13   Q        And now you indicated here today that you became

14   familiar with Austin Burke a couple months before June 11th;

15   is that correct?

16   A        Yes, sir.

17   Q        So you're telling us today that you met him

18   approximately April of 2017?

19   A        Somewhere around there, yeah.

20   Q        Okay.  And he would come over regularly?

21   A        Yeah.  He was staying with Rickey for awhile.

22   Q        Okay.  And again, when you would go over, Hayle would

23   be with you?

436

1    A       Yes.

2    Q       So she would have met Austin as well back in April of

3    2017?

4    A       Not exactly sure if it was April.  But it was a

5    little before June, yes.

6    Q       A little before June?

7    A       Yes.

8    Q       So to say that you met Austin on June 11th, that

9    would be inaccurate?  It would be false?

10   A       No.  I didn't just meet him on June 11th.  I knew him

11   prior to then.

12   Q       And Hayle saying that she met him on August 11th,

13   that would be false as well?

14   A       You say August 11th?

15   Q       Or excuse me.  June 11th.  That would be false?

16   A       No.  Yeah, we knew him prior to June 11th.

17   Q       All right.  Now, do you recall meeting with Detective

18   Greaver on June 18th of 2017; is that correct?

19   A       Yes.

20   Q       And when you went there, did you tell Detective

21   Greaver that you were hanging out at Pam Roupe's house at

22   approximately 10:00 on Sunday morning?

23   A       Yes, sir.

437

Q        Okay.  Now, today you came in here and you told this

jury that Austin was there on Saturday, June 9th, and began

talking about how he was going to rob Brandon Sample; is that

correct?

A        Yes.

Q        Okay.  But when you went and met with Detective

Greaver you actually stated that he told you that morning that

he was going to rob Brandon Sample; is that correct?

A        No, I didn't.

Q        You didn't tell him that?

A        No.

Q        Okay.  So when we go back and we ask Detective

Greaver about your interview and question him about that

interview, he's going to say that that conversation never

happened?

A        No.  When I went to him, I went to him -- I went to

the police station, actually.  And then after the police

station is when he had called and we had met with him to give

statements with him.  Austin was talking about it -- he said

he had seen him and he was planning to do it.  And when --

after he did it is when he came back -- well, actually, the

night before he went and did it is when he said he was gonna

go rob him.

438

1    Q       So it's the night before now, not the day?

2    A       Well, night.  Day.  Before.

3    Q       Okay.  And again, your indication when you talked to

4    Detective Greaver was you told him that you learned through

5    Hayle and Jess that Austin saw him when he was leaving Willow

6    Lake and he got picked up?

7    A       That's what we were told.

8    Q       Okay.  And so you're saying that happened on

9    June 10th?

10   A       No.

11   Q       So it happened on June 11th?

12   A       Whatever day he was at Willow.  His mom swears he was

13   at Willow, but I was told he was picked up from Willow Lake.

14   I don't know the actual truth of how they came in contact with

15   each other.  I just know that he had met up with him.

16   Q       Okay.  Did -- was Austin at Pam Roupe's house on

17   June 11th?

18   A       Yes.  That I recall.

19   Q       What time was he there?

20   A       He was there -- it was nighttime.

21   Q       Do you recall what time?

22   A       No, I don't.

23   Q       But it was before he had left then?  So obviously you

1    saw Austin?

2    A        Yes.

3    Q        Was he there with anybody?

4    A        He -- before he met with Brandon or after?

5    Q        At any -- was Brandon there?

6    A        Yes.  He had pulled in the driveway with Brandon in

7    the car, yes.

8    Q        So you saw Brandon Sample that day?

9    A        In the car, yes.

10   Q        Now, you indicated that you had a bonfire that night;

11   is that correct?

12   A        It was just a little fire.

13   Q        A little fire in the backyard?

14   A        Yes.

15   Q        So anybody that said that there was no fire, that you

16   were all hanging out in the kitchen, that would be false?

17   A        (Witness shakes head.)

18   Q        No, it wouldn't be false?

19   A        No.  We would go from the fire to the kitchen.

20   That's just what we did when we were over there.  We always

21   had fires and we'd hang out in the kitchen and we'd play

22   cards.

23   Q        Prior to meeting with the police, did you talk to

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Haley's cousin Makayla?

2    A       Yes, sir.

3    Q       And isn't it true that you told Makayla that Austin

4    had come back to Pam Roupe's house covered in blood admitting

5    that he shot Brandon Sample in the head?

6    A       No, I did not tell Makayla that.

7    Q       And did you tell Makayla that you personally

8    witnessed Austin being back at the house covered in this

9    blood?

10   A       I never mentioned anything to Makayla about blood.  I

11   guess I had spoken with Makayla about it, but never mentioned

12   blood to Makayla, no.

13   Q       Okay.  So if Makayla told that to police officers,

14   that you told her that, she would have been lying?

15   A       Yes.  Because I never physically seen him covered in

16   blood.

17   Q       Now, you're also indicating that on June 11th when

18   you were hanging out at Pam Roupe's house you saw that firearm

19   that continues to be put up on the screen; is that correct?

20   A       Yes.

21   Q       And when you saw this, everybody else was around;

22   correct?  Hayle was there, Nate was there, Rickey was there?

23   A       Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

441

1    Q       So they would have all seen it too?

2    A       Yes.

3    Q       Now, on Monday, June 12th, you indicated to the

4    police again that you had met back at Pam Roupe's house and

5    you, Rickey, Deidre, Hayle, and Austin were there; is that

6    correct?

7    A       Yes.

8    Q       And you indicated that Austin began talking about

9    things, about dropping the car off?

10   A       Yes.

11   Q       On the Niles bike path; is that correct?

12   A       Yes, sir.

13   Q       But you told police that initially you didn't put 2

14   and 2 together until you began reading reports; is that

15   correct?

16   A       Yes.

17   Q       So you began piecing all of this together and coming

18   up with your story after you read the reports that were being

19   published by the media; is that correct?

20   A       No, sir.  When he had came back and he was talking

21   about it, I didn't realize who it was at the time.  When the

22   article had come out and it said Brandon's name in the car,

23   that is when I realized 2 and 2 and went to the police.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

442

```
 1   Q        And you went to the police at 2:00 in the morning on
 2   the 15th of June?
 3   A        Yes.
 4   Q        So three days after he supposedly told you that he
 5   shot Brandon Sample --
 6   A        He didn't --
 7   Q        -- and dropped his car off at the Niles bike path?
 8   A        He did not say a name, no.
 9   Q        When did you learn that the car was dropped off at
10   the Niles bike path?
11   A        I think it was the morning after he had came back.
12   Q        So that Monday morning?
13   A        Yes.
14   Q        So now you're telling us that on Monday morning you
15   were at Pam Roupe's house again and Austin was there and
16   that's when he admitted to dropping the car off at the bike
17   path?
18   A        Whatever day they found the car, it was the night
19   before.  Because that is when we went to the police.  And then
20   the police found the car the day after, the morning after.
21   Q        So you went to the police and told them Austin's
22   story and then the police found the car?
23   A        Yes.  They found it the next morning.
```

443

1   Q        So you're going to tell us that the police found the

2   car on June 16th because you went to them on the 15th; is that

3   correct?

4   A        I'm pretty sure.

5   Q        Did you tell the police that you spoke with Rickey

6   and Deidre and they informed you that on June 11th Austin came

7   back to the house, woke Rickey up and was covered in blood?

8   A        Yes.

9   Q        Now, again, your testimony here today was that Austin

10  took Brandon out to Hatchet Man Road, forced him out of the

11  car?

12  A        Yes.

13  Q        Is that correct?

14  A        Yes.

15  Q        Made him get on his knees; is that correct?

16  A        Yes.

17  Q        Put a gun to the front of his head?

18  A        I'm not exactly sure where.  He said two different

19  places.

20  Q        Well -- so your initial statement was he looked at

21  him and said, "Fucking look at me"?

22  A        Yes.

23  Q        Is that correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

444

1    A        Yes.

2    Q        So he had to look up at Austin while he was on his

3    knees; is that correct?

4    A        Yes.

5    Q        With a gun to his head?

6    A        Yes.

7    Q        And he shot him?  And you said the first time he told

8    you he shot him one time behind the ear?

9    A        Yes.

10   Q        And then the other time he said he shot him in the

11   middle of the forehead --

12   A        Yes.

13   Q        -- and behind the ear.  There was never a mention

14   about being shot in the back of the head; would you agree?

15   A        Right here would be close to the back of the head,

16   yes.

17   Q        How about in the middle of the back of the head?

18   A        No.

19                     MR. OLSON:  May I have a moment, Your

20   Honor?

21   BY MR. OLSON:

22   Q        Miss Simms, you indicated that on June 11th you saw

23   Brandon Sample in a car; is that correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

445

1  A       Yes.

2  Q       What time was that?

3  A       I couldn't -- I couldn't remember.

4  Q       Was it daylight?

5  A       No.

6  Q       Was it night?

7  A       It was night.

8  Q       It was at night?

9  A       Yes.

10  Q       You left at midnight; correct?  That's your testimony

11  here today, that you left --

12  A       Yeah.  I left.

13  Q       -- Pam Roupe's house at midnight?  So we know it was

14  before midnight.  And you're indicating to us that he pulled

15  up?

16  A       Yes.

17  Q       In his white car?

18  A       Yes.

19  Q       How did you know it was Brandon?

20  A       Because after the story had came out, it was his car.

21  He said he dropped the car off.  It was the same day.  I mean,

22  it's common sense.

23  Q       Okay.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

446

1    A        Same white Malibu.  Same kid.  Glasses.

2    Q        Did you -- are you able to approximate a time for us?

3    Was it shortly before you left?

4    A        It was right about the time I was leaving because I

5    was getting into the car to leave.

6    Q        So it was close to midnight?

7    A        Yes.

8    Q        Was there anybody else with him?

9    A        With Austin?

10   Q        With Brandon.

11   A        Yeah.  Austin.

12   Q        Just those two?

13   A        Yes.

14                    MR. OLSON:  No further questions.

15                    THE COURT:  Redirect.

16                    MR. BECKER:  Yeah.

17                    REDIRECT EXAMINATION

18   BY MR. BECKER:

19   Q        Jessica, you could be off on your times; correct?

20   A        Yes.  It's been so long.

21   Q        When these events were happening, you weren't writing

22   them down and saying, "Well, I better write this down that I

23   saw Austin Burke in a car at 12 midnight"?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

447

1  A       Right.

2  Q       And, "Well, I'm leaving to take my sisters home.

3  It's 12 midnight."  It could have been later?  Could have been

4  1:00?

5  A       Right.

6  Q       It could have been anytime that night?  You don't

7  recall?

8  A       No.  I just knew it was getting late and I had to

9  take them home.

10 Q       Now, I know we talked a lot about dates and we may

11 have confused you with dates.

12 A       Right.

13 Q       The date that you saw Austin Burke and he was sort of

14 at the house all day at Niles?

15 A       Uh-huh.

16 Q       And I want to specifically ask you about that date.

17 But you had seen him occasionally before that?

18 A       Yes.

19 Q       Okay.  You wouldn't say you were friends with him?

20 A       No.  Just --

21 Q       You knew he had a relationship with --

22 A       Makayla Egbert.

23 Q       -- Makayla Egbert?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

448

1    A        Right.

2    Q        And that's really all you kind of knew about him?

3    A        Yes.

4    Q        Now, the day the car was found was right after that?

5    Actually, the next morning.  So you didn't go to the police

6    about the car until a couple days later; right?

7    A        Yes.

8    Q        All right.  So you didn't lead the police to the car.

9    You knew the car had been found at that point?

10   A        Yes.

11   Q        So you were a little confused?

12   A        Yeah.

13   Q        You didn't go to the police and say, "Hey, he just

14   told us the car was on the bike path"?  Because it had already

15   been found at that point?

16   A        Yeah.

17   Q        All right.  So you're getting a little confused?

18   A        Yeah.

19   Q        But you did say after the car was found this

20   defendant told you he left it on the bike path; right?

21   A        Yes.

22   Q        And this defendant told you he killed Brandon Sample?

23   A        Yes, sir.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

449

1    Q        And this defendant --

2                        MR. HARTWIG:  Objection, Your Honor.

3    Leading.

4                        THE COURT:  Sustained.

5                        MR. BECKER:  All right.

6    BY MR. BECKER:

7    Q        After the car was found and before you went to the

8    police, what did this defendant tell you he did to Brandon

9    Sample?

10                       MR. OLSON:  Objection.  Asked and answered.

11                       THE COURT:  Asked and answered.

12                       MR. BECKER:  Well, it's redirect.

13                       THE COURT:  Let's go on.  Go to something

14   else.

15                       MR. BECKER:  Well, I'm trying to clarify

16   the time.

17            Can we approach?

18                       (At sidebar:)

19                       THE COURT:  You asked her that exact

20   question on direct.

21                       MR. BECKER:  Yeah.  Right.  And he's got

22   her --

23                       THE COURT:  No.

                          OFFICIAL COURT REPORTER
                       TRUMBULL COUNTY * WARREN, OHIO

450

```
1                    MR. BECKER:  Okay.  Withdraw.

2                    (End of sidebar.)

3      BY MR. BECKER:

4      Q       Jessica, have you ever testified in court before?

5      A       No, sir.

6      Q       All right.  You didn't keep a notebook of the events

7      that happened during this timeframe?

8      A       No.

9      Q       And you're trying to remember as best you can, nine

10     months later?

11     A       Yes.

12     Q       Suffice it to say, you're not lying?

13     A       No, sir.

14     Q       There was no reward money given to you?

15     A       No, sir.

16     Q       You didn't benefit in any way by going to the police?

17     A       No, sir.

18     Q       You didn't get citizen of Niles of the year or

19     anything like that?

20     A       No, sir.

21     Q       You got no benefit out of anything you said?

22     A       No.

23                    MR. BECKER:  Thank you.
```

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

451

1          THE COURT:  Recross.

2          MR. OLSON:  Thank you, Your Honor.

3                    RECROSS EXAMINATION

4    BY MR. OLSON:

5    Q      Miss Simms, you would agree with me that this is

6    several months later from when you went and made the

7    statement; is that correct?

8    A      Yes.

9    Q      So when you made the statements to the police, it

10   would have been freshest in your mind at that point in time?

11   A      Yes.

12   Q      And so if you would have told the police at that

13   point in time that you left at midnight because you had to get

14   your sisters home, that would be pretty accurate because it

15   was fresh in your mind then; is that correct?

16   A      Yes.

17   Q      I mean, you were able to look back a couple days and

18   see in your mind what time you had to get your sisters home,

19   get them into bed and everything else; is that correct?

20   A      Yes.

21   Q      And plus, you know, Hayle left with you too; is that

22   correct?

23   A      Yes.

                    OFFICIAL COURT REPORTER
              TRUMBULL COUNTY * WARREN, OHIO

452

1   Q       So she would have known and confirmed what time that

2   you left; is that correct?

3   A       Yes.

4   Q       You would agree with me that you never told the

5   police that you saw Brandon Sample that night; is that

6   correct?

7                   THE COURT:  What night?

8                   MR. OLSON:  I'm sorry, Your Honor.  Thank

9   you.

10  BY MR. OLSON:

11  Q       On the night -- on your interview, on June 18th, you

12  never told them that you saw Brandon on June 11th?

13  A       I don't remember if I did or not.  It's been so long.

14                  MR. OLSON:  Okay.  No further questions.

15                  THE COURT:  You may step down.  Thank you.

16          Call your next witness.

17                  MR. BECKER:  Joann Gibb.

18                      *   *   *

19                  JOANN GIBB,

20  having been duly sworn, was examined and testified as follows:

21              <u>DIRECT EXAMINATION</u>

22  BY MR. BECKER:

23  Q       Joann, would you introduce yourself to the jury,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

453

1    please?

2    A        I am Joann Gibb.  I'm a computer forensic specialist

3    with the Ohio Attorney General's Bureau of Criminal

4    Investigations.

5    Q        And what are your duties at the Attorney General

6    Bureau of Criminal -- Bureau of Criminal Investigation?

7    A        I perform forensic analysis on digital media.  That

8    can be anything from cell phones to computers to cameras.

9    Anything that can contain digital memory.

10   Q        And have you received any specialized training or

11   schooling to prepare you for the position that you work in?

12   A        Yes.  I have a degree of -- with information

13   technology with a minor in computer -- a minor in criminal

14   justice through Youngstown State University.  And I have over

15   1,100 hours of training of computer and cell phone forensics.

16   Q        And do you make it a part of your duties to analyze

17   cell phones?

18   A        Yes, I do.

19   Q        And have you previously testified as an expert

20   witness in any courtrooms here in the state of Ohio?

21   A        Yes, I have.

22   Q        And specifically, you have previously testified as an

23   expert here in Trumbull County; correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

454

1    A        Yes.  Yes, I have.

2                  MR. BECKER:  All right.  Your Honor, I'd

3    move at this point for admission of Miss Gibb as an expert in

4    the analysis of cell phones.

5                  THE COURT:  Any questions?

6                  MR. OLSON:  No objection.

7                  MR. HARTWIG:  No objection.

8                  THE COURT:  You will be considered an

9    expert.  Proceed.

10                  MR. BECKER:  Thank you.

11   BY MR. BECKER:

12   Q        I want to direct your attention to a case and a cell

13   phone that was presented to you by the Warren Police

14   Department back on July 26th of 2017 or roughly in that date.

15            Did you have a chance to be given a Samsung Galaxy

16   phone from the Warren Police Department?

17   A        Yes.

18   Q        All right.  I'm going to hand you what's been marked

19   for purposes of identification as State's Exhibit Number 3 and

20   ask if you recognize State's Exhibit Number 3?

21                  (Whereupon, State's Exhibit No. 3, Samsung

22   Phone, was introduced for identification.)

23   A        Yes, I do.  This was the second item submitted on

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

455

1    that case.

2    Q       All right.  And I'm going to have you open that up,

3    if you could.  I'll give you a pair of scissors there.

4    A       (Witness complies.)

5    Q       Do you recognize that item?

6    A       Yes, I do.

7    Q       How do you recognize it?

8    A       This was the phone that was submitted as item 2.

9    It's a Samsung Galaxy express phone.  And it's model number

10   SM-J320A.

11   Q       All right.  And did you perform any analysis on that

12   phone?

13   A       Yes, I did.

14   Q       What exactly did you do with that phone?

15   A       Initially I tried to acquire the device's memory

16   through a software called Cellebrite.  Cellebrite would not

17   recognize this phone.  So I ended up performing what's called

18   an in-system programming read where I actually solder wires on

19   the board of the phone and use specialized software in a

20   device to pull the memory and place the memory into a file.

21   Q       Now, I'm going to take that item from you.  And we'll

22   put this over here.

23           All right.  So when you do that, what are some of the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    things that you're doing when you examine that phone?

2    A        I loaded the image file that came from this procedure

3    into Cellebrite's physical analyzer.  Cellebrite's physical

4    analyzer software was able to produce text messages, call

5    history, it rebuilt the file system of the phone, and I was

6    able to pull off the artifacts that were found on that image.

7    Q        And that's kind of what you do for a living?

8    A        Yes.

9    Q        All right.  So with respect to that, first of all,

10   cell phones -- and even that cell phone -- have a tremendous

11   amount of data and information on them; correct?

12   A        Correct.

13   Q        Some of the items on those cell phones are just the

14   regular programming and the regular things that a cell phone

15   needs to do to operate, to call people, to text people, to do

16   those kind of things?

17   A        Correct.

18   Q        And then I assume that phone like other phones, the

19   person who owns that or controls it can download applications

20   or put other things on that phone?

21   A        Correct.

22   Q        And, again, those take up a tremendous amount of

23   memory?

457

1    A         Correct.

2    Q         So one of the things, though, that Cellebrite and

3    that program you use can do is extract -- we can look for,

4    say, certain times for text messages or phone calls; correct?

5    A         Correct.  We can sort by dates and times.

6    Q         All right.  I'm going to hand you what has been

7    marked for purpose of identification as State's Exhibit 47.

8    It's a one-page document.  And do you recognize State's

9    Exhibit 47?

10                   (Whereupon, State's Exhibit No. 47,

11   Extraction Report, was introduced for identification.)

12   A         Yes.  This is some data that was derived from the

13   memory of the device that I examined.

14   Q         And this printout is a result of that program, that

15   Cellebrite program that you use to extract that from the

16   phone?

17   A         Correct.

18   Q         All right.  First of all, can you tell us what's that

19   showing?  Is that showing some phone calls and also -- or at

20   least one phone call and some text messages?

21   A         Correct.  These are phone calls and text messages,

22   SMS messages.

23   Q         What is SMS?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

458

1    A        SMS stands for short message services.  They're text

2    messages.  They usually don't include media.

3    Q        All right.

4    A        Like pictures or audio or anything like that.

5    Q        Okay.  So those items on that page that are depicted

6    there, they indicate the phone number that they were sent from

7    or received from; correct?

8    A        Correct.  Sent to or received from.

9    Q        All right.  They also -- if the person who had that

10   phone put in, say, "Chris Becker" as the person receiving or

11   sending the message to, that would show up there; correct?

12   A        The contact information, Cellebrite will match the

13   contact information to the phone number on here.

14   Q        All right.  And in this particular case, is there a

15   number matched to an individual that has a name?

16   A        Yes.

17   Q        And what is the name on that?

18   A        The name appears to be "B Samps."

19   Q        All right.  "B Samps."  Now, also, if you look on the

20   column down, I believe it's the right-hand side?  Yeah, the

21   right-hand side, there's a box that says "deleted"?

22   A        Correct.

23   Q        And there are a whole bunch of -- is it Xs?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

459

1    A        The word "yes."

2    Q        There's the word "yes"?  Tell us how that comes

3    about.

4    A        Cellebrite was able to recover -- these were deleted

5    text messages.  And Cellebrite was able to recover these

6    deleted text messages.

7    Q        So the fact that I have a cell phone and I were to

8    text Detective Greaver here and say, "John, meet me for lunch

9    at 12:00 today" and then later on I deleted it, there's the

10   possibility it's still on my phone; correct?

11   A        Correct.

12   Q        How does that work?

13   A        It's a deleted algorithm within the program in your

14   phone.  It may not have been written to the database yet.  It

15   may be removed from the database but within the hex of the

16   database itself.  There's multiple ways we can recover deleted

17   text messages.

18   Q        All right.  And that's what that program does;

19   correct?

20   A        Correct.

21   Q        And then there are some other messages that were not

22   deleted?

23   A        Correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q      And I believe on that extraction report that you

2    have, there is one phone call; correct?

3    A      Correct.

4    Q      And is that an outgoing or incoming call?

5    A      That's an outgoing phone call.

6    Q      Does it say who it was made to or what number?

7    A      It was to a person by the name of B Samps.  Do you

8    want me to read the number?

9    Q      Yeah.

10    A      The phone number that it was made to was

11    1-330-770-3515.

12    Q      And that means that Cellebrite has determined that

13    B Samps was called on that particular incident?

14    A      Yes.  This was on the call log of the phone.

15    Q      And does it tell you what time and what date that

16    call was made?

17    A      The date was 6-12 of 2017 at 1:18 a.m.

18    Q      All right.  Now, that is a fair and accurate copy of

19    the extraction report that you ran after you analyzed State's

20    Exhibit Number 3; correct?

21    A      Yes.  It's part of the extraction report.

22    Q      That's part of it.  You have many, many pages?

23    A      Absolutely.

461

1    Q       But we asked you specifically to find any contacts on

2    June 11th and June 12th between Brandon Sample, and we gave

3    you that phone number, and Austin Burke which is his phone.

4    That's where you got that from?

5    A       Okay.  Uh-huh.

6    Q       Then there was some text messages that began again on

7    June 13th, I believe; correct?

8    A       Correct.

9    Q       Were those text messages deleted?

10   A       No.

11   Q       And that is indicated in that extraction report;

12   correct?

13   A       Correct.

14   Q       All right.  So I'm going to publish this to the jury.

15   This is a fair and accurate copy of what you pulled out or

16   what the extraction report looks like?

17   A       Yes.

18   Q       Okay.  I don't know if -- you might have to get off

19   the witness stand.  I know these are kind of small.  I don't

20   know if you can see this clearly or not.

21           So what you're saying is -- and if it's your

22   testimony, that from line 1 to line 13, these were all text

23   messages or what we call SMS messages?

1   A       Yes.

2   Q       There were some incoming and outgoing.  So the person

3   who called or texted, this would be their number.  And they

4   were incoming back and forth?  And this is listed as "B Samps"

5   right here, the number; correct?

6   A       Correct.

7   Q       And this will tell us the date and time?  These are

8   on June 11th.  We're going to use sort of military time here.

9   This is like 10:00 at night which would be 22 whatever, 22

10  whatever, 22 whatever; correct?

11  A       Correct.

12  Q       And you actually are able to pull off Cellebrite the

13  actual conversation, the actual words; correct?

14  A       Correct.

15  Q       And these text messages went all the way down to line

16  11 which was on June 11th at about 10:23 p.m.; is that

17  correct?

18  A       Correct.

19  Q       And that was a message, outgoing, from that phone you

20  analyzed to B Samps?

21  A       Correct.

22  Q       All right.  And all of these text messages on June

23  11th were deleted?

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

463

1   A       Uh-huh.

2   Q       But you were able to recover them even though they

3   were deleted?

4   A       Correct.

5   Q       And then on -- there's a call log.  There was an

6   outgoing call from that phone, State's Exhibit 3, to B Samps;

7   is that correct?

8   A       Yes.

9   Q       And then there's no other conversation until

10  June 13th when there was an outgoing message from that phone,

11  State's Exhibit 3, to B Samps, and it said, "Yo, is you

12  straight nigga?  You're all over Facebook.  WTF.  HMU."

13  Correct?

14  A       Correct.

15  Q       All right.  And then there's another text message on

16  June 13th at about 12:35 where the person is asking him

17  basically have you overdosed?  Has he died?  Quit screwing

18  around.  That kind of stuff.  Those text messages, though,

19  weren't deleted; correct?

20  A       Correct.

21  Q       All right.  Now, we also had you look for some other

22  phone messages for an individual named Brittani Merten.  And I

23  believe you punched in her number.  And I'm going to hand you

464

1   State's Exhibit 48 and see if you recognize State's Exhibit

2   48?

3                    (Whereupon, State's Exhibit No. 48,

4   Extraction Report, was introduced for identification.)

5   A        Yes, I do.

6   Q        What is State's Exhibit 48?

7   A        This is a report of the data recovered on item 2 with

8   conversations back and forth from Brittani.

9   Q        And that's how it's listed and the contact is listed

10  in the phone, State's Exhibit 3, that you examined?

11  A        Correct.

12  Q        All right.  And with particular attention to -- let

13  me make sure I have the right -- okay.  Particularly on items

14  31 and I believe it's 37, do you see the text messages and

15  what was said?

16  A        Item 31 was an outgoing text message stating, "See if

17  my clip for the 9MM is out there, baee."  B-a-e-e.

18  Q        And do you know what time -- I keep saying time, but

19  what date and time that text message was sent?

20  A        Item 31 was an outgoing text sent on 6-12 of 2017 at

21  12:20 a.m.

22  Q        All right.  And that was from State's Exhibit 3, the

23  phone you analyzed, that information?

465

1    A        Correct.

2    Q        Okay.  Then on the next page there is a line, I

3    believe it's line 37?

4    A        Okay.

5    Q        And what is line 37 saying?

6    A        Line 37 is on outgoing SMS message that says, "Out in

7    N-i-l-e-w."

8    Q        All right.  And when I pull up the keyboard on my

9    cell phone, the "S" and the "W" are right above each other?

10   A        The "S" and the "W"?

11   Q        When I have my keyboard out.

12   A        Oh, yes.

13   Q        Okay.  They're -- I think the "S" is above or below

14   the "W"?

15   A        The "S" is below the "W".

16   Q        The "S" is below the "W".  Okay.  Common typing

17   mistake or typo?

18   A        Yes.

19   Q        All right.  And what time and what date -- what date

20   and what time was that text message sent?

21   A        That text message was sent on 6-12 of 2017 at 2:08

22   a.m.

23   Q        So at 2:08 a.m., whoever had State's Exhibit Number 3

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

466

1    texted to that Brittani that they were out in Nilew,

2    N-i-l-e-w?

3    A       Correct.

4    Q       All right.  And that's a fair and accurate copy of

5    the extraction report from that; correct?

6    A       Yes, sir.

7    Q       Now, we also had you look at some photographs that

8    were recovered from that phone.  And I'm going to hand you

9    what have been marked for purpose of identification as State's

10   Exhibits 11 and 13 and ask if you recognize those two items?

11   A       Yes, I do.

12   Q       How do you recognize State's Exhibits 11 and 13?

13   A       These were two pictures found on the item two

14   submission.  These were found within the extraction.

15   Q       Okay.  You refer to them as item two, but that's

16   BCI's item.  For purposes here, we marked it as State's

17   Exhibit 3.

18   A       Okay.  State's Exhibit 3.

19   Q       I don't want any confusion.  But for your purposes,

20   it's item two?

21   A       Correct.

22   Q       And is there a numeric thing or something that you

23   can tell that those were taken off the phone and you've

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

467

1    compared them to?

2    A       The file names are unique file names.  And at the

3    bottom of the picture is the file path of where these pictures

4    existed on the device.

5    Q       And you've confirmed that those, in fact, did come

6    off that phone?  In fact, you created a flash drive or

7    created -- or copied a flash drive with that information and

8    provided it to us?

9    A       Correct.

10   Q       Okay.  So let me publish these for the jury.  I'm

11   going to show you what's been marked for purposes of

12   identification as State's Exhibit 11.  And State's Exhibit

13   11 -- I'm trying to get to a point where we can see here.

14           You were talking about file numbers or file -- maybe

15   I'm not smart enough to figure out, but what were you

16   referring to?

17   A       The file name at the top.

18   Q       That's up here?

19   A       Correct, the 497303 number.

20   Q       Okay.

21   A       That is the file name.

22   Q       All right.  And that file and this picture that we

23   printed out came from State's Exhibit Number 3?

468

1     A        Correct.

2     Q        Okay.  And that's a fair and accurate copy of the

3     actual image that was on that phone?

4     A        Correct.

5     Q        All right.  I'm going to show you what's been marked

6     for purposes of identification as State's Exhibit 13 and ask

7     if you recognize State's Exhibit Number 13?  And, again, there

8     is a file number up here; is that correct?

9     A        Correct.

10    Q        And that number corresponds to a file in that phone?

11    A        Correct.

12    Q        And that is a fair and accurate picture of an image

13    that was saved on that phone?

14    A        Correct.

15                    MR. BECKER:  Your Honor, I have no further

16    questions.

17                    THE COURT:  Cross.

18                    MR. OLSON:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20    BY MR. OLSON:

21    Q        Good morning, Miss Gibb.

22    A        Good morning.

23    Q        Miss Gibb, I just want to go over a few things with

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

469

1   you.

2           Initially, you indicated that there was only one

3   phone call on the extraction report between the phone that you

4   checked and the number (330) 770-3515; is that correct?

5   A       What was on that report, yes.

6   Q       Okay.  I'm going to show you what I've marked as

7   Defendant's Exhibit A.  Miss Gibb, I'm going to show you

8   what's been marked as Defendant's Exhibit A.  Is that a

9   document you're familiar with as you look at it?

10  A       Yes.  These are more artifacts from the Cellebrite

11  extraction report.

12                  (Whereupon, Defendant's Exhibit A,

13  Extraction Report, was introduced for identification.)

14  Q       And that's the extraction report that you completed;

15  is that correct?

16  A       Correct.

17  Q       Okay.  I want you to go to the very last page of the

18  documents I just gave you.

19  A       Yes, sir.  I'm sorry.  One more page.

20  Q       Okay.

21  A       Yes, sir.

22  Q       Okay.  And does that show phone calls?

23  A       That shows an outgoing phone call, yes.

470

1    Q        And, again, that's under a different time zone?

2    Because what time does that show?

3    A        That shows UTC plus zero which is a different time

4    zone from what we are in now.

5    Q        Do you know what the difference is?

6    A        Yes.

7    Q        It's four hours?

8    A        Four hours.

9    Q        Okay.  So you have a phone -- outgoing phone call; is

10   that correct?

11   A        Yes.

12   Q        And that is to the B Samps number that was previously

13   identified?

14   A        Yes.

15   Q        Is there also a telephone call that's been

16   highlighted?

17   A        Yes.

18   Q        Okay.  And where was that phone call?  Was it

19   incoming or outgoing?

20   A        That was incoming.

21   Q        From what number?

22   A        That was (330) 770-3515.

23   Q        So the same number?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

471

1   A       Yes.

2   Q       So we actually have two phone calls?

3   A       Yes.

4   Q       Okay.  So the phone number that's identified as

5   B Samps actually made an incoming call to Austin Burke's

6   telephone at what time?

7   A       That was at 12:26:17 a.m. UTC.

8   Q       Which would be what our time?

9   A       8:26:17 a.m.

10  Q       And what was the length of that call?

11  A       Two seconds.

12  Q       And in your experience, what is a two-second call?

13  Would that be consistent with, "Hey, send me your number."

14  Somebody calls and hangs up just so you have it?

15  A       It's a quick call, yeah.

16  Q       Two-second conversation?

17  A       It's nothing.

18  Q       You really aren't gonna exchange much.

19          We also heard about some of the messages that were

20  deleted between Mr. Burke and the name identified as B Samps;

21  is that correct?

22  A       Yes.

23  Q       Were any of those phone calls deleted?

472

1    A       No.

2    Q       So those remain there.  Was the contact deleted?

3    A       No.

4    Q       So the contact remained on the phone?

5    A       Yes.

6    Q       You also identified some exchanges that went between

7    that phone and an individual by the name of Brittani; is that

8    correct?

9    A       Yes.

10   Q       And it asks about a clip for a 9MM on there?

11   A       Yes.

12   Q       Was that deleted?

13   A       No.

14   Q       We also looked at Exhibit 11 which showed pictures

15   with two guns on the guy's chest; is that correct?

16   A       Yes.

17   Q       Do you know when that was created?

18   A       I really don't know.

19   Q       Okay.

20   A       I'd have to look it up.

21   Q       You would agree with me that in this picture it's

22   showing two guns sitting on his chest with his left hand; is

23   that correct?

1    A        Yes.

2    Q        You would agree with me that there's no tattoos on

3    that hand?

4    A        None that I can see.

5    Q        Okay.  And the later photograph, you're not sure when

6    that was created either?

7    A        No, sir.

8    Q        You do see tattoos --

9    A        Yes.

10   Q        -- on the left hand on this one?

11   A        Yes, I do.

12   Q        So it's safe to assume that the first picture,

13   Exhibit 11, was created much earlier in time than Exhibit 13?

14   A        It appears to be, yes.

15                    MR. OLSON:  May I have one moment, Your

16   Honor?

17                    THE COURT:  You may.

18   BY MR. OLSON:

19   Q        Just for clarity, again, on the incoming telephone

20   call to -- from the B Samps number into the cell extraction?

21   A        On this one?

22   Q        Correct.

23   A        Okay.


                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

474

1   Q       For us, can you clarify what date that was made?

2   That call.

3   A       That was -- the date in the report is showing UTC

4   6-12-2017 at 12:26 a.m.  Or I'm sorry, 12:26 -- yes, 12:26

5   a.m.  So that would be the day before.  Yes.  That would be

6   the day before, 6-11-2017, at 8:26:17 a.m.

7   Q       A.m. or p.m.?

8   A       I'm sorry.  P.m. Thank you.

9   Q       Okay.  And also in that extraction report, are you

10  able to identify whether B Samps was a contact before that

11  phone call?

12  A       I don't understand the question, sir.

13  Q       So when I have a phone and let's say that the

14  two-second phone call was to allow me to input that number,

15  I'd create a contact; is that correct?

16  A       Uh-huh.

17  Q       In my phone.  Are you able to tell with that

18  extraction report when the contact was generated?

19  A       Not from this one.

20  Q       May I see this?

21  A       Yes, sir.

22          MR. OLSON:  May I approach the witness,

23  Your Honor?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1          THE COURT:  You may.

2    BY MR. OLSON:

3    Q      I want you to go to line number 13 on that report.

4    A      (Witness complies.)  On the timeline report?

5    Q      Correct.

6    A      Yes, sir.

7    Q      What does that line 13 read?

8    A      That shows a contact.

9    Q      And what does that -- is that when the contact is

10   created?

11   A      It appears to be.

12   Q      Okay.  And what time does that show?

13   A      6-12-17 at 5:19:46 a.m. UTC.

14   Q      So right after the 1:00 telephone call, the 1:18

15   phone call that came in?

16   A      Correct.

17   Q      And again, that contact was generated after a phone

18   call comes in and was not deleted from the phone?

19   A      Correct.

20   Q      And the telephone call made at 1:18 a.m. was not

21   deleted from the phone?

22   A      Correct.

23                   MR. OLSON:  No further questions.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

476

1          THE COURT:  Redirect.

2                    <u>REDIRECT EXAMINATION</u>

3     BY MR. BECKER:

4     Q       Well, let me ask you this.  There was contact --

5     there was contact between that phone much prior to that

6     according to that report; correct?

7     A       Correct.

8     Q       Yeah.  So there was text messages that were sent,

9     whether or not the contact was created or not, the name

10    "B Samps," there was contact between that 770 number and the

11    phone you analyzed much earlier than 1:18 on June 12th?

12    A       Correct.

13    Q       In fact, they were the deleted text messages that

14    were sent back and forth on June 11th?

15    A       Correct.

16    Q       And the fact that it was -- it says "B Samps" and you

17    say that was when it was created, he could have had it under a

18    different name then; correct?  Possibly?

19    A       Yeah.  I don't know.  I'd have to look at the

20    contacts to see what number.

21    Q       But definitely someone who was texting that number

22    had the number beforehand?

23    A       Correct.

                    OFFICIAL COURT REPORTER
               TRUMBULL COUNTY * WARREN, OHIO

477

1   Q       And one of those text messages on State's

2   Exhibit 47 -- is that 47?

3   A       Yes.

4   Q       47, one of those that was deleted says, "What's up

5   G"; right?

6   A       It says, "W-a-s-s-g-u-u-d, Wassguud?"

7   Q       All right.  The text?

8   A       Correct.

9   Q       And that was to the outgoing phone which, regardless

10  of when it was determined to be "B Samps," that number was

11  already being used by that phone; correct?

12  A       Correct.

13  Q       And the response was what?

14  A       Incoming, two minutes later, it reads -- do you want

15  me to read the message?

16  Q       Yes.

17  A       "Shit, just at this chick's house swimmin.  I'm gonna

18  have to take J White back to Akron in a bit but do you still

19  want to link up when I get back?"

20  Q       And was there a response to that text message?

21  A       There was another incoming message and then an

22  outgoing message at 22:06 saying, "Hell yeah.  LMK bro.  I

23  never sleep.  LOL."

1    Q        And then there's another message?

2    A        An incoming message right after that.  "Ha ha man.

3    If I don't sleep I legit hallucinate.  Literally just happened

4    last weekend but word bro it'll probably be like 12:30 or

5    something.  You said you'd be at your dad's?"

6    Q        And then there's another response?

7    A        Outgoing.  "Damn.  Ha ha.  That's crazy.  I'll be in

8    Warren on the west side."  S-i-d-s.

9    Q        And what time was that?

10   A        That was at 22:03.

11   Q        And regardless of whether it was connected to a

12   contact or not, those conversations occurred long before he

13   talked to you about that contact being created?

14   A        It was prior to that.

15   Q        Yeah.

16   A        To the report, correct.

17   Q        Those conversations are prior to that?

18   A        Correct.

19   Q        All right.  And those conversations were the ones

20   that were deleted?

21   A        Correct.

22   Q        All right.  And some others as well; correct?

23   A        Correct.

479

1          MR. BECKER:  All right.  Thank you.

2          THE COURT:  Recross.

3          MR. OLSON:  Thank you, Your Honor.

4                    RECROSS EXAMINATION

5   BY MR. OLSON:

6   Q     Going back to Exhibit A.

7   A     I don't know where I'm at now.

8   Q     Okay.

9   A     Sorry.

10  Q     That's okay.

11  A     Okay.

12  Q     This is Exhibit A.

13  A     Thank you.

14  Q     Okay.  So we just went over numerous text messages

15  that were sent between phones; is that correct?

16  A     Correct.

17  Q     And that would be identified as line number one on

18  those reports; is that correct?

19  A     Line number one?

20  Q     Is there -- open up the -- go to I believe the third

21  page.

22  A     (Witness complies.)  Yes.

23  Q     Okay.  So line number one starts text messages; is

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

480

1    that correct?

2    A        Yes, sir.

3    Q        And that's that "What's good?  What's happening?

4    What's up G"?

5    A        Correct.

6    Q        What time was that text message sent?

7    A        On this report it's showing 6-12-17 at 2:01:40 a.m.

8    UTC.

9    Q        Which would be what our time?

10   A        That would be -- well, this one is, "What up

11   gangster?"  This one is -- that would be 10:01 a.m.

12   Q        Okay.  So the first text message that comes in from

13   that phone number that's identified as "B Samps" later on is

14   at 10:01 p.m.?

15   A        Correct.

16   Q        The phone call that was two seconds long came in at

17   what time?

18   A        Phone call, two seconds long --

19   Q        That was the very last page.

20   A        The last page.

21   Q        Yes.

22   A        Okay.  Thank you.  The two-second-long incoming phone

23   call was at -- on 6-12-2017 at 12:26 a.m. UTC, which would be

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

481

1    10:26 a.m.

2    Q       10:26 or 8:26?

3    A       I'm sorry.  8:26.

4    Q       So at 8:26 we have a two-second phone call?

5    A       Yes, sir.

6    Q       Two hours later is the first text message that you

7    uncover between those two numbers in this entire extraction

8    report; is that correct?

9    A       I'd have to look at the entire extraction report to

10   state on that.  This is on this -- this is like an individual.

11   Q       Okay.  The one that the prosecutor gave you, which

12   was identified as Prosecutor's Exhibit 48; correct?  Does that

13   have messages as well?

14   A       No.  This is the Brittani messages.  This is the one.

15   Q       Oh, okay.  I'm sorry.  And that is 47?

16   A       Yes.

17   Q       And that one that they gave you that shows messages

18   between the number identified as B Samps and the phone that

19   you did the extraction report on, again, that was the same

20   time, 10:01?

21   A       Correct.

22   Q       So we know, based upon what they're presenting you,

23   the two-second phone call occurred prior in time to the text

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

482

1    messages being sent?

2    A        Correct.

3    Q        Two hours earlier?

4    A        Correct.

5                    MR. OLSON:  Thank you.  No further

6    questions.

7                    THE COURT:  You may step down.  Thank you.

8           Ladies and Gentlemen, we're to the luncheon break.

9    We'll take one hour.  We'll come back at about five after 1.

10   Do not discuss this case among yourselves, nor with anyone

11   else.  Do not form or express an opinion.  See you a little

12   after 1.

13                   (Whereupon, a recess was had commencing at

14   12:10 p.m. and concluding at 1:15 p.m.)

15                   THE COURT:  Mr. Becker, you may call your

16   next witness.

17                   MR. BECKER:  Thank you, Your Honor.

18          The state would call Tim Cook.

19                          *   *   *

20                     TIMOTHY COOK,

21   having been duly sworn, was examined and testified as follows:

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

483

1                         <u>DIRECT EXAMINATION</u>

2    BY MR. BECKER:

3                         MR. BECKER:  Your Honor, this witness would

4    prefer not to be photographed.

5                         THE COURT:  All right.

6    BY MR. BECKER:

7    Q       All right.  Would you please state your name for the

8    record?

9    A       Timothy Cook.

10   Q       And how old are you?

11   A       33.

12   Q       All right.  You have been in trouble with the law;

13   correct?

14   A       Uh-huh.

15   Q       Okay.  What have you been in trouble with?

16   A       Numerous things.

17   Q       You've been to prison?

18   A       Uh-huh.

19   Q       Mr. Cook, you were in jail in June and July of 2017;

20   is that correct?

21   A       Yes, sir.

22   Q       And you were here in the Trumbull County Jail across

23   the street?

484

1    A       Yes, sir.

2    Q       While you were in jail, were you in jail with an

3    individual that you knew as Austin Taylor Burke?

4    A       Yes, sir.

5    Q       And was there a time when you overheard Austin Taylor

6    Burke talking about his case with other inmates?

7    A       Yes, sir.

8    Q       And were you able to overhear what Austin Taylor

9    Burke said about his case?

10   A       Yes.  He said, you know, he shot him, it didn't seem

11   real because there wasn't that much blood.  But he said he did

12   it.  Just kind of a messed up thing to hear.

13   Q       All right.  And at some point after that, did you

14   contact the Warren Police with that information?

15   A       Uh-huh.

16   Q       And you gave a statement to this detective as to what

17   you heard?

18   A       Yes, sir.

19   Q       And did you get any benefit from giving that

20   statement?

21   A       No, sir.

22   Q       Did you want to get a benefit?

23   A       Definitely did.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        All right.  And you didn't get any charges dropped;
2    you weren't released from jail, you got no reduced sentence or
3    anything; right?
4    A        No, sir.
5    Q        The individual who you overheard saying he shot
6    somebody in the head -- is that where he said he shot him at?
7    A        Uh-huh.
8    Q        Is he here in the courtroom today?
9    A        Yes, sir.
10   Q        Can you please point to him?
11   A        (Witness indicates.)
12            MR. BECKER:  Let the record reflect he's
13   identified Austin Taylor Burke.
14            Thank you.
15            THE COURT:  Cross?
16            MR. HARTWIG:  Thank you, Your Honor.
17                       CROSS EXAMINATION
18   BY MR. HARTWIG:
19   Q        Mr. Cook, you've got convictions for breaking and
20   entering; correct?
21   A        Yes, sir.
22   Q        Aggravated possession of drugs; correct?
23   A        Yes, sir.

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

1  Q        Felonies that lead you to the penitentiary?

2  A        Uh-huh.

3  Q        Yes?

4  A        Yes.

5  Q        And at the time that you were in the Trumbull County

6  Jail on this, you were in for a pending felony; correct?

7  A        Yes, sir.

8  Q        All right.  And isn't it true that that pending

9  felony was for stealing from your grandmother?

10  A        No.

11  Q        No.  What was the charge?

12  A        It was a breaking and entering charge on my own

13  house.  It got dismissed.

14  Q        All right.  And you just happened to be around

15  Mr. Burke?

16  A        Yes, sir.  I was laying in the stack of bunks.  I was

17  dope sick because I'm a recovering drug addict and overheard

18  it.

19  Q        All right.  So you just thought, hey, maybe I can get

20  some benefit out of this?

21  A        Right.  Yes, sir.

22  Q        They call you a snitch when you do that kind of

23  thing; right?  Isn't that kind of the common term?

1  A        Yeah.

2  Q        Snitching?

3  A        Yeah.

4  Q        And if you snitch, whether you make something up or

5  you say you heard something, you try to get a benefit?  That's

6  what you tried to do; correct?

7  A        Yes, sir.

8  Q        All right.  And when they didn't give it to you, you

9  just had such a good conscious --

10  A        No, sir.  I was forced to come here today.

11                  MR. HARTWIG:  Okay.  No further questions.

12                  THE COURT:  All right.  Redirect.

13                  MR. BECKER:  No, Your Honor.

14                  THE COURT:  All right.  You're excused.

15      Call your next witness.

16                  MR. BECKER:  State would call William

17  Moskal.

18                         *   *   *

19                  WILLIAM MOSKAL,

20  having been duly sworn, was examined and testified as follows:

21                  <u>DIRECT EXAMINATION</u>

22  BY MR. BECKER:

23  Q        All right.  Would you state your name for the record?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Yes.  William Moskal.

2    Q        Where are you employed at?

3    A        Ohio Attorney General's Office.

4    Q        And what is your occupation there?

5    A        Criminal intelligence analyst.

6    Q        Mr. Moskal, what are the duties that you perform at

7    BCI in that capacity?

8    A        It's a wide range of things.  We conduct financial

9    analysis, phone analysis, we locate suspects, victims,

10   witnesses of crimes.  They typically call it subject workups.

11   And along with quite a few other things.  So I'd be here all

12   day telling you every little bit that we do.

13   Q        Okay.  So you do a lot of that?

14   A        Yes, sir.

15   Q        Okay.  I might have you just pull that microphone a

16   little bit closer to you.

17            So Mr. Moskal, how long have you been employed there?

18   A        Since 2012.

19   Q        And you, as part of your duties, conduct what's

20   called cell site mapping?

21   A        Yes, sir.

22   Q        What is cell site mapping?

23   A        It's taking information from cellular companies and

489

1  mapping the towers that are associated with phone calls and

2  texts.

3  Q        And how are you able to do that?

4  A        Several ways.  You can manually put the latitude and

5  longitude in, or you could use software that we have, it's

6  called Pen-Link, that automatically locates those cell phone

7  towers for you.

8  Q        All right.  And so if we were to get records from

9  someone's phone -- and we have to subpoena that?  It's not

10 something that's normally on your bill; right?

11 A        Correct.

12 Q        So we have to subpoena the phone company and that

13 phone company will give us information showing cell tower

14 usage.  We're not talking about the actual phone itself.

15 We're talking about the cell phone towers that were used by

16 that number?

17 A        That's correct, yes.

18 Q        And then you take that information and you basically

19 just put it on a map?

20 A        Correct, yes.

21 Q        Okay.  And you can give us a general idea of cell

22 phone tower usage for a particular phone at a particular time

23 based upon the cell phone company's records that we've given

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

490

1    you?

2    A       Yes.

3    Q       Okay.  Were you required to do that or asked to do

4    that here in a case here in Warren, Ohio?

5    A       Yes, I was asked to do that.

6    Q       For Detective John Greaver of the Warren Police

7    Department?

8    A       Yes, sir.

9    Q       And you have generated a report -- and actually it's

10   two reports, I guess, for purposes of this case.  I'm going to

11   hand you what has been marked for purposes of identification

12   as State's Exhibit 50 and State's Exhibit 51 and ask if you

13   recognize State's Exhibit 50 and 51?

14          (Whereupon, State's Exhibits 50-51, Phone Call Analysis

15   Reports, were introduced for identification.)

16   A       Yes, I do.

17   Q       All right.  What are State's Exhibits 50 and 51?

18   A       These are phone call analysis reports that we do at

19   BCI.

20   Q       All right.  And they were done specifically in this

21   case with information that Detective Greaver provided you;

22   correct?

23   A       Yes, sir.

491

1    Q        All right.  I'm going to hand you what has been

2    marked for purposes of identification as State's Exhibit 22.

3    And if you could, I would look at State's Exhibit 22.

4            (Whereupon, State's Exhibit 22, Cell Phone Records, was

5    introduced for identification.)

6    A        Yes.  These look like cell phone records from AT&T to

7    me.

8    Q        All right.  And those are the cell phone records that

9    you used to compile your data in State's Exhibits 50 and 51?

10   A        Yes, sir.

11   Q        All right.  And we asked you to narrow down the

12   timeframe.  We didn't ask you put in -- we didn't ask you to

13   put in all of those records onto a map; we narrowed it down to

14   timeframe; correct?

15   A        Yes, sir.

16   Q        So explain to the jury, then, what State's

17   Exhibits 50 and 51 are.  What is the difference between the

18   data or the mapping used to make those two items?

19   A        Okay.  Exhibit Number 50 is an AT&T -- it's called a

20   NELOS report.  And what AT&T does, they gather information on

21   your phone, whether you're using it or not, of locations of

22   where you've been for their network distribution such as more

23   towers if they want to put more towers in certain locations.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

492

1   It has nothing to do with phone calls.  It has just data

2   records that they like to keep.

3   Q       Okay.  And what is State's Exhibit 51 then?

4   A       51 are actually phone calls that have been recorded

5   and -- which would give you the date and time, location, the

6   tower that was used, how long the call was, who they called,

7   along with the location of the towers and just a few other

8   bits of information for their network capabilities.

9   Q       And would that include text messages as well?

10  A       Yes, sir.

11  Q       All right.  So to clarify or to summarize, State's

12  Exhibit 50 is just where the phone would be pinging?  And

13  that's sort of randomly; sometimes it pings more than once or

14  twice a minute, sometimes it doesn't ping for 5, 10 minutes,

15  20 minutes at a time?

16  A       That all depends on the company itself when they do

17  it.  But, yes, it's random.

18  Q       Okay.  So it's just sort of random information just

19  so they know what usage and where they might be?

20  A       Uh-huh.

21  Q       The other one, State's Exhibit 51, is actually usage

22  and what towers were being using during those times; correct?

23  A       Yes, sir.

493

1   Q       Okay.  So with respect to State's Exhibit 51 -- I'm

2   sorry, 50 -- I have put a tab in there starting at a time and

3   just tell me, do you recognize those pages and what you did?

4   A       Yes, I do recognize these.  These are geolocation

5   historical data collected by the cell phone company.

6   Q       And you basically took the information that was

7   collected from that State's Exhibit 22, I believe, the phone

8   records, and just put it on a map?

9   A       That's right.

10  Q       And we gave you locations of where certain things

11  were important to this case such as on your map you have 713

12  Mason Street in Niles, Ohio; correct?

13  A       Correct.

14  Q       You also have a location on a bike path in Niles

15  where a vehicle was located?

16  A       Yes.

17  Q       You also have the location of where a body was found?

18  A       Yes, sir.

19  Q       And you have the location of where Austin Taylor

20  Burke lived?

21  A       Yes, sir.

22  Q       All right.  So you basically have four locations.

23  You just sort of drop a pin on there and then you created

494

1   these maps using the information the phone company provided us

2   and you just put it on a map?

3   A      Yes, sir.

4   Q      All right.  So let's start with that first page.  And

5   you put a box every time -- now this is the -- this is the

6   exhibit that is keeping track of what we call the pings?

7   A      Correct.

8   Q      Okay.  And you basically put these on a map, showed

9   the tower and then you have a green circle.  What's the

10   significance of the green circle?

11   A      That is the radius that the cell phone company would

12   give you.

13   Q      Okay.

14   A      And determining roughly -- it's an estimate of where

15   that phone may be in that area.

16   Q      All right.  Did you also then superimpose a box onto

17   the map showing the usage, the time, the date and that type of

18   information?

19   A      It has some information, yes.

20   Q      Okay.  And you know the phone number that we were

21   using; correct?

22   A      Yes.

23   Q      You looked at it.  What was the phone number that was

495

1   used for your data?

2   A        (330) 891-7261.

3   Q        All right.  And I'm going to ask you to look again at

4   State's Exhibit 22 and tell me if that is the subscriber or is

5   that the information for the phone number you just read?

6   A        Yes, sir, it is.

7   Q        And that was obtained from AT&T?

8   A        Yes, sir.

9   Q        And does it say who the subscriber of that phone

10  number you just gave -- what was it, (330) 891 --

11  A        -- 7261, yes.

12  Q        Does it say who the subscriber is?

13  A        Yes.  The name is Austin Burke.

14  Q        All right.  So I'm going to show you -- and I hope

15  you can see this on the board.  If I could have State's

16  Exhibit 50.  So let's start with State's Exhibit 51.  I'm

17  going to show you -- these are the pings for 891 --

18  (330) 891-7261.  And this is at about 5:33 a.m. on June 12th.

19  And can you -- let me see if I can brighten this up.  All

20  right.  So can you see the information that we asked you to

21  provide on that phone?

22  A        I see a target number.

23  Q        Hold on.  Is that a little bit better?  If you have

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

496

1    to step off the witness stand --

2    A        I can see it now, thanks.

3    Q        Okay.  All right.  So the green area that you've

4    determined, what's the significance of that green circle?

5    A        In the center of it would be where the tower is

6    located.

7    Q        All right.

8    A        And then going out from there is the radius that the

9    cell phone company provides to you, the possibility of the

10   handset being --

11   Q        And we have the date, the time.  Now there's no

12   number dialed because these are what we call the pings?

13   A        That's correct.

14   Q        All right.  And this location shows us -- I know

15   you're not familiar with Trumbull County, but this looks like

16   the bottom of Mosquito Lake, it's in Cortland, on the right

17   here, Champion Heights?

18   A        Yes.

19   Q        And you dropped the pins down at the bottom where it

20   says "victim's car and 713 Mason Street"?

21   A        Correct, yes.

22   Q        All right.  And there's another pin to the north of

23   there that is the address that we gave you showing where the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    defendant lived?

2    A        Yes.

3    Q        And I'm going to pull this down a little bit.  And

4    then there's a -- there's a location that says "body

5    location"?

6    A        Yes.

7    Q        We gave you that information and the coordinates

8    where that was?

9    A        Yes, sir.

10   Q        Okay.  So there's a series of pings that you took

11   from that phone.  I'll try and get the color back.  So now

12   we're looking at another ping.  Can you tell us when that ping

13   occurred and where the location is?

14   A        The --

15   Q        The date and time.  If you can't see it, by all

16   means --

17   A        Yeah.  No, the date and time is going to be 6-12-17

18   at 3:35 a.m.

19   Q        All right.

20   A        And then it gives the beginning location, which is

21   the lat and long of the tower.

22   Q        All right.  And the lat and long is what you're

23   referring to as latitude and longitude?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

498

1    A        Yes, sir.  Yes.

2    Q        Okay.  I believe these pings are in chronological

3    order.  Here is another one with a very, very, very small

4    circle on that; correct?

5    A        Yes.

6    Q        Can you point that out where the small circle was for

7    this tower?

8    A        Yeah.  It's right here.

9    Q        And I believe that's just a little bit south of

10   Route 82 and State Route 5?

11   A        Yes.

12   Q        According to that map?

13   A        Yes.

14   Q        I'll put another page on there.  And what date and

15   time was that located at?

16   A        5-12-17 at 5:41 a.m.

17   Q        A.m.?

18   A        Yes.

19   Q        That's June 12th again?

20   A        Yes.

21   Q        And now I'll put the next page up.  And can you see

22   where that location is?

23   A        Yes.  It's right here.

499

1  Q      And on that map, or I'm sorry, on that longitude and

2  latitude information, what time and date -- what date and time

3  was that ping recorded?

4  A      6-12-17 at 5:44 a.m.

5  Q      All right.  The next page, do you see that?

6  A      Yes, sir.

7  Q      All right.  And what is the date and time on that

8  ping?

9  A      6-12-17, 5:45 a.m.

10 Q      And you would agree with me that these last few pings

11 have been moving from a northerly to a southerly direction if

12 north is at the top of the page?

13 A      Yes.

14 Q      All right.  The next ping?

15 A      6-12-17 at 9:57 a.m.

16 Q      And is that ping, at that time, on June 12th at --

17 what time is that?

18 A      9:57.

19 Q      9:57 in the morning.  Is that relatively close to

20 where you have marked the victim's car?

21 A      Yes.

22 Q      And is it within -- and within that circle, is there

23 a street called 713 Mason Street?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

500

1    A        It appears to be, yes.

2    Q        Okay.  Now there's another photograph.  And can you

3    tell me the date and time of that ping?

4    A        6-12-17 at 10:57 a.m.

5    Q        And, again, located within that cell phone tower

6    usage that was provided by AT&T, using their longitude and

7    latitude and the information they provided, located within

8    that circle, do you see where the victim's car was located?

9    A        Yes, sir.

10   Q        And do you see the pin where 713 Mason Street is

11   located?

12   A        Yes, sir.

13   Q        All right.  And 713 Mason, when you put it into

14   Google Earth, it just tells you where it is; right?

15   A        Correct.

16   Q        Do all of those photographs fairly and accurately

17   depict the map that you created based on AT&T's latitude and

18   longitude records that were subpoenaed and given to you in

19   State's Exhibit 22?

20   A        Yes.

21   Q        All right.  Now I'm going to show you State's

22   Exhibit 51.  And just to refresh the jury, State's Exhibit 51

23   is mapping you did in reference to calls or text messages that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

501

1   were made; correct?

2   A        Correct.

3   Q        And that's the -- what we call the AU report?

4   A        That's what AT&T refers to them.

5   Q        AT&T refers to it.  I'm sorry.  I'm going to start,

6   first of all, with the time.  All right.  And is there a way

7   to tell whether this was a call or a dialed number or you just

8   know it was dialed you can't tell whether it was a text or

9   phone call?

10  A        Not by this, no, I don't.

11  Q        So we just know there was a text or a call made and

12  we have the number that was used; correct?

13  A        Correct.

14  Q        And these are from the official records at AT&T?

15  This, again, came from AT&T, Exhibit 22?

16  A        Correct.  Yes.

17  Q        What time -- what date and time was the tower used in

18  this phone call -- or I mean in this action?

19  A        6-12-17 at 2:08 a.m.

20  Q        And is that tower being used there?  Can you see what

21  city that's in?

22  A        That looks like it's near Niles.

23  Q        And is it within the radius or usage of where 713

502

1    Mason Street would be?

2    A        Appears to be, yes.

3    Q        And where the vehicle was found?

4    A        Yes.

5    Q        All right.  I will put on the next photograph or the

6    next usage which was either a text or a phone call.  Again,

7    can you see the date and the time?

8    A        Yes, I can.

9    Q        And what was the date and time that AT&T provided to

10   you to create this map?

11   A        6-12-17 at 2:08 a.m.

12   Q        And there is the number that was dialed?

13   A        Yes.  The number and the number dialed also.

14   Q        And, again, do you see the usage, the cell phone

15   tower usage is 713 Mason Street, Niles, Ohio included within

16   that cell phone tower usage area?

17   A        Yes.

18   Q        And by the way, these are all from these phone

19   records which you've described as (330) 891-7261?

20   A        Yes.

21   Q        Yes.  And that was the phone that you previously

22   testified was assigned to Austin Burke?

23   A        Yes.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

503

1    Q       Was the subscriber?

2    A       Yes.

3    Q       What date and time are we looking at here?

4    A       6-12-17, 2:09 a.m.

5    Q       And, again, is that cell phone tower usage, is 713

6    Mason street, Niles, Ohio included in that area?

7    A       Yes.

8    Q       All right.  I'm going to show you this page of

9    Exhibit -- State's Exhibit 51.  Do you see the date and the

10   time?

11   A       Yes.

12   Q       Okay.  And what is the date and time for this usage?

13   A       6-12-17, 2:29 a.m.

14   Q       Okay.  And let me ask you.  The pings had circles on

15   them, that report; is that correct?

16   A       Yes.

17   Q       These have sort of pie-shaped pieces.  Why is that?

18   A       The NELOS report, the historical ping locations, just

19   gives you a radius.  So it's an encompassed circle of

20   somewhere within that circle.

21           This is actually a tower and a sector that's given by

22   AT&T.  So a tower is broken down typically into three sides,

23   and this is what side AT&T is saying was used on that tower.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

504

1   Q       According to their own records?

2   A       Yes.

3   Q       Okay.  So you have a cell phone tower -- the first

4   document I showed you just short of showed all three of those

5   sides?

6   A       Yes.

7   Q       The phone or text messages which we're looking at now

8   just show you that one-third pie shape?

9   A       Yes, sir.

10  Q       All right.  Now I'm going to show you another page

11  from your report, State's Exhibit 51; do you see that?

12  A       Yes.

13  Q       And can you tell us the date and time on that?

14  A       6-12-17, 3:07 a.m.

15  Q       And, again, is 713 Mason Street, Niles, Ohio within

16  that coverage area?

17  A       It appears to be, yes.

18  Q       Can you tell us this location -- or I'm sorry -- the

19  date and time on this location?

20  A       6-12-17, 3:07 a.m.

21  Q       And, again, is 713 Mason Street within that coverage

22  area?

23  A       Yes.


                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

505

1    Q        Now I'm going to have you look at this location.  Now
2    do you see usage from that phone in a different location?
3    A        Yes.
4    Q        And what date and time are we talking about here?
5    A        6-12-13 at 3:46 a.m.
6    Q        And the location now is not Mason Street, and it's
7    also not where the location of the car was?
8    A        Correct.
9    Q        All right.  Now the next usage we have, can you tell
10   me the date and time of that usage?
11   A        6-12-17 at 5:14 a.m.
12   Q        And although we are not in the location of where the
13   body was found, you would agree that that's a lot closer than
14   where we were with the cell phone towers at 713 Mason Street?
15   A        Correct.
16   Q        All right.  And from that point on, there were a
17   number of calls.  And I'm not going to publish them all to the
18   jury, but there were a number of calls continued to be made in
19   that area?
20   A        Yes.
21   Q        And we know eventually, though, because you've
22   previously testified as to the pings, that that handset was
23   then pinging at, you said I think about 9:50 in the morning

506

1   back in the Niles area?

2   A       I believe so.  I'd have to look again.

3   Q       If I -- if I had you review that, State's

4   Exhibit 51 -- or I'm sorry, State's Exhibit 50.  Yeah.  These

5   two right here.  That one and the next one.

6   A       Okay.

7   Q       So you would agree that the ping for that same phone

8   number was made at what time?

9   A       9:57 and 10:57 I'm looking at.

10  Q       And that would have been back down in the area where

11  713 Niles was?

12  A       Correct, yes.

13  Q       Okay.  All right.  Do these records fairly and

14  actually depict the information that you posted into the

15  mapping program?

16  A       Yes.

17  Q       And the originals are in your file and you have

18  those?

19  A       Yes.

20              MR. BECKER:  Your Honor, I have no further

21  questions.

22              THE COURT:  Cross.

23              MR. OLSON:  Thank you, Your Honor.


                OFFICIAL COURT REPORTER
              TRUMBULL COUNTY * WARREN, OHIO

| | |
|---|---|
| 1 | <u>CROSS EXAMINATION</u> |
| 2 | BY MR. OLSON: |
| 3 | Q       Good afternoon, sir. |
| 4 | A       Hello. |
| 5 | Q       Is it Detective Moskal, Mr. Moskal? |
| 6 | A       Bill is fine with me. |
| 7 | Q       Bill.  Okay, Bill.  We just went over your analysis |
| 8 | that you performed.  When did you get this analysis to -- or |
| 9 | the assignment? |
| 10 | A       Few months ago.  I don't remember the exact date. |
| 11 | Q       Okay.  It wasn't back in June?  It was later on? |
| 12 | A       Yes. |
| 13 | Q       Like closer to today? |
| 14 | A       Yeah, a few months ago. |
| 15 | Q       Okay.  And that was on the request of Detective |
| 16 | Greaver? |
| 17 | A       Yes, sir. |
| 18 | Q       Had there been any other requests prior to that to do |
| 19 | this and you were just too busy or weren't able to get around |
| 20 | to it? |
| 21 | A       No. |
| 22 | Q       Okay.  And you would agree with me that the only |
| 23 | phone number that you did this for was the one that we are now |

508

1   looking at -- right now, the (330) 891-7261; is that correct?

2   A       Yes.

3   Q       They could have submitted multiple people and you

4   could have done the same type of analysis; is that correct?

5   A       Yes.

6   Q       Okay.  And I just want to go over -- okay.  So we

7   have the ping and we have the almost -- is it called

8   triangulation?  Is that --

9   A       No.  That would be a way to find a tower.  These are

10  just cell phone towers that the handset used to connect with.

11  Q       Okay.

12  A       So it's just -- Report AU is what AT&T calls it.

13  Q       So when you issued your report, you had a cover page;

14  is that correct?

15  A       Yes.

16  Q       And there is one section that says, "Disclaimer for

17  cell site analysis"; is that correct?

18  A       Uh-huh.

19  Q       And this reads, "This analysis is based solely on

20  cell site locations provided by AT&T"; correct?

21  A       Yes.

22  Q       It further states, "These locations are the cell

23  sites that the handset phone number connected to, not the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

509

1   location of the handset phone number itself"?

2   A        Correct.

3   Q        Can you explain to us what that means?

4   A        Sure.  So in the AU report -- that's the one with the

5   pie sections -- the phone would have hit off that tower in

6   that sector.  And it connected to that tower.  It can't

7   give -- I can't give a location, neither can that report, of

8   where exactly that phone was at on 123 Main Street, an

9   example.  I can't find that information out.  It's just

10  connected with that cell phone tower.

11  Q        Okay.  And also on page 2 of your cover page it would

12  read, "This analyst providing this mapping cannot testify in

13  court to the following:  Actual range, signal strength, or

14  coverage area of the cell site"; correct?

15  A        Uh-huh.

16  Q        "Network traffic, activity on a cell site during a

17  specific date and time"?

18  A        Yes.

19  Q        "Maintenance performed on a cell site during a

20  specific date and time"?

21  A        Correct.

22  Q        "Or weather and geographic variables affecting a cell

23  sites's operation"?

510

1    A        Correct.

2    Q        And then it says, "It is recommended that the phone

3    carrier be contacted for this type of testimony"; is that

4    correct?

5    A        That's -- yes.

6    Q        And why do you put that disclaimer in here?

7    A        That was given to me by my supervisor because those

8    are things that we cannot testify to.

9    Q        But why -- why would it matter if there was

10   maintenance on a cell site or geographic or weather variable?

11   A        I'm not sure.

12   Q        Is it possible that if I'm in a specific area and I

13   am behind a wall using my cell phone I may not connect to the

14   closest tower because I'm being -- my signal is being blocked

15   by it?  Is that possible?

16   A        It's possible.

17   Q        Okay.  And same with weather?  If there's weather in

18   an area, isn't it possible that signals can be impacted and go

19   in different directions?  Possible?

20   A        Possible.

21   Q        If there's maintenance on a tower that makes a tower

22   down in a certain location, your cell would then go out to a

23   different tower or search for a different tower; correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

511

1    A        Possible, yes.

2    Q        Okay.  And also, when we look at records that are

3    issued by phone companies such as AT&T, we have records that

4    are classified as mobility and -- have you worked with AT&T in

5    the past and talked with their analysts?

6    A        AT&T's analysts?

7    Q        Correct.

8    A        I've worked with their records before, not with their

9    analysts.

10   Q        Okay.  So you've been familiarized with the term on

11   records mobility; correct?

12   A        I've heard it before, yes.

13   Q        Okay.  And mobility identifies the cell towers which

14   your phone is hitting?

15   A        Okay.

16   Q        Correct?  We also have a record that states,

17   "Historical precision location information."  Have you ever

18   seen those records?

19   A        Yes.

20   Q        The historical precision location information tells

21   you where your actual device is based upon the signals and GPS

22   on your phone?

23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

512

1   Q       Did you look at the historical precision location
2   information when you were doing your analysis?
3   A       That's the NELOS report.
4   Q       Okay.  That's the NELOS report that is these pie
5   shapes?
6   A       No, the circles.
7   Q       The circles.  Okay.  So at any point in time as you
8   went through your analysis and you did these maps, there was
9   nothing that covered the spot where it showed body location;
10  is that correct?
11  A       I'd have to review it.
12  Q       Well, you have the reports with you right now?
13  A       No.
14  Q       Oh.  Starting with Exhibit 51 -- and, again, we'll go
15  back to the timeframe that was previously reviewed by the
16  prosecution of 2:00 a.m. to 9:00 a.m. on June 12th of 2017.
17  Are there any of those pie shapes that cover the area that the
18  body location is on?
19  A       You'll have to give me a second to go through all of
20  'em.
21  Q       Sure.
22  A       What was the timeframe again?
23  Q       From 2 a.m. until 9:00 a.m.  Or actually I believe it

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

513

1   was later.  9:57 a.m. I believe.

2   A       Okay.  No.

3   Q       Not one covers that area; is that correct?

4   A       It's near there, but --

5   Q       But it's also near Mr. Burke's residence; is that

6   correct?

7   A       Correct.  Yes.

8   Q       And the ones that show -- again, we went over it and

9   you said it shows the side of the tower that is being

10  contacted; is that correct?

11  A       Yes.  The sector, right.

12  Q       And when you look at the cell phone reports that you

13  have in front of you, when Mr. Burke is in the Bristolville

14  area, his home is on the same side that the phone is

15  communicating with the tower; is that correct?

16  A       I can't say whether or not -- there's multiple --

17  let's see.  His residence falls within a tower and a sector.

18  Q       Okay.  So you would expect that if he made a phone

19  call from his residence that it would fall within that sector

20  as you're displaying on your report?

21  A       Yes.

22  Q       Now, did you go into the earlier parts of the day,

23  such as from 2 p.m. on the 11th until 11:00 p.m. that night?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

514

1   A        No, I did not.  This was -- I started at midnight on
2   the 12th.
3   Q        Okay.  And you would be capable of identifying that
4   information and putting it on a chart and a graph just like
5   you did on all this other information?
6   A        Yes.
7   Q        And if you did that, you would have been able to
8   identify whether Mr. Burke was in the area of somewhere like
9   Willow Lake which is in the Bristol area; correct?
10  A        No, I can't say he was there.  I could say the
11  handset --
12  Q        Correct.
13  A        -- was in the area.
14  Q        You would be able to identify if he was in the range,
15  if Willow Lake would fall in that range; is that correct?
16  A        The handset, yes.
17  Q        And you didn't do that?  You weren't asked to do
18  that?
19  A        I don't remember Willow Lake, no.
20  Q        Okay.  And you weren't asked about, again, any other
21  phones to analyze?
22  A        No.
23                  MR. OLSON:  One moment, Your Honor.


                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

515

1   BY MR. OLSON:

2   Q        I'm sorry.  I didn't ask.  On the ones with the

3   pings, with the circles, if we would go same timeframe,

4   between 2 a.m. and 10:00 a.m. on the 12th, is there any of

5   those circles that encompassed the body location?

6   A        I need to review that also.  This is --

7   Q        I believe it was behind.  Oh.  I'm sorry.  I set it

8   on this table.

9   A        Yeah.  Here we go.

10  Q        And that, for the record, is Exhibit 50?  50?

11  A        I don't see one.

12  Q        So as you sit here today -- and that's your full

13  report; is that correct?

14  A        Yes, sir.

15  Q        And as you sit here today, you can say based upon

16  reviewing your report that there was no ping or communication

17  that would encompass the body location?

18  A        I don't see one, no.

19              MR. OLSON:  Thank you.  No further

20  questions.

21              THE COURT:  Redirect.

22              MR. BECKER:  Yeah.  Very briefly.

23              REDIRECT EXAMINATION

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

516

1    BY MR. BECKER:

2    Q        First of all, with respect to the pie shapes, which I

3    believe is the AU report, that -- in order to generate the

4    record with my cell phone carrier, in this case AT&T, I have

5    to either call somebody or text somebody; right?

6    A        Yes.

7    Q        And you've previously testified that those pings are

8    just sort of random times; right?

9    A        Yes, sir.

10   Q        For the NELOS -- how do you pronounce it?

11   A        NELOS.

12   Q        NELOS report?

13   A        Yes.

14   Q        And sometimes those pings can be many, many minutes

15   or maybe even an hour or two long without a ping; correct?

16   A        I've noticed that, yes.

17   Q        Yes.  So even on AT&T's records, I could physically

18   be somewhere, not use my phone for an hour or two, and not

19   have my phone ping for an hour or two; correct?

20   A        It's possible, yes.

21   Q        And therefore, there would be no record of that;

22   right?

23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

517

1  Q     So it's totally possible to be somewhere where you

2  wouldn't be on that map because you didn't use your phone,

3  either by text or phone call, and the phone company didn't

4  ping my phone?

5  A     It's possible, yes.

6                MR. BECKER:  All right.

7                THE COURT:  Recross?

8                MR. OLSON:  I have nothing further, Your

9  Honor.

10               THE COURT:  You may step down.  Thank you.

11               THE WITNESS:  Okay.

12               THE COURT:  Mr. Becker, you still need a

13  couple minutes?

14               MR. BECKER:  Can I have just like five

15  minutes, just a quick break to make sure?

16               THE COURT:  We're going to excuse the jury.

17  We have a problem with the technology getting the next

18  presentation for you.  It will just take a short period of

19  time.  We'll just take a ten-minute break.

20      Again, report down to the petit jury room.  Do not

21  discuss this case among yourselves, nor with anyone else.  Do

22  not form or express an opinion.

23             (Whereupon, a recess was had commencing at

518

1   1:58 p.m. and concluding at 2:12 p.m.)

2                   THE COURT:  Mr. Becker, you may call your

3   next witness.

4                   MR. BECKER:  Thank you, Your Honor.  The

5   state would call Mike Roberts.

6                           *   *   *

7                   MICHAEL A. ROBERTS,

8   having been duly sworn, was examined and testified as follows:

9                       DIRECT EXAMINATION

10  BY MR. BECKER:

11  Q       Would you please introduce yourself to the jury?

12  A       I'm Michael Roberts, R-o-b-e-r-t-s.  I work at the

13  Bureau of Criminal Investigation, or as it's more commonly

14  referred to as Ohio BCI.  I work in the crime lab division,

15  assigned to the firearms department.  My classification is a

16  forensic scientist, which I analyze firearms and

17  firearms-related evidence.

18  Q       And you make analyses of firearms, including things

19  such as determining operability of firearms; correct?

20  A       That's correct.  Yes, sir.

21  Q       And you also attempt to make identifications of both

22  shell casings and bullets that have been fired from a

23  particular weapon?

519

1   A        That's correct.  Yes, sir.

2   Q        And we won't get into it today, but there are certain

3   ways you can do that both for a casing from a gun and for the

4   actual bullet that comes out of the barrel of a gun; correct?

5   A        Absolutely, yes, sir.

6   Q        All right.  Now, I want to direct your attention to

7   your BCI lab number 17-38207.  You have been subpoenaed here

8   today in that case.  I believe at one point you were given a

9   firearm to test and what was at the time believed to be a

10  fragment; is that correct?

11  A        Yes, sir.

12  Q        Okay.  What did you do when you received those items?

13  A        Well, I examined the fragment itself to determine if

14  I could see and determine if it was actually from a bullet.

15  And after that, I also examined the firearm for operability as

16  well.

17  Q        All right.  Well, let's talk about two things here.

18  I'm going to show you what has been marked for purposes of

19  identification State's Exhibit 1 and State's Exhibit 2.  We

20  have marked these for purposes in this courtroom as State's

21  Exhibit 1 or 2 -- 1 and 2.  However, BCI uses different

22  analysis; correct?  A different numbering system?

23          (Whereupon, State's Exhibit 2, Projectile, was introduced

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

520

1   for identification.)

2   A       Yes.  It's a BCI tracking number or case number

3   that's assigned to each case that's brought into our agency.

4   Q       All right.  So with respect to -- and it just so

5   happens in this case we reversed the numbers.  Your lab number

6   is our State's Exhibit 2, and I think that's your lab number

7   1; is that correct?

8   A       Correct.

9   Q       And our State's Exhibit 2 is actually your lab number

10  1?

11  A       Correct.

12  Q       Okay.  How do you recognize State's Exhibits 1 and 2?

13  A       I can recognize the envelope by the -- my initials

14  over the sealed tape, along with the BCI case number and item

15  number.  And the same reason for the box here.

16  Q       We've actually removed that firearm from its

17  safekeeping, but is that the firearm you examined?

18  A       Yes, sir.  I recognize it as well because my initials

19  are on the side of the firearm.

20  Q       Okay.  Now, Mr. Roberts, with respect to those, first

21  of all, State's Exhibit Number 2, were you able to determine

22  whether or not that actual item was from a bullet fragment?

23  A       During my analysis, I was unable to see any rifling.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    And it was a nonmetallic fragment.  So -- which is
2    inconsistent with being a bullet fragment.
3    Q       Okay.  So if that item were obtained from the autopsy
4    by the Trumbull County Coroner and he felt that might be a
5    bullet fragment, he would be incorrect?
6    A       Yes.  I would say it's not.  It's inconsistent.
7    There's nothing on there to tell me that it's a bullet
8    fragment.
9    Q       Okay.
10   A       Actually there's what looks to be -- appears to be
11   hair on it.
12   Q       All right.  So additionally, then, you were presented
13   that firearm which can you describe that firearm for me which
14   is State's Exhibit Number 1?
15   A       Sure.  It's a .22 long rifle caliber which is a small
16   caliber semiautomatic pistol.  And how you would load the
17   pistol is one of two ways.  You could raise up the barrel here
18   and put a cartridge here and then lower it.  Or you could put
19   cartridges in what's called a magazine.  Some people call it a
20   clip.  Technically it's called a magazine.  You would load
21   them in here and there's a spring that causes tension for
22   the -- and it pushes the cartridges upward.  You would put the
23   ammunition in here and load it this way and then put it into

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   the hand grip area up until you hear it click.  And then you

2   would pull the slide back and then release it and it would

3   load the first cartridge into the chamber of the semiautomatic

4   pistol and be ready to fire at that point.

5   Q       And you could shoot that gun without ever having to

6   reload it until you ran out of bullets in that magazine or

7   that clip?

8   A       That's correct.  That's the way it's designed, yes.

9   Q       And are you familiar or were you aware of how many

10  bullets that magazine would hold?

11  A       I did not measure this.  I wasn't asked to measure

12  how many the maximum capacity of the magazine is.

13  Q       More than one?

14  A       Yes.

15  Q       More than two?

16  A       Yes.

17  Q       Maybe about six or seven?

18  A       I would say -- I would say about nine.

19  Q       About nine in there?

20  A       Yeah, I would think so.

21  Q       All right.  Now, that clip and that magazine that you

22  just showed, once that gun is loaded, I could carry it around

23  for a year without taking that magazine out to put any bullets

523

1    in it; correct?

2    A        Correct.  You can carry it around as long as you

3    wanted to.

4    Q        And, in fact, someone else could have loaded that

5    gun, given it to me, and I could walk around for a year or two

6    with that handgun without ever touching that magazine?

7    A        Correct.

8    Q        All right.  Now, with respect to State's Exhibit 1,

9    did you determine whether it was operable?

10   A        Yes.

11   Q        And what did you do to determine its operability?

12   A        I loaded the magazine up, put it into the firearm

13   like I described earlier and went into our shooting room and

14   fired off two cartridges into the water tank and recovered the

15   bullets from the tank and the cartridge cases from the outside

16   of the tank.

17   Q        So you have an expert opinion as to whether or not

18   State's Exhibit 1 is actually a working firearm?

19   A        Yes.

20   Q        And it is?

21   A        Yes.

22   Q        Okay.  And you created a two-page report which I will

23   present to you as State's Exhibit Number 41.  I'm going to ask

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

524

1    you to look at this two-page report and tell me, is that a

2    fair and accurate copy of your original report?

3            (Whereupon, State's Exhibit 41, BCI Report, was

4    introduced for identification.)

5    A        Yes, it is.

6    Q        And your signature is on that report?

7    A        Yes, sir.  It's on the second page.

8    Q        Now with respect to that type of caliber gun, even

9    though you weren't presented to determine -- what was later

10   determined not to be a fragment by the Trumbull County

11   Coroner, you have examined calibers such as .22 handguns such

12   as this before; correct?

13   A        Correct.  Many times, yes.

14   Q        And you have, in the course of your career which

15   spans almost, what, 20, 25 years now?

16   A        Since 1992.

17   Q        All right.  That you've been with BCI?

18   A        Yeah.  Doing the same job.

19   Q        And there are many, many times when a .22 bullet is

20   fired into a person's body, whether it be their head or their

21   body, and there's nothing but fragments and you still can't

22   make a comparison; is that correct?

23   A        That's correct.  Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

525

| | |
|---|---|
| 1 | Q        That's because the .22-caliber is quite small? |
| 2 | A        Yes.  It has a smaller surface, yes. |
| 3 | Q        And that's what you really need in terms of making an |
| 4 | identification is you need those lands and grooves and the |
| 5 | things that leave the markings on a bullet or a shell casing |
| 6 | to make those? |
| 7 | A        That's correct.  We look at markings that are |
| 8 | imparted from the firearm onto the bullet and the cartridge |
| 9 | case as well to identify the projectile or cartridge cases |
| 10 | back to a particular firearm. |
| 11 | Q        And you were not presented with a cartridge casing in |
| 12 | this case? |
| 13 | A        Correct. |
| 14 |                   MR. BECKER:  All right.  I have nothing |
| 15 | further, Your Honor. |
| 16 |                   THE COURT:  Cross. |
| 17 |                   MR. HARTWIG:  Thank you, Your Honor. |
| 18 |                   CROSS EXAMINATION |
| 19 | BY MR. HARTWIG: |
| 20 | Q        Good afternoon, Mr. Roberts. |
| 21 | A        Good afternoon. |
| 22 | Q        Just -- really just a few questions. |
| 23 | A        Okay. |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

526

1 Q Okay.  Would you agree with me that all types of

2 handguns that can fire a .22-caliber would result in the same

3 finding?  Meaning many different types of guns can shoot a

4 .22-caliber bullet; correct?

5 A Yes. .22 -- are you talking .22-caliber pistols

6 and --

7 Q Yes.  Pistols.

8 A Yes.  They can fire -- there's different types of

9 pistols, yes.

10 Q So -- but if I fire five different pistols and they

11 all have .22-caliber bullets, the ending result, whether it's

12 into a body or a target, is going to be the same; it's a

13 .22-caliber; correct?

14 A Yes.  The bullet is going to be a .22-caliber bullet,

15 but they're going to have different rifling marks or tooling

16 marks from the barrel as the bullet travels through it.  And

17 that's how we can distinguish between one firearm and another.

18 Q Okay.  In this particular case, the detective did not

19 submit additional ammunition to compare to the ones that were

20 in the cartridge; correct?

21 A Correct.  What I was submitted was a pistol, a

22 magazine, nine cartridges, and that fragment.

23 Q All right.  And so you were not submitted a separate

527

1    baggie of additional .22-caliber bullets for comparison?

2    A       I was not, no.  To answer your question, no.

3    Q       All right.  Okay.  Your conclusion in your report is

4    still that item one was examined and found to contain one

5    nonmetallic off-white colored fragment.  So you still referred

6    to it as a fragment.  Were you able to determine what it was?

7    A       No.

8    Q       No?

9    A       No.

10   Q       How about the size of it?

11   A       Very small.

12   Q       Okay.  And I saw a picture of it.  It appears to have

13   hair on it; right?

14   A       Correct.

15   Q       All right.  All you know is that it's nonmetallic and

16   in your opinion it was inconsistent with a bullet?

17   A       That's correct.

18                    MR. HARTWIG:  Okay.  No further questions.

19                    THE COURT:  Redirect.

20                    MR. BECKER:  No, Your Honor.

21                    THE COURT:  All right.  You're excused.

22   Thank you.

23                    THE WITNESS:  Thank you, Judge.


                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1          MR. BECKER:  Thank you.

2          State would call Lynda Eveleth.

3                    *   *   *

4                    LYNDA EVELETH,

5     having been duly sworn, was examined and testified as follows:

6                    <u>DIRECT EXAMINATION</u>

7     BY MR. BECKER:

8     Q       Would you state your name for the jury, please?

9     A       Lynda Eveleth.

10    Q       Where are you employed?

11    A       The Ohio Bureau of Criminal Investigations located in

12    Richfield, Ohio.  It's commonly referred to as BCI.

13    Q       And what are your current -- or what is your current

14    job title?

15    A       Forensic scientist.

16    Q       And how long have you been employed there?

17    A       A little over 20 years and 11 months.

18    Q       What are your current primary duties there?

19    A       My duties include DNA testing in which I will compare

20    DNA profiles from evidence samples to DNA profiles from known

21    samples which are called standards.

22    Q       And can you tell this jury what your educational

23    background is?

1   A       I have a bachelor of science and I have a master of

2   science in biology.  Both are from the University of Akron.

3   Q       And have you received any specialized training in the

4   area of forensic DNA analysis?

5   A       I've completed approximately a year and a half DNA

6   training through BCI which included lectures, lab exercises,

7   practicals, and written exams.

8   Q       And approximately how many times have you performed

9   DNA analyses?

10  A       Thousands.

11  Q       And have you testified as an expert in any courts in

12  the state of Ohio?

13  A       Yes.

14  Q       And I believe you've been qualified as an expert here

15  in the courts of Trumbull County as well; correct?

16  A       Yes.

17              MR. BECKER:  Your Honor, I would move to

18  have Miss Eveleth qualified as an expert in the area of DNA.

19              THE COURT:  Any questions?

20              MR. OLSON:  No objection, Your Honor.

21              THE COURT:  She will be considered an

22  expert.  Proceed.

23  BY MR. BECKER:


                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

1    Q        Lynda, what is DNA?

2    A        DNA stands for deoxyribonucleic acid.  It's a long

3    string-like molecule that's found in our cells throughout our

4    body.  We receive half of our DNA from our mother and half

5    from our father.  It makes us who we are.  It will determine

6    if we are a plant or a human.

7    Q        And what makes DNA useful for forensic comparisons

8    here in the courtroom?

9    A        It is useful in forensics because no two people, with

10   the exception of identical twins, will have the same DNA.  So

11   when we're performing our DNA testing, we're able to tell one

12   person from another.

13            It's also useful in forensics because the DNA is the

14   same throughout the body.  If we receive evidence from a crime

15   scene in the form of blood, we can compare that DNA profile to

16   a known sample which would be a swabbing from a mouth.

17   Q        All right.  And Lynda -- or Miss Eveleth I should

18   say -- did you conduct any DNA testing on samples that were

19   submitted to you from the Warren Police Department in Case

20   Number 17-38207?

21   A        Do you have a copy of my report?

22   Q        I do.  I will approach you and hand you what has been

23   marked for purposes of identification as State's Exhibit 42.

1        (Whereupon, State's Exhibit 42, BCI Report, was

2   introduced for identification.)

3   A       I'm able to identify this as the BCI report that was

4   written for the DNA results for this particular case.  It will

5   have the BCI lab number at the top with my initials and my

6   signature.

7   Q       All right.  And that's a fair and accurate copy of

8   your DNA results?

9   A       Yes.

10  Q       Okay.  And in this particular case, you were asked to

11  examine -- make a comparison between a known swab of DNA from

12  an individual named Austin Taylor Burke?

13  A       Correct.

14  Q       Okay.  And you attempted -- and I'm going to hand you

15  State's Exhibit Number 1.  Be careful because it's loose in

16  there.  But you were able to take swabbings from State's

17  Exhibit Number 1; is that correct?

18  A       I'm able to identify this by the BCI label that will

19  list the BCI lab number and item number.  This is a firearm

20  which samples were collected and DNA testing was performed.

21  Q       All right.  Now, with respect to your DNA testing,

22  you were unable to match Austin Taylor Burke's DNA to any

23  place on that firearm; correct?

1    A        Correct.

2    Q        All right.  You also got an unknown male suspect --

3    subject -- on the magazine; is that correct?

4    A        Yes.

5    Q        All right.  So you don't know who that is, do you?

6    A        No.

7    Q        You just know that the DNA profile is different?

8    A        Yes.

9    Q        All right.  So, Miss Eveleth, let me ask you this.

10   And those findings are depicted in your report; correct?

11   A        Yes.

12   Q        When we're talking about trying to obtain DNA from a

13   firearm, what kind of -- what kind of DNA -- or I'm sorry --

14   what generally is left on there?  I guess, what's on there?

15   A        When someone is handling a firearm, we're collecting

16   swabs from locations on the firearm to detect DNA.  So if

17   someone is handling an item, we are testing that item to see

18   if someone has handled it.

19   Q        All right.  And has it been your experience in 20

20   plus years at BCI that sometimes people can handle items and

21   not leave any DNA on it?

22   A        Yes.  That is possible.

23   Q        All right.  If someone were to wipe that off with a

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

533

1  rag -- because all we're talking about basically is just skin

2  cells that may have fallen off on that item, if it's not

3  blood; right?

4  A        If DNA is wiped off of an item then they will not

5  detect DNA.

6  Q        All right.  And if there's simply not enough DNA to

7  gather, you won't detect it either?

8  A        If there isn't enough DNA then my report will state

9  that data was not suitable for comparison, which means there

10 isn't enough DNA present to detect a DNA profile to make a

11 comparison.

12 Q        Does that mean there's no DNA there?  Or it just

13 means there is not enough?

14 A        It doesn't mean that DNA is not there.  DNA was

15 detected, but there isn't enough DNA to make a comparison.

16 Q        And what did you find in this particular case

17 regarding the swabbed areas that came -- that were not

18 identified as a third person?

19 A        There was a swab of the trigger, item 2.1.  That data

20 was not suitable for comparison.

21          There was a swab of the handle areas, which is item

22 2.2, and data was not suitable for comparison.

23          There was a swab from the magazine, item 2.3, which

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

534

1   was a mixture.  A mixture means it's consistent with more than

2   one person contributing to the DNA.  On this particular

3   sample, an unknown male DNA profile was detected.  And there

4   was additional data that was not sufficient for comparison.

5   Q       All right.  Go ahead.

6   A       And there was a swabbing of the rounds, which was

7   item 2.4, and the data was not suitable for comparison.

8   Q       All right.  So you have -- I just want to be clear on

9   what we're talking about here.  If I could take a look at your

10  report very briefly here.  You have not -- data not suitable

11  for comparison from the trigger, the handled areas, and the

12  rounds.  And you have a mixture where it's an unknown male.

13  And we don't know who that is.  But when you say "data is not

14  suitable for comparison," does that mean there was something

15  there and you just didn't have enough DNA?  Or there was

16  nothing there?

17  A       It means DNA was detected but there isn't enough DNA

18  to make a comparison.

19  Q       All right.  So it's possible anyone could -- there's

20  somebody's DNA on there.  We just didn't have enough,

21  basically?

22  A       Yes.

23  Q       For your purposes of your testing?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

535

1    A        Correct.

2    Q        Okay.  And the results you've put into that form

3    which you've already testified to as a fair and accurate copy?

4    A        Yes.

5                    MR. BECKER:  May I have one moment?

6    Q        And finally, Miss Eveleth, basically what you're

7    testifying here today is that sometimes you don't always get

8    enough DNA to test; correct?

9    A        Correct.

10   Q        And that was the case in this particular instance?

11   A        Yes.

12                   MR. BECKER:  Thank you.

13                   THE COURT:  Cross.

14                   MR. OLSON:  Thank you, Your Honor.

15                   <u>CROSS EXAMINATION</u>

16   BY MR. OLSON:

17   Q        Good afternoon, Miss Eveleth.

18   A        Good afternoon.

19   Q        Just real quickly going over your report of August

20   10th of 2017.  Again, you tested the DNA of Austin Burke and

21   compared it to the swabs of the trigger, handle areas,

22   magazine, and rounds; is that correct?

23   A        The DNA testing that was performed on those samples

536

1    from the firearm, those DNA profiles were compared to the

2    standard from Austin Burke.

3    Q        Okay.  And you did not receive any additional DNA

4    samples from any other individuals such as a Nicholas Goett or

5    anybody like that?

6    A        No.

7    Q        And, again, when we look at area 2.3, swab of

8    magazine, it indicates a mixture on your DNA conclusions,

9    unknown male, sufficient for comparison, major, Austin Burke

10   excluded, major.  So can you explain to me each line.  So

11   "mixture," what do we mean there?

12   A        A mixture means it's consistent with more than one

13   person contributing to the DNA profile.

14   Q        Okay.  And skipping down to "Austin Burke, excluded

15   major," that means when you test that -- and even though there

16   is a mixture of more than one person contributing, he was not

17   one of those people contributing; is that correct?

18   A        A mixture can be a DNA profile that's consistent with

19   two contributors in about the same amount of DNA, or there can

20   be a mixture where there's more DNA from one contributor from

21   another.

22           If there is a mixture with more DNA from one

23   contributor, that's called the major contributor.  The portion

1    of the DNA that's present in a lesser amount is the minor

2    contributor.

3            So for this particular sample, the swab of the

4    magazine, Austin Burke is excluded as the major contributor

5    for the sample.  There was additional data that was detected,

6    but there isn't enough to make a comparison to the additional

7    data.

8    Q       So what you're saying, though, is you cannot identify

9    Austin Burke as the minor or major contributor or say that he

10   ever handled the swab [sic] of the magazine based upon your

11   analysis; correct?

12   A       There wasn't a DNA profile that was present to make

13   a -- that was compared to Austin Burke that was consistent

14   with Austin Burke.

15   Q       Okay.  And then that's the same for the swab of the

16   trigger, handle areas, and rounds?

17   A       Correct.

18   Q       So when you received this firearm, based upon your

19   analysis, you can make no conclusion that Austin Burke had

20   handled that firearm?

21   A       I don't know if he handled the firearm.

22   Q       But you do know somebody handled the swab of

23   magazines, but we do not know who because you did not receive

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

538

1   that DNA profile; correct?

2   A        Correct.

3   Q        And when we look at the DNA suitable for comparison,

4   you're saying, well, there's some DNA there, it's just not

5   enough to test against, that could be the DNA from this

6   unknown male; is that correct?

7   A        I don't know who contributed the DNA to those

8   samples.

9   Q        So I'm just saying it could be?  Could be him?  Could

10  be anybody; correct?

11  A        It's DNA from a person.  I don't know who that person

12  is.

13                  MR. OLSON:  Thank you.  No further

14  questions.

15                  THE COURT:  Redirect.

16                  MR. BECKER:  No, Your Honor.

17                  THE COURT:  All right.  You may step down.

18  Thank you.

19          Call your next witness.

20                  MR. BECKER:  State would call Dan Lester.

21                        *   *   *

22                  DAN LESTER, JR.,

23  having been duly sworn, was examined and testified as follows:


OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

539

1                          <u>DIRECT EXAMINATION</u>

2    BY MR. BECKER:

3    Q       Would you state your name for the record, please?

4    A       My name is Dan Lester --

5    Q       Go ahead.

6    A       -- Jr., I was going to say.

7    Q       And where are you employed at?

8    A       Trumbull County Sheriff.

9    Q       What is your title there?

10   A       I'm a lieutenant with the Sheriff's Office in the

11   jail division.

12   Q       And what are your duties as a lieutenant in the jail

13   division?

14   A       I'm the security officer, as well as the

15   administrator of the GTL phone system.

16   Q       And what is the GTL phone system?

17   A       That is the inmate phone call recording system.

18   Q       All right.  Now, how long have you been with the

19   Trumbull County Sheriff's Department?

20   A       29 years.

21   Q       So as the administrator of the GTL phone system, can

22   you please tell this jury how that phone system works?

23   A       An inmate will pick up the phone and enter a six

540

1    digit PIN and enter a secure 4 digit PIN and call out.

2    Q      Inmates can't receive calls coming in to them;

3    correct?

4    A      No, sir.

5    Q      So when an inmate is booked into the jail, he's given

6    these PIN numbers and they're unique to each and every inmate?

7    A      That's correct.

8    Q      So when an inmate wants to call someone, he has to

9    use that PIN system to call out?

10    A      Correct.

11    Q      To whatever number they want to?

12    A      Right.

13    Q      And just for purposes of clarification, the

14    attorney jail-- calls made to attorneys are not recorded;

15    correct?

16    A      That's true.

17    Q      All right.  And there's a different way that they go

18    about when they want to speak to their attorney?

19    A      Yes.

20    Q      Okay.  Now, all of the calls other than the ones to

21    their attorneys are recorded; is that correct?

22    A      Yes.

23    Q      And they are digitally stored in the -- in an area or

```
1    location where you have access to them; correct?

2    A       Correct.

3    Q       And you are able to record those digitally recorded

4    phone calls?

5    A       Yes, I am.

6    Q       All right.  I asked you to record a phone call made

7    on June 27, 2017, at around 12:25 p.m. from inmate Austin

8    Burke; is that correct?

9    A       Yes, it is.

10   Q       And you have done that and you've brought a

11   digital -- or a flash drive that I have inserted into this

12   laptop here; correct?

13   A       Right.

14   Q       All right.  As part of your duties, you have also

15   listened to other jail phone calls of Austin Taylor Burke?

16   A       Yes, I have.

17   Q       And you're familiar with his voice?

18   A       Yes, I am.

19   Q       All right.  I'm not going to touch this.  If I could

20   have you step down.  I'll probably mess it up.

21                   MR. BECKER:  Your Honor, could we take --

22   and I hate to indulge the Court, but can I take a

23   five-minute -- we may attempt to use the court's laptop
```

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

542

1  player.

2                    THE COURT:  Ladies and Gentlemen, we have a

3  technology problem.  We will take another ten minutes.  Do not

4  discuss this case among yourselves, nor with anyone else.  Do

5  not form or express an opinion.

6                    (Whereupon, a recess was had commencing at

7  2:42 p.m. and concluding at 3:00 p.m.)

8                    THE COURT:  Return to the stand, please.

9  You remain under oath.

10          I think we have the glitches worked out now,

11  Mr. Becker.

12                    MR. BECKER:  Thank you, Your Honor.

13                    THE COURT:  Let's try it one more time.

14                    MR. BECKER:  Thank you, Your Honor.  I

15  apologize both to the Court and to the jury.  I'm not an

16  expert in high technology.  I probably spend too much time

17  fishing and swimming than computers.

18  Q       All right.  Officer Lester, when I left you, you were

19  talking about recorded phone calls.  I'm going to play you

20  what has been marked now for purposes of identification as

21  State's Exhibit Number 29 and ask you to listen to State's

22  Exhibit 29.

23          (Whereupon, State's Exhibit 29, Recorded Jail Phone

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

543

```
 1    Calls, was introduced for identification.)
 2                         (Whereupon, State's Exhibit 29 was played
 3    for the jury commencing at 3:01 p.m.)
 4                         MR. OLSON:  May we approach, Your Honor?
 5                         THE COURT:  You may.  Approach.
 6                         (At sidebar:)
 7                         MR. OLSON:  I just question what relevance
 8    this has at this point.
 9                         MR. BECKER:  He's almost to the point where
10    he says -- she asked him if the gun is registered and he says,
11    "No, I don't think so."
12                         MR. HARTWIG:  That's already been said.
13                         MR. BECKER:  Oh, did he say that?
14                         MR. HARTWIG:  Now they're just talking.
15                         MR. BECKER:  Oh.
16                         MR. HARTWIG:  Yeah.
17                         MR. BECKER:  I'm sorry.  Yeah, I'll stop it
18    here.  But I don't want it to -- I don't want -- if they want
19    me to stop it, that's fine.  I just don't want it to seem as
20    if I'm hiding anything.
21                         THE COURT:  I'll tell the jury.
22                         MR. BECKER:  Okay.  Tell the jury.
23                         (End of sidebar.)
```

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

544

1          THE COURT:  By agreement of the parties,

2   we're going to stop it at that time.  There's not anything

3   more relevant to this case in the rest of that phone call.

4          MR. BECKER:  Right.

5          THE COURT:  All right.  Let's proceed,

6   Mr. Becker.

7          MR. BECKER:  Okay.  Thank you, Your Honor.

8   BY MR. BECKER:

9   Q       Corrections Officer -- or Lieutenant Lester rather,

10  the voice that you've heard on there, you've confirmed through

11  the recording system that that is the call of Austin Burke?

12  A       Correct.

13  Q       And that's a fair and accurate copy of that telephone

14  call on June 27th, 2017 at about 12:25 p.m?

15  A       Yes, it is.

16  Q       And the voice that you recognize as the inmate, is

17  that individual named Austin Taylor Burke?

18  A       Yes, it is.

19  Q       And is he here in the courtroom today?

20  A       Yes, he is.

21  Q       Could you please identify him?

22  A       Light blue shirt, blue tie.

23          MR. BECKER:  Thank you, Your Honor.  I have

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

545

1    nothing further.

2                        THE COURT:  Cross.

3                        MR. OLSON:  No questions, Your Honor.

4                        THE COURT:  All right.  You may step down.

5    Thank you.

6                        THE WITNESS:  Thank you.

7                        THE COURT:  Call your next witness.

8                        MR. BECKER:  State would call Detective

9    John Greaver.

10                            *   *   *

11                   DETECTIVE JOHN GREAVER,

12   having been duly sworn, was examined and testified as follows:

13                        <u>DIRECT EXAMINATION</u>

14   BY MR. BECKER:

15   Q       Okay.  Would you state your name for the record,

16   please?

17   A       John Greaver.

18   Q       Where are you employed?

19   A       The Warren City Police Department.

20   Q       What are your duties there?

21   A       I'm in the investigations division of the police

22   department.

23   Q       And how long have you been with the Warren Police

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

546

1    Department?

2    A       16 years now.

3    Q       How long have you been in the detective division?

4    A       This is my seventh year in the detective division.

5    Q       All right.  Did you become assigned to the case of

6    Brandon Sample?

7    A       I did.

8    Q       All right.  Please tell this jury how you became

9    involved, and particularly what date, and then what you

10   started to do when you discovered that?

11   A       I was originally assigned this case on June 13th.  It

12   was a missing persons case.  After I was assigned the case, I

13   started calling hospitals to see if the missing person,

14   Brandon, was in the hospital.  And I also then called his

15   mother and spoke with her.

16           I then called Niles Police Department.  We had

17   learned that Brandon's car had been recovered on that -- on

18   the 13th, the day I was assigned the case, the car was

19   recovered in Niles.

20   Q       It was recovered before that; correct?

21   A       Correct.  That's when I learned that it was

22   recovered.  I apologize.

23   Q       Yeah.


                        OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

547

1   A        That's when I learned that it was recovered.

2   Q        And when you were assigned the case, what did you

3   know about it other than Brandon Sample had not been heard

4   from since Sunday -- or I'm sorry -- early morning hours of

5   Monday, June 12th?

6   A        When I had talked to Stephanie Sample, Brandon's

7   mother, she had told me that --

8                        MR. HARTWIG:  Objection.

9                        MR. BECKER:  It's not -- can we approach?

10                       THE COURT:  Approach.

11                       (At sidebar:)

12                       THE COURT:  What's the hearsay exception?

13                       MR. BECKER:  Yeah.  It's offered for the --

14  not for the truth of the matter, but for why he acted and what

15  he did.

16                       THE COURT:  Any other objection?

17                       MR. OLSON:  I do, Your Honor.  He has his

18  report with him.  I mean, unless he's not able to recollect, I

19  don't see why he can read from his report.  He has to base his

20  testimony on his recollection.

21                       THE COURT:  He can use it to refresh it.

22  You can take it away from him if you want to, but then you can

23  hand it back to him to refresh his recollection.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

548

1              MR. OLSON:  That's fine.

2              THE COURT:  I am going to overrule your

3    objection.  Let's go.

4              MR. BECKER:  Thank you, Your Honor.

5              (End of sidebar.)

6    BY MR. BECKER:

7    Q      Okay.  So were you telling us you made contact with

8    Brandon's mother at some point?

9    A      I did.

10   Q      And what did you do in response to what she told you?

11   A      Well, she had told me that he was with a friend named

12   Josh on Sunday and that him and Josh were going to mow his

13   grandmother's grass.  She also thinks that he was hanging out

14   with a male named Austin Burke whom he met at DYS when Brandon

15   was a corrections officer and Austin was an inmate.

16   Q      And from that point on, what did you do?  You, I

17   think, called the 911 center; is that correct?

18   A      I did.  I called the 911 center, explained to them

19   the situation that we had and Brandon -- the case of this

20   Brandon's missing person case qualified for us to ping his

21   phone to find out where his phone was or the area that it was.

22   Q      And what was the last known date and time where

23   Brandon's phone was known to be?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

549

1   A      The last time was Bristol on Monday morning at 4:38

2   in the morning.  That's what the 911 center advised me.

3   Q      And throughout this investigation, we have attempted

4   to subpoena the historical cell phone -- cell tower records

5   for that telephone; is that correct?

6   A      I did.

7   Q      And we have not received any response --

8   A      We have not.

9   Q      -- from his carrier?

10   A      We have not.

11   Q      All right.  At some point on the 13th after you had

12   spoken to Brandon's mother, you then began to do some other

13   things relating to this?

14   A      I did.  I was familiar with Austin's name from

15   previous cases.  I went to his house, knocked on the door.  We

16   did not get an answer at the door.  I left a card, my business

17   card, on the door for him to call me back.

18          I then received a call from Detective Ronnie Wright

19   from the Niles Police Department.  He advised us that a female

20   had contacted him with information on Brandon.  We then --

21   later that day we met with the Niles City detectives, and

22   there we met with Makayla Egbert.

23          Makayla introduced herself to us as Austin's

1    ex-girlfriend.  She went on to tell us things that she had

2    heard secondhand from other people.  She had told us that

3    Austin had killed Brandon on Hatchet Man Road.  Well, I

4    apologize.  No, she did not tell me Hatchet Man Road at that

5    point.  That was later on in the evening.  She told us that

6    she received information from Jessica Simms that Austin killed

7    Brandon.

8    Q       And later on you were able to determine a location

9    that you were getting through this Makayla Egbert that it was

10   Hatchet Man Road?

11   A       She called me later that evening and told me that she

12   had heard that Austin had dumped his body on Hatchet Man Road.

13   Q       All right.  And this would have still been on

14   June 13th?

15   A       Yes, sir, the evening of June 13th.

16   Q       And what did you do from that point?

17   A       I had not heard of Hatchet Man Road.  I'm not from

18   that area.  So I called a few deputies that I know, and they

19   were not sure.  So I then called a retired deputy and he did

20   some research and he thought it was the dead-end of Hyde

21   Oakfield Road which is also in that area, just a little bit

22   farther south than Peck Leach.

23           So the next morning we went up to Hyde Oakfield, my

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

551

1    partner and I.  We walked around.  There's supposed to be a
2    house on stilts back there and this Hatchet Man house.  But we
3    couldn't find it.  So we left.

4            I called the Ohio Department of Natural Resources.
5    They knew exactly what Hatchet Man was and exactly where it
6    was.  They knew the story behind Hatchet Man.  So we agreed to
7    meet them the following day and then they would take us back
8    there.

9    Q       That was June 15th?

10   A       Yes, sir.

11   Q       Okay.  And this was all based upon information that
12   you were getting from Makayla Egbert who indicated to you that
13   she was talking to Hayle Roupe?

14   A       Hayle Roupe's girlfriend Jess Simms.

15   Q       And Jess Simms?

16   A       Yes.

17   Q       And then what happened?

18   A       I had spoke with Shawn Andrews from the Department of
19   Youth Services.  He was Brandon's direct supervisor.  I did
20   confirm with Mr. Andrews that Brandon was working there while
21   Austin was an inmate there.

22   Q       And they confirmed that?

23   A       They did confirm that, that's correct.


                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1  Q        Now, at some point did you speak to Austin Burke
2  himself?

3  A        I did.

4  Q        Please tell the jury how that came about.

5  A        I was given a phone number for him and I had called
6  it and left him a message.  Or wasn't able to leave him a
7  message.  He had then called me right back on my office phone.
8  He agreed to meet me at his mother's house on Miller South
9  Road in Bristol.

10         So my partner and I, we drove to Bristol and spoke
11 with Austin at his house.  When we spoke to Austin at the
12 house, I asked him what was going on with Brandon.  And he
13 said, "Brandon picked me up on the way home from Willow Lake.
14 I was walking home.  He stopped and gave me a ride home."

15         He told me that he had another guy in the car with
16 him.  He couldn't remember his name.  He thought maybe it was
17 either Josh or Tyler.  And then drove him home to Miller South
18 Road in Bristol where Austin stayed there the rest of the
19 night.  He did not leave.

20 Q        And at that point, did you and your fellow detective
21 leave his home?

22 A        We did.

23 Q        All right.  He wasn't under arrest.  He was never

1    placed in custody?

2    A       He was not.

3    Q       Never Mirandized him because he was not in custody?

4    A       That's correct.

5    Q       And you then proceeded with your investigation;

6    correct?

7    A       Correct.

8    Q       And what did you do then?

9    A       After, we met the ODNR personnel at Route 45 and 88

10   and they took us to Peck Leach all the way to that dead-end

11   road where we all ended there at the jury view.

12           Now, the house on stilts with the Hatchet Man house

13   is about 500 yards past that location where that opening was,

14   where the bus and car were.  We stopped there.  So we walked

15   through those roads back to the Hatchet Man house.  We checked

16   that area.  We were not able to locate any signs or any

17   evidence of Brandon or that anybody had even been there.

18           It was at that point we had walked out back to where

19   we parked our cars where that opening was when we started to

20   smell something decaying.  And it was that point we checked up

21   over a small hill, the small hill in the pictures, and we

22   found Brandon lying there.

23   Q       And you were able to see the photographs that were

554

1    testified to here earlier by Detective Morris.  All of those

2    photographs fairly and accurately depicted the scene?

3    A        That's correct, sir.

4    Q        Including the photographs that I -- all of the

5    photographs that were on the disc which I believe we marked

6    State's Exhibit 52.  They all fairly and accurately depicted

7    the view that day?

8    A        That's correct.

9    Q        Even though there were some mud puddles out there,

10   there was a lot of very dry ground there?

11   A        It was very dry.

12   Q        Very different than when we went there Monday?

13   A        Very much so, yes.

14   Q        Obviously the overgrowth.  There was a lot of plants

15   there?

16   A        Yes.

17   Q        Could you tell if there was any activity going on

18   back there?

19   A        There was a current logging site.  We could hear them

20   logging in the distance.  The ODNR staff told us that there is

21   big logging trucks coming in and out of that road a lot.  We

22   didn't see any while we were there.  There wasn't anybody

23   else -- we didn't see any other people there while we were

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

555

1    doing our business there.

2    Q       And once the body was discovered, it was in the

3    position that we saw earlier?

4    A       That's correct.

5    Q       Did you then at some point notice the shoe?

6    A       I did.

7    Q       And the shoe would indicate to you that perhaps the

8    body was moved from a location and drug over that hill?

9    A       That's correct.

10   Q       Now, then the various members of other law

11   enforcement agencies were called, including Detective Morris,

12   to process and photograph that scene; correct?

13   A       That's correct.

14   Q       Were any shell casings found?

15   A       No, sir.

16   Q       Were there any shell casings that were -- or an

17   attempt to look for shell casings?

18   A       There were several attempts to look for shell

19   casings.

20   Q       And how was that done?

21   A       Well, the day we were there we looked.  The day we

22   found Brandon.  And then a few days later, I don't remember

23   the exact date, we went back to the scene and looked again for

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    shell casings.  And we just were not able to find any.

2    Q        All right.  And -- now at this point now we're on

3    to -- this would have been June -- June 15, 2017; is that

4    correct?

5    A        That's correct, yes.

6    Q        And you said you contacted -- and at some point you

7    were able to determine that Austin Burke had been to the

8    Department of Youth Services?

9    A        Correct.

10   Q        All right.  I'm going to hand you what's been marked

11   for purposes of identification as State's Exhibit 21.  It is a

12   certified copy of his adjudication.  It's a one-page document.

13   I'm going to hand you State's Exhibit 21.  Do you recognize

14   that item?

15       (Whereupon, State's Exhibit 21, Adjudication, was

16   introduced for identification.)

17   A        I do.

18   Q        What is State's Exhibit 21?

19   A        It is appearance of proceeding from juvenile court.

20   It shows Austin Burke was adjudicated.  Violation of

21   probation, aggravated burglary, unruly curfew, violation of

22   probation, protection order, and aggravated burglary.

23   Q        But aggravated burglary was the only one that he was

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    adjudicated on; correct?

2    A       Yes, that's correct.

3    Q       Does it have his parent's name on there, who his

4    mother would be?

5    A       It does.

6    Q       And what's the name?

7    A       It says, "Parent, Jamie Sell."

8    Q       She was present during those proceedings?

9    A       It would appear so, yes.

10   Q       According to that document?

11   A       According to this document, yes.

12   Q       And that document is certified?  It has a signature

13   from the Clerk of Courts and it's got like a raised seal on

14   it?

15   A       It does, yes, sir.

16   Q       All right.  So let's continue with your investigation

17   when we start talking about after your discovery of the body.

18   What did you do then?

19   A       After we discovered the body, based on the

20   information we were given, we had went and spoke with the

21   Sample family and informed them that we had found a body.  And

22   I had told them based on the information that we had that we

23   were pretty certain that it was Brandon.  I also informed them

558

1    that the coroner would have to make the final identification

2    because of the state of decomposition.

3    Q       And that was done at a later date by Trumbull County

4    Coroner, Humphrey Germaniuk?

5    A       That's correct.

6    Q       And we'll have him tomorrow testify as to how that

7    was done?

8    A       That's correct.

9    Q       Okay.  So then you began to interview some of these

10   witnesses that you were getting information through Makayla

11   Egbert from; correct?

12   A       That's correct.

13   Q       Including Makayla Egbert?

14   A       That's correct.

15   Q       And there were some of these witnesses, and we've

16   heard extensive cross examination on some of them, that were

17   not truthful with you initially; correct?

18   A       That's correct.

19   Q       One would be Rickey Roupe?

20   A       Correct.

21   Q       Nathan Moats?

22   A       Correct.

23   Q       And they eventually, though, came back to you a

559

1    second time and indicated to you that they had been untruthful

2    with you the first time?

3    A      That's correct.

4    Q      All right. As far as Jessica Simms and Hayle Roupe,

5    they never really wavered from their statement, did they?

6    A      No.

7    Q      You attempted -- or you actually spoke to Brittani

8    Merten; is that correct?

9    A      I did.

10   Q      She indicated that pretty much she didn't have any

11   contact with him, but she testified earlier as to her phone

12   calls; correct?

13   A      Brittani had told me that she had never asked Austin

14   about Brandon. But when Rickey and Brandon were -- Rickey and

15   Austin were talking about Brandon she would leave the room so

16   she didn't know what they were saying.

17   Q      Okay. Now, the location -- and I believe Detective

18   Morris testified to this -- but the location where the body

19   was found on Hatchet Man Road, do you know what county that

20   was in?

21   A      That's in Trumbull County.

22   Q      Okay. Now, when you were at the location there, you

23   then -- or I'm sorry -- after the location, you went and spoke

560

1    to a number of the witnesses.  You tried to track down some of

2    these witnesses, including Josh White; correct?

3    A       That's correct.

4    Q       Just tell us what you did over the course of the next

5    few days then?

6    A       I actually interviewed Josh White on the 15th, the

7    day that we located Brandon's body.  That was later that

8    afternoon.  We had set up an appointment for him to come in.

9    So that was on the 15th at about 4:40 p.m.  I interviewed

10   Josh.  He gave me his story.  That he was at another friend's

11   house in Niles and he had got in touch with Brandon and

12   Brandon had went and picked him up.  They had then went from

13   this friend in Niles to his grandmother's house in

14   Bristolville and proceeded to mow her grass.  They then mowed

15   the grass.  Josh contacted a friend of his named Billie

16   Holness.  And they went from Josh's -- or I'm sorry -- from

17   Brandon's grandmother's house to Howland to Billie Holness'

18   house to swim.

19   Q       And you confirmed that with Billie Holness?

20   A       I did.

21   Q       Now, did either Billie Holness or Josh tell you that

22   they were with Austin Taylor Burke?

23   A       They did not.

```
1    Q        And eventually, then, you obtained information on
2    June -- well, is there anything else you did between then and
3    June 20th?
4    A        Plenty.
5    Q        Okay.  Lots of other followup.  Yeah, yeah.  What are
6    some of the things you did?  And without telling me what
7    anybody told you, what are some of the things you did?
8    A        I interviewed several other witnesses.  I apologize.
9    I'm going back over my notes.
10   Q        Okay.
11   A        More witnesses.  We filed the murder warrant for
12   Austin based on some of the information that we learned to
13   that point before the 20th.
14   Q        Okay.  So there was actually a warrant for him before
15   the 20th?
16   A        Yes, sir.
17   Q        Based upon the information that you had obtained from
18   some of these witnesses, including the Hayle Roupe, Jessica
19   Simms, Rickey Roupe, Nathan Moats and some of those
20   individuals?
21   A        Deidre Keener, yes.
22   Q        Deidre Keener.  I'm sorry.  I keep leaving out Deidre
23   Keener.
```

562

1    A        And I apologize.  A warrant was actually filed on

2    June 20th.

3    Q        So that day?

4    A        Yes.

5    Q        Later in the day on June 20th, much later, did you

6    get information that Austin Taylor Burke was arrested?

7    A        I did.

8    Q        And how did that information come to you?

9    A        We had been pinging Austin's phone throughout the day

10   after we had filed the warrant to try to locate him.  We

11   always seemed to be one step behind him.  We couldn't catch up

12   with him.

13   Q        So he would have the phone pinged by the 911 center?

14   A        That's correct.

15   Q        And if he was in a location you'd go out and try to

16   find him?

17   A        Correct.  But we were always several steps behind him

18   because it's a historical think, the pinging.

19   Q        All right.

20   A        So we had stopped looking for him that afternoon.

21   And I had went home.  And later that evening I received a call

22   from our dispatch, the Trumbull County 911 center, that the

23   phone was pinging across from the Pizza Joe's in Cortland and

1  that the Pizza Joe's had just been robbed.  The Cortland

2  Police Department was there at the apartment across from Pizza

3  Joe's and they had sent the dispatch a picture of Austin that

4  was there because they were saying that the person there gave

5  them the wrong name.  The picture I received from the 911

6  dispatcher was definitely a picture of Austin Burke.  And I

7  was able to ID him at that point.

8  Q      And they had dispatch contact the Cortland Police to

9  tell them --

10  A      That's correct.

11  Q      -- that individual was not who he was saying he was?

12  A      That's correct.

13  Q      And he was arrested?

14  A      That's correct.

15  Q      At some point you take a statement from Austin Taylor

16  Burke; is that correct?

17  A      I did, the next day.

18  Q      Okay.  And tell us how and where that came about?

19  A      That was at the Trumbull County Jail the next morning

20  at about 8:39 in the morning.  My partner and I, Detective

21  Mackey, went to the jail.  We brought Austin into a room at

22  the jail.  I read Austin his Miranda rights.  And he did

23  acknowledge to me that he understood them and signed the

564

1    waiver form.

2    Q        Now, before you go any further, you had spoken to him

3    back on the 14th, I believe.  Just explain to the jury why you

4    did not read him his Miranda rights on the 14th?

5    A        On the 14th I did not read his Miranda rights because

6    he was not in custody.  You need --

7    Q        That's what triggers --

8    A        Correct.  Custody and interrogation then triggers

9    Miranda warnings.

10   Q        He was not in custody at the time you spoke to him on

11   the 14th so there is no requirement that you Mirandize him?

12   A        That's correct.

13   Q        I am going to hold you up here for one second.  I'm

14   going to hand you what has been marked for purposes of

15   identification as State's Exhibit 27.  I'm going to ask if you

16   recognize State's Exhibit 27?

17   A        I do.

18       (Whereupon, State's Exhibit 27, Constitutional Rights

19   Form, was introduced for identification.)

20   Q        What is State's Exhibit 27?

21   A        It's our Warren Police Department constitutional

22   rights and waiver of rights form.

23   Q        Okay.  And we're going to listen to the conversation

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

565

1     that you had that was recorded in the Trumbull County Jail.

2     But when we listen to that, we can hear you discuss those

3     rights with him and the waiver of those rights?

4     A      Correct.

5     Q      And he initialed and signed those rights and

6     indicated he would speak to you at that point?

7     A      He did.

8     Q      Okay.  And that's a fair and accurate copy of the

9     original that you have in your file?

10    A      Yes, sir.

11    Q      So from that point, continue.  I'm sorry.

12    A      So after he had informed me that he understood his

13    rights and he -- and signed the waiver form, I had proceeded

14    to ask him again about Brandon.  And he repeated the same

15    story he had told me at his house.  He said that Brandon had

16    picked him up about 7:30 while he was walking home from Willow

17    Lake.  He said that Brandon had another kid in the car with

18    him and they drove him to his house on Bristol Townline Road,

19    I think it was, where -- Austin's address -- and then Brandon

20    dropped him off and he stayed there.

21    Q      Now, at this point in your investigation, you had had

22    the cell phone of Austin Taylor Burke because the police in

23    Cortland had arrested him with it?

566

1  A        That's correct.

2  Q        But that cell phone had not been sent to Joann Gibb

3  for analysis yet?

4  A        No, it had not.

5  Q        At that point, did you have the historical cell phone

6  data from AT&T?

7  A        I believe that I had it by then.

8  Q        No, I'm talking about from Austin's phone.

9  A        Correct.

10 Q        You had the cell phone tower records?

11 A        I don't remember if I had it by then or not.  I know

12 that I had gotten -- received it, but I don't remember the

13 exact date.  I apologize.

14 Q        Hold on here.  Let me show you State's Exhibit 22

15 which is the historical cell phone data records.

16 A        Okay.

17 Q        You see the date on there?

18 A        July 1st, yes, sir.

19 Q        So you would not have had those?

20 A        I did not, no, sir.

21 Q        So you did not have this, and you did not -- even

22 though you had his phone, which is State's Exhibit Number 3,

23 you did not have the analysis that was conducted by Joann

1    Gibb?

2    A        That's correct.

3    Q        All right.  So go ahead.  Austin then gave you a

4    statement in the jail?

5    A        He had pretty much said the same thing he told me

6    when I was at his house.  Like I said, Josh -- or Brandon was

7    driving down the road, picked him up in front of Willow Lake

8    and took him home.  And that happened around 7:30.  He also

9    told me that day that he thought they both had drugs in the

10   car and he thought that he was taking his friend back to Akron

11   after he dropped him off.

12   Q        Okay.  Now, I'm going to play for you what has been

13   marked for purposes of identification as State's Exhibit 28.

14        (Whereupon, State's Exhibit 28, Defendant's Statement,

15   was introduced for identification.)

16                        (Whereupon, State's Exhibit 28 was played

17   for the jury commencing at 3:32 p.m. and concluding at 3:38

18   p.m.)

19   BY MR. BECKER:

20   Q        We have just listened to State's Exhibit 28.  Do you

21   recognize the voices on State's Exhibit 28?

22   A        I do.

23   Q        One of those -- there's actually three voices on

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

568

1   there; correct?

2   A       Correct.

3   Q       Please identify the three voices you heard on State's

4   Exhibit 28.

5   A       Myself, my partner Detective Wayne Mackey, and Austin

6   Burke.

7   Q       And that's a fair and accurate copy of your

8   conversation with him on June 21, 2017, at the Trumbull County

9   Jail?

10  A       That's correct.

11  Q       All right.  Now, after that, you began to do some

12  other things.  You obtained some search warrants; correct?

13  A       I did.

14  Q       Including the search warrants for his mouth and to

15  get DNA swabs?

16  A       I did.

17  Q       We searched that duffle bag?

18  A       We did.

19  Q       There was also the request made to the phone

20  companies which only Mr. Burke's phone company AT&T responded

21  to; correct?

22  A       Correct.

23  Q       We located and you have spoken to other witnesses

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

569

1   since that date; correct?

2   A       Correct.

3   Q       All right.  The individual that you identified as

4   Austin Taylor Burke and who is depicted in State's Exhibit 29,

5   is he here in the courtroom today?

6   A       He is.

7   Q       Can you please identify him?

8   A       Sitting here with the light blue shirt and dark blue

9   tie.

10                  MR. BECKER:  May I have one moment, Your

11  Honor?

12  BY MR. BECKER:

13  Q       Now, at some point you were contacted by the

14  defendant's -- well, you had spoken at one point to a girl

15  named Meredith -- I'm drawing a blank.

16  A       Loges.

17  Q       Loges, yes.  And she had provided you some

18  information; correct?

19  A       She did.

20  Q       At some point, though, then you were contacted again

21  by Meredith Loges's mother; correct?

22  A       Correct.

23  Q       She indicated that she had information with Austin

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  with a firearm; correct?

2  A       Correct.

3  Q       And that was the basis -- and we've seen it here.

4  It's already been marked State's Exhibit Number 12.  That is

5  the video of him shooting the gun that Meredith testified to

6  herself; correct?

7  A       That's correct.

8  Q       That was actually from Meredith's phone, but it was

9  provided by Meredith's mother?

10  A       That's correct.

11  Q       You then made contact with the Cortland Police and

12  obtained State's Exhibit Number 3 from them which was the

13  Samsung Galaxy phone?

14  A       I did.

15  Q       And also you obtained some other physical evidence

16  from the city of Cortland that was supplied to BCI?

17  A       Correct.

18                  MR. BECKER:  Your Honor, I have nothing

19  further of this witness.

20                  THE COURT:  Cross.

21                  MR. OLSON:  Thank you, Your Honor.

22

23


                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

571

<u>CROSS EXAMINATION</u>

BY MR. OLSON:

Q      Good afternoon.

A      Good afternoon, sir.

Q      Okay.  Detective Greaver, based upon your direct examination and your report, you agree that you were assigned to this case on June 13th?

A      That's correct.

Q      And at that point in time Brandon had already been missing for over 24 hours, roughly?

A      Yes.

Q      30 hours since the last known communication, somewhere in that area?

A      Since the 11th.

Q      Right.  12th.  12th, morning?

A      Correct, yes.

Q      Okay.  Just so we're on the same page.

A      Yes.  Yes.

Q      I just want to make sure.  And again, when you're assigned at this point, it's a missing persons?  This isn't a homicide investigation that you're engaging on June 13th; correct?

A      Correct.

OFFICIAL COURT REPORTER<br>TRUMBULL COUNTY * WARREN, OHIO

572

1    Q       And at the initial stages, you are working with
2    Brandon's mother, Stephanie Sample; is that correct?
3    A       I had spoken with her.
4    Q       Right.  And that was approximately 10:36 in the
5    morning?
6    A       Yes.
7    Q       I mean, obviously you're making these reports --
8    A       I try my best.
9    Q       -- pretty contemporaneous, but obviously there may be
10   some delay?
11   A       Correct, yes.
12   Q       And during this initial stage, you're speaking with
13   her at 10:36, she said that -- she gave you some background
14   information about Brandon?
15   A       She did.
16   Q       She indicated that he had some addiction issues?
17   A       She did.
18   Q       She indicated that he also had some possible
19   disabilities, but he was highly functional?
20   A       Correct.
21   Q       Okay.  She indicated that on Sunday, which would have
22   been the 11th, he went to his grandmother's house and mowed
23   the grass?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

573

1    A        Okay.

2    Q        And that he was hanging out with a friend named Josh;

3    correct?

4    A        Correct.

5    Q        Now, the way you wrote it in your report, it says,

6    "Brandon mowed his grandmother's grass on Sunday and then was

7    hanging out with his -- with a friend, Josh"; is that correct?

8    A        That's what it says, correct.

9    Q        So it indicates that Brandon went and cut the grass

10   and then went to pick up Josh?

11   A        That's what it says.

12   Q        And we heard from Mr. Sample today, and he indicated

13   that Brandon had left the house around 11:00, 12:00, on the

14   11th, went up to cut the grass?

15   A        Correct.

16   Q        Okay.  Now, it also reports that she thinks he was

17   also hanging out with a male named Austin Burke?

18   A        Correct.

19   Q        Did you gain from her how -- how she came to that

20   conclusion or why she believed that her son was hanging out

21   with an individual named Austin Burke?

22   A        I did not.

23   Q        Okay.  Did you inquire of her of whether she knew who

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1   Austin Burke was?

2   A       I don't believe so.

3   Q       And, again, the last text that was received was

4   roughly 4:40 in the morning?

5   A       I have 4:38 in my --

6   Q       Correct.

7   A       -- in my notes.

8   Q       I'm just rounding up.

9   A       Yes, sir.

10  Q       We know it was that timeframe?

11  A       Yes, sir.  Yes, sir.

12  Q       Okay.  So when you initially get assigned to this

13  case, too, Brandon has been missing for right around 30 hours.

14  There had already been reports that were issued.  And when I

15  say "reports," missing person's reports; is that correct?

16  A       We had -- our agency had taken a missing persons

17  report, yes.

18  Q       Okay.  And then Ms. Sample had also called the

19  Trumbull County 911 center?

20  A       I don't know.

21              MR. OLSON:  May I approach the witness,

22  Your Honor?

23              THE COURT:  Is this B?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

575

1                     MR. OLSON:  B, Your Honor, yes.

2      BY MR. OLSON:

3      Q       Detective, I'm going to show you what's been marked

4      as Exhibit B.

5                     (Whereupon, Defendant's Exhibit B, Missing

6      Persons Entry, was introduced for identification.)

7      A       Okay.

8      Q       Are you familiar with that document?

9      A       I am.

10     Q       Okay.  And can you explain to the jury what that

11     document is?

12     A       What this is is a missing person's entry through the

13     Ohio state L.E.A.D.S. system.  L.E.A.D.S. is a state-wide

14     computer system law enforcement uses.

15     Q       And what was the date that that report was generated?

16     A       June 12th.

17     Q       Okay.  And does it have a time that it was generated?

18     A       20:35 hours, which is 8:35 p.m.

19     Q       Okay.  So we know you got the assignment at 10:20 on

20     the 13th?

21     A       Correct.

22     Q       So almost 12 hours, little over 12 hours had elapsed

23     since she contacted the 911 center; is that correct?

576

1   A        She did not contact.  We would have contacted the 911

2   center.

3   Q        Okay.

4   A        She filed the report with us, with our agency, and

5   then we had him entered into the 911 system.

6   Q        I understand.  Okay.  So before you get assigned,

7   though, the missing report came in roughly 12 hours, 14 hours

8   before?

9   A        Yes.  That's fair, yes.

10  Q        And, again, that report indicates that Brandon was

11  last seen at 1900 hours.  I mean, it's kind of scribbled on

12  there.  I don't think that was your writing, but --

13  A        Yes.  Yes.  It does say that.  I don't know if it's

14  my writing or not.

15  Q        Okay.  And is there other things written on there?

16  A        Stephanie Sample's phone number.  "Josh said Brandon

17  texted Austin Taylor Sunday night.  Going to hang out with

18  Josh."

19  Q        So who said -- who said that Brandon texted Austin

20  Sunday night?

21  A        This is very well -- could be my handwriting.

22  Q        Okay.

23  A        I'm not sure, but it says on here, "Last seen Sunday

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    1900 hours, which is 7:00 p.m."  And it says, "Going to hang

2    out with Josh.  Josh says Brandon texted Austin Taylor Sunday

3    night."

4    Q       Okay.  So Josh was providing information through

5    Stephanie at that point?

6    A       Correct.

7    Q       Okay.  Do you know if there was also posts going on

8    social media such as Facebook and things of that nature?

9    A       I don't know if I had noticed it starting at that

10   point or not.

11   Q       Okay.  Did you go to the family and ask to gather

12   some of these posts so you can compare them when maybe some

13   statements were coming in to determine whether it was accurate

14   or whether you could say that's a bunch of BS?

15   A       I did not.

16   Q       Okay.  Do you know if there was local news agencies

17   reporting before you got assigned?

18   A       I don't know if there was or not.

19   Q       Okay.  So later on, at 12:10, you get a second phone

20   call from Stephanie Sample; is that correct?

21   A       Yes.

22   Q       And at this point in time, she's advising you that

23   she heard through her daughter -- did you identify who her

578

1    daughter was?

2    A       I don't think so.  At that point I did not.

3    Q       Okay.  She heard through her daughter that Josh White

4    had contacted her and said to check the woods behind the

5    grandmother's house; is that correct?

6    A       That is correct.

7    Q       Okay.  You personally did not speak to Josh then?

8    A       Not at that point, no.

9    Q       Is there a reason that you didn't call him to ask

10   him, "Hey, why are you telling us to check the woods?"

11   A       I did not.  Not at that point, no.

12   Q       Did you have a phone number for him?

13   A       I don't know if I had his phone number at that point

14   or not.

15   Q       All right.

16   A       I don't remember.

17   Q       Now, again, it was referred to the grandmother's

18   house.  Did you identify who the grandmother was?

19   A       I did speak with her.  I don't remember if I

20   identified her or not, but we did go to her house and speak

21   with her.

22   Q       Okay.  Can you tell us where the grandmother lived?

23   A       5040 State Route 45 in Bristolville.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

579

1    Q        Bristolville?

2    A        Yes.

3    Q        And is this the same location that Josh White was

4    indicating he went with Brandon to help cut the grass?

5    A        Correct.

6    Q        Did you, in fact, go into the woods --

7    A        Did not.

8    Q        -- that day?

9    A        Did not.

10   Q        You did not.  Was there a search and rescue team that

11   was dispatched to there?

12   A        I remember hearing something about it, but I don't

13   know if they were dispatched or not.  I was not a part of that

14   so I don't know.

15   Q        Okay.  So you didn't speak with the Mecca Township

16   Volunteer Fire Department K-9 Search and Rescue?

17   A        I don't remember speaking with them.

18   Q        You did not have or instruct anybody to bring a

19   canine unit?

20   A        I did not.

21   Q        To go to the woods to check for the scent?

22   A        I did not.

23   Q        So as you sit here today, you cannot say that he was

580

1    or was not in the woods behind grandmother's house?

2    A        I did not check those woods.

3    Q        Now, when you later interviewed Mr. White on

4    June 15th, you brought up the location of where Brandon

5    Sample's body was found; is that correct?

6    A        I don't have it in my notes that I did, but when I

7    put things from interviews, I just put what I think is

8    important.  So it's not in my notes.  It's very possible that

9    I could have.

10   Q        So coming in here today, you did not review any of

11   these interviews to refresh your recollection?

12   A        I tried.  But there was a lot of them.

13   Q        Okay.  I understand.

14   A        I tried.

15   Q        But during that interview, do you recall if Josh

16   really did not limit it to just behind grandma's house; he

17   said, "I told -- I had that feeling that you should have

18   checked the woods in Bristol"?

19   A        It's possible, sir.

20   Q        Now, also during this very early stage of this

21   investigation you receive a telephone call from the Niles

22   Police Department that the car that was owned by Brandon

23   Sample was located; is that correct?

581

1    A        That's correct, sir.

2    Q        And the dispatch summary indicated that it was

3    located by a third -- a third person on the bike trail in

4    Niles?

5    A        That's correct.

6    Q        And we heard from the Niles police officer today that

7    said around 7:15, 7:30 is when the call came in?

8    A        Correct.

9    Q        By the time you received this report, the car had

10   already been towed out of that location?

11   A        That's correct.

12   Q        Is that correct?

13   A        Yes, sir.

14   Q        And you would agree with me that there was no

15   evidence that was recovered from that vehicle?

16   A        That's correct.

17   Q        Do you know the level of the experience of the

18   officers that performed the inspection of that vehicle?

19   A        I do not.

20   Q        Do you know what protective measures they took to

21   avoid contamination of evidence or spoliation of evidence or

22   anything like that?

23   A        I do not, sir.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

582

1    Q        And you would agree with me that things such as

2    fingerprints or gunshot residue or fibers or things like that,

3    it's very delicate evidence, and if you do not properly handle

4    it, it can be lost forever?

5    A        That's correct.

6    Q        Was there an inventory of the items that were found

7    in the vehicle taken?

8    A        I don't recall, sir.

9    Q        Do you have an inventory here today?

10   A        I could check and see.  I may have or may not.  I

11   don't know.

12   Q        Did you do the inventory or did Niles do it?

13   A        I did not do an inventory.  So if there was one done,

14   it would have been done by Niles.

15   Q        Okay.  And, again, when we say there was a lack of

16   evidence, there was no cell phone located in the vehicle; is

17   that correct?

18   A        As far as I know, yes, sir.

19   Q        There was no blood splatter or blood stains in the

20   vehicle?

21   A        That's correct.

22   Q        There were no weapons, bullets, or gunshot residue

23   that you ever recovered?

583

1    A        That's correct.

2    Q        There were no drugs or drug residue?

3    A        That's correct.

4    Q        No fibers?

5    A        Not that I know of.

6    Q        No cigarette butts?

7    A        Not that I know, sir.

8    Q        No bottles, cans, food packages, anything like that?

9    A        Not that I'm aware.

10   Q        Any additional footprints or fingerprints or tire

11   markings maybe of a different vehicle that drove in the same

12   location as the -- as Brandon Sample's car, was that looked

13   for?

14   A        Where at?

15   Q        On the bike trail.  So maybe somebody followed

16   whoever dropped the car off, picked them up, and took them

17   away.  Did you look to see if there were any tire prints that

18   could have been left?

19   A        I did not.

20   Q        Now, once you received this report that the vehicle

21   had been located, you immediately went to the impound lot and

22   inspected the vehicle; is that correct?

23   A        I don't know if it was immediate, but we did go check

584

1   the -- check the car.

2   Q       Same day, I think?

3   A       It may have been.

4   Q       Did you test for evidence yourself?

5   A       I did not.

6   Q       Did you take any photographs?

7   A       Took photographs.

8   Q       Okay.  And you took photographs of what?

9   A       The car.

10  Q       Just the outside or?

11  A       Yes.

12  Q       Did you take any photographs of the inside?

13  A       I don't think I did, sir.

14  Q       Did you go into the trunk?

15  A       We did look in the trunk.

16  Q       Okay.  Any photographs of in the trunk?

17  A       I don't think so.

18  Q       But no attempts to recover evidence through like

19  tapes or things like that?

20  A       No, sir.

21  Q       No special lighting used like to see latent prints

22  or --

23  A       No, sir.

1   Q        -- anything like that?  Did not note any footprints

2   or any mud prints in the interior of the vehicle?

3   A        Did not.

4   Q        So you would agree with me that there was nothing,

5   based upon your inspection of this vehicle, that would

6   indicate Austin Burke was in there when the vehicle was left

7   in the Niles bike path?

8   A        No, sir.

9   Q        Now, Makayla Egbert, you indicated, reported to the

10  Niles police station on June 13th; is that correct?

11  A        That's correct.

12  Q        At about 14:37, which would be 2:37 p.m.; is that

13  correct?

14  A        That's when I was called.  She was going to meet us

15  there.  She had not been there yet.  So shortly after that, at

16  15:00 hours.

17  Q        You went and met her there?

18  A        Yes.  Yes, sir.

19  Q        Okay.  And you performed this initial interview with

20  her?

21  A        I did.

22  Q        And at the initial interview she indicated that she

23  received her information from Jess?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

586

1    A        Correct.

2    Q        When I say "Jess," I'm talking about Jessica Simms.

3    A        Correct.

4    Q        And she said that Austin Burke came back to the

5    residence of Pamela Roupe on the night of the 12th covered in

6    blood; is that correct?

7    A        That's what my notes say, correct.

8    Q        Okay.  And she said, "Jessica told me she was there";

9    correct?

10   A        It says, "Jess stated that Austin killed someone last

11   night.  She then started checking, found the posts about

12   Brandon being missing on Facebook.  She stated that she also

13   told -- she was also told that Austin came to her

14   grandmother's that night covered in blood and told her cousin

15   Rickey that he had just set some dude's head on fire."

16   Q        Okay.  Do you recall Makayla telling you Jessica says

17   she was there?

18   A        I do not, sir.

19   Q        So if we would play the video right now, you

20   cannot -- whatever it says it says?

21   A        Correct.  Oh, yeah.  Yes, sir.

22   Q        Okay.  And we'll get back to that.

23   A        Okay.

1    Q       You would agree with me that you did not follow up

2    with Jessica immediately; is that correct?

3    A       That's correct.

4    Q       You would agree with me that at the initial interview

5    Makayla makes no reference to a vehicle being left on the bike

6    path?

7    A       No, she did not.

8    Q       You would agree with me that she makes no reference

9    to a phone?

10   A       No, sir.

11   Q       No reference to wallet or anything like that?

12   A       Not that I can remember, no, sir.

13   Q       No reference to Hatchet Man Road?

14   A       Not at that point, no, sir.

15   Q       No reference to any clothing?

16   A       No, sir.

17   Q       Okay.  She also makes it clear that she was going

18   through Facebook posts and looking at this information?

19   A       She did.  I believe she did tell me that, yes.

20   Q       Okay.  She talks to you about her relationship with

21   Austin; is that correct?

22   A       I think she just told me she used to date him.

23   Q       Right.  And then she indicated to you that she didn't

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

588

1    talk to him for a long period of time?

2    A        I remember that, yes.

3    Q        Did you -- you got this entire extraction of Austin

4    Burke's telephone; is that correct?

5    A        That's correct.

6    Q        And it had all of his text messages for however long

7    he was using that phone; is that correct?

8    A        I believe so.

9    Q        Did you go and see text messages that were exchanged

10   between Makayla and Austin Burke just prior to her making

11   these reports somewhere around June 2nd, June 3rd, where she

12   was very upset with Austin, saying that he was playing games

13   with her regarding dating?

14   A        I don't remember that, sir.

15   Q        Do you remember looking at the e-mail -- or text

16   message exchanges between them?

17   A        No.

18   Q        Okay.  Brandon Sample's phone records, you received

19   the cell phone history of calls and texts from Brandon's

20   father; is that correct?

21   A        That's correct.

22   Q        Now, do you recall when you received those?

23   A        Give me one second.  Let me just check my notes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

589

1    That would have been on the 13th at 16:35 hours, which is 4:35

2    p.m. I received that e-mail.

3    Q      Okay.  And through your previous notes and your

4    previous testimony you indicated that you knew that the phone

5    last pinged at 4:38 in the morning in Bristolville; is that

6    correct?

7    A      That's what I was told by the 911 center, correct.

8    Q      Okay.  Did you check or did you receive any

9    additional ping information at any point in time?

10    A      No.  No, sir.

11    Q      And you would agree with me to this date you have

12    still not received any cell site information data for Brandon

13    Sample's phone?

14    A      That's correct.

15    Q      You would agree with me that that's very important

16    information?

17    A      Yes.

18    Q      That would show us where he was at?

19    A      Correct.

20    Q      Because you cannot sit here and testify today that

21    Brandon Sample ever left the Warren area?

22    A      I can.

23    Q      You can?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

590

1    A        When we -- well, we found him in Bristolville.

2    Q        But -- okay.  The Trumbull County area?

3    A        Correct.

4    Q        You cannot confirm that he actually traveled to Akron

5    at any point in time?

6    A        Just through testimony of witness statements.

7    Q        And that's Josh White?  That's the only one?

8    A        That's correct.

9    Q        Correct?  You did not speak with anybody else in

10   Akron --

11   A        I did not.

12   Q        -- that positively identified Brandon as being there?

13   A        No, I did not.

14   Q        And would you agree with me that the report that you

15   received was kind of generic?  It just gave the length of the

16   calls and the number?

17   A        The date and the time.

18   Q        Right.

19   A        Yes, sir.

20   Q        And, again, it did not provide the cell site data

21   information that we have for Austin Burke on it?

22   A        It did not.

23   Q        And, again, the request was made.  Do you know -- do

1    you remember who the carrier is for Brandon?

2    A      I do not, sir.  I apologize.

3    Q      Do you know when you made the request?

4    A      I believe it was December, maybe in December,

5    beginning of January.  I do not remember the exact time, sir.

6    Q      And when was the last time you followed up on this

7    information?

8    A      I check my e-mail daily.  That's how it comes.

9    Q      Did you reach out to the cell carrier and say, "Hey,

10    we got our trial starting"?

11    A      No, sir.

12    Q      "I really need this information"?

13    A      No, sir.  I would get an automated system and talk to

14    a computer for ten minutes.  So no -- when they get it, they

15    e-mail it to me.

16    Q      You would agree with me that when a man is sitting on

17    trial for murder, ten minutes, it's not really that long of a

18    time --

19    A      It may be.

20    Q      -- to wait for some important information?

21    A      It may be.  But like I said, we get those through

22    e-mail.  That's how they come.  That's how I was looking for

23    it.

592

1   Q       Now, again, on June 13th at approximately 18:46,

2   which would be 6:46 p.m., you get a call from Makayla; is that

3   correct?

4   A       That's correct.

5   Q       Now we're getting the report that she heard through a

6   friend that Austin dumped the body at Hatchet Man Road; is

7   that correct?

8   A       That's correct.

9   Q       Did you identify who this friend was?

10  A       Did not.

11  Q       Did you ask?

12  A       I don't recall if I did or not, sir.

13  Q       So there was no followup on how she's getting her

14  information?

15  A       No.

16  Q       It's, hey, whatever she tells me I'm gonna note this

17  and I'm not gonna follow up?

18  A       I'm going to note it and I'm going to follow up on

19  the tip that I received.

20  Q       So -- and you would agree with me that during the

21  conversation she didn't really know what the real name of

22  Hatchet Man Road was?

23  A       She did not, correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Q        She did not personally reveal the name of the friend

2   that she got the information from?

3   A        She did not.

4   Q        You would agree with me that this report of Hatchet

5   Man Road and the body being dumped there comes to you after

6   reports came to you that Josh White told you to check the

7   woods in Bristol?

8   A        That was after, that's correct.

9   Q        And you would agree with me that at the time that you

10  were interviewing Makayla she lived in Bristolville?

11  A        I believe so, yes.

12  Q        And through your investigation, and even at this

13  early part of your investigation, you learned that some of

14  these kids that came in here and testified were in contact

15  with a woman by the name of Jill Davis who is a family friend

16  of the Samples?

17  A        I believe so, yes.

18  Q        Did you find out during -- through your investigation

19  if Jill Davis learned through the family that Josh White was

20  saying, "Hey, check the woods in Bristolville"?

21  A        I think the only thing I remember about Josh White

22  was that first day when I had heard from Brandon's mother to

23  check the woods in Bristol -- behind Brandon's grandmother's

594

1   house.

2   Q        And again, you would agree with me that you did not

3   go on social media and see if any of this type of information

4   was being posted at that point?

5   A        I did not at that point, no, sir.  I don't recall

6   doing that anyhow.

7   Q        Now, on the 13th at around 2:37 p.m., you interviewed

8   Pamela Roupe; is that correct?

9   A        No. On the 13th at 2:37 p.m?

10  Q        Yes.

11  A        No.

12  Q        3:37.  I'm sorry.

13  A        That's correct.  Yep.  I gotcha.

14  Q        My military time is a little bit off.  You would

15  agree with me that that video is not recorded or videoed.

16  A        No, sir.  That is not recorded.

17  Q        Okay.  And that just indicates that Pam Roupe told

18  you Austin was there on Sunday, he stayed the night and left

19  Monday morning?

20  A        Correct.

21  Q        All right.  Now, again, continuing into your

22  investigation, on June 14th you meet up with Austin Burke; is

23  that correct?

595

1    A        Yes.

2    Q        You attempted to contact him on the 13th.  He wasn't

3    home; correct?

4    A        Correct.

5    Q        June 14th you call him on his cell phone.  He doesn't

6    answer.  You leave a message?

7    A        Did not leave a message.

8    Q        Did not --

9    A        Was not able to.  The voicemail was not set up.

10   Q        Okay.  He immediately calls you back?

11   A        Yes, within a minute.

12   Q        He did?

13   A        Yes, within a minute he called me back.

14   Q        He agreed to meet with you?

15   A        He did.

16   Q        Okay.  So he wasn't trying to avoid you at any point

17   in time?

18   A        No, sir.  Not at that point.

19   Q        At 10:30, you did meet with Austin at his mom's

20   house; correct?

21   A        I did.

22   Q        You would agree with me that he confirmed he knew

23   Brandon Sample?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

596

1    A        He did.

2    Q        He admitted that he was with him on June 11th?

3    A        He did.

4    Q        He said that he was picked up by Brandon at

5    approximately 7:30 p.m?

6    A        That's correct.

7    Q        And he was picked up as he was walking home from

8    Willow Lake?

9    A        That's correct.

10   Q        Do you know the location of Willow Lake?

11   A        I do.

12   Q        It's State Route 45; is that correct?

13   A        Yes, sir.

14   Q        Do you know how far that is from Austin Burke's home?

15   A        I don't know the exact distance, but it's pretty

16   close.

17   Q        Pretty close?

18   A        Yeah.

19   Q        Within walking distance?

20   A        I believe so, yeah.

21   Q        Okay.  Did you go to Willow Lake and see if they had

22   a video that would confirm that Austin was there that evening

23   -- or that day?

597

1   A        I did not.

2   Q        Okay.  Did you ask Austin for an identification of

3   people that would be able to go and identify him being there?

4   A        I did not.

5   Q        Did you go to his mom and ask her, "Hey, was Austin

6   at Willow Lake at any certain time on the 11th?"

7   A        I did speak to his mother, but I did not ask her

8   that.

9   Q        Okay.  You did, again, through your investigation

10  confirm that Brandon's grandmother, at that time, lived on

11  State Route 45?

12  A        Correct.

13  Q        And that's the same route as Willow Lake?

14  A        That's correct.

15  Q        And it's close in proximity as well; is that fair?

16  A        Fairly close, yes, sir.

17  Q        And what Austin indicated to you is that Brandon

18  drove by him as he was walking; correct?

19  A        Yes.

20  Q        Turns around because he indicated Brandon must have

21  recognized him, pulled up behind him, and asked him if he

22  needed a ride home?

23  A        He just -- I just have in my notes that Brandon drove

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   by and picked him up in front of Willow Lake.

2   Q       Was Austin's initial interview recorded?

3   A       It was not, sir.

4   Q       Your notes do indicate that Austin said, "Hey, there

5   was another guy in the car"?

6   A       Correct.

7   Q       And he said, "I can't remember his name; I think it

8   was Tyler or Josh"?

9   A       That's correct.

10  Q       All right.  He identified that Josh had a beard?

11  A       He did.

12  Q       He said that they gave him a ride to his house and

13  dropped him off; is that correct?

14  A       Yes.

15  Q       He said that it appeared that they were doing drugs?

16  A       Yes.  He thought that they both had heroin.

17  Q       Okay.  And, again, going back to the initial reports

18  and initial discussions that you were having with Ms. Sample,

19  you confirmed through her that, hey, maybe Brandon had some

20  type of drug problem?

21  A       Yes.

22  Q       So that's not outlandish statements there; would you

23  agree?

599

1   A        No.  No, it is not.

2   Q        Austin tells you, "After he dropped me off, I never

3   saw him again"?

4   A        Correct.

5   Q        Now, in your investigation, after you get this

6   information from Austin Burke, do you go out and try to meet

7   up with Josh White, confirm that he has a beard or anything of

8   that nature?

9   A        I did not.

10  Q        Through your investigation, did you learn that Josh

11  White did, in fact, have a beard?

12  A        I did see him on Facebook, that he did have a beard.

13  Q        Through your investigation, did you confirm that his

14  appearance was pretty -- the representations that Austin gave

15  of his appearance were pretty accurate?

16  A        When Josh came in for his interview, he did not have

17  a full beard.

18  Q        Okay.  But, again, based upon your observation of

19  looking at him on Facebook and comparing those images to what

20  Austin was describing, pretty accurate?

21  A        Correct.  Josh did have a beard, yes.  Yes, sir.

22  Q        Now, through this trial we've heard several witnesses

23  come in and we know that Austin has had his troubles in the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    past.  Got in trouble with that agg. burglary, was

2    adjudicated.  And do you know if that adjudication was based

3    on an admission?

4    A       I do not, sir.

5    Q       Did you ever question him on it?

6    A       That was not my case, sir.

7    Q       Okay.

8    A       No, I do not know anything about the case.

9    Q       And, again, you confirmed that Brandon Sample was

10   working at the DYS facility that Austin was housed in during

11   the period of time?

12   A       They were there at the same time, correct.

13   Q       Correct?

14   A       Yes.

15   Q       You also contain in your report that you spoke with a

16   Shawn Andrews?

17   A       Yes.

18   Q       And he was -- he did a records search and found that

19   there were no problems ever identified between Austin Burke

20   and Brandon Sample?

21   A       That's correct.  He was not able to confirm any

22   problems between the two during Brandon's employment.

23   Q       You'd also agree with me that when you received the

1  phone records for both Austin Burke and those generic records

2  for Brandon Sample that it was Brandon that initiated the call

3  with Austin?

4  A       I'd have to see the records, but it's possible.

5  Q       I'm going to show you what's previously been marked

6  Exhibit A.  May I approach the witness Your Honor?

7                    THE COURT:  You may.

8  BY MR. OLSON:

9  Q       And again, I'll refer you to the final page of this

10 report.  And it'll show -- and there's a highlight of a call?

11 A       Correct.

12 Q       Two seconds long?

13 A       Yes.

14 Q       And it shows that it was an incoming call; is that

15 correct?

16 A       That's correct.

17 Q       And you would agree with me that the documents that

18 you have in your hand are an extraction report from Austin

19 Burke's phone?

20 A       That's correct.

21 Q       Okay.  So based upon all of your investigation, all

22 the records you've received on Brandon Sample's phone and

23 Austin Burke's phone, that was the first contact that you can

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    identify?

2    A       Yes, sir.

3    Q       Okay.  And you'd also agree with me that even after

4    that phone call, the very first text message that was sent out

5    was Brandon Sample reaching out to Austin Burke?

6    A       I believe that's correct.

7    Q       I think if you go to page 3.

8    A       Yes, that is correct.  Yes.

9    Q       Okay.  So that would not be consistent with claims

10   that Brandon had difficulty with Austin in DYS?

11   A       I don't know that.

12   Q       He's reaching out to him?

13   A       I don't know that.

14   Q       We do know that he's reaching out to him; correct?

15   A       He is reaching out, but I don't know of any claims of

16   the problems at DYS.

17   Q       Well, we are also able to go to DYS and say, "Hey,

18   there's no record of this"?

19   A       He was also not able to confirm any problems,

20   correct.

21   Q       Did you learn at any point why Brandon was no longer

22   employed at DYS?

23   A       I know his father told me, but I don't remember why.

603

1    Q        Okay.  It had nothing to do with Austin Burke?

2    A        No, it did not.

3    Q        All right.  On June 15th -- because now you're

4    following up on leads, you go out to what is identified as

5    Hatchet Man Road; is that correct?

6    A        Correct.

7    Q        At approximately 9:00 in the morning, you find

8    Brandon Sample's body in a wooded area of Peck Leach Road?

9    A        Correct.

10   Q        You find this body over a small embankment?

11   A        That's correct.

12   Q        How far off the roadway would you say it was?

13   A        Well, the roadway goes back and kind of comes into an

14   opening.  So the opening that was there where that woodpile

15   was, and then that little shack that was built there, it was

16   probably, I would guess 15 feet from the clearing there.

17   Q        So it wasn't miles into the --

18   A        It was not.  No, sir.

19   Q        And throughout your investigation, some of the

20   interviews that you had, some people indicated that Austin

21   came in and told us that he dragged his body for miles into

22   the woods and -- and buried it?

23   A        I don't remember that.

604

1    Q        Okay.  If it's on the videos then --

2    A        If it's there, it's there, but I don't remember that.

3    Q        So now you find yourself in the middle of a crime

4    scene?

5    A        Yes, sir.

6    Q        We have a body.  Based upon your investigation, your

7    experience, your training, you now are -- have converted this

8    from a missing person's investigation into a homicide

9    investigation?

10   A        Correct.

11   Q        So you have training in the treatment of a crime

12   scene; is that correct?

13   A        That's correct.

14   Q        You follow the FBI 12-step process?

15   A        I do not know what that is, sir.

16   Q        Okay.  You've got to protect the scene though?

17   A        Correct, you've got to protect the scene.

18   Q        We've got to prepare the scene?  We've got to protect

19   the scene?

20   A        Correct.

21   Q        So do you do an initial survey of the scene to

22   determine how big of a crime scene you're going to identify?

23   A        Sir, once we found the body -- I'm a Warren Police

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    detective, but I'm also assigned to the Trumbull County

2    Homicide Task Force.  So once we had found Brandon, I had to

3    call the sheriff and let him know.  And so I was informing the

4    sheriff and my bosses at the city.  So I was not doing

5    anything with the crime scene.  Once we had gotten the sheriff

6    notified and I had spoken with my boss with the Warren City

7    Police Department and they agreed that I would just continue

8    the investigation for the task force, that's when we started

9    calling out the other people to help us with the crime scene.

10   Q       Who was in control of that crime scene?  Who was in

11   charge of it?

12   A       At that point, Detective Mackey and I were there.

13   Q       Okay.  So you, at this point, whether you're part of

14   the team or not, you're the only two there.  The burden falls

15   to you that I've got to preserve this crime scene, protect any

16   evidence from being destroyed?

17   A       Correct.  That's correct.

18   Q       Or anything like that?

19   A       Yes.

20   Q       So you have to do an initial survey of just

21   determining how big of a crime scene I'm gonna make this?

22   A       We looked around the initial area, sure.

23   Q       Okay.  And did you cordon it off?  Did you rope it

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

606

1   off?

2   A        We did not.

3   Q        Did you have a crime scene log?

4   A        I did not.  No, sir.

5   Q        So you did not know who was coming and entering and

6   exiting the crime scene?

7   A        There was nobody there but myself, Detective Mackey,

8   and the three agents from Ohio Department of Natural

9   Resources.  Nobody else was coming and going from that area.

10  Q        Okay.  How did you protect it to establish a pathway

11  so maybe you're not trampling over the person that committed

12  the crime's steps or --

13  A        We were already informed from ODNR that it was an

14  active logging road and there were trucks coming in and out of

15  there throughout the day.  So trying to find any tracks from a

16  vehicle other than the logging trucks would have been

17  difficult.

18  Q        What about footprints going into the --

19  A        Same thing.  It was very dry.  And with the trucks

20  coming in and out, it would have been very difficult to have

21  any footprints coming out of there.

22  Q        Did you try?

23  A        Did not.

1    Q       Could have?

2    A       Could have, sure.

3    Q       You also still have to avoid contamination of

4    evidence that may be on the body; is that correct?

5    A       That's correct.

6    Q       What did you do to protect that?

7    A       We did not touch the body until Dave Morris got there

8    to process the crime scene.

9    Q       And who is Dave Morris?

10   A       He is the detective from Cortland Police Department,

11   also assigned to the Trumbull County Task Force.

12   Q       He is the one that was here today that provided

13   testimony?

14   A       That's correct, sir.

15   Q       Now, his testimony was he was only responsible for

16   taking pictures?

17   A       Correct.

18   Q       So who was responsible for removal of the body?

19   A       Once we got ahold of the coroner, the coroner made a

20   decision that it was okay to go ahead and move the body.  And

21   from there I don't know because I was not at the scene when

22   the body was removed.

23   Q       Before removing the body, you did take some

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

608

1    photographs; correct?

2    A       Me?

3    Q       Well, your team?

4    A       Yes.  Yes, sir.  Yes, sir.

5    Q       Did you take any photographs to see if there was

6    blood pooling in the body that showed movement of the body?

7    A       No, sir.

8    Q       Okay.  Did you take -- did you call out any

9    entomologists or anybody to go in and see, hey, how long --

10   how big are these bugs, what are the bug cycles, things of

11   that nature?

12   A       No, sir.

13   Q       In your training, you've learned that insects have a

14   very unique and very distinct cycle of life?

15   A       Correct.

16   Q       And it could help you determine time periods and

17   whether there's been disruption of the body and a bunch of

18   things like that; is that correct?

19   A       That's not what I do, sir.  So I don't know.

20   Q       So you don't agree with that?

21   A       I don't know.  That's not what I do.

22   Q       Okay.

23   A       I'm not a crime scene technician.

1    Q       So you would agree that you didn't bring out anybody

2    that is an expert in that to see if there had been movement of

3    the body or how long this body had been there?

4    A       No, sir.

5    Q       Or how long this body had been dead?

6    A       No, sir.

7    Q       Okay.  So do you recall who removed the body?

8    A       No, sir.  I do not.

9    Q       And it's not noted anywhere; correct?

10   A       Not in my case notes it is not.

11   Q       Do you stay there until the body is removed?

12   A       I was not there when the body was removed.

13   Q       Okay.  So you went to meet with Brandon Sample's

14   parents?

15   A       That's correct.

16   Q       Before that body was taken away?

17   A       That's correct.

18   Q       And as you testified, you went in and told them you

19   found a body, we are not really -- we don't know who it is at

20   this point.  The coroner will identify?

21   A       I told them based on the information that we received

22   we believed it to be Brandon, but the coroner would have to

23   make the final identification.

1    Q        And then after you leave the parents, that's when you

2    go back to the Warren Police Department and at this point in

3    time you have -- you have an appointment to interview Josh

4    White?

5    A        That's correct.

6    Q        And that occurred at about 4:40 p.m?

7    A        Correct.

8    Q        And he appeared at the Warren Police station

9    accompanied by family members; is that correct?

10   A        That's correct.

11   Q        His mother, his father, and his brother?

12   A        That's correct.

13   Q        And based on your -- his statements, he would have

14   had contact with each one of these family members on the night

15   of the 11th into the 12th; is that correct?

16   A        That's correct, yes.

17   Q        But you did not interview one of them?

18   A        I did not.

19   Q        Now, Josh White tells you that he was picked up by

20   Brandon at approximately 5:30 on June 11th; is that correct?

21   A        Yes.

22   Q        That he was picked up at a friend's house?

23   A        Yes.

1  Q       What was the friend's name?

2  A       I did not get the name on my report, on my notes.

3  Q       Did you go interview the friend?

4  A       I did not.

5  Q       Okay.  Prior to being picked up, Josh White tells you

6  that he went canoeing at Mosquito Lake; is that correct?

7  A       That's correct.

8  Q       Do you find out the names of the people that he was

9  with, who he went canoeing with?

10 A       I did not.

11 Q       Did you go out and confirm that in any manner?

12 A       I did not.

13 Q       He says when Brandon picks him up they leave this

14 unknown friend's house and they are heading towards

15 Bristolville; is that correct?

16 A       He gave me the address of the friends's house, but I

17 don't have the name on here.

18 Q       Okay.

19 A       The address was 1621 Morris Place in Niles.  And they

20 picked him up, yes, at approximately 5:30 and drove to his

21 grandmother's.

22 Q       But before they get to grandmother's, he indicates to

23 you --

1   A        He runs out of gas.

2   Q        -- Brandon runs out of gas?

3   A        Yes.

4   Q        And he had to push the car from the middle of some

5   street into a gas station?

6   A        Correct.

7   Q        Is that correct?

8   A        Yes, sir.

9   Q        Josh says "I put $2 worth of gas in because Brandon

10  has no money on him"?

11  A        Okay.

12  Q        Correct?

13  A        Yes, yes.

14  Q        Did you go to the gas station and ask for video to

15  confirm that they were there?

16  A        I do not.

17  Q        He then says that they drive to the Warren Speedway;

18  is that correct?

19  A        Yes.

20  Q        Brandon fills up there; is that correct?

21  A        Correct.

22  Q        He tells you that Brandon had a Speedway card?

23  A        Correct.

613

1   Q       He also told you what was in Brandon's wallet; his

2   ID, he had a Speedway member card?

3   A       He had a Speedway Speedy Reward card, yeah.

4   Q       So he's telling you what's in his buddy's wallet.  Do

5   you find that strange?

6   A       I did not at the time.

7   Q       Okay.  Do you find that strange now?

8   A       I do not.

9   Q       You've been sitting with Mr. Becker for four days of

10  this trial.  Do you know what's in his wallet?

11  A       I do not hang out with Mr. Becker on a daily basis,

12  so I would not see his wallet on a daily basis.

13  Q       How about your partner, do you know what's in his

14  wallet?

15  A       I have a pretty good idea, actually, yes, sir.

16  Q       Okay.  But the reason that Josh tells you he knows

17  what's in the wallet is because three weeks prior Brandon lost

18  his wallet in Warren and somebody turned it in?

19  A       He did tell me that, correct.

20  Q       Okay.  Did you go to where it was turned in and

21  confirm that?

22  A       I did not.

23  Q       So based upon the statements that were being made by

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    Josh, we can assume that Brandon had a wallet on him that

2    night?

3    A        Correct.

4    Q        Did he have a wallet when the body was found?

5    A        I don't recall there being a wallet in his private

6    property, in his personal property.

7    Q        Is there a wallet in evidence?

8    A        There is not.

9    Q        So safe to assume that it's missing at this point?

10   A        Safe to assume.

11   Q        Okay.  They say that he gets -- or Josh says that

12   they get to his grandmother's house at about 6 p.m.; is that

13   correct?

14   A        Yes, between 5:30 and 6.  Yes.

15   Q        So he's picked up at 5:30 based upon his statement;

16   is that correct?

17   A        Correct, yes.

18   Q        How far of a drive is it from Niles to Bristolville?

19   A        I don't know miles, but that's probably a 25-minute

20   drive.

21   Q        25-minute drive?

22   A        Yeah.

23   Q        And in this time period we have a car that breaks

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

615

1   down, runs out of gas, has to be pushed to the gas station?

2   A       Correct.

3   Q       Then it leaves that gas station and goes to the

4   Warren Speedway gas station?

5   A       Correct.

6   Q       So did you determine how far or how long it would

7   take to go from this gas station that it broke down at to the

8   Warren gas station?

9   A       I did not.

10  Q       How far would it be to go from that Warren gas

11  station to Bristolville?

12  A       Probably about a 20-minute drive I would guess.

13  Q       Timeframe doesn't sound like it's adding up?

14  A       No, the timeframe does not sound like it's adding up,

15  sir.

16  Q       Now, do you learn if Josh's grandma was present -- or

17  excuse me -- Brandon's grandma was present when Josh and

18  Brandon arrive there?

19  A       I don't remember if I asked her that or not.  I

20  remember speaking with her, but I don't remember if I asked

21  her that.

22  Q       And you don't ask Josh in his interview; is that

23  correct?

616

1   A        I don't believe I did.

2   Q        And you would agree with me that there is no

3   questioning of Josh's grandmother -- or Brandon's grandmother

4   on the -- on any video or audio?

5   A        There is not.  There is not.

6   Q        Josh tells you that they cut the grass from 6:00 to

7   8:00; is that correct?

8   A        That's correct.

9   Q        He says that it was impossible for them to have

10  picked up Austin on Route 45 because they were cutting grass

11  and it took awhile?

12  A        I don't remember him telling me that it was

13  impossible.  He just -- I just remember him telling me that

14  they didn't do it, that they didn't pick Austin up.

15  Q        And, again, we heard the testimony today from

16  Brandon's father indicating that the grass was cut earlier in

17  the day.  Did you follow up during your investigation to find

18  out what time the grass was cut?

19  A        I did not.

20  Q        So they complete cutting the grass and they go to

21  Billie Holness' house; is that correct?

22  A        According to their statement, yes.

23  Q        Okay.  And that was about 21:15, 9:15 p.m.; correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        That sounds about right.

2    Q        They arrive at --

3    A        20:30 hours.  They mowed until 20:30 hours and then

4    they drove to 3732 Birch to swim.

5    Q        And Billie Holness tells you they got there about

6    21:15, which would be about 9:15?

7    A        That's correct.

8    Q        Billie tells you that they swam until about 23:00, or

9    11:00?

10   A        Let me see my notes.

11   Q        That's July 3rd of 2017.

12   A        Thank you.  Josh got there at 21:15.  He texted her

13   and told her he was in her driveway.

14   Q        And based upon her statements to you, they swam until

15   about 11:00 p.m?

16   A        Yes.

17   Q        Okay.  Josh tells you that they then leave Billie's

18   house and they go to Josh's grandmother's house; is that

19   correct?

20   A        Correct, yes.

21   Q        And he tells you that they arrive there at 23:07,

22   11:07 p.m?  Very specific time?

23   A        I don't have that time in my notes that I can see,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

618

1   but that's possible.

2   Q        Okay.  And, again, you don't go out after you get

3   this information from Josh and confirm this with Josh's

4   grandmother or Josh's father; correct?

5   A        I did not confirm what, sir?

6   Q        That they went there.

7   A        No, I did not.  No.

8   Q        He says that he gets changed from his clothes and

9   they leave?

10  A        Yes.

11  Q        Says that he forgets his money and he has to turn

12  around and go back to the grandmother's house; is that

13  correct?

14  A        That's correct.

15  Q        He says that he calls his father and says, "Hey, I

16  forgot my money.  Run it out to me"?

17  A        Correct.

18  Q        And father meets them at 11:15 to give him back the

19  money?

20  A        I don't have that in my notes, but if it's on the

21  video, it's on the video, yes.

22  Q        Okay.  Again, don't talk to dad to confirm this?

23  A        Josh's dad?

1    Q       Right.

2    A       No, I did not.

3    Q       And you don't look at Josh's phone records to confirm

4    this?

5    A       Did not.

6    Q       He says then they go from Josh's grandmother's house

7    directly to Akron?

8    A       Correct.

9    Q       Don't stop anywhere else?

10   A       Correct.

11   Q       Correct?

12   A       Yes.

13   Q       Today we heard from Mr. Sample that they went to his

14   house?

15   A       Yes, we did.

16   Q       He never tells you that; right?

17   A       Not that I can remember, no, sir.

18   Q       And if he goes to the Sample house right after they

19   leave swimming there's gonna be some time, then, to go to

20   Josh's grandma's house?  Times that aren't accounted for;

21   correct?

22   A       I believe so, yeah.  I'll agree with that.

23   Q       Then he says that at about 12:15 a.m. he has to call

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

620

1    his brother to unlock the latch to his house because he

2    doesn't have a key?

3    A        That's correct.

4    Q        Did you talk to his brother to confirm that?

5    A        I did not.

6    Q        Did you speak with his brother or mother to confirm

7    what time he got home?

8    A        I talked to his mother and his brother in the lobby

9    of the police station about him getting there, but I do not

10   have a recorded statement of that.

11   Q        And you don't recall off the top of your head today

12   what time he was there?

13   A        No.  No, sir.

14   Q        During this interview, you specifically note and

15   identify that Josh had some bruising to his hand; is that

16   correct?

17   A        That's correct.

18   Q        He gives you the explanation that he punched a

19   bedpost?

20   A        Yeah.  He had two wounds on his hand.  One he told me

21   he punched a bedpost, and the other he had injured himself

22   working with sheet metal, I believe he said.

23   Q        The bruise from punching the bedpost, did you take

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

621

1    photos of that?

2    A        I did not.

3    Q        Were you able to confirm that through anybody else?

4    A        That he punched the bedpost?

5    Q        Right.

6    A        No, sir.

7    Q        Given the condition of Brandon Sample's body, I'm

8    assuming that there was nobody inspecting that body for

9    additional bruises?

10   A        No, sir.

11   Q        Just the gunshot wound.  So you don't know if there

12   was a --

13   A        You'll have to ask the coroner that, sir.

14   Q        I'm saying on your personal knowledge, you have no

15   idea if there was a struggle, if there was a fight, if there

16   was anything like that?

17   A        I do not, sir.

18   Q        And, again, you identified that there was also

19   another scratch on his hand; correct?

20   A        That's what he told me, yes.

21   Q        He told you that he cut his hand working with sheet

22   metal approximately a month before that date?

23   A        I don't remember him saying a month, but if it's on

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

622

1     the video, it's on the video.

2     Q      Okay.  Again, no photographs of that?

3     A      No, sir.

4     Q      And like we covered briefly, during this interview,

5     he again raises his suspicion that Brandon would have been

6     found in the woods?

7     A      He did say that, yes, sir.

8     Q      At the time that he made his initial statement to

9     the -- well, not his initial statement, but the statement that

10     came through Stephanie Sample, the police did not release any

11     information concerning the phone ping; is that correct?

12     A      I did not release any information, sir.

13     Q      And you have no information in your case file, being

14     the lead detective, that you identified that somebody released

15     phone pinging in Bristolville --

16     A      No, sir.

17     Q      -- before June 13th?

18     A      No, sir.

19     Q      Okay.  No statements had yet been made about the body

20     being dumped in Bristol?

21     A      No, sir.  Not to my knowledge, sir.

22     Q      And, again, when he made that initial statement, it

23     was being investigated as a missing person, not as a homicide?

623

1    A       That's correct.

2    Q       In fact, during the investigation, there were reports

3    coming in that were saying Brandon was being held hostage?

4    A       I remember something like that.

5    Q       For drug debts?

6    A       I remember something like that.

7    Q       In fact, on the 13th, based on some false accusation

8    that was being made, there was somebody that responded to

9    Austin Burke's house to look and see if Brandon Sample was

10   there; do you recall that?

11   A       No, sir.

12   Q       Are you familiar with Brian Galida?

13   A       I know the name, sir.

14   Q       And do you know what agency he works for?

15   A       I believe he works for the Sheriff's Office, Trumbull

16   County Sheriff's office.

17   Q       Okay.

18   A       I think.

19   Q       So you do not remember reviewing his narrative

20   statement that says that a family member had called and said

21   that they received information saying Brandon was being held

22   by Austin Burke for a drug debt?

23   A       I don't remember that.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

624

1   Q       I'm going to show --

2                   MR. OLSON:  May I approach the witness,

3   Your Honor?

4                   THE COURT:  You may.

5   BY MR. OLSON:

6   Q       I'm going to show what's been marked Exhibit C.  Can

7   you review that document and see if you recall it?

8                   (Whereupon, Defendant's Exhibit C,

9   Narrative Supplement, was introduced for identification.)

10                  MR. OLSON:  Your Honor, may we approach

11  while he's reviewing that?

12                  THE COURT:  You may.

13                  (At sidebar:)

14                  MR. OLSON:  I just -- I didn't know how

15  long the Court wanted to go.

16                  THE COURT:  Well, I wanted to be done by

17  now.  But how long are you going to be?

18                  MR. OLSON:  It can be very extensive with

19  this witness.

20                  THE COURT:  Well, I guess if we stop

21  here then -- we're not too worried about breaking here.  I'd

22  rather break here than break after he was done.

23                  MR. BECKER:  Whenever you want to break.


                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

625

1              MR. OLSON:  That's why I wanted to let the

2    Court know.

3              THE COURT:  Let's go ahead and do that.  I

4    don't want to keep them here until 5:30.  I'm sure you'll have

5    some redirect.

6              MR. BECKER:  I'm going to be very brief.

7              MR. OLSON:  Thank you, Your Honor.

8              (End of sidebar.)

9              THE COURT:  All right.  Just to finish up

10   here now, do you recognize that document?  Does it refresh

11   your memory?

12             THE WITNESS:  A little bit.  Yes, sir.

13   Yes, sir.

14             THE COURT:  I just spoke with counsel.

15   This is the time we usually like to stop.  Defense counsel

16   have indicated they've got a little bit more time to get into

17   that and then we have redirect and recross.  We don't want to

18   be too late tonight.  So we're going to take this

19   opportunity -- I'm going to ask counsel to mark where

20   they are -- and we're going to close for this evening.  We'll

21   start up tomorrow at 9:00 and we'll bring Detective Greaver

22   back on tomorrow.

23             Do not discuss this case among yourselves, nor with

626

1    anyone else.  Do not form or express an opinion.  Avoid any

2    media regarding this case.  Have a pleasant evening.  We'll

3    see you tomorrow morning.

4                      (At 4:37 p.m., court was adjourned to

5    Thursday, March 8, 2018.)

6                      (Note:  For further proceedings, please

7    refer to Volume IV.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                    IN THE COURT OF COMMON PLEAS

2                      TRUMBULL COUNTY, OHIO

3

4    State of Ohio,              : CASE NO:  2017-CR-403

5        Plaintiff,              :

6                                :

7    -vs-                        : <u>TRANSCRIPT OF PROCEEDINGS</u>

8    Austin Taylor Burke,        :

9        Defendant.              :   VOLUME IV - JURY TRIAL

10

11

12          Be it remembered, that at the Jury Trial of the

13   above-entitled cause, in the Court of Common Pleas, Trumbull

14   County, Ohio, beginning on the 5th day of March, 2018, and

15   continuing thereafter, as hereinafter noted, before the

16   Honorable Andrew D. Logan, the following proceedings were had:

17

18

19

20

21

22

23   Official Court Reporter:  Lori J. Rittwage

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

627

1                    A P P E A R A N C E S:

2


3
     On behalf of the State of Ohio:
4
          Atty. Christopher D. Becker
5         Trumbull County Prosecutor's Office
          160 High Street
6         Warren, OH  44481
          Phone:  (330) 675-2426
7         Email:  psbecker@trumbull.co.oh.us

8


9    On behalf of the Defendant:

10        Atty. Bradley G. Olson
          Dimeo Olson Law Group, LLC
11        28 North Mill Street
          New Castle, PA  16101
12        Phone:  (330) 318-3453
          Email:  brad_olson_jr@yahoo.com
13
          Mr. Edward Hartwig
14        120 Marwood Circle
          PO Box 3965
15        Boardman, OH 44513
          Phone:  (330) 718-9499
16

17

18

19

20

21

22

23


                    OFFICIAL COURT REPORTER
               TRUMBULL COUNTY * WARREN, OHIO

628

1                     **I N D E X**

2               **E X A M I N A T I O N S**

| | WITNESS | Page | Line |
|---|---|---|---|
| 3 | **DETECTIVE JOHN GREAVER (CONT'D)** | | |
| 4 | Continuing Cross Examination By Mr. Olson | 632 | 23 |
| 5 | Redirect Examination By Mr. Becker | 719 | 16 |
| | **WILLIAM PRINCE** | | |
| 6 | Direct Examination By Mr. Becker | 730 | 4 |
| | **LEAH SMITH** | | |
| 7 | Direct Examination By Mr. Becker | 737 | 8 |
| | Cross Examination By Mr. Hartwig | 746 | 16 |
| 8 | **DONAVON BUNNER** | | |
| | Direct Examination By Mr. Becker | 749 | 4 |
| 9 | Cross Examination By Mr. Hartwig | 755 | 3 |
| | Redirect Examination By Mr. Becker | 757 | 21 |
| 10 | Recross Examination By Mr. Hartwig | 758 | 19 |
| | **STACIE CASSIDY** | | |
| 11 | Direct Examination By Mr. Becker | 760 | 4 |
| | Cross Examination By Mr. Hartwig | 765 | 7 |
| 12 | Redirect Examination By Mr. Becker | 767 | 16 |
| | Recross Examination By Mr. Hartwig | 768 | 4 |
| 13 | **JUSTIN BORAWIEC** | | |
| | Direct Examination By Mr. Becker | 769 | 4 |
| 14 | Cross Examination By Mr. Hartwig | 774 | 9 |
| | **MELANIE ENGLE** | | |
| 15 | Direct Examination By Mr. Becker | 782 | 1 |
| | Cross Examination By Mr. Olson | 799 | 10 |
| 16 | Redirect Examination By Mr. Becker | 814 | 2 |
| | **STEPHANIE TAYLOR** | | |
| 17 | Direct Examination By Mr. Becker | 817 | 4 |
| | **SHAWN MARX** | | |
| 18 | Direct Examination By Mr. Becker | 822 | 10 |
| | Cross Examination By Mr. Olson | 826 | 21 |
| 19 | **BRITNI WILLIAMS** | | |
| | Direct Examination By Mr. Becker | 829 | 17 |
| 20 | Cross Examination By Mr. Hartwig | 832 | 14 |
| | **STEPHANIE KERSTETTER** | | |
| 21 | Direct Examination By Mr. Becker | 834 | 11 |
| | **OFFICER BRANDON RICE** | | |
| 22 | Direct Examination By Mr. Becker | 838 | 7 |
| | Cross Examination By Mr. Olson | 841 | 2 |
| 23 | **OFFICER JOHN WESTON** | | |
| | Direct Examination By Mr. Becker | 842 | 4 |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

629

1

Cross Examination By Mr. Hartwig                      854    21
2    Redirect Examination By Mr. Becker                   862    19
Recross Examination By Mr. Hartwig                   864    12
3           OFFICER NICHOLAS MANCINI
Direct Examination By Mr. Becker                     868     1
4    Cross Examination By Mr. Olson                       879    11
DR. HUMPHREY GERMANIUK
5    Direct Examination By Mr. Becker                     888    13
Cross Examination By Mr. Hartwig                     907     1
6
E X H I B I T S
7

Exhibit                        Description      Page    Line
8    State's Exhibit 53             Photos            631    18
Defendant's Exhibit D          Call Summary      639     2
9    Defendant's Exhibit E          Extraction Report 655    17
Defendant's Exhibit F          Dispatch Summary  694    18
10   State's Exhibit 54             Facebook Page     720    11
State's Exhibit 9              Firearm Trace     732    18
11                                  Summary
State's Exhibit 10             Firearms          735     5
12                                  Transaction
Record
13   State's Exhibits 31-34         Photos            739    11
State's Exhibit 14             Photo             741     9
14   Defendant's Exhibit G          Witness Statement 766    13
Defendant's Exhibit H          Witness Statement 776     2
15   State's Exhibit 55             Text Message      788    17
State's Exhibit 35             Photo             792     7
16   State's Exhibit 36             Photo             793    21
State's Exhibit 37             Photo             794     3
17   Defendant's Exhibit J          Facebook Messages 801    21
Defendant's Exhibit K          Witness Statement 804     8
18   Defendant's Exhibit M          Police Report     828    11
State's Exhibit 30             Video             830    22
19   State's Exhibit 8              Plastic Bag       854     2
State's Exhibit 4              Tennis Shoes      872     4
20   State's Exhibit 7              Sweatpants        874    22
State's Exhibit 38             Photos            877    10
21   State's Exhibit 6              Plastic Bag       877    21
State's Exhibit 19             Autopsy Report    902    10
22   State's Exhibit 20             Autopsy Photos    902    16
Defendant's Exhibit I          Witness Statement 927     5

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

630

## E X H I B I T S   A D M I T T E D

|  | Page | Line |
|---|---|---|
| State's Exhibit Nos. 1-55 | 925 | 6 |
| Defendant's Exhibits A, B, E, H and J | 934 | 18 |

## M O T I O N S

|  | Page | Line |
|---|---|---|
| Motion | 925 | 13 |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

631

1           March 8, 2018

2           THE COURT:  We're in court out of the

3    presence of the jury just to take care of a couple

4    housekeeping items.

5           Mr. Becker, you had something for the record?

6           MR. BECKER:  Yes, Your Honor.  Yesterday I

7    made the mistake of marking two exhibits as State's

8    Exhibit 52.  The first State's Exhibit 52 was a one-page

9    document that was testified to by Deidre Keener that indicated

10   she had received a call from the defendant on June 20, 2017,

11   and had returned the call at about 10:50 p.m.  It was a

12   snapshot from her phone -- or a screen shot.

13         I then inadvertently marked the photographs of the

14   crime scene with Detective Morris as well as State's 52.  I've

15   taken the liberty of changing that to State's 53.  So that has

16   been testified to, but it should be State's Exhibit 53 rather

17   than 52.

18         (Whereupon, State's Exhibit 53, Photos, was introduced

19   for identification.)

20         THE COURT:  And 53 is a group of

21   photographs then?

22         MR. BECKER:  Yeah.  It's a CD containing

23   about, I'd say about 25 or 30 photos.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

632

 1                    THE COURT:  It's a CD?

 2                    MR. BECKER:  Yeah.  It's a CD.

 3                    THE COURT:  Anything from defense counsel?

 4                    MR. OLSON:  Nothing, Your Honor.

 5                    THE COURT:  Again, we're just trying to get

 6      it straightened out here.

 7           Anything else while the jury is still out,

 8      Mr. Becker?

 9                    MR. BECKER:  Nothing on behalf of the

10      state.

11                    THE COURT:  Mr. Olson, anything on behalf

12      of the defendant?

13                    MR. OLSON:  Nothing.

14                    THE COURT:  Let's bring the jury up.

15                    (Whereupon, a recess was had commencing at

16      9:04 a.m. and concluding at 9:09 a.m.)

17                    THE COURT:  Good morning, Ladies and

18      Gentlemen.  We continue with the state's case this morning.

19      Mr. Greaver, if you'll return to the stand.  You remain under

20      oath.

21           Mr. Olson, you may continue your cross.

22                    MR. OLSON:  Thank you, Your Honor.

23                                  * * *


                          OFFICIAL COURT REPORTER
                      TRUMBULL COUNTY * WARREN, OHIO

1                    <u>CONTINUING CROSS EXAMINATION</u>

2    BY MR. OLSON:

3    Q        Morning, Detective.

4    A        Morning, sir.

5    Q        Yesterday when we broke we were just getting into --

6    is it Deputy Galida's report?

7    A        That's correct.

8    Q        Before we go back to that report real quickly,

9    though, during some cross examination we did go over some

10   statements that were made to you by Makayla Egbert.

11   A        Uh-huh.

12   Q        Do you recall that?

13   A        Yes, sir.

14   Q        And during examination I was asking if you remembered

15   if Makayla told you that Jess had been there and witnessed

16   Austin coming back to the home; do you recall that?  Do you

17   recall the question?

18   A        I do not.  I do recall the question, yes, sir.

19   Q        Okay.  And I indicated that there was an audio

20   recording of Makayla that made those statements; is that

21   correct?

22   A        Correct.

23   Q        And you indicated that you did not recall the audio

634

1    tapes themselves; is that correct?

2    A       Correct.

3    Q       Since yesterday's examination, did you have an

4    opportunity --

5                        THE COURT:  You may proceed.

6                        MR. OLSON:  Thank you, Your Honor.

7    BY MR. OLSON:

8    Q       So since yesterday's questioning, did you have an

9    opportunity to go back to your office, pull those interviews

10   and listen to them?

11   A       I did not.

12   Q       Okay.  Now, Detective, you would agree with me that

13   you did meet with Makayla Egbert at the Niles Police

14   Department on the 13th; is that correct?

15   A       That is correct.

16   Q       Okay.  And the initial interview with Makayla Egbert

17   was only by audio.  It was not by video; is that correct?

18   A       That is correct.

19   Q       And I'm going to put this as close to you as

20   possible.  One second.

21   A       Sure.

22                        MR. BECKER:  Your Honor, I'm going to

23   object at this point.  Can we approach?

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

635

1          THE COURT:  You may.

2          (At sidebar:)

3          MR. BECKER:  Your Honor, I think this is

4    way beyond the scope.  This is clearly hearsay.  He's asking

5    this witness to talk about a statement taken by a witness who

6    hasn't even testified in this courtroom.  They have the same

7    ability to subpoena witnesses.  They could have cross examined

8    and they did cross examine Jessica Simms yesterday.  And

9    whatever answers she gave, they're stuck with it.  They're

10   collaterally trying to attack the testimony of Jessica Simms

11   through hearsay through a third person who hasn't even

12   testified.  It's clearly hearsay.

13          THE COURT:  What's the hearsay exception?

14          MR. OLSON:  Your Honor, it would be a

15   hearsay exception because we're not offering it for the truth

16   of the matter, but the effect on the listener.  This is part

17   of the investigation.

18          THE COURT:  Sustained.

19          MR. BECKER:  Thank you.

20          (End of sidebar.)

21   BY MR. OLSON:

22   Q      All right.  So, again, you didn't listen to the

23   interview of Makayla Egbert?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   A       I did not.

2   Q       And you don't recall her saying anything about Jess

3   witnessing this?

4                   MR. BECKER:  Objection.  That's hearsay.

5                   THE COURT:  Asked and answered.  He didn't

6   hear anything.  Let's go on.

7   BY MR. OLSON:

8   Q       At the end of the interview with Makayla Egbert, was

9   there a statement made by you or another detective indicating

10  that you had received information regarding Brandon's body

11  being in the woods and that you had gone there and

12  investigated that and found it not to be credible?

13  A       I do not remember that, sir.

14  Q       You do not remember that.  Okay.  So on -- on the

15  break that we entered into yesterday, we were getting into

16  your -- the report of Detective Galida; is that correct?

17  A       Correct.

18  Q       And as part of your investigation, you received that

19  report?

20  A       I do remember this, yes, sir.

21  Q       Okay.  And we were questioning whether there was

22  information being presented to you that turned out to be

23  untrue or false; is that correct?  Or to your detective staff

1   or whoever was assisting with the investigation?

2   A       Information of?

3   Q       Just random people that were calling in saying

4   information that they were receiving.

5   A       Correct.

6   Q       Okay.

7   A       Yes.

8   Q       Okay.  With respect to Detective -- or Deputy

9   Galida's report, was there a call that Brandon Sample was seen

10  and he was at a friend's house with Austin?

11  A       Would that be in this report?

12  Q       Correct.  I'll refer you to the final paragraph of

13  that report.

14  A       Okay.

15  Q       Now, again, is there indication within that record

16  that stated that Deputy Galida received information that

17  Brandon Sample had driven Austin to Cody's house -- and when I

18  say Cody, Cody Snyder's house -- in a white pickup truck?

19  A       It does say that.

20  Q       Okay.  And does it indicate that Detective or Deputy

21  Galida responded there?

22  A       It does.

23  Q       And does it indicate that they did find Austin Burke

638

1    present at that address?

2    A       That's correct.

3    Q       Was there any indication that Brandon Sample was

4    there?

5    A       It does not appear so, no.

6    Q       It actually says he was not there?

7    A       Yes, it does.

8    Q       Okay.

9    A       "Victim was not present."

10   Q       Also, there were reports going in through Niles; is

11   that correct?

12   A       Yes.

13   Q       And you were receiving those reports as well?

14   A       Yes.

15   Q       Do you recall receiving a report of a telephone call

16   that was made to the Niles City Police Department on June 14th

17   at approximately 11:25 p.m.?  Do you recall that?

18   A       I do not.

19                   MR. OLSON:  I believe this would be Exhibit

20   D.

21   BY MR. OLSON:

22   Q       I'm going to show you what's been marked as

23   Defendant's Exhibit D.  Can you please identify what that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

639

1    exhibit is?

2                        (Whereupon, Defendant's Exhibit D, Call

3    Summary, was introduced for identification.)

4    A        It appears to be a dispatched call summary for the

5    Niles City Police Department.

6    Q        Okay.  And what is the date of that dispatch summary?

7    A        June 14, 2017.

8    Q        Does it have a time?

9    A        It does.  23:13 hours, which is 11:13 p.m.

10   Q        Okay.  And there is -- are there notes contained on

11   that report?

12   A        Yes, sir.

13   Q        And can you identify what time those notes are taken?

14   A        23:25 p.m., 11:25 p.m.

15   Q        So they're taken contemporaneously with the phone

16   call coming in?

17   A        Correct.

18   Q        And in your experience as a police officer, have you

19   interacted with dispatchers --

20   A        I have.

21   Q        -- in their job?  And normally what happens is a

22   telephone call comes in to the dispatch center and while

23   they're taking that call they're typing down statements that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    are being made?

2    A        That's correct.

3    Q        Okay.  Can you tell the jury what that note says?

4                      MR. BECKER:  Objection.

5                      THE COURT:  It's not his document.

6                      MR. OLSON:  May we approach, Your Honor?

7                      (At sidebar:)

8                      MR. BECKER:  Your Honor, it's hearsay.

9    You're reading in hearsay.  I don't even know who called in.

10   You're asking hearsay upon hearsay.  It's double hearsay.

11   It's a report from the dispatch on a call they got.  We don't

12   even know who it came from.

13                     MR. OLSON:  Your Honor, our position would

14   be, this is his investigation.  These are his records.  This

15   was -- it would at least survive --

16                     THE COURT:  I don't think he ever indicated

17   he saw this report.

18                     MR. OLSON:  He said he received it.

19                     THE COURT:  I don't think he said that.

20                     MR. OLSON:  But I would say that this would

21   at least be an exception through a business record.  He's

22   maintaining --

23                     THE COURT:  It is not his business record

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    though.

2                        MR. BECKER:  Yeah.

3                        MR. OLSON:  This trial is going to take

4    forever, then, because we're going to subpoena --

5                        THE COURT:  Little late.  Do what you need

6    to.

7                        MR OLSON:  Okay.

8                        (End of sidebar.)

9    BY MR. OLSON:

10   Q      As part of your investigation, did you follow up on

11   leads that were indicating that Brandon Sample was being held

12   captive by the -- by Austin Burke?

13   A      I was following up on leads that Austin was involved

14   in his murder, yes.

15   Q      Were some of those reports that Austin was holding

16   him captive?

17   A      I believe there was --

18   Q      For a drug debt?

19   A      I believe there was something like that.  I don't

20   recall exactly what it was.

21   Q      Okay.  So you don't recall what was being called in

22   to you by the Niles Police Department?

23   A      No, sir.


                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1   Q       Okay.  Does that report indicate that they called and
2   left you a message?
3   A       It just says that this info wants to be passed on --
4   the caller wants info to be passed on.
5   Q       Okay.  You don't remember if that was faxed to you?
6   A       I do not, sir.
7   Q       So if a record would indicate it was faxed to you,
8   you don't know if that was true or false?
9   A       I do not.
10  Q       Now, when you responded to the call that indicated
11  that there was a belief that Josh -- that Brandon's body may
12  have been in the woods behind grandma's house, you weren't
13  sure what the source of that information was?
14  A       I know Stephanie Sample told me that -- I believe she
15  told me that Josh told her that.
16  Q       Okay.  So it was Josh that was feeding that
17  information --
18  A       Yes, sir.
19  Q       -- that you were receiving?
20  A       Yes.
21  Q       Now, you don't know if he was telling other people
22  that as well?
23  A       I do not.

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

643

1   Q       And, again, you did not interview him; is that

2   correct?

3   A       Not at that --

4   Q       Immediately?

5   A       No, sir.  Not immediately.

6   Q       Now, during the interview of Josh White, again, you

7   conducted that interview; correct?

8   A       Correct.  Yes, sir.

9   Q       And during that interview, you were questioning him

10  the kind of clothing that Brandon Sample was wearing; is that

11  correct?

12  A       That's correct.

13  Q       And you would agree with me that during that

14  investigation, during that questioning, he continued to

15  indicate to you that he really wasn't sure about the type of

16  shorts or shirt that he was wearing?

17  A       He had made mention that he thought he had gray Nike

18  shorts on.  And he said a couple different types of shirts it

19  could have been.

20  Q       Correct.

21  A       That he could have had on.  But he didn't remember

22  precisely what kind of shirt he had on.

23  Q       At one point, he said maybe a baseball shirt?

644

1    A        Yes, sir.

2    Q        Which is those three-quarter sleeves?

3    A        Yes, sir.

4    Q        And that wasn't the type of clothing that was being

5    worn?  Or was it?  Was that the type of clothing that you

6    found on Brandon Sample?

7    A        Sir, the only thing I remember of the clothing that I

8    have is the gray shorts.  And I remember the blue shoe.

9    Beyond that, I don't remember the shirt.

10   Q        Okay.  So the gray shorts that Josh said he was

11   wearing, it did fit what you discovered on Brandon Sample that

12   day?

13   A        That, along with the shoes.  Correct.

14   Q        Okay.  And he did identify specifically the types of

15   shoes that Brandon Sample was wearing?

16   A        Yes, sir, he did.

17   Q        And, again, if we go back and we look at those

18   pictures, one of those shoes had actually come off and got

19   wedged between the 2 x 4 at the crime scene; is that correct?

20   A        It was a piece of wood, yes, sir.

21   Q        During that interview, Josh White also indicated to

22   you that he still had clothing in Brandon Sample's vehicle; is

23   that correct?

645

1    A        He did.

2    Q        He indicated that -- and he specifically referenced

3    that he had a pair of shorts, camo shorts, that were in the

4    car in the back seat that were covered in mud?

5    A        He did.

6    Q        Those shorts were never located or tested; is that

7    correct?

8    A        That is correct.

9    Q        Now, again, you indicated -- and we looked at

10   testimony yesterday -- the scene of the crime.  You would

11   agree with me that there was a lot of testimony that the scene

12   was pretty dry?

13   A        It was.

14   Q        Okay.  But we had testimony coming in that Brandon's

15   clothes were soaking wet?

16   A        I disagree with that.  I don't know what the

17   testimony was.

18   Q        I'm asking you solely about the testimony yesterday.

19   A        I don't recall testimony.  I remember there being a

20   question whether they were wet or not, yes.

21   Q        Okay.  And, again, Josh has muddy clothing, but this

22   was never followed up on; correct?

23   A        No, sir.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        And, again, there was questions yesterday about the

2    tires on the vehicle when it was found at the Niles bike path;

3    do you recall that?

4    A        Yes, sir.

5    Q        And, again, the detective that was -- or the officer

6    that was testifying about the location of the Niles bike path,

7    he indicated that the area was dry?

8    A        Correct.

9    Q        Okay.  And I questioned him, "Did you see mud on the

10   tires?"  And initially he said no, but on redirect he was

11   presented again with a picture, and it showed mud on the, on

12   the rear tire?

13   A        Yes, sir, I remember that.

14   Q        So we have somebody that comes to you admitting that

15   he had shorts that were wet and covered in mud, we have a car

16   with mud on the rear tire, and none of this was followed up

17   on?

18   A        No, sir.

19   Q        Okay.  No samples were taken from the pants to

20   compare to see if it was the same source as what was found on

21   the vehicle?

22   A        No, sir.

23   Q        That could be done?

647

1   A        It could be, but from what I understand, all the

2   testing -- dirt samples would just say that that's indigenous

3   of northeast Ohio.

4   Q        But you're not an expert?

5   A        I am not an expert.

6   Q        And you did not send this to a lab to see if there's

7   different --

8   A        No, sir.  I brought it up, and that's what I was

9   told.  That all it would say is it would be indigenous to

10  northeast Ohio.

11  Q        So you brought up, what, the testing of the --

12  A        The soil samples.

13  Q        When you brought up about testing soil samples, are

14  you talking about testing soil samples at the scene?

15  A        Yes, at the scene.

16  Q        Because you, again, would agree that you did not

17  follow up on the shorts?

18  A        I did not follow up on the shorts.

19  Q        Now, also during this interview of Josh White, he

20  came in and he was adamant that he had never met Austin Burke

21  ever; is that correct?

22  A        That is correct, yes, sir.

23  Q        There was no explanation as to how Austin identified

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

648

1    him by name saying, "I think his name was Josh or Tyler or

2    something like that"; correct?

3    A        There was -- one of the text messages between Brandon

4    and Austin, Josh had -- or Brandon had mentioned he had to

5    take J White back to Akron.

6    Q        J White.  I mean, J could be John, Jim?

7    A        It could be.

8    Q        Jerry?

9    A        It could be.

10   Q        But he said "Josh"; correct?

11   A        He said Josh or Tyler.  He wasn't sure.

12   Q        Okay.  But, again, Josh in that interview did not

13   know that those text messages were exchanged?

14   A        That is correct.

15   Q        You didn't question him as to, "Hey, how would Austin

16   have known your name?"

17   A        I did not.  No, sir.

18   Q        And, again, you got the phone records for Austin

19   Burke?

20   A        I did.

21   Q        Okay.  And you got the phone records for Brandon

22   Sample?

23   A        I did.

649

1   Q       And, again, you would confirm that the number that
2   Austin Burke had and the number -- and the reports that you
3   received from Brandon Sample, they're indicating no call
4   before June 11th of 2017; is that correct?
5   A       That's correct.
6   Q       Now, again, there is a phone call that we went over
7   that was made on June 11th at 7:30 p.m. from Brandon Sample's
8   phone to Austin Burke's phone; is that correct?
9   A       That's correct.
10  Q       And, again, that phone call lasted approximately two
11  seconds?
12  A       That's correct.
13  Q       And we went over with the expert yesterday, that
14  could be somebody sending their number?
15  A       Correct.
16  Q       So it would be recorded in their phone?
17  A       Yes.
18  Q       You would agree that two seconds is typically not
19  long enough to have a conversation?
20  A       I would agree with that.
21  Q       Not long enough to make plans as to hooking up later?
22  A       I would agree with that.
23  Q       Now, we also have text messages that were on that

1   phone; is that correct?

2   A       Yes, sir.  On Austin's phone.

3   Q       On Austin's phone?

4   A       Correct, yes.

5   Q       And, again, we were not able to read the text

6   messages on Brandon's phone because Brandon's phone, the

7   records have never been received?

8   A       That is correct.

9   Q       Okay.  And those records were requested in December?

10  A       December, January.  I don't remember the exact date.

11  Q       So approximately six or seven months after your

12  investigation began?

13  A       Yes.

14  Q       That's when you followed up -- or made the initial

15  request for records?

16  A       That's correct.

17  Q       Now, again, the text messages that we went over

18  yesterday -- and not me and you, but what we've heard through

19  testimony -- there was a text message from Brandon to Austin

20  that says he was swimming at this chick's house; correct?

21  A       Yes.

22  Q       And he had to bring J White back to Akron; correct?

23  A       Correct.

1    Q        But wanted to know if Austin still wanted to link up?

2    A        Correct.

3    Q        Okay.  Now, you would agree between that 7:30

4    telephone call and the 10:00 text messaging that was going

5    back and forth, there had been no other communication

6    identified on that phone?

7    A        I'd have to look at the records to be certain on

8    that, sir.

9    Q        We'll look at 'em.

10   A        Sure.

11   Q        I'm going to provide you again Exhibit A.  Can you

12   look back through those records and go to -- the last page is

13   the telephone calls; is that correct?

14   A        Yes, sir.

15   Q        Okay.  Can you identify again what those, the times

16   of those telephone calls are?

17   A        One was at 12:26 a.m., and one was at 5:18 a.m.

18   Q        Okay.  And then let's go to page 3, I believe it was,

19   where the text messages start.

20   A        Okay.

21   Q        Is that correct?

22   A        Yes.

23   Q        Page 1 and 2 are just summary reports that were

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

652

1    generated by the extraction --

2    A       Yes.

3    Q       -- report?

4    A       Yes.

5                    MR. BECKER:  If I may, are those UTC times

6    or the correct times?

7                    MR. OLSON:  They're UTC times.

8                    MR. BECKER:  I just wanted to clarify that.

9    BY MR. OLSON:

10   Q       And, again, we did go over Exhibit A yesterday was

11   all UTC times?

12   A       That's correct.

13   Q       That's how the extraction report generates it through

14   the phone?

15   A       That's correct.

16   Q       So, again, on the UTC times, we had a phone call

17   coming in at approximately 7:30?

18   A       Yes.

19   Q       Okay.  And the very first text message came in at

20   what time?

21   A       2:01 a.m. UTC time.

22   Q       Which would be 10:02?

23   A       I believe it's four hours, minus four hours, so yeah.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

653

1  Q        So 10:02.  What time was the text message that came

2  in that said, "I'm at this chick's house" and "do you still

3  want to link up?"

4  A        That would have been at 2:05 a.m. UTC time, so 10:05

5  p.m.

6  Q        Okay.  So between 10:02 and 10:05, was there any

7  statement, "Hey" -- making plans?

8  A        No, sir.

9  Q        So, again, the first time that we see anything about

10 still linking up is at 10:05?

11 A        Correct.

12 Q        And the only thing prior to that is a two-second

13 phone call?

14 A        Yes.

15 Q        So how do you explain to us that there is a

16 two-second phone call, no other communication at any point in

17 time, but there's a question, "Do you still want to link up?"

18 being sent to you by Brandon Sample?

19 A        I cannot explain that, sir.

20 Q        Would that be consistent with Austin's story that,

21 "Brandon Sample picked me up as I was walking home from Willow

22 Lake and drove me home"?

23 A        It could be.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

654

1    Q        Right?  Because they could have a conversation in the

2    car; is that correct?

3    A        They could have.

4    Q        Right.  And we have no other data that you've

5    gathered through anything that indicated -- through family

6    members or anybody else -- that Brandon Sample ever mentioned

7    Austin Burke's name?

8    A        No.

9    Q        Again, during the interview, how did Josh White

10   appear?  Like what was his characteristics?  Did he have a

11   beard?

12   A        I believe he had a small beard.  Wasn't clean shaven.

13   Q        Okay.  And, again, Austin Burke told you that the guy

14   that was in the front seat had a beard?

15   A        He did.

16   Q        And his name was Josh or Tyler or something like

17   that?

18   A        Yes.  He wasn't sure.

19   Q        We also did a complete phone extraction.  Did you get

20   copies of the phone extraction reports?

21   A        From Austin's phone?

22   Q        Correct.

23   A        Yes, sir, I did.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q        Did you go through them?

2    A        I did.

3    Q        Okay.  Did you see messages from a Carlos Rodriguez?

4    A        That name sounds familiar, yes.

5    Q        And with the messages -- did you read the messages

6    between Carlos and Austin?

7    A        I read a lot of them, sir.  I don't remember which

8    ones said what.

9                       MR. OLSON:  May I approach the witness,

10   Your Honor?

11                      THE COURT:  You may.

12   BY MR. OLSON:

13   Q        I'm going to show you what's been marked as

14   Defendant's Exhibit E.  Does that identify an extraction

15   report?

16   A        It does.

17                      (Whereupon, Defendant's Exhibit E,

18   Extraction Report, was introduced for identification.)

19   Q        Okay.  And does it have at the top the participants?

20   A        It does.

21   Q        And does it -- can you identify who those

22   participants are?

23   A        It says Austin Taylor and Carlos Rodriguez.

1    Q       Okay.  And you would agree with me that it shows on

2    that extraction report how they -- who made the request to get

3    together on Facebook Messenger; do you agree?  At the top.

4    A       It says, "Conversation, Instant Messages,

5    Participants."

6    Q       Does it say, "Carlos added you on Messenger.  Add him

7    back to reach him quickly when you want to chat"?  Very top.

8    A       Oh, yes, sir.  I see it.  Yes, sir.

9    Q       And then there's some conversations that -- that

10   happened between Austin and Carlos; is that correct?  There's

11   messages back and forth?

12   A       Yes, sir.

13   Q       Okay.  There is one message on 6-20-2017 at 16:42 UTC

14   time?

15               MR. BECKER:  Your Honor, I'm going to

16   object at this point.  If we can approach.

17               THE COURT:  You may.

18               (At sidebar:)

19               MR. BECKER:  Your Honor, once again, he's

20   trying to introduce hearsay statements from a Carlos

21   Rodriguez.  It is not admissible because it's not a statement

22   against his interest.  It's basically a statement saying that

23   this defendant gave -- he's gonna say he gave him a ride home

1    that night and went to Akron.  Now, he can either put his

2    client on the stand and he can testify to that conversation or

3    he can put Carlos Rodriguez on the stand.  But he can't

4    introduce a hearsay statement through this detective.

5                    MR. OLSON:  My position would be, one, this

6    is his investigation.  He's confirmed that he is familiar with

7    those documents.  This is a business record now.  It was

8    extracted from his phone.  It became part of his investigative

9    file.  He reviewed the file.  He said that he reviewed

10   numerous text messages that were contained on that report.  He

11   can certainly testify as to what he did when he reads this

12   message, if he followed up or he did not.  I believe --

13                   THE COURT:  You can ask him if he followed

14   up on it, but you can't ask him what was said.

15                   MR. OLSON:  Okay.

16                   (End of sidebar.)

17   BY MR. OLSON:

18   Q       Did you review this text message?

19   A       Just now.

20   Q       During your investigation?

21   A       I reviewed a bunch of 'em, sir.  I don't recall if I

22   read through the whole thing or not.

23   Q       You would agree with me that receiving information

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

658

1  through the suspect's phone in a homicide case can be very

2  important evidence?

3  A        I would agree with that.

4  Q        And you would agree with me that if there are

5  statements that are coming through those messages that are

6  inconsistent with statements that are given to you by supposed

7  witnesses that that would give you reason to follow up on the

8  statements that were made to you?

9  A        Could you repeat that?  I'm sorry.

10  Q        Okay.  So if I get a message through an extraction

11  report that is inconsistent with something that another

12  witness told me in an interview, that's pretty important; you

13  would agree?

14  A        It would depend on the information.

15  Q        Okay.  And you may want to go and look for that

16  person and question them as to, "Hey, how did you get this

17  information?"

18  A        Again, it would depend on the information.

19  Q        Okay.  Reading this text message, was there anything

20  that you ever found to be concerning as relating to Josh

21  White's statements?

22  A        I do not recall, sir.

23  Q        Did you ever receive any conversations or

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

659

1   communications that Josh White was telling somebody that he

2   was -- that Austin Burke was with him when he got a ride to

3   Akron?

4   A        I do not.

5   Q        You do not remember reading that?

6   A        I do not, no, sir.

7   Q        Or getting a call?

8   A        I do not.

9   Q        But if it's on the phone?

10  A        If it's on the phone, if the information is on the

11  phone, it's on the phone.  Yeah.

12  Q        Okay.  Now, you would agree with me that during the

13  interview with Josh White you never asked to see his phone?

14  A        I did not.

15  Q        Okay.  You would agree with me that during this

16  interview Josh White had his phone?

17  A        He did.

18  Q        Okay.  Because when he was discussing about the TOMS

19  shoes?

20  A        Correct.

21  Q        He was trying to get on to the website?

22  A        That's correct.

23  Q        So his phone is sitting there?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        That's correct.

2    Q        You're doing a murder investigation?

3    A        That's correct.

4    Q        This is a person that was with Josh White -- or with

5    Brandon Sample, we know, through other people the night of the

6    murder?

7    A        That's correct.

8    Q        And he has his phone on him and you don't look to see

9    if there's any communication?

10   A        I did not.

11   Q        And, again, you would agree with me that you got a

12   complete phone extraction report for Austin Burke's phone?

13   A        I did.

14   Q        And you got that through a subpoena?

15   A        I did.

16   Q        And a subpoena is a request through the court that

17   gives you the power to go and get somebody's personal

18   property?

19   A        That's correct.

20   Q        You would agree with me that you could have done that

21   for Josh White's phone as well?

22   A        I could have.

23   Q        And you would agree with me that you did not?

661

1   A        I did not.

2   Q        You would also agree with me that at no point in time

3   did you call dispatch, as you did with Austin Burke's phone,

4   and ask for pinging results?

5   A        I don't believe Josh White would have qualified.  His

6   phone would not have qualified to be pinged.

7   Q        But, again, you never made the call?

8   A        I did not make the call, sir, no.

9   Q        And would you agree with me that obtaining these

10  detailed phone records and reports could have been used to

11  confirm or dispel statements that were being made by Josh

12  White?

13  A        It's possible.

14  Q        Right.  Because if he was saying that he was dropped

15  off at his house at 12:15 or 1:15 or whatever time that he

16  said he was dropped off, if his phone records show that he was

17  still in the Warren area at that time, then he was not being

18  truthful with you; correct?

19  A        Who are you speaking about?

20  Q        Josh White.  If he would have told you, "I was

21  dropped off in Akron at 12:15 a.m. by Brandon Sample," but

22  then you go and get his phone records and they would show that

23  he was still in Akron at 12:15, he wasn't being truthful with

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   you?

2   A       I don't understand what you're saying.  So you're

3   saying if he was dropped off in Akron at 10:15 and I got his

4   phone records and they said that he was still in Akron at --

5   Q       No, no, no.  What I'm saying is if during his

6   interview --

7   A       Uh-huh.

8   Q       -- he says to you, "Hey, on June 12 of 2017, Brandon

9   Sample dropped me off at 12:15 a.m. in Akron, Ohio," if you

10  would have received his phone extraction report and that phone

11  extraction report would have shown you that he was still in

12  Warren at 12:15, then his statement about being dropped off in

13  Akron couldn't be true?

14  A       I would agree with that, yes, sir.

15  Q       Now, again, during this interview Josh White brings

16  up the name Austin Taylor; is that correct?

17  A       It could be.

18  Q       Okay.  You don't remember your interview with him?

19  A       I remember him bringing up Austin's name, but I don't

20  remember if he used his last name or not.

21  Q       Do you remember if you were investigating initially

22  an Austin Taylor instead of an Austin Burke, or if reports

23  were coming in --

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

663

1    A        Yes.  Yes.  That's correct.

2    Q        Okay.  So initially reports are coming in of an

3    Austin Taylor?

4    A        I had known Austin Taylor from previous things.

5    Q        Okay.  And so, again, later on you had to confirm

6    that it was Austin Burke and not an Austin Taylor?

7    A        I had known that prior.

8    Q        Okay.  But, again, there is witness statements coming

9    in to you?

10   A        Correct.

11   Q        And that's the name that Josh White gave initially?

12   You don't remember?

13   A        I do not.  I'm sorry.

14   Q        But do you remember that during this conversation

15   Austin -- Josh says that Brandon told him Austin was going to

16   pay him a thousand dollars to do something?

17   A        To help him with something, correct.

18   Q        Didn't tell him what it was to help him with?

19   A        That's correct.

20   Q        Josh says he warns against it, says, "Don't do that"?

21   A        That's correct.

22   Q        You have the text messages, again, between Austin and

23   Brandon; is that correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

664

1   A       That is correct.

2   Q       Did you see any mention on any of those text messages

3   about, "Hey, I got this thousand dollars for you.  I need to

4   hook up with you to go do this work"?

5   A       There was not.

6   Q       So another thing that you could not confirm that Josh

7   White told you?

8   A       Correct.

9   Q       On June 16th -- that was the only interview that you

10  did on June 15th; is that correct?  If you looked at your

11  records?

12  A       That's correct.

13  Q       And so the next day you have a second interview with

14  Makayla; is that correct?

15  A       That's correct.

16  Q       And you have that interview yourself on video?

17  A       That's correct.

18  Q       Okay.  And you're questioning her about what she

19  knew?

20  A       That's correct.

21  Q       Through her you learn that she's now saying

22  information was learned not through Jess but Rickey Roupe?

23  A       That's correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

665

1   Q       The information you were learning was that Rickey

2   told her that Brandon was at her house?

3   A       That's correct.

4                   MR. BECKER:  I'm going to object.

5                   THE COURT:  I don't know if that has been

6   testified to or not.

7                   MR. BECKER:  Okay.  So go ahead.

8   BY MR. OLSON:

9   Q       Was there any information you ever received that

10  Rickey was making statements that Austin convinced Brandon to

11  stay at Rickey Roupe's house with him and use drugs with him?

12  A       That's correct.

13  Q       Cocaine and pills; is that correct?

14  A       I don't remember the drugs, but I remember that

15  statement.

16  Q       Okay.  And in your report, does it indicate that

17  Austin told Rickey that he set his head on fire?

18  A       Yes.

19  Q       Confirmed that that wasn't true; correct?  There was

20  no fire set to --

21  A       I have not heard that from the coroner.  You would

22  have to ask the coroner that to be certain.

23  Q       And now on June 16th you begin hearing that the --

666

1    Brandon Sample's car was dumped on the bike trail?

2    A       I had heard that -- yes, yes.

3    Q       Okay.  Again, in the initial interview, do you recall

4    Makayla made no mention to that, to the car and the bike

5    trail?

6    A       That is correct.

7    Q       You also received some information that when Austin

8    returned to Rickey Roupe's house that they had a bonfire in

9    the back; is that correct?

10   A       That's correct.

11   Q       And there was a statement made that they burned

12   Brandon Sample's clothes -- or excuse me -- Austin Burke's

13   clothes?

14   A       Yes, that was a statement.

15   Q       Pam Roupe, the grandmother, went out, gathered up

16   these clothes out of the fire pit and put them in a bucket for

17   you?

18   A       I believe she gathered up the ashes is what I was

19   told.

20   Q       Okay.  Were you able to recover those?

21   A       We looked at the house.  I did not find a bucket of

22   ashes.

23   Q       During that interview, did she indicate to you that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

667

1    Pamela Roupe was not home?  If you recall.

2    A       I do not recall, but I know Pam told me that she was

3    not home.

4    Q       She told you that she was not home?

5    A       Yes.

6    Q       Okay.  Through discussions with Makayla, did you ask

7    her if Austin admitted to her that he had killed Brandon

8    Sample?

9    A       I don't remember asking her that specifically.

10   Q       Did she ever offer that, "He told me that he didn't

11   do this"?

12   A       No, I don't recall that.

13   Q       So that's not part of the interview that you had with

14   her?

15   A       I don't recall, sir.

16   Q       And you would agree with me that Makayla is the

17   person that was probably closest with Austin out of that

18   entire group of people?

19   A       I would not agree with that.

20   Q       Based upon your discussions with Makayla, she had

21   indicated that she had been dating Austin in the past?

22   A       She had, but she had also told me that Rickey had

23   lied to us to protect Austin.  So that would mean that Rickey

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

668

1    would have been --

2    Q      I'm not asking you about what Rickey told you or what

3    -- I'm saying length and knowledge.  Who's known Austin out of

4    that group of people the longest?  Makayla?  Who was from

5    Bristol?

6    A      Rickey had said he had known Austin since he was in

7    diapers.  So I don't know.  I don't know, sir.  I don't know

8    the answer to that.

9    Q      Now, again, this information that you received about

10   Brandon convincing -- or Austin convincing Brandon to remain

11   at Rickey Roupe's house and use drugs with him and not go back

12   to Akron, that was inconsistent with the information you were

13   getting from Mr. White indicating that they went to Billie

14   Holness's house; correct?

15   A      That's correct.

16   Q      You also followed up with Billie Holness and learned

17   through her that that was true, that they were there swimming?

18   A      That's correct.

19   Q      So that statement, if you believe that, it can't be

20   true that Austin and Brandon were hanging out doing drugs at

21   Rickey Roupe's house early in the afternoon or --

22   A      I couldn't confirm that, sir.

23   Q      You had an interview with Jessica Simms; is that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   correct?

2   A       That's correct.

3   Q       Okay.  And Jessica Simms indicated that she had left

4   at midnight; is that correct?  Midnight on the 11th into the

5   12th?

6   A       I don't have that in my notes, but if's on the video,

7   it's on the video.

8   Q       Now, again, we heard from Deidre Keener yesterday; is

9   that correct?

10  A       Correct.

11  Q       And, again, that indication was Austin was hanging

12  out at around 6:00 p.m. with Rickey, Pam, Nate, her, Hayle and

13  Jess; is that correct?

14  A       I believe that's what she testified to.

15  Q       Okay.  She confirmed Brandon Sample was not there?

16  A       Early in the afternoon.

17  Q       Correct?

18  A       Correct.

19  Q       Okay.  She told you, "We didn't have a bonfire.  We

20  were hanging out in the kitchen"; correct?

21  A       I don't believe she told me they didn't have a

22  bonfire.

23  Q       If that was on the video then --

1    A        If she said that they did not have a bonfire and

2    that's on the video, I don't recall that.

3    Q        Okay.  She confirmed with you that she had very

4    limited contact with Austin Burke up to that day?

5    A        Correct.

6    Q        She had met him a handful of times?

7    A        Correct.

8    Q        She tells you that Austin leaves before midnight?  Do

9    you recall?

10   A        After midnight, before 1:00.

11   Q        Okay.  Now, we heard testimony from Hayle and Jessica

12   that indicated they left around midnight; correct?

13   A        Correct.

14   Q        And they said that Austin had left before them; is

15   that correct?  That was the testimony.

16   A        Okay.

17   Q        Do you recall that?

18   A        If that was the testimony, sir.  I don't recall.

19   Q        I mean, this is your investigation.

20   A        I understand.

21   Q        I don't want to put words in your mouth, but did you

22   make a timeline of who's telling you what and comparing the

23   witness notes?

671

1   A        I have everything in my notes, that I tried to

2   remember to put into my notes.

3   Q        Okay.  And, again, we have a report that you

4   generated; is that correct?

5   A        Would that be my case notes?

6   Q        Correct.

7   A        Yes.

8   Q        And also during interviews and things of that nature,

9   you're writing down notes?

10  A        Yes.

11  Q        Contemporaneously as they're telling you things?

12  A        Yes.

13  Q        And then you take those notes and you go back and

14  type them all up?

15  A        Correct.

16  Q        And, again, you're extracting what you felt was

17  important based upon their statements to you, correct, to put

18  into your final report?

19  A        Correct, yes.

20  Q        And you also had the benefit of while you're drafting

21  this report to go back and listen to the interviews that were

22  being provided to you; is that correct?

23  A        Sure, yes.

672

1    Q        And you also had the benefit of getting all the
2    documentation from the Niles Police Department and the
3    Trumbull County Sheriff's Office and looking at all this to
4    compile your reports; is that correct?
5    A        That's fair to say, yes, sir.
6    Q        Okay.  So you had the opportunity to make timelines,
7    mark down who is telling you what, what time they were there,
8    who was there?  All this information, it was all at your
9    fingertips through this investigation?
10   A        Sure.
11   Q        But today when you're here testifying in trial you
12   would agree with me you don't have that?
13   A        No, I do not have that, sir.
14   Q        You would agree with me that that's pretty important
15   information, to compare witness statements to confirm if
16   they're true or false?
17   A        I would agree with that, sure.
18   Q        I mean, if somebody is telling me Austin and Brandon
19   were hanging out at 6:00 or 8:00 at night at Pamela Roupe's
20   house and using cocaine and pills, and another witness says
21   Austin Burke was never there, and another witness says, "Well
22   they showed up at midnight," these are all inconsistent; you
23   would agree with me?

673

1    A        I would agree with the times being inconsistent, yes.

2    Q        And you would also agree if one person is saying Jess

3    and Hayle and Rickey were present and then another person

4    saying Jess and Hayle left, that could be inconsistent?

5    A        The times would be inconsistent.

6    Q        Right.  So, again, when we're going back and we're

7    looking at these notes and reports, it's important to get

8    timelines and compare these statements?

9    A        I would agree with that.

10   Q        But, again, in this report, we're looking at when

11   Deidre is talking to you, she's saying Austin left between 12

12   and 1?

13   A        After midnight, before 1:00, correct.

14   Q        And, again, that's inconsistent with Jess and Hayle?

15   A        The times would be inconsistent, sure.

16   Q        She also told you that around 3:30 or 4:00 Austin

17   came knocking on the door; is that correct?

18   A        That is correct.

19   Q        Okay.  And he says that he wants to talk to Rickey?

20   A        Correct.

21   Q        Okay.  But she tells him Rickey is sleeping, you

22   can't talk to him; correct?

23   A        Yes.

674

1    Q        So Austin says, "Then I want to talk to you";
2    correct?

3    A        Correct.  Yes, sir.

4    Q        This person that he's met five or six times, he wants
5    to talk to her?  And goes in the house and tells her, "I'm
6    gonna rob this dude"?  That's what he says; correct?

7    A        That's correct.

8    Q        And -- again -- now, if we look at what she testified
9    to yesterday, she testified that Austin stood at the door, he
10   never went in the house; is that correct?  If you remember.

11   A        If that was the testimony.  I don't remember, sir.

12   Q        And if that was the testimony, you would agree with
13   me that that's inconsistent to what she told you in the
14   interview, that Austin went in the house?

15   A        Well, it could be.

16   Q        Now -- and again, during your interview of Deidre,
17   she tells you that Rickey and Pam were sleeping and she was up
18   playing on her phone; is that correct?

19   A        I believe so, yes.

20   Q        Okay.  And so she never makes mention of the name
21   Nate being there?

22   A        She did not.

23   Q        Okay.  And, again, saying that Pam was there sleeping

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

675

1   is inconsistent with the statement that Pam made to you that

2   said she wasn't there?

3   A        That is correct.

4   Q        And so those two are sleeping, Hayle is laying on her

5   back playing on her phone?

6   A        Deidre.

7   Q        Or Deidre.  I'm sorry.  Thank you.  Deidre is lying

8   on her back, playing on her phone.  She goes to the door,

9   Austin makes these statements to her, she looks out the window

10  and she's able to identify Brandon Sample from looking out

11  that window; is that correct?

12  A        She had told me that she didn't know who he was at

13  that time, but after she had seen pictures of him she

14  remembered that that was him.

15  Q        Okay.

16  A        And that he was in the white car.

17  Q        But she didn't give you a description of what the

18  white car was at that point in time?

19  A        No, Deidre Keener did not tell me what kind of car it

20  was.  Just that it was a white car.

21  Q        Okay.  And she says, "I tried to talk Austin out of

22  it, but he wouldn't listen and he left and I went back to

23  bed"?

676

1   A       That's correct.

2   Q       She doesn't wake up Pam and say, "Hey, this kid just

3   came here and said he was gonna rob another kid"; right?

4   A       She did not.

5   Q       She didn't wake up Rickey and say, "Hey, your buddy

6   came here"?

7   A       She did not tell me that she woke Rickey up.

8   Q       She didn't call the police?

9   A       She did not.

10  Q       And your interview is on June 18 of 2017; is that

11  correct?

12  A       Correct.

13  Q       That is six days after Brandon Sample went missing;

14  is that correct?

15  A       That's correct.

16  Q       No prior telephone call or anything to you or another

17  police department prior to that date; is that correct?

18  A       To Deidre Keener?

19  Q       By Deidre Keener to you or to Niles or to any other

20  police department that was --

21  A       No.  No.  She did not contact us.

22  Q       And by the 18th, there's a lot of information out

23  there now; is that correct?

677

1    A        That's correct.

2    Q        The car is out there, that it was found on the Niles

3    bike path?

4    A        That's correct.

5    Q        The death of Brandon Sample was out there?

6    A        That's correct.

7    Q        The location of where he was killed is out there?

8    A        I believe so, yes.

9    Q        Or the location where he was found, not necessarily

10   killed; correct?

11   A        Yes.

12   Q        Because through your investigation you were not able

13   to determine where he was killed?

14   A        I have no evidence to suggest that he was killed

15   anywhere else but where we found him.

16   Q        But you also have no evidence to show that he was

17   shot there; correct?

18   A        Other than him being there and being shot, that's all

19   I have.

20   Q        Correct.  No bullet?

21   A        No.

22   Q        No forensic evidence?

23   A        No, sir.


                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

678

1   Q       Nothing like that?

2   A       No, sir.

3   Q       So Deidre Keener then states that she woke up around

4   7:00 a.m. and she left?

5   A       Correct.

6   Q       Okay.  She said she had to go to work?

7   A       Correct.

8   Q       Told you she couldn't sleep, had to get out of there?

9   A       Yes.

10  Q       When she left, she indicated that Austin Burke was

11  not present in that home; is that correct?

12  A       That is correct.

13  Q       That is inconsistent with the statement that was made

14  by Nate the other day; is that correct?

15  A       I don't remember.

16  Q       You don't remember what Nate told you?

17  A       I remember what he told me in the interview, but I

18  don't remember what he testified to.

19  Q       Okay.  In the interview he told you that Brandon was

20  there -- or excuse me, that Austin was there, woke him up --

21  he woke up at like 6:00 a.m.?

22  A       I don't remember.  I don't remember the date that I

23  interviewed Nate.  I'll have to find that.

679

1   Q       We'll get into that.

2   A       Okay.  All right.

3   Q       So then Deidre goes on to tell you that on Monday,

4   the 12th around 4:00 p.m. they're all back at Rickey Roupe's

5   house; is that correct?

6   A       That's correct.

7   Q       And that they're sitting around the dining room

8   table?

9   A       Correct.

10  Q       Okay.  And Austin is there; correct?

11  A       Correct.

12  Q       Starts dropping hints of putting a bike on -- putting

13  a car on a bike path?

14  A       That's correct.

15  Q       Okay.  She indicated to you then that he didn't

16  specifically state it but when she started looking at Facebook

17  and the news media she put 2 and 2 together?

18  A       That's correct.

19  Q       And we heard her say "2 and 2 together" yesterday as

20  well?

21  A       That's correct, yes, sir.

22  Q       But then later on in her interview she tells you that

23  Brandon starts -- or Austin starts bragging about putting

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Brandon's car on the bike path; is that correct?

2   A       Correct.

3   Q       So you would agree with me that there's some

4   inconsistencies with the statements that Deidre is making as

5   to some of the other information you were getting from people

6   like Pam Roupe?

7   A       That's correct.

8   Q       And from people like Nate that we'll get into if

9   you -- well, at this point you don't remember?

10  A       Correct.  I'll have to find out from my notes on that

11  interview.

12  Q       All right.  Again, going back, just to make sure

13  we're on the same page.  Initially, when you get the first

14  call from Makayla, she's indicating she got information

15  through Jess Simms; is that correct?

16  A       That's correct.

17  Q       Now, when you speak to Jess Simms, Jessica tells you

18  that she got all of her information through Rickey Roupe and

19  other people -- Deidre; correct?  She didn't say, "Austin

20  Burke told me" or "I was present when Austin Burke came back

21  and was covered in blood"?

22  A       I have that Jess -- Jessica Simms stated that early

23  Sunday morning Austin said he was going to rob this kid who

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   used to be a CO at DYS.

2   Q        Okay.  So let's go there real quick.

3   A        Okay.

4   Q        So in your report -- and, again, you're taking down

5   notes contemporaneously as Jessica Simms is talking to you?

6   A        That's correct.

7   Q        And in your report it indicates that Austin Burke is

8   present at the Roupe house on Sunday morning and begins making

9   statements that he is going to rob Brandon Sample who used to

10  be a CO at DYS?

11  A        It says this kid used to be a CO at DYS.

12  Q        Okay.  And we concluded that that was Brandon Sample?

13  A        That's correct.

14  Q        Yesterday when she was testifying she said that he

15  made the statement on Saturday; do you remember that?

16  A        If that's what she testified to, okay.

17  Q        You don't particularly remember it, but the testimony

18  would be what the testimony is?

19  A        Correct.  Yes, sir.

20  Q        But if she said yesterday during her testimony that

21  it was Saturday and your notes said it was Sunday, that's

22  inconsistent?

23  A        That's correct, sir.

1    Q        Okay.  Also -- let's just go with Sunday.  Okay.  So

2    she's indicating that Sunday morning around 10:00 a.m. or

3    11:00 a.m. Austin Burke makes this statement to Jessica Simms

4    or whomever else is there?

5    A        Correct.

6    Q        Says, "I'm going to rob Brandon Sample"; is that

7    correct?

8    A        This kid that used to be a CO at DYS, correct.

9    Q        And, again, we go back into these phone records and

10   there's no contact between Brandon and Austin at that time in

11   the morning?

12   A        At -- Sunday morning?

13   Q        Correct.  We went through the phone records.  The

14   first phone call came in 7:30 at night on Sunday, the 11th; is

15   that correct?

16   A        May I look at your --

17   Q        Certainly.  And for reference, the phone calls are

18   the final page and the text messages are the third page.

19   A        Yeah.  That's correct, sir.  Yes.

20   Q        Okay.  So there's no communication that you have from

21   this extraction report of early morning conversations between

22   Austin and Brandon at that time that Jessica Simms is saying

23   that?

683

1   A        That would be correct.

2   Q        And, again, you did an investigation where you talked

3   to a bunch of family members, friends, people like that, and

4   everybody told you they never heard the name Austin Burke

5   prior to him being identified as the person he was last seen

6   with?

7   A        Prior to the 13th?

8   Q        Correct.

9   A        No.  No, they did not hear that name prior to the

10  13th.

11  Q        All right.  Now, again, the explanation that Jessica

12  Simms gave you was that Austin was picked up by Brandon as he

13  was walking home from Willow Lake Park; is that correct?

14  A        That Jess Simms told me?

15  Q        Right.  During her interview she said that she

16  learned that Austin was riding around with --

17  A        That's correct, yes.

18  Q        -- with Brandon Sample all day and was trying to

19  figure out a plan to rob him?

20  A        That's correct.

21  Q        Okay.  That was inconsistent with all this testimony

22  that we've heard from other people; is that correct?

23  A        I have not heard that from anybody else.

684

1    Q       And, in fact, we heard from Brandon's father who got

2    up on the stand and testified that his son was home at 10:00

3    in the morning; correct?

4    A       I believe so, yes.

5    Q       Left to go cut his grandmother's grass; correct?

6    A       Yes.

7    Q       Got on the telephone right around 3 or 4 and told him

8    he was almost done cutting his grandmother's grass?  You don't

9    recall?

10   A       I don't remember that.

11   Q       If that's the testimony, that's the testimony?

12   A       Yes.

13   Q       But that, again, would be inconsistent with Jessica

14   Simms' statements to you?

15   A       It could be, yes.

16   Q       Could be?  I mean, I don't want to say "could be"?

17   A       Well, it could be because I don't know if Austin was

18   with him or not at that point.

19   Q       Okay.  You never heard that name?

20   A       Correct.

21   Q       At that point in time?

22   A       Correct.

23   Q       And you had GPS data on Austin Burke; is that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   correct?

2   A        That's correct.

3   Q        You had the phone records that we went over

4   yesterday?

5   A        That's correct.

6   Q        Except you had much more extensive phone records than

7   what we had yesterday?

8   A        Correct.

9   Q        You had earlier dates all the way through maybe the

10  20th?

11  A        Correct.

12  Q        Okay.  And those -- and we got into it earlier;

13  there's a difference between the mobility and the cell site

14  data.  One is pinging locations, and the other one is GPS?

15  A        Correct.

16  Q        You remember hearing that testimony?

17  A        Yes.  Yes.

18  Q        And during that testimony -- I keep hitting that.

19  I'm sorry.

20           During that testimony, the expert indicated that on

21  the GPS you can punch that data in to Google Earth through

22  your phone and you could come up with an address as to

23  where -- an approximate location of where that cell phone is

1    located?

2   A      Correct.

3   Q      Did you do that?

4   A      I did that.

5   Q      Okay. And you would agree with me that during the

6   morning hours up until 2:00 on the 11th Austin Burke was in

7   the area of Niles?

8   A      May I take a look?

9   Q      This is mine. I did it. I don't know if you had --

10  do you have yours that you went through?

11  A      Okay. If that's what it is, that's what it says.

12  Q      Okay. But again, you did it; correct?

13  A      I did a lot of things, yes, sir.

14  Q      Believe me, I understand.

15  A      Yes, sir.

16  Q      You have a very tough investigation that you're going

17  through.

18  A      Yes, sir.

19  Q      A lot of data that you're going through. You would

20  agree location of Austin Burke is a very important and key

21  factor in your investigation?

22  A      It is, sir.

23  Q      So we have somebody that's saying Austin Burke is

687

1    riding around -- that would be in Bristolville -- at some

2    point to set up a robbery of Brandon Sample?

3    A       Okay.

4    Q       Correct?

5    A       Yes, sir.

6    Q       And again, her statement was he was picked up from

7    Willow Lake?

8    A       Okay.

9    Q       As he was walking home?

10   A       Yes.

11   Q       Correct?

12   A       Yes, sir.

13   Q       Now, if his GPS phone data showed that he was down in

14   Niles, that can't be true; you would agree?

15   A       Correct.

16   Q       Okay.  So, again, did you do that?  Did you go

17   through and note "Jess Simms told me" --

18   A       I did not, no.

19   Q       Okay.  Hindsight, that's an important thing to do?

20   A       It may have been.

21   Q       Okay.  Throughout this investigation you indicated

22   that you did go through the GPS data?

23   A       I did.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

688

1    Q        Look and see where this phone was?

2    A        I tried my best.

3    Q        And at one point did you mark on the GPS records some

4    locations that you identified?

5    A        I did.

6    Q        One of those was Willow Lake; is that correct?

7    A        That's correct.

8    Q        So you actually confirmed a statement that Austin

9    Burke made?  His cell phone, at approximately 2:00 p.m., was

10   at Willow Lake?

11   A        Yes.  In the area of Willow Lake, yes.

12   Q        Well, if I give it to you, it would show you Willow

13   Lake?

14   A        Correct.

15   Q        Is that correct?

16   A        Yes.

17   Q        You didn't put "area of Willow Lake"?

18   A        No, I did not.

19   Q        And again, as you went through that -- because you

20   would then go through each one thereafter; you would agree?

21   A        Yes.

22   Q        That it continued to show he was at Willow Lake area?

23   A        Correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

689

1    Q       Within a mile or so?

2    A       That's correct.

3    Q       And, again, we heard the data -- or the testimony

4    from the expert that said, you know, you can't be pinpointed.

5    It's not a laser beam shooting out of space --

6    A       That's correct.

7    Q       -- that shows you pinpoint, on the penny, where

8    you're at?

9    A       That's correct?

10   Q       Correct?

11   A       Yes.

12   Q       So if this data showed that Austin Burke was in the

13   Willow Lake area from 2:00 p.m. until 7:30 p.m., that would

14   confirm his statement; correct?

15   A       That would be consistent with what he told me,

16   correct.

17   Q       That would also dispel the statements that were made

18   by people like Rickey Roupe that said that he was at his house

19   between 6 and 8?

20   A       It could, yes.

21   Q       It could, or it would?  I mean, if he's at Willow

22   Lake until 7:30, he can't be in Niles?

23   A       That's correct.

1    Q       I mean, that's about 15 miles away?

2    A       Yes, yes.

3    Q       You'd agree?

4    A       Yes.

5    Q       So, again, looking at that, if the GPS data on his

6    phone showed he was at Willow Lake, then Rickey's statement

7    cannot be true?

8    A       That would be inconsistent, correct.

9    Q       And you were able to do this all the way up until,

10   like I said, the 20th of June?  You had the records to do

11   this?

12   A       That's correct.

13   Q       Okay.  And, again, if these records showed Willow

14   Lake from 2:00 p.m. until 7:30 p.m. and then showed the area

15   of his house, be consistent with Austin's statement to you?

16   A       That he was in that area, correct.

17   Q       Okay.  And you had that data?

18   A       Yes.

19   Q       Okay.  You also learned through your investigation of

20   a person by the name of Cody Snyder came up?

21   A       That's correct.

22   Q       Okay.  And you interviewed Cody Snyder?

23   A       I did.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

691

1  Q       Okay.  And there was some information that you

2  received that Austin was at Cody Snyder's house or Cody Snyder

3  had picked him up?

4  A       That's correct.

5  Q       Do you remember getting a Facebook message or posting

6  that was from Cody Snyder that indicated he was at the

7  house -- or he went to pick up Austin?

8  A       That's correct, yes.

9  Q       Okay.  Did you go and confirm that with Cody's

10 father?

11 A       I did not.

12 Q       Okay.  Going back to Willow Lake, did you go to

13 Willow Lake and ask for video?

14 A       I did not.

15 Q       Did you ask for a listing of people to interview to

16 confirm Austin's presence there?

17                 MR. BECKER:  Your Honor, this is asked and

18 answered.

19                 THE COURT:  Asked and answered.  Let's move

20 along.

21                 MR. OLSON:  I'm sorry, Your Honor.  I do

22 recall that.

23 BY MR. OLSON:

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  Q       And would you agree, though, that that is information
2  that you could have used to confirm or dispel Austin Burke's
3  statements to you?
4  A       Getting video?
5  Q       Getting video, getting identification of people that
6  were there?
7  A       It may have, correct, yeah.
8  Q       Now, during the interview of Deidre she indicated
9  that Rickey told her he came back covered in blood; is that
10 correct?
11 A       Yes.
12 Q       Austin came home covered in blood?
13 A       Yes, I believe that's correct.
14 Q       Okay.  And that is inconsistent with what Rickey
15 Roupe testified to yesterday?
16 A       Yes.
17 Q       That's inconsistent with what he told you in his
18 interviews?
19 A       That's correct.
20 Q       She also said that Austin was playing with a gun?
21 A       Yes.
22 Q       Okay.  But you received some statements from others
23 that they hadn't seen Austin with a gun for days prior to

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   this -- to this homicide of Brandon Sample?

2   A       I had received statements that Austin had had a gun.

3   Q       Prior to?

4   A       Yes.

5   Q       Okay.

6   A       Yes.

7   Q       Rickey never made mention that on that Monday Austin

8   was there with a gun?

9   A       I don't remember Rickey saying that, no.

10  Q       And this was Rickey's house?

11  A       Correct.

12  Q       She indicated to you that Austin -- or that after

13  Austin made these statements to her she went directly to the

14  Niles Police Department?

15  A       Jess Simms did?

16  Q       Correct.

17  A       Yes.

18  Q       And she made a statement to the effect that Austin

19  was at the Roupe house playing with a gun?

20  A       Correct.

21  Q       Okay.  Did you go and review the records, the

22  dispatch records, from Niles Police Department from the

23  20th -- or, excuse me, from that Monday at 2:00 a.m. to see

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

694

1   what was reported?

2   A       I did.

3   Q       Okay.  So you're familiar with those records?

4   A       That's correct.

5                   MR. OLSON:  I'm sorry.  I think it's F.  Is

6   it F?

7                   THE COURT:  E.

8                   MR. OLSON:  E?  Sorry, Your Honor.

9                   MR. BECKER:  What are we looking at here?

10  I'm confused.

11                  MR. OLSON:  It's the dispatch summary.  It

12  is an F, Your Honor.  I'm sorry.

13  BY MR. OLSON:

14  Q       Detective Greaver, I'm showing you what's been marked

15  as Defendant's Exhibit F.  Is that the dispatch summary that

16  you reviewed and you're familiar with?

17  A       It is.

18                  (Whereupon, Defendant's Exhibit F, Dispatch

19  Summary, was introduced for identification.)

20  Q       Okay.  And there's statements made on there; is that

21  correct?

22  A       That's correct.

23  Q       At the bottom it says "Notes"?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A       That's correct.

2    Q       And does it mention anything about a gun on there?

3                    MR. BECKER:  Your Honor, I'm going to

4    object to this again.

5                    THE COURT:  He said he reviewed it.  Does

6    it mention anything?

7    A       It just says, "Austin is known to carry a pistol."

8    BY MR. OLSON:

9    Q       Okay.  It just says, "Austin is known to carry a

10   pistol."  Does it indicate that he was being held hostage?

11   That Brandon was being held hostage for a drug debt?

12   A       "Held due to a drug deal."

13   Q       Okay.  And that -- what date was that report?

14   A       On the 15th.

15   Q       At 2:00 a.m.?

16   A       2:12 a.m., correct.

17   Q       Okay.  And that's before the discovery of the body;

18   correct?

19   A       That is correct.

20   Q       And, again, we've heard a lot of testimony about the

21   significant decomposition of the body when it was found?

22   A       That's correct.

23   Q       So that body wouldn't decompose, in your experience,

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

1   in a four-hour period of time in the condition it was in?

2   A       You would need to ask the coroner that.  I don't

3   believe so, but you'd have to ask the coroner.

4   Q       I'm saying in your experience?

5   A       Correct.

6   Q       I mean -- and so that report that we just looked at,

7   it doesn't have any names?  It just says, "Niles PD"?

8   A       That's correct.

9   Q       But based upon your investigation you learned that at

10  that time was the time that Jessica Simms and Hayle Roupe did

11  go to the police department?

12  A       It was around that time, yes.

13  Q       So that doesn't really confirm that they went into

14  the police department and said, "Hey, Austin Burke has this

15  gun at Pam Roupe's house"?

16  A       Not this one.

17  Q       The interview which was three days later?

18  A       I have in my file a call log from Niles where they

19  did say.

20  Q       Okay.  Does it also say about the drug debt?

21  A       I don't believe so.

22  Q       Okay.  So their report changed?

23  A       I can pull that out of my file if you'd like.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

697

1   Q       During your investigation you also became
2   knowledgeable about a duffle bag and a backpack; is that
3   correct?
4   A       That's correct.
5   Q       The duffle bag was at Pamela Roupe's house; is that
6   correct?
7   A       That's correct.
8   Q       And the information that you were receiving was
9   indicating that the clothes from the night of the killing were
10  contained within that duffle bag; is that correct?
11  A       I was told that everything from that night was in the
12  duffle bag.
13  Q       Okay.  So you would think clothes, gun?
14  A       Correct, yes.
15  Q       Keys to the car?
16  A       Correct.
17  Q       Cell phone?
18  A       Correct.
19  Q       Wallet?
20  A       Correct.
21  Q       This stuff was all missing?
22  A       Correct.
23  Q       From Brandon?

698

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And it would all relate to that night? |
| 3 | A | That's correct. |
| 4 | Q | You seized that bag; is that correct? |
| 5 | A | I did. |
| 6 | Q | After you got a warrant on it, went through it? |
| 7 | A | Yes, correct. |
| 8 | Q | You found nothing in there? |
| 9 | A | That's correct. |
| 10 | Q | So you would agree with me that you did not recover |
| 11 | | any gunshot residue? |
| 12 | A | That's correct. |
| 13 | Q | No blood? |
| 14 | A | That's correct. |
| 15 | Q | You would agree that there were no keys? |
| 16 | A | That's correct. |
| 17 | Q | No cell phone? |
| 18 | A | That's correct. |
| 19 | Q | No wallet? |
| 20 | A | Austin's wallet. |
| 21 | Q | Just Austin's? |
| 22 | A | That's correct. |
| 23 | Q | No credit card? |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | No Speedway membership? |
| 3 | A | That's correct. |
| 4 | Q | You also received the backpack; is that correct? |
| 5 | A | That's correct. |
| 6 | Q | Again, same thing? |
| 7 | A | That's correct. |
| 8 | Q | Nothing in there? |
| 9 | A | That is correct. |
| 10 | Q | No clothes? |
| 11 | A | Correct. |
| 12 | Q | No cell phone, no keys? |
| 13 | A | Correct. |
| 14 | Q | To this date, you have not recovered the cell phone? |
| 15 | A | That's correct. |
| 16 | Q | You have not recovered keys? |
| 17 | A | Correct. |
| 18 | Q | You did not execute a search warrant on Josh White's |
| 19 | | house -- |
| 20 | A | I did not. |
| 21 | Q | -- to see what's there? |
| 22 | A | I did not. |
| 23 | Q | To be fair, you didn't execute a search warrant on |

700

1    Austin Burke's home to see if it was there or not?

2    A        That is correct.  I did not.

3    Q        No family came forward and said, "Hey, I found some

4    suspicious property"?

5    A        That is correct.

6    Q        You interviewed Austin after he was taken into

7    custody on this case; is that correct?

8    A        That's correct.

9    Q        He again stated to you, "Yes, I was with Brandon

10   Sample that night"?

11   A        He did.

12   Q        7:30?

13   A        Correct.

14   Q        "I was picked up from Willow Lake"?

15   A        On the way home from Willow Lake, yes.

16   Q        On the way home.  And we already went through that

17   that's not unbelievable, to say that Austin was walking home

18   from Willow Lake to his house?

19   A        Correct.

20   Q        He again confirmed that there was another male in

21   that car?

22   A        He did.

23   Q        That male had a beard?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

701

1              THE COURT:  Mr. Olson, we have been through

2    this time and time again.  You've asked that about three

3    times.  Let's move it along.

4              MR. OLSON:  Yes, sir.  This is the second

5    interview, though, Your Honor.  I want to show that it was --

6              THE COURT:  Move it along.

7    BY MR. OLSON:

8    Q       During that same interview, you questioned Austin

9    about the telephone call that came in at 1:18; is that

10   correct?

11   A       I asked him if he had heard from Brandon.

12   Q       And he said he did?

13   A       He did.

14   Q       And he said Brandon told him he was going to the east

15   side of Warren to buy heroin; do you remember that?

16   A       Yes.

17   Q       And there was no followup on that to see if that was

18   true?

19   A       Correct.

20   Q       And the 1:18 phone call was 48 seconds long?

21   A       Something like that.  40 something.  Yes.  I don't

22   remember, but yes.

23   Q       And there was no phone calls after that?

702

1    A        That's correct.

2    Q        No text messages up until later the next day at

3    the -- on the 12th when Austin starts texting, "Bro, where you

4    at?"

5    A        I believe that's correct.

6    Q        And, again, by the 12th, at the time that Austin

7    starts sending out that text, information is starting to be

8    passed along that Brandon Sample was missing?

9    A        Correct.

10   Q        And we heard from other witnesses, to include Josh

11   White, that said Austin was being tagged on Facebook of the

12   missing person reports?

13   A        I believe -- yes.  Yes.

14   Q        So Austin is like, "Yo, where you at?  I'm, you know,

15   being looked at about this.  I can't have this kind of heat"?

16   That was the text message?

17   A        That's what he said, yes.

18   Q        All right.  On the 22nd, you went back to the scene.

19   And you would agree with me that between -- oh, no.  Excuse

20   me.  Strike that.  On the 22nd, you went back to the scene?

21   A        I did.

22   Q        And, again, no shell casing?

23   A        That's correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

703

1    Q       That was the last time you went to the scene; is that
2    correct?

3    A       That's correct.

4    Q       I mean, at that point in time, you searched that
5    scene twice?

6    A       Correct.

7    Q       No evidentiary value found there at all?

8    A       That is correct.

9    Q       The 23rd is when your interview with Rickey Roupe
10   occurs?

11   A       Yes.

12   Q       Okay.  And, again, in that interview he indicated
13   Austin was there between 6 and 8 p.m.?

14                   MR. BECKER:  Your Honor, I'm going to
15   object.  This has been asked and answered at least three
16   times.

17                   THE COURT:  Move it along.

18                   MR. OLSON:  Yes.

19   BY MR. OLSON:

20   Q       Did Rickey say that Austin was at his house in the
21   morning?

22                   MR. BECKER:  Objection.  Asked and
23   answered.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

704

1          MR. OLSON:  Your Honor, this was Nate.  I
2   asked about what Nate said.
3          THE COURT:  Ask your question.  Do not
4   repeat another question that you've already asked, please.
5          MR. OLSON:  Yes, Your Honor.
6   BY MR. OLSON:
7   Q      Did Rickey tell you Austin was at the house at 6 a.m?
8   A      I don't see that in my notes, sir.
9   Q      Okay.  Your testimony -- or your interview with
10  Rickey, Rickey indicated that initially that morning when he
11  left he didn't say anything about killing Brandon; is that
12  correct?  He called him later on?
13  A      I believe that's correct, yes.
14  Q      Did you go through the phone messages between Rickey
15  and Austin?
16  A      I'm sure I did.
17  Q      Okay.  Do you recall seeing any messages exchanged
18  between Rickey and Austin about this incident?
19  A      I thought there was something that Rickey had asked
20  Austin about it, but I don't recall exactly what it said.
21  Q      And it was a denial?
22  A      I believe so, correct.
23  Q      Correct?  I mean, again, you had thousands of

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

1    messages?

2    A        Correct.

3    Q        You did not uncover one message that had Austin

4    admitting to doing this?

5    A        That's correct.

6    Q        Talked to numerous of his friends?

7    A        That's correct.

8    Q        You didn't go out and talk to any of these people

9    either to say, "Hey, did Austin ever call you on the phone and

10   say anything to you?"

11   A        I talked to one.

12   Q        Who was that?

13   A        That Jeff Patty.

14   Q        Okay.  And he didn't know anything?

15   A        No.

16   Q        He just said that night Austin --

17   A        They had a Facebook conversation.

18   Q        Correct.

19   A        Yes.

20   Q        Do you recall in the interviews the witnesses such as

21   Hayle or Jessica saying that Austin was going to rob Brandon

22   for six to seven pounds of heroin?

23   A        I believe that was Deidre that said that.

706

1   Q        Okay.

2   A        But, yes, I do recall somebody saying that.

3   Q        Six to seven pounds of heroin is an awful lot of

4   heroin; you would agree?

5   A        Yes.

6   Q        What would you say the street value of six to

7   seven pounds of heroin is?

8   A        I do not know the drug game, sir.  I couldn't even

9   guess to that.  I have no idea.

10  Q        But it's quite high?

11  A        Astronomical.

12  Q        Like hundreds of thousands of dollars?

13  A        Yes.

14  Q        That just wasn't credible to you?

15  A        That's correct.

16  Q        That's a statement that a witness made to you?

17  A        That she was told by Austin, correct.

18  Q        You interviewed Brandon Sample's girlfriend; is that

19  correct?

20  A        That is correct.

21  Q        No mention of Austin Burke's name ever coming with

22  her; is that correct?

23  A        That is correct.

707

1    Q        You did interview Cody Snyder?

2    A        I did.

3    Q        And he confirmed everything that Austin said, that he

4    was picked up that night?

5    A        No.  No.  Cody -- I had interviewed Cody because

6    Austin had told me that he had been home all night.

7    Q        But then the Facebook message that you got --

8    A        Correct.  Indicated that Austin had not been home all

9    night, that he had went to Cody's house.  And I interviewed

10   Cody.  And Cody confirmed that he had picked Austin up that

11   night at his house.

12   Q        Okay.  And that was about 9:30?

13   A        I don't recall the time, but it was in the evening.

14   Q        Do you recall where Cody lives?

15   A        It was near Austin.

16   Q        Very close?

17   A        Yes.  I don't remember the address, but I remember it

18   being near -- close to Austin.

19   Q        And Cody did not remember how long Austin was there?

20   A        He did not, and he did not remember if he stayed the

21   night or not.

22   Q        All right.  So it could have been very brief and

23   Austin went back home?  And again --

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        I don't know.  I don't know.

2    Q        Detective Greaver, I'm going to show you what's been

3    marked as State's Exhibit 23.  Again, are you familiar with

4    that document?

5    A        Yes.

6    Q        That is the document you received from Brandon's

7    father?

8    A        That is correct.

9    Q        And that's the printout of the telephone numbers that

10   were coming in and going out of Brandon's phone call?

11   A        That's correct.

12   Q        All the way up through the 12th of June?

13   A        Correct.

14   Q        And we had a phone call that was identified at 1:18

15   a.m. as an incoming call; is that correct?

16   A        That's correct.

17   Q        And we confirmed that that (330) 891-7261 number was

18   Austin Burke?

19   A        That's correct.

20   Q        Okay.  There are two phone calls after that; would

21   you agree?

22   A        That's correct.

23   Q        One was at 2:14 a.m.?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   A       Yes, sir.

2   Q       And it shows destination?

3   A       Akron, Ohio.  Well, Akron.

4   Q       Okay.  And it has a phone number?

5   A       It does.

6   Q       (330) 573-8234?

7   A       Correct.

8   Q       We confirmed with Mr. Sample that he was not familiar

9   with that phone number; is that correct?

10  A       I believe so.

11  Q       And did you investigate that number?

12  A       I did not.

13  Q       And not only do we have one phone call made at 2:14

14  a.m.; we have a second one on -- at 2:15 a.m. to the same

15  exact number?

16  A       Correct.

17  Q       And that was the very last phone call that was made

18  by Brandon Sample's phone?

19  A       Correct.

20  Q       After that phone call, based upon the testimony we've

21  heard from Brandon's father, all phone calls were going

22  directly to voicemail?

23  A       That's correct.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

710

1    Q       Okay.  And there were only text messages coming?

2    A       Correct.

3    Q       You're familiar with cell phones?

4    A       Yes.  Somewhat.

5    Q       Right.  I'm sure if I had a 12-year-old up there they

6    could tell us a lot more about a cell phone --

7    A       Yes, sir, that's correct.

8    Q       -- than what we can say.  But unless there's a

9    password on a phone, anybody could send a text from a phone;

10   is that correct?

11   A       That's correct.

12   Q       As long as I have the device, I can send a text

13   message from that phone?

14   A       As long as there's not a password on it.

15   Q       If there is a password, as long as I know that

16   password?

17   A       Correct.

18   Q       And, again, we don't know if Brandon's phone had a

19   password or not?

20   A       Do not.

21   Q       And based upon your investigation, you cannot say

22   that Brandon Sample was still alive at 4:30 a.m. on June 12th

23   of 2017; is that correct?

1   A       I cannot say that, correct.

2   Q       So you would agree with me that this number, pretty

3   important, as to the person that owns that?

4   A       It may have been.

5   Q       I mean, conversation could have happened that we will

6   never know about?

7   A       Correct.

8   Q       Could have been a person that actually saw Brandon

9   Sample?

10  A       It may have been.

11  Q       Talked to him.  And did you do anything to try to

12  find out who that number was?

13  A       I did not.

14  Q       And in the course of your investigation, you would

15  agree with me -- there was one person familiar or had a link

16  to Akron; correct?

17  A       That's correct.

18  Q       And that was Josh White?

19  A       That's correct.

20  Q       So the last phone call was made to an Akron number,

21  and we know the last destination for certain for Brandon

22  Sample -- or -- for Brandon Sample was Akron, Ohio?  I mean,

23  that's where he was going?

712

1    A        I have statements that he went to Akron, and I have
2    statements that he was in Niles also.
3    Q        Correct.  By these witnesses we heard from?
4    A        Correct.
5    Q        With the inconsistent testimony?
6    A        That's correct.
7    Q        And through your investigation, did you go out to try
8    to find out if, in fact, Brandon Sample owed anybody money for
9    drug debts?
10   A        I did not.
11   Q        Okay.  And, again, this was an individual that you
12   learned initially at your investigation may have had a drug
13   problem?
14   A        That's correct.
15   Q        When Brandon Sample's body was found, he was clothed;
16   correct?
17   A        Correct.
18   Q        Gray shorts?
19   A        (No response.)
20   Q        Gray shorts?
21   A        Gray shorts.
22   Q        A black shirt pulled up over his head?
23   A        I don't know if it was black or not, but there was a

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   shirt pulled up over his head.

2   Q       Dark colored?

3   A       Yes.

4   Q       Was there like another, like a tee shirt on him?  Or

5   was that just part of his -- like the shirt?  Did he have two

6   shirts on?

7   A       I don't recall him having two shirts on.

8   Q       Okay.  So we know he had a dark-colored shirt pulled

9   up over his head?

10  A       Correct.

11  Q       Socks, underwear, all of that?  Do you know?

12  A       I don't recall his socks or underwear.

13  Q       When he was removed from the scene, he still had that

14  clothing on; is that correct?

15  A       That's correct.

16  Q       When he got to the coroner's office, he still had

17  that clothing on?

18  A       You'd have to ask the coroner that.  I was not there.

19  Q       At some point in time, was -- were you detectives

20  contacted about the retrieval of the clothing?

21  A       We were.

22  Q       Okay.  And there was a conclusion made about that

23  clothing; is that correct?  To just destroy it?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

714

1   A       That's correct.

2   Q       So that clothing is not here today?

3   A       It is not.

4   Q       And that clothing was not tested; is that correct?

5   A       Not to -- no, it was not.  Not to my knowledge.

6   Q       You didn't do GSR on it?  Gunshot residue?

7   A       No.

8   Q       You didn't do fiber strips --

9   A       No.

10  Q       -- to see if maybe there was something there?

11  A       No, sir.

12  Q       It may be difficult to find something.  I mean, the

13  body, we don't know how long it was there?

14  A       I'm not an expert, but in the state that the body was

15  in, it would be highly unlikely.

16  Q       Highly unlikely, but not impossible?

17  A       You'd have to ask an expert that, I don't know.

18  Q       During your investigation, did you ask an expert?

19  A       I did not.

20  Q       And you were in contact with a lab; right?  On the

21  fragments and the other stuff that were recovered, you had

22  communication with lab techs from --

23  A       I don't believe I had direct communication with them,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  but our evidence technician had --

2  Q       And you could have made that request as the lead

3  detective?

4  A       I could have.

5  Q       To have strips done or to contact to see if it was

6  worthwhile?

7  A       I could have.

8  Q       And you didn't?

9  A       I did not.

10  Q       Okay.  You would agree in a lot of investigations,

11  especially in the drug areas, we'll do what we call a wiretap

12  or a phone interception; correct?  Where you have a party call

13  another party and try to get them making incriminating

14  statements.  Have you ever been involved in that?

15  A       I have not been involved in that, no, sir.

16  Q       Do you know in the drug investigations if that's

17  done?

18  A       I do not.  I don't investigate drugs, sir.

19  Q       All right.  You didn't look to try to have another

20  one of these witnesses call Austin Burke and try to get him to

21  make an incriminating statement?

22  A       No, sir, I did not.

23  Q       Okay.  You would agree with me that you never checked

716

1    to see if there was any relationship between any of the

2    parties at the Roupe household and the household where Josh

3    tells you he was picked up in in Niles?

4    A       I did not.

5    Q       Okay.  And you would agree with me, Niles isn't a

6    huge community?  It's pretty small?

7    A       I don't know that pretty small is right, but it's not

8    a huge community.  I'll agree with that.

9    Q       Okay.  And, again, there could have been some

10   relationship between those people?

11   A       I had not had any reason to believe that.  I was not

12   given --

13   Q       But you didn't do an investigation?

14   A       I was not given any information to indicate that.

15   Q       All right.

16   A       To follow up on that.

17   Q       But to be fair, today and yesterday when you

18   testified, you didn't even remember the guy's name?

19   A       That's correct.

20   Q       Throughout your investigation, was the name Jill

21   Davis coming up a lot?

22   A       I remember the name coming up.  I don't know if it

23   was coming up a lot.  But I remember it coming up.

717

1    Q        Did you interview her at all?

2    A        I did not.

3    Q        Did you see what types of communications she was

4    having with Jessica Simms who came in here and testified?

5    A        I believe that I did.  I don't recall exactly what

6    they were.

7    Q        During our review of the crime scene, we noted a blue

8    tarp that was right near the body; is that correct?

9    A        That's correct.

10   Q        That tarp had some dust and dirt on it; correct?

11   A        It may have.

12   Q        I mean, if you don't remember.

13   A        I don't remember.

14   Q        If I showed you it, you would recall it though;

15   correct?

16   A        Yes.  I recall the tarp being there, yes.

17   Q        Did you seize that tarp?

18   A        I did not.

19   Q        Did you direct that it be seized?

20   A        I did not.

21   Q        You would agree that a tarp could be used to cover a

22   body?

23   A        It was not covering the body.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

718

1   Q        I'm saying --

2   A        It could be, sure.

3   Q        Correct.  If the body was placed into the car or into

4   a trunk, we can cover a body with a tarp?  We can roll the

5   body up in a tarp?

6   A        You could.

7   Q        If this crime occurred out on the street or the

8   pathway to the crime scene, I can use a tarp to drag the body.

9   Dead weight is pretty heavy?

10  A        Yes.  I would imagine it is.

11  Q        Easier to drag than to maybe pick up or carry or

12  something like that?

13  A        It could.  I don't know.

14  Q        Tarp could have contained information relating to

15  this investigation of this crime?  Could have?

16  A        It may have.  I did not look at the tarp as evidence.

17  Q        Even though it was within feet of the body?

18  A        Yes.  I did not view it as evidence.

19  Q        And somebody that may have used that for this crime,

20  maybe to conceal the body or to assist them with the body,

21  they wouldn't want that on them?  They would discard it?

22  A        Correct.  I would agree with that.

23  Q        Makes sense?  Sure.  So, I mean, discarding it near

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  the body, leaving it alone; correct?

2  A        I don't know, sir.

3                      MR. OLSON:  May I have a moment, Your

4  Honor?

5              Your Honor, I have no further questions.

6                      THE COURT:  All right.  Ladies and

7  Gentlemen, we'll take this opportunity for our midmorning

8  break.  We'll take 15 minutes.  Do not discuss this case among

9  yourselves, nor with anyone else.  Do not form or express an

10  opinion.

11                      (Whereupon, a recess was had commencing at

12  10:44 a.m. and concluding at 11:04 a.m.)

13                      THE COURT:  Detective Greaver, return to

14  the stand.

15                      MR. BECKER:  Thank you, Your Honor.

16                      REDIRECT EXAMINATION

17  BY MR. BECKER:

18  Q        Sounds to me like, Detective Greaver, you got the

19  wrong guy; right?

20  A        I don't believe that.

21  Q        Okay.  Well, let's talk about some things in this

22  investigation that are important.

23              First of all, you were questioned about Josh White

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    referring to someone named Austin Taylor; is that correct?

2    A       I believe so.

3    Q       All right.  And I think you'll recall the testimony

4    of Josh White that he looked up Austin Taylor on Facebook;

5    correct?

6    A       I believe so.

7    Q       I'm going to hand you what I'm going to mark as

8    State's Exhibit 54.  Do you recognize what State's Exhibit 54

9    is?

10   A       It is a Facebook page.

11          (Whereupon, State's Exhibit 54, Facebook Page, was

12   introduced for identification.)

13   Q       Of who?

14   A       Austin Taylor.

15   Q       And is that Austin Taylor, Austin Taylor Burke in

16   this case?

17   A       It is, sir.

18   Q       Okay.  So if I went on Facebook, which I did during

19   the break, and printed this picture out and looked for Austin

20   Taylor, this is the Facebook page; right?

21   A       That's correct.

22   Q       And you heard the testimony of Josh White saying that

23   he did look up the Facebook page of Austin Taylor; correct?

721

1    A        I believe so, sir.

2    Q        And that's the Facebook page of one Austin Taylor who

3    is, although without the tattoos, the defendant in this case?

4    A        That is correct.

5    Q        Now, there was a lot of discussion about text

6    messages and extraction reports and things like that.  The

7    extraction report that was previously marked as State's

8    Exhibit 47 that JoAnn Gibb testified to yesterday; is that

9    correct?

10   A        I believe so.

11   Q        All right.  And you recall that the text messages up

12   until -- well, actually, all the text messages on June 11th

13   between Austin Burke and Brandon Sample had been deleted from

14   his phone; correct?

15   A        That is correct.

16   Q        And they were able to retrieve those?  JoAnn Gibb was

17   able to retrieve those; correct?

18   A        That is correct.

19   Q        And, in fact, one of those text messages stated --

20   from Brandon Sample to the victim -- stated, "I'm at this

21   chick's house swimmin'.  I'm gonna have to take J White back

22   to Akron in a little bit.  But do you still want to link up

23   when I get back?"  Do you remember that?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

722

1   A       Yes, sir.

2   Q       Okay.  And then there's conversation that they were

3   gonna hook up?

4   A       That's correct.

5   Q       That was deleted?

6   A       That's correct.

7   Q       All of those were deleted?

8   A       Correct.

9   Q       And you'd agree that when you interviewed both times

10  this defendant he never told you that he had plans to meet up

11  with Josh -- or I'm sorry -- Brandon Sample that night;

12  correct?

13  A       I believe so.

14  Q       All right.  And there was extensive cross examination

15  about whether or not there had been a phone call for two

16  seconds and then that was my contact number and then you could

17  save that as my contact number; correct?

18  A       Correct.

19  Q       But you don't have any idea whether or not Brandon

20  Sample and Austin Burke spoke face-to-face at any point in

21  this case; correct?

22  A       I do not.

23  Q       Could have?

723

1    A        Could have.

2    Q        Wouldn't be on any phone record?

3    A        That's correct.

4    Q        All right.  And you did find information that they

5    actually knew each other; is that correct?

6    A        Yes.

7    Q        And you were able to confirm that Austin Burke was in

8    prison -- or I'm sorry -- in DYS at the same time that Brandon

9    Sample was an employee there?

10   A        That's correct.

11   Q        All right.  Now, you were asked, I believe -- and I

12   think you answered this today -- but yesterday you were asked

13   whether or not there was information -- or the only

14   information you had that Austin was with Brandon that night or

15   was going to meet him was from Josh; correct?

16   A        That's correct.

17   Q        But we do know that there was also conversation

18   between the defendant and Austin [sic] that they were going to

19   hook up on those deleted phone calls; correct?

20   A        Between Brandon and Austin.

21   Q        Or those deleted text messages?

22   A        Yes.

23   Q        Okay.  And you were asked a lot about phone records

724

| | |
|---|---|
| 1 | at 2 in the afternoon, about who was swimming at Willow Lake, |
| 2 | and who would have seen him there.  Brandon Sample was alive |
| 3 | at 2:00 on Sunday, the 11th; correct? |
| 4 | A      As far as I know, yes, sir. |
| 5 | Q      All right.  And, in fact, whether he was swimming at |
| 6 | 2:00 or 1:00 or 3:00, you agree that in investigations |
| 7 | sometimes people get their times mixed up or don't have the |
| 8 | exact time? |
| 9 | A      Yes, sir. |
| 10 | Q      Is that anything unusual in your line of work? |
| 11 | A      It is not. |
| 12 | Q      Sometimes you can talk to three or four witnesses and |
| 13 | they'll give you three or four different times as to when |
| 14 | something happened? |
| 15 | A      That is correct. |
| 16 | Q      All right.  Now let's talk about, really -- well, |
| 17 | let's talk about something else.  You were questioned about |
| 18 | searching Austin Burke's house; correct? |
| 19 | A      I was. |
| 20 | Q      All right.  What do you need in order to obtain a |
| 21 | search warrant? |
| 22 | A      Probable cause. |
| 23 | Q      All right.  You have to have some type of -- and what |

725

1  is probable cause?

2  A       Facts that would lead a reasonable person to believe

3  a crime has been or will be committed.

4  Q       And to search a certain location, you have to have

5  information that something happened there?

6  A       That's correct.

7  Q       Or that some piece of evidence is there?

8  A       That's correct.

9  Q       What witness or what piece of evidence did you have

10  that anyone told you was located at Austin Burke's house?

11  A       I had none.

12  Q       All right.  So you couldn't just go search his house;

13  right?

14  A       That's correct.

15  Q       And you couldn't get a search warrant?

16  A       That's correct.

17  Q       All right.  And that's why you didn't search his

18  house?

19  A       That is correct.

20  Q       So let's talk about Austin Burke.  You interviewed

21  him two times; correct?

22  A       That's correct.

23  Q       Where did he tell you he was both times on the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

726

1    evening -- or early morning hours of June 12?

2    A        At his house.

3    Q        All right.  And there's quite a bit of information

4    that he was not at his home all night; correct?

5    A        That is correct.

6    Q        That would include witness statements?

7    A        Correct.

8    Q        That would include his cell phone records; correct?

9    A        That's correct.

10   Q        That would include words from his own mouth -- or

11   from his own phone?

12   A        Correct.

13   Q        When he texted Brittani Merten and told her at 2:08

14   in the morning that he was in Niles; right?

15   A        That's correct.

16   Q        What witness in this case told you that Josh White

17   was in Niles during the relevant period of time?  I'm not

18   talking about earlier in the day or some other time.  During

19   the relevant period of time when other witnesses put this

20   defendant and Brandon Sample together in Niles?

21                  MR. OLSON:  Objection.  Hearsay.

22                  THE COURT:  Overruled.

23                  THE WITNESS:  Could you repeat the question

                    OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

727

1    for me?

2    BY MR. BECKER:

3    Q      What witness told you that Josh White was in Niles

4    during the relevant period of time?

5    A      I did not -- no witness told me that, sir.

6    Q      What witness told you that Josh White left the car on

7    the bike path in Niles?

8    A      I did not have a witness tell me that, sir.

9    Q      What witness told you that Josh White shot Brandon

10   Sample on Hatchet Man Road?

11   A      I did not have a witness tell me that.

12   Q      The source of your information to go rely -- or I'm

13   sorry -- to go look on Hatchet Man Road, who was that

14   emanating from?

15                   MR. OLSON:  Objection.  Hearsay.

16   A      Austin Burke.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  Austin Burke.

19   BY MR. BECKER:

20   Q      And when you went to Hatchet Man Road, what body did

21   you discover on Hatchet Man Road?

22   A      Brandon Sample's body.

23   Q      Okay.  And following the coroner's report -- you were

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

728

1    asked about testing for GSR and you could have looked at the

2    clothes.  GSR, are you familiar with what GSR is?

3    A        I am.

4    Q        What is it?

5    A        Gunshot residue.

6    Q        Okay.  Did the -- did the Trumbull County Coroner

7    tell you the cause of death of Brandon --

8                       MR. HARTWIG:  Objection.

9                       MR. BECKER:  Well, let me ask this.

10   BY MR. BECKER:

11   Q        Pursuant to the investigation, were you made aware of

12   the cause of death of Brandon Sample?

13   A        I was.

14   Q        And what was the cause of death?

15   A        Gunshot wound.

16   Q        So if you tested the shirt, that -- you already know

17   he's shot; right?

18   A        Correct.

19   Q        You were also asked about the tarp and the items on

20   there.  What witness in this case told you that there was a

21   tarp involved?

22   A        I did not have a witness tell me that.

23   Q        You were questioned extensively about searching the

729

1  car in Niles, that there could have been gunshot residue in

2  the car, blood in the car.  What witness in this case told you

3  that Brandon Sample was shot in the car?

4  A      I did not have a witness tell me that.

5  Q      Okay.  And the evidence and testimony that you were

6  presented in this case, or the evidence and the statements

7  that you received, all pointed to Josh -- or I'm sorry --

8  Brandon Sample's body being found where?

9  A      At Hatchet Man Road.

10  Q      And where did you find Brandon Sample's body?

11  A      On Hatchet Man Road.

12                  MR. BECKER:  I have nothing further.

13                  THE COURT:  Recross.

14                  MR. OLSON:  Your Honor, I have no

15  questions.

16                  THE COURT:  All right.  You may step down.

17  Thank you.

18        Call your next witness.

19                  MR. BECKER:  Thank you, Your Honor.  State

20  would call William Prince.

21

22

23

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

730

```
 1                              *   *   *

 2                         WILLIAM PRINCE,

 3    having been duly sworn, was examined and testified as follows:

 4                         DIRECT EXAMINATION

 5    BY MR. BECKER:

 6    Q       Would you state your name for the record, please?

 7    A       William Matthew Prince.

 8    Q       Where are you employed at?

 9    A       I'm employed with the ATF National Tracing Center in

10    Martinsburg, West Virginia.

11    Q       And how long have you been employed there?

12    A       I've been employed there since I retired out of the

13    Air Force for 15-½ years.

14    Q       What are your current-- or what is your current title

15    there?

16    A       I am the section supervisor in charge of records

17    custodian and out-of-business records search requests.

18    Q       So what are your duties there?

19    A       My duties are to oversee documents that are

20    certified, make sure they're accurate.  And when the records

21    custodian isn't there, I'm the records custodian.  And I'm

22    actually the one that certifies the documents myself too.

23    Q       So let me ask you.  At ATF and where you're at, your
```

1   duties are basically records come in regarding firearms that

2   are registered and you also said out-of-business records?

3   A        When -- what we do is we trace the firearm history of

4   roughly 400,000 firearms a year from police departments all

5   over the country, crime guns recovered.

6           And also as part of the Crime Gun Control Act in

7   1968, firearms dealers, when they go out of business, they're

8   required to turn in their out-of-business records to the ATF.

9   And that's where I work, at the National Tracing Center.

10  Q        And what is done with those out-of-business records

11  when they're received at your department?

12  A        They're microfilmed.  Or nowadays they're digitally

13  imaged and they're scored electronically.  And then when

14  police departments need information for them or we have to

15  trace firearm histories for law enforcement, we access those

16  records to assist law enforcement.

17  Q        All right.  I want to direct your attention

18  specifically to a firearm trace that was submitted to your

19  agency on June 23, 2017, by David Morris of the Cortland

20  Police Department.  Are you familiar with that firearms trace

21  request?

22  A        Yes, I am.

23  Q        All right.  Did you, as a result of that request,

732

1    perform an actual firearms trace?

2    A        We have about 350 people that work at the tracing

3    center.  Our federal employees and contractors actually trace

4    the firearm, but I did certify the documents at the request.

5    Q        So you would not have personally looked it up, but

6    you are the custodian of those records; correct?

7    A        Exactly.  Back when the firearm trace was submitted,

8    we have dozens of people that do data entry that would

9    actually trace the firearm.

10   Q        Okay.  I'm going to hand you what's been marked for

11   purpose of identification as State's Exhibit Number 9.  It is

12   a four-page document.  And I'm going to ask if you recognize

13   State's Exhibit Number 9?

14   A        Yes, I recognize it.

15   Q        And what is State's Exhibit Number 9?

16   A        This is a certified copy of a firearm trace summary

17   report.

18        (Whereupon, State's Exhibit 9, Firearm Trace Summary, was

19   introduced for identification.)

20   Q        And is that the trace request that was made by the

21   Cortland Police Department on June 23, 2017?

22   A        Yes, it was.

23   Q        Do you, looking at that document, know the make,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

733

1   model, and serial number of the firearm that was traced?

2   A       Yes, I do.

3   Q       Could you please tell this jury what the firearm was

4   and the serial number that was requested to be traced?

5   A       Yes.  It's a Taurus .22 pistol, model PT22, and the

6   serial number Y100112.

7   Q       All right.  I'm going to hand you what's been marked

8   previously for purposes of identification in this courtroom as

9   State's Exhibit Number 1.  And I'm going to ask you if you can

10  see on this firearm a serial number?

11  A       Yes, I've seen this serial number.

12  Q       And could you tell the jury what the serial number is

13  for that firearm?

14  A       Yes, it's Y100112.

15  Q       Is that the same serial number as the documentation

16  that you were requested to submit a trace on on June 23rd?

17  A       Yes, it is.

18  Q       Okay.  Thank you.  And as a result of that trace,

19  were you able to determine if that firearm was registered to

20  any purchaser?

21  A       Well --

22  Q       Yeah.  I may be missing --

23  A       There's no national firearm registration.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

734

1    Q        I understand.

2    A        But it was successfully traced from Taurus

3    International in Miami, Florida to the wholesaler, to the

4    retail dealer, to an individual purchaser.

5    Q        Might want to pull that microphone back in front of

6    you.

7    A        Sorry.

8    Q        Okay.  So it was traced from its point of origin

9    where it came into the country, to the retailer, to eventually

10   a person that actually purchased it?

11   A        Yes.  And Taurus is out of Brazil, but it was

12   actually manufactured in Miami.

13   Q        All right.  So this firearm, the one that -- State's

14   Exhibit 1, the one that you were asked to trace, who did you

15   actually trace it last being registered to?

16   A        The individual purchaser that the retail firearms

17   dealer sold the firearm to was Jamie Lee Sell.

18   Q        And was there an address where Jamie Lee Sell

19   indicated she lived at?

20   A        Oh, yes.  It's required, yeah.  5106 Miller South

21   Road, Bristolville, Ohio 44402.

22   Q        Okay.  Now I'm going to hand you what's been marked

23   for purposes of identification -- I'm sorry, purposes of

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

735

1    identification as State's Exhibit Number 10.  And this is a --

2    this is an 8-page document.  I'm going to ask if you recognize

3    State's Exhibit Number 10?

4    A       Yes, I recognize it.

5           (Whereupon, State's Exhibit 10, Firearms Transaction

6    Record, was introduced for identification.)

7    Q       All right.  What is State's Exhibit Number 10?

8    A       This is a firearms transaction record.

9    Q       And because the business that that document was

10   generated at is out of business, they were required by federal

11   law to then turn those back over to the ATF; is that correct?

12   A       Correct.

13   Q       And as you've previously testified to, they are

14   digitally imaged and you have a digital image of that in your

15   records as the records custodian at ATF; correct?

16   A       Correct.

17   Q       And, again, with respect to State's Exhibit 10, is

18   the same serial number indicated on that, the same gun and

19   serial number?

20   A       Yes.  It's the same firearm, same make, model, serial

21   number.

22   Q       As you just testified to in State's Exhibit 9 and

23   State's Exhibit 1?

736

1    A        Yes, it is.  In fact, this is the source document

2    that enabled us to successfully trace the firearm to the

3    purchaser.

4    Q        And, again, the purchaser listed in State's Exhibit

5    Number 10 is whom?

6    A        The purchaser listed in there -- in fact, the

7    purchaser fills this out along with the firearms dealer.

8    Jamie Lee Sell.

9    Q        And is that the same address as the trace request

10   that's in State's Exhibit 9?

11   A        Yes, it is.

12   Q        Okay.  And those records are certified by you as the

13   record keeper?  You have the originals.  Whether or not

14   they're digital, but they are originally kept in your

15   business?

16   A        Exactly, yes.  This is a true certified copy that I

17   myself personally certified.

18                   MR. BECKER:  Okay.  I have nothing further,

19   Your Honor.

20                   THE COURT:  Cross?

21                   MR. HARTWIG:  No cross, Your Honor.

22                   THE COURT:  You may step down.  Thank you.

23        Call your next witness.

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

737

1        MR. BECKER:  Your Honor.  The state would

2   call Brandon Rice.

3        I'm sorry, Your Honor.  I'm going to call Leah Smith.

4

5                        *   *   *

6                     LEAH SMITH,

7   having been duly sworn, was examined and testified as follows:

8                   DIRECT EXAMINATION

9   BY MR. BECKER:

10  Q      Okay.  Would you state your name for the record,

11  please?

12  A      Leah Smith.

13  Q      Leah, how old are you?

14  A      15.

15  Q      And Leah, you're going to have to pull that

16  microphone down to your mouth so we can hear you.

17         Okay.  You're -- how old are you?

18  A      15.

19  Q      When did you turn 15?

20  A      March 17th.

21  Q      I want to direct your attention to on or about

22  June 20, 2017, of last -- of 2017.  Do you recall the day that

23  you were with your friends and you guys had gone swimming

                   OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

738

1    someplace?

2    A        Yes.

3    Q        Please tell the jury where you went swimming at on

4    June 20th.

5    A        Willow Lake.

6    Q        And who was with you on June 20, 2017?

7    A        Mel -- Melanie, Donavon, Austin, Stacie, Nick, and

8    Justin.

9    Q        Okay.  You're gonna have to pull that a little

10   closer.  You've got to be a little bit louder.

11            All right.  Was there ever a point that you saw a man

12   named Nathan there?

13   A        No.

14   Q        You never saw a man named Nathan?

15   A        No.

16   Q        Okay.  Austin?

17   A        I saw Austin there, but not Nathan.

18   Q        Did you know him as Nathan or Austin then?

19   A        Austin.

20   Q        You knew him as Austin.  Okay.  Now, at some point

21   you guys went back to someone's apartment; is that correct?

22   A        Yes, sir.

23   Q        Do you recall whose apartment you went to?

739

1   A       Melanie's.

2   Q       Do you recall where that was at?

3   A       In Cortland.

4   Q       All right.  Do you know what county Cortland is in?

5   A       (Witness shakes head.)

6   Q       Okay.  That's all right.  I'm going to show you what

7   have been marked for purpose of identification as State's

8   Exhibits 31, 32, 33 and 34 and ask if you recognize them.  31,

9   32, 33, and 34.  Do you recognize those photographs?

10  A       Yes.

11          (Whereupon, State's Exhibits 31-34, Photos, were

12  introduced for identification.)

13  Q       Okay.  With respect to each one, please refer to the

14  number on the back and tell me what we're looking at.

15  A       For picture 31, this is Melanie's bedroom.

16  Q       All right.

17  A       32, that's her closet.

18  Q       All right.

19  A       33, that's in her room next to her bed.

20          And for 34, that's still in her room.

21  Q       Okay.  Do those look like how her apartment looked on

22  June 20th, 2017?

23  A       Yes, sir.


                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

740

1  Q       All right.  Is that a pretty clean apartment,

2  everything nice and tidy?

3  A       No.

4  Q       I'm going to publish these for the jury.  With

5  respect to State's Exhibit 31, you said that's her bedroom?

6  A       Yes.

7  Q       State's Exhibit 32 you describe as her closet?

8  A       Yes.

9  Q       All right.  State's Exhibit 33, you describe that as

10 also being in her bedroom closet?

11 A       Yes.

12 Q       And State's Exhibit 34; correct?

13 A       Yes.

14 Q       All right.  Those are fair and accurate pictures of

15 what it looked like at her apartment on that day; correct?

16 A       Yes.

17 Q       I'm going to hand you -- well, let me ask you this.

18 At some point, the individual you knew as Austin, did he and

19 you guys all go back to the apartment?

20 A       Yes.

21 Q       Do you recall whether it was light or day -- I'm

22 sorry -- night or day?

23 A       We got there like, in like the late evening.

741

1    Q        All right.

2    A        And we all hung out.

3    Q        Still sunlight though?

4    A        Yeah.

5    Q        All right.  I'm going to show you what's been marked

6    for purpose of identification as State's Exhibit 14 and ask if

7    you recognize State's Exhibit 14?

8    A        Yeah.

9        (Whereupon, State's Exhibit 14, Photo, was introduced for

10    identification.)

11   Q        And do you recognize the four people in that

12   photograph?

13   A        Yes, sir.

14   Q        Who are the four people in that photograph?

15   A        Austin, Melanie, Donavon, and me.

16   Q        I'm sorry.  Say it -- you have to speak up a little

17   bit louder.  Austin?

18   A        Austin, Melanie, Donavon, and me.

19   Q        All right.  And I'm going to publish this photograph

20   for the jury.  And do you know whether that photograph was

21   taken -- or where it was taken at?

22   A        In Melanie's living room.

23   Q        At Melanie's living room?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

742

1    A        Uh-huh.

2    Q        That day?

3    A        That morning, I think.

4    Q        Okay.  Well, I'm going to show you State's Exhibit --

5    and you see yourself there?

6    A        Yes.

7    Q        You're on the far right?

8    A        Yes.

9    Q        Which one is Donavon?

10   A        The one to the left of me.

11   Q        That would be here?

12   A        Yes.

13   Q        Who is this individual?

14   A        Melanie.

15   Q        That's whose apartment it was?

16   A        Yes.

17   Q        Who is this individual?

18   A        Austin.

19   Q        All right.  Now, I want to direct your attention --

20   and this is -- this is a window behind you here?

21   A        Yes.

22   Q        That's daylight.  It's not dark?

23   A        Yeah.

743

1   Q     All right.  Now, I want to direct your attention to

2  later on in the evening after it got dark.  Did Melanie have

3  some cats there?

4   A     Yes.

5   Q     And did something happen with the cats?

6   A     Yeah, it got outside.

7   Q     Both of them?

8   A     Just one.

9   Q     Just one.  And what did you guys do, then, to look

10  for the cats?

11   A     We all went outside and we were looking.

12   Q     And at some point was Austin there or did he leave?

13   A     I have -- I honestly don't remember.

14   Q     You don't remember him looking for the cats?

15   A     No.  I know it was just me and Donavon.

16   Q     At some point, did you lose track of where Austin

17  was?

18   A     Yeah.

19   Q     And at some point, did he return to the apartment?

20   A     Yes.

21   Q     Approximately what time do you remember him coming

22  back to the apartment?

23   A     I don't know.  It was just probably around like 9 or

1    10 maybe.

2    Q        All right.  And after Austin got back to the

3    apartment, a short time later the police arrive?

4    A        Yes.

5    Q        What did the police do when they arrived?

6    A        They came in and they started searching the house.

7    Q        Well, did they ask to -- everyone what their names

8    were?

9    A        Yeah.

10   Q        And what did Austin tell the police his name was?

11   A        Nathan.

12   Q        Did you know that to be incorrect?

13   A        Yes.

14   Q        Did you say anything to the police?

15   A        No.

16   Q        Why not?

17   A        I was scared.

18   Q        When Austin came back to the apartment, did you see

19   anything in his hands?

20   A        Yes.

21   Q        What did you see?

22   A        Money.

23   Q        A lot?

745

1   A       Yeah.

2   Q       Do you know what he did with the money?

3   A       He was just flapping it around and counting it.

4   Q       Did you see -- ever see Austin with a gun that night?

5   A       No.

6   Q       All right.  Now, the photograph that I have up here,

7   State's Exhibit 14, do you recall how Austin was dressed that

8   day?

9   A       Yes.

10  Q       What kind of pants did he have?

11  A       Gray sweatpants.

12  Q       And can we see gray sweatpants here?

13  A       Yes.

14  Q       And those are the pants Austin was wearing?

15  A       Yes.

16  Q       Do you recall when he came back, was he wearing this

17  shirt or a different shirt?

18  A       Different shirt.

19  Q       What kind of shirt did he have on?

20  A       A black hoodie.

21  Q       Do you know where the black hoodie went to?

22  A       No.

23  Q       The individual that you knew as Austin that's in this

746

1    picture and you saw with a large sum of money at about 10 or

2    11:00 on June 20th, is he here in this courtroom?

3    A       Yes.

4    Q       Can you please identify him?

5    A       (Witness indicates.)

6               MR. BECKER:  Allow the record to reflect

7    she's identified the defendant.

8    A       He's to the right of me.

9    Q       Excuse me?

10   A       He's right there.

11   Q       Oh, okay.  Yeah.

12              MR. BECKER:  Your Honor, I have nothing

13   further.

14              THE COURT:  Cross.

15              MR. HARTWIG:  Thank you, Your Honor.

16                   <u>CROSS EXAMINATION</u>

17   BY MR. HARTWIG:

18   Q       Good morning, Leah.

19   A       Good morning.

20   Q       So before June 20th, did you know Austin?

21   A       Yes.

22   Q       All right.  How well did you know him?

23   A       We were talking for awhile.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    Q        Okay.  Talking by Facebook?

2    A        Yeah.

3    Q        All right.  And, in fact, more than a week before the

4    20th did you know him?

5    A        Yes.

6    Q        Months or years?

7    A        Probably a couple months.

8    Q        Couple months.  Okay.  And you guys frequently, then,

9    communicated by Facebook; correct?

10   A        Yes.

11   Q        All right.  You had indicated to police when they

12   interviewed you that you did not know Austin was using an

13   alias; do you recall saying that?

14   A        Yes.

15   Q        All right.  So as far as he represented to you, he

16   was always Austin Burke?

17   A        Yes.

18   Q        Yes.  Okay.  So what time did you guys go swimming

19   that day?

20   A        We left early in the morning and we were there all

21   day and then we were gonna go back to Melanie's apartment to

22   have a movie night.

23   Q        And when the cat got outside and you and Donavon went

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

748

1    looking for the cat, how long were you outside?

2    A        Probably for like ten minutes.

3    Q        Okay.  In the interview you had with police, you

4    indicated to them you were not sure if or when Burke left the

5    residence; do you recall saying that?

6    A        Yes.

7    Q        All right.  So when the Prosecutor asked you if you

8    lost track of him, meaning you had no idea where he was, he

9    could have still been in the apartment?

10   A        Yes.

11   Q        Yes.  Okay.  And do you recall not mentioning to

12   police that he came back with a bunch of money?

13   A        Yes.

14   Q        All right.  So today is the first time we're hearing

15   of that story; would you agree with me?

16   A        Yes.

17                    MR. HARTWIG:  Okay.  No further questions.

18                    THE COURT:  Redirect.

19                    MR. BECKER:  Nothing further, Your Honor.

20                    THE COURT:  You may step down.  Thank you.

21           Call your next witness.

22

23


                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

749

```
1                        *   *   *
2                    DONAVON BUNNER,
3    having been duly sworn, was examined and testified as follows:
4                    DIRECT EXAMINATION
5    BY MR. BECKER:
6    Q       Would you state your name for the record?
7    A       Donavon Bunner.
8    Q       All right.  Donavon, I'm going to have you pull that
9    mike close to your mouth.  Get it as close as you can.
10   A       Donavon Bunner.
11   Q       There you go.  That's better.  All right.  How old
12   are you, Donavon?
13   A       17.
14   Q       And when is your birthday?
15   A       June 4, 2000.
16   Q       June 4th?
17   A       (Witness nods head.)
18   Q       Okay.  Donavon, I want to direct your attention to
19   June 20th of last year.  Were you with some friends at Willow
20   Lake?
21   A       Yeah.
22   Q       All right.  Prior to that, though, you had been at
23   McDonald's at some point?
```

750

1    A        Yeah.  I was getting my orientation.

2    Q        For a job there?

3    A        (Witness nods head.)

4    Q        And at some point someone had to come and pick you up

5    and then you went back to Willie Lake; correct?

6    A        Yes, sir.

7    Q        Now, can you please tell this jury who was at -- do

8    you recall -- first of all, do you recall what time it was

9    that you ended up going to Willow Lake?

10   A        I do not.  I do not, no.

11   Q        You don't remember the time?

12   A        (Witness shakes head.)

13   Q        Okay.  But you know you went there?

14   A        Yeah.

15   Q        Now, when you got to Willow Lake, do you remember who

16   was there?

17   A        Yeah.  It was me, Mel, Justin, Leah, Stacie, and

18   Austin.

19   Q        And you had known Austin previously; correct?

20   A        Yes.

21   Q        And at some point you guys left Willow Lake and went

22   to another location?

23   A        Yeah.  We went back to Mel's apartment.

| | | |
|---|---|---|
| 1 | Q | And do you know what city Mel's apartment was in? |
| 2 | A | Cortland. |
| 3 | Q | Do you know what county Cortland is in? |
| 4 | A | Trumbull, I'm assuming. |
| 5 | Q | Well, do you know or do you not know? |
| 6 | A | I do know, yeah. |
| 7 | Q | So it's in Trumbull County? |
| 8 | A | (Witness nods head.) |
| 9 | Q | Now, what time -- or when you got back to Trumbull, |

10  what did you guys -- or I'm sorry, when you got back to

11  Cortland, what did you do?

| 12 | A | We were just hanging out in the apartment. |
| 13 | Q | I'm going to show you what's been marked for purpose |

14  of identification as State's Exhibit 14.  Do you recognize

15  State's Exhibit 14?

| 16 | A | Yeah. |
| 17 | Q | What is State's Exhibit 14? |
| 18 | A | Picture of me, Leah, Mel, and Austin. |
| 19 | Q | All right.  I'm going to publish this to the jury. |

20  Where was this photograph taken at?

| 21 | A | Mel's apartment. |
| 22 | Q | And was it taken that day? |
| 23 | A | Yeah. |

1    Q        And it's daylight, obviously; right?

2    A        Yep.

3    Q        We can see sunshine on your shoulder here and a

4    window.  So if Austin Burke had told his mother in a recorded

5    phone call that he just got to that apartment before he was

6    arrested, that would be incorrect?

7    A        Can you say that again?

8    Q        He was there -- if Austin had said he had only been

9    there ten minutes that day, that would be incorrect; right?

10   A        Yeah.

11   Q        Because he's there right now; right?  And it's

12   daylight.

13   A        Yeah.

14   Q        All right.  Do you remember a point in time where

15   Melanie's cat or cats got out of the house?

16   A        Yeah.

17   Q        Do you remember if it was one or two cats?

18   A        Two cats.

19   Q        Two cats got out.  And what did you guys do to go

20   look for the cats?

21   A        Went outside to look for the cats.

22   Q        Do you remember who went outside?

23   A        Everybody.

1    Q        And at some -- and who is everybody?

2    A        Everybody that was there.  Me, Justin, Leah, Stacie,

3    Austin.  Everybody went to look for the cats.

4    Q        Now, at some point, did you locate both cats or just

5    one of them?

6    A        We found one cat.

7    Q        Later on, do you recall at some point Austin coming

8    back to the apartment?

9    A        Yeah, I was under the impression we was all looking

10   for the cats, but yeah.

11   Q        And shortly after that, the police arrived?

12   A        Yes.

13   Q        And do you recall the police asking everyone for

14   their names and where they -- their information?

15   A        Yeah.

16   Q        Did you tell them what your name was?

17   A        Yes.

18   Q        Did you give them the correct name?

19   A        Yeah.

20   Q        Did Austin tell the police his correct name?

21   A        He told him his name was Nathan.

22   Q        He told them his name was what?

23   A        Nathan.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

| | | |
|---|---|---|
| 1 | Q | You knew that not to be true; correct? |
| 2 | A | Yes, sir. |
| 3 | Q | Did you tell the police that? |
| 4 | A | No. |
| 5 | Q | Why not? |
| 6 | A | I was scared.  I didn't want to -- like, I don't |

know.  I just --

Q       Now, did you rob the Pizza Joe's?

A       No, sir.

Q       Did you have a gun that day?

A       No, sir.

Q       Did you ever get any money?

A       No, sir.

Q       Did you ever have any money that day?

A       No, sir.

Q       The individual who told the police his name was

Nathan and he's depicted in that photograph, State's

Exhibit 14, is he here in the courtroom today?

A       Yes, sir.

Q       Can you please point to him?

A       (Witness indicates.)

            MR. BECKER:  And let the record reflect

he's identified the defendant.  I have nothing further, Your

1    Honor.

2                        THE COURT:  Cross.

3                        <u>CROSS EXAMINATION</u>

4    BY MR. HARTWIG:

5    Q       Morning, Donavon.

6    A       Good morning.

7    Q       So your testimony is that you guys went swimming

8    earlier in the day; correct?

9    A       (Witness nods head.)

10   Q       Yes?

11   A       Yes, sir.  My bad.

12   Q       This picture marked as State's Exhibit 14 that you

13   just reviewed --

14   A       Yes, sir.

15   Q       -- was taken at Melanie's apartment; correct?

16   A       Yes, sir.

17   Q       And that was taken prior to you going swimming?

18   A       No.  Afterwards.

19   Q       Okay.  What time did you get back to the apartment?

20   A       I'm not sure.  Not too -- we weren't there any like

21   way too long of a time.  We weren't there for too much long.

22   Q       All right.  When did the cat get out?

23   A       Probably about 15 minutes after us being there.

756

1   Q        All right.  It was dark at that point; correct?

2   A        Yeah.  So 15 like --

3   Q        I'm sorry.  Say that again.

4   A        It was like 20 -- 20 minutes after us being there.

5   We weren't there for --

6   Q        You weren't there very long.  So this picture,

7   although it is shows some light, it soon became dark?

8   A        Yes, sir.

9   Q        Then the cat gets out; right?  And then everyone in

10  the apartment, including Austin, you guys go out to look for

11  the cat; right?

12  A        Yes, sir.

13  Q        All right.  Now, you were interviewed by police when

14  they came over?

15  A        Yes, sir.

16  Q        At that point in time, you told 'em everything that

17  you recall from that evening; correct?

18  A        Yeah.

19  Q        You wanted to be honest with them; correct?

20  A        Yes.

21  Q        All right.  Is Leah your girlfriend?

22  A        No.

23  Q        Just a friend?

757

1   A        (Witness nods head.)  Yeah.

2   Q        Okay.  She came and testified that the only two

3   people that left the apartment to go look for the cat were you

4   and her.  That's not true, is it?

5   A        No.

6   Q        You're positive that it was everybody?

7   A        Yeah.  I'm positive.

8   Q        All right.  Do you have any idea why she would come

9   in and not tell the truth?

10  A        No.

11  Q        No.  Okay.  So you didn't mention anything to the

12  police that while you were at the apartment after you were

13  looking for the cat that Austin came back with a whole bunch

14  of money, sat down, and counted it in front of you and Leah?

15  A        No.

16  Q        Right.  Because that didn't happen?

17  A        No.

18                  MR. HARTWIG:  All right.  No further

19  questions.

20                  THE COURT:  Redirect.

21                  <u>REDIRECT EXAMINATION</u>

22  BY MR. BECKER:

23  Q        Well, you just didn't see that; right?


                   OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

758

1   A       Yeah.

2   Q       You were in different parts of the apartment?

3   A       What did you say?

4   Q       Were you and Leah always in the same room in the

5   apartment?

6   A       No.  I mean, we were all just listening to music,

7   like hanging out and walking around the apartment.

8   Q       So some people were in the bedroom?

9   A       At certain times.

10  Q       And some people were in other parts of the house,

11  like the living room or the kitchen?

12  A       At certain times, yeah.

13  Q       So if Leah said she saw this defendant with a lot of

14  money, you may not have been there when that happened;

15  correct?

16  A       Correct.

17                  MR. BECKER:  Okay.

18                  THE COURT:  Recross.

19                  RECROSS EXAMINATION

20  BY MR. HARTWIG:

21  Q       You told police, based on the police report, you were

22  lying on the couch when Austin came back in; correct?

23  A       No.  I told them that I was in the bedroom.  I was

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

759

1    laying down.

2    Q        If the report indicates that you said you were lying

3    on the couch when Burke comes back to the living room, that's

4    not accurate?

5    A        Yeah.  I thought you said when the cops showed up.

6    Q        Oh, no, no, no.  When Burke showed up?

7    A        Yeah.  I was lying on the couch.

8    Q        All right.  So when he walks in, you're lying on the

9    couch; correct?

10   A        Yeah.

11   Q        And at that point when he walks in, he doesn't have a

12   bunch of money on him; correct?

13   A        Not that I saw, correct.

14   Q        And did he just hang out like you guys were hanging

15   out before?

16   A        Yeah, we were all listening to music, smoking hookah.

17                    MR. HARTWIG:  All right.  Thank you.

18                    THE COURT:  You may step down.  Call your

19   next witness, please.

20                    MR. BECKER:  Stacie Cassidy.

21

22

23


                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1                          *   *   *

2                      STACIE CASSIDY,

3   having been duly sworn, was examined and testified as follows:

4                   <u>DIRECT EXAMINATION</u>

5   BY MR. BECKER:

6   Q       Would you state your name for the jury, please?

7   A       Stacie Cassidy.

8   Q       Stacie, how old are you?

9   A       23.

10  Q       When is your birthday?

11  A       May 7th of '94.

12  Q       Stacie, I want to direct your attention to June 20th

13  of 2017.  On that date, do you recall going to Willow Lake

14  with some friends?

15  A       Yes.

16  Q       Who all went to Willow Lake with you?

17  A       Donavon, I was with Justin -- or no, Justin wasn't

18  there.  Justin's friend Nick was there because I brought him

19  there.  And I believe Leah was there.  And then Austin was

20  there.

21  Q       All right.  Did you know Austin as Austin on that

22  date?

23  A       No.  I just met him that day.

                      OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

761

1   Q     And what name did he tell you he was?

2   A     Nathan.

3   Q     All right.  Now, I want to direct your attention

4   to -- some point, did Donavon have to go to work or need

5   picked up from McDonald's?

6   A     Yes.

7   Q     Do you know who did that?

8   A     I believe it was Mel because I went with Nick to

9   Mel's apartment.  And we were there for like roughly two hours

10   by ourselves waiting for them to come back.  And that was what

11   she was doing in the time.

12   Q     And eventually all those people came back to Mel's

13   apartment?

14   A     Yes.

15   Q     So who would have been at Mel's apartment in the

16   afternoon or early evening of June 20th?

17   A     It would have been Justin, Leah, Donavon, Austin, and

18   myself, and Kimberly.

19   Q     Okay.  Do you have any contact with Kimberly anymore?

20   A     No.  I just met her that one day.

21   Q     And you wouldn't have a number for her how to get

22   ahold of her?

23   A     Huh-uh.

1    Q       Now, at some point in the apartment, then, did the

2    cats get out?

3    A       Yes.

4    Q       And when the cats got out, what did everyone do?

5    A       We went outside.  We were looking for the cats.  We

6    did find the one.  We were looking roughly about 9:00, 9:30.

7    Q       Would this have been dark or light then?

8    A       Yes, it was dark.

9    Q       And do you recall what time you got back from -- what

10   time the other people got back from Willow Lake?

11   A       It was roughly about, I'd say 8, 8:30, around that

12   time.

13   Q       All right.  I showed you at one point a photograph

14   marked as State's Exhibit 14.  I'm going to hand it to you

15   again.  Do you recognize State's Exhibit 14?

16   A       I recognize the people.  I believe that was taken the

17   same day.

18   Q       All right.  You didn't take that picture though?

19   A       No.

20   Q       And you're not in that picture?

21   A       No.

22   Q       You recognize all four individuals in that photograph

23   though; correct?

763

1    A        Yes.

2    Q        You can just put that on the rail there.

3             Now, at some point, did you lose track of where this

4    Nathan individual was?

5    A        Yes.  Because I had just met him.  So I kind of

6    wasn't really paying attention to like what he was doing and

7    the cats got out at the time.  So since I was friends with

8    Mel, I was helping her find the cats because they jumped out

9    the window.  And I was like kind of concerned because she

10   lived so close to the street that like maybe they would get

11   out and someone would run them over.

12   Q        And at some point then later on did Nathan come back

13   to the apartment?

14   A        Yes.

15   Q        Did you see that or were aware of that?

16   A        Not at the time.  But like when I went back, we found

17   the one black cat.  We brought the cat inside.  And he was

18   already inside.  So I didn't actually see him go inside.

19   Q        All right.  And at some point did the police arrive?

20   A        Yes.  It was probably roughly about ten, maybe ten,

21   fifteen minutes after like we had all gotten in the house.  So

22   we just got in the house and then the cops were knocking on

23   the door.

764

1  Q       And at some point did the police start asking
2  everyone in the apartment what their names were?
3  A       Yes.  They asked for their names and then if they
4  could give their socials.
5  Q       Did you give them your name?
6  A       Yes.  And my social.
7  Q       Did you, at any point, ever hear Nathan than give his
8  name as Nathan?
9  A       Yes.
10  Q       He told the police his name was Nathan?
11  A       Yes.
12  Q       Did you ever discover he went by another name?
13  A       Just reading up on the news.  That was about it.
14  Because, like I said, I just met him for I'd say like 15,
15  30 minutes that day.  We had brief interaction.
16  Q       Did you have a gun that day?
17  A       No.
18  Q       Did you rob Pizza Joe's?
19  A       No.
20  Q       And the person that you met on June 20th, 2017, and
21  told you his name was Nathan and also told the police his name
22  was Nathan, do you see him here in the courtroom today?
23  A       Yes.

765

1    Q       Could you please identify him?

2    A       Right there.  (Witness indicates.)

3                    MR. BECKER:  All right.  Thank you.  I have

4    no further questions.

5                    THE COURT:  Cross.

6                    MR. HARTWIG:  Thank you.

7                    CROSS EXAMINATION

8    BY MR. HARTWIG:

9    Q       Morning, Stacie.

10   A       Morning.

11   Q       How long did you guys leave the apartment to look for

12   the cat?

13   A       I'd say roughly probably like 30 minutes to an hour.

14   We were outside for what seemed like awhile.

15   Q       Okay.  Because somebody else came in and just

16   testified before you that it was like ten minutes?

17   A       I mean, I feel like it was longer than that.

18   Q       Okay.  But Austin was in the apartment when you left?

19   A       Yes.

20   Q       Right.  And when you came back, he was in the

21   apartment?

22   A       Yes.

23   Q       Right.  And you never mentioned to police that he had

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

766

1    any money; correct?

2    A        No.

3    Q        All right.  And do you recall giving a written

4    statement to police?

5    A        Yes.

6                    MR. HARTWIG:  All right.  Your Honor, may I

7    approach?

8                    THE COURT:  You may.

9    BY MR. HARTWIG:

10   Q        I'm handing you what's been marked as Exhibit G I

11   believe it is, Your Honor.  Can you identify that for me?

12   A        Yes.  This was my statement.

13                   (Whereupon, Defendant's Exhibit G, Witness

14   Statement, was introduced for identification.)

15   Q        All right.  And when did you -- when did you write

16   that out?

17   A        This would have been the night it happened.  Or

18   rather the morning.  Because it was like, I think the cops

19   came about 11ish.  And then we were there until like 2 in the

20   morning was when we were allowed to be released.  So it was

21   like a lengthy process.

22   Q        And when it came down to the part that you wrote

23   regarding Austin's whereabouts that night, what's the last

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

767

1   sentence say?  What was your indication?

2   A       "I just met him today.  I exchanged no words with

3   him.  He was there the whole night."

4   Q       I didn't hear the last part?

5   A       "I just met him today.  I exchanged no words with

6   him.  He was there the whole night."

7   Q       Okay.  So back when it happened, which was awhile

8   ago, your recollection was Austin was in the apartment the

9   whole time?

10  A       Uh-huh.

11  Q       Yes?

12  A       Yes.

13                  MR. HARTWIG:  Thank you.  No further

14  questions?

15                  THE COURT:  Redirect.

16                  <u>REDIRECT EXAMINATION</u>

17  BY MR. BECKER:

18  Q       You don't know where he was, though, when you were

19  looking for the cats for half an hour or an hour or so?

20  A       Correct.

21  Q       He could have been gone?

22  A       Yeah.  Because for all I know, he might have still

23  been in the apartment because I didn't see anybody leave

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

768

1    because we were looking for the cats.

2                        MR. BECKER:  Okay.  Thank you.

3                        THE COURT:  Recross.

4                    <u>RECROSS EXAMINATION</u>

5    BY MR. HARTWIG:

6    Q        Just to be clear, the Prosecutor got up and said,

7    "While you were outside for 30 minutes to an hour," but you

8    did testify on cross you're not sure about how long you were

9    outside?

10   A        I'm not a hundred percent positive because we were

11   like -- I wasn't really paying attention to the time, but it

12   was anywhere it seemed like 30 minutes to an hour.

13   Q        Okay.  And you never saw Austin with any money at any

14   point?

15   A        No.

16                        MR. HARTWIG:  Okay.  Thank you.

17                        THE COURT:  You may step down.  Thank you.

18           Call your next witness.

19                        MR. BECKER:  Thank you, Your Honor.  State

20   would call Justin Borawiec.

21

22

23

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

1                              *   *   *

2                          JUSTIN BORAWIEC,

3    having been duly sworn, was examined and testified as follows:

4                        <u>DIRECT EXAMINATION</u>

5    BY MR. BECKER:

6    Q       Would you state your name for the record?

7    A       Justin Borawiec.

8    Q       There you go.  That's better.  Justin, how old are

9    you?

10   A       17.

11   Q       And when is your birthday?

12   A       March 28 of 2000.

13   Q       I want to direct your attention to June 20th of last

14   year, which was 2017.  On that date, did you go to Willow Lake

15   and go swimming?

16   A       Yes, sir.

17   Q       And who was with you when you were there swimming?

18   A       Leah, Donavon.  I'm not really sure off the top of my

19   head --

20   Q       All right.

21   A       -- who all was there.

22   Q       Okay.  Was an individual named Austin there?

23   A       Yes, sir.

                        OFFICIAL COURT REPORTER
                   TRUMBULL COUNTY * WARREN, OHIO

770

1    Q        Okay.  Had you known Austin previously?

2    A        No, sir.

3    Q        That was the first time you had met him?

4    A        Yes, sir.

5    Q        Eventually, did you all go back to an apartment in

6    Cortland, Ohio?

7    A        Not the same day I don't think, but yeah.

8    Q        Not the same day?

9    A        I don't know if I -- it might have been that night.

10   I'm not really positive.

11   Q        Yeah.  In the evening hours, did you go back?

12   A        Yeah.

13   Q        So it's the same day, it's just now getting into the

14   evening and night time hours?

15   A        I think so, yes.

16   Q        All right.  And at some point, do you remember

17   Melanie -- well, first of all, whose apartment was it?

18   A        It was Melanie's.

19   Q        And did you know Melanie?

20   A        Yes, I was like best friends with her at the time.

21   Q        And when you were at the apartment there -- so you

22   knew where she lived?

23   A        Yes, sir.

| | | |
|---|---|---|
| 1 | Q | And it was in Cortland? |
| 2 | A | Yes, sir, right off of Main Street. |
| 3 | Q | Do you know what county that's in? |
| 4 | A | Trumbull County. |
| 5 | Q | And do you know how close it is to the Pizza Joe's? |
| 6 | A | Right across the street, basically. |
| 7 | Q | And you live in Cortland; right? |
| 8 | A | Yes, sir. |
| 9 | Q | Now, at some point, did Melanie's cats get out? |
| 10 | A | Yes, sir. |
| 11 | Q | Was it one of them or both of 'em? |
| 12 | A | (No response.) |
| 13 | Q | If you remember. |
| 14 | A | I don't really remember, no, sir. |

15  Q       And do you remember who went out and started looking

16  for the cats?

17                   MR. OLSON:  Objection, Your Honor.

18  Speculation.  He said he didn't remember the cats missing.

19                   THE COURT:  No, I think he remembered that.

20  Overruled.  Go ahead and answer.

21  BY MR. BECKER:

22  Q       Do you remember anyone going out and looking for

23  cats?

772

| | | |
|---|---|---|
| 1 | A | I think a couple people did, yes. |
| 2 | Q | Were you one of them? |
| 3 | A | No. |
| 4 | Q | Were you able to see Austin the entire evening? |
| 5 | A | Not the entire evening, no, sir. |
| 6 | Q | At some point, you didn't know where he was? |
| 7 | A | Yes, sir.  Correct. |
| 8 | Q | And at some point, were you there when he returned to |

9  that apartment?

| | | |
|---|---|---|
| 10 | A | Yeah.  Yes, sir. |
| 11 | Q | And was there a time shortly after that that the |

12  police arrived?

| | | |
|---|---|---|
| 13 | A | Yes, sir.  It was right after the fact. |
| 14 | Q | And after the police arrived, do the police start |

15  asking everyone in the apartment what their names and socials

16  and dates of birth were?

| | | |
|---|---|---|
| 17 | A | Yes, sir. |
| 18 | Q | Did you hear Austin tell them what his name was? |
| 19 | A | Yes.  He said it was Nathan. |
| 20 | Q | Did you know that to be incorrect? |
| 21 | A | No.  No, sir, I did not. |
| 22 | Q | Well, I thought you knew him as Austin? |
| 23 | A | I knew him as Nathan.  That's what I got introduced |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    to him as.

2    Q       Oh, you knew him as Nathan?

3    A       Yes, sir.

4    Q       You now know that it's really Austin?

5    A       Yes, sir.

6    Q       So prior to the police arriving, you thought his name

7    was Nathan?

8    A       Yes, sir.  Correct.

9    Q       He told him his name was Nathan?

10   A       Correct.

11   Q       And as far as you knew, his name was Nathan?

12   A       His name was Nathan, yes.

13   Q       Now, did you rob the Pizza Joe's that night?

14   A       No, sir.

15   Q       Did you have a firearm that night?

16   A       No, sir.

17   Q       Did you have any large sum of money on you that

18   night?

19   A       No, sir, I did not.

20   Q       The individual that you knew as Nathan and who you

21   heard tell the police his name was Nathan, is he here in the

22   courtroom?

23   A       Yes, sir.

774

| | |
|---|---|
| 1 | Q        Can you please point to him? |
| 2 | A        (Witness indicates.) |
| 3 | MR. BECKER:  Let the record reflect the |
| 4 | witness has identified the defendant.  I have nothing further, |
| 5 | Your Honor. |
| 6 | THE COURT:  Cross. |
| 7 | MR. HARTWIG:  Thank you. |
| 8 | THE WITNESS:  Am I good to get up? |
| 9 | CROSS EXAMINATION |
| 10 | BY MR. HARTWIG: |
| 11 | Q        How you doing, Justin? |
| 12 | A        Good.  How are you, sir? |
| 13 | Q        Good.  So you testified you met Austin on June 20th? |
| 14 | A        What was that? |
| 15 | Q        Did you testify that you met Austin on -- |
| 16 | A        Yes, sir. |
| 17 | Q        -- June 20th? |
| 18 | A        Yes, sir. |
| 19 | Q        But you knew him on June 20th as Nathan? |
| 20 | A        Yes, sir. |
| 21 | Q        All right.  Never talked to him before?  This was it? |
| 22 | This was the very first time? |
| 23 | A        Yeah.  I just got introduced to him.  Barely a word |

1   spoken.

2   Q       Okay.  Had you ever even heard of somebody named

3   Austin before?

4   A       No, sir.

5   Q       An Austin Taylor, Austin Burke?

6   A       No, sir.

7   Q       Okay.  When the police came over, you gave a written

8   statement; correct?

9   A       At Melanie's?  Yes, sir.

10  Q       I'm sorry?

11  A       At Melanie's.  Yes, sir.

12  Q       At Melanie's apartment?

13  A       Yeah.  It was like a voice statement.  Like they

14  recorded my voice.  Or they wrote it down maybe.  It was in

15  the passenger seat of a cruiser and they had me say my

16  statement.

17  Q       Okay.  Give me just one moment.

18  A       Okay.

19                  MR. HARTWIG:  Your Honor, may I approach?

20                  THE COURT:  You may.

21  BY MR. HARTWIG:

22  Q       Justin, I'm going to hand you what's been marked as

23  Defense Exhibit H.

776

1    A        Okay.

2                        (Whereupon, Defendant's Exhibit H, Witness

3    Statement, was introduced for identification.)

4    Q        Can you take a look at that and see if you can

5    identify that for me?

6    A        Yes, sir.

7    Q        What is that?

8    A        My statement.

9    Q        All right.  So that's a written statement?

10   A        Yes, sir.

11   Q        Okay.  Now, at the time you gave that written

12   statement, all the facts of what you observed that night were

13   fresh in your mind; correct?

14   A        Yes, sir.

15   Q        All right.  Now, would you agree with me -- well,

16   hold on a sec.  I'll withdraw that.

17            You had testified that you lost track of Austin while

18   he was in the apartment?

19   A        Yes, sir.

20   Q        All right.  You never mentioned that to police; would

21   you agree with me?

22   A        I don't know.

23   Q        Okay.  Well, read your statement.

777

1     A       Okay.

2     Q       Would you agree with me that what you wrote in your

3     statement was he went to the bathroom?

4     A       Okay.

5     Q       At which time you wouldn't see him; correct?

6     A       Yeah.  I was on the couch.

7     Q       Yeah, you were on the couch?

8     A       Uh-huh.

9     Q       And then he comes back to the living room; correct?

10    A       Yes, sir.

11    Q       All right.  You don't mention anything in that

12    statement that he leaves the apartment or returns from the

13    apartment; would you agree with me?

14    A       Yes, sir.

15    Q       Okay.  So you don't mention anything in there that

16    you saw him return with money or anything like that; correct?

17    A       No, sir.

18    Q       All right.  Now --

19                   MR. HARTWIG:  Approach again, Your Honor?

20                   THE COURT:  You may.

21    BY MR. HARTWIG:

22    Q       I'm handing you what's been marked as Defense Exhibit

23    I?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Okay.

2    Q        Excuse me.  Was that G?  This should be H.  Take a

3    look at that.

4    A        Okay.

5    Q        Starting at the top, can you identify -- well, let me

6    ask you this.  Do you have a Facebook page?

7    A        Yes, sir.

8    Q        And do you post on Facebook?

9    A        Barely.

10   Q        Okay.  Does that indicate that that is a Facebook

11   message from your account?

12   A        Where at?

13   Q        The highlighted section.  Is that your name?

14   A        Yes, sir.

15   Q        All right.  What's the date?  The highlighted date?

16   A        6-17 of 2017.

17   Q        All right.  So that's June 17th, three days before

18   the robbery at Pizza Joe's; would you agree with me?

19   A        I don't remember when the robbery was.

20   Q        Well, we're talking about the evening of June 20th.

21   A        Okay.

22   Q        That you wrote the statement?

23   A        Okay.  Yes, sir.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Q       The day that you first met Austin?

2   A       Yes, sir.

3   Q       Right?

4   A       Yeah.

5   Q       Who is the first message to on June 17th from your

6   Facebook account?

7   A       Where does it say the message?

8   Q       Would you agree with me that that's your name here?

9   A       Yes.

10  Q       It says, "Participant, Justin Nathaniel Borawiec";

11  right?

12  A       Correct.

13  Q       And it's to an Austin Taylor?

14  A       Okay.

15  Q       Okay?

16  A       Okay.

17  Q       And that is on June 17th, 2017; would you agree with

18  me?

19  A       Sure.  That's what it says, yeah.

20  Q       Okay.  So it appears you are sending a message.  "You

21  are now connected on Messenger."

22  A       Yes.

23  Q       Justin Borawiec with Austin Taylor?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

780

1   A        That's what it says, yes, sir.

2   Q        Okay.  That's on June 17th?

3   A        Okay.

4   Q        Subsequent messages --

5                  MR. BECKER:  Speak into the microphone.

6                  THE WITNESS:  Okay.  I'm sorry.

7                  MR. HARTWIG:  All right.  Thank you.

8   Q        Okay?

9   A        Okay.

10  Q        Would you agree with me, then, there is messages on

11  June 17th, June 19th, all from you to an Austin Taylor and

12  from Austin Taylor to you?

13  A        That's what it says, yes.  Correct.

14  Q        All right.  So you were communicating with Austin

15  Taylor prior to June 20th; correct?

16  A        I don't remember any of this, no, sir.

17  Q        Okay.  You don't dispute that that's your Facebook?

18  A        That is my Facebook, correct.

19  Q        Right.  And you don't dispute that it's showing that

20  you're messaging with an Austin Taylor; correct?

21  A        That's what it says, yes.  Correct.

22                 MR. HARTWIG:  Okay.  No further questions.

23  Thank you.


                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

781

1              MR. BECKER:  Your Honor, may I approach the

2    witness?  I didn't get a chance to see the exhibit.

3              MR. HARTWIG:  Oh, I'm sorry.

4              THE WITNESS:  I don't remember any of that,

5    to be honest with you.

6              MR. BECKER:  I have nothing further, Your

7    Honor.

8              THE COURT:  You may step down.  We've

9    gotten ourselves to the luncheon time.  We'll take an hour

10   lunch.  It's right about noon.  We'll come back at 1:00.

11         Do not discuss this case among yourselves, nor with

12   anyone else.  Do not form or express an opinion.

13             (Whereupon, a recess was had commencing at

14   12:05 p.m. and concluding at 1:11 p.m.)

15             THE COURT:  Mr. Becker, you may call your

16   next witness.

17             MR. BECKER:  Thank you, Your Honor.  The

18   state would call Melanie Engle.

19                       *   *   *

20                  MELANIE ENGLE,

21   having been duly sworn, was examined and testified as follows:

22

23

                    OFFICIAL COURT REPORTER
              TRUMBULL COUNTY * WARREN, OHIO

782

1                                   <u>DIRECT EXAMINATION</u>

2       BY MR. BECKER:

3       Q       Okay.  Would you state your name for the record,

4       please?

5       A       My name is Melanie Engle.

6       Q       Melanie, how old are you?

7       A       I'm 20 years old.

8       Q       And when is your birthday?

9       A       11-05 of '97.

10      Q       So you were 19 in June of last year?

11      A       Yes, sir.

12      Q       All right.  I want to direct your attention to

13      June 20th of 2017.  On that date, were you living in the city

14      of Cortland, Ohio?

15      A       Yes, sir.

16      Q       Where were you living at?

17      A       At 241 West Main Street, Apartment C.

18      Q       How long had you been living there?

19      A       Seven or eight months.  Since October of last year.

20      Q       Did you have any roommates?

21      A       No.

22      Q       Now, on that date, did you end up going to Willow

23      Lake that day?

                              OFFICIAL COURT REPORTER
                          TRUMBULL COUNTY * WARREN, OHIO

783

1    A       Yes.

2    Q       Who did you go to Willow Lake with?

3    A       Justin Borawiec and Leah.

4    Q       Do you know Leah's last name?

5    A       I do not.

6    Q       Do you know how they all got there?

7    A       I -- I remember I drove Justin and Leah with me.

8    Q       All right.

9    A       And then I -- I think everyone just kind of met

10   there.

11   Q       Now, who would be "everyone met there?"  Who would

12   that be?

13   A       Stacie, Nick, Austin, Kimmy, me, Justin, Leah and

14   Donavon.

15   Q       Who is Nick?

16   A       Nick was a friend of ours.

17   Q       All right.  And so Nick was there swimming as well;

18   correct?

19   A       Yes.

20   Q       And at the time, there was an individual named Nathan

21   there?

22   A       Yes.

23   Q       Did you know him by any other name?

784

1    A        I did not, no.

2    Q        You just knew him as Nathan?

3    A        Nate.

4    Q        He introduced himself to you as Nate?

5    A        Vaguely.  Just like, "Nate" and "hello."

6    Q        Okay.  And after awhile, you guys were done swimming.

7    And where did you go to?

8    A        We went back to my apartment.

9    Q        And that's the apartment in Cortland that you

10   mentioned?

11   A        Yes.

12   Q        So who went back to the apartment in Cortland?

13   A        It was everybody that had been at the -- at Willow

14   Lake, but we took different cars.

15   Q        All right.  So now at your apartment in Cortland, who

16   is all there?

17   A        Justin, Leah, Donavon, Nate, Stacie, and Nick.

18   Q        Now, at some point, I'm going to hand you what's been

19   marked for purpose of identification as State's Exhibit 14 and

20   ask if you recognize State's Exhibit 14?  Do you recognize

21   that?

22   A        I do.

23   Q        What is State's Exhibit 14?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   A        That is a picture of Leah, Donavon, myself, and Nate.

2   Q        And where was that picture taken at?

3   A        In my apartment.

4   Q        And do you recall what day that picture was taken?

5   A        I do not recall.

6   Q        Well, if you just met Nate, would it have been taken

7   that day?

8   A        I believe it was taken earlier that day.  Before we

9   left.

10  Q        All right.  So before you went to Willow Lake, Nate

11  was at your house?

12  A        Yes.

13  Q        Okay.  And that's the first day you had ever met that

14  Nate fellow; right?

15  A        Personally?  Or on a more personal level, I think

16  yes.  We had seen each other briefly at parties and other

17  occasions.

18  Q        That's the first time he had ever been to your house;

19  right?

20  A        Yes, that's the first time he had been at my house.

21  Q        Or to your apartment.  Okay.  So I'm going to show

22  this to the jury.  This photograph was taken at sometime

23  during the day?

786

1    A       Yes.

2    Q       And the individual you knew as Nate, he's to the left

3    there?

4    A       Yes.

5    Q       And can you tell me, do you see what kind of pants

6    he's wearing in that picture if I hand it to you?

7    A       It looks like gray sweats.

8    Q       Okay.  And you had seen him throughout the day with

9    gray sweatpants on?

10   A       Yes.

11   Q       All right.  Donavon is the middle kid there?

12   A       Yes.

13   Q       Beside you.  And that's Leah Smith?

14   A       Yes, sir.

15   Q       Do you recall who took that picture?

16   A       I do not recall specifically, no.

17   Q       But it had to have been taken June 20th because that

18   was the first time he had ever been to your apartment, Nate?

19   A       Yes.

20   Q       So at some point, then, you all went back to your

21   apartment, including Nate; correct?

22   A       Yes.

23   Q       After you're done swimming?

787

1   A       Yes.

2   Q       And you were there for quite awhile?

3   A       Quite awhile?  No.  Maybe an hour.

4   Q       All right.  And at some point, one or both of your

5   cats got loose?

6   A       Yes.  Both of my cats.  When everybody -- I believe a

7   couple people went outside to smoke and when they came back

8   inside the cats got out.

9   Q       Did people go out to look for the cats?

10  A       Yes.

11  Q       And who went out and looked for the cats?  If you

12  remember.

13  A       Nick, Justin, Donavon, and I believe Nate.

14  Q       Now, at some point, did you sort of lose track of

15  where Nate was?

16  A       Yes, because I was more concerned with knowing that

17  Nick was upset.

18  Q       And Nick was upset about what?

19  A       That Donavon and I were talking.

20  Q       And let me ask you.  I guess the implication was Nick

21  was trying to have a relationship with you?

22  A       Yes.

23  Q       And he was jealous of Donavon?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

788

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So what happened to Nick? |
| 3 | A | He walked down to Burger King. |
| 4 | Q | And do you recall approximately what time that was? |
| 5 | A | I got a message from my sister at around -- I think |

6  just about 10 that he was in the lobby.

7  Q       All right.  Now, I'm going to show you what I'm going

8  to mark for purposes of identification as State's Exhibit 54.

9                    THE COURT:  You had 54.

10                    MR. BECKER:  Oh, I'm sorry.  Thank you.

11                    THE COURT:  It's 55.

12                    MR. BECKER:  55.

13  BY MR. BECKER:

14  Q       I'm going to ask you to look at State's Exhibit 55.

15  Do you recognize what that is?

16  A       That's a message between me and my sister.

17      (Whereupon, State's Exhibit 55, Text Message, was

18  introduced for identification.)

19  Q       And what's your sister's name?

20  A       McKenna.

21  Q       And what time did she ask you that Nick was in Burger

22  King?

23  A       9:58.

789

1    Q        9:58 on June 20th?

2    A        Yes, sir.

3    Q        And she basically said, "What's he doing here looking

4    like a crack addict?"

5    A        Yes.

6    Q        Do you know Nick to be a crack addict?

7    A        No, he was upset.

8    Q        He was upset.  So I'm going to publish for the jury

9    State's Exhibit 55 and the relevant portion of that.  "M" is

10   for your sister McKenna?

11   A        Sir.

12   Q        I'm sorry.  The "M" there is for your sister McKenna?

13   A        Yes.

14   Q        And this is your phone.  This is an incoming text

15   that you received from McKenna?

16   A        Yes, sir.

17   Q        And the date is June 20th at 9:58 p.m.; correct?

18   A        Yes, sir.

19   Q        So you were still at the house then; right?

20   A        No.  I had already left.

21   Q        To go down to Burger King?

22   A        Because I was looking for him.

23   Q        All right.

790

1   A       Because he hadn't come back and I knew he was looking

2   for the cats.

3   Q       All right.  And is this a fair and accurate copy --

4   or a picture of your cell phone and the message you had with

5   your sister McKenna at 9:58 on June 20th?

6   A       Yes, sir.

7   Q       So when you got to Burger King, what happened?

8   A       He was already eating his food.  So we sat down and

9   we talked for awhile and we waited until he was finished.

10  Q       Then what did you do?

11  A       And then I drove him home in Vienna.

12  Q       I'm sorry.  You drove him home where?

13  A       To Vienna.

14  Q       And when you got home to your apartment at 241C,

15  Cortland, what happened as you got home?

16  A       The police were all -- there was already police

17  everywhere.  And I -- I came home and I was just coming up my

18  stairs and I had just, you know, just finished taking off my

19  shoes and everything when we heard the knock on the door.

20  Q       I just want to be specific.  The police were not in

21  your apartment or at your apartment, but they were outside of

22  it?

23  A       Yes.

1  Q       All right.  They didn't come and knock on the door

2  until you arrived?

3  A       Yes.

4  Q       Then what happened?

5  A       And then I was in the kitchen when they asked -- that

6  they needed everybody's social and everything like that.  And

7  then they got everybody's socials and everything and then they

8  left and I walked them out to the door.  And then they came

9  back probably three, four minutes later.

10  Q       And what happened when they came back?

11  A       They identified that somebody wasn't telling the

12  truth.

13  Q       And who was not telling the truth?

14  A       Who I knew to be Nick.  Not Nick.  Nate.

15  Q       Nate?

16  A       Nate.

17  Q       And that individual, is he here in the courtroom

18  today?

19  A       Yes, sir.

20  Q       Can you please point to him?

21  A       (Witness indicates.)

22  Q       That's the individual that you recognize as Nate, the

23  defendant in this case?

792

1    A       Yes, sir.

2    Q       All right.  Now, Leah, I'm going to show -- or I'm

3    sorry.  I'm going to show you some photographs that have been

4    marked 31 through State's Exhibit 37.  I'm going to ask you to

5    look at each one of these individually.

6    A       (Witness complies.)

7            (Whereupon, State's Exhibit 35, Photo, was introduced for

8    identification.)

9    Q       Do you recognize those photographs?

10   A       Yes.

11   Q       What are they?

12   A       Pictures of my room after it had been searched.

13   Q       Was your room pretty messy or pretty neat?

14   A       It was pretty messy, yes.

15   Q       All right.  And were there a lot of clothes and bags

16   of clothes?

17   A       Yes.

18   Q       Things strewn around?  All right.  So I'm going to

19   publish these very briefly.  State's Exhibit 31, do you

20   recognize that photograph?

21   A       Yes, sir.

22   Q       I'm sorry.  What is that a picture of?

23   A       A picture of my dresser towards the end of my bed and

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

793

1    miscellaneous things.

2    Q        State's Exhibit 32?

3    A        That is of my closet.

4    Q        State's Exhibit 33?

5    A        The heater, miscellaneous objects on the floor.

6    Q        State's Exhibit 34?

7    A        Baskets of clothing and my dresser in the background.

8    Q        State's Exhibit 35?

9    A        My bed and next to my bed the door.  And the bed.

10       (Whereupon, State's Exhibit 35, Photo, was introduced for

11   identification.)

12   Q        Now with particular attention to this picture, I'm

13   going to point out to you a pair of gray tennis shoes here.

14   Are those your tennis shoes?

15   A        No, sir.

16   Q        But they're in your bedroom?

17   A        Yes, sir.

18   Q        Okay.  And State's Exhibit 36, that's a close-up of

19   those tennis shoes; correct?

20   A        Yes, sir.

21       (Whereupon, State's Exhibit 36, Photo, was introduced for

22   identification.)

23   Q        And finally, State's Exhibit 37.  Do you recognize

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    that?

2    A        I do not, no.

3        (Whereupon, State's Exhibit 37, Photo, was introduced for

4    identification.)

5    Q        Do you recognize this basket?

6    A        The basket, yes.

7    Q        Do you recognize the bag in there?

8    A        No.

9    Q        All right.  Now, at some point, all were required to

10   give statements to the police?  You also consented to them to

11   search -- they asked if they could search your apartment;

12   correct?

13   A        Yes, sir.

14   Q        And you signed a written consent to search?  You

15   didn't say, "No, get a search warrant," or, "Get out of here"?

16   A        Yes, sir.

17   Q        So you let them search?

18   A        Yes, sir.  I even asked if they wanted to bring in,

19   you know, dogs or, you know, anything else to help.

20   Q        Whatever they could to help?

21   A        Yeah.

22   Q        And during the night -- or during that search, they

23   took those gray shoes?  Or do you know what they took?

1   A        I do not know what they took.

2   Q        Okay.  We'll talk to the police about what they took.

3            And then eventually you gave a statement.  They were

4   done and they left and the next day happened; correct?

5   A        Yes.

6   Q        Now, the next day, your mother came to help, I think,

7   move you out of there?

8   A        Yes, sir.

9   Q        All right.  There was a little bit of a dispute

10  between you and your mother and some arguments that night

11  about a fellow being arrested in your apartment as a suspect

12  in something?

13  A        Yes, sir.

14  Q        Now, also at your apartment -- do you have a hobby or

15  something that you like to do?

16  A        I like to do crafting.

17  Q        And did you have some of that crafting at your

18  apartment during this time?

19  A        Yes.  I had wooden roses and a box full of

20  miscellaneous glitter and glue and whatnot.

21  Q        I'm going to show you what's been marked for purposes

22  of identification as State's Exhibit 39 and ask if -- that is

23  State's Exhibit 39.  The two pictures at the top, do you

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

796

1    recognize those?

2    A       I do.

3    Q       What are those?

4    A       Vases of flowers I had arranged.

5    Q       And that's one of your hobbies?  You like to do that?

6    A       Yes.

7    Q       All right.  There's two pictures at the bottom of

8    those; one has like a little baggie and the other one appears

9    to have a gun in there; correct?

10   A       Yes, sir.

11   Q       Did you create those vases and flowers and then put

12   in the gun and the baggie there?

13   A       No, sir.

14   Q       So when you created those, there was no gun or baggie

15   in?

16   A       No, sir.

17   Q       All right.  The next day, however, your mother looked

18   at these; correct?

19   A       Yes, sir.

20   Q       And she discovered these items in there?

21   A       Yes, sir.

22   Q       And what did you do at that point when your mother

23   discovered that?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

797

1    A        She handed me -- she had picked up the baggie and

2    handed it to me.  And I put it in my shirt and I walked out

3    and I went and got the police officer.  And the police officer

4    came in and my mom had -- my mom picked the flowers up and

5    showed that -- and showed them where she found them.

6    Q        You didn't put those there?

7    A        No.

8    Q        Even though you created those arrangements?

9    A        Yes.

10   Q        All right.  I'm going to show you -- and those are

11   fair and accurate pictures of the arrangement of flowers and

12   what was inside those pots?

13   A        Yes.

14   Q        Okay.  I'm going to show you State's Exhibit 38, it

15   is two photographs, and ask if you recognize those two

16   photographs?

17   A        I do not, sir.

18       (Whereupon, State's Exhibit 38, Photos, was introduced

19   for identification.)

20   Q        You --

21   A        I remember it happening, yes.

22   Q        Well, where are those two photographs at?

23   A        In my kitchen.

                          OFFICIAL COURT REPORTER
                      TRUMBULL COUNTY * WARREN, OHIO

798

1    Q       All right.  At the Cortland address?

2    A       Yes, sir.

3    Q       Okay.  I'm going to publish this to the jury.  Two

4    photographs on State's Exhibit 38.  All right.  This is your

5    kitchen at that apartment?

6    A       Yes, sir.

7    Q       There's a trash bag here.  Do you recall where that

8    trash bag was?

9    A       Where the -- well, it looks -- if that's my hair box,

10   then it would have been in the bathroom.

11   Q       All right.  And eventually it ended up here in the

12   kitchen; correct?

13   A       Yes, sir.

14   Q       And this is your hair box?

15   A       Yes, sir.

16   Q       And I know you eventually or someone found some money

17   in there; correct?

18   A       Yes, sir.

19   Q       Quite a large sum of money?

20   A       Yes, sir.  I was never told the actual amount.

21   Q       Now, you didn't put that money in there, did you?

22   A       No, sir.

23   Q       And you didn't claim that money, did you?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        No, sir.

2    Q        You didn't rob the Pizza Joe's, did you?

3    A        No, sir.

4    Q        Did you ever have a gun in your apartment?

5    A        No, sir, never.

6                    MR. BECKER:  I have nothing further, Your

7    Honor.

8                    THE COURT:  Cross.

9                    MR. OLSON:  Thank you, Your Honor.

10                   <u>CROSS EXAMINATION</u>

11   BY MR. OLSON:

12   Q        Good afternoon, Melanie.  How are you?

13   A        Good.  How are you?

14   Q        Okay.  Melanie, you indicated that on June 20th of

15   2017 you had gone to Willow Lake with Justin and Leah; is that

16   correct?

17   A        Yes, sir.

18   Q        Do you recall what time that was?

19   A        I cannot tell you, truthfully.

20   Q        Okay.  Was it in the morning?  Afternoon?  Do you

21   recall that?

22   A        I believe it was towards the morning.

23   Q        Okay.  And nobody else went with you; is that

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    correct?

2    A       I don't -- I believe there was -- we all kind of met

3    there.

4    Q       When you say, "We all kind of met there," who is

5    "we"?

6    A       Nick and Stacie and me and who I knew as Nate and

7    Kimmy.

8    Q       Did you all leave from your house or did just the

9    three of you go and then Nate -- the person you know as Nate

10   and Nick meet you there?

11   A       I believe we split off in the morning and then went

12   back because Kimmy and I think Nate didn't have their bathing

13   suits or something along those lines.  But I cannot recall

14   them being in the car when we went in to Willow Lake.

15   Q       Okay.  So is it your testimony here today that the

16   person that you knew as Nate was at your house in the morning?

17   A       Yeah.  Yes.

18   Q       Okay.  How did he get there?  Do you know?

19   A       I picked Kimmy and him up.

20   Q       And do you know what time you picked them up?

21   A       No, sir.  I couldn't tell you.

22   Q       Melanie, you have a -- and, again, your testimony is

23   you never met -- you never knew Austin personally before that

1    date?  Saw him at parties, but really didn't know him; is that

2    correct?

3    A      Yes.

4    Q      Didn't know what his name was?

5    A      No.

6    Q      What was the first time you were introduced to him

7    and it was identified that his name was Nate?

8    A      I think the first time that I -- it was at a --

9    Kimmy's house at a lake.

10    Q      Okay.  And do you remember when that was?

11    A      I do not remember the exact date, no.

12    Q      Okay.  But as of the 20th of June, you still knew him

13    as Nate; is that your testimony?

14    A      Yes, sir.

15    Q      You have a Facebook account; is that correct?

16    A      Yes, sir.

17    Q      Okay.  I'm going to show you what is marked as

18    Defendant's Exhibit J.  At the top of that document, does it

19    identify that that's a Facebook Messenger program?

20    A      Yes.

21                (Whereupon, Defendant's Exhibit J, Facebook

22    Messages, was introduced for identification.)

23    Q      Okay.  And does it show who the participants are?

802

1    A       Yes.

2    Q       Okay.  And can you identify who those participants

3    are?

4    A       Myself and Austin Taylor.

5    Q       Okay.  And who do you know as Austin Taylor?

6    A       I knew him as Nate.

7    Q       On Facebook?  So -- and let's get an idea of how

8    Facebook Messenger works.  It's through the Facebook program;

9    is that correct?

10   A       Yes, sir.

11   Q       Okay.  And when you get on Facebook, you can become

12   friends with somebody; is that correct?

13   A       Yes, sir.

14   Q       And then they have their own messenger service on

15   that program that you can communicate back and forth?

16   A       Yes, sir.

17   Q       It's almost like text messaging; you'd agree?

18   A       Yes, sir.

19   Q       And when you become friends with somebody and you

20   send out this request, you know what their name is; correct?

21   A       Yes, sir.

22   Q       And on that document there, it shows that the

23   person's name was Austin Taylor; is that correct?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   A       Yes, sir.

2   Q       And what date did you become friends or what date are

3   you communicating with Austin Taylor on that document?

4   A       The 20th.

5   Q       Is there a date of the 19th?

6   A       Yes.

7   Q       6-19 of 2017; is that correct?

8   A       Yes, sir.

9   Q       Okay.  And so we know that as of 6-19 of '17 you were

10  communicating with Austin Taylor?

11  A       Facebook, you can put what's not your real name.

12  Q       Okay.

13  A       I had automatically -- I had assumed that his name

14  was Nate but that he was going by a nickname.  Or maybe his

15  nickname was Nate.

16  Q       Okay.  Now, you also on the date of this incident,

17  you made a written report at approximately 12:50 in the

18  morning; is that correct?  To the police officers.

19  A       The following day?  So the 21st?

20  Q       Oh, yes.  It would be the 21st.

21  A       Yes, sir.

22  Q       Okay.  Do you recall the written statement that you

23  made?

804

1    A        Not word for word, no.

2    Q        Okay.  If I'd give it to you, would it refresh your

3    recollection of what was on there?

4    A        Yes, sir.

5    Q        I'm now showing you what's been marked as Defendant's

6    Exhibit K.  Can you review that document?

7    A        (Witness complies.)

8                     (Whereupon, Defendant's Exhibit K, Witness

9    Statement, was introduced for identification.)

10   A        Excuse me.  What?

11   Q        Review the document.  Do you recognize it?

12   A        Yes.

13   Q        Okay.  And is that the written statement that you

14   made on the 21st at 12:50 a.m.?

15   A        Yes.

16   Q        Okay.  And in that written document does it say that

17   you went to Willow Lake around 11 or 12?

18   A        Yes, sir.

19   Q        And after you went to Willow Lake it indicates that

20   you brought Donavon to McDonald's; is that correct?

21   A        Yes, sir.

22   Q        And Donavon had his orientation that day?

23   A        Yes, sir.

Q        Okay.  After orientation, you brought Donavon back to Willow Lake; is that correct?

A        Yes, sir.

Q        And then it indicates in there when you got to Willow Lake your group was joined up with a person that you knew as Nate; is that correct?

A        Yes, sir.

Q        Okay.  So that didn't indicate that Nate was at your house earlier in the day and then traveled to Willow Lake with you guys; is that correct?  It indicates he joined with you there?

A        Yes, sir.

Q        Okay.  You continued to go swimming while you were there; is that correct?  Is that what it states?

A        Yes, sir.

Q        You were there until Willow Lake closed; is that correct?

A        I left to go back to work.

Q        Okay.

A        And then they let me leave early.  So I went back to Willow Lake.

Q        Okay.

A        And then we left.

806

1    Q        Okay.  And it says that you left after closing of

2    Willow Lake; is that what it says?

3    A        Yes.

4    Q        Okay.  Do you recall the time that Willow Lake

5    closes?

6    A        I do not recall what time it closes.

7    Q        Okay.  Is it in the early evening hours?

8    A        I believe so.

9    Q        After you go to Willow Lake and it closes, you leave;

10   is that correct?

11   A        Yes, sir.

12   Q        Now this person that you know as Nate is with you?

13   A        Yes, sir.

14   Q        You go to his house?

15   A        Yes, sir.

16   Q        Okay.  He gets some snacks?

17   A        Yes, sir.

18   Q        And then you travel to your house; is that correct?

19   A        Yes, sir.

20   Q        Do you recall what time that you get to your house?

21   A        I do not recall exactly what time.

22   Q        Okay.  Was it is dark out by then, like dusk?

23   A        Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

807

1    Q       Okay.  You indicate in there that you all took
2    showers?

3    A       Yes.

4    Q       Okay.  So -- including the guy that you knew as Nate,
5    he took a shower at your house; is that correct?

6    A       Yes, sir.

7    Q       At some point in time your friend Nick leaves the
8    apartment; is that correct?

9    A       Yes, sir.

10   Q       You indicated he became upset because you were
11   talking to Donavon?

12   A       Yes, sir.

13   Q       Do you know what time he left your house?

14   A       Probably about 15 minutes before I had went looking
15   for him.

16   Q       Okay.

17   A       So at about -- probably about 9:30.

18   Q       But you can't be exact as to the time today?

19   A       No, sir.

20   Q       And while he was -- when he left, you continued to
21   text him; is that correct?

22   A       Text Nick?

23   Q       Yes.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

808

1    A        Yes.

2    Q        He told you he'd talk to you later, he'd see you on

3    Saturday?

4    A        Yes, sir.

5    Q        You told him you were going to come pick him up?

6    A        Yes, sir.

7    Q        Is that correct?

8    A        Yes, sir.

9    Q        He said, "No, leave me alone"?

10   A        Yes, sir.

11   Q        He said he was fine?  "I'll talk to you later"?

12   A        Yes, sir.

13   Q        And then at approximately 9:58 is when your sister

14   text you and said that Nick was at the Burger King looking

15   like a crack addict; is that correct?

16   A        Yes, sir.

17   Q        How far away is Burger King from your house?

18   A        Maybe a minute drive.  It's just down the road.

19   Q        A minute drive.  How far of a walk?

20   A        Of a walk?  Probably about 10 to 15 minutes.

21   Q        You would agree that in that document, that written

22   statement that you made, before Nick left, you did not

23   identify any other person leaving; is that correct?  No one

1    else left from your apartment that's identified in that

2    document, the written statement?

3    A       Yes.

4    Q       Then you indicated that you go to the Burger King,

5    you pick up Nick?

6    A       Yes.

7    Q       He was eating at that point in time?

8    A       Yes.

9    Q       So if it's a minute drive, you got there right around

10   10, we'll assume?

11   A       Yes, sir.

12   Q       He got there at 9:58.  You immediately went when you

13   talked to McKenna?

14   A       Well, I was already out looking for him.

15   Q       Okay.

16   A       So when I texted him, I probably got there about

17   10:04, 10:05.

18   Q       Okay.  Yeah.  And then you sat there, let him eat and

19   then you drove him home?

20   A       Yes, sir.

21   Q       Where did he live?

22   A       In Vienna.

23   Q       Okay.  How far of a drive was it from Vienna -- from

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Cortland Burger King to Vienna?  Do you recall?

2    A       Probably about 20 minutes.

3    Q       Okay.

4    A       I was on -- my mom pulled up the GPS and showed the

5    officers.

6    Q       Okay.  So 20 minutes to Vienna, 20 minutes back?

7    A       Yes, sir.

8    Q       Okay.  And in your written statement it indicates

9    that when you got back to your house, you went and did your

10   makeup; is that correct?

11   A       Yes, sir.  I got up and they had said, "Do you want

12   to go?"  So I immediately walked to my bathroom and did my

13   makeup.

14   Q       And then shortly after that the cops were there; is

15   that correct?

16   A       Yes, sir.

17   Q       What time did the cops arrive?

18   A       What time exactly, I can't say.

19   Q       Do you recall roughly what time it was?  Was it after

20   10:30?  Was it 11?  Just so we know a time frame.

21   A       I -- they were rushing me to go, so I had walked up

22   the stairs and they said, "We should go to a hotel or we

23   should go to the hookah lounge or something."

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

811

1    Q        Who said that to you?

2    A        Who I knew as Nate and just that it was kind of a

3    group decision.

4    Q        Okay.  Did you ever see this person that you knew as

5    Nate with any cash on him, large amounts of cash?

6    A        No.  I was never alone with him after I got home.

7    Q        Okay.  Did you ever see this person named Nate with a

8    firearm in his possession?

9    A        Not that I -- no.

10   Q        Okay.  And you indicated in your report when you got

11   there everybody was there; is that correct?

12   A        Yes.

13   Q        Okay.  And nobody was acting suspicious or looking

14   different than when you had left?

15   A        No.  That's why I didn't know what was going on.

16   Q        And here today you cannot tell this jury that you

17   ever witnessed the person that you knew as Nate leave your

18   apartment?

19   A        Other than to look for my cats, no.

20   Q        Okay.  Do you recall what time you went to look for

21   your cats?

22   A        I do not recall what time it was.

23   Q        Was it -- was that before or after Nick left?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

812

1  A        That was before Nick left.  Because Nick left while

2  they were looking.

3  Q        Did Nick go out to help you look?

4  A        Yes.  Nick went out to help look.

5  Q        Okay.  And then after you -- do you know how long it

6  took you to look for the cats?

7  A        No, I don't remember, but I know that -- I believe

8  Justin was still outside.  Justin had just come inside

9  whenever he -- and he told me that Nick had walked away.

10  Q        Did everybody, after looking for your cats, go back

11  into your apartment?

12  A        I think they came in to talk for a little bit, but

13  they might have left afterwards.  I can't say for certain

14  though.

15  Q        Okay.  Because eventually you left to go look for

16  Nick?

17  A        I -- yeah.  Once I heard that he had left, I left.

18  Q        Now, you also made a second statement at 3:49 on the

19  21st as well; is that correct?

20  A        Yes, sir.

21  Q        In that statement -- is that your statement as you

22  remember it?

23  A        Yes, sir.

813

1  Q       And in that statement you would agree with me that

2  you indicated that you were the one that moved that trash bag

3  we saw on the dishwasher or whatever that may have been and

4  hung it there?

5  A       Yes.  I had moved all of my trash bags into the

6  kitchen.

7  Q       Okay.  So you did that yourself?

8  A       Yes, sir.

9  Q       Okay.  I just wanted to be clear with that.

10         And, again, the bullets that were found in that

11 little satchel, you did not find that; you're saying your mom

12 found that?

13 A       Yes, sir.

14 Q       And you do not know who put that there?

15 A       No, sir.

16 Q       Okay.  You also found a firearm; is that correct?

17 A       Yes, sir.

18 Q       And you do not know who put that there?

19 A       No, sir.

20 Q       Correct?

21              MR. OLSON:  One moment, Your Honor.

22         I have no further questions.

23              THE COURT:  Redirect.


                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

814

1           MR. BECKER:  Very briefly, Your Honor.

2                    <u>REDIRECT EXAMINATION</u>

3   BY MR. BECKER:

4   Q       Melanie, you were gone to Burger King prior to the

5   robbery happening at Pizza Joe's; correct?

6   A       Yes, sir.

7   Q       And by implication, then, Nick was nowhere near there

8   when the robbery at Burger King happened?

9   A       Pizza Joe's, but yes.

10  Q       Pizza Joe's?

11  A       Yes, sir.

12  Q       And you have no idea who or if anybody left your

13  apartment from the time you went to Burger King you said at

14  about 10:04 or 10:05 until you got back from taking him out to

15  Vienna which you said was maybe 11:00 or so?

16  A       Well, I actually left my house prior to my sister

17  texting me.

18  Q       Okay.

19  A       So from --

20  Q       9:50?

21  A       At least 9:58, but probably about 9:55 I wasn't at my

22  apartment.

23  Q       And you got back what time, do you think, from

1   Vienna?

2   A       I want say it was 10:45, 10:50.

3   Q       So you have no idea if anyone would have left or

4   anyone came in and out of your apartment?

5   A       No, sir.

6   Q       Now, you were asked about the trash bag that got

7   moved.  You moved that trash bag with your hair dye in it that

8   eventually had the money in it; correct?

9   A       Yes, sir.

10  Q       Okay.  When did you do that?

11  A       Right after the -- when the police officers were --

12  had just left.

13  Q       All right.

14  A       We were collecting up the trash and stuff.

15  Q       All right.

16  A       So I had gone to the bathroom and I -- while I was in

17  there, I pulled -- I got the trash from in the bathroom and

18  moved it into the kitchen with another trash bag.

19  Q       Did you look in there very carefully?

20  A       No.

21  Q       You just grabbed it and put it in the kitchen?

22  A       Yes, sir.

23  Q       And, again, you didn't have any money?  You wouldn't

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

816

1    have put any money in there?

2    A        No, sir.

3                     MR. BECKER:  All right.  Thank you.

4                     THE COURT:  Recross.

5                     MR. OLSON:  Nothing further, Your Honor.

6                     THE COURT:  You may step down.

7        Call your next witness.

8                     MR. BECKER:  Thank you, Your Honor.

9    Stephanie Taylor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                          *   *   *

2                     STEPHANIE TAYLOR,

3     having been duly sworn, was examined and testified as follows:

4                     <u>DIRECT EXAMINATION</u>

5     BY MR. BECKER:

6     Q       Would you state your name for the record, please?

7     A       Stephanie Taylor.

8     Q       Stephanie, where do you live at?

9     A       In Cortland, Ohio.

10    Q       And do you have any children?

11    A       I do.

12    Q       What are their names?

13    A       All of them?

14    Q       Yeah.

15    A       Let's see.  I have Glen, Cassi, James, Zachary,

16    Melanie, McKenna, Aleah and Gabriella.

17    Q       That's a full house.

18    A       Yes, it is.

19    Q       Your daughter, Melanie, in June of 2017, was she not

20    living with you?

21    A       She was not.

22    Q       Do you recall where she was living at in June of

23    2017?

818

1    A       She was living on, I believe that's High Street in

2    Cortland.

3    Q       All right.  Do you know what county that's located

4    in?

5    A       Trumbull.

6    Q       Now, on June 20th, 2017, did something happen in the

7    downtown area of Cortland and you became concerned for your

8    daughter?

9    A       I did.

10   Q       And what did you find out had happened?

11   A       I received a text message from one of my daughters

12   saying that Pizza Joe's had been robbed, which is right across

13   the street from the apartment.  And I texted her and said,

14   "Don't go home.  I want you to come here and stay here

15   tonight.  They haven't found whoever did this."

16   Q       You knew at that time she was not at her apartment?

17   A       I believe I did.  Or I just assumed she wasn't at

18   home yet.

19   Q       Now, she actually went back to the apartment;

20   correct?

21   A       I believe she did.  She said she did.

22   Q       All right.  And then at some point the next day or

23   early that next morning you, I think, decided that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   Stephanie -- or I'm sorry -- that Melanie needed to come back

2   home?

3   A      Yes.

4   Q      All right.  So you went to the apartment.  When is

5   the first time you went to the apartment after the robbery?

6   A      It was lunchtime the following day and I asked her

7   where she was.  And she was driving around with -- doing some

8   errands.  And I said, "You have to answer me.  Where are you?"

9   And she wasn't answering me very quickly.  And so I pulled her

10  up on GPS and I drove to where she was and sat in the parking

11  lot while she was at Giant Eagle and waited for her to come

12  out.  And she said that she was hungry.  We went and ate at

13  McDonald's and then she received a phone call from an

14  investigator saying that they wanted to go back into her

15  apartment and look for whatever they hadn't found yet.

16  Q      All right.  And you met the officers back at her

17  apartment then?

18  A      Yes.

19  Q      And she had to unlock the door and let them in?

20  A      Yes.

21  Q      Now, you were in the apartment while the officers

22  continued to search the apartment.  Did you find something

23  after they left or as they were leaving after they had looked?

820

1    A        At that point, I had asked if I could clean.  And I

2    had a garbage bag and I was just sweeping my arm across any

3    flat surface into a trash bag.  And I went into the kitchen

4    and there were two vases on the floor of wooden roses and I

5    picked up the roses out of one container and there was a --

6    something black, a bag looking thing at the bottom.  I picked

7    it up and it was heavy.  Squeezed it.  And there were bullets.

8    And then I called to my husband and said, "I have -- there's

9    bullets."  And so he said, "Don't touch anything."  And then

10   he went and got the officers.  And as he was walking down to

11   get the officers, I lifted the roses and there was a gun in

12   the other --

13   Q        You didn't find the gun itself; you found the

14   bullets?

15   A        I found the bullets in the right-hand container and

16   then on the left, the left flower pot, I lifted the roses and

17   there was a gun.

18   Q        So both of them you lifted out?

19   A        Uh-huh.

20   Q        Okay.  I'm going to show you what's been marked for

21   purposes of identification as State's Exhibit 39.  There's

22   actually four photographs there.  Can you identify the four

23   photographs in State's Exhibit 39?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Those are the roses and the flower pots.

2    Q        All right.  I'm going to hand you what's been marked

3    for purpose of identification as State's Exhibit Number 5 and

4    ask you if you recognize the contents of State's Exhibit

5    Number 5?

6    A        That looks like it.

7    Q        And you squeezed this and you said there's bullets

8    inside there?

9    A        Uh-huh.

10   Q        That appears to be what you found?

11   A        Yes.

12   Q        In one of those flower vases?

13            I'm going to hand you what's been marked for purposes

14   of identification as State's Exhibit Number 1.  Does that look

15   like what you observed in the other flower pot?

16   A        I could only see it from the end.

17   Q        Okay.

18   A        So --

19   Q        All right.  But you then called the police; is that

20   correct?

21   A        Oh, yes.  My husband came up and was like, "Don't

22   touch anything."  And they came right up.

23                    MR. BECKER:  All right.  I have no further

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1   questions, Your Honor.

2                   THE COURT:  Cross?

3                   MR. OLSON:  We have nothing.

4                   THE COURT:  You may step down.  Thank you.

5         Call your next witness.

6                   MR. BECKER:  Thank you, Your Honor.

7                           *   *   *

8                       SHAWN MARX,

9   having been duly sworn, was examined and testified as follows:

10                  DIRECT EXAMINATION

11  BY MR. BECKER:

12  Q     Shawn, if you could pull that microphone a little bit

13  closer to you.

14        Would you state your name for the record?

15  A     Shawn Marx.

16  Q     Shawn, where do you live at?

17  A     260 West Main.

18  Q     West Main?

19  A     In Cortland.

20  Q     All right.  Is that -- do you know what county that's

21  in?

22  A     Trumbull.

23  Q     Shawn, how long have you lived there?

823

1    A        Oh, I moved in in the end of May.

2    Q        Of what year?

3    A        This year.  Or last year.  '17.

4    Q        2017?

5    A        Uh-huh.

6    Q        I want to direct your attention to June 20th, 2017,

7    in the evening hours.  Were you outside of your apartment at

8    some point around 10:15 or so?

9    A        Yeah, I was on the stoop smoking a cigarette.

10   Q        And did something unusual happen as you were out on

11   the stoop?

12   A        Yeah.  Somebody ran out of Pizza Joe's and ran right,

13   right to me.

14   Q        Now, where is Pizza Joe's in relation to where you

15   were -- your apartment is and your stoop where you were

16   smoking?

17   A        If I'm sitting on my stoop, it's to the left two

18   buildings up about a hundred yards.

19   Q        All right.  And do you recall how this individual was

20   dressed?

21   A        In dark clothing.  He was shuffling around.  He ran

22   behind a pickup truck and he was shuffling around doing

23   something.  And he took off stuff and I could see his face.

1   He looked at me, I looked at him, and he ran.

2   Q       And at this point, did that person have a mask on or

3   anything?

4   A       Not when I saw him, no.

5   Q       All right.  And were you able to identify who that

6   was?

7   A       Yeah.

8   Q       Who was it?

9   A       It's the defendant.

10  Q       All right.  And would you point the defendant out in

11  this case?

12  A       Right there (Witness indicates.)

13  Q       How close to you -- or how close to him were you?

14  A       From me to you.

15  Q       About maybe 20 feet?

16  A       Under a street light.

17  Q       All right.  And did you tell the police you

18  identified him at that time?

19  A       No.  I just -- I didn't know where he went.  I was

20  worried about him trapping him in.  I went around the other

21  side of the building.

22  Q       Where did he go?

23  A       He shot in-between a house and the one building.  He

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

825

1  ran through that.  And I went around the building to make sure

2  he didn't get across 46.

3  Q     Okay.  So for the jurors that may not know, you're on

4  the same side as Pizza Joe's?

5  A     Right.

6  Q     He went across the street?

7  A     Correct.

8  Q     And what is across the street?

9  A     Daybreak Music.

10 Q     And did he go to what would be the west side of

11 Daybreak Music, or to the east side of Daybreak Music?

12 A     He went to the left side.  I don't know which one is

13 the east side.

14 Q     All right.  The left side.  If you're looking at

15 Daybreak --

16 A     It would be the left side.  There's a parking lot.  I

17 went to the right side.

18 Q     And did you ever see him come out that way?

19 A     No.

20 Q     You don't know where he went, though, from there?

21 A     No.

22 Q     You told the police you had seen him run out?

23 A     No.  I haven't seen him around.  All I seen him was

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

826

1   running out that night.

2   Q        Yeah, but -- what I'm saying is you told the police

3   you saw him come out of Pizza Joe's?

4   A        Oh, yeah, absolutely.

5   Q        Did you see anything in his hands?

6   A        No, but he had something in his pocket.  It was

7   shiny.  I assumed it was a pistol or something.

8   Q        But you couldn't see it?

9   A        No.

10  Q        All right.  The individual you saw that night, is he

11  here in the courtroom?

12  A        There he is right there.

13  Q        All right.  That's the individual?

14  A        I said he had a really bad haircut.  That was my --

15  Q        Now, you are wearing glasses, I see?  Were you

16  wearing your glasses at that time?

17  A        Yeah.

18                      MR. BECKER:  All right.  Thank you,

19  Mr. Marx.

20                      THE COURT:  Cross.

21                      <u>CROSS EXAMINATION</u>

22  BY MR. OLSON:

23  Q        Mr. Marx, on the date of the incident on the 20th and

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

827

1  following into that night, you had to give a written

2  statement; is that correct?

3  A       A what?

4  Q       A written statement to the police officers?

5  A       Yeah.

6  Q       And you would agree with me that the written

7  statement that you provided indicated that the man was about 6

8  feet tall; correct?

9  A       Right around there.

10 Q       Had short dark hair?

11 A       Uh-huh.

12 Q       Correct.  Blue jeans?  Was wearing blue jeans?

13 A       Something dark.  So I assumed blue jeans.

14 Q       Well, you said blue jeans.

15 A       Okay.

16 Q       Is that what -- I mean, I can show it to you.

17 A       Sure.  Sure.

18 Q       He was wearing a red shirt?

19 A       Uh-huh.

20 Q       Carrying a sweatshirt; is that correct?

21 A       It's been a long time, but yeah, go ahead.

22 Q       And wearing tennis shoes?  Tennis shoes?

23 A       Uh-huh.  Yeah.

828

1    Q        You would agree with me that nowhere in your written

2    statement did you say that you saw a man with tattoos on his

3    face?

4    A        I didn't need to.

5    Q        You didn't need to?

6    A        Why would I say that?  They already had the picture

7    of it.  He ran right up to me.

8    Q        I'm going to show you Exhibit M.  Are you familiar

9    with that document?

10   A        Yeah.  Pardon me.

11                    (Whereupon, Defendant's Exhibit M, Police

12   Report, was introduced for identification.)

13   Q        Mr. Marx, are you familiar with that document?

14   A        It's a police report.

15   Q        Okay.  And it shows your name on it?

16   A        Uh-huh.

17   Q        Shows your signature at the bottom?

18   A        Uh-huh.

19   Q        And, again, when the officers came to you, they asked

20   you to provide all of the details that you knew about that

21   evening?

22   A        Uh-huh.

23   Q        Is that correct?  And you would agree with me that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  nowhere on that document --

2  A        No, it doesn't.

3  Q        Please let me ask the question.  You would agree with

4  me that nowhere on that document does it say that the man ran

5  out of the store, came up to you and you noticed that he had

6  tattoos on his face?

7  A        No.

8                         MR. OLSON:  No further questions.

9                         THE COURT:  Redirect.

10                        MR. BECKER:  Nothing further, Your Honor.

11                        THE COURT:  You may step down.  Thank you.

12           Call your next witness.

13                        MR. BECKER:  Thank you, Your Honor.

14                              *   *   *

15                          BRITNI WILLIAMS,

16  having been duly sworn, was examined and testified as follows:

17                      <u>DIRECT EXAMINATION</u>

18  BY MR. BECKER:

19  Q        Would you state your name for the record, please?

20  A        Britni Williams.

21  Q        Britni, how old are you?

22  A        18.

23  Q        Britni, I want to direct your attention to June 20th,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    2017.  Where were you working at in June of 2017?

2    A       Cortland Pizza Joe's.

3    Q       How long had you worked there?

4    A       About eight months.

5    Q       Now, a little after 10:00 that night, did something

6    unusual happen at Pizza Joe's?

7    A       Yes.

8    Q       What happened?

9    A       We were closing and a man came in demanding money.

10   Q       And did you see a gun?

11   A       Yes.

12   Q       Can you describe the gun?

13   A       It was small, silver.  That's about it.

14   Q       All right.  Didn't really get a lot of details with a

15   gun pointed at you?

16   A       No.

17   Q       I'm going to show you what has been marked for

18   purposes of identification as State's Exhibit Number 30.  And

19   I'm going to ask if you can identify what's going on in

20   State's Exhibit 30.  Do you recognize this location?

21   A       Yes.  That's the lobby.

22        (Whereupon, State's Exhibit 30, Video, was introduced for

23   identification.)


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

```
1    Q       And this location is in what city?

2    A       Cortland.

3    Q       Do you know what county it's in?

4    A       Trumbull.

5    Q       I'm going to stop this right here.  Who is the other

6    lady that's in the store with you?

7    A       Jamie.

8    Q       All right.  And where were you at when you came out?

9    A       I was in the kitchen cleaning.

10   Q       Why did you have to come out?

11   A       Because she did not know how to open the register.

12   Q       Only you knew how to open the register?

13   A       She freaked out and did not remember.

14   Q       Okay.  What did you do after he left?

15   A       We went to a phone and called the police.

16   Q       Now, were you able to get a look at much of that

17   person's face?

18   A       No.

19   Q       Is that a fair and accurate copy of the events as

20   they happened after 10:00 on June 20th, 2017?

21   A       Yes.

22   Q       And you saw yourself in there opening the register?

23   A       Yes.
```

832

1    Q       Do you have any idea how much money you gave that
2    individual?
3    A       Let's see.
4    Q       If you don't know, it's okay.
5    A       I don't.
6    Q       The better person would be -- would be Stephanie
7    Kerstetter who the owner or manager there?
8    A       Yes.
9    Q       Okay.  And she's out in the hallway?
10   A       (Witness nods head.)
11   Q       Thank you.
12                   THE COURT:  Cross.
13                   MR. HARTWIG:  Thank you, Your Honor.
14                   CROSS EXAMINATION
15   BY MR. HARTWIG:
16   Q       Hi, Britni.  It took about two or three minutes, this
17   whole ordeal, or less?
18   A       I can say probably less.
19   Q       Less.  Okay.  You had indicated in your written
20   statement, I believe, that he was in for at least two or
21   three minutes, but we have the video so we know the timing of
22   it?
23   A       Yeah.

                        OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

833

1    Q        It might have seemed a little longer, but it was

2    pretty quick?

3    A        Yes.

4    Q        And you didn't give a lot of details because you

5    couldn't see his face; right?

6    A        No.

7    Q        What you had indicated was a man walked in, had a

8    gun, had a ski mask; right?

9    A        Uh-huh.

10   Q        You said he was tall, wearing sweat pants and a

11   hoodie; right?

12   A        Yes.

13   Q        Would you agree with me after watching the video that

14   he wasn't wearing gloves?

15   A        Yes.

16   Q        He had a gun in his right hand and when he asked for

17   the money -- he comes up and puts both hands out and says,

18   "Put it in here"; is that what he said?

19   A        Yes.

20   Q        And you didn't indicate to the police that you

21   noticed that he had tattoos on either hand?

22   A        I didn't notice that.

23   Q        You didn't notice?  All right.


                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

834

1          MR. HARTWIG:  All right.  No further
2     questions.  Thank you.
3               THE COURT:  Redirect.
4               MR. BECKER:  No, sir.
5               THE COURT:  You may step down.  Thank you.
6          Call your next witness.
7               MR. BECKER:  Stephanie Kerstetter.
8                    *  *  *
9               STEPHANIE KERSTETTER,
10    having been duly sworn, was examined and testified as follows:
11                   <u>DIRECT EXAMINATION</u>
12    BY MR. BECKER:
13    Q     Would you state your name for the record, please?
14    A     Stephanie Kerstetter.
15    Q     Stephanie, do you own any businesses here in Trumbull
16    County?
17    A     I general manage three businesses.
18    Q     I'm sorry.  You're the general manager of a business
19    here in Trumbull County?
20    A     Yes.
21    Q     What business is that?
22    A     Cortland, Lordstown and Champion.
23    Q     For what business is it?

                    OFFICIAL COURT REPORTER
               TRUMBULL COUNTY * WARREN, OHIO

1    A        Pizza Joe's.

2    Q        Okay.  I'm sorry.

3    A        Sorry.

4    Q        You might have said that.  I might not have heard.

5    June 20, 2017, was the Cortland Pizza Joe's robbed?

6    A        Yes, it was.

7    Q        And were you notified that it had been robbed?

8    A        Yes, I was.

9    Q        Did you go out there that night?

10   A        I did.

11   Q        Why did you go out there?

12   A        Because they were robbed at gunpoint so...

13   Q        As a manager, you felt it was your responsibility?

14   A        Oh, absolutely.

15   Q        And at some point did you determine a dollar amount

16   of money that was missing?

17   A        I did.

18   Q        How did you do that?

19   A        At the end of the night, there's a report that's run.

20   And we put the numbers in the computer and it comes out with a

21   number.

22   Q        And were you able to determine the dollar amount of

23   money that was taken on June 20th, 2017?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

836

| | | |
|---|---|---|
| 1 | A | I was. |
| 2 | Q | How much was that? |
| 3 | A | $775. |
| 4 | Q | Even? |
| 5 | A | Yes. |
| 6 | Q | Now, is it possible it could be off a dollar or two? |
| 7 | A | Absolutely. |
| 8 | Q | But it wouldn't have been off 230 or so dollars? |
| 9 | A | No, sir. |
| 10 | Q | Okay.  So if there was $230 missing, it's missing? |
| 11 | A | Right. |
| 12 | Q | Okay.  That location is located in what county? |
| 13 | A | Trumbull County. |

14                    MR. BECKER:  Okay.  I have nothing further.

15                    THE COURT:  Cross?

16                    MR. HARTWIG:  No cross, Your Honor.

17                    THE COURT:  You may step down.  Thank you.

18                    MR. BECKER:  Your Honor, can we approach

19      real briefly?

20                    THE COURT:  You may.

21                    MR. BECKER:  Dr. Germaniuk is the last

22      witness, and I don't know how long you guys are going to be

23      with him.  I don't know if you just want to take a break now

837

1  and finish him up.  Or if you guys are not going to be too

2  long with him, we can just keep chugging.

3                  MR. HARTWIG:  I don't think we're going to

4  real long, but it's not going to be five minutes.

5                  THE COURT:  If he's the last witness, we'll

6  take a break now.

7                  (End of sidebar.)

8                  THE COURT:  I think we're down to the last

9  witness, but I think it's going to take awhile so we're going

10  to take a break first.

11                  MR. BECKER:  There's three other witnesses.

12  I'm sorry.  They're police officers.  They may be a little

13  while too.

14                  THE COURT:  We'll still take our break.

15                  MR. BECKER:  I'm sorry.  I'm losing my

16  mind.  Let's just take a break and I'll bring 'em up because

17  they're downstairs.

18                  THE COURT:  We're going to take a break.

19          Do not discuss this case among yourselves, nor with

20  anyone else.  Do not form or express an opinion.

21                  (Whereupon, a recess was had commencing at

22  2:09 p.m. and concluding at 2:28 p.m.)

23                  THE COURT:  Mr. Becker, you may call your

838

1    next witness.

2                    MR. BECKER:  Officer Brandon Rice of the

3    Cortland Police Department.

4                         *   *   *

5                    OFFICER BRANDON RICE,

6    having been duly sworn, was examined and testified as follows:

7                      <u>DIRECT EXAMINATION</u>

8    BY MR. BECKER:

9    Q       Would you introduce yourself to the jury, please?

10   A       My name is Brandon Rice.  I am a police officer for

11   the city of Cortland.

12   Q       How long have you been there?

13   A       15 years.

14   Q       I'm going to direct your attention to June 20th,

15   2017.  Were you working that day?

16   A       Yes.

17   Q       And were you called to Pizza Joe's about 10:12 p.m.

18   in reference to an armed robbery?

19   A       Yes.

20   Q       All right.  What did you do when you first arrived?

21   A       I was one of the midnight officers coming on to shift

22   so when I arrived I went to the apartment on Main Street just

23   to assist the guys.  They had already taken Austin Burke into

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   custody.

2   Q       All right.  So you didn't quite -- you weren't on

3   duty when the robbery actually happened?

4   A       Right.  I was just getting ready to come on.  I think

5   I got to the scene about 22:45.

6   Q       All right.  So that would have been 10:45?

7   A       Yeah.

8   Q       And it wasn't too much longer after that that you

9   found out they had a suspect in custody?

10  A       Yes.

11  Q       All right.  What did you do with that -- did you

12  search anything in the apartment?

13  A       No, I transported him.

14  Q       You just -- your role was just to transport the

15  suspect?

16  A       Yeah.

17  Q       Who was identified at that point as Austin Taylor

18  Burke?

19  A       Yes.

20  Q       Now, when you got him to the station, did you take

21  custody of anything from his person?

22  A       I took a Samsung cell phone out of his right pants

23  pocket.

1    Q       All right.  Did you take anything else?

2    A       No.

3    Q       I'm going to hand to you what's been marked for

4    purposes of identification as State's Exhibit Number 3.  I'm

5    going to ask you to identify State's Exhibit Number 3.

6    A       The cell phone and the battery from the cell phone.

7    Q       All right.  That you took from the individual?

8    A       Yeah.

9    Q       All right.  Is the individual you got that from on

10   June 20th, 2017, here in the courtroom?

11   A       Yes.

12   Q       Could you please identify him?

13   A       (Witness indicates.)

14   Q       He's the defendant in this case?

15   A       Yes.

16   Q       And you didn't have any search before or after that

17   apartment?

18   A       No.  I searched him when I got him up to the station.

19   Q       They were done with their work?

20   A       Yeah.

21              MR. BECKER:  Okay.  I have nothing further,

22   Your Honor.

23              THE COURT:  Cross.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

841

1                    MR. OLSON:  Just very briefly.
2                    <u>CROSS EXAMINATION</u>
3    BY MR. OLSON:
4    Q        Officer Rice, you would agree, then, you didn't
5    interview any witnesses; is that correct?
6    A        No.
7    Q        And you also would agree with me that you just
8    recovered that cell phone and no other items?  There was no
9    money mixed with it or anything like that?
10   A        Just the cell phone.
11   Q        Okay.  And Mr. Burke didn't indicate to you that he
12   had any other clothing that was missing or anything like that;
13   is that correct?
14   A        I don't believe I even spoke to him.
15                    MR. OLSON:  Okay.  Nothing further, Your
16   Honor.
17                    THE COURT:  Redirect?
18                    MR. BECKER:  No, Your Honor.
19                    THE COURT:  You may be excused.
20                    MR. BECKER:  State would call Officer John
21   Weston.
22
23


                         OFFICIAL COURT REPORTER
                     TRUMBULL COUNTY * WARREN, OHIO

842

1                              *   *   *

2                      OFFICER JOHN WESTON,

3    having been duly sworn, was examined and testified as follows:

4                      <u>DIRECT EXAMINATION</u>

5    BY MR. BECKER:

6    Q        Okay.  Would you state your name for the jury?

7    A        John P. Weston.

8    Q        Where are you employed?

9    A        City of Cortland Police Department.

10   Q        How long have you been there?

11   A        Full time, for 23 years.  I've been there since 1988.

12   Q        I want to direct your attention to June 20th, 2017.

13   Were you employed with the city of Cortland on that date?

14   A        Yes, I was.

15   Q        Were you on duty that day?

16   A        I had came on duty that day for midnight turn for the

17   21st, yes.

18   Q        Approximately what time would you have gotten on duty

19   for midnight turn?

20   A        Approximately 22:45 hours.

21   Q        So about quarter 'til 11?

22   A        Yes, sir.

23   Q        At that point, were you aware that there had already

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

843

1    been a robbery at the Pizza Joe's?

2    A       Yes, I was.

3    Q       What did you do in -- well, first of all, did you

4    respond to the scene?

5    A       I did respond to the scene and I assumed command of

6    the scene as I was the senior officer.

7    Q       What did you do when you arrived there?

8    A       Initially, I got a report from the officers that were

9    there.  I learned that there was a canine track in progress.

10   I went to Pizza Joe's where the robbery occurred.  I viewed

11   the videotape of the event.

12   Q       All right.  What did you gain from the videotape of

13   the event?

14   A       That Pizza Joe's was robbed at gunpoint by a male

15   wearing a hoodie, gray sweatpants, and he had a mask of some

16   sort over his head.

17   Q       All right.  Do you recall indicating -- being able to

18   determine what type of tennis shoes he had?

19   A       I don't recall that, no.

20   Q       All right.  If I were to show you some of the

21   security video, would that refresh your memory?

22   A       Yes, it would.

23   Q       Okay.  I'm going to show you what's been marked for

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

844

1    purpose of identification as State's Exhibit Number 30.  And

2    do you recognize this location?

3    A      Yes.  That's Pizza Joe's in the city of Cortland.

4    Q      Now, let me ask you.  Were you able to determine

5    whether or not the date and timestamp was a little off?

6    A      I do recall something about the timestamp being off,

7    but I can't remember exactly what it was at this time.

8    Q      All right.  So let me ask you.  If the police reports

9    indicated that the timestamp -- or I'm sorry -- that the

10   robbery occurred at about 10:12 p.m., that would be about an

11   hour and four minutes after this timestamp; correct?

12   A      That sounds correct, yes.

13   Q      Is that anything unusual?

14   A      No.  That happens with video cameras and surveillance

15   systems a lot, for the time to be off.

16   Q      Does this appear to be what you reviewed?

17   A      Yes, this is one of 'em.

18   Q      I believe there's also a few other camera angles; is

19   that correct?

20   A      Yes, there is.  I believe there is an outside view.

21   Q      And did you review those as well?

22   A      That is correct.

23   Q      I'm going to show you a different camera angle.  Are

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

845

1    you familiar with this camera angle?

2    A        Yes, that's the outside of the doorway.

3    Q        And I'm going to replay this, just restart this here.

4    Were you able to determine the direction of where that person

5    was coming from?

6    A        In that -- he was coming from a southwest direction.

7    Q        And later on, were you able to identify any

8    individuals in that direction, that general direction?

9    A        Can you repeat the question?

10   Q        The angle where that person ran from, is that the

11   location where the individual that gave you a false name was

12   later arrested from?

13   A        That is correct.

14   Q        And we're looking at another camera -- same camera

15   angle but the person leaving; correct?

16   A        Yes.

17   Q        All right.  And at one point were you or fellow

18   officers able to determine the color or type of shoes he was

19   wearing?

20   A        I believe, if I recall, they were like a gray type

21   tennis shoe.

22   Q        All right.  That refreshed your memory?

23   A        Yes, it does now.  Those are the same shoes we found

846

1    in the bedroom in the apartment across the street.

2    Q        There were shoes just like that in an apartment

3    across the street?

4    A        That is correct.

5    Q        Now, there were some other camera angles as well, I

6    believe from the back.  What is this view looking at?

7    A        This is looking at the side parking lot of Pizza

8    Joe's.  Where the subject is going now is the drive-thru

9    walking up alongside the building.

10   Q        And this is before the robbery?

11   A        That's correct.

12   Q        So this area here is to the left?

13   A        Yes.  The Pizza Joe's is on the left.  Right there

14   where you see the subject disappearing from view, that's the

15   drive-thru area.

16   Q        Are you familiar with this building?

17   A        I am.

18   Q        What building is that?

19   A        It's an apartment building and it also used to house

20   Jo-Kar Kennels.  They are no longer there.

21   Q        The apartment where you made an arrest, you have to

22   go around this building?

23   A        That is the same apartment building.  It was the

847

1   upstairs east side apartment.

2   Q      And this individual here -- or I'm sorry -- this

3   building down the street, is there a witness that was

4   identified through there?

5   A      There was.  He lived two doors down from that vacant

6   building.

7   Q      Wouldn't be this building.  This would be the next

8   one down?

9   A      It's one or two down from there, yes.

10  Q      That's a fair and accurate view of the events that

11  night?

12  A      Yes, it is.

13  Q      And this is after the robbery, you'll see him go

14  basically down the street?

15  A      Right alongside that building and down the street to

16  the south.

17  Q      And then finally the last camera angle.  You were

18  able to obtain a view -- this is a continuation of after the

19  robbery; is that correct?

20  A      That's correct.

21  Q      I'll pause this right here.  So if Mr. Marx was in

22  front of these buildings, he would be about 20 feet from that

23  person?

848

1    A        Approximately, yes.

2    Q        Now, Officer Weston, eventually you were able to get

3    consent after you reviewed that to search an apartment; is

4    that correct?

5    A        That is correct.  From the resident, Melanie Engle.

6    Q        How is it that you came to suspect that there was

7    something going on at 241C Main Street -- West Main Street in

8    Cortland?

9    A        During the investigation of the robbery, the dog, the

10   canine had done a track that went south and then came back

11   north.  While they were doing that, we were also being advised

12   through dispatch that a ping was being made to a cell phone

13   for a subject that had a murder warrant and he was located in

14   Jo-Kar Grooming's building.

15   Q        We just saw the black and white videos from behind

16   Pizza Joe's.  You identified that building as part of the same

17   building as the apartment complex?

18   A        That is correct, yes.

19   Q        Now, eventually you and your fellow officers went to

20   241C, Cortland?

21   A        Yes.  Myself and K-9 Officer Edwards from Warren City

22   went to 241C.  Melanie let us in.  She told us there were

23   other people in the house.  We went upstairs and asked if

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

849

1     anybody saw what happened across the street at Pizza Joe's.

2     Q       And were you able to get information from the

3     individuals inside there, such as their date of birth, social,

4     and their names?

5     A       Yes.  I asked them all for date of birth, socials --

6     not socials, but dates of birth and phone numbers.

7     Q       All right.  Did an individual in that apartment

8     identify himself as Nathan Novicky?

9     A       Yes, he was, with a birth date, I believe, of

10    10-10-97.

11    Q       And were -- you eventually found out that that was

12    not true?

13    A       I did, yes.

14    Q       How did you do that?

15    A       We collected names and dates of the birth numbers and

16    phone numbers for everybody in the apartment.  Went downstairs

17    to further conduct more investigation outside.  Then I

18    obtained a picture of the murder warrant suspect.

19    Q       The individual whose phone was pinging in that area?

20    A       Yes.

21    Q       All right.  And what happened then?

22    A       I could clearly see that the one gentleman that was

23    sitting on the couch upstairs was the guy with the murder

850

1    warrant.

2    Q      And that individual, is he here in the courtroom

3    today?

4    A      He is.

5    Q      Can you please identify him?

6    A      He's seated at the table there with a checkered shirt

7    on beside the two men in suits.

8    Q      And did you -- or were you able to determine his real

9    name?

10   A      Yes, Austin Burke.

11   Q      And Mr. Burke never volunteered that he was Austin

12   Taylor Burke; correct?

13   A      He did not, no.

14   Q      In fact, he told you he was Nathan Novicky?

15   A      That is correct.

16   Q      And he even gave you a fake date of birth?

17   A      And a fake phone number.

18   Q      Yeah, and a fake number.  He was then placed in

19   custody and taken by one of your fellow officers, I believe,

20   Brandon Rice?

21   A      Yes.  We -- myself and Officer Edwards took him into

22   custody.  I directed Officer Rice to take him to the station,

23   not to speak with him.  Take him up there, process him and

1  take him down to Warren City -- on the Warren City warrant to

2  the Trumbull County Jail.

3  Q      All right.  Now, did you stick around and do any

4  searching, or did you go inside again to 241C West Market

5  Street, Cortland, Ohio?

6  A      I did, yes.

7  Q      And I'm going to hand you what's been marked for

8  purposes of identification as State's Exhibits 31, 32, 33, 34,

9  35 and 37.  Exhibits 31, 32, 33, 34, 35, 36 and 37.  I'm going

10  to ask if you recognize those exhibits?

11  A      Yes, I do.

12  Q      Do those photographs all fairly and accurately depict

13  the scene inside of 241C West Market, Cortland, Ohio.

14  A      Yes, West Main Street, yes.

15  Q      I'm sorry.  West Main Street.  And in those

16  photographs are a pair of gray Nike tennis shoes; is that

17  correct?

18  A      That is correct.

19  Q      And did you obtain or do you know of a fellow officer

20  that would have obtained them that night?

21  A      Yes, we took those in as evidence, yes.

22  Q      Were there a pair of gray sweat pants taken as well?

23  A      There was a pair of gray sweat pants and a plastic

1   Sparkle bag that were both located in the white hamper that's

2   depicted in one of these pictures.  It had a Bob Marley album

3   cover thrown over top of them.  Picked that up and inside

4   there was the gray sweat pants and the bag.  The pants had the

5   pocket outside of them just as they were on the video of the

6   Pizza Joe's robbery.

7   Q       Okay.  I'm going to -- I'm not going to print it out,

8   but there was a photograph and we have it if need be, but

9   there was a photograph of that laundry basket which you said

10  had a Bob Marley album --

11  A       Yes.

12  Q       -- on top of that plastic bag in the laundry basket?

13  A       That is correct.  That's Exhibit 37.

14  Q       All right.  Those items were all gathered for what

15  reason?

16  A       As evidence to be used for later testing possibly or

17  identification of the subject.

18  Q       What physical characteristics -- I'm sorry.  Were any

19  of those items depicted on State's Exhibit 30, the security

20  video?

21  A       Yes.

22  Q       All right.  I'm going to hand you what's been marked

23  for purposes of identification as State's Exhibit Number --

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

853

1   State's Exhibit Number 7 and State's Exhibit Number 8 and

2   State's Exhibit Number 4.

3         With respect to State's Exhibit Number 4, can you

4   tell me what's contained in that item?

5   A     This is the pair of Nike shoes that were taken from

6   the apartment in the back bedroom.

7   Q     And do those appear to be the same or similar as the

8   Nike shoes depicted on the security video?

9   A     They do to me.

10   Q     I'm going to hand you State's Exhibit Number 7 and

11   ask if you recognize State's Exhibit Number 7?

12   A     These are the gray sweatpants seen in the video at

13   the Pizza Joe's robbery.  And as you can see, the pocket is

14   still in the shape that we found it outside just like it was.

15   Q     And --

16   A     In the video.

17   Q     In the video, the pocket -- one of the pockets is

18   inside out?

19   A     Yes, you can see.

20   Q     Okay.  I'm going to have you look at State's Exhibit

21   Number 8 and ask if you recognize State's Exhibit Number 8?

22   A     Number 8 is the clear Sparkle bag that was also found

23   in the white hamper under top of the Bob Marley album on top

854

1    of the sweatpants.

2         (Whereupon, State's Exhibit 8, Plastic Bag, was

3    introduced for identification.)

4    Q      All right.  And finally I'm going to show you what's

5    been marked for purposes of identification as State's

6    Exhibit Number 6.  Oops, I'm sorry.  Wait a minute.  My bad.

7    Okay.

8         Do State's Exhibits Number 4, 8 -- yeah, 4 and 8, do

9    they appear to be in the same or substantially the same

10   condition as when you first recovered them?

11   A      That's correct.

12   Q      As well as State's Exhibit Number 7?

13   A      That is correct also.

14   Q      Okay.  Now, you were not present the next day when a

15   firearm and money were recovered in this case; correct?

16   A      I was not.

17                  MR. BECKER:  All right.  Thank you,

18   Officer.

19                  THE COURT:  Cross.

20                  MR. OLSON:  Thank you.

21                  <u>CROSS EXAMINATION</u>

22   BY MR. HARTWIG:

23   Q      Good afternoon, Officer.

855

1   A         Good afternoon, sir.

2   Q         Was there any video surveillance of the same person

3   going in to Pizza Joe's?

4   A         Try that one more time for me.

5   Q         Okay.  We saw surveillance of a person -- the back of

6   Pizza Joe's near the drive-thru; correct?

7   A         That's correct.

8   Q         And we see a person run from Pizza Joe's to the south

9   and cross the street; correct?

10  A         That's correct.

11  Q         So before the robbery, is there any surveillance of a

12  person entering Pizza Joe's?

13  A         Yeah, your first video shows that.  Shows the guy

14  coming --

15  Q         At the drive-thru area?

16  A         No, in the front door.

17  Q         Oh, from inside?

18  A         No.  I believe that you can see from the outside,

19  from him coming in.  Then you see him come to the counter.

20  And then there's another view of him leaving out that same

21  front door.

22  Q         Okay.  All right.  I may have missed that, but okay.

23  So we see him come in and then run outside, correct, to the

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1    south?

2    A       He went out and skated around the building and went

3    through the parking lot.

4    Q       To the parking lot?

5    A       So he actually went a little bit north and along the

6    buildings and across the road.

7    Q       Would you agree with me that the video shows him

8    continuously going to that building and then continuously

9    going across the street?

10   A       Going to which building, sir?

11   Q       I'm sorry?

12   A       Going to which building?

13   Q       After he crosses the parking lot, there is a white

14   building there?

15   A       Yep.

16   Q       That building.

17   A       Yes.

18   Q       Once he gets there, he crosses the street; correct?

19   A       In a direction, yes, but not directly across the

20   street.  Looks like a little bit of an angle.

21   Q       All right.  So he takes a little bit of an angle.

22   But my point is, I'm asking you, he doesn't stop at any point;

23   right?  He runs along the parking lot and runs across the

857

1    street; correct?

2    A       I believe if you watch the video he does slow down a

3    little bit.

4    Q       He doesn't stop is what the question was?

5    A       I don't recall that.  I'd have to see the video

6    again.

7    Q       Okay.  All right.  The person that was in the store

8    robbing these young women went to great lengths to disguise

9    themselves; correct?

10   A       That is correct.

11   Q       All right.  Covered their entire face; correct?

12   A       Mostly covered, yes.

13   Q       Right.  Didn't want to be identified; right?

14   A       I wouldn't think, no.

15   Q       This particular person did not wear gloves; would you

16   agree with me?

17   A       Yes.

18   Q       You agree with me that both hands, both hands, were

19   visible; correct?

20   A       One hand come out of the pocket, I believe, but I

21   don't -- I'd have to see the video again.

22   Q       We just watched the video; right?

23   A       Okay.  If you want to play it again, I'd be happy to

1    look at it.

2    Q        Okay.  If you want pop that on.  Stop right there.

3    All right.  Would you agree with me at that point the person's

4    face and body are covered up but his hands are not covered?

5    A        Yes.  One hand has the gun, the other one has a

6    plastic bag in it, yes.

7    Q        So would you agree with me there is no attempt by

8    this person to hide any distinguishing features on his hands,

9    if there were?

10   A        If you say so, I guess.

11   Q        Well, we are looking at the same still photo,

12   Officer.  I'm not trying to fight with you here, but I'm

13   asking you, do you see any distinguishing features on his

14   hands?

15   A        Not from this camera, no.

16   Q        And did the clerks, either of the clerks, identify

17   any distinguishing features on his hands?

18   A        Not that I'm aware of.

19   Q        All right.  So both clerks, neither one, noticed

20   anything; correct?

21   A        Not at that time I don't guess.

22   Q        Now, do you think if a person went to great lengths

23   to disguise themselves, if they had distinguishing features on

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

859

1    their hands that they would want to cover those up, for fear

2    of being identified?

3    A        Hypothetically you would think that, yeah.

4    Q        Okay.  Do you recall learning from the clerks that a

5    description included that the person was of mixed race?

6    A        I don't recall that, no.

7    Q        All right.  Did you review the written statements of

8    Jamie Hillard and Danielle Garces?

9    A        I'm sure I did at the time, but I don't recall.

10   Q        You don't recall whether in their written statements

11   they described the person as --

12   A        I do not recall every detail of their statement.

13   Q        You'd have no reason to not believe the fact that

14   they're contained in their written statements?

15   A        I have no reason not to believe that, no.

16   Q        Okay.  Now, the person who claimed to identify the

17   robber said he was sitting out front on his porch smoking a

18   cigarette?

19   A        Yes.  Mr. Shawn Marx, yes.

20   Q        Did you speak to him as part of the investigation?

21   A        I did, yes.

22   Q        All right.  Were you present when he gave a written

23   statement?

860

1    A        I don't know if I was present when he gave a written

2    statement.  I heard -- he gave an oral statement to me.

3    Q        Did you write that down?

4    A        No.

5    Q        Okay.  Did you bring him in to the station and do an

6    interview with him?

7    A        No, we would have had one of the other guys take a

8    written statement from him probably.

9    Q        In your experience -- you've been around a long time.

10   What's a photo lineup?

11   A        A photo lineup is when you take pictures of a bunch

12   of people of similar facial features and races and stuff and

13   have somebody pick out the person, if they can.

14   Q        All right.  And what's the point of that?

15   A        To identify a subject.

16   Q        I know, but why do you have like protocols for them?

17   Right?  There's all kind of rules with a photo lineup?

18   A        Sure.

19   Q        Why?

20   A        So that you don't get the wrong guy.

21   Q        Exactly, right?  You don't just take a picture of

22   somebody, walk up and go, "Hey, is it this guy?"; right?

23   A        Right.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Q       You have to have a blinded administrator, for
2    example; right?
3    A       That is correct.
4    Q       Right?  You're only allowed to show the lineup two
5    times?
6    A       That's correct.
7    Q       If they can't identify it, then you have to stop?
8    A       That is correct.
9    Q       And, again, the point is, you run through all of
10   those rules so you can determine whether there's reliability
11   to a supposed identification; correct?
12   A       That's the theory behind it, yes.
13   Q       Right.  Otherwise you could bring somebody in and
14   say, "Yeah, it's that person sitting there"; right?
15   A       It depends on what the circumstances are, but yes.
16   Q       Now, in this case, did you bring Mr. Marx in and say,
17   "Hey, sit down.  We're going to go through all of the rules
18   and protocol to do a photo lineup"?
19   A       No.
20   Q       All right.  Do you have any idea why one of these
21   shoes in front of you, these gray tennis shoes, one has a
22   lace, one doesn't?
23   A       Not a clue.

1   Q       All right.  Would you agree with me that the person

2   that's on the video is running across the parking lot?

3   A       Yes.

4   Q       All right.  Did you ever find a lace that goes with

5   that shoe there?

6   A       No.

7   Q       All right.  Did you ever find a red shirt in the

8   apartment?

9   A       No.

10  Q       Did you ever find a ski mask in the apartment?

11  A       No.

12  Q       All right.  So what was found was you found some

13  sweats, shoes, some money, a gun, but no mask, no red shirt;

14  correct?

15  A       Correct.

16              MR. HARTWIG:  I have no further questions.

17  Thank you.

18              THE COURT:  Redirect.

19                  REDIRECT EXAMINATION

20  BY MR. BECKER:

21  Q       Officer Weston, I left State's Exhibit 30 on here.

22  Is it -- you might even want to step down and look at the

23  laptop.  Is it possible that the left hand of this person may

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

863

1   have some markings?

2   A       Would you like me to step down?

3   Q       Yeah, if you could.  Or is it just simply too hard to

4   tell?  But it's a possibility?

5   A       Oh, sure, it's a possibility.

6   Q       And it appears as if some of the plastic bag is

7   around his hand as well?

8   A       That's correct.

9   Q       Okay.  Go ahead and have a seat there.  And I'm

10  sorry.  I didn't quite understand it.  Did you say under cross

11  examination that Mr. Marx did, in fact, identify the

12  defendant?  Did you say he identified someone?

13  A       He didn't pick anybody out, no.

14  Q       Oh, okay.

15  A       No.  He just gave us information about the subject

16  that fled.  There was no reason to do a photo lineup.

17  Q       So he didn't -- but there's also such a thing that's

18  called a showup; right?

19  A       Right.

20  Q       And sometimes you can just bring someone if it's

21  within an immediate time.  That wasn't done either in this

22  case?

23  A       No, it wasn't.

864

1    Q        Okay.  And you would agree that in your experience of

2    20 plus years victims of crimes, particularly firearm crimes,

3    aren't necessarily paying attention to hands and tattoos and

4    things like that?

5    A        That's correct.  They're usually looking at the gun

6    pointed at them.

7    Q        And especially when they're 17-year-old girls?

8    A        That is also correct.

9                    MR. BECKER:  I have nothing further.

10                   THE COURT:  Recross.

11                   MR. HARTWIG:  Yes.

12                   <u>RECROSS EXAMINATION</u>

13   BY MR. HARTWIG:

14   Q        Officer, while he's pulling up another video, would

15   you agree with me that rather than looking at a still photo

16   from a computer of the robber's left hand that being in person

17   approximately two feet away would give you a better

18   perspective or view of any distinguishing features?

19   A        I would say normally, but when you got a gun pointed

20   at you, things are different.

21   Q        Okay.  Good point.  But as far as if you were going

22   to look at somebody's hands, you would have a better view if

23   you're in person two feet away than you looking at this video?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    A        Oh, absolutely.

2    Q        Now, Mr. Marx, when he did talk to you, he did not

3    give a description of anything other than supposed height,

4    weight, build, and clothing; correct?

5    A        That's my recollection, yes.

6    Q        Right.  So if he had said, "Hey, listen, this person

7    has tattoos on his face," right, or "on his neck," that would

8    have been pretty important information; right?

9    A        Yes.

10   Q        You would have certainly have noted that; correct?

11   A        If he told me, yes.

12   Q        So apparently he did not tell you that?

13   A        I don't recall that.

14   Q        All right.  Because, again, you would have noted it;

15   right?

16   A        Most likely.

17   Q        All right.  Okay, Officer.  So we see this guy go

18   across the parking lot to that corner; correct?

19   A        That's correct.

20   Q        All right.  And then from there at an angle across

21   the street; correct?

22   A        Also correct.

23   Q        All right.  Do we -- before the robbery, do we ever

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

866

1    see anybody come across the street back towards the building?

2    A        Not that I'm aware of.

3    Q        All right.  Do we see anybody from this view, from

4    this area here, come across the street before the robbery?

5    A        Not that I recall.

6    Q        All right.  Just that someone comes out, goes to the

7    corner, and at an angle that way; correct?

8    A        Yes.

9    Q        And, again, the person who comes across here doesn't

10   stop but continues right across the street; correct?

11   A        Yes.

12   Q        Would you also agree with me that the person who is

13   crossing the street here still has the black garment that he

14   had on inside the store?

15   A        Appears that way.

16   Q        Yeah.  Doesn't appear that he stops and takes it off;

17   right?

18   A        Doesn't appear to, no.

19   Q        No.  And in fact if you watch -- if you watch him --

20   if you can continue that.  Thank you.  So he slows down, I'll

21   give you that, but he just, as a continuous motion, continues

22   across the street; would you agree?

23   A        Yes.

867

| | |
|---|---|
| 1 | Q        He doesn't take off his hoodie, stick it under his |
| 2 | arm; right? |
| 3 | A        The hoodie?  No. |
| 4 | Q        No, right? |
| 5 | A        We don't know if he took the mask off though.  You |
| 6 | can't tell that from the pictures. |
| 7 | Q        You can't tell that either; right? |
| 8 | A        No. |
| 9 | Q        But in order to do that, he probably would have |
| 10 | stopped somewhere and did that.  But all we see is a |
| 11 | continuous -- all the way across the street; correct? |
| 12 | A        Yes. |
| 13 | MR. HARTWIG:  All right.  No further |
| 14 | questions. |
| 15 | THE COURT:  All right.  You may step down. |
| 16 | Thank you. |
| 17 | Call your next witness. |
| 18 | MR. BECKER:  Officer Nick Mancini. |
| 19 | *   *   * |
| 20 | OFFICER NICHOLAS MANCINI, |
| 21 | having been duly sworn, was examined and testified as follows: |
| 22 | |
| 23 | |

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

868

<u>DIRECT EXAMINATION</u>

BY MR. BECKER:

Q       Would you state your name for the record, please?

A       Patrolman Officer Nicholas Mancini.

Q       Where are you employed?

A       City of Cortland.

Q       How long have you been there?

A       Approximately 15 years, the last five years full time.

Q       I want to direct your attention to June 20, 2017. Were you on duty at that date?

A       Yes.

Q       And were you on duty or coming on duty?

A       I was on duty.

Q       All right.  And at approximately 10:12, 10:15 p.m., was there a call in reference to an armed robbery at Pizza Joe's?

A       Yes.

Q       What did you do when you heard that call?

A       We first responded to the area and started checking the area for the suspect.

Q       Did you ever review the security video?

A       Yes.  After I was requested to go to the Pizza Joe's.

OFFICIAL COURT REPORTER<br>TRUMBULL COUNTY * WARREN, OHIO

869

```
 1    Q       All right.  And for the sake of argument, you've seen
 2    the security videos, both the front and the back and inside
 3    the store?
 4    A       Yes.
 5    Q       All right.  Now, I'm going to show you part of
 6    State's Exhibit 30 and ask if you recall this section of
 7    State's Exhibit 30 and reviewing this.  This is the security
 8    video of the front door.  It may help, but can you see the
 9    direction from where the person came from, just coming before
10    they went into Pizza Joe's?
11    A       Yes.
12    Q       And where did they come from?
13    A       They came from the west.
14    Q       Would that be --
15    A       It would be towards State Route 46.
16    Q       All right.  And is that the location -- well, are you
17    sure about that?  From the west?
18    A       Yes.
19    Q       Well, this road runs north or south -- or east and
20    west?
21    A       Yes, it runs east and west.
22    Q       So this person is coming across the street, not down
23    the street; right?
```

870

1          MR. OLSON:  Objection.  Leading.

2          THE COURT:  Just get it sorted out here.

3   A      From the video right there, he came from the west.

4   But if you look at a previous video, you can see --

5   Q      The back way?

6   A      Yes.

7   Q      But prior to running into -- there is prior video of

8   him in the back of the store?

9   A      Yes.

10  Q      Okay.  But I'm talking about when he actually went in

11  the store, he came in from which direction?

12  A      The north.

13  Q      All right.  The north?

14  A      Or excuse me.  He ran into the store from the --

15  coming into it to the north.

16  Q      All right.  So he's coming to us from the north?

17  A      Yes.

18  Q      Across the street, is that an area that you began to

19  search after this robbery?

20  A      Yes.

21  Q      What was the significance of searching that area?

22  A      There was three of us, so we all started checking

23  different areas.

871

1    Q        And it's after -- you reviewed the video from Pizza

2    Joe's, and at some point you narrowed in on a location as 241

3    West Main Street, Apartment C; correct?

4    A        Yes.

5    Q        What caused you to focus in on that area?

6    A        I was told to head that way from the other officers

7    because they already conducted the investigation that led them

8    there.

9    Q        And when you got there, were you part of a search of

10   that location?

11   A        Yes.

12   Q        So there had already been a consent to search signed

13   by the occupant?

14   A        I was part of it when we had the lady sign it for us.

15   Q        And she was cooperative?

16   A        Yes.

17   Q        She didn't say, "No, I don't want you to do the

18   search"?

19   A        No.

20   Q        And, in fact, you did find in that location some

21   items that were taken; correct?

22   A        Yes.

23   Q        And I'm going to hand you -- have you look at what's

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

872

1   been marked for purposes of identification as State's Exhibit

2   Number 4.  Do you recognize State's Exhibit Number 4?

3   A       Yes.

4           (Whereupon, State's Exhibit 4, Tennis Shoes, was

5   introduced for identification.)

6   Q       How do you recognize it?

7   A       Through the writing and the shoes.

8   Q       All right.

9   A       The markings.  And my signature is underneath

10  Patrolman Brandon Rice.

11  Q       So you and Officer Rice would have obtained this and

12  then put it in the bag, and you were present when he grabbed

13  that?

14  A       Yes.

15  Q       Okay.  These items are a pair of Nike tennis shoes;

16  is that correct?

17  A       Yes.

18  Q       Are these the same -- substantially the same

19  condition as when you retrieved them on June 20th?

20  A       Yes.

21  Q       Might have been after midnight, the 21st?

22  A       Yes, it would have been.

23  Q       What was the significance of these shoes in relation

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    to the video?

2    A       When I watched the video, I noticed the white

3    markings on the gray shoes to be --

4    Q       You're talking about the markings on the back?

5    A       Yeah.  Yep.

6    Q       And also located in that house -- I'm going to have

7    you look at State's Exhibits 31 through 36 and ask if you --

8    I'm sorry, 37.  31 through 37, do you recognize those

9    photographs?

10   A       Yes, I do.

11   Q       All right.  Do those photographs all fairly and

12   accurately depict the scene as you saw it on June 20th, into

13   the 21st?

14   A       Yes.

15   Q       All right.  Could you describe, was that apartment

16   neat and tidy or was it a little messy?

17   A       It was a little messy.  It was --

18   Q       Extremely messy?

19   A       I've seen worse, but it was messy.

20   Q       You then found State's Exhibit 4, which were the

21   shoes?

22   A       Uh-huh.

23   Q       There was a photograph of a trash -- or a baggie -- a

874

1 Sparkle bag, which is I believe State's Exhibit Number 8; do

2 you recognize State's Exhibit 8?

3 A        Yes.

4 Q        And you were present when Exhibit State's 8 was

5 found?

6 A        Yes.

7 Q        Your signature is on there?

8 A        Yes.

9 Q        Just like it is on State's Exhibit 4?

10 A        Yes.

11 Q        State's Exhibit 8 is in the same or substantially the

12 same condition as when it was when you recovered it?

13 A        Yes.

14 Q        Okay.  And that was located where?

15 A        In a white hamper or clothes basket.

16 Q        Was there something on top of it that had to be moved

17 to locate it, do you recall?

18 A        I do not recall at this time.

19 Q        Okay.  I'm going to show you what's been marked for

20 purposes of identification as State's Exhibit Number 7 and ask

21 if you recognize State's Exhibit Number 7?

22        (Whereupon, State's Exhibit 7, Sweatpants, was introduced

23 for identification.)

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   A       Yes.

2   Q       How do you recognize that?

3   A       My signature.

4   Q       You were present when this was found?

5   A       Yes.

6   Q       And this is a pair of gray sweatpants with the pocket

7   pulled out?

8   A       Yes.

9   Q       All right.  Actually be the right pocket.  What was

10  the significance of these gray sweatpants with the right

11  pocket pulled out?

12  A       Because when I was watching the video I noticed when

13  he pulled the gun out of his pocket the pocket come inside

14  out.

15  Q       Okay.

16  A       And when Officer Weston --

17  Q       Okay.  Now, you were never able to locate a hoodie or

18  a mask; correct?

19  A       Correct.

20  Q       You were never able to locate that night the

21  dark-colored sweatshirt?

22  A       Correct.

23  Q       That night, you were not able to locate a firearm?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

876

1    A        Correct.

2    Q        You were not able to locate any money that night;

3    correct?

4    A        Correct.

5    Q        So now the next day came around, which was the 21st,

6    and I believe sometime in the afternoon of the 21st you went

7    back to that apartment and started looking again?

8    A        Yes.

9    Q        What was the reason in doing that?

10   A        I believe during the morning hour the day shift

11   officers were down there.  So when I come on on afternoon

12   turn, since I was there the night before, I went down to

13   assist with anything that they needed.

14   Q        And were you present when a firearm was located?

15   A        No.

16   Q        All right.  But you were called back almost

17   immediately after that when something else was found in that

18   apartment; correct?

19   A        Yes.

20   Q        What was found in the apartment?

21   A        The -- I was called back once the firearm was found.

22   Q        All right.

23   A        So then when I was back there, we had them fill out

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

877

1    statements.  And then I went up and started checking the

2    kitchen area again.

3    Q       All right.  And what did you find in the kitchen

4    area?

5    A       I located a blue grocery bag with garbage inside and

6    a hair coloring dye box with a large amount of money.

7    Q       I am going to hand you what's been marked for

8    purposes of identification as State's Exhibit 38.  It's two

9    photographs.  Do you recognize those two photographs?

10   A       Yes.

11   Q       The hair dye box and the blue trash bag you saw, are

12   they in that photograph?

13   A       Yes.

14   Q       And is that the -- does that fairly and accurately

15   depict the scene as you saw it on June 21st?

16   A       Yes.

17   Q       I'm going to hand you what's been marked for purposes

18   of identification as State's Exhibit Number 6 and ask if you

19   recognize State's Exhibit Number 6?

20   A       Yes, I do.

21       (Whereupon, State's Exhibit 6, Plastic Bag, was

22   introduced for identification.)

23   Q       Okay.  I'm going to pull out of State's Exhibit

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1     Number 6 -- well, first of all, there's a blue trash bag;
2     correct?
3     A       Yes.
4     Q       And a bunch of garbage?
5     A       Miscellaneous garbage.
6     Q       Miscellaneous garbage.  And I'm going to show you
7     what is a hair color box.  It says "Color silk, beautiful
8     color," and there seems to be a large amount of money inside
9     there; correct?
10    A       Yes.
11    Q       Did you count that money?
12    A       Not on scene.  Once we returned to the station it
13    was.
14    Q       And do you know approximately how much money was in
15    there?
16    A       I believe it was $545.
17    Q       All right.  And it was found just like that in this
18    hair dye box?
19    A       Yes.
20    Q       Which was in this blue trash bag?
21    A       Yes.
22    Q       And that is in the same or substantially the same
23    condition other than it was in this blue bag when you found

879

1   it?

2   A        Yes.

3   Q        All of these events occurred in what city?

4   A        City of Cortland.

5   Q        And what county?

6   A        Trumbull County.

7                    MR. BECKER:  I have nothing further, Your

8   Honor.

9                    THE COURT:  Cross.

10                    MR. OLSON:  Thank you, Your Honor.

11                    <u>CROSS EXAMINATION</u>

12  BY MR. OLSON:

13  Q        Good afternoon, Officer Mancini.

14  A        Good afternoon.

15  Q        You indicated that you were on duty on the 20th at

16  10:12; is that correct?

17  A        Yes.

18  Q        Now, we watched the video.  And the video indicated

19  that this robbery occurred at approximately 10:08; is that

20  correct?

21  A        Yes.

22  Q        And did you check that time at any point in time to

23  see if that was the accurate time?  I mean, I know it shows

880

1    9 --

2

3    A        Uh-huh.

4    Q        -- 12.  Did you confirm whether it was just an hour

5    off?

6    A        I do not recall.

7    Q        Okay.  And so, again, if we assume that that was an

8    hour off, the robbery occurs at 10:08, you get to dispatch at

9    approximately 10:12; is that correct?

10   A        Yes.

11   Q        Approximately how long did it take you to get there?

12   A        Approximately less than a minute.

13   Q        Less than a minute.  So you're there by 10:13?

14   A        Uh-huh.

15   Q        When you get to the store, do you get out of the car

16   and immediately begin scanning, or were you driving around?

17   A        We were driving around.

18   Q        And, again, you would indicate at that point in time

19   you had seen nobody?

20   A        Uh-huh.

21   Q        The suspect runs across the street, goes along some

22   buildings and then kind of goes out of view on the video; is

23   that correct?

881

1    A        Yeah.

2    Q        And as you're scanning around, does anybody ever get

3    out of the vehicle to start going to look for the suspect?

4    A        I can't account for the other officers.  I can say I

5    didn't.

6    Q        You didn't.  Okay.  At some point in time, you were

7    directed to go back towards the Pizza Joe's and to that

8    apartment; is that correct?

9    A        Yes.

10   Q        What time -- do you remember what time that was?

11   A        No, I do not.

12   Q        Okay.  Do you go to the Pizza Joe's after responding

13   back?

14   A        (No response.)

15   Q        So you were patrolling around; correct?

16   A        Uh-huh.

17   Q        You come back because you're told to go to the

18   apartment that's across the street?

19   A        After I searched the area I was told to go to Dairy

20   Queen and set up a perimeter.

21   Q        Where is the Dairy Queen in relation to this?

22   A        It would be up -- the next block.  Basically up the

23   block.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

882

1   Q       Okay.  Did you interact with any witnesses at that
2   point?
3   A       No.
4   Q       All right.  Did you ever interact with any witnesses
5   that night?
6   A       Yes.
7   Q       Okay.  Who did you speak with?
8   A       I believe his name was Shawn Marx.
9   Q       Okay.  And Mr. Marx, when you get with him, did he
10  identify what the suspect looked like?
11  A       He just said a male.  That's all I can remember at
12  this time.
13  Q       Okay.  He did not identify that the male had tattoos?
14  A       No.  He never told me that.  He just told me the
15  direction that the male ran.  And that's why I started
16  checking that area.
17  Q       Okay.  Did he indicate to you that the male had
18  the -- a sweatshirt under his arm and was wearing a red shirt?
19  A       I cannot recall at this time.
20  Q       Okay.  Did you ever review his written statement?
21  A       No.
22  Q       Okay.  Now, you indicated that on the next day you
23  returned to the apartment that's across the street from Pizza

883

1    Joe's; is that correct?

2    A       Yes.

3    Q       And during the search of that residence you

4    ultimately recovered $545; is that correct?

5    A       On my second time there, yes.

6    Q       Correct.  And it was stashed inside of a hair dye

7    box?

8    A       Yes.

9    Q       Is that correct?  Did you eventually learn how much

10   money was actually stolen from the Pizza Joe's?

11   A       I never got a full count.  There's other officers

12   that said there was an approximate amount, but Pizza Joe's

13   never told me because they didn't have an amount that night.

14   Q       Did you know what the approximate amount was that was

15   given to you?

16   A       The next day.

17   Q       And how much was that?

18   A       They said somewhere between 7 and $800.

19   Q       And at no other point in time did you ever recover

20   any additional money, or no other money was turned over to

21   you; is that correct?

22   A       No.

23   Q       Now, we went through some of the clothing items that

1   you seized from that apartment that night.  And with

2   particularity, the gray Nike shoes?

3   A       Uh-huh.

4   Q       How popular, in your opinion, do you think Nike shoes

5   are?

6   A       Nike shoes?

7   Q       Right.

8   A       They're popular.

9   Q       Okay.  And you can't say how many people have gray

10  shoes with white markings?  You don't know what the sales of

11  those shoes were?  A lot of people could have them; correct?

12  A       I could say after looking at a lot of people

13  throughout my shift I don't recognize anybody with shoes like

14  that.

15  Q       Okay.  Now on the video, however, you see the male

16  suspect running from the Pizza Joe's; is that correct?

17  A       Yes.

18  Q       These shoes that we had here today, there was no

19  laces on the one shoe; is that correct?

20  A       Yes.

21  Q       You do not ever see the shoe flopping off his foot or

22  falling off or anything like that in the video?

23  A       On the video, no.

885

```
1    Q        And do you ever recover another shoelace?

2    A        We never --

3    Q        Did you recover the -- any red shirt?

4    A        No, we did not.

5    Q        No sweatshirt?  You didn't recover the sweatshirt?

6    A        No, we didn't recover the sweatshirt.

7    Q        Didn't recover a mask?

8    A        No.  There was many sweatshirts and shirts inside the

9    house.  There was no way of knowing.  We weren't gonna recover

10   every piece of the girl's clothing in her apartment.

11                   MR. OLSON:  All right.  One moment, Your

12   Honor.

13           I have nothing further.

14                   THE COURT:  Redirect.

15                   MR. BECKER:  No, sir, Your Honor.

16                   THE COURT:  You may step down.  Thank you.

17           Counsel, approach.

18                   (Whereupon, a discussion was held off the

19   record.)

20                   THE COURT:  Ladies and Gentlemen, I believe

21   we are down to the last witness.  I have a matter of

22   housekeeping I have to deal with with counsel outside of your

23   presence.  So we are going to give you a ten-minute break.
```

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1      Do not discuss this case among yourselves, nor with

2   anyone else.  Do not form or express an opinion.

3                       (Whereupon, a recess was had commencing at

4   3:19 p.m. and concluding at 3:26 p.m.)

5                       (At sidebar:)

6                       THE COURT:  We're in the courtroom, but out

7   of the presence of the jury prior to the examination of

8   Dr. Germaniuk.  There's a general objection being made.  Let's

9   put it on the record and any proffer that you would like to

10  present.

11                      MR. HARTWIG:  Thank you, Your Honor.

12      Your Honor, we were -- we were provided the coroner's

13  report and certificate of death as part of this case.  Two

14  weeks prior to trial, we were informed that x-rays that were

15  supposedly performed at the time of the autopsy were now

16  available for our view.  There were no findings of those

17  x-rays included in the original coroner's report at all.

18      Now, I spoke to Dr. Germaniuk today prior to his

19  testimony, and he indicated to me that he brought the x-rays,

20  that last night he discovered what appears to be another

21  bullet fragment contained within the skull.  He is surmising

22  that it is from a second gunshot wound, although he can't find

23  an entrance or exit wound to match that particular shot.

                         OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1    So, he's speculating that perhaps there was a second

2  gunshot wound.  We are asking that that part of his testimony

3  be excluded, for a couple reasons.  One, we didn't have

4  opportunity to prepare for that cross examination with an

5  expert or even a consultant.  And it was not included in the

6  original report.  So it's beyond the scope of his expert

7  report.

8                    THE COURT:  Mr. Becker.

9                    MR. BECKER:  Your Honor, I think it's

10  certainly permissible for the Doctor to have a different

11  opinion or change his opinion.  Certainly if he would be on

12  the witness stand and the cross examination was going the

13  other way and they were able to get him to change his opinion,

14  he's entitled to change his opinion.  I think they're more

15  than entitled to cross-examine him and they can discuss that

16  in closing and the fact that he didn't put that in the initial

17  report.  I certainly think it's fair for cross-examination and

18  closing, but it would be proper to allow him to opine as an

19  expert that perhaps he did miss and make a mistake and there

20  was just perhaps two bullets.

21                    THE COURT:  I'm going to overrule your

22  objection.  We'll allow him to speak to the issues here and

23  then everything can be argued, again, on closing.

888

1          MR. HARTWIG:  Thank you, Your Honor.

2          MR. OLSON:  Thank you, Your Honor.

3          MR. BECKER:  Thank you, Your Honor.

4          (End of sidebar discussion.)

5          (Whereupon, a recess was had commencing at

6     3:28 p.m.  and concluding at 3:32 p.m.)

7          THE COURT:  Mr. Becker, you may call your

8     next witness.

9          MR. BECKER:  Doctor Humphrey Germaniuk.

10          *  *  *

11          DR. HUMPHREY GERMANIUK,

12     having been duly sworn, was examined and testified as follows:

13          <u>DIRECT EXAMINATION</u>

14     BY MR. BECKER:

15     Q     Good afternoon, Doctor.

16     A     Good afternoon.

17     Q     Apologize for the lateness of your appearance here

18     today.  But with that said, would you please introduce

19     yourself to the jury and tell the jury what your occupation

20     is?

21     A     My name is Humphrey Don Germaniuk, spelled

22     H-u-m-p-h-r-e-y D-o-n G-e-r-m-a-n-i-u-k.  And my occupation is

23     the coroner and medical examiner for Trumbull County, Ohio.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

889

1    Q        And could you please tell the jury your background

2    that's prepared you for this position?

3    A        Well, really, my training, education and experience

4    began more than 40 years ago.  When I was 19, I volunteered at

5    the Manhattan Medical Examiner's Office in the summer of 1973

6    where I assisted in over a thousand autopsies.  And it was

7    love at first sight.  Because from that moment on, I knew

8    exactly what I wanted to do.

9            I went to Wagner College in Staten Island, New York

10   where I was a biology major, a nursing major, and a chemistry

11   minor.

12           After that I proceeded to the city of Perugia,

13   P-e-r-u-g-i-a, in Italy where for one year I took various

14   courses in philosophy, architecture, literature, and liberal

15   arts.

16           From there, I went to the University of Turin,

17   T-u-r-i-n, in Italy.  And I was there from 1977 until 1981

18   when I transferred to the University of Rome in Italy.

19   Graduated from the University of Rome in 1984 with the M.D.

20   degree.

21           After that, I went to The Ohio State University

22   Hospitals to do four years of specialty training in pathology;

23   two years in anatomic pathology, and two years in clinical

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

890

1  pathology.

2        After I finished those four years, I then went to

3  Miami in Dade County where I began my specialty training in

4  forensic medicine or forensic pathology.  I was there from

5  1988 to 1989.

6        In 1989, I went to Syracuse, New York and was an

7  assistant medical examiner there from 1989 until 1993, after

8  which I proceeded to Washington D.C. and I was appointed the

9  deputy chief medical examiner of the nation's capitol.

10        I was the deputy chief until I think 1996 or 1997

11  when I was then appointed by Mayor Marion Barry as the chief

12  medical examiner for Washington D.C.  So I was there until

13  1998.  The city was broke.  We didn't have a budget or money

14  or much of anything.

15        And having trained at Ohio State, I was very familiar

16  with the geography in this part of the state.  And so when

17  they were looking, I was a knockin'.  And so I came here in

18  1998 and have been here ever since.

19  Q     Okay.  And at some point you were elected as the

20  duly-elected coroner for Trumbull County; is that correct?

21  A     That was in 2008.

22  Q     And you have been elected since then two other times?

23  A     Yes.

1    Q     All right.  Now, Doctor, are you a member of any

2    medical associations or professional associations?

3    A     Yes.

4    Q     And could you tell the jury what those associations

5    and organizations are that you belong to?

6    A     I'm a member of the National Association of Medical

7    Examiners which represents forensic pathologists throughout

8    the country.

9          I'm a member of the Ohio State Coroner's Association

10   which also represents the coroners in the state of Ohio.

11        I was a past member of the American Society of

12   Clinical Pathology and a past member of the College of

13   American Pathology.  And except the organizations cost too

14   much money a month for getting a magazine.  So I am no longer

15   members of that.  But I served for quite a bit.  In the

16   College of American Pathology, I sat on the Forensic Pathology

17   Committee where we established standards for the practice of

18   forensic medicine throughout the country.

19        With the American Society of Clinical Pathology, it

20   was similar as far as getting involved in forensic pathology.

21   So that's in a nutshell from what I can remember.

22   Q     And, Doctor, during the course of your career, you

23   have performed, safe to say, thousands of autopsies?

892

1   A        I'm past 8,000 forensic autopsies at this time.

2   Q        And you have previously testified as an expert

3   witness in forensic pathology in numerous jurisdictions

4   throughout the country; correct?

5   A        I have been certified as an expert in forensic

6   pathology in the state of Florida, in the state of New York,

7   in the District of Columbia, in the state of Maryland, in the

8   state of Virginia.

9   Q        And you have previously testified as an expert

10  witness here in the state of Ohio?

11  A        Yes.

12  Q        And you've previously testified as an expert witness

13  here in Trumbull County; correct?

14  A        Yes.

15           MR. BECKER:  All right.  At this time, I

16  would move to have Dr. Germaniuk declared an expert in

17  pathology.

18           THE COURT:  Any questions?

19           MR. HARTWIG:  No questions.  No objection.

20           THE COURT:  He will considered be expert.

21  BY MR. BECKER:

22  Q        Doctor, can you tell the jury, what exactly is an

23  autopsy?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

893

A        The word autopsy comes from the Greek, which means to
see for yourself.  Prior to approaching the patient, you try
to get as much information as you can.  It's just like when
you go to see your doctor.  They don't start banging you with
a reflex hammer or setting you up for a CAT scan.  They ask
you a bunch of questions.  What brings you here?  How long
have you had it?  Ever had it before?  Anyone else in your
family have it?  What brings it on?  What makes it go away?
And the same thing before we approach our patients; we try to
get as much information as we possibly can.  We try to go to
the scene, if at all possible.  We try to get an emergency
medical technician's report.  Try to get the police report.
Subpoena the hospitals to see if there's any medical records.
They become part of the permanent case file.  So this way
before you approach the patient you have some idea of what's
going on with them, where they've been, what they've done, any
underlying disease processes.

Q        All right.  When you examine an individual that has
died of-- well, first of all, let me ask you this.  In Ohio,
when is it required that a coroner perform an autopsy on an
individual?

A        It is the function of the coroner.  We interviewed
someone yesterday looking for a position here in Trumbull

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

894

1   County with our office and basically his coroner is pretty

2   much clueless as far as what cases need to be brought in, what

3   do not need to be brought in, who gets an autopsy, who doesn't

4   get an autopsy.

5           We're basically regulated by Ohio Statute 313 as far

6   as unexplained deaths, sudden deaths, deaths happening during

7   the course of work, motor vehicle accidents, suspicious

8   deaths, suicides, possible homicides, poisoning, and where

9   there was no apparent medical history that accounted for the

10  person's death, they would bring in that case.

11  Q       All right.  Doctor, I'm going to direct your

12  attention to June of 2017 last year and in particular on

13  June 19, 2017, an autopsy that you performed at 9:30 a.m.  I

14  believe it was styled your Case Number 17-159, and it was the

15  autopsy of one Kenneth Brandon Hayes Sample.  Did you bring

16  that file with you here today?

17  A       Yes.  May I refer to it?

18  Q       Yes.

19  A       Yes, I was notified on the 15th of June in 2017 at

20  10:12, and then I did the autopsy on June 19th beginning at

21  9:30 in 2007 -- 17.

22  Q       I'm sorry.  Go ahead.

23  A       No.  In 2017.

1   Q      2017.  And, Doctor, can you relay to this jury what

2   you did in relation to the autopsy of Kenneth Brandon Hayes

3   Sample and your findings relating to that autopsy?

4   A      Well, basically our investigators got the information

5   that he was last seen Sunday night, the 11th of June.  The

6   patient's car was found in the woods off the bike trail in

7   Niles.  He was decomposed.  He had a medical history of

8   depression and anxiety.  And according to his parents there

9   was a pain medication addiction.  So because it appeared to be

10   an unnatural death he then became our case 17-159 and we began

11   to expand the notes that we took.

12   Q      And when you examine a body, I believe there are

13   three axes to an autopsy; is that correct?

14   A      Right.  You'll have -- autopsy revolves around three

15   axes.

16         The first is the external examination.  What does

17   this individual look like without any medical therapy?  What

18   kind of scars, tattoos, do they have?  So what does the body

19   look like without any additional information regarding injury

20   or medical therapy?

21         The second axis is medical therapy.  What medical

22   therapy has this patient received?

23         The third axis is basically what injuries do they

1 have?

2 And so once you've arrived at those three axes -- and

3 really the fourth one is toxicology, testing for drugs and

4 poisons.

5 Once you've gone through those four axes you could

6 then, within reasonable medical certainty, arrive as to a

7 cause and manner of death.

8 Q And can you please relate what you did on June 19,

9 2017, for the autopsy of Kenneth Brandon Hayes Sample and

10 relate your findings to this jury?

11 A Well, the first thing to do is to identify him. And

12 so we had his dental x-rays from Dr. Wilson who was his

13 dentist. We subpoenaed those. Got them. Compared those

14 dental x-rays against the jaw that we had. And it matched.

15 That was of Mr. Sample. So he was positively identified.

16 Second thing was he was in moderate decomposition, so

17 we spent a lot of time doing total body x-rays. I think we

18 took seven -- probably more than seven -- x-rays of the entire

19 body looking for any kind of trauma or fragments or anything

20 like that.

21 And then after that we began our external

22 examination.

23 Q All right. With respect to those x-rays, did you

897

1   find anything in the body that appeared -- as if it shouldn't

2   have been in the body?

3   A       Yes.

4   Q       What did you find?

5   A       There's at least one definite gunshot wound and one

6   probable gunshot wound.

7   Q       Where were those gunshot wounds located?

8   A       One gunshot wound was to the back of the head.  The

9   other one gunshot wound was to the right side of the neck.

10  Q       All right.  Did you bring those x-rays with you here

11  today?

12  A       Yes, I did.

13  Q       Could you show the jury what we're referring to?  And

14  I don't know if you would be able to publish them up here for

15  the jury, but you might be able to hold them up and they could

16  see?

17  A       Here we go.  Basically these are the x-rays of

18  Mr. Sample that we took on the 19th.  We know it's Mr. Sample

19  because he was identified by dental x-rays.  And it's the 19th

20  because we have our sticker here and my initials.  We have the

21  metallic fragments inside the skull that you can see here.

22  And we have another fragment outside the skull tissue.  Not an

23  exit wound.  It's probably consistent with another gunshot

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

898

1    wound.  So probably -- one definite and probably a second one

2    here to the neck.

3    Q      And I don't know if it'll help if we put it on there

4    or not.  Maybe not?

5    A      No.  Oh, yeah, it does.

6    Q      Okay.  And, Doc, I'm going to hand you a laser

7    pointer here.  Maybe you can point out what you're talking

8    about.  The yellow button.  I'm sorry, Doctor.

9    A      Yeah.  That's one of the fragments inside the head.

10   And this is the one outside in the tissues of the neck.

11   Q      All right.  That x-ray is the exact x-ray of --

12   A      It's the original.

13   Q      The original of Brandon -- I'm sorry -- Kenneth

14   Brandon Hayes Sample?

15   A      Yes.

16   Q      And do you have another x-ray of the body?

17   A      Yeah.  The second x-ray is from a different view.  As

18   you can basically see, the fragments inside his skull, and you

19   can see the other fragments here in the soft tissues of his

20   neck, probably behind his ear.

21   Q      All right.  Thank you, Doctor.

22   A      (Witness resumes witness stand.)

23   Q      Now you mentioned that the body was in a state of

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    decomposition; is that correct?

2    A       Yes.

3    Q       What was being -- can you describe where the

4    decomposition was and the extent of decomposition?

5    A       Well, it was moderate decomposition.  Basically you

6    had darkening of the skin, skin slippage, the body was covered

7    in maggots.  In fact, the maggots took the skin off his face

8    so you could see the bones.  The maggots took the skin off the

9    scalp so you can see the skull bones.  In portions of the arm,

10   maggots took all of the tissue away so you can actually see

11   the exposed bone there.

12   Q       And with reference to the x-rays you took, was there

13   any other location on the body that you noticed any type of

14   gunshot wounds or any type of fragments?

15   A       No.

16   Q       All right.  So continuing with your external

17   examination, what did you do then?

18   A       Basically with the external examination, one gunshot

19   wound was pretty obvious.  The maggots had done their job.

20   And so we had exposed skull.  And there was a perforation in

21   the back of the left side of his skull.  Basically the maggots

22   had eaten most of the brain.  So what we were dealing with was

23   dust.  You try to palpate it and squish it and see what you

1   can retrieve, but there really wasn't much to retrieve.

2          The second fragment on the side of the neck, once

3   again when you're dealing with decomposing human skin and

4   maggots, we originally palpated it and then you apply gentle

5   water to wash off the maggots and stuff and I lost the

6   fragment, unfortunately.  I accept responsibility for it.

7   Those things do occur.  And I wasn't able to retrieve the

8   fragment.

9   Q      Now, Doctor, you continued to the examination, and I

10  believe then you did an internal examination; is that correct?

11  A      Yes.

12  Q      And please relate your findings from the internal

13  examination.

14  A      Basically, my autopsy findings regarding the internal

15  examination were moderate decompositional change and a

16  penetrating gunshot wound to the head.

17  Q      And, Doctor, were you then able to look at and make

18  any findings regarding the cause and manner of death of

19  Kenneth Brandon Hayes Sample?

20  A      Yes.

21  Q      And can you relate those findings to this jury?

22  A      After completing the autopsy, the cause of death was

23  penetrating gunshot wound to the head.  And the manner of

901

1   death was homicide.

2   Q        Doctor, did you then put -- well, did you then

3   eventually get a report regarding the toxicology contained in

4   Kenneth Brandon Hayes Sample?

5   A        Yes.  I did.

6   Q        All right.  And I believe in the toxicology you found

7   that there was .087 of ethanol in his body; is that correct?

8   A        That's correct.  0.087.  Slightly above the legal

9   limit for public intoxication.

10  Q        And can you explain to the jury, would that

11  necessarily mean that the individual you examined, Kenneth

12  Brandon Hayes Sample, was drunk or intoxicated?

13  A        No.  When you have decompositional change, why does

14  your body change?  The bacteria -- we begin to ferment.

15  Fermentation makes beer, it makes wine, it makes good grain

16  whiskey.  So when you ferment you also produce alcohol.  So in

17  dealing with a decomposed body, a blood alcohol or chest fluid

18  alcohol of 0.087, there's either consumption, decomposition,

19  or a combination of both.  And I can't really distinguish

20  between those three.

21  Q        All right.  Doctor, did you put your findings into a

22  report?

23  A        Yes, I did.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

902

1    Q        I'm going to hand you what's been marked for purposes

2    of identification as State's Exhibit Number 19.  It is a

3    one -- it is a six-page document with the toxicology attached

4    to it.  So it's a total of seven pages.  If you can compare

5    that with your original.

6    A        State's Exhibit Number 19 consists of six pages of

7    autopsy protocol and one page of toxicology, or drug testing,

8    which are true and accurate copies of the originals in the

9    case file.

10       (Whereupon, State's Exhibit 19, Autopsy Report, was

11   introduced for identification.)

12   Q        Thank you, Doctor.  Doctor, you took some autopsy

13   photos during this autopsy.  I'm going to hand you State's

14   Exhibit Number 20 which contains two photographs and ask if

15   you can identify State's Exhibit Number 20?

16       (Whereupon, State's Exhibit 20, Autopsy Photos, was

17   introduced for identification.)

18   A        State's Exhibit Number 20 are photographs of the

19   wound of entrance in the left side of the back of the skull.

20   And it's got our case number in it, my stamper in it, and it's

21   stamped 17-159.

22   Q        And does that photograph depict some of the decay

23   and, I guess, infestation?

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1   A       Yes, it does.

2   Q       All right.  And what does it -- what are some of

3   those things that you can see there?

4   A       Well, as I said earlier, most of the flesh had been

5   eaten off by maggots.  In fact, in the wound of entrance you

6   can basically see one of the maggots crawling in.

7   Q       All right.

8   A       So it depicts some of the findings.

9   Q       I'm going to publish that photograph to the jury --

10  or those photographs.  I'm going to hand you the laser pointer

11  again.

12          Tell the jury how it is that you orient -- I see your

13  case number there, the 17-CR -- or I'm sorry, 17-159 number

14  there.  How do you orient the placard that you use?

15  A       Basically to orient, I always have it pointing

16  towards the top of the head.  And so this way we know that

17  this is the top of the head up here, this is the neck or the

18  bottom of the head down here.  So in all of my photographs

19  that I've done for 40 years or so and also when I teach my

20  students, I always tell them to properly orient the photograph

21  so you have some idea of which way is up, down, pointing

22  towards the head or not pointing towards the head.

23  Q       All right.  And from this portion -- or from this

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

904

1   picture, where would that potential second gunshot or the

2   second fragment have been?

3   A        On the right side.

4   Q        On this same side?

5   A        Yeah, the right side.

6   Q        All right.  And, Doctor, I think you see in

7   the injury there, is that actually a maggot that we're looking

8   at?

9   A        Well, the second one has got the maggot.  But this

10  one might have portions of a metallic fragment which we

11  removed.  It is later submitted to the police.  And I said,

12  "Fragment recovered from skull."  And the police said it's not

13  a bullet fragment.  It's metallic stuff.

14  Q        So let's look at the second photograph.  And I think

15  in that photograph you can still see the maggot infestation?

16  A        Yeah.  There's one right there.

17  Q        Now, Doctor, let me ask you a couple of questions.

18  First of all, these photographs fairly and accurately depict

19  the originals that you took or -- and the body of Kenneth

20  Brandon Hayes Sample?

21  A        Yes, they do.

22  Q        Okay.  Doctor, let me ask you a couple of questions

23  here.  The first is, would a body in the state and condition

1   of Kenneth Brandon Hayes Sample, would it be possible for you

2   to determine if there were any bruising?

3   A       No.  Basically you decompose, you bloat, there's

4   darkening of the skin, the skin slips away like degloving.  So

5   you have skin slippage.  So it's difficult if not impossible

6   to distinguish any kind of bruising.

7   Q       And with respect to the infestation of maggots and

8   the deterioration of the body, is it -- would it be unusual if

9   the body were wet, even if conditions were dry for a number of

10  days?

11  A       Not unusual.  What happens when you decompose?  You

12  end up bloating or swelling up.  There is simply bodily

13  tissues that were expanded by fermentation.  Fluids begin to

14  exit the body.  And that would basically account for wet

15  clothing.

16  Q       All right.  So even your clothes would be wet, even

17  if the area had been dry where the body was for a number of

18  days?

19  A       Yes.  We get them inside of apartments even though

20  they haven't been out in the rain.

21          MR. BECKER:  All right.  Doctor, I thank

22  you for your testimony here today.  I believe they'll have

23  some questions on cross examination.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

906

1                    THE COURT:  Cross.

2                    MR. HARTWIG:  Thank you.

3

4                              *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

907

<u>CROSS EXAMINATION</u>

BY MR. HARTWIG:

Q        Good afternoon, Doc.

A        Good afternoon, Mr. Hartwig.

Q        We know one another; correct?

A        Yes, we do.

Q        Just thought I'd tell the jury that we've worked on
both sides of cases?

A        That's correct.

Q        Right?  That, you know, on behalf of the state and
I've also consulted with you privately on defense cases?

A        That's correct.

Q        I always enjoy listening to your testimony.  So, Doc,
when the body of Brandon Sample came to your office,
decomposing, blood and maggots on it, what's the very first
thing you do?  Do you disrobe the body?

A        Yes.  We take the clothes off.  When they're wet, we
hang them up to dry.  Once they're dried, we turn them over to
the appropriate police agency.

Q        Okay.  And is that part of the protocol, is to take
all the clothing, list it all, document its condition, take
photographs?

A        Well, we don't take photographs of the clothing.  We

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

908

1    leave that up to the laboratory or the police to do.  What we

2    removed as far as clothing goes was one pair of gray shorts,

3    one pair of red, white and blue American Eagle brand boxer

4    briefs, one dark color Gilden, G-i-l-d-e-n, tee shirt, and one

5    blue canvas shoe which was a slip-on.  So he really had four

6    items of clothing.

7    Q        Okay.  What color was the tee shirt?

8    A        The what?

9    Q        The tee shirt.

10   A        Let's see here.  Dark color.

11   Q        Okay.  Do you recall whether or not there was an

12   undershirt on the body?

13   A        Not in what we received.

14   Q        Okay.  Do you recall the positioning of the shirt

15   when it arrived at your office?

16   A        No.

17   Q        No?  All right.  And you and I talked a little bit

18   about this case a week ago maybe or somewhere around there;

19   correct?

20   A        Yes, that's correct.

21   Q        And I inquired about whether or not you had

22   photographs of the autopsy?

23   A        Yes.

909

1  Q        And what was it that you told me at that point?

2  A        That I photographed the entrance wound and the skull.

3  Q        Didn't you also indicate, though, that the

4  photographs were lost by your office?

5  A        As part of the download -- normally at the end of the

6  year we download all of our photographs.  And usually it's on

7  a 32 gigabyte hard drive.  But in 2017 we had so many

8  photographs that we were unable to download all of the

9  photographs and some got lost.  Luckily, before the download

10  for the 2017 cases we did make a compact disc and turn it over

11  to police.  I think those are the photographs that are intact.

12  Q        Okay.  Did you observe on the body any evidence of

13  close-range firing?

14  A        No.  Not in a decomposing body.  You really can't

15  distinguish soot or stippling or anything like that.  I think

16  I put that in my protocol; that you really can't appreciate

17  the range.

18  Q        Can you just tell the jury what -- in your

19  experience, what is the stippling that you're talking about or

20  the soot?

21  A        Basically, when you pull the trigger on a firearm

22  there is an explosion that takes place that propels the

23  projectile.  Why does the projectile travel the furthest?  It

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    has the most mass.  What has lesser amounts of mass?

2    Basically, burning gunpowder, unburned gunpowder, residue from

3    the last gunshot, oil if the firearm has been cleaned.  That

4    is the next step behind the projectile.  So that would be

5    stippling or peppering.  That's what it looks like on the

6    skin.  Sometimes you can make a thumbnail sketch determination

7    just looking at the stippling.  But usually what you want to

8    try to do is get the police to get the same lot of ammunition

9    and the same firearm, fire it up against a bunch of white

10   sheets and this way they can measure out the actual distance.

11           The last phase is what's known as soot.  What has the

12   least amount of mass?  The smoke from the burning gunpowder.

13   And sometimes you can see the soot deposition on the skin,

14   especially in suicide cases where people have contacted

15   gunshot wounds or where there's close-range fire.

16           In this case, I wasn't able to determine any soot,

17   nor was I able to determine any stippling.

18   Q       Did you note any on the clothes, particularly on the

19   tee shirt?

20   A       No.

21   Q       No you didn't observe any, or no you didn't look for

22   it or?

23   A       I looked, but I didn't observe any.

1    Q       Okay.  Do you know -- do you have any notes regarding

2    whether or not the tee shirt was examined for any bullet

3    holes?

4    A       It should have been, but I don't have any notes

5    regarding that type of report.

6    Q       All right.  So it should have been looked at and

7    noted, but you didn't do that?

8    A       That's correct.  The police usually do that.

9    Q       Okay.  And then you -- after you were done with the

10   clothes, you gave them back to the police; correct?

11   A       Yes.

12   Q       All right.  And we've learned that those clothes have

13   since been destroyed?

14   A       That's unfortunate.

15   Q       Okay.  All right.  So the whole point of trying to

16   observe and note soot and GSR is to determine the range of

17   firing; correct?

18   A       Yes.  GSR is gunshot wound residue.

19   Q       Okay.  And if you look at all those factors without a

20   decomposing body, you're able to determine the range, how

21   close somebody might be when they're shot?

22   A       You may or may not.  If you have clothing that is

23   sopping wet with decompositional fluid, you've got maggots all

912

1    over the place, I'll leave that up to the experts with their

2    magical chemical tests to determine what we have.

3    Q        So at least in this case, in your opinion, you can't

4    give an opinion within a reasonable degree of medical

5    certainty?

6    A        No, I cannot.  That's why I turn it over to the

7    police that will take it to the crime lab and they'll have

8    their magical chemical tests to see what we have.

9    Q        Did you measure the wound that's in the back of the

10   skull?

11   A        Yes.

12   Q        Do you have a picture of that or a note?

13   A        It's in a picture.

14   Q        This picture here, Doc?

15   A        Yeah.  It's a one-quarter of an inch round

16   perforation.

17   Q        Okay.  Is it true that when a bullet goes into the

18   back of let's say the skull, it sort of bevels inward?

19   A        Yes.

20   Q        Okay.  And it stretches the skin upon entrance;

21   correct?

22   A        Well, it will tear through the skin.

23   Q        Yeah.

913

1   A        There wasn't any skin left.

2   Q        Okay.  And is it common that for that bullet hole to

3   shrink back?  To shrink?

4   A        Not with bone, no.  Bone is pretty sturdy.  It's not

5   gonna shrink with bone.

6   Q        In this particular case, you're not a ballistics

7   expert?

8   A        No.

9   Q        You are a gun enthusiast; correct?

10  A        Yes, I have an extensive collection of firearms.  Not

11  because I'm some kind of a coo-coo but because when you're

12  dealing with forensic pathology part of our work involves

13  firearms.  Which end of the barrel does the bullet come out

14  of?  How do different firearms work?  Where is the safety on a

15  .45-caliber semiautomatic?  Single action, double-action

16  revolvers.  Things like that.

17  Q        So would you agree with me that it would be

18  impossible to determine what caliber of bullet entered the

19  skull?

20  A        Well, small.

21  Q        Small?

22  A        But it's not the meatballs, like the .38s or

23  .40-caliber or .45s.  Probably .32-caliber or under.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

914

1    Q        Okay.  So it could be .22, .25, .32?

2    A        Yeah, somewhere in that range.

3    Q        All right.  And because we're unable to recover any

4    fragments to compare, that would make it speculative to

5    determine caliber; correct?

6    A        That would be correct.

7    Q        Did you note bloodstaining on the tee shirt?

8    A        Sometimes you can.  Especially when there's

9    decompositional change, that pretty much -- the bodily fluids

10   will intermingle with any kind of blood and you really can't

11   make that determination.  The crime laboratory should be able

12   to make that determination regarding blood, regarding what is

13   decompositional fluid.  That's more of a chemical test.  I

14   believe they she still use Ninhydrin, n-i-n-h-y-d-r-i-n, but

15   there are probably other chemical tests now that are far more

16   advanced.

17   Q        Would you also agree with me, Doc, that you're unable

18   to determine when the body -- when the person died?

19   A        Well, time of death is from when the person was last

20   seen or heard from until they are found.

21   Q        So you can't say it happened on a certain day?

22   A        No, I can't pull out a stopwatch and say at exactly

23   this moment on this particular day is when this body was

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    deceased.

2    Q        And that would be the same for time and location;

3    correct?

4    A        Yes.

5    Q        So in your investigation you can't determine that

6    Brandon Sample was shot where he was found; correct?

7    A        That's correct.

8    Q        All right.  Were there any other potential causes of

9    death?

10   A        No.

11   Q        All right.  And how did you determine that?

12   A        Well, by doing a complete and thorough postmortem

13   examination.  He was a young man of age 22 years.  Heart,

14   besides decompositional change, was fine.  Coronary arteries

15   was fine.  No evidence of previous heart attacks.  Lungs were

16   fine.  Liver was fine, aside from decomposition.  Same thing

17   with the kidneys and all the other organs.

18   Q        Okay.  So, Doc, was there any evidence that either

19   the body or the clothes were burnt?

20   A        For what?

21   Q        Burnt?

22   A        Burnt?

23   Q        By fire.  Any evidence of --

916

1    A        None that I saw.

2    Q        Okay.  And you examined the entire body and the

3    clothes?

4    A        Yes.

5    Q        No evidence whatsoever of fire being set to the body?

6    A        That's correct.

7    Q        Okay.  Any evidence that the body had been dragged

8    through dirt, gravel, mud, anything like that?

9    A        Sometimes you can tell.  Sometimes you can't.  If you

10   were to drag me and then leave me to rot, basically the

11   decompositional change would erase all of that evidence of any

12   kind of dragging.

13           If you have drag marks, it's usually on the skin.

14   But if you've got no skin because of decomposition you can't

15   really tell if there's drag marks or not.

16   Q        And as you indicated in direct testimony, you also

17   couldn't determine whether the body had been beaten or

18   anything like that?

19   A        No, I could not make that determination.

20   Q        So unable to determine whether there was a struggle

21   prior to being shot?

22   A        That's correct.

23   Q        You were able to determine that there was one

1    entrance wound; correct?

2    A        Yes.

3    Q        And no exit wounds?

4    A        That's correct.

5    Q        So although you indicate that there's a probable

6    second bullet, you can't find an entrance wound to go along

7    with that theory; correct?

8    A        Well, basically the maggots would find the entrance

9    wound for you and that's where they would begin lunch.  Why

10   work?  You have a hole.  You've got blood.  You've got bodily

11   fluids.  They'll start their lunch right there and continue on

12   eating.  So really the decompositional change and maggots will

13   obscure all that evidence.

14   Q        Well, we do see one entrance wound, though, that has

15   a maggot infestation; correct?

16   A        Correct.

17   Q        We just don't see a second one?

18   A        Because basically you're dealing with maggots.  I

19   mean, they took out bones of his face.  There was no face

20   left.  Basically the neck was -- portions of that were gone.

21   Q        And, Doc, just to be -- just to be fair, you didn't

22   include the theory that there was a probable second bullet

23   wound in your original coroner's report to us; correct?

918

1    A        That's correct.

2    Q        All right.  You just came up with that, told me that

3    outside today for the first time?

4    A        Yes.

5    Q        Okay.  With regard to the one entrance wound that we

6    did find, you had indicated in your report, I believe, that it

7    came from left to right, slightly downward to upward; correct?

8    A        I believe so.

9    Q        All right.

10   A        Yeah.

11   Q        That being said, would you agree with me that you're

12   unable to determine the positioning of the body at the time of

13   the entrance of the bullet?

14   A        That's correct.

15   Q        So you wouldn't be able to determine whether Brandon

16   was standing?

17   A        No, I wouldn't.

18   Q        Or kneeling or laying flat on his stomach; correct?

19   A        No.

20                     MR. HARTWIG:  Just one moment.  Thank you.

21                     THE WITNESS:  Sure.

22   BY MR. HARTWIG:

23   Q        Doc, based on the entrance wound that we talked

                     OFFICIAL COURT REPORTER
                  TRUMBULL COUNTY * WARREN, OHIO

919

1    about, left to right, down to up, are you able to determine in
2    any way based on your experience whether this would have been
3    a left-handed shooter, right-handed shooter?
4    A       You can't tell.
5    Q       Because you can't tell which way the body was?
6    A       Well, you can't tell if it's left handed or right
7    handed.  I mean, there are some people here that shoot a rifle
8    left handed and some people that shoot a handgun right handed.
9    So you really can't tell what the hand position was of the
10   shooter.
11   Q       Okay.
12   A       If he was holding it in his right hand or the shooter
13   was holding it in their left hand.
14   Q       Are you familiar with transfer gunshot residue?
15   A       Yes.
16   Q       All right.  So typically a lot of times you see on a
17   shooter the residue will kick back and be on the person's
18   hands, clothes?
19   A       That's correct.  You would do a gunshot residue or
20   the police would do a gunshot residue on your suspected
21   shooter.
22   Q       Sure.  And then the idea of transfer gunshot residue
23   is that if it's --

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

920

1          MR. BECKER:  I'm going to object.  I don't

2     think this is his area of expertise.

3          THE COURT:  Is it, Doc?  Do you know?

4          THE WITNESS:  Well, with transfer, a

5     limited amount of knowledge, sure.  You have cylinder flare

6     and things like that.

7          THE COURT:  Overruled.

8     BY MR. HARTWIG:

9     Q     So would you expect to have gunshot residue on a

10    shooter?

11    A     May or may not.

12    Q     Okay.  If it was, would you expect it to be easily

13    transferred to other things such as a -- other clothing,

14    steering wheel, or anything you would touch?

15    A     It may.  It may not.

16         MR. HARTWIG:  All right, Doc.  Good seeing

17    you.  Thank you.

18         THE WITNESS:  Okay.

19         THE COURT:  Redirect.

20         MR. BECKER:  No, Your Honor.

21         THE COURT:  All right, Doctor.  You may

22    step down.  Thank you.

23         THE WITNESS:  Thank you very much.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

921

1          THE COURT:  Mr. Becker, does that conclude

2     your presentation of witnesses?

3          MR. BECKER:  Subject to the admission of

4     exhibits, yes.

5          THE COURT:  Hold on for a second.

6          Ladies and Gentlemen, that will conclude our

7     presentation for today then.  I have some things I have to

8     deal with with counsel outside of your presence.  That will

9     take us until about 4:30.  We'll come back in tomorrow morning

10    at 9:00 and deal with the nature and extent of the defense

11    case.  There's a good chance we will resolve this case with

12    final arguments and give it to you for deliberations tomorrow.

13    Supposed to be some nasty weather out there.  Be careful

14    coming in.

15          Do not discuss this case among yourselves, nor with

16    anyone else.  Do not form or express an opinion.  Have a

17    pleasant evening.  Our alternates still have to be in tomorrow

18    morning.

19          (Whereupon, the jury was excused at 4:14

20    p.m.)

21          THE COURT:  We're on the record out of the

22    presence of the jury.  The defendant is present.  We're here

23    regarding the conclusion of the state's case.  Mr. Becker, you

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    have certain exhibits you'd like to offer into evidence?

2                    MR. BECKER:  Yes, I do, Your Honor.  Your

3    Honor, at this time, I would move for admission of State's

4    Exhibits 1 through 55 inclusive.  I believe they've all been

5    testified to and authenticated by the various witnesses or

6    stipulated to.  Some of the phone records were actually

7    stipulated to.

8                    THE COURT:  All right.  Any objections?

9                    MR. OLSON:  Your Honor, we do have an

10   objection to Exhibits 11, 12 and 13.  11 is the photo of the

11   defendant with the two guns with a tag on it that reads, "My

12   two baddest bitches and they loyal."  We believe that, number

13   one, it was never properly authenticated.  There was nobody

14   that testified as to who took that photograph, when it was

15   taken, when that was placed on to the phone.

16          Secondly, we believe that there's no probative value.

17   Or, if there's any probative value, it's certainly outweighed

18   by the prejudice, especially given the tag that goes over that

19   photograph.

20          With respect to the video of Austin shooting a gun,

21   same objections, Your Honor.

22                    THE COURT:  Which one was that?

23                    MR. OLSON:  That's 12.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

923

1          THE COURT:  That's 12.  Okay.

2          MR. OLSON:  That was recovered from

3    Meredith Loges' telephone.  Once again, there was no testimony

4    by her as to when that photograph -- when that video was taken

5    or what relevance it has to this case, especially if the

6    firing of that firearm was done prior to the events that are

7    in question before Your Honor today.  We object that there's

8    no relevance to that.

9          And then, finally, the photo of the defendant with

10   the gun and the gray Nike shoes.  That's Exhibit 13.  Same

11   objection.  Once again, there was no evidence or there was no

12   testimony as to when those photographs were taken.

13         And, again, they are cumulative and unduly

14   prejudicial.  We saw the Nike shoes.  We saw the gun.  We

15   heard about the ownership of the gun.  We heard testimony from

16   others that indicated possession of my client with that

17   firearm.  So, again, we would ask that those three exhibits be

18   excluded.

19         THE COURT:  Mr. Becker.

20         MR. BECKER:  Your Honor, I think they're

21   highly probative of the charges of having weapons under

22   disability.  Specifically, photograph 11 depicts the same gun.

23   It was testified to by probably half a dozen witnesses that

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

924

1  the defendant was identified in that photograph.  And that it
2  was the same firearm that they had observed him numerous times
3  with.  I think it's clearly probative of him being in
4  possession and having weapons under disability, as well as
5  going to the armed robbery and the specifications and the
6  aggravated murder and the firearm specification.

7        With respect to Number 12, the video of him shooting
8  the gun, his girlfriend testified that that was taken sometime
9  in June.  And she testified that she left the country on
10  June 9th.  And of course the charge is on or about June --
11  with respect to the one weapon under disability, on or about
12  June 12th.  That clearly shows within days of the crime he had
13  a firearm.

14        13 is extremely important in the fact that not only
15  does it show him with a gun and the gray Nike tennis shoes,
16  his hand was identified by numerous witnesses and the tattoos,
17  and those same or almost similar gray Nike tennis shoes were
18  found on June 20th in the apartment.

19        So we believe all three of those photographs are
20  extremely probative of not only the weapons under disability
21  charges but as well they all go to the robberies, the firearm
22  specifications and both aggravated robberies and the firearm
23  specification and the aggravated murder, and we'd ask the

925

1   Court to overrule that.

2                    THE COURT:  Objection overruled.  11, 12

3   and 13 will be admitted into evidence along with the balance

4   of the Exhibits 1 through 55.  You didn't have any other

5   objections?

6                    (Whereupon, State's Exhibit Nos. 1-55 were

7   admitted into evidence.)

8                    MR. HARTWIG:  No, Your Honor.

9                    THE COURT:  All right.  With that, the

10  state rests?

11                   MR. BECKER:  Yes, Your Honor.

12                   THE COURT:  All right.  Motion?

13                          <u>MOTION</u>

14                   MR. OLSON:  Your Honor, we would make a

15  Rule 29 motion.  It's our position that the state has failed

16  to meet its burden with respect to all of the crimes and

17  specifications charged against my client.  Even when looking

18  at the evidence in light most favorable to the state, we

19  believe that the state has failed to meet its burden.

20  Therefore, ask for a dismissal of all charges.

21                   THE COURT:  Mr. Becker.

22                   MR. BECKER:  Your Honor, we believe and the

23  Court is well aware in a light most favorable to the

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

1   prosecution there is overwhelming evidence of the defendant's
2   guilt of each and every one of these charges as could be
3   interpreted by a fair and reasonable jury.
4                       THE COURT:  I am going to overrule your
5   Rule 29 motion and we'll proceed.
6           So it's up to the defense at this point in time.  Do
7   you wish to call any additional witnesses here tomorrow?
8                       MR. OLSON:  Your Honor, we do not
9   anticipate calling any witnesses.  I will also for the record
10  renew my objection based upon the venue.  We raised that
11  pretrial motion.  Again, it's our position that the state,
12  especially on the murder charge, has failed to demonstrate
13  that the actual crime occurred within Trumbull County and,
14  therefore, we'd move for a dismissal on that ground.
15                      THE COURT:  Right.
16                      MR. OLSON:  And the renewal of the joinder
17  of the robbery case with the murder case, as well as the
18  failure to sever the firearm.
19                      THE COURT:  Again, we ruled against your
20  request to sever the June 20th matters from the others.
21  That's noted for the record.  And all of the other prior
22  rulings of the Court stand.  Venue, I believe, is a jury call
23  and they'll make that call accordingly.

927

1           MR. HARTWIG:  One clarification for the

2  record, Your Honor, with regard to one of our exhibits.  We

3  had mistakenly identified Justin Borawiec's voluntary

4  statement as Exhibit H.  We have corrected it to be Exhibit I.

5           (Whereupon, Defendant's Exhibit I, Witness

6  Statement, was introduced for identification.)

7           THE COURT:  That's Borawiec's statement?

8           MR. HARTWIG:  Yes.

9           THE COURT:  All right.

10           MR. BECKER:  What was I?

11           MR. HARTWIG:  I is --

12           MR. BECKER:  There was a previous I.

13           MR. HARTWIG:  Well, that is the previous I.

14  Wait a second.

15           MR. OLSON:  I think we marked two Hs.

16           THE COURT:  I didn't have an I.

17           MR. HARTWIG:  Yeah.  We did.  We marked two

18  Hs.

19           THE COURT:  So you don't intend to call any

20  further witnesses?

21           MR. HARTWIG:  We don't.

22           THE COURT:  You have certain exhibits you'd

23  like to have admitted into evidence?  Go ahead.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

928

1          MR. OLSON:  Your Honor, we'd move for the

2     admission of Exhibits A through M that have been presented

3     throughout the course of this trial.

4          THE COURT:  Okay.  Mr. Becker, any

5     objections?

6          MR. BECKER:  Yes, Your Honor.  I would

7     object -- first of all, I'd object to Exhibit A, as the times

8     are incorrect on that report.  They're using the UTC time.  I

9     don't know what the significance of that is.

10         Also, I think I would object to Exhibit -- I don't

11    know which one this is.

12         MR. OLSON:  This is all A.

13         MR. BECKER:  Yeah.  I'd object to all of A.

14    It's already admitted into one of the state's exhibits except

15    for -- part of it is, but the times are off.  They're using

16    the wrong UTC time and I believe they were all testified to

17    anyway in the previous State's exhibit.  Additionally --

18         THE COURT:  The state has that same

19    information?

20         MR. BECKER:  Yeah.  That's in State's

21    Exhibit either 47 or 48 I believe.

22         THE COURT:  The reason you want a different

23    set of those is?

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

929

1              MR. OLSON:  The only question I would have,

2    Your Honor, is during the testimony regarding the state's

3    exhibit that's the same as A there was an indication that the

4    7:30 telephone call was not included.  As long as that

5    telephone call --

6              THE COURT:  Check that out and see right

7    now.

8              MR. BECKER:  Where is that at?  I don't

9    have an objection to entering that in there.

10              MR. OLSON:  That came at the end.

11              MR. BECKER:  Can we just enter that in as

12    A?

13              MR. OLSON:  Yeah.

14              MR. BECKER:  Yeah, that's fine.  I don't

15    have an objection to B, just being the one page with the two

16    calls.  You're going to have to figure out the time.  Whatever

17    the time is.

18              THE COURT:  Is that Exhibit B?

19              MR. BECKER:  Their Exhibit A.

20              MR. OLSON:  That would be Exhibit A.

21              THE COURT:  Exhibit A is going to be

22    limited to the one page and then there's no objection;

23    correct?

930

1              MR. BECKER:  Right.

2              THE COURT:  All right.  Very well.

3              MR. BECKER:  Exhibit B, I think, is just a

4    L.E.A.D.S. report.  I don't think there was any -- it was

5    testified to, but it's full of hearsay.  I don't know who

6    created it or where it came from.  The record keeper is not

7    here.  We'd object to that.  It's basically just saying that

8    Brandon suffers from mental illness and it's got the

9    defendant's mother's phone number written on it and it's got

10   notes.  I think it's been testified to and I think it's

11   improper to enter that.  I don't even think Detective Greaver

12   realized -- was able to say that was his.

13             THE COURT:  Regarding that?

14             MR. OLSON:  Your Honor, it would be our

15   position that it is probative and I believe Detective Greaver

16   did indicate that he received that report, he was familiar

17   with that report, and that he thought that those notes that

18   were contained on that record were his.  So for those purposes

19   I would say that it is admissible.

20             THE COURT:  I am going to overrule your

21   objection.  That'll come in.  All right.

22             MR. BECKER:  All right.  Exhibit C is

23   clearly, it's just a police report.  It was written by Brian

1    Galida.  It's a one-page document.  I think that's clearly

2    hearsay.  I think the author of it was not here.  I think it's

3    obviously improper to allow some reports in and not others.

4    If we're going to introduce all the police reports, we might

5    as well introduce every police report.  And I think it's

6    improper to allow just one page in one police report.  It has

7    been testified to.

8              MR. OLSON:  Your Honor, our position was it

9    is part of the investigative file.  He did testify to it,

10   confirmed the information contained therein, and it's

11   probative to the matter.

12             THE COURT:  I'm going to sustain the

13   objection.  That will be out.

14             MR. BECKER:  Thank you, Your Honor.

15        Your Honor, same thing with Exhibit D.  It is the

16   Niles City call summary.  It's, again, a hearsay report from

17   the city of Niles.  I think it's improper to permit that to be

18   admitted into evidence.

19             THE COURT:  Mr. Olson?

20             MR. OLSON:  Your Honor, we'd have the same

21   position, but I recognize based upon the Court's previous

22   rulings, but we would ask for its admission anyway.

23             THE COURT:  Sustained.  That's out.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

932

1            MR. BECKER:  Your Honor, Defense Exhibit E

2    is a one-page document.  I don't have an objection to that.

3    It came from the extraction report.  I would note for the

4    record, though, that the time is wrong.  So they'll have to

5    explain that.

6            THE COURT:  That will be in.

7            MR. BECKER:  F, same objection to the

8    previous --

9            THE COURT:  It's a dispatch summary.

10           MR. BECKER:  It's a dispatch summary, yeah.

11   I think that's improper.

12           THE COURT:  Sustain the objection to that.

13           MR. BECKER:  Your Honor, State's Exhibit G

14   is a written statement from Stacie Cassidy.  And while I think

15   they're entitled to cross-examine, which they did on that, I

16   think it's improper to introduce those.

17           THE COURT:  I think that's G, I, H --

18           MR. BECKER:  I don't have -- yeah, that

19   would be G, I, K, L, M.  I don't see an H.

20           THE COURT:  H, isn't that Melanie?

21           MR. BECKER:  There's an H and an I.  I'm

22   not sure which one.  H is now the Facebook messages of Nathan

23   Borawiec.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

933

1              THE COURT:  Okay.  You're objecting to all
2    of the statements?

3              MR. BECKER:  Yeah.

4              THE COURT:  I'm going to sustain the
5    objection to all of the statements.  Again, the testimony is
6    from the witness stand.  I don't like to put statements in.

7              MR. BECKER:  Okay.  So that would be G,
8    H or I --

9              MR. OLSON:  What did you mark?  I thought
10   that you just marked it as I, Your Honor.

11             THE COURT:  I thought -- there was a
12   statement -- I've got the statement from police on behalf of
13   one of the witnesses as G.  I, I had as Justin Borawiec's
14   statement.  I thought that was his statement.  H, I had as
15   Melanie's statement.

16             MR. BECKER:  No.  H is actually Nathan --
17   H, I believe, is Nathan Borawiec's Facebook page.

18             THE COURT:  Facebook.  That's a different
19   thing.  I'm talking about the statements now.

20             MR. BECKER:  So I think those all should
21   be --

22             THE COURT:  And K was a statement?

23             MR. BECKER:  Correct.


                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

934

1           THE COURT:  And L is a statement?

2           MR. BECKER:  And so is M.

3           THE COURT:  And M is a statement.  Right.

4    All the statements go out.

5           MR. BECKER:  All right.  And then we have

6    no objection to the Facebook conversations involving Nathan

7    Borawiec, which I believe is Exhibit H?

8           MR. OLSON:  Yes.

9           MR. BECKER:  And the Facebook conversation

10   involving Melanie Engle which is marked as Exhibit J.

11          THE COURT:  Okay.  So we're set then?

12          MR. OLSON:  Yes, Your Honor.

13          THE COURT:  All of the exhibits as noted

14   will be admitted in.  And I sustained the objection to certain

15   other ones.  I think the record is clear on that now.

16        So I'll allow counsel to make sure you've got those

17   sorted out prior to tomorrow then.

18             (Whereupon, Defendant's Exhibits A, B, E, H

19   and J, were received into evidence.)

20        With that, you -- I'm assuming you're going to renew

21   your motion?

22          MR. OLSON:  Yes, Your Honor.

23          THE COURT:  And I'm going to overrule your

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

935

1    motion.

2         With that, you rest?

3              MR. OLSON:  Yes, Your Honor.

4              THE COURT:  Very well.  We've had a chance

5    to -- let's go off the record.

6              (Whereupon, a discussion was had off the

7    record.)

8              THE COURT:  We can go back on the record.

9    We've had a chance to discuss the charge in general.  There's

10   been a request that's not in the charge that's been delivered

11   to everyone regarding a limiting instruction regarding the use

12   of the prior criminal acts for having weapons while under a

13   disability.  It's an appropriate request.  The state is going

14   to deliver that proper language to my magistrate who will

15   place it in there and that will be in as part of the charge.

16              MR. OLSON:  Thank you, Your Honor.

17              THE COURT:  Other requested additions or

18   objections to this charge?

19              MR. HARTWIG:  Nothing further.

20              THE COURT:  Anything, Mr. Becker?

21              MR. BECKER:  No, Your Honor.  I have

22   nothing to add.

23              THE COURT:  Very well.  Then the charge

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

936

1   will be ready.  We'll come on in tomorrow morning.  We'll do
2   closings, the charge, and we'll have the jury out hopefully in
3   the morning.  We're off record.
4                        (Whereupon, the hearing concluded at
5   4:35 p.m.).
6                        (Note:  For further proceedings, please
7   refer to Volume V.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1          IN THE COURT OF COMMON PLEAS

2             TRUMBULL COUNTY, OHIO

3

4  State of Ohio,              : CASE NO:  2017-CR-403

5      Plaintiff,              :

6                              :

7  -vs-                        : <u>TRANSCRIPT OF PROCEEDINGS</u>

8  Austin Taylor Burke,        :

9      Defendant.              :   VOLUME V - JURY TRIAL

10

11

12          Be it remembered, that at the Jury Trial of the

13  above-entitled cause, in the Court of Common Pleas, Trumbull

14  County, Ohio, beginning on the 5th day of March, 2018, and

15  continuing thereafter, as hereinafter noted, before the

16  Honorable Andrew D. Logan, the following proceedings were had:

17

18

19

20

21

22

23  Official Court Reporter:  Lori J. Rittwage


                OFFICIAL COURT REPORTER
            TRUMBULL COUNTY * WARREN, OHIO

937

1                          A P P E A R A N C E S:

2

3

    On behalf of the State of Ohio:

4

        Atty. Christopher D. Becker
5       Trumbull County Prosecutor's Office
        160 High Street
6       Warren, OH  44481
        Phone:  (330) 675-2426
7       Email:  psbecker@trumbull.co.oh.us

8

9   On behalf of the Defendant:

10      Atty. Bradley G. Olson
        Dimeo Olson Law Group, LLC
11      28 North Mill Street
        New Castle, PA  16101
12      Phone:  (330) 318-3453
        Email:  brad_olson_jr@yahoo.com

13

        Mr. Edward Hartwig
14      120 Marwood Circle
        PO Box 3965
15      Boardman, OH 44513
        Phone:  (330) 718-9499

16

17

18

19

20

21

22

23

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

938

1               **I N D E X**

2

3           **C L O S I N G   A R G U M E N T S**

4

5                                            **Page**    **Line**

6       Mr. Becker                            939      19

7       Mr. Olson                             965       3

8       Final Closing Argument Mr. Becker     994       3

9

10                                           **Page**    **Line**

11      Jury Instructions                    1002       1

12

13                                           **Page**    **Line**

14      Sentencing                           1032       3

15

16                                           **Page**    **Line**

17      Verdict                              1028      13

18

19

20

21

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

939

1      March 9, 2018

2          THE COURT:  Ladies and Gentlemen of the

3  Jury, as we concluded yesterday's proceedings, the state had

4  finished presentation of evidence.  We resolved any matters

5  regarding the conclusion of the state's case.  I then

6  addressed the defendant.  The defendant has elected not to put

7  any further witnesses on.  We resolved any issues with regard

8  to the conclusion of defense case.  The defense has now

9  rested; correct, Mr. Olson?

10          MR. OLSON:  That is correct, Your Honor.

11          THE COURT:  So we come to the final part of

12 the case which are the closing arguments of counsel and the

13 charge.  The state will have an opportunity to address you

14 first in closing arguments.  They will have an opportunity for

15 rebuttal.  The defense will address you one time during

16 closing arguments.

17      Mr. Becker, you may proceed.

18          MR. BECKER:  Thank you, Your Honor.

19              CLOSING ARGUMENT

20          MR. BECKER:  May it please the Court,

21 Mr. Olson, Mr. Hartwig, and most important, Ladies and

22 Gentlemen of the Jury.  First off, I want to say thank you so

23 much for your time this week, your patience with some of the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    snafus that I've had with modern technology, your time, and

2    being away from your jobs, your loved ones, your families and

3    for serving our community.

4         If you'll recall back on Monday when you were all

5    seated in here, we had a number of jurors throughout the

6    courtroom, we talked about a lot of things.  But one of the

7    most important things we talked about was reasonable doubt.

8    And each and every one of you are going to use reasonable

9    doubt to find the defendant not guilty [sic] of each and every

10   one of these counts and each and every specification.

11        Let's talk about the most simple of the elements of

12   each of these crimes.  The Court will instruct you in a few

13   minutes about the elements of every crime.  Every crime has

14   four or five elements.  Venue is an element in every single

15   offense.  And almost every witness that testified throughout

16   the week to all of the events, whether it was the murder, the

17   aggravated robbery, the having weapons under disability, the

18   tampering with evidence, or the robbery at Pizza Joe's, and

19   the having weapons under disability on June 20th, except for a

20   few of the kids that they're 14, 15, but even some of them

21   knew they lived in Trumbull County and these events happened

22   in Trumbull County.  So venue has been proven beyond any and

23   all doubt in this case.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1      So let's talk about the charges.  June 12th, 2017,

2   there are four charges.  Aggravated murder with a firearm

3   specification, aggravated robbery with a firearm

4   specification, tampering with evidence, and having weapons

5   while under a disability.

6      On June 20th at Pizza Joe's in Cortland, Ohio, there

7   are two counts; aggravated robbery, again with a firearm

8   specification, and having weapons under disability.  You

9   remember, the Court is going to instruct you it's not that

10  he's disabled.  It's the disability of him having that

11  adjudication.

12     So let's talk about Counts 4 and 5 first.  Counts 4

13  and 5 are having weapons while under a disability.  Count 4,

14  on or about June 12th, the date that Brandon Sample was

15  murdered, and having weapons while under a disability on or

16  about June 20, 2017, the Pizza Joe's robbery.  And we'll talk

17  about the evidence relating to those two counts.

18     First of all, venue.  Like I said, venue has been

19  proven beyond a reasonable doubt.  The officers from Cortland

20  on June 20th testified, Trumbull County.  And you had a

21  plethora of witnesses say that on or about -- that's the key,

22  on or about, it doesn't have to be exactly that day -- on or

23  about June 12th, this defendant was seen by Rickey Roupe,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

942

1    Hayle Roupe, Deidre Keener, Jessica Simms, Nathan Moats, and

2    his girlfriend was kind enough and you will have with you a

3    video of him shooting a gun which she said was about June 8th.

4    She went on her trip, if you'll recall, out of the country on

5    June 9th she went on a cruise.  So thank you to Meredith Loges

6    for recording that for us.

7           And it's not just any gun that they describe.  It

8    wasn't a black gun or a 9-millimeter or a revolver or a rifle.

9    What kind of gun was it?  Every witness was very specific that

10   it was a small -- small silver gun with marbled handles.

11          So let's talk about his girlfriend Meredith Loges.

12   Well, she was nice enough to record that video of him shooting

13   a gun in early June.  You have that video.  It's State's

14   Exhibit 12.  We played it on the screen.  You can go back and

15   watch it when you deliberate.

16          The defendant himself said he had a gun during

17   June 12th.  If you'll recall, he had a text message from his

18   phone on June 12th, 2017 at 12:20 a.m. when he texted Brittani

19   Merten, "See if my clip for the 9-millimeter is out there,

20   Bae."  And you'll recall Brittani Merten testifying, "Oh,

21   yeah, he had a gun and they were playing with it and somehow

22   the clip fell out of it and they looked in the pond or the

23   lake or something."

                    OFFICIAL COURT REPORTER
                TRUMBULL COUNTY * WARREN, OHIO

943

1          The defendant himself had a gun.  That text message
2     was retrieved by JoAnn Gibb, the computer expert that
3     testified here.  That text message is on the extraction
4     report.  It's marked State's Exhibit 48.  It's line 31.  So
5     his own phone tells you he had a gun on June 12th.

6          The defendant was also kind enough for us to take
7     pictures with himself and his two baddest bitches.  Those are
8     State's Exhibit 11 and 13.  Pay particular attention to
9     State's Exhibit 13A which also has his hand which was
10    identified by a number of witnesses with those tattoos and
11    that marble handled gun and some gray Nike tennis shoes.  And
12    we'll talk about those tennis shoes in a moment.  Those photos
13    were on his phone, and witnesses identified his tattoos in
14    those photographs.  One of them, his face is on it, the one
15    with his two baddest bitches.

16         Counts 4 and 5, State's Exhibit 11 and 13.  Those
17    photographs have him holding that small silver handgun with
18    marble grips.  Again, use your reason and common sense.  The
19    witnesses said it was a small silver handgun with marble
20    grips.  Wasn't a 9-millimeter.  It wasn't a black gun.  It
21    wasn't a blue gun.  Heck, today my girlfriend has a pink gun.
22    And those of you that have guns know that's a pretty
23    distinctive looking handgun.

944

1          You have the gun itself, State's Exhibit 1.  Rickey

2    Roupe, Hayle Roupe, Deidre Keener, Jessica Simms, and Nathan

3    Moats all identified that gun when I held it up here for them

4    to look at.  It's a .22-caliber handgun with marble grips.

5    And guess what?  It's registered to his mother and was found

6    in the very apartment he was arrested in the day after the

7    Pizza Joe's robbery in Cortland.

8          What does your reason and common sense say about a

9    gun that's registered to the defendant's mother ending up

10   hidden in an apartment where he was arrested at with people

11   who barely knew him?  Think of the testimony of the young lady

12   who lived there who said, "Yeah, I do flower arrangements.

13   That's one of my hobbies."  And I asked her.  "Did you put

14   this bag of bullets and marble handled .22 registered to this

15   defendant's mom in your pots?"  "No."

16         You have the ATF records.  Remember the quirky little

17   guy from West Virginia that came here and wanted to talk about

18   1968?  He really loves his job.  I'm not going to hold that

19   against him.  But he was real happy to tell you about how the

20   transactions were recorded, how when a business closes and

21   it's sold and they're an ATF dealer they have to come down to

22   West Virginia and they microfilm them.  Great guy.  And you

23   will have those records, State's Exhibits 9 and 10, showing

1  Jamie Sell, this defendant's mother, purchased that gun in
2  July of 2009.

3       You have his own mother asking him on the phone on
4  June 27, 2017 after he was indicted, that's State's Exhibit
5  29, we played that here in the courtroom and you'll have that
6  with you back in the jury room, and she asked if the firearm
7  was registered.  And the defendant said, "No, I don't think
8  so."  Well, guess who knew it was registered?  His mother.
9  Because she registered it in July of 2009 which you'll have
10  that exhibit.

11       And the defendant told his mom later on, "You're
12  talking too much about the case."  Well, again, using your
13  reason and your common sense, what does your reason and common
14  sense say about what he said?  If I didn't commit a crime and
15  my mother asked me -- my mother, for god's sakes.  There's a
16  lot of people I may have told some half truths to and that
17  I've done some things, but I learned at a very young age not
18  to mess around with my mother.  So when my mother asks me, "Is
19  that gun registered?" what is it the response should be?
20  "What gun are you talking about, mom?  There was no gun, mom."
21  Instead, he told her, "You're saying too much, mom.  And I
22  don't think it's registered."

23       You have a certified copy of his adjudication as a

delinquent child.  It is State's Exhibit Number 21.  You will
see on that document that he was convicted or sentenced for an
aggravated burglary with a firearm specification which is a
felony of the first degree.  The Court will instruct you in
its closing argument -- or I'm sorry, in its jury
instructions -- that aggravated burglary, a felony of the
first degree, is, in fact, a felony offense of violence which
he has been adjudicated of.

The defendant is guilty beyond all -- any and all
possible doubt regarding Counts 4 and 4 of having weapons
under a disability on both June 12th which is Count 4 and June
20 which is Count 5.

Tampering with evidence is Count 3.  Well, let's talk
about what tampering with evidence is.  Now, the Court is
going to give you some definitions as to what tampering with
evidence is.  But basically it's knowing that a proceeding or
an investigation will begin, he did alter, destroy, conceal,
or remove any record, document, or thing to impair its value
or availability in the investigation.  Well, let's talk about
that.

Let's start with his own phone.  His own phone that
JoAnn Gibb got on this very witness stand and extracted the
extraction report which you will have as State's Exhibit 47

1   shows that there were 11 deleted text messages which she was

2   able to recover.  And not just any 11 text messages.  They

3   were 11 text messages on June 11th in the evening hours around

4   10:00 between him and Brandon Sample.  Brandon Sample texted

5   him, which was deleted from his phone but recovered by the

6   analyst, "Shit, just at this chick's house swimming.  I'm

7   gonna have to take J White back to Akron in a bit, but do you

8   still want to link up when I get back?"  Now, I don't care how

9   he gets -- we spent, painstakingly, three hours here the other

10  day talking about, you know, who knew what, what did you look

11  at, when did they meet?  They may have run into each other two

12  weeks ago and said, "I'll get hold of you.  We'll get together

13  next week or Saturday or Friday."  It doesn't matter.  That

14  was a painstaking effort in futility if you ask me.  "Just at

15  this chick's house swimmin'.  Gotta drop J White back to

16  Akron.  Wanna hook up?"  That was on June 11th at 10:05.  You

17  have those text messages which were deleted.

18          What's his response?  "Damn.  Ha ha.  That's crazy.

19  I'll be in Warren on the west side."  6-11-17 at 10:23.  You

20  will have those phone records.  And you'll also see the

21  extraction report that shows you that message was deleted and

22  when it was sent.

23          The defendant, though, never told Detective Greaver

948

1    he had any deleted text messages.  He, like most people, and

2    until I got involved in doing this, I had no idea.  I thought

3    if I deleted something off my phone it's off my phone.  Well,

4    guess what?  Wrong.

5         Brandon Sample's phone was never found after June

6    12th, 2017.  It was never even used after 4:40 a.m.  Where did

7    that go?

8         Brandon Sample's wallet was never found.  Do you

9    recall there was some testimony in cross examination about

10   where was his wallet?  It wasn't in the car down in Niles.  It

11   wasn't at the scene.

12        Brandon Sample's car was on the bike path in Niles.

13   We know that.  So that was taken or moved.

14        Brandon Sample's keys to his car were never found.

15   There was testimony about that.

16        And most importantly, Brandon Sample himself wasn't

17   found for four days.  Did the fact that they couldn't find

18   Brandon Sample for four days impact this investigation?  You

19   heard the coroner testify about the rotting flesh, about there

20   was possibly a second bullet but so much was chewed off he

21   couldn't tell.  He thought he had a fragment.  The body had

22   maggots in it.  He's cleaning it off, maggots, and

23   unfortunately fragments are going down the drain as he's

949

trying to clean the badly decomposing body of Brandon Sample.
Well, who left him there?

And where was Brandon Sample's body found?  The exact
location that this defendant a few weeks earlier had taken his
girlfriend Meredith Loges and Rickey Roupe to.  Meredith Loges
and Rickey Roupe both testified that they were swimming out
at -- out in Hiram, or out that way, Nelson Ledges, and he
said, "You want to see a scary place?"  And he took them to a
place called what other?  Hatchet Man Road.  That's the exact
location where Rickey Roupe, Hayle Roupe, Deidre Keener,
Jessica Simms, and Nathan Moats all testified that the
Defendant told them he killed him at.  Hatchet Man Road.  Now,
I want you to use your reason and common sense and think
again.  Each and every one of you were out there on Monday
afternoon.  I want you to think of Trumbull County and how big
this county is.  And think about going down that road and
where that road was.

Ladies and Gentlemen, the defendant is guilty beyond
any and all possible doubt of tampering with evidence.  The
car, the keys, the phone, the wallet, the body of Brandon
Sample.  He hid them.  You remember that testimony?  The body
was drug over the hill.  There was a shoe there.  They walked
all around and couldn't find it until they smelled it.

1          Let's talk about Count 6, the Pizza Joe's robbery on

2     June 20th at Pizza Joe's in downtown Cortland.  You have the

3     video.  You see the robber run, literally run from the house

4     where he was arrested from.  You'll see from -- on one of the

5     videos he runs right in the door directly across the street

6     that was identified by the police officers as 241C West Main

7     Street.  That's State's Exhibit 30.  Play it.  Watch it.

8     Watch all the videos.  You were there on the jury view.  And

9     the testimony is that the apartment where the robber came from

10    was right there.  You saw it.  You went out there Monday

11    afternoon.  Witnesses testified that the apartment where the

12    defendant was arrested within the hour after the robbery was

13    right across the street.  The video shows the robber at the

14    tail end of it after he sort of swings around in that parking

15    lot.  Where does he go?  Right back across the street.  The

16    video shows pretty much exactly what Shawn Marx said.  The

17    robber went across the street and was about 20 feet from him

18    when he was at the corner of that building.  Shawn, as you'll

19    recall, will say he was further down.

20          Look at the video and see that the robber is covering

21    his left hand with the bag, the defendant's tattooed hand,

22    with a plastic bag.  Remember the voir dire questioning?  And

23    do you remember sometimes I asked you about the differences

                        OFFICIAL COURT REPORTER
                    TRUMBULL COUNTY * WARREN, OHIO

1   and the age of Judge McKay.  And I don't remember if the
2   jurors are still here that we questioned, but you were all
3   here.  At one point, the young lady that was seated at Number
4   6 there -- and I think someone who may or may not be here -- I
5   asked them, "How long were you here at orientation?"  And
6   every one of you was here.  One person said an hour and a
7   half.  Somebody else said three hours.  Well, does that make
8   them liars?  Does that change the fact that they were wrong?
9   I lose track of time.  Thank goodness I have a clock here.
10  Thank goodness I can look at my phone.  But when I'm not doing
11  anything or when I'm just hanging out or when I'm just sitting
12  doing something, I don't write down, "Well at 10:05 I did
13  this.  At 12:13 I did that."  It's hard to remember.  We all
14  lose track of time.  And none of those people had a gun
15  pointed at them.  Or none of those people that testified.
16  Those clerks did.  So is it within your reason and common
17  sense that the young lady who was the clerk there didn't see
18  any tattoos?  The whole thing lasted about 30 seconds.
19  Somebody has a gun at me, I'm not saying, "Well, let's see,
20  he's got a tattoo there.  He's got this.  He's about 6'3",
21  blue eyes.  Could you turn around so I can get a better
22  description of your clothes?"
23          And what else do we have regarding the aggravated

1    robbery in Cortland?  Well, at that point on June 20th, we

2    already know this detective filed a warrant for his arrest on

3    the aggravated murder.  They're pinging his phone.  You'll

4    recall Detective Greaver saying, "We chased him around all

5    day.  We were always a step behind."  And the defendant's

6    phone was pinging at the dog grooming store that you folks saw

7    on the jury view which is right in front of and connected,

8    basically, to that apartment.

9        When the police go to identify people in the

10   apartment, what happens?  "Hey, who are you?"  "Oh, I'm

11   Melanie Engle, I live at blah, blah, blah, blah, blah."  What

12   does this guy say?  "I'm Nathan Novicky."  Now, once the

13   police confirmed the pings were still coming from his phone

14   and confirmed he was there, they went back and said, "You're

15   not Nathan Novicky.  You're Austin Taylor Burke, wanted for

16   aggravated murder."

17       What's found in the apartment that the defendant ran

18   from the robbery at Pizza Joe's and back to where he was

19   arrested at when he was using his false name?  Well, there's a

20   pair of gray Nike tennis shoes with writing on the back heel.

21   That's State's Exhibit 4.  Compare that to State's Exhibit 13

22   and 13A which are gray Nike tennis shoes.  And what you'll

23   notice about those gray Nike shoes and I realized -- I could

1   run in flip flops if I had to.  But if you look at those,

2   they're laced like in circles.  They're not laced crisscross.

3   They're gray.  They're Nikes.  And there's a picture of him --

4   I think one of the witnesses said, "Oh, yeah, he was wearing

5   gray Nikes.  He always had his gray Air Jordans on."  Compare

6   those to the shoes that are seen on the robber as he exits and

7   goes right towards Shawn Marx in that video.  Again, compare

8   those shoes with all of those -- particularly the picture

9   with -- I'm sorry.  Compare those shoes in State's Exhibit 4

10  and the shoes in 13 and 13A.  One of those pictures with his

11  baddest bitches, the marbled handgun that was registered to

12  his mother is in there.  I want you to look at the laces and

13  how they're looped and not crisscrossed.

14          The sweat pants.  Let's talk about the sweat pants,

15  State's Exhibit 7.  They're also depicted on the video from

16  the counter inside.  And just like one of the officers, I

17  don't remember if it was Weston or one of the officers from

18  Cortland said, "When he came in, he pulled the gun out of his

19  right pocket and the pocket came out."  And he's, you know,

20  got the gun.  And look at the gun too.  Look very closely.

21  Kid is pretty big.  That gun is barely in his hands.  It's a

22  very small gun.  The right pocket was pulled out.  Well, when

23  they grabbed the gray sweat pants in State's Exhibit 7, the

954

1   pocket was pulled out.  Right pocket pulled out inside out
2   when it was found in the apartment.
3          The white Sparkle bag, State's Exhibit 8, was found
4   in the laundry basket.  It was under that Bob Marley record
5   that was covering that.  It was in the same room where the
6   gray sweat pants and the gray tennis shoes were found.
7          The money, $545 found out of 775.  Does it surprise
8   you, using your reason and common sense, that in that pig sty
9   of an apartment the police didn't find everything?  You'll
10  recall the testimony of Melanie Engle's mother who came in
11  here and said, "Well, I asked the police the next day if I
12  could start cleaning and I just started dumping stuff in the
13  trash."  Well, where was the $545.  In the trash.  Thank god
14  she didn't throw that away.
15         And think about where the money was found.  It was in
16  the trash in a box the very next day.  I want you to use your
17  reason and common sense and think about that money for a
18  moment.  If anybody else in that apartment had stolen that
19  money and after the police checked 'em out and after they gave
20  their written statements and the next day when Melanie is over
21  there cleaning and running errands and her mom said she
22  tracked her down at Giant Eagle and she's doing errands, would
23  any of those kids have gone back the next morning and said,

1    "Hey, Melanie, I left something here at your house.  Can I go
2    get it?"  But the one person who wasn't able to do that
3    because he was arrested was already gone.
4            Think about the phone call the defendant made for one
5    minute at 10:50 p.m. to Deidre Keener and Hayle Roupe.  The
6    defendant told them, "I came into some money."  And Deidre
7    Keener screen shotted it and kept it on her phone, State's
8    Exhibit I think it's 54 or 55, the screen shot.  It's got his
9    picture on it as the contact.  "You missed a call from
10   Austin."  She called him back.  "Did you mean to talk to me?"
11   One minute.  Just like she said.  What does your reason and
12   common sense say about that money?  The others who weren't
13   arrested didn't rob the store.  Why wouldn't they take the
14   money.  They're free to go.  They gave a good statement.  They
15   checked out.  They gave a great name, social, date of birth.
16   All checked out.  Get out of here.  No warrants for you.
17           And finally in that apartment is State's Exhibit
18   Number 1.  Once again, this defendant's mother's firearm, one
19   of his two baddest bitches.  So proud of this gun.  The same
20   gun that when he was indicted a week later on all these
21   charges, on June 27th he told his mom, "I don't think it's
22   registered."  It's the same silver gun that Rickey Roupe,
23   Hayle Roupe, Deidre Keener, Jessica Simms, Nathan Moats, all

1   identified and gave statements about.  And guess what?
2   Remember that three-hour exercise we went through?  Well, they
3   gave all those statements and identified that firearm before
4   the police even had it.  Rickey Roupe, Hayle Roupe, Deidre
5   Keener, Jessica Simms, they all described that gun long before
6   June 20th.  He met with 'em -- in fact, you'll see Jessica,
7   Deidre and Hayle gave statements, you know, 15th -- remember
8   they said they went down on the 15th to the Niles Police
9   Department.  They gave statements on the 16th, 17th, 18th.
10  You'll have three exhibits on June 18th where they gave their
11  photo lineup and circled this defendant as the one who had the
12  gun and told people that he killed Brandon Sample on Hatchet
13  Man Road.  There's no doubt that he committed the aggravated
14  robbery with a gun spec of Pizza Joe's.  They all described
15  that gun long before it was ever even traced to this
16  defendant's mother.
17          And guess what?  Rickey Roupe, Hayle Roupe, Deidre
18  Keener, Jessica Simms, Nathan Moats, they were all right.  He
19  did have a gun that was small, silver, and marble handled.
20          Ladies and Gentlemen, the defendant is guilty beyond
21  all possible doubt of the aggravated robbery and firearm
22  specification of Pizza Joe's on June 20th, 2017.
23          Let's talk about the last two charges, aggravated

957

1   murder and the aggravated robbery of Brandon Sample with a

2   firearm specification as to each of those counts.

3           First of all, it was established many times in this

4   case they knew each other.  Brandon was a guard at DYS when

5   the defendant was an inmate for his aggravated robbery with a

6   firearm adjudication.  The Court will instruct you right in

7   the jury instructions motive doesn't matter.  I can't prove

8   motive.  There could be a thousand reasons why somebody did

9   something.  Think of a robbery.  Maybe they did it for thrill.

10  Maybe they did it for money.  Maybe they did it, you know,

11  because they like to do those kinds of things.  You heard in

12  this case from various witnesses, drugs, there might have been

13  an incident at DYS where Brandon got this defendant in

14  trouble.  Brandon molested a child.  You'll recall the

15  testimony of Rickey Roupe saying, "I was real mad because he

16  told me he molested a child and that's why I put that on

17  Facebook."  But it doesn't matter.  Motive doesn't matter.

18  The Court is going to instruct you, we don't have to prove

19  motive.

20          Now, let's talk the most important piece of evidence

21  in this entire case.  The body of Brandon Sample.  Where was

22  it found?  I want you to use your reason and your common

23  sense.  And I want you to think of all of the places in

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  Trumbull County where a body could be found.  We have Mosquito
2  Lake.  Gotta be ten miles long and a mile wide in some places.
3  We have the Mahoning River that probably cuts through this
4  county for 20 miles I'll bet.  There are dumpsters, abandoned
5  houses and buildings.  Good Lord, unfortunately Warren has
6  become a playground of empty buildings and homes
7  unfortunately.  You've got Warren, Niles, Kinsman, Mecca,
8  Brookfield, Hubbard, there's fields, Newton Falls, bridges.
9  Think of all those places.  Think of Trumbull County as a huge
10  stack of hay.  And now think of Hatchet Man Road.  That's a
11  needle in a haystack, Ladies and Gentlemen.  A giant haystack.
12  What does your reason and common sense tell you about Hatchet
13  Man Road?  Of all the places in Trumbull County where a body
14  could be found, not just any body, the body of Brandon Sample,
15  why did John Greaver, Detective John Greaver, go to Hatchet
16  Man Road on June 15th, 2017?  Why?  Why did he go there?  I
17  can't remember.  Oh, yeah.  In fact, Detective Greaver didn't
18  even know where it was.  Remember he told you he went down
19  Oakdale Road or some other road and it wasn't the right road?
20  He had to talk to the Department of Natural Resources
21  officers.  He went to that needle in the haystack because
22  Hayle Roupe, Jessica Simms, Rickey Roupe, Nathan Moats and
23  Deidre Keener were telling Makayla Egbert who was telling him.

959

1    And who was telling them?  He was.  Austin Taylor Burke told

2    his friends and his acquaintances and the people he hung out

3    with where they could find Brandon Sample.  The same Austin

4    Taylor Burke that just a few weeks prior to that directed his

5    own girlfriend and took 14-year-old Rickey Roupe to where

6    again?  Oh, yeah, pardon my sarcasm, Hatchet Man Road.

7            And how did Hayle Roupe, Jessica Simms, Rickey Roupe,

8    Nathan Moats and Deidre Keener say the defendant was killed?

9    He shot him.  What does your reason and common sense say about

10   that, how someone was killed?  There's lots of ways you can

11   kill somebody.  You can stab them.  You can beat them.  You

12   can strangle them.  You can run them over with a car.  I'm

13   sure you folks could come up with a few more.  But

14   Dr. Humphrey Germaniuk testified that he was shot.  And not

15   just shot anywhere.  He was shot in the head.  State's

16   Exhibits 18 and 19.  You'll see those fragments.

17   Unfortunately Dr. Germaniuk is a very long time serving

18   coroner.  He's done thousands of autopsies.  He couldn't get

19   the fragments.  Cleaning those maggots off, they went down the

20   drain.  You saw the x-ray, though, of the fragments that he

21   testified to.  We brought the little board over and he put

22   that on there.  And where did Hayle Roupe, Jessica Simms,

23   Rickey Roupe, Nathan Moats, and Deidre Keener say he shot

1  Brandon?  In the head.  And, again, what does your reason and

2  common sense and logic tell you about where you could be shot

3  at?  Well, you could be shot in the chest.  You could be shot

4  in the heart.  You could be shot in the stomach.  You could be

5  shot in the back.  You could be shot on the side.  That's not

6  what the evidence was in this case.  That's not what the

7  testimony was.  They said he was shot in the head on Hatchet

8  Man Road.  Where did they get their information?  Oh, yeah,

9  this guy.  Dr. Germaniuk confirmed what Hayle Roupe, Jessica

10  Simms, Rickey Roupe, Nathan Moats, and Deidre Keener all said

11  the defendant told them.

12       And how many times did the defendant tell Hayle

13  Roupe, Jessica Simms, Rickey Roupe, Nathan Moats, and Deidre

14  Keener the defendant had been shot?  One or two times.  What

15  does your reason and common sense tell you abut that?

16       Mike Roberts testified.  He was the expert from BCI

17  that said the gun worked.  It held what?  I think he said,

18  what, nine rounds it could hold?  The body of Brandon Sample,

19  he could have been shot three, four, five, six, seven, eight,

20  nine times with that gun.  There were extra bullets found in

21  the place in Cortland where he was arrested with the mother's

22  gun.  Dr. Germaniuk confirmed what Hayle Roupe, Jessica Simms,

23  Rickey Roupe, Nathan Moats, and Deidre Keener said the

1    defendant told them.  He shot him one or two times in the head

2    on Hatchet Man Road.

3          Where did this defendant tell the detective that --

4    John Greaver -- where he was, not one time, but two times on

5    the night of the murder?  "Oh, Detective Greaver, I was home.

6    I'm a good boy."

7          One time was before he was arrested and both times

8    were before his phone was searched.  And is it true that he

9    was home all night on June 12th, 2017?  Nope.  And you know

10    how I know it?  He proved it.  He proved it with the search of

11    his own phone.  Look at extraction report State's Exhibit 48,

12    line 37.  Remember the text between him and Brittani Merten,

13    that girl that got up here?  The first thing she said was,

14    "Oh, I just kissed him.  I didn't have sex with him.  I just

15    kissed him."  Remember her?  June 12th, 2017 at 2:08 a.m.,

16    there is a text message from this defendant to Brittani

17    Merten, "Out in Nilew, N-i-l-e-w."  Well, if you all look at

18    your cell phone or a typewriter, the W, I believe, is above

19    the S.  Common mistake, typo.  Out in Nilew.  Well, what does

20    your reason and common sense say?  It doesn't say I'm at home.

21          Cell phone records and the mapping.  The records are

22    22.  The mapping is 50 and 51.  You'll have those maps.  I put

23    them up there.  You'll have them here in this exhibit.  Show

what?  At 2:08 a.m. his phone was using a cell tower in guess
where?  Niles, Ohio.  So at 2:08 he texted Brittani Merten and
said he was in Nilew.  And at 2:08 his cell phone records, his
texts and calls, that AU report, State's Exhibit 51, show his
phone was in Niles.  Niles is where Deidre Keener and Nathan
Moats say they saw him with Brandon Sample that night.
Brandon Sample's white car.  Remember there was a big question
about Deidre said, "I looked out the kitchen window and I
could see him."  "Well, wasn't the headlight shining in your
face?  You couldn't see.  You don't know who it was."  And she
said, "Well, I didn't know who it was, but later on I found
out it was Brandon Sample."  And his phone was using towers in
Niles, just where he said he was, just where he told the girl
he likes to kiss, Brittani Merten, he was there until 3:07.

        And then what happened?  Well then his phone starts
to move in a northerly direction.  You will see in that report
at 3:46 a.m. his phone starts to move through Warren and
eventually near Hatchet Man Road where the body was found.
His phone is now up there at 4:51 a.m.  And the last time that
anyone ever heard from Brandon's phone was the text message
that his father got at 4:40 a.m.  You have those phone
records.  They're State's Exhibit 23.

        Then at around 5:30 in the morning his pings start

963

moving across 305 and then to Niles where his phone is pinged at 5:45 a.m., 9:57 a.m. and 10:57 a.m.  That's State's Exhibit 50.  Is that consistent with Rickey Roupe and those guys says he was here in the morning?  It absolutely is.  And is that consistent with Brandon's white Chevy Malibu being found at 7:34 a.m. on the bike path in Niles?  Yeah.

Ladies and Gentlemen, this defendant is guilty beyond every possible imaginary doubt of the aggravated murder and aggravated robbery, the car, the wallet, the keys, of Brandon Sample on June 12th, 2017.

Now, the Court is going to talk about relying on things in the most important of your affairs as reasonable doubt.  They may get up here and say, "Well, why should you rely on Hayle Roupe and Jessica Simms and Rickey Roupe?  And all these guys, couple of them lied the first time."  Well, Jessica never lied.  Hayle certainly didn't lie.  She was the little girl that testified the second day almost in tears up there when we were talking about that.  She didn't lie.  In fact, her and her girlfriend Jessica, they went to the police as soon as they put things together at 2 something in the morning at Niles and said, "We think we know something about killing Brandon Sample."

But why should you believe them in the most important

964

1   of your affairs?  I'll tell you why.  Because he did.  He

2   relied on 'em.  He's a big shot.  Remember he told 'em, "I'm

3   in a gang.  I'm in the 38s or the 86s" or whatever.  Hayle

4   said he was laughing about it.  He wants to be Mr. Big.

5           Why should you rely on them?  I'll tell you a second

6   reason why you should rely on them in the most important of

7   your affairs.  Because Detective John Greaver, in the most

8   important of his affairs, solving crimes, solving the most

9   serious of crimes in this county and in this city, aggravated

10  murder, he relied on them.  Thank goodness he relied on them.

11  Because if Detective Greaver had not relied on the information

12  that they gave him from this defendant's mouth and where they

13  said the defendant was and told them that he killed Brandon

14  Sample on Hatchet Man Road, Brandon Sample would have probably

15  been long gone to the elements.  We may still be looking for

16  Brandon Sample to this day.

17          Ladies and Gentlemen, this defendant is guilty beyond

18  any and all possible doubt of each and every count and each

19  and every specification.

20          Ladies and Gentlemen, I'll get to speak to you one

21  last time.  But, again, I want to reiterate my thanks for your

22  service, your time, and your dedication.  Thank you so much

23  for this service you are performing for your fellow citizens

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

965

1    here in Trumbull County.

2                    THE COURT:  Mr. Olson.

3                    <u>CLOSING ARGUMENT</u>

4                    MR. OLSON:  Thank you, Your Honor.

5           May it please the Court, Mr. Becker, Ladies and

6    Gentlemen of the Jury.  First, before I begin, I would like to

7    thank this jury panel for its service on behalf of Mr. Ed

8    Hartwig and myself and Austin Taylor Burke.  As the

9    prosecution indicated in his opening, you know, we recognize

10   the sacrifices that you people make to come here and sit for a

11   week listening to the testimony, taking the time out of your

12   personal affairs, taking time away from your family.  And we

13   really appreciate that.  Because we honestly believe that this

14   is one of the most important functions that we have in this

15   country.  Without you, there's tyranny.  And, again, we thank

16   you.

17          Giving closing arguments is always one of the most

18   nerve-racking times for me.  And the reason is is I go back

19   through my notes and I look at the examinations that were done

20   on the witnesses and the notes that I took.  I look and say,

21   "Did I ask all the questions that this jury wanted to hear?

22   Did they get all the information that each one of these

23   witnesses that came up on this stand and able -- to enable

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

966

1    them to make a determination as to the facts of this case?"

2         I know at times -- and Mr. Becker identified the

3    cross examination of Detective Greaver as grueling.  Well,

4    Ladies and Gentlemen, that's my job.  My job is to make sure

5    that you are well-informed of all the information, to make

6    sure that you are well informed of the investigation that was

7    performed and the things that could have been performed.  So,

8    again, I recognize at times things may get long.  But, again,

9    it's necessary.

10        Mr. Austin Burke, he sits here today scared because

11   his fears are, is this jury going to judge me on my

12   appearances?  Is it going to judge me on my past?  Because

13   there's no denying, Austin Burke had some trouble as a youth.

14   He was in trouble.  He was punished.  He went -- he went to a

15   place, a facility, to be punished.  But that does not mean

16   that Austin Burke committed the crimes that he is being

17   accused of.  And we cannot judge Austin Burke on the crimes

18   that he is being accused of because of his past.

19        He also is nervous because we recognize this is a

20   very tragic event that we're addressing.  But as I stated in

21   my opening, the process that we're in in our judicial system

22   right now, sympathy plays no role.  Because sympathy blinds

23   you to facts.  If we allow sympathy to enter into our criminal

1   justice system, we become blinded and improper convictions

2   happen.  Innocent people go to jail on sympathies.  But after

3   the jury selection process, I am confident that this jury will

4   not allow prejudices or sympathies and emotions to determine

5   their decision.  Because we went through all of this.  We

6   learned all this from you and we selected you because you

7   indicated in your answers that you could remain fair and

8   impartial.  That you could listen to all the evidence.  And

9   that you could make a decision based upon that evidence.  You

10  told us when you were being examined that you want to know all

11  the evidence and what could have been done in this

12  investigation to make sure that an innocent man is not going

13  to jail.

14          So we look, again, what is reasonable doubt?  It is

15  the highest standard of proof.  Why is it the highest standard

16  of proof?  Because in a civil action, we may lose money.

17  Money can be made up.  But in a criminal action, we are

18  actually looking to take away somebody's liberty.  Put them in

19  jail.  And, therefore, we have to require the state to prove

20  the highest degree of proof to take away this man's freedom.

21          And when we look at what reasonable doubt is, we must

22  look at the most important affairs in our own lives.  What

23  would we rely on in those most important affairs in our lives?

968

1    That's the standard that you have to provide to Austin Taylor

2    Burke.  You don't provide him with a lower standard because he

3    was in trouble as a youth or because people came in and made

4    accusations against him.  People can make accusations against

5    any of us.  But, again, that's why we place a burden on the

6    state to prove beyond a reasonable doubt that Austin Burke is

7    guilty of these crimes.  So that's the threshold that you must

8    maintain when you review this evidence.  What would you be

9    willing to rely and act upon without hesitation in the most

10   important of your own affairs?

11        Ladies and Gentlemen, this case comes down to

12   credibility.  As the evidence came through, we know that there

13   is no direct evidence.  There is no firearm.  There is no

14   blood stained clothing.  There is nothing that links Austin

15   Burke to this crime other than some accusations of five kids

16   that came in here and testified.  And we'll get into their

17   testimony here in just a minute.

18        The state did bring in some expert testimony to

19   attempt to assist you in making your determination.  And we

20   got -- we had the pleasure of listening to Dr. Germaniuk who

21   has done thousands of autopsies.  And I'm not going to get up

22   here and say Dr. Germaniuk doesn't know what he's doing, that

23   he was incompetent in being able to perform these types of

969

investigations.  However, when we look at his testimony and we
look at the evidence, we learn very quickly this wasn't his
best work.  Let's look at it.  He lost photographs of the
autopsy.  He lost bullet fragments that could have been
tested, that could have helped us determine what type of
firearm that this -- that Brandon Sample was killed by.  We
don't have that.

            We don't have a firearm.  We have pictures of Austin
Burke at some unknown time prior to this crime with a .22
pistol.  What did Dr. Germaniuk tell us, though?  Could have
been a small-caliber weapon that caused this injury.  Well,
what's a small-caliber weapon?  Anything under a .32.  So a
.32, a .25, a .22.  Very popular types of guns.  Any of these
could have caused the death of Brandon Sample.  Nothing links
the injury that was inflicted upon Brandon Sample to the .22
firearm that was pictured in the state's evidence that was put
up on that big screen throughout the course of this trial.
Nothing.  Not one iota of evidence.

            And what did Dr. Germaniuk tell us about that?
Dr. Germaniuk told us that there is a method that you can
determine the gunshot wound and see if it links back to a gun
that was recovered.  You fire the gun into some barrels.  You
test what the hole size is in the barrel and compare it to the

1   gunshot wound in the victim.  Was that done?  It wasn't.  That

2   wasn't done.  How hard would it be for the detective or for

3   somebody on this investigation crew to go out, take the gun

4   that they recovered, it was in their possession, and fire it

5   into the water barrels and compare?

6          Now, the state may want to get up and say, "Well, we

7   knew it was a gunshot wound.  We had the evidence."  So just

8   let's not test it.  Let's just let it go.  Is that how we want

9   to rely on our criminal justice system, is to just make

10  conclusions without looking at the evidence?

11         He also told us that it was very -- it's normally

12  part of the process to maintain the clothing, to test the

13  clothing, to see if there's gunshot residue on the clothing.

14  To see -- because if you recall on the video, when Brandon

15  Sample's body was located, his shirt was pulled up over his

16  head.  Now, we don't know how many gunshot wounds that

17  Dr. Germaniuk is now saying Brandon Sample suffered.  One,

18  possibly two.  But we don't know if those gunshot wounds were

19  inflicted with the shirt pulled up over his head or not.  And

20  the state may say, well, what does it matter?  Brandon Sample

21  is dead.  Well, the reason that it matters is because maybe

22  that can confirm to us how this injury occurred.  The

23  recreation of the crime scene.  The testing to see if it was a

1    close-range shot.  We were getting statements coming in from

2    witnesses.  They did nothing to confirm those statements.  Is

3    that how we want our criminal justice system to be?  That we

4    make conclusions without testing the evidence, without testing

5    the reliability?

6         We also had Mr. Mike Roberts come in.  And, again,

7    Dr. Germaniuk when he did his initial autopsy, he takes a

8    fragment off the scalp of Brandon Sample's head and he makes a

9    conclusion that that is a bullet fragment.  That fragment is

10   then sent off to the crime lab.  And what's the results?  It's

11   not a bullet fragment.  So, once again, I'm not up here to

12   tell the Ladies and Gentlemen of this Jury that Dr. Germaniuk

13   is not qualified to be the coroner of Trumbull County.  But I

14   am up here to say maybe this wasn't his best work.  Maybe this

15   wasn't the best investigation that he's ever performed.

16        We also -- when Dr. Germaniuk came in yesterday to

17   testify about this possible second bullet fragment, he

18   indicated on cross examination that he discovered that this

19   second fragment may have been in Brandon Sample's neck region

20   the night before he came in to testify as he was prepping.  He

21   went back and he looked at the x-rays and noticed that there

22   was this, what appeared to be a fragment.

23        However, as he testified on cross examination, he

1    indicated that he attempted to recover that fragment so it

2    could be tested.  Well, my question becomes, how do you try to

3    retrieve something that you didn't know was there during the

4    initial autopsy?  And again, let's go back to his autopsy

5    report.  You'll have that available to you.  There's no

6    reference to a gunshot wound to the neck region.  In his

7    testimony he tells us there is no entry wound that he could

8    identify.  Maybe that was the fragment that he thought he lost

9    when he was trying to recover it.  We don't know.  We don't

10   know if his x-rays were taken before or after he attempted the

11   retrieval of that fragment.  He didn't testify to it.  We

12   can't speculate to when those x-rays were taken.  But what we

13   do know is what he initially concluded was a bullet fragment

14   was not.

15          Linda Eveleth.  She came in and she testified that

16   she tested the DNA on the firearm.  And on the majority of

17   this testing she was unable to reach any conclusion as to who

18   handled that firearm.  Am I going to get up here and tell the

19   Ladies and Gentlemen of this Jury that Austin Burke never

20   handled that firearm?  Absolutely not.  Absolutely not.  We

21   have pictures.  I'm not going to get up here and tell you that

22   those pictures are self-imposed or they're lies.  They're not.

23   He had handled that firearm in the past.  When was the last

1    time he handled it?  What witness came in here and told you

2    that he handled it or had it on June 12th of 2017?  Not one.

3    No one told us that they saw Austin Burke with a firearm on

4    June 12th of 2017.  Or June 11th.  Because depending on which

5    witness you believe, Austin may or may not have been at Rickey

6    Roupe's house on June 11th of 2017 hanging out with those

7    kids.

8           But not one of them told us Austin Burke had a

9    firearm.  Now we did have some witnesses that on June 12th

10   said that they woke up in the morning and Austin was still

11   there at Rickey Roupe's grandmother's house as they were

12   leaving.  And that Rickey -- or Austin woke up somewhere

13   around 9:00 a.m. and he left.  Again, it was questioned.  "Did

14   you see a firearm on him that day?"  "No."  No one sees this

15   firearm on him.  Not one person.  Not one witness came in here

16   and said the day that they're accusing my client of committing

17   a homicide that Austin Burke had a firearm.  Well, they said,

18   "Well, he carried it in a bag.  We wouldn't know."  Well,

19   Ladies and Gentlemen, Detective Greaver recovered that bag.

20   He testified to it.  Was there a firearm in that bag when he

21   recovered it?  No.  Was there bullets in that bag when he

22   recovered it?  No.  Were there clothing contained within that

23   bag?  There were.  Did any of them have gunshot residue or

1   link anything to the crime?  No.  They want you to believe the

2   words of these witnesses that came up on this stand and said,

3   "Austin Burke told me that he committed this crime."  But

4   let's think about how that went down.  None of these witnesses

5   came forward until the news hit -- the media took hold of

6   these claims and began running these stories.  Missing person

7   reports came out.  People were in contact with family members

8   of Brandon Sample's family.  Of course the Sample family is

9   going to do whatever it takes to find where their son is.

10  They're going to publish this stuff all over the world.  Put

11  it on Facebook.  And what do these witnesses tell us?  Austin

12  Burke was making mention and then they saw it on Facebook and

13  put two and two together and that's how they reached these

14  conclusions.  But, again, it wasn't -- it wasn't accurate

15  stories.  They said Austin Burke came back and he was covered

16  in blood.  Where are these clothes?  Where are these clothes

17  covered in blood?

18          "Austin Burke came back and he told us he set the

19  body on fire.  He set the kid's head on fire."  We asked

20  Dr. Germaniuk when he investigated this and did the autopsy,

21  "Was there any burning on this body?  Was his clothes burned?"

22  "No."  It's not until after the body is discovered and after

23  the news media reports that Brandon Sample has been found and

1   where he's been located that all of a sudden these other

2   individuals start coming forward.

3          We heard testimony about the report that was made by

4   Hayle and Jessica Simms to the Niles Police Department on

5   June 14th at approximately 2 a.m.  Did they go in and say,

6   "Austin Burke told us that he killed Brandon Sample"?  No.

7   That's not the evidence.  They said he had a firearm at Pamela

8   Roupe's house and there was indication that he was holding

9   Brandon hostage for a drug debt.

10         And I asked Detective Greaver, "Given the condition

11  of that body that you found on June 14th, was it possible that

12  it would be in such a decayed state in that short period of

13  time?  And he said, "Well, I'm not an expert, but in my

14  experience, no."  They didn't go in and say, "Austin Burke

15  told us that he killed Brandon Sample."  And the Niles Police

16  Department, when they followed up on the lead that was given

17  by Jessica Simms and Hayle Roupe, what did we learn?

18  Conveniently, Austin wasn't there.  They stated -- they

19  immediately reported to the Niles Police Station.  As soon as

20  they left.  Austin Burke is not there.

21         We also had JoAnn Gibb.  She came in.  She did the

22  extraction report of Austin Burke's telephone.  And, yes, it

23  did show that there was some communication between Austin

1    Burke and Brandon Sample on June 12th -- or June 11th and into

2    June 12th of 2017.  Did Austin Burke deny that?  No.  He told

3    the detectives, "Brandon Sample picked me up at 7:30 p.m. as I

4    was walking home from Willow Lake."  Now let's think about

5    that.  Detective Greaver himself said he looked -- he did

6    somewhat of an analysis of Austin Burke's cell phone records.

7    And he learned and noted that at one point in time, at a time

8    that Austin said he was at Willow Lake, he was at Willow Lake.

9         I asked Detective Greaver, "Is it reasonable to

10   believe that Austin Burke lived close enough that he would

11   walk home from Willow Lake?"  He said, "Yes, it's within a

12   couple miles."

13        Let's look at the text message that was exchanged and

14   sent by Brandon Sample at 10:00 p.m. on the night in question.

15   What does he say?  "I'm with J White."  Why would he tell

16   Austin Burke "I'm with J White" if Austin Burke didn't know

17   who J White is?  Why wouldn't he say, "I'm with a friend at a

18   chick's house"?  Why would he give a name?

19        And what else does he say?  "Do you still want to

20   link up?"  Now, again, as we confirmed in the phone records,

21   the only prior conversation that is seen in those phone

22   records was a two-second telephone call at 7:30 p.m. on

23   June 11th.  Isn't it funny that that phone call, that two

977

1    second phone call which everybody that testified confirmed,

2    you can't have a conversation on a telephone for two seconds.

3    Everyone that testified said that.  Comes up two-second phone

4    call at the same time that Austin Burke says, "Brandon Sample

5    picked me up and brought me home."  Ladies and Gentlemen, I

6    would ask you, if Austin Burke did this and he wanted to

7    conceal the killing of Brandon Sample as they are suggesting

8    by his deleting of text messages, why would he have ever told

9    the detectives he was with Brandon Sample?  He had no reason

10   to.  He could have said, "I haven't seen that kid since I was

11   in DYS."  He didn't.  He came forward, said, "I was with

12   Brandon Sample at 7:30."

13          Here's the other thing.  The phone records.  See, the

14   prosecution only presented phone records from midnight on the

15   12th to approximately 9:00 a.m. the next day.  Why didn't they

16   look at the records prior to that when Austin was saying,

17   "Hey, I was home," to confirm, in fact, Austin Burke was in

18   Bristolville.  At the very times that Austin Burke said he was

19   in Bristolville.

20          Did they track the days before or days after on

21   Brandon Sample -- or on Austin Burke's phone to see if that

22   was a regular routine of Austin, of where he was on June 12th?

23   They didn't.

1          Another important thing about these phone records

2     when you look at them.  And Mr. Moskal confirms this.  Not one

3     of those cell data logs shows Austin Taylor Burke in the area

4     of the body at any point in time.  It shows him in the

5     location of his house.  Now, the prosecution on examination,

6     they just wanted to say, "Well, maybe they just didn't ping

7     the phone at that time."  So we have this long track of

8     records and it just so happens that the times that Austin

9     Burke would have been in the location where Brandon Sample's

10    body was recovered, his phone didn't ping.  But all the other

11    times it did.  And it showed in the area of his home.  I asked

12    Mr. Moskal.  If he made a call, a call from his house, would

13    those records be consistent with that?  He said yes.

14          The investigation into this case.  Ladies and

15    Gentlemen, this case was the first time I had the opportunity

16    to meet Detective Greaver.  And Detective Greaver has been an

17    officer in this community for 18 years.  I am not going to get

18    up here and tell you that Detective Greaver is incompetent in

19    his job.  Absolutely not.  I don't believe that Detective

20    Greaver would have given us misinformation as he testified.

21          But what I believe in this case is that Detective

22    Greaver, because of his experience with Austin Burke, as he

23    testified he knew Austin Burke from his past, once he learned

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   that Austin Burke was identified as a possible person who was

2   last seen with Brandon Sample, he became the sole target.  And

3   what he did after that was instead of conducting an

4   investigation to gather evidence, he began collecting evidence

5   to support a conclusion.  A conclusion that Austin Burke did

6   it.  And anything that was inconsistent with that or anything

7   that would disprove that was ignored.  Was it intentional, or

8   was it just below his normal standards?  I can't answer that.

9   But we saw it.  We saw it.  We listened to every single

10  witness that came up here that is the one that provided

11  Detective Greaver with statements.  Would you say they were

12  consistent?  Your memories will serve to make the judgment in

13  this case.  Not Mr. Becker's.  And not mine.  But I would

14  suggest to you that as you go back and recall the testimony of

15  each one of these kids that came in here, they are completely

16  inconsistent with one another.  They completely show different

17  people who were at different places at different times.  This

18  isn't did he come at 8:30 or 9:00 and did he stay for an hour

19  or an hour and a half?  No.  This is, who was present when he

20  was there?  Was Brandon Sample there?  We heard Jessica Simms

21  saying that Austin Burke was planning to rob him on June 11th

22  in the morning.  Nobody else came in and said that.  If you

23  had believed Jessica Simms or Rickey Roupe who said that at

1  some point in the earlier evening before he supposedly came

2  back, Brandon Sample accompanied Austin Burke to Rickey

3  Roupe's house, then you'd have to disbelieve the testimony of

4  Josh White, you'd have to disbelieve the information that

5  Detective Greaver gathered to confirm that Brandon Sample did,

6  in fact, go swimming until 11:00 in Warren, Pennsylvania -- or

7  in Warren, Ohio.

8          During this investigation, we also had confirmation,

9  as Detective Greaver testified to, that a friend of Austin

10  confirmed that he was picked -- he picked up Austin at his

11  home at 9:30 p.m. and they went to Cody's house, Cody Snyder.

12  Again, it was very simple for Detective Greaver to map out the

13  phone logs of Austin Burke and see what time he was actually

14  there till.  What you will see is at midnight, 1, 2:00 -- up

15  until 2:00 in the morning he was in Bristolville.

16          We go back and we look at, again, the forensic

17  evidence not only from the gym bag but there was also a

18  backpack that Detective Greaver recovered from Austin's

19  girlfriend's mom.  They tested that.  Again, no evidence that

20  Austin Burke was involved in a crime.  They recovered no

21  forensic evidence from that bag.

22          Nothing that links Austin Burke to having any contact

23  with Brandon Sample at any time after the phone call at 1:18.


OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    And, again, he admitted to the phone call at 1:18 a.m.  He

2    didn't delete that.  He didn't delete the contact of Brandon

3    Sample.  So the prosecution is telling you he's trying to hide

4    his involvement with Brandon Sample because he was deleting

5    messages at 10:00 p.m.  However, he keeps the phone call at

6    1:18 and he keeps the contact in his phone.  He doesn't try to

7    conceal that.  So if he's trying to conceal his contact with

8    Brandon Sample, why would he not delete the contact itself?

9         We heard testimony from these kids that come in that

10   say Austin Burke drives to Bristolville, kills Brandon Sample,

11   drives back to Niles and dumps the car off on a bike path

12   because he ran out of gas.  Did Detective Greaver check to see

13   if the car was out of gas?  We heard no testimony about that.

14        Also, the needle in the haystack.  We're up in

15   Bristolville.  Hatchet Man Road.  Let's think back to the

16   first time that we hear about checking the woods for Brandon

17   Sample's body.  Where did that come from?  Did that come from

18   one of these witnesses, Hayle Roupe or Jessica Simms or Rickey

19   Roupe or Deidre Keener?  No.  The first contact that Detective

20   Greaver gets to check the woods by grandma's house was

21   information he received that was passed along by Josh White.

22   Where did grandma live?  Bristolville.  Does Detective Greaver

23   do any follow up on that?  Does he go and talk to Josh White

982

1    and say, "Why would you tell us to check the woods?"  At this
2    point, it's a missing person.  It's not a homicide.  Why is he
3    telling him to check the woods?  Maybe he knew that he was in
4    the woods by grandma's house.  Hatchet Man Road, only a few
5    miles from where grandma lives.  We went -- we went and viewed
6    Hatchet Man Road.  We went through Bristolville.  Bristolville
7    is basically the abutting town of Hatchet Man Road.  Just a
8    few miles from grandma's house.
9         Let's also listen to the testimony of Josh White.
10   Josh White indicates to us he had no idea who Austin Burke
11   was.  Never met him.  Never picked him up.  Never had any
12   contact with him.  Yet when Detective Greaver interviews
13   Austin Burke, Austin Burke is able to give a description of
14   the kid.  Says his name is Josh or Tyler or something like
15   that, that he lived in Akron, and that he had a beard.  How
16   would Austin Burke know this information about Josh White
17   unless he met Josh White?  And, again, we go back to that text
18   message that Brandon Sample sent.  Why would Brandon tell
19   Austin, "I'm bringing J White home."  Why would he refer to
20   his name?  He could have just said "a friend."
21        We also hear through Detective Greaver that during
22   his interview Josh White offers that, "Hey, there was some
23   muddy clothing, some muddy shorts that were left in the back

1   seat of Brandon Sample's car."  Now, those shorts were never

2   recovered, but why would Josh White offer that information?

3   He wasn't questioned about it.  Why would he offer it?  What

4   we come to learn is, and we saw it on the video, or on the

5   pictures, and it was confirmed through the witness, the area

6   where Brandon Sample's body was found was bone dry.  The bike

7   trail where Brandon's car was found was bone dry.  But they

8   identified mud on the tire and the wheel well.  Did they

9   compare the mud on the pants to the car?  No.  Because they

10  never even attempted to get the pants from Josh White.

11          Why did Josh White change his appearance when he went

12  in for the interview?  He had a beard.  Went in shaven.  Why?

13  Is this somebody that's trying to conceal themselves?  Is this

14  somebody that's trying to make Austin look like he's lying

15  when he says he met him, just in case he gave a description of

16  him?

17          None of this was followed up on.  We are talking

18  about an aggravated murder case.  And none of this was

19  followed up on.  I suggest to you, these are things that we

20  have to demand to not send an innocent man to jail.  You need

21  to follow up on this type of evidence.  This is what -- this

22  is what an investigation is.  You receive information and you

23  see if it holds water.  None of that was done.  It was discard

984

1   anything that would show that Austin Burke may have been

2   telling the truth and only look at the information that is

3   showing that he did this.  Whether it's consistent or

4   inconsistent with the evidence that they recovered or with

5   what other witnesses said to them.  We have to demand more.

6          Cell phone records.  The records show that a request

7   was made for Austin Burke's records on July 1st.  Very early

8   on in this investigation.  They were able to get Austin

9   Burke's records so they can track him through this GPS data

10  that we saw on those pie charts.  Did they get Brandon

11  Sample's?  They requested it.  In December.  Six months -- or

12  seven months -- because he said December, January timeframe.

13  Six or seven months after they find the body, they file the

14  charges, and their investigation has been going on.  I asked

15  Detective Greaver, "Did you follow up to see where they were?"

16  "No, it didn't come through my e-mail."  "Did you call the

17  company?"  "No, I would probably have been on an automated

18  system for ten minutes."  Ten minutes?  Ten minutes?  We had

19  an investigation going on for seven months.  He can't sit on

20  the phone for ten minute to see if Brandon Sample's phone

21  records would correspond and correlate with where Austin Burke

22  was at that time?  Because I tell you, Ladies and Gentlemen,

23  that that is a missing key to this case.  If we had Brandon

1    Sample's phone records, we could compare them to Austin

2    Burke's and see if they were ever together.  We could see if

3    Austin Burke -- or Brandon Sample ever left Trumbull County

4    and made it to Summit County and to Akron.  We could see if he

5    ever left Summit County.  We don't know.

6           Also, we get the generic phone records from data.  He

7    sends Detective Greaver over these generic phone records that

8    just show the listing of the numbers and some text messages

9    that had gone out.

10          There were two telephone calls made after the

11   telephone call by Austin Burke.  One was at 2:14 a.m., and one

12   was at 2:15 a.m.  And the records will show you that they were

13   made to a telephone number that is identified as Akron.

14   Ladies and Gentlemen, we didn't hear any testimony that Austin

15   Burke had any connections to Akron, Ohio.  Did we hear of any

16   other person that had contact in Akron, Ohio?  Josh White.

17   Josh White had a contact -- he lived in Akron, Ohio.  This

18   information was made available to Detective Greaver.  And it

19   wasn't followed up on.  Call the number.  How long does it

20   take to make a phone call to say, "Hey, this number came up in

21   an investigation.  Can you please identify?  Do you mind

22   coming in to talk with us?  We'd like to know what your

23   relationship is with certain individuals."  A minute phone

1    call.  Never made.  Is this the type of investigation that we

2    want to use to convict somebody of aggravated murder?

3         When we -- when Detective Greaver interviewed Josh

4    White, Josh White's family was there.  His mom, his dad, and

5    his brother.  And what we knew through the interview of Josh

6    White, as confirmed by Detective Greaver, is that he would

7    have come in contact with each one of these individuals that

8    night.  Did he interview any of them?  Not one.  Not one

9    person did he call in.  They're there.  Bring them in to the

10   interview room.  "What time did Josh call you?  What time did

11   Josh arrive at the house?  What time did you unlock the door

12   for Josh?"  They're there.  They don't even attempt.  You know

13   why?  Because it would not be any evidence against Austin

14   Burke.  It was irrelevant to them at that point.

15        Yes, there was evidence missing.  The car keys, the

16   wallet, and the cell phone.  There was one witness that was

17   able to testify to everything in the wallet.  Who was that?

18   Josh White.  Maybe it was just some innocent ability to know

19   what was in your buddy's wallet because he lost it a few weeks

20   prior and it was dropped off at some gas station.  Maybe it

21   wasn't.  We have absolute confirmation that Josh White was

22   with Brandon Sample on the date he disappears.  That's not

23   cause to want to search his house, to demand his phone

1    records, to ping his phone?  They didn't even make an

2    application for it.  Why not?  Because it's not evidence that

3    would put our client and convict our client.  So it's

4    irrelevant.  Move on.  Is this the evidence that we're going

5    to allow to convict a man of first degree -- or aggravated

6    murder?

7          Ladies and Gentlemen, we heard what we often refer to

8    as the jailhouse snitch, Tim Cook, come in.  And he says, "I

9    heard Austin Burke admit to this."  Is he reliable?  What did

10   he tell us on the stand?  He was in jail.  He was going

11   through drug withdrawals and he was looking for a way to get

12   out.  And when the state said they weren't gonna help him, he

13   wasn't coming back in.  He was forced here.  That was his

14   testimony.  He was forced to be here.  Is that somebody that

15   is honest, wanting to come forward with reliable information?

16   I say to you he's not.  He is not somebody to be relied upon.

17   He is not somebody that confirms the state's case.  He is not

18   somebody that gets them beyond a reasonable doubt.  Is that

19   somebody you would rely upon in the most important of your

20   affairs?

21         Few more things about the murder investigation.  We

22   did learn real early on that in the interview with Josh White

23   he had bruising on his hands.  No pictures taken.  Cut on his

1    finger that he said happened 30 days prior.  That's a pretty

2    long-lasting cut.  No pictures.  Did you go to the employer

3    and say, "Hey, Josh show up for work on the 12th?  What time

4    did he show up?  Was he acting different?"  All simple things

5    that could be done.  Very simple things.  Phone calls.

6    Probably wouldn't even take ten minutes.  None of this was

7    done.

8         On June 20th of 2017, Austin Burke was accused of

9    committing a robbery of the Pizza Joe's in Cortland.  The

10   testimony that came in was that Austin was across the street

11   from the Pizza Joe's that was robbed hanging out in an

12   apartment with several other people.  These several other

13   people that came in and testified all lied.  They all said

14   that they knew Austin Burke as Nate.  But there were -- there

15   are messages that you can see from Facebook that shows that

16   they were exchanging back and forth.  Melanie Engle, Donavon,

17   the Borawiec kid.  They were all talking back and forth.  They

18   knew exactly who Austin Burke was.

19        And what else do we learn from this robbery

20   investigation?  Yes, the robbery lasted a very short period of

21   time.  30 seconds.  If that.  And, yes, it's a heart-racing

22   event if you're a cashier.  Somebody comes in waving a gun

23   around, flashing it in front of you.  But at the same time,

989

there were descriptions provided by each one of these witnesses. And they testified what they recalled. Not one of them said, "I saw tattoos on his face." Okay, his face was partially covered. Not one of them said, "I saw a tattoo on his hand." Ladies and Gentlemen, it's very obvious, the tattoos that Mr. Burke has on his hands. They're very obvious. Very obvious. They say a bag was wrapped around them. Well, was there tattoos on knuckles? Did they ask about that?

The one witness that did come forward -- and I suggest to you was honest -- was Stacie Cassidy. Stacie Cassidy is the one witness that did not lie to her -- about not having prior knowledge of Austin Burke. We don't see any communications between Stacie and Austin prior to that day. And what was her testimony? They went outside to look for cats. And the remainder of the time Austin Burke was at the apartment.

Now, we heard from Melanie Engle that said they went outside to look for the cats while Nick sat up in the apartment. Nick leaves when they return from getting the cats. Or from finding the one cat. So Stacie would confirm the only time that she didn't really know where Austin was was when they were looking for the cats. And through Melanie's

1 own testimony, that was before the robbery of the Pizza Joe's.

2   What else do we know about the robbery of the Pizza

3 Joe's?  At the time that it occurred, we know there were two

4 people not at that residence at that time.  Nick Goett and

5 Melanie.  Melanie testified that she gets a text message from

6 her sister at 9:58 that Nick was at the Burger King looking

7 like a crack head.  And we questioned her.  "How far was

8 Burger King?"  Minute drive.  She said, "I got there about

9 10:04."  Now, of course she explained he sat there and ate and

10 then, "I brought -- I brought Nick home."  It's a minute drive

11 away from the Pizza Joe's.

12   And what do we hear?  We heard about a dog that was

13 brought in that began tracking the scent of the perpetrator.

14 And it goes up past the house in a direction and then it

15 starts coming south and the scent is lost.  Consistent with

16 somebody maybe getting in a car?

17   Now, we heard from Mr. Marx.  And they say, the

18 prosecution says, "Oh, he told us exactly how it was.  You saw

19 it on the video.  Runs right past him.  Within 20 feet."  Is

20 that what Mr. Marx testified to?  No.  Mr. Marx told us that

21 this man ran right up on him, stopped, had no mask on, had no

22 sweatshirt on, was wearing a red shirt and took off and was

23 wearing blue jeans.  And he did not notify the police of the

1  tattoos on his face because it was readily apparent.  That

2  doesn't even make sense, I tell you.  Wouldn't that be the

3  first description that you provide, is the appearance of the

4  man's face?  The distinguishing characteristic that most

5  people do not have.  Most people do not have facial tattoos.

6  You can immediately identify who he is by identifying the

7  facial tattoos.

8          Missing mask.  Missing money.  $250.  So we saw how

9  they found the money.  Remember it was in the hair dye box and

10  it was folded and placed in a box that was then placed in a

11  garbage bag?  Now, today, it's the state's suggestion to you

12  that maybe he hid $240 elsewhere.  So he removed a portion of

13  the money and put it elsewhere and then folded up $540 and put

14  it in there?  And isn't it convenient that a bunch of police

15  officers arrive at that apartment on the night of the robbery

16  and perform a complete search of that residence and at that

17  point in time no gun is found and no cash is found?  It's not

18  found until the next day when Melanie and her parents are

19  cleaning out the apartment.  Did Austin have access to that

20  apartment the next day?  No.  Melanie did.  And it just so

21  happens that the bag that she takes out of her bathroom and

22  brings into the kitchen that day had the box with the cash in

23  it.  And it just so happens that they're cleaning off plants

1   that she does for a hobby and a bullet packet -- or a package

2   of bullets and a firearm is uncovered.

3        Ladies and Gentlemen, the firearm does go back to the

4   ownership of Jamie Sell who is Brandon -- or excuse me, who is

5   Austin Burke's mother.  Am I going to sit here and tell you

6   there was no way that Austin Burke handled that firearm at any

7   point in that day?  I'm not.  Am I going to tell you that it

8   is reasonable to believe that somebody else handled that

9   firearm that day?  Absolutely.  And you know why I can tell

10  you that?  Because we have confirmation from the lab.  Another

11  male individual's prints were on the clip.  Was it that

12  individual that refused to come in to give a statement when he

13  was contacted by the police?  Because if we remember the

14  testimony, Mr. Goett refused to come in and provide any

15  statement to the police.  The only one that refused to go and

16  look for the cats and left when they returned.  Is it possible

17  that a gun was sitting upstairs and Mr. Goett leaves?  Does

18  anybody ask the other witnesses what Mr. Goett was wearing

19  when he left?  Do we get the Burger King video that shows how

20  long they sat there?  Once again, no.  All of this stuff

21  readily accessible to the investigating police officers, and

22  none of it was done.

23        The tennis shoes.  We have a tennis shoe that did not

1   have a shoelace in it.  But we very clearly see the
2   perpetrator of that robbery running.  And, yes, I've run in
3   flip flops, just as Mr. Becker indicated if he had to run in
4   flip flops he could.  Is it a different style of running?
5   Would there be a unique characteristic if I'm running with a
6   shoe that does not have a shoelace in it?  Would it be
7   flopping off my foot?  Where is the shoelace?  Where is the
8   mask?  Where is the sweatshirt?
9        Ladies and Gentlemen, when you take all of this
10   evidence and you look at it with the threshold that you are
11   required to look at it with, whether it would be believable
12   when you're making the most important decisions of your own
13   affairs, when you look at the credibility of these witnesses
14   and weigh their credibility just as you would in your own
15   affairs when you're talking to another person about an
16   important affair and determining whether that person is
17   believable or not, are these the people that you are going to
18   believe?  Are these the people that remove my client's
19   presumption of innocence?  I tell you, after you fairly weigh
20   the evidence that has been presented in this case, there is
21   only one verdict that can come back on the aggravated murder
22   and the aggravated robbery counts.  And that's not guilty.
23       Thank you.

994

1          THE COURT:  Mr. Becker.

2          MR. BECKER:  Thank you, Your Honor.

3              <u>FINAL CLOSING ARGUMENT</u>

4          MR. BECKER:  I'll be very brief.

5      Ladies and Gentlemen, this is the last chance I have

6  to speak to you.  And I would like to thank each and every you

7  one of you very much for your time, patience and service.  I

8  will try not to be boring, but I think there are some points I

9  need to make.

10      First of all, none of us are perfect.  I'm not

11  perfect.  If I did anything that misrepresented the state, the

12  witnesses, this detective, in this investigation at my office,

13  please don't hold that against them and the work that they

14  did.

15      Well, let's talk about the robbery, first of all, in

16  Cortland.  First of all, is there ever an answer why this guy

17  lies to the police in Cortland and doesn't say, "I'm Austin

18  Burke, here's my date of birth?"  Using your reason and common

19  sense, the reason he's lying is because he's wanted for

20  aggravated murder.  They're looking for him.  He's been

21  questioned.  There's no doubt why he lies to the police.

22      And if Melanie Engle and her friend Nick Goat --

23  Goett -- first of all, is he a time traveler?  You have in

these exhibits a picture of her cell phone from her sister
Makayla saying, "Why is Nick here looking like a crack
addict?" at 9:58 p.m.  Well, the robbery, according to the
police -- and I know the time stamp is off about an hour --
didn't occur until after 10:00 p.m.  So how does Nick Goett go
from Burger King back to the Pizza Joe's and then back to
Vienna with his girlfriend or his friend there, Melanie Engle?
And how does the money end up back in the apartment?  And why
would Melanie Engle, if she was anyhow involved in it or
anyone else involved in it, call the police and say, "We found
some money and we found a gun here"?  She wouldn't tell the
police that.

     Let's talk about the robbery and the possibility of
the money being -- some of the money being in another bag, one
of those bags that Melanie's mother said she just started
throwing away.  Well, what do we know was in three different
places?  We know the gun was in one flower pot.  We know the
bag of bullets was in another flower pot.  And we know $545
was in a hair dye box in the trash.  Using your reason and
common sense, is it reasonable to think that there might have
been 200 and some dollars in another bag or another location
that was never found?  Maybe with the mask.  Maybe with the
hoodie that were never found.  Absolutely.  And I like the

1   poo-poo'ing of the, "Well, yeah, his mom's registered gun was

2   there.  It means nothing."  This case ought to be entitled

3   "Poor poor Austin Burke."  He just can't catch a break.

4   Everyone is out to get poor Austin Burke.

5          Now, let's talk about the murder.  Who cares who was

6   swimming at Willow Lake at 3:00 on Sunday, the 11th of June?

7   What difference does that make?  Who cares?  He says, "Well,

8   Austin told you he had contact."  Everybody knows he had

9   contact.  They said they knew each other.  They knew each

10  other from DYS.  But he didn't delete the phone call.  No.  We

11  don't know what was said on the phone call.  We don't know if

12  anything was said.  What did he delete?  He deleted the

13  evidence from his phone that said he was going to meet Brandon

14  Sample after 12:15 and after he dropped off Josh White.  Now

15  it's been implied and infringed -- or I'm sorry, implied and

16  assumed and sort of hinted around, oh, Josh White, look out

17  for that Josh White.  He said, "Sometimes I wear a beard.

18  Sometimes I don't wear a beard.  I shave it sometimes."  Using

19  your reason and common sense, what witness, what piece of

20  evidence links Josh White to any of this?  What link does he

21  have, connection.  Who did he tell, "I killed Brandon Sample

22  with a gun on Hatchet Man Road"?  Who did he tell that to?

23  What witness?

997

1       They talk about his friend Cody.  Well, Cody said he
2   was there at 9:30 that night up in Bristolville.  Okay.  So
3   what?  Why do I care where he was at at 9:30?  We know for a
4   fact that Josh and Brandon were swimming at Billie Holness's
5   house.  We believe he was taking him back to Akron.  What
6   difference does that make?
7       And what about the car?  "Well, they didn't do this.
8   They didn't do that."  Well, this defendant admits to being in
9   the car.  Why do you think he tells this investigator, "Oh,
10  yeah, I was in the car with him at 7:45."  Well, let's think
11  about that.  Detective Greaver didn't talk to him until
12  June 14th.  At that point, the car had been found on the bike
13  path in Niles.  It was found literally that morning at 7:30.
14  So Detective Greaver, if you listen to one of his statements
15  on the recorded statement, says, "There's some things in that
16  car, Brandon."  "Oh, well, yeah, I was in the car.  You'll
17  probably find my" -- of course implying, "You'll find my
18  fingerprints and my DNA.  Of course I was in the car.  I went
19  on a ride with Josh that day."  Of course.  So there's no need
20  to search the car for fingerprints and DNA.
21      And what about the last two phone calls made?  So
22  what?  He called somebody in Akron.  Maybe he called -- who
23  knows.  It doesn't matter.

1             They want you to believe -- to believe this

2    defendant's story, you have to believe that someone who told

3    six people about killing Brandon Sample and shooting Brandon

4    Sample in the head, and leaving his body and doing it on

5    Hatchet Man Road, a place where he had taken one of the

6    witnesses, actually two of the witness, including his

7    girlfriend, who had a .22-caliber handgun which he took

8    pictures of and his girlfriend made videos of with him and for

9    which he was arrested with in the same location, and for which

10   he had conversation -- and was registered to his mother.  And

11   when his mother asked, "Is the gun registered," which she

12   registered when this kid was 11 years old and he says, "Oh no,

13   I don't think so," and he says, "Well, you're saying too much

14   on the phone, mom," and to believe a kid who told this

15   detective, "I was home all night" and then finds deleted phone

16   records and phone pings showing that he wasn't home all night.

17   And in fact at 2:08 a.m. in Niles, Ohio where he texted

18   Brittani Merten, where witnesses say he was, where witnesses

19   said they saw him with Brandon White, where his phone then

20   left and pinged all the way to Bristolville.  And they want to

21   made a big deal about, "Well, it didn't ping."  Well, look at

22   those records.  Sometimes that phone didn't ping for an hour

23   or two, three or four hours at some points.  And is it

1    reasonable to assume that -- if what he says is true -- and I

2    believe every word because this Detective relied upon it and

3    found Brandon Sample's needled body in that haystack of

4    Trumbull County.  And I'll tell you.  Does it make any sense

5    to say, "Hey, get on your knees.  Hey, I'm out here on Hatchet

6    Man Road.  I'm gonna blow this guy's head off.  Okay.  I'll

7    talk to you later."  Really?  Does that make any reasonable

8    common sense to you?

9           And to believe all of that, to show his phone

10   records, they want you to disbelieve every bit of evidence

11   that says he did it.  It's just poor Austin.  Everybody is out

12   to get him.  Oh, the police didn't do their job.  Warren

13   Police didn't do their job.  The coroner didn't do his job.

14   Cortland Police didn't do their job.  We didn't do our job.

15   Poor, poor Austin.

16          Ladies and Gentlemen, all you need in this case is

17   your reason and your common sense.

18          The DNA on the magazine.  I've got firearms at home.

19   I guarantee you, my brother, my father's DNA, my family's DNA

20   is on there.  There's probably strangers' DNA on some of those

21   magazines.

22          And the BCI expert in DNA, Linda Eveleth, just said

23   there wasn't enough.  Sometimes there is not enough.  There's

1000

1    insufficient.  And you can fire that gun.  You can carry that

2    gun around for months and never touch the magazine.

3         Ladies and Gentlemen, I know it's been a long

4    morning.  You have been extremely patient.  Extremely

5    attentive.  You have been a wonderful jury.  I thank you for

6    your time and service.

7         I'm going to sit down now, but I want you to think of

8    this one thought.  Use your reason and common sense.  And if

9    you find that this defendant didn't commit any of these

10   crimes, then by all means, acquit him and give him back one of

11   his baddest bitches.  But if you do, and I submit to you that

12   there is overwhelming evidence of his guilt on each and every

13   count, then I ask you to do what you promised and what you

14   took an oath to do and to go back into that jury room and

15   return verdicts on all counts and specifications of guilty.

16        Thank you very much.

17             THE COURT:  All right.  Ladies and

18   Gentlemen, the balance of the case now would be the charge of

19   the Court.  It's somewhat lengthy.  In order to avoid any

20   incidental contact while we have our break here, I'm going to

21   ask everyone to remain seated here now until the jury leaves.

22   We'll take 15 minutes of a break.  When the jury leaves -- if

23   the deputies will keep everyone in the courtroom until the

1  jury makes their way down to the second floor.  And then

2  everyone else can take their break at this point in time.

3          Do not this case among yourselves, nor with anyone

4  else.  Do not form or express an opinion.

5                          (Whereupon, a recess was had commencing at

6  10:59 a.m. and concluding at 11:16 a.m.)

7

8                                      *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1    JURY INSTRUCTIONS

2            BY THE COURT:  Members of the jury:  You

3    have heard the evidence and the arguments of counsel.  The

4    court and the jury have separate functions.  You decide the

5    disputed facts, and the Court provides the instructions of

6    law.  It is your sworn duty to accept these instructions and

7    apply the law as it is given to you.  You are not permitted to

8    change the law, nor apply your own conception of what you

9    think the law should be.  Similarly, the Court may not

10    interfere in any way with your function as jurors.

11            Now, a criminal case begins with the filing of an

12    indictment.  The indictment informs the defendant that he has

13    been charged with an offense.  The fact that it was filed may

14    not be considered for any other purpose.  The plea of not

15    guilty is a denial of the charges and puts at issue all of the

16    essential elements of each charge.

17            Now, the defendant is presumed innocent unless his

18    guilt is established beyond a reasonable doubt.  The defendant

19    must be acquitted of an offense unless the state produces

20    evidence which convinces you beyond a reasonable doubt of

21    every essential element of the offense charged in the

22    indictment.

23            Now, reasonable doubt is present when, after you have

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  carefully considered and compared all of the evidence, you

2  cannot say you are firmly convinced of the truth of the

3  charge.  Reasonable doubt is a doubt based on reason and

4  common sense.  Reasonable doubt is not mere possible doubt,

5  because everything relating to human affairs or depending on

6  moral evidence is open to some possible or imaginary doubt.

7  Proof beyond a reasonable doubt is proof of such character

8  that an ordinary person would be willing to rely and act upon

9  it in the most important of his or her own affairs.

10          Now, you must determine the issues in this case based

11  on the evidence.  Evidence is all of the testimony received

12  from the witnesses, the exhibits that are admitted into

13  trial -- or admitted during the trial, and facts agreed to by

14  counsel.

15          Now, evidence may be direct or circumstantial or

16  both.  Direct evidence is the testimony given by a witness who

17  has seen or heard the facts to which or she testifies, and it

18  includes exhibits admitted during the trial.

19          Circumstantial evidence is proof of facts or

20  circumstances by direct evidence from which you may reasonably

21  infer other related or connected facts which naturally and

22  logically follow according to the common experience of

23  mankind.

1004

1       Now, to infer, or to make an inference, is to reach a

2    reasonable conclusion or deduction which you may but are not

3    required to make from other facts which you find have been

4    established by direct evidence.  Whether an inference is made

5    rests entirely with you.  Direct and circumstantial evidence

6    are of equal weight and probative value.

7       Now, the evidence does not include the indictment or

8    the opening statements or closing arguments of counsel.  The

9    opening statements and closing arguments of counsel are

10   designed to assist you.  They are not evidence.

11      Now, statements or answers that were stricken by the

12   Court or which you were instructed to disregard are not

13   evidence and must be treated as though you never heard them.

14   You must not speculate as to why the Court sustained an

15   objection to any question or what the answer to that question

16   might have been.  You must not draw any inference or speculate

17   upon the truth of any suggestion included in a question that

18   was not answered.

19      The things that you saw during the jury view are not

20   evidence, but they may help you to understand the evidence.

21   Now, the phone records, including subscriber information, call

22   and text detail, and the historical cell phone data from the

23   victim's phone and the defendant's cell phone shall be

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    admitted as business records and without the need for

2    authentication testimony from the actual phone companies and

3    keeper of records.

4         Now, you are the sole judges of the facts and the

5    credibility of the witnesses and the weight to give to the

6    evidence.  To weigh the evidence, you must consider the

7    credibility of the witnesses.  You will apply the tests of

8    truthfulness which you apply in your daily lives.  These tests

9    include the appearance of each witness on the stand; his or

10    her manner of testifying; the reasonableness of the testimony;

11    the opportunity he or she had to see, hear, or know the things

12    concerning which he or she testified; his or her accuracy of

13    memory; frankness or lack of it; intelligence, interest and

14    bias, if any; together with all the facts and circumstances

15    surrounding the testimony.  Applying these tests, you will

16    assign to the testimony of each witness such weight as you

17    deem proper.  You are not required to believe the testimony of

18    any witness simply because he or she is under oath.  You may

19    believe or disbelieve all or any part of the testimony of any

20    witness.  It is your province to determine what testimony is

21    worthy of belief and what testimony is not worthy of belief.

22         Now, it is not necessary that the defendant take the

23    witness stand or make a statement.  The defendant has a

constitutional right not to testify or make a statement. The

fact that the defendant did not testify or make a statement

must not be considered for any purpose.

Now evidence and testimony was received about the

commission of an aggravated robbery in Trumbull County Common

Pleas Court Juvenile Division which is a crime other than --

which is a crime other than the offenses with which the

defendant is charged in this trial. The defendant was --

evidence was received for a limited purpose. That was to

prove the element of having weapons while under a disability

in Counts 4 and 5. It was not received and you may not

consider it to prove the character of the defendant in order

to show that he acted in conformity or in accordance with that

character. If you find from the evidence that the -- if you

find that the evidence of the commission of an aggravated

robbery in Trumbull County Common Pleas Court Juvenile

Division is true and that the defendant committed it, you may

consider that evidence only for the purpose of deciding

whether it proves that the defendant had been convicted of an

offense involving a felony of violence.

Now, generally, a witness may not express an opinion.

However, one who follows a profession, such as the Bureau of

Criminal Investigation experts and the coroner in this case,

1 │ can and are allowed to express opinions because of their

2 │ education, knowledge, and experience that qualifies them to do

3 │ so.  This testimony is admitted to assist you in arriving at a

4 │ just verdict.  However, again, upon you alone rests the duty

5 │ of deciding what weight should be given to the testimony of

6 │ these experts.  In determining what weight to give to the

7 │ testimony of experts, you can accept all, part, or none of

8 │ their testimony.  You can consider all of the other factors

9 │ that I have mentioned in judging a witness's testimony and

10 │ also you can consider their education, their background in

11 │ general, and their familiarity with this case.

12 │        Now, the right of the Court to try the defendant

13 │ depends on proof that the offense was committed in Trumbull

14 │ County, Ohio.  This is called venue.  Venue is an essential

15 │ element of the offenses and the specifications charged in the

16 │ indictment and, as with the other elements, must be proven by

17 │ the state beyond a reasonable doubt.

18 │        Now, the defendant, Austin Taylor Burke, is on trial

19 │ in this case as a result of an indictment returned against him

20 │ charging Count 1, aggravated murder, with a firearm

21 │ specification; Count 2, aggravated robbery with a firearm

22 │ specification; Count 3, tampering with evidence; Count 4,

23 │ having weapons while under a disability; Count 5, having

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1  weapons while under a disability; and, Count 6, aggravated

2  robbery with a firearm specification.

3          Now, although the counts are numbered in

4  chronological order, I feel it would make more sense to

5  instruct you on the second count, aggravated robbery with a

6  firearm specification, before I instruct you on the aggravated

7  murder count as to Count 1, as some of the terms that I'm

8  going to define for you relative to the charges will also be

9  used in the Count 1, aggravated murder, instructions.

10          Before you can find the defendant guilty of Count 2,

11  aggravated robbery with a firearm specification, you must find

12  beyond a reasonable doubt that on or about June 12, 2017, and

13  in Trumbull County, Ohio, the defendant, Austin Taylor Burke,

14  in committing a theft offense as defined in 2913.01 of the

15  Ohio Revised Code, or while fleeing immediately after the

16  offense, had a deadly weapon on or about his person or under

17  his control and either displayed the weapon, or indicated he

18  possessed it, or used it.

19          I'll define some terms for you now.

20          Theft offense is defined as purposely depriving

21  Kenneth Brandon Hayes Sample of property, to-wit: Chevrolet

22  Malibu and/or cell phone, knowingly obtain or exert control

23  over the Chevrolet Malibu and/or cell phone without the

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1 consent of Kenneth Brandon Hayes Sample or any person
2 authorized to give consent.

3       Purpose to commit an offense -- a theft offense is an
4 essential element of the crime of aggravated robbery. A person
5 acts purposely when it is his specific intention to cause a
6 certain result.  It must be established in this case that at
7 the time in question there was present in the mind of the
8 defendant a specific intention to commit the theft offense.

9       Purpose is a decision of the mind to do an act with a
10 conscious objective of engaging in specific conduct.  To do an
11 act purposely is to do it intentionally and not accidentally.
12 Purpose and intent mean the same thing.  The purpose with
13 which a person does an act is known only to himself, unless he
14 expresses it to others or indicates it by his conduct.  The
15 purpose with which a person does an act is determined from the
16 manner in which it is done, the means and the weapon used, and
17 all the other facts and circumstances in evidence.

18       Proof of motive is not required.  The presence or
19 absence of motive is one of the circumstances bearing upon
20 purpose.  Whether an act is a crime -- where an act is a
21 crime, a good motive or purpose is not a defense.

22       A person acts knowingly, regardless of his purpose,
23 when he is aware that his conduct will probably cause a

certain result.  A person has knowledge of circumstances when he is aware that such circumstances probably exist.

Since you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence.  You will determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that he would be committing the offense.

Now, property.  It is a question of fact for your determination whether or not any property was taken or controlled, regardless of the value.  Property means any property, real or personal, tangible or intangible, and any interest or license in any property.

Owner means any person who is the owner of or who has possession or control of or any license or interest in property, even though the ownership, possession, control, or interest is unlawful.

To deprive means to withhold property from another permanently, or for such period as to appropriate a substantial portion of its value or use or with purpose to restore it only upon payment of a reward or consideration; dispose of property so as to make it unlikely that the owner will recover it; accept, use, or appropriate money, property

1    or services with purpose not to give proper consideration in

2    return therefore, and without reasonable justification or

3    excuse for not giving proper consideration.

4    Deadly weapon means any instrument, device, or other

5    thing capable of inflicting death and designed or specially

6    adapted for use as a weapon, or possessed, carried, or used as

7    a weapon.

8    Now, a weapon is an instrument, device, or thing

9    which has two characteristics.  The first characteristic is

10   that it is capable of inflicting or causing death.  The second

11   characteristic is in the alternative; either the instrument,

12   device, or thing was designed or specially adapted for use as

13   a weapon, such as a gun, billy club or brass knuckles, or it

14   was possessed, carried or used in this case as a weapon.

15   These are questions of fact for you to determine.  You may but

16   are not permitted to infer the possession and operability of a

17   deadly weapon from the defendant's words or conduct.

18   Now, on or about his person or under his control

19   means that the deadly weapon was either carried on the

20   defendant's person or was so near the defendant's person as to

21   be conveniently accessible and within his immediate physical

22   control or physical reach.

23   If you find the state proved beyond a reasonable

1012

1  doubt all of the essential elements of the offense of

2  aggravated robbery as charged in Count 2, then your verdict

3  must be guilty.  If you find the state failed to prove beyond

4  a reasonable doubt all of the essential elements of the

5  offense of aggravated robbery as charged in the indictment,

6  your verdict must be not guilty.

7       Now, if you find the defendant guilty of aggravated

8  robbery, you will then separately consider the firearm

9  specification.  You must decide whether the state proved

10  beyond a reasonable doubt that the defendant, at the time of

11  committing aggravated robbery, had a firearm on or about his

12  person or under his control and displayed the firearm,

13  indicated that he possessed it, or used it to facilitate the

14  offense.

15       Now, if your verdict as to aggravated robbery is not

16  guilty, you will then not decide these issues.

17       Some additional definitions.

18       Firearm means any deadly weapon capable of expelling

19  or propelling one or more projectiles by the action of an

20  explosive or combustible propellant.  Firearm includes any

21  unloaded firearm and any firearm which is inoperable but which

22  can readily be rendered operable.

23       I have previously defined deadly weapon for you.

1    When deciding whether a firearm is capable of
expelling or propelling one or more projectiles by an action
of explosive or combustible propellant, you may rely on
circumstantial evidence including, but not limited to,
statements, representations, and actions of the defendant.

On or about his person or under his control has been
defined for you.

Thus, if as to the firearm specification you find
that the state proved beyond a reasonable doubt all the
essential elements of the specification, your verdict must be
guilty as to this specification.

If, as to the firearm specification, you find the
state has failed to prove beyond a reasonable doubt any one of
the essential elements of the specification, then you must
find the defendant not guilty of the specification.

Now, before you can find the defendant guilty
regarding Count 1, aggravated murder, you must find beyond a
reasonable doubt that on or about June 12, 2017, and in
Trumbull County, Ohio, the defendant, Austin Taylor Burke, did
purposely cause the death of another, to-wit: Kenneth Brandon
Hayes Sample, while committing, or attempting to commit, or in
fleeing immediately after committing or attempting to commit,
aggravated robbery, all in Trumbull County, Ohio.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1014

1    I'll define some additional terms.

2    Purposely has been previously defined.

3    Cause is an essential element of the offense of
4    aggravated murder.  Cause is an act which directly produces
5    the death of another, without which it would not have
6    occurred.

7    Now, while committing or attempting to commit, or
8    while fleeing immediately after committing or attempting to
9    commit means that the death must occur as part of acts leading
10   up to or occurring during or immediately after the commission
11   of aggravated robbery and that the death was directly
12   associated with the commission or flight immediately after the
13   commission of the aggravated robbery.  The term "while" does
14   not require that the death occur during the same instant as
15   the aggravated robbery or that the death must have been caused
16   by the aggravated robbery, nor does it mean that the
17   aggravated robbery must have been the motive for the death.
18   Rather, "while" means that the death must be directly
19   associated with the aggravated robbery as part of a continuous
20   occurrence.  The term "while" means that the death must occur
21   as part of acts leading up to, or occurring during immediately
22   subsequent to the aggravated robbery.  You may consider the
23   time, place, causal connection, and any other evidence to

1015

1 determine if the death and aggravated robbery amounts to one

2 continuous occurrence.

3      Aggravated robbery is an essential element of the

4 offense of aggravated murder.  Aggravated robbery is

5 attempting or committing a theft offense, or in fleeing

6 immediately after the attempt or offense, and the defendant

7 did have a deadly weapon on or about his person or under his

8 control and either displayed the weapon, brandished it,

9 indicated he possessed it, or used it.

10      And I have previously defined the essential elements

11 of aggravated robbery.

12      Now, if you find that the state proved beyond a

13 reasonable doubt all of the essential elements of the offense

14 of aggravated robbery as charged in Count 1 of the indictment,

15 your verdict must be guilty as to that charge.

16      If you find that the State failed to prove all the

17 essential elements of the offense of aggravated murder as

18 charged in the indictment then your verdict must be not

19 guilty.

20      Now, again, if you find the defendant guilty of

21 Count 1, you will then separately consider the firearm

22 specification.  And it is the same as in Count 1.  If your

23 verdict as to Count 1 is not guilty, then you will not discuss

1  the specification as to Count 1.

2         And I previously defined all the essential elements

3  of the firearm specification.

4         If you find as to the firearm specification as to

5  Count 1 that the state proved beyond a reasonable doubt all of

6  the essential elements of that specification, your verdict

7  must be guilty as to that specification.

8         If you find that the state failed to prove all the

9  essential elements of the specification, your verdict must be

10 not guilty as to the specification.

11        Now, before you can find the defendant guilty

12 regarding Count 3, tampering with evidence, you must find

13 beyond a reasonable doubt that on or about June 17th --

14 June 12, 2017, and in Trumbull County, Ohio, the defendant,

15 Austin Taylor Burke, knowing that an official proceeding or

16 investigation is in progress, or is likely to be instituted,

17 did conceal or remove any thing with purpose to impair its

18 value or availability as evidence in such proceeding or

19 investigation.

20        Purpose has been defined for you.

21        Knowingly has been defined for you.

22        Official proceeding means any proceeding before a

23 legislative, judicial, administrative, or other governmental

1  agency or official authorized to take evidence under oath and

2  includes any proceeding before a referee, hearing examiner,

3  commissioner, notary, or other person taking testimony or a

4  deposition in connection with an official proceeding.

5  Public official means any elected or appointed

6  official or employee or agent of the state or any political

7  subdivision thereof, whether in a temporary or permanent

8  capacity, and including without limitation legislators,

9  judges, and law enforcement officers.

10  Now, if you find the state proved beyond a reasonable

11  doubt all the essential elements of the offense of tampering

12  with evidence, your verdict must be guilty.

13  If you find that the state failed to prove beyond a

14  reasonable doubt all of the essential elements of the offense

15  of tampering with evidence, then your verdict must be not

16  guilty.

17  Now, before you can find the defendant guilty of

18  Count 4, having weapons while under a disability, you must

19  find beyond a reasonable doubt that on or about June 12, 2017,

20  and in Trumbull County, Ohio, the defendant, Austin Taylor

21  Burke, did knowingly acquire, have, carry or use a firearm

22  when Austin Taylor Burke has been adjudicated as a delinquent

23  child for the commission of the offense that, if committed by

1018

1  an adult, would have been a felony of violence, to-wit:

2  aggravated burglary.

3          I have defined some terms for you.

4          Knowingly.

5          Have means to possess.

6          A person has possession when he knows that he has an

7  object on or about his person or places it where it is

8  accessible to his use or direction and he has the ability to

9  direct or control it.

10         Ownership is not necessary.  A person may possess or

11  control property belonging to another.

12         Firearm has been defined for you.

13         Capable of expelling or propelling has been defined

14  for you.

15         A felony offense of violence.  Aggravated burglary is

16  a felony offense of violence.

17         Now, if you find the state proved beyond a reasonable

18  doubt all of the essential elements of the offense of having

19  weapons under a disability, then your verdict must be guilty.

20         If you find the state failed to prove beyond a

21  reasonable doubt any one of the essential elements of the

22  offense of having weapons while under a disability, then your

23  verdict must be not guilty.

1    Now, before you can find the defendant guilty of

2  Count 5, having weapons while under a disability, you must

3  find beyond a reasonable doubt that on or about June 20, 2017,

4  and in Trumbull County, Ohio, the defendant, Austin Taylor

5  Burke, did knowingly acquire, have, carry, or use a firearm,

6  when Austin Taylor Burke has been adjudicated a delinquent

7  child for the commission of an offense that, if committed by

8  an adult, would be a felony offense of violence.  Again,

9  to-wit: aggravated burglary.

10    And, again, the same definitions as in the prior

11  count.

12    If you find the state proved beyond a reasonable

13  doubt all of the essential elements of having weapons while

14  under a disability on that date, your verdict must be guilty.

15    If you find the state failed to prove beyond a

16  reasonable doubt any one of the essential elements of the

17  offense on that date, your verdict must be not guilty.

18    Now, as to Count 6 --

19    MR. BECKER:  Your Honor, can we approach?

20    THE COURT:  You can.

21    (At sidebar:)

22    MR. BECKER:  Your Honor, Count 6 is a cut

23  and paste that I did not correct from Brandon Sample.  You

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

 1    could just say you previously defined, but the only difference

 2    is it's Pizza Joe's and U.S. currency.  I don't know if you

 3    just -- and then from here you can probably just say, "I've

 4    already defined all of the terms for you."  And it's just

 5    going to say "U.S. currency" here.  And then you can probably

 6    go all the way to page 17 because you've previously defined

 7    all those terms.  And then you must go to the -- if they

 8    find --

 9                    THE COURT:  Is that acceptable to defense

10    counsel?

11                    MR. OLSON:  Yes.

12                    MR. HARTWIG:  One other correction.  On

13    page 4, when indicating the juvenile delinquency adjudication,

14    they put -- on just this page, not on 13 or 14 -- but they put

15    agg robbery when it's an agg burglary.  And that was

16    represented in closing on the PowerPoint as agg robbery.  And

17    then a little further down.

18                    THE COURT:  We'll make those changes.

19                    MR. HARTWIG:  Would we be able to let the

20    jury know that it was mentioned in closing as an agg robbery

21    as an oversight?

22                    THE COURT:  I'll just mention it right now.

23                    MR. HARTWIG:  Okay, Your Honor.  Thank you.

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1021

 1          (End of sidebar.)

 2          THE COURT:  Ladies and Gentlemen, we've

 3   caught a couple of typos here.

 4          Number one, earlier on when I was indicating the

 5   prior underlying offense for having weapons while under a

 6   disability, it was at one point in time indicated it was an

 7   aggravated robbery.  It is an aggravated burglary.  I want to

 8   make sure you're aware of that.  It might have been mentioned

 9   that way in closing also.

10          And other than that, we have some typos that we'll

11   fix before it gets to you here.

12          But in the robbery on June 20th, you must find that

13   in Trumbull County, Ohio, the defendant, Austin Taylor Burke,

14   in committing a theft offense, or in fleeing immediately after

15   the offense, had a deadly weapon on or about his person or

16   under his control, and he displayed the weapon, indicated he

17   possessed it, or used it.

18          The theft offense is defined as purposely depriving

19   Pizza Joe's of property, to-wit: U.S. currency.

20          And knowingly obtain or exert control over the U.S.

21   currency without the consent of Pizza Joe's or a person

22   authorized to give consent.

23          And I've already defined purpose, knowingly,

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   property, owner, deprive, deadly weapon, capability of deadly

2   weapon, and on or about his person or under his control.

3                   MR. BECKER:  And the firearm specification.

4   That's missing.

5                   THE COURT:  That comes next.

6           If you find the state proves beyond a reasonable

7   doubt all of the essential elements of aggravated robbery,

8   your verdict is guilty.

9           If you find they failed to prove the essential

10  elements, then your verdict is not guilty.

11          And again, if it's guilty, then you address the

12  firearm specification.

13          If they prove beyond a reasonable doubt all of the

14  essential elements of the firearm specification, they're

15  guilty of the firearm specification.

16          If they fail to, then you're not guilty of the

17  firearm specification.

18          Now, the charges set forth in each count of the

19  indictment constitute a separate and distinct matter.  You

20  must consider each count and the evidence applicable to each

21  count separately, and you must state your findings as to each

22  count uninfluenced by your verdict as to any other count.  The

23  defendant may be found guilty or not guilty of any one of the

1   offenses charged.

2         You must not discuss or consider the subject of

3   punishment.  Your duty is confined to a determination whether

4   the defendant is guilty or not guilty of the charges.

5         You must not be influenced by any consideration of

6   sympathy or prejudice.  It is your duty to carefully weigh the

7   evidence, to decide all disputed questions of fact, to apply

8   the instructions of the Court to your findings, and render

9   your verdict accordingly.  In fulfilling your duty, your

10  efforts must be to arrive at a just verdict.  Consider all the

11  evidence, and make your findings with intelligence and

12  impartiality and without bias, sympathy, or prejudice so that

13  both the state of Ohio and the defendant will feel that this

14  case was fairly and impartially tried.

15        Now, if during the course of this trial the Court

16  said or did anything that you consider an indication of the

17  Court's view as to the facts, you are instructed to disregard

18  it.

19        Now, your initial conduct upon entering the jury room

20  is a matter of importance.  It is not wise to immediately

21  express a determination to insist upon a certain verdict

22  because if your sense of pride is aroused, you may then

23  hesitate to change your opinion, even if you later decide you

1 are wrong.  Consult with one another, consider each other's

2 views, and deliberate with the objective of reaching an

3 agreement if you can do so without disturbing your individual

4 judgment.  Each of you must decide this case with your fellow

5 jurors.  Do not hesitate to change an opinion if you are

6 convinced it is wrong.  However, you should not surrender an

7 honest opinion in order to be congenial or to reach a verdict

8 solely because of the opinion of the other jurors.

9    Now, you will have with you these verdict forms.  I

10 will go through them with you at this time.  They're fairly

11 self-explanatory.  These are in the order that the indictment

12 reads.  Count 1, "We the jury, duly impaneled and sworn or

13 affirmed, find the Defendant, Austin Taylor Burke," and

14 there's an asterisk and the instructions are down below, you

15 fill in with an ink pen, "did" or "did not," at the time of

16 committing aggravated -- no, that's the specification.  I have

17 it mixed up here.  First count is "guilty" or "not guilty of

18 aggravated murder, did purposely cause the death of another,

19 Kenneth Brandon Hayes Sample, while committing or attempting

20 to commit, or while fleeing immediately after committing or

21 attempting to commit aggravated robbery on June 12, 2017, in

22 the manner and form he stands charged in the indictment."  And

23 there's a date line and 12 signature lines.  Again, it's a

1   criminal case.  There have to be 12 signatures for a proper

2   verdict.

3           Count 2 is the specification.  Again, only if you

4   found him guilty of Count 1 do you address the specification.

5   And you insert "did" or "did not" have a firearm on or about

6   his person at the time of the offense.  Again, we need a

7   unanimous 12 people.

8           Count 2 is aggravated robbery.  Guilty or not guilty

9   of aggravated robbery.  Again, dated and signed by all 12.

10          The specification as to Count 2.  Again, as to the

11  firearm.

12          Count 3 is tampering with evidence.  Again, guilty or

13  not guilty of tampering with evidence.  Fill it in

14  accordingly.

15          Count 4 is having weapons while under a disability.

16  And this is for the June 12th offense.  Guilty or not guilty.

17          Count 5 is having weapons while under a disability

18  for the June 20th allegations.  Again, all 12 signatures.

19          And Count 6 is aggravated robbery regarding Pizza

20  Joe's.  And that is on June 20th, 2017.  Again, we need guilty

21  or not guilty and 12 signatures on that.

22          And then the firearm specification as to Count 6.

23          So those are the various verdict forms that you have

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    with you.  Now, from this time on, you will be in the charge

2    of my bailiff.  My court reporter will assist.  You will

3    follow their instructions in every regard.  If you desire to

4    communicate with the Court, you should do so only in writing

5    and only after careful consideration of the language used so

6    that the same does not unnecessarily disclose the status of

7    your deliberations and making sure that your inquiry was clear

8    and unambiguous.  The request must be signed in writing and

9    signed by the foreman or forelady.

10          Now, oftentimes we're requested a copy of a

11   transcript, especially in a confusing case like this.  You

12   won't get a copy of the transcript.  It takes a long time to

13   put that together.  You must rely upon your collective

14   recollections.

15          Now, during all breaks, you will follow the

16   instructions of the bailiff, but do not discuss this case with

17   her or among yourselves during any breaks.  Again, if you are

18   released for a luncheon break, which is a likely option here,

19   you can't discuss this in groups less than the 12 of you.  The

20   12 of you have to be together in the jury room before you can

21   discuss any part of the case.

22          The Court will place in your possession the exhibits

23   and the verdict forms.  The foreman or forelady will retain

1027

1   possession of these records and return them to the court.  The

2   foreman or forelady will see that your discussions are orderly

3   and that each juror has an opportunity to discuss this case

4   and cast his or her vote.  Otherwise, the authority of the

5   foreman or forelady is the same as with the other jurors.

6          Until the verdict is announced in open court, you are

7   not to disclose to anyone else the status of your

8   deliberations or the nature of your verdict.

9          Now, the two alternate jurors that we chose, in this

10  case Mr. Hardval and Miss Frantz, it will not be necessary --

11  as long as the other 12 jurors are ready to proceed, seeing no

12  reasons that they can't -- you will be excused when the jury

13  goes in to start deliberations.  You can leave then or stay as

14  our guest until a verdict is reached, but I ask you not to

15  indicate to anyone what your verdict might have been until one

16  is delivered by the other jurors.

17         Counsel have anything else at this time?

18                  MR. HARTWIG:  Not from the defense, Your

19  Honor.

20                  MR. BECKER:  Nothing from the state, Your

21  Honor.

22                  THE COURT:  All right.  Again, your first

23  duty upon entering the jury room is to choose one of yourself

1028

1　as foreman to lead your deliberations.  I wish you luck in

2　your deliberations.  My bailiff will get your schedule sorted

3　out.  You will have with you copies of these instructions that

4　should answer most of your questions.

5　　　　Good luck to you.

6　　　　　　　　(At 11:52 a.m., the jury retired to the

7　jury room to commence deliberating upon its verdict.)

8　　　　　　　　(Whereupon, a recess was had, commencing at

9　3:55 p.m. and concluding at 4:05 p.m.)

10　　　　　　　　(Whereupon, the following proceedings

11　occurred in open court at 4:54 p.m.)

12　　　　　　　　　　　* * *

13　　　　　　　　　　VERDICT

14　　　　　　　　THE COURT:  Ladies and Gentlemen of the

15　Jury, it's my understanding you've reached a verdict.

16　Mr. Zatvarnicky, it appears you have the verdict forms.  I'm

17　assuming you are the foreman.  If you'll hand the verdict

18　forms to my bailiff so that I can review them.

19　　　　　　　　(Whereupon, the verdict forms were

20　delivered to the Court.)

21　　　　　　　　THE COURT:  The verdict forms all appear to

22　be in order.  The defendant rise and face the jury.  I'll read

23　them at this time.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1       Count 1, regarding aggravated murder, "We, the jury

2   in this case, duly impaneled and sworn or affirmed, find the

3   Defendant, Austin Taylor Burke, guilty of aggravated murder,

4   did purposely cause the death of another, Kenneth Brandon

5   Hayes Sample, while committing or attempting to commit, or

6   while fleeing immediately after committing or attempting to

7   commit, aggravated robbery, on or about June 12, 2017, in the

8   manner and form he stands charged in the indictment.

9       As to the specification as to Count 1, the jury finds

10  that he did, at the time of committing the aggravated murder

11  as charged in Count 1, have a firearm on or about his person

12  or under his control, displayed the weapon, indicated he

13  possessed it, used it to facilitate the offense.

14      As to Count 2, indictment for aggravated robbery, the

15  jury finds the defendant guilty of aggravated robbery, in

16  attempting or committing a theft offense, or in fleeing

17  immediately after the attempt or offense.

18      And did have the deadly weapon on or about his person

19  or under his control.  Either displayed the weapon, brandished

20  it, indicated he possessed it, or used it.  All on June 12,

21  2017.  Again, signed by all 12 jurors.  Dated this date.

22      Count -- specification as to Count 2, the jury finds

23  that he did have a firearm on or about his person or under his

1030

1    control.  Again, signed by all 12 jurors and dated this date.

2            Count 3, tampering with evidence, the jury finds the

3    defendant guilty of tampering with evidence.  Again, signed by

4    all 12 jurors, dated this date.

5            Having weapons while under a disability as to the

6    June 12, 2017 offense, the verdict is guilty.  Again, signed

7    by all 12 jurors and dated this date.

8            Having weapons while under a disability as to the

9    June 20th, 2017 incident, the jury finds the defendant guilty.

10           As to aggravated robbery as to the June 20th, 2017,

11   event, the jury finds the defendant guilty.

12           And as to the firearm specification, the jury finds

13   that he did have a firearm on or about his person or under his

14   control.

15           Guilty as to all charges and specifications.  Did I

16   properly read your verdict, Mr. Zatvarnicky?

17                   JUROR NO. 8:  Yes, sir.

18                   THE COURT:  Anything further from the

19   state?

20                   MR. BECKER:  No, Your Honor.

21                   THE COURT:  Anything further from the

22   defense?

23                   MR. HARTWIG:  No, Your Honor.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1031

1    THE COURT:  Bond will be revoked.  The

2  defendant will be remanded into the custody of the Trumbull

3  County Sheriff for sentencing which will be tentatively set

4  for March 27th.  Thank you very much, Ladies and Gentlemen of

5  the Jury.  We can't resolve this matter without you.  Again,

6  I'll have a few words with you back in the jury room.

7    MR. BECKER:  Your Honor, do you want to set

8  that on the regular criminal day?

9    THE COURT:  No, it will be set at 11:00.

10  We are adjourned.

11    (Whereupon, the hearing concluded at

12  5:01 p.m.)

13

14

15

16

17

18

19

20

21

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1032

1       * * *

2       March 27, 2018

3       <u>SENTENCING</u>

4       THE COURT:  The Court calls case

5   2017-CR-403, which is State of Ohio versus Austin Taylor

6   Burke.

7       Counsel, if you'll come forward with your client.

8       MR. OLSON:  Good morning, Your Honor.

9       THE COURT:  All right.  Again, the

10  defendant is in court, along with his counsel, Mr. Olson.  The

11  state is represented by Mr. Becker.

12      On March 9th, 2018, a Trumbull County jury returned a

13  verdict of guilty as to all counts and specifications

14  presented to them, to-wit: Count 1, aggravated murder with a

15  firearm specification in the death of Brandon Sample; Count 2,

16  aggravated robbery with a firearm specification; Count 3,

17  tampering with evidence; Count 4, having weapons while under a

18  disability; Count 5, having weapons while under a disability;

19  Count 6, aggravated robbery with a gun specification for the

20  robbery of Pizza Joe's on June 20th.

21      The matter was set for sentencing this day, and the

22  Court has ordered and received a presentence investigation

23  which I have reviewed.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1    Now, prior to sentencing, on Friday, March 23, 2018,

2    the Court received a Rule 29 Motion for Acquittal and a Rule

3    33 Motion for a New Trial.  The state filed an expedited

4    response on March 26, 2018.  The Court has reviewed the

5    motions, memoranda, relevant applicable law, and has denied

6    both motions by judgment entry filed this date.

7    We are now here for the purposes of sentencing.

8    Prior to sentencing, Mr. Burke, is there anything you or your

9    attorney on your behalf would like to say to this Court prior

10   to sentencing?

11   MR. OLSON:  Your Honor, on behalf of

12   Mr. Burke, may it please the Court, Attorney Bradley G. Olson.

13   As the Court has gone through today, my client stands

14   convicted of several serious offenses.  And we recognize that

15   in the overarching principles of the sentencing code is the

16   punishment of the offender.  However, that is a qualified

17   statement or principle, as the statute directs that the trial

18   court is to impose the minimum sanctions that accomplishes the

19   purposes and principles of sentencing.

20   And when crafting the sentence, there are a few

21   issues that I would like the Court to take into consideration.

22   First, Your Honor, this morning I did provide three written

23   statements from people that are quite familiar with Mr. Burke

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1   and the character that he possesses.

2          The family is also here that has shown support of

3   Mr. Burke throughout this process, and I believe that that is

4   very important when it comes to the rehabilitation abilities

5   of the offender.

6          Another thing that I would ask the Court to consider

7   is the youthful age of Mr. Burke.  At the time that Mr. Burke

8   was charged with these offenses, he was 18 years old.  The

9   high court of this country has recognized as recently as 2012

10  in matters such as *Miller* versus *Alabama* and *Graham versus*

11  *Florida* that human development and the greater ability of

12  youthful offenders demonstrates their ability to rehabilitate

13  better than people of more advanced age.  While I recognize

14  that those cases did address minors, it's not like there's a

15  magic switch that turns on when you turn 18 years of age.

16  Again, he was still a very young individual when he was

17  charged with these offenses, and I suggest that these cases do

18  suggest that he would be less deserving of the most severe of

19  punishments that could be imposed.

20         Additionally, Your Honor, prior to the beginning of

21  trial, a plea offer was presented by the state which offered

22  15 years to life incarceration.  Again, while I recognize that

23  my client did reject that plea offer and elected to proceed

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1 with trial in which he was convicted, I believe that the offer

2 that was presented by the state shows that the state did

3 recognize some ability for his ability to reform and to

4 rehabilitate from these crimes.  The information that was

5 presented in the state's memorandum for sentencing, that was

6 all available to the state at the time that the plea

7 recommendation was made to this Court.  So I would ask the

8 Court to take that into consideration when it's crafting the

9 sentence for my client.

10         Your Honor, we've heard numerous testimony and

11 records concerning my client's prior crimes.  These crimes are

12 all committed as a juvenile offender.  None of the crimes that

13 he was sentenced for as a juvenile were crimes of violence

14 towards others.  They were all resolved through the admission

15 of the -- of Mr. Burke.  So he admitted to these offenses as a

16 juvenile.

17         And then during his incarceration at both JJC and

18 DYS, he did make positive decisions while incarcerated, which

19 included the completion of his GED, he completed trade

20 training, and he participated in numerous programs which

21 included life skill classes, AA classes, and numerous other

22 classes that were made available through the system.

23         Furthermore, Your Honor, while I recognize that the

1  state is requesting the imposition of a sentence of life

2  without the possibility of parole, I believe that the

3  rehabilitation reform offered through the Department of

4  Rehabilitation and Corrections cuts against that.  You know,

5  there are programs and safeguards included within our criminal

6  justice system that will sufficiently evaluate and determine

7  the level of rehabilitation and whether he's met

8  rehabilitation requirements that reduce the recidivism risk

9  that he would pose to the community at large.  We have to

10  believe in our criminal justice system and the ability of our

11  Department of Rehabilitation and Corrections to reform our

12  offenders, especially the youngest of our offenders who are

13  the most vulnerable in the system because if a sentence of

14  life without the possibility of parole is imposed against a

15  youth offender such as Mr. Burke, that is an extremely long

16  period of time being incarcerated.  And while I recognize that

17  the system demands punishment, there is opportunity,

18  especially for a youthful offender, to demonstrate his ability

19  to reform.

20         Also, Your Honor, before this Court are multiple

21  convictions.  And while I recognize that this Court has the

22  absolute discretion to run those sentences consecutive to one

23  another, I would suggest to the Court that if it is inclined

1037

1  to allow Mr. Burke to demonstrate his ability to reform and

2  enter a sentence that is something other than life without the

3  possibility of parole, there is no need for a consecutive

4  sentence because if he reaches that level where he has

5  demonstrated his ability and rehabilitative needs that he can

6  be released, to include further punishment for other crimes I

7  do not believe would be necessary, as the goals of the

8  sentencing would have already been accomplished through the

9  initial sentence.

10        Also, in the sentences that are being imposed today,

11 there are at least two sentences before Your Honor that have

12 to be consecutive.  Those are the gun specs.  So with three

13 years on each of the gun specs, we're looking at six years

14 consecutive already there.  Mr. Burke is also scheduled to go

15 before the Honorable Judge Rice for another offense today that

16 mandates another consecutive sentence, and the state has

17 recommended an additional three years on that offense.  So

18 we're looking at 9 years of consecutive sentences already on

19 just the offenses that mandate under our sentencing code a

20 consecutive sentence.

21        So in conclusion, Your Honor, based upon all of the

22 foregoing, what I would ask the Court to impose is the life

23 sentence with the possibility of parole after 20 years on the

1  murder charge, with the aggravated robbery charges running

2  concurrent with that.  And then recognizing that he will also

3  be serving at least a minimum of 9 years consecutive for the

4  gun spec and the other charge before Judge Rice, which would

5  mean that Mr. Burke would not be eligible for parole until

6  29 years have been served.  Again, that would put him at the

7  age of 49 years old.  And I do not believe that any man that

8  ever comes before this Court that is 49 years of age was the

9  same man that he was when he was 18 or 19 years of age.

10  Maturity does come into play.  Human development and brain

11  development continues until 25.  These are things that have

12  been recognized.  So when we take that all into consideration,

13  I ask that the Court impose a sentence accordingly.

14          Thank you, Your Honor.

15              THE COURT:  Mr. Burke, anything you want to

16  say?

17              THE DEFENDANT:  No, sir.

18              THE COURT:  Anything from the state?

19              MR. BECKER:  Yes, Your Honor.  First, I'd

20  note for the record that I did provide the Court with a

21  sentencing memorandum and a supplemental memorandum.  And I'd

22  also note for the record, and I believe Mr. Olson will concur,

23  the state filed a motion to substitute photographs of the U.S.

1039

1  currency that was admitted at trial, and I don't believe there
2  was an objection?
3                          THE COURT:  I haven't seen that.
4                          MR. OLSON:  That's correct, Your Honor.
5                          MR. BECKER:  Okay.  So the Court -- if it's
6  all right, the Court will prepare an entry to substitute the
7  photographs for the U.S. currency that's currently in this
8  case.
9                          THE COURT:  That will be done.
10                         MR. BECKER:  All right.
11      Your Honor, just very briefly, I would note that
12  there was mention that the state did offer the defendant an
13  offer of murder with a three-year specification and an 18
14  years to life sentence.  I think it's a little disingenuous to
15  say that the state believed he's a good character and could be
16  rehabilitated based on that.  That was based upon the fact of,
17  like any trial, there are problems and offers.  To rule
18  otherwise would be to say that the defendant and his attorneys
19  came to the state the first day -- or the morning of the
20  second day of trial and asked for flat time.  So he must be
21  guilty because he asked and his attorneys asked for flat time.
22      And I would stand here and tell this Court that
23  Mr. Olson cited some Supreme Court cases dealing with

                    OFFICIAL COURT REPORTER
                 TRUMBULL COUNTY * WARREN, OHIO

1  juveniles and, of course, life sentences are still permissible

2  for juveniles if the Court finds that they are irreparably

3  corrupt and permanently incorrigible.  There is your poster

4  child for irreparably corrupt and permanently incorrigible.

5  He stands here before you.

6         To run any of these sentences concurrently with each

7  other is basically to acknowledge they're free crimes.  And

8  the state has outlined in its memorandum separate victims,

9  separate times, separate incidences.  And we would

10  respectfully, again, reiterate that if the Court does not

11  impose a life sentence with no parole to at least run those

12  consecutive from the June 12th date to the June 20th date.

13  I'll let the motion stand -- the prior memorandum that I filed

14  stand on its own merits.

15         And I would advise the Court that there are three

16  victims that would like to address the Court pursuant to 2930

17  of the Revised Code and their victims' rights and Marcy's law.

18             THE COURT:  Very well.  Move him to the

19  side so we can bring the victims up.

20         State your name for the record.

21             KENNETH SAMPLE:  My name is Kenneth Sample.

22         Good morning, Your Honor.  Thank you for allowing me

23  this time to speak.

1    Really don't know what I'm supposed to say.  As a

2  parent, I don't think any parent should have to make this type

3  of statement due to the loss of their child through murder.

4  But since -- the last couple of weeks, I've thought about

5  things.  I thought about what the prosecutor stated during the

6  case.  That he didn't, he didn't have motive, didn't have to

7  prove motive.  And I think there was no motive other than it

8  was done just because he could do it.

9    The defense brought up several times all the

10  witnesses had different testimonies as to why he did it, and I

11  think he just merely told them different things because he

12  wanted to make himself look bigger, tougher.

13    They had mentioned he did time in DYS.  He did good

14  things in DYS.  He did such good things that upon release he

15  has pictures and videos of him with guns that he's not

16  allowed, that his family should never even have allowed him to

17  have in his possession to cause this crime.

18    The defense said, you know, 49 years he won't be the

19  same man.  But in 49 years, he'll still be alive.  And my son,

20  Kenneth Brandon Sample, who was a goofy young kid, helped

21  special needs children, might have been a little naive, had

22  some problems of his own, but nothing that he wasn't trying to

23  work through, and if this hadn't have happened he would still

1042

1  be alive in 49 years.  So I just ask that the charges are all

2  run consecutively.  I don't think he changed after DYS, and I

3  don't think he'll change after he's been incarcerated for any

4  amount of time.

5          Thank you, sir.

6                  BRITTANY SAMPLE:  Your Honor, my name is

7  Brittany Sample.  Brandon was my brother.  And on June 12th,

8  2017, he was murdered and left to lie alone for days as we

9  searched for him.

10          My brother was a gentle soul.  He would have never

11  hurt anybody in his whole life.  And, yes, he had his issues

12  that he was working through.  But he was fearless.  And so --

13  his smile was contagious and he just brought joy everywhere he

14  went.

15          Brandon wasn't the only victim of this crime.  My

16  family, myself, and countless members of the community and his

17  friends are all victims.  We are left with a hole in our heart

18  that was once filled by his spirit, and that hole will forever

19  remain.  And in 49 years, I will still have that hole.  Every

20  day I will think of my brother.  And to me, allowing someone

21  to be free when they have taken the life of somebody that

22  could have done great things just isn't fair.

23          And I thank you for your time.

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1043

1     THE COURT:  Thank you.

2     REGINA SAMPLE:  Hi.  My name is Regina

3  Sample, and Brandon was my grandson.  My only grandson.  I

4  will never have another grandson.  I could count on Brandon

5  for anything I needed.  All I'd do was call.  He was one of

6  the sweetest kids.  Had the biggest heart.  Would help anyone.

7  And I don't have that anymore.  I'll never hear his voice

8  again.  I'll never see his face again.  He just walked out of

9  the house and was never seen again.

10     I can't sleep.  I can't function.  This is -- this

11  has destroyed every one of us.  It's touched every one of our

12  lives.  And if he got 29 years, my grandson is not gonna come

13  back in 29 years.  He's not gonna come back in a hundred

14  years.  He's gone.  And nothing can ever replace that.  And I

15  don't think that he should be allowed to walk the street when

16  my grandson will never step foot out again.

17     I just wanted you to know that my grandson was a

18  terrific kid.  He wasn't perfect.  I mean, none of us are.  We

19  all have problems.  We all have faults.  But he didn't do

20  anything to deserve to be murdered for.

21     His Army buddies took it so hard.  They couldn't

22  believe that someone could murder a goofy kid with the biggest

23  smile on his face.  That was my grandson.  He touched so many

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1044

1    lives.  And if he could have lived, how many more could he

2    have touched?  That, we'll never know.

3         Thank you.

4              THE COURT:  Thank you.  Are you done?

5              MR. BECKER:  Yes, sir.  Thank you, Your

6    Honor.

7              THE COURT:  Bring him back.  Again, to make

8    sure that the record is correct, I have reviewed all of the

9    victim statements prior to this and the statements that were

10   submitted by the defendant.

11        Taking into consideration the principles and purposes

12   of sentencing, the Court notes that recidivism is quite likely

13   in this case.

14        In regard to the seriousness of the offense, the

15   Court finds that there's nothing more serious than murder.

16        The Court further finds the defendant has shown no

17   remorse.

18        As to factors that show his conduct is less serious,

19   the Court finds none.  Generally, the age of the defendant

20   would be a mitigating factor, but his conduct and criminal

21   adjudications as a minor show that that's not the case.

22        With indications of likely recidivism and the more

23   seriousness conduct and no indicators of less recidivism and

1  less serious conduct, and viewing your record as a whole in

2  the light of the case, the Court finds that you are a danger

3  to society.  A continuous line of felony adjudications,

4  including crimes of violence, gun charges, breaking into

5  houses, probation and parole violations, entering with an

6  aggravated burglary with a gun spec that resulted in an

7  extended commitment to DYS.  It is necessary that you be

8  removed from society for the safety of society.  Your sentence

9  is as follows:  As to aggravated murder, I sentence you to

10  life imprisonment with parole eligibility after 30 years.  As

11  to the firearm specification, three years mandatory, prior to

12  and consecutive with.  As to aggravated robbery, 11 years,

13  concurrent -- 11 years concurrent, and the gun spec will

14  merge.  As to tampering with evidence, 36 months, concurrent.

15  As to having weapons while under a disability as to the

16  aggravated murder, 36 months, concurrent.  As to having

17  weapons while under a disability as to the Pizza Joe's,

18  36 months, concurrent.  As to Count 6 -- now, this is a

19  separate offense of violence, holding a gun to two unarmed

20  young ladies at Pizza Joe's.  This cannot go unpunished.  I

21  will sentence you to 11 years for that and three years for a

22  gun specification, this to run consecutive to the 30 years to

23  life and gun spec.  This will be served, again, consecutively

1046

1     to Count 1.

2            It is necessary to punish the defendant and protect

3     the public and not disproportionate, as the offender's

4     criminal history shows that consecutive sentences are

5     necessary to protect the public.  That's 33 years, plus 14.

6     Total of 47 years.

7            Nothing we can do can bring back Brandon Sample, but

8     removing you from society will keep other people safe.

9            He'll be remanded, then, for the purposes of this

10    sentence after sentencing down the hall.

11           Now, when you are released from -- when and if you

12    are released from prison, you have post-release control that's

13    mandatory.  If you're released before serving your life

14    sentence as to Count 1 and the maximum possible post-release

15    period is equal to the length of the life sentence imposed on

16    the aggravated murder charge in Count 1, as well as the

17    consequences for violating conditions of post-release control

18    imposed by the Parole Board.

19           Now, further, as to Counts 2 and 6, you will have a

20    mandatory period of 5 years post-release control.

21           As to Count 3, 4, and 5, a 3-year optional period of

22    post-release control.  There will be certain terms or

23    conditions imposed upon you.  If you violate those conditions,

1047

1  more strict conditions could be imposed, or the length of time

2  extended, or additional prison time imposed in increments of

3  up to 9 months, but not exceeding one-half your original term.

4       And if you commit a felony while subject to a period

5  of post-release control, you subject yourself to an additional

6  prison term which consists of the maximum amount of time

7  remaining on post-release control, or 12 months, whichever is

8  greater.

9       You are further instructed that most prison inmates

10  are eligible to earn days of credit against their prison

11  sentence for each completed month of productive participation

12  in an educational or employment program developed by ODRC,

13  with specific standards for performance by prisoners.  Some

14  inmates, including those confined for sex offenses and the

15  most serious first- or second-degree felonies or homicides,

16  are not eligible to earn those days of credit.

17       Now, you have been convicted as a result of a jury

18  trial.  You have an automatic right to appeal.  If you do not

19  have the funds to employ an attorney, one would be appointed

20  at no cost.  If you do not have the funds to have a record

21  supplied to the Court of Appeals, a record would be supplied

22  at no cost.  Do you intend to appeal this?

23            THE DEFENDANT:  Yes, sir.


OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1048

1       THE COURT:  Mr. Olson, are you going to

2  take care of his notice of appeal?

3       MR. OLSON:  He has retained appeals

4  counsel, Your Honor.

5       THE COURT:  All right.  He has retained

6  appeals counsel.

7  Anything further from the state at this time?

8       MR. BECKER:  No, Your Honor.

9       THE COURT:  Anything further from the

10 defense?

11      MR. OLSON:  Nothing further, Your Honor.

12      THE COURT:  He needs to go down to Judge

13 Rice to resolve that other case.

14 We're adjourned.

15      (Whereupon, the hearing concluded at

16 11:41 a.m.)

17

18

19

20

21

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO

1049

1    <u>REPORTER'S CERTIFICATE</u>

2

3        I HEREBY CERTIFY the above and foregoing is a true

4    and correct transcript of all evidence introduced and

5    proceedings had in the Jury Trial on the 5th day of March,

6    2018, of the within-named case as shown by my stenographic

7    notes, taken by me during the hearing and at the time the

8    evidence was being introduced.

9

10

11

12                                    _____
                                      LORI J. RITTWAGE
13                                    Official Court Reporter

14   May 15, 2018

15

16

17

18

19

20

21

22

23

OFFICIAL COURT REPORTER
TRUMBULL COUNTY * WARREN, OHIO