## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| AUSTIN TAYLOR BURKE, | CASE NO. 4:22-CV-1271-JGC |
| Petitioner, | JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN CYNTHIA DAVIS, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

Through counsel, on July 19, 2022, Petitioner Austin Burke, a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). The District Court has jurisdiction over the petition under § 2254(a). On August 8, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Aug. 8, 2022).

On August 24, 2022, having examined the petition in accordance with Rule 4 of the Rules Governing Section 2254 Proceedings in the United States District Courts (Habeas Rules), I ordered the parties to file contemporaneous briefs addressing whether the petition was timely. (ECF #5). On September 28, 2022, Mr. Burke filed his supplemental brief addressing the timeliness of the petition. (ECF #7).

On October 6, 2022, Respondent Donald Redwood, in his official capacity as Warden of the Southern Ohio Correctional Facility (hereinafter, the State), filed the Return of the Writ, arguing the petition is time barred and the grounds for relief it raises are procedurally defaulted,

insufficiently pled, not cognizable, and meritless. (ECF #8). On November 21, 2022, Mr. Burke filed his Traverse and moved for an evidentiary hearing. (ECF #11).

In the Return of the Writ, the State requested that Donald Redwood be automatically substituted as the Respondent because he is the Warden of the Southern Ohio Correctional Facility. (ECF #8 at PageID 57). Mr. Burke similarly notes this fact in his Traverse. (ECF #11 at PageID 2015). I take judicial notice that the Ohio Department of Rehabilitation and Corrections official government website lists Cynthia Davis as the current Warden of the Southern Ohio Correctional Facility. *See Southern Ohio Correctional Facility (SOCF)*, *Ohio Dept. of Rehab. & Corr.*, http://drc.ohio.gov/about/facilities/southern-ohio-correctional-facility (last accessed Sept. 30, 2024). Thus, under Fed. R. Civ. P. 25(c) and Rule 2(a) of the Habeas Rules, I substitute her as the proper respondent here.

For the reasons discussed below, I recommend the District Court **DISMISS** the petition as time barred. I also **DENY** his request for an evidentiary hearing.

## PROCEDURAL HISTORY

### A.    State court factual findings

The Ohio Court of Appeals, Eleventh Appellate District, made the following factual findings on direct appeal. These findings are presumed correct unless Mr. Burke rebuts that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

> {¶2} On June 12, 2017, 22-year-old Kenneth Brandon Hayes Sample ("Brandon") was reported missing by his parents. That morning, Brandon's car was found abandoned on a bike path in Niles, Ohio. Three days later, on the morning of June 15, 2017, Brandon was found deceased in a remote and densely overgrown area of Bristol Township, Ohio. Following an investigation, on the morning of June 20,

2

2017, the Warren Police Department issued a murder warrant for the arrest of Austin Taylor Burke ("Austin"), who was 18 years old at the time.

{¶3} Shortly after 10:00 p.m. on the night of June 20, 2017, Pizza Joe's restaurant in Cortland, Ohio, was robbed at gunpoint. Within the hour, Austin was discovered at an apartment across the street from Pizza Joe's and gave officers a false name, false birth date, and false telephone number. Austin was arrested for failure to disclose personal information and obstructing official business, as well as the active murder warrant, and was later charged with the armed robbery of Pizza Joe's.

{¶4} On June 26, 2017, a Grand Jury indicted Austin on six counts:

1.   Aggravated Murder, an unclassified felony with a firearm specification, in violation of R.C. 2903.01(B) & (F) and R.C. 2941.145;
2.   Aggravated Robbery, a first-degree felony with a firearm specification, in violation of R.C. 2911.01(A)(1) & (C) and R.C. 2941.145;
3.   Tampering with Evidence, a third-degree felony, in violation of R.C. 2921.12(A)(1) & (B);
4.   Having Weapons while under Disability, a third-degree felony, in violation of R.C. 2923.13(A)(2) & (B);
5.   Having Weapons while under Disability, a third-degree felony, in violation of R.C. 2923.13(A)(2) & (B); and
6.   Aggravated Robbery, a first-degree felony with a firearm specification, in violation of R.C. 2911.01(A)(1) & (C) and R.C. 2941.145.

{¶5} Counts 1, 2, and 4 arose from allegations that on or about June 12, 2017, Austin shot and killed Brandon with a firearm at the end of Peck Leach Road in Bristol and then took Brandon's vehicle, drove it to Niles, and abandoned it on the bike trail. Count 3 was prosecuted on the basis that Austin tampered with evidence related to the homicide. Counts 5 and 6 arose from allegations that on or about June 20, 2017, Austin robbed the Pizza Joe's in Cortland at gunpoint and then hid the firearm in the apartment across the street. At all relevant times, Austin was prohibited by law from having a firearm due to a prior juvenile delinquent adjudication for aggravated burglary. The indictment was designated as case No. 2017 CR 403. Austin pled not guilty and failed to post a $1,000,000.00 bond.

{¶6} On October 23, 2017, defense counsel filed a motion to sever the counts related to June 12, 2017, from the counts related to June 20, 2017, for purposes of trial. The state of Ohio opposed the motion. The trial court summarily denied the motion on December 14, 2017.

{¶7} On December 28, 2017, defense counsel filed multiple motions to exclude or suppress evidence. The state opposed the motions, and the trial court held a hearing on January 8, 2018. On January 29, 2018, the trial court denied the defense motions.

{¶8} On the first day of trial, March 5, 2018, defense counsel filed a motion to sever Counts 4 and 5 (having weapons while under disability) from the remaining counts in the indictment. The trial court denied the motion, noting that "stipulations regarding such prior convictions are permitted and may minimize any potential prejudicial effect." No such stipulation was offered.

{¶9} The jury trial began with a jury view of the location in Bristol where Brandon's body was found, the location in Niles where Brandon's car was found, the location of a house in Niles where Austin and Brandon were last seen together, the location of the armed robbery in Cortland, and the location of an apartment in Cortland where the firearm was found.

{¶10} At the conclusion of the state's case-in-chief, defense counsel moved for Crim.R. 29 acquittal, which was denied. Defense counsel also renewed its motion to sever the homicide charges from the armed robbery charges and its motion to sever the weapons under disability charges. The renewed motions were denied, and the defense rested.

{¶11} The jury returned a verdict of guilty on all charges and specifications on March 9, 2018. The matter was referred to the adult probation department for a presentence investigation report prior to sentencing.

\* \* \*

{¶15} The trial court sentenced Austin as follows: Count 1: life imprisonment with parole eligibility after 30 years, plus 3 years mandatory on the firearm specification, to run prior to and consecutive, for a total of 33 years; Count 2: 11 years, concurrent to Count 1, with the firearm specification merged; Counts 3, 4, and 5: 36 months each, concurrent to each other and concurrent to the other counts; Count 6: 11 years, plus 3 years mandatory on the firearm specification, to run prior to and consecutive, for a total of 14 years. Count 6 was ordered to run consecutive to Counts 1-5. A nunc pro tunc entry was issued for the purpose of clarifying for the Ohio Department of Rehabilitation and Correction that Austin's total imprisonment term is 47 years prior to eligibility for parole.

(ECF #8-1 at PageID 381-86; *see also State v. Burke*, Nos. 2018-T-0032 and 2018-T-0035,

2019 WL 2172718, at \*1-2 (Ohio Ct. App. May 20, 2019) (citations omitted), *appeal not allowed*,

131 N.E.3d 75 (Ohio 2019) (table)).

4

**B.     Direct appeal**

On April 6, 2018, Mr. Burke filed a timely notice of appeal through new counsel to the

Eleventh District. (ECF #8-1 at PageID 274). Mr. Burke raised five assignments of error:

1.  The trial court erred in taking evidence of cell-tower location data that the state searched and seized without a warrant.

2.  The trial court erred in hearing a separate unrelated robbery with [Mr.] Burke's murder charge.

3.  The jury returned a verdict against the manifest weight of the evidence.

4.  The combined effect of any two or more errors above renders the cause reversible under the cumulative-error doctrine.

5.  The trial court erred in sentencing [Mr.] Burke to maximum consecutive terms of imprisonment as to his weapon-in-detention conviction.

(*Id.* at PageID 287-88). On January 7, 2019, the Eleventh District overruled all five assignments of

error but remanded the matter *sua sponte* for the trial court to incorporate the consecutive-

sentencing findings into the sentencing entries and correct an error in the firearm specification.

(*Id.* at PageID 426-28).

On February 15, 2019, Mr. Burke, through the same counsel, filed a timely notice of

appeal with the Supreme Court of Ohio. (*Id.* at PageID 430-31). In his memorandum in support of

jurisdiction, Mr. Burke set forth three propositions of law:

1.  Admission into evidence of cell tower location data that the state searched and seized without a warrant violates the Fourth Amendment to the U.S. Constitution and its analogue in the Ohio Constitution.

2.  Trying a separate unrelated robbery with a wholly unrelated murder charge while admitting evidence into one charge inadmissible in the other violates the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment Notice Clause, and their analogues in the Ohio Constitution.

3.  Allowing a conviction to rest on contradictory and equivocal evidence violates the Fourteenth Amendment Due Process Clause, the Sixth Amendment's Notice Clause, and their analogues in the Ohio Constitution.

5

(*Id.* at PageID 433). The State opposed jurisdiction. (*Id.* at PageID 448-64). On September 17, 2019, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 466). Mr. Burke did not further appeal his conviction to the Supreme Court of the United States.

## C.    State post-conviction petition

On May 16, 2019, while his direct appeal was pending before the Supreme Court of Ohio, Mr. Burke filed, through the same counsel, a petition for post-conviction relief. (ECF #8-1 at PageID 467-85). Mr. Burke did not state clear grounds for relief, but under the heading "Issues Gleaned from the Affidavits" he asserted:

> [T]he defense posits that the following points of fact present competent and credible evidence dehors the record of, inter alia, constitutional error in terms of prosecutorial discovery misfeasance, nonfeasance, and/or malfeasance, in terms of the Fourth, Fifth, Sixth Amendments, and Fourteenth Amendments to the U.S. Constitution, particularly of the Sixth Amendment's directive that a defendant be " . . . informed of the nature and cause of the accusation[,]" trial counsel misfeasance, nonfeasance, and/or malfeasance relative to the disclosure and investigation of evidence in terms of the Sixth (and Fourteenth Amendments') guarantees of the right to effective assistance of counsel, one instance of jury misconduct, in violation of the Sixth and Fourteenth Amendment's jury guarantees, and many instances witness malfeasance relative to the verity of certain facts, such to violate, inter alia, the Sixth Amendment confrontation clause, as it applies to the state through the Fourteenth Amendment.

(*Id.* at PageID 478-79). The state courts interpreted this passage to assert four grounds for post-conviction relief: (1) a discovery violation by the State, (2) ineffective assistance of trial counsel, (3) juror misconduct, and (4) a violation of the Confrontation Clause due to a lack of witness credibility. (*See id.* at PageID 780-81; *see also id.* at PageID 856).

Mr. Burke attached eleven affidavits from his brother, mother, and other community members. (*See id.* at 478-84). The affidavits detail as follows:

1.    Cassandra Boyles testified Preston Whitacre confessed to her that he assaulted and murdered the victim, Mr. Sample, along with a co-conspirator, Ricky Roupe. (*See id.* at PageID 486). Ms. Boyles recounts Mr. Whitacre

6

telling her that "Austin Burke is the one going down for the murder." (*See id.*). Ms. Boyles adds Mr. Whitacre told her the "last kid that tried to fight me got his pussy ass shot" and that the murder of Brandon Sample "was his work but that's what Austin [Burke] gets for being a pussy bitch." (*See id.*).

2. Donna Cottrill averred that Shawn Marx, a witness to the Pizza Joe's robbery who testified at Mr. Burke's trial, was a drug dealer and drug addict. (*See id.* at PageID 487). Ms. Cottrill was in the courtroom when Mr. Marx testified, and she opined he was under the influence of methamphetamines while testifying. (*See id.*). She states that her sister is in drug-addiction treatment because of Mr. Marx. (*Id.*). Ms. Cottrill then attached docket sheets of two drug-related charges, one in 2018 and one in 2019, to substantiate her claims that he is a drug user and dealer. (*Id.* at PageID 488-97). Ms. Cottrill does not explain how she knows Mr. Marx was high on the day of the robbery or while testifying.

3. Lisa Cope testified she heard from Mary Roupe, the aunt of Mr. Roupe, who heard from her mother, Pam Roupe, that several children had been fighting at Pam Roupe's house, including Mr. Whitacre, and Pam Roupe suspected one of them had killed someone. (*Id.* at PageID 498). In addition to Mr. Whitacre, the group of children included Mr. Sample, Mr. Roupe, and Josh White. (*Id.*). She repeats her testimony in another substantially similar affidavit submitted in response the State's later motion for summary judgment on the post-conviction petition. (*Id.* at PageID 767-68).

4. Gage Sell, Mr. Burke's brother, averred he saw Mr. Burke return home "just before dark on Sunday, June 11th, 2017"—before Mr. Sample was murdered in the early hours of June 12, 2017. (ECF #8-1 at PageID 503). Mr. Sell testified "[Mr. Burke] was home before I went to bed, and was home early in the morning when I woke up." (*Id.*). Mr. Sell does not specify when he went to sleep on June 11, 2017 or when he woke up on June 12. Mr. Sell further asserted Mr. White lied while testifying at Mr. Burke's at trial. (*Id.*).

5. In a second affidavit, Mr. Sell testified he recognized a juror as his driving instructor, and he and the juror discussed Mr. Burke's case. (*Id.* at PageID 505). Mr. Sell accuses the juror of perjuring herself during voir dire when she stated she did not know Mr. Burke's family or the facts of the case so that she would be selected for the jury. (*Id.*). Mr. Sell informed Mr. Burke's trial attorney of his suspicions as the jury assembled to read the verdict. (*Id.*).

6. Jamie Sell, Mr. Burke's mother, testified that commercial phonebook databases list the last number that Mr. Sample called before the murder as belonging to Joe Leamon. (ECF #8-1 at PageID 513). Ms. Sell attached printouts of the commercial phonebooks' reports on the phone number. (*Id.* at PageID 515-29). Ms. Sell's further research into Mr. Leamon's "criminal

background, and social media, revealed he is a heroin dealer, and currently is awaiting sentencing in federal court for 18 counts of heroin, and 18 counts of other drug trafficking." (*Id.*). Ms. Sell also attacks the thoroughness of Detective Greaver's investigation into the murder and that he did not investigate Mr. Sample's last phone call. (*Id.*). Ms. Sell asserted the information supported a theory that Mr. Sample was involved with a heroin dealer on the night he was killed. (*See id.*).

7.  Lori White accuses Mr. White of lying when he testified at Mr. Burke's trial that both he and Mr. Sample never used heroin. (*Id.* at PageID 555). Ms. White testified Mr. White has a reputation as a heroin addict and he has been subsequently arrested for drug-related offenses. (*Id.*).

8.  Ms. Sell asserts the State omitted from discovery, and from presentation at trial, 19 text messages between the victim and Mr. Burke. (*Id.* at PageID 558). Ms. Sell asserts she knows what the messages contained and that they support Mr. Burke's testimony that he and the victim did not meet that night. (*Id.*). She does not specify what the messages contain or how she knows their contents.

9.  Ms. Sell testifies that it was impossible for Mr. Burke to have robbed the Pizza Joe's restaurant because he did not match the descriptions of the robber given by the two Pizza Joe's employees. (*See* ECF #8-1 at PageID 568-571). Ms. Sell attached one employee's police statement that described the robber as "a mixed man" who is tall, wearing a dark hoodie, and she "thinks his eyes were green, but [she] was far away." (ECF #8-1 at PageID 570). The other employee's police statement described a "tallish skinny" man who she thought was "mixed" and wore "a black ski mask, grey sweatpants, and" she thought "a blue hoodie." (*Id.* at PageID 571). Ms. Sell testifies that Mr. Burke has a "pale complexion with brown/hazel eyes." (*Id.* at PageID 568, 581). Ms. Sell recounts that a police officer testified Mr. Burke's shoes were the shoes the robber of Pizza Joe's was wearing, and the robber was recorded on surveillance footage running from the restaurant. (*Id.* at PageID 568). Mr. Burke's shoes were recovered missing a shoelace that rendered it impossible, in Ms. Sell's opinion, for the robber to flee wearing Mr. Burke's shoes because the robber would have struggled to keep one shoe on. (*Id.* at PageID 568-69).

10. Ms. Sell testifies on March 10, 2018, the day after the verdict, Donavon Bunner, a witness to the robbery, contacted her "because he felt bad and knew [Mr. Burke] was not guilty of the murder or the robbery." (*Id.* at PageID 580). Ms. Sell continued that Mr. Bunner asserted another witness had lied on the stand. (*Id.*). Mr. Bunner has not submitted an affidavit recanting his trial testimony, but Ms. Sell attached Facebook Messenger statements by Mr. Bunner to that effect. (*Id.* at PageID 585-89).

11. Ms. Sell recounted that Mr. White testified he had never met or talked with Mr. Burke prior to the day of the murder though subsequent text messages show the witness tried to sell Mr. Burke a handgun after meeting him. (*Id.* at PageID 614). Ms. Sell also asserts that the photograph of the handgun is not evidence that Mr. Burke possessed it as the photograph was texted to him by Mr. White. (*Id.*). Ms. Sell further opines that the position of the victim's legs indicated his body went into rigor mortis while sitting in a chair, inconsistent with the State's theory of the case that the victim was shot while on his knees. (*Id.*). Ms. Sell is a registered nurse. (*Id.* at PageID 619).

Mr. Burke asserted these affidavits were not available at the time of his trial and discovered through subsequent interviews. (*Id.* at PageID 484).

The State sought summary judgment on Mr. Burke's post-conviction petition, arguing the affidavits do not meet the Ohio law standards to be relevant, materially advance a petitioner's claim, and be minimally cogent. (*Id.* at PageID 679-82). The State attached an affidavit from the Director of the Trumbull County Juvenile Detention Center testifying that in response to Ms. Boyles's affidavit, he searched his facility's records and found Mr. Whitacre was in his custody from June 6 to 13, 2017. (*See id.* at PageID 633). Thus, the State argued Mr. Whitacre could not have murdered Mr. Sample on June 12, 2017. (*Id.* at PageID 625).

In reply, Mr. Burke attached a second affidavit from Ms. Cope substantially repeating her previous affidavit. (*Id.* at PageID 767). On February 27, 2020, the Trumbull County Court of Common Pleas denied Mr. Burke's petition. (*Id.* at PageID 779-86). It determined the affidavits raised issues that could have been raised at trial and were not proper evidence because they were not based on personal knowledge and contain hearsay. (*Id.* at PageID 784-85). The trial court then conducted an in-camera review of sealed juvenile records that, in the court's view, contradicted the allegations in Mr. Burke's petition. (*Id.* at PageID 785). The trial court then dismissed Mr. Burke's petition for post-conviction relief. (*Id.* at PageID 779).

On March 20, 2020, Mr. Burke timely appealed through new counsel the trial court's denial of his post-conviction petition to the Eleventh District. (*Id.* at PageID 787). Mr. Burke raised one assignment of error:

> The trial court erred by dismissing the petition without an evidentiary hearing because the affidavits provided in a Petitioner's Motion to Vacate filed pursuant to R.C. § 2953.21 established a meritorious issue.

(*Id.* at PageID 812). On November 30, 2020, the Eleventh District overruled the assignment of error and affirmed the trial court's denial of post-conviction relief. (*Id.* at PageID 854-70).

On January 14, 2021, Mr. Burke timely appealed through counsel the Eleventh District's decision to the Supreme Court of Ohio. (*Id.* at PageID 872-73). Mr. Burke advanced one proposition of law:

> A Constitutional due process violation occurs when the trial court dismisses a petition without an evidentiary hearing if the affidavits in a Petitioner's Motion to Vacate filed pursuant to R.C. 2953.21 established a meritorious issue.

(*Id.* at PageID 882). On April 16, 2021, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 927; *see also State v. Burke*, 166 N.E.3d 1245 (Ohio 2021) (table)). Two justices dissented from the denial of jurisdiction, writing separately that Mr. Burke raised whether a different person had confessed to the murder and so they would accept jurisdiction "to clarify the standards that apply when determining whether a postconviction petition should proceed to an evidentiary hearing." *Burke*, 166 N.E.3d at 1246-47 (Donnelly, J., dissenting). Mr. Burke did not further appeal the denial of his post-conviction petition to the Supreme Court of the United States.

### FEDERAL HABEAS PETITION

On July 19, 2022, Mr. Burke, through new counsel, filed a petition for a writ of habeas corpus, raising as follows:

1.     The state court's resolution of the illegally seized information of cell-tower data was objectively unreasonable in light of *Carpenter v. United States*, 585 U.S. 296 (2018) and previous decisions of the United States Supreme Court.

2.     The trial court erred in hearing a separate unrelated robbery with [Mr. Burke]'s murder charge which was unduly prejudicial and the state court's resolution of the claim was objectively unreasonable under 28 U.S.C. § 2254(d)(1)-(2).

3.     The jury returned a verdict against the manifest weight of the evidence because the evidence is insufficient to establish guilt beyond a reasonable doubt.

4.     Trial counsel was ineffective under the Sixth and Fourteenth Amendments for failing to investigate and/or the evidence was unavailable.

5.     Prosecutorial misconduct for failing to correct testimony [the State] would have reason to believe was false.

6.     [Mr. Burke] was deprived of his right to confront witnesses as the affidavits set for material facts and demonstrate a denial of fundamental fairness.

7.     Trial counsel was ineffective for failing to object to juror misconduct.

(ECF #1 at PageID 19, 22, 24, 26, 36, 37).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Burke's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore the statute acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant

to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The state-court decision does not need to refer to relevant Supreme Court cases or even demonstrate awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

A state-court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Id.* A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision involves an unreasonable application of the Supreme Court's precedent if (1) the state court identifies the correct governing legal rule from the Supreme Court's

cases but unreasonably applies it to the facts of the state prisoner's case, or (2) if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *See Williams*, 529 U.S. at 407. The appropriate measure of whether a state-court decision unreasonably applied clearly established federal law is whether that state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Under § 2254(d)(2), state-court factual determinations stand unless they are objectively unreasonable given the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18.

Under federal law, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-129 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for

ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

DISCUSSION AND ANALYSIS

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers—including the statute of limitations—limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001).

**A.     Timeliness of the petition**

AEDPA establishes a one-year statute of limitations applicable to applications for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2244(d). AEDPA's strict filing deadlines promote the finality of convictions and curb dilatory tactics. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

The limitations period is not jurisdictional; rather, it is an affirmative defense the responding party must raise in its first responsive pleading. *Day v. McDonough*, 547 U.S. 198, 205

14

(2006); *see also Scott v. Collins*, 286 F.3d 923, 927-28 (6th Cir. 2002). However, the court may on its own initiative consider the timeliness of a habeas petition. *Day*, 547 U.S. at 203-04, 209; *see also* Habeas Rule 4(b). Though not jurisdictional, when the State asserts the limitations period and the petition is late, the district court should dismiss the case. *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009).

AEDPA's statute of limitations period runs from the latest of four dates:

(1)    The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(2)    The date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(3)    The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)    The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

A state-court judgment becomes "final" on direct review for purposes of § 2241(d)(1) when the time for pursuing direct review in state court or the Supreme Court of the United States expires. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Under § 2244(d)(2), the limitations period is tolled while a properly filed application for state post-conviction relief or other collateral review with respect to the pertinent judgment or claim remains pending.

Mr. Burke argues the limitations period was statutorily tolled until Friday, July 16, 2022, three days before the petition was filed on Monday, July 19, 2022, but Mr. Burke is entitled equitable tolling for those days because his counsel's application for admission to practice before this court was still pending and the actual-innocence exception applies to permit review. (ECF #7).

The State agrees the limitations period was statutorily tolled until April 18, 2022, 92 days before the petition was filed on July 19, 2022, but argues Mr. Burke is not entitled to equitable tolling and does not meet the requirements of the actual-innocence exception. (ECF #8 at PageID 66-93).

### 1.    The start date of the one-year limitations period

Because Mr. Burke did not pursue a direct appeal all the way to the Supreme Court of the United States, his conviction becomes "final" for the purposes of starting the one-year limitations period at the expiration of the time for pursuing direct review in the Supreme Court expires. *See Gonzalez*, 565 U.S. at 150. The time for seeking review with the Supreme Court of the United States expired 90 days after the entry of judgment by the Supreme Court of Ohio. *See* 28 U.S.C. § 2101(d); U.S. Sup. Ct. R. 13(1). The Supreme Court of Ohio declined jurisdiction over Mr. Burke's direct appeal on September 17, 2019 (ECF #8-1 at PageID 466), so his conviction became "final" within the meaning of § 2244(d)(1)(a) 90 days later, on December 16, 2019. *See* Fed. R. Civ. P. 6(a)(1) ("[I]n computing any time period . . . exclude the day of the event that triggers the period."); *Bronaugh v. Ohio*, 235 F.3d 280, 285 (6th Cir. 2000) (applying Rule 6(a) standards to computation of time for § 2244(d) statute of limitations purposes). Absent statutory and equitable tolling, the one-year limitation period would start on December 16, 2019.

### 2.    Statutory tolling

The parties agree the AEDPA one-year limitations period was statutorily tolled until at least April 16, 2021 while Mr. Burke pursued state post-conviction relief. (ECF #7 at PageID 51; ECF #8 at PageID 68-69). The parties disagree whether statutory tolling extends beyond that date.

Under § 2244(d)(2), the limitations period is tolled while "a properly filed application for state post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending." Mr. Burke properly filed a petition for post-conviction relief on May 16, 2019.

(ECF #8-1 at PageID 467-85). At that time, his direct appeal was pending before the Supreme Court of Ohio and, as discussed above, his conviction was not "final" until December 16, 2019. So, on that date the limitations period would begin, it was immediately statutorily tolled by the pending state post-conviction petition.

The limitations period remained tolled while Mr. Burke pursued further state-court review of his state post-conviction petition. *See Holbrook v. Curtin*, 833 F.3d 612, 615-16 (6th Cir. 2016) (discussing cases holding that § 2244 tolls AEDPA's limitations period while a habeas petitioner appeals the denial of his state post-conviction motion). Mr. Burke appealed the denial of his post-conviction petition to the Eleventh District and then to the Supreme Court of Ohio. (*Id.* at PageID 787, 872-73). The Supreme Court of Ohio declined jurisdiction over Mr. Burke's appeal of the denial of his post-conviction petition on April 16, 2021. (*Id.* at PageID 927).

The parties disagree on whether the limitations period started on April 16, 2021 with that decline of jurisdiction or whether the limitations period is tolled for an additional 90 days. (ECF #7 at PageID 51-52; ECF #8 at PageID 69-70). It is unclear from his briefing whether Mr. Burke is arguing his state post-conviction petition is still "pending" under § 2244(d)(2) during the 90-day window to appeal the denial of his post-conviction petition to the Supreme Court of the United States or that because he filed his state post-conviction petition *before* his conviction became "final" under § 2244(d)(1)(A), he never received the benefit of the 90-day period to pursue a direct appeal to the Supreme Court. Mr. Burke cites two cases in support, *Jimenez v. Quarterman*, 555 U.S. 113 (2009), and *Abela v. Martin*, 348 F.3d 164 (6th Cir. 2003) (en banc), but these do not help explain his argument because *Jimenez* analyzes §2244(d)(1) while *Abela* analyzes § 2244(d)(2). (*See* ECF #7 at PageID 51). I analyze each argument in turn.

First, there is no statutory tolling under § 2244(d)(2) for the 90-day period for Mr. Burke to seek Supreme Court review of the denial of his state post-conviction petition. *Jimenez* does not support this argument because it does not examine the extent of tolling under § 2244(d)(2) but narrowly holds the habeas petitioner's conviction became "final" under § 2244(d)(1)(A) on the date the out-of-time appeal granted by the state court of last resort became final. *Jimenez,* 555 U.S. at 119. In *Abela*, the Sixth Circuit held that the limitations period was "tolled from the filing of an application for state post-conviction or other collateral relief until the conclusion of the time for seeking Supreme Court review of the state's final judgment on that application independent of whether the petitioner actually petitions the Supreme Court to review the case." *Abela*, 348 F.3d at 172-73.

But that holding in *Abela* was overruled by the Supreme Court in *Lawrence v. Florida*, 549 U.S. 327 (2007). There, the Supreme Court held when seeking review of the denial of state-postconviction relief, "filing of a petition for certiorari before this Court does not toll the statute of limitations under § 2244(d)(2)." *Lawrence,* 549 U.S. at 382. The Court found that the tolling provision contained in § 2244(d)(2) applies only to *state* post-conviction or collateral remedies, and that Supreme Court review of a state's denial of post-conviction relief is a *federal* post-conviction remedy. *See id.* at 333.

Both the Sixth Circuit and this Court have recognized that part of *Abela*'s holding is no longer good law. *See, e.g., Sherwood v. Prelesnik*, 579 F.3d 581, 588 (6th Cir. 2009) ("The Supreme Court's decision in *Lawrence* overruled this court's holding in *Abela v. Martin*."); *Anderson v. Brunsman*, 562 F.App'x 426, 430 (6th Cir. 2014) ("the ninety-day period applicable to petitions for certiorari to the United States Supreme Court does not enter the calculation in [state post-

18

conviction proceedings], for the reason that the motion for delayed appeal was not a part of the direct review") (citing *Lawrence*, 549 U.S. at 332); *Green v. Noble*, No. 4:20-CV-555, 2021 WL 1132275, at *10 (N.D. Ohio Mar. 5, 2021), *report and recommendation adopted*, 2021 WL 1124075 (N.D. Ohio Mar. 24, 2021). Thus, there is no statutory tolling under § 2244(d)(2) for the 90-day period for Mr. Burke to seek Supreme Court review of the denial of his state post-conviction petition.

Second, Mr. Burke is not entitled to 90 days' tolling added onto the tolling provided by § 2244(d)(2) because he filed his state post-conviction petition before his conviction became "final" under § 2244(d)(1)(A). Section 2244(d)(1) provides "A 1-year period of limitation shall apply to an application for a writ of habeas corpus" and "The limitation period shall run from the latest of" four enumerated dates. 28 U.S.C. § 2244(d)(1). On the other hand, § 2244(d)(2) provides "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending *shall not be counted toward any period of limitation* under this subsection." *Id.* § 2244(d)(2) (emphasis added). Because the statutory text specifies that time "shall not be counted toward any period of limitation under [§ 2244(d)(1)]," the provision necessarily requires the limitation period to be running before § 2244(d)(2) can exclude time from being counted. Put another way, § 2244(d)(1) starts the one-year limitations clock and § 2244(d)(2) can only pause that clock when it would otherwise be running.

When Mr. Burke (aided by counsel) filed his state post-conviction petition on May 16, 2019, he did so when his conviction was not "final" under § 2244(d)(1) because his appeal to the Supreme Court of Ohio was still pending. Without a "final" conviction to start the one-year limitations period under § 2244(d)(1), there was no period of limitation for § 2244(d)(2) to pause.

Thus, Mr. Burke should not be credited with an additional 90 days' tolling to compensate that he failed to maximize the possible tolling available to him.

In sum, Mr. Burke's limitations period did not start until December 16, 2019, when his conviction was made "final" under § 2244(d)(1)(A). The limitations period was then immediately tolled by § 2244(d)(2) until April 16, 2021, while Mr. Burke pursued state post-conviction relief. The limitations period resumed on April 17, 2021, the day after the Supreme Court of Ohio declined jurisdiction over his appeal. *See Scarber v. Palmer*, 808 F.3d 1093, 1095 (6th Cir. 2015) (holding "the limitation period resumed running the day after the Michigan Supreme Court upheld the denial of Scarber's request for leave to appeal" the denial of a post-conviction petition); *see also* Fed. R. Civ. P. 6(a)(1). The one-year limitations period then would have lapsed on April 17, 2022, one year later, but because that date is a Sunday, the filing window for Mr. Burke's petition actually closed on Monday, April 18, 2022. *See* Fed. R. Civ. P. 6(a)(1)(C). Mr. Burke's petition was filed on July 19, 2022, so, after applying statutory tolling, the petition is 92 days late.

### 3.   Equitable tolling

AEDPA's statute of limitations is not "an inflexible rule requiring dismissal whenever its clock has run" and is "subject to equitable tolling." *Holland v. Florida*, 560 U.S. 631, 645-46, 649 (2010) (cleaned up). A habeas petitioner is entitled to equitable tolling if he shows (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Id.* at 649.

Mr. Burke argues he is entitled to equitable tolling because his counsel applied for admission to practice before this Court prior to the expiration of the AEDPA deadline and it was pending when the deadline expired. (ECF #7 at PageID 52). Mr. Burke does not advance any legal

support for this proposition or explain why he could not submit the petition in expectation that his attorney would be admitted. If construed as a request for equitable tolling for missing a filing deadline, the Supreme Court has held that missing a filing deadline due to "a miscalculation" is a "garden variety claim of excusable neglect" that does not warrant equitable tolling. *Holland*, 560 U.S. at 651. Mr. Burke states that he filed the petition two days late (from the deadline with the additional 90-day delay added he advanced above). (*Id.*). Even if Mr. Burke were entitled to equitable tolling from delays in his attorney's pro hac vice admission, Mr. Burke does not establish that he is entitled to the 92 days' equitable tolling required to make his petition timely.

### 4. The actual-innocence exception

Mr. Burke argues his petition should be reviewed under the actual innocence exception. (ECF #7 at PageID 52). He advances the same affidavits presented in his state post-conviction petition in support. Under this exception, the AEDPA statute of limitations may be equitably tolled where the petitioner makes a credible showing of actual innocence, "so that by refusing to consider his petition due to timeliness the court would cause a fundamental miscarriage of justice." *See Patterson v. Lafler*, 455 F.App'x 606, 609 (6th Cir. 2012).

The Supreme Court has cautioned "that tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). To be entitled to equitable tolling, Mr. Burke must "present new evidence that contemplates establishing his actual innocence—a lower bar than conclusively establishing that he did not do the crime." *Hubbard v. Rewerts*, 98 F.4th 736, 748 (6th Cir. 2024). He must do so by presenting "new reliable evidence—whether it be exculpatory or scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The new evidence must show "it is

more likely than not that no reasonable juror would have convicted the petitioner." *Id.* at 329; *see also House v. Bell*, 547 U.S. 518, 538 (2006) ("to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."). Solely undermining the state's case is not enough. *Hubbard*, 98 F.4th at 748. But a petitioner can make out a valid actual-innocence-gateway claim "even if he cannot show that he is, in fact, innocent." *Keith v. Hill*, 78 F.4th 307, 315 (6th Cir. 2023) (analyzing the same factual standard but in the context of allowing a successive petition under 28 U.S.C. § 2244(b)(2)(B)(ii)); *House*, 547 U.S. at 553-54 ("conclusive exoneration" not required to show "actual innocence").

In evaluating whether it is more likely than not any reasonable juror would have reasonable doubt about Mr. Burke's guilt, this Court must consider the "evidence in its entirety": "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (cleaned up) (citing *Schlup*, 513 U.S. at 327-28); *see also Clark v. Warden*, 934 F.3d 483, 496 n.5 (6th Cir. 2019). Then, based on this total record, this Court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538. This Court may not make an independent factual determination about what likely occurred, but rather must assess the likely impact of the evidence on reasonable jurors. *Id.*

a.   **The evidence presented at trial**

In its opinion affirming his convictions, the Eleventh District summarized the State's case implicating Mr. Burke for the murder of Brandon Sample and the robbery of the Pizza Joe's restaurant. (*See* ECF #8-1 at PageID 392-415). That summary spans 24 pages, so in the interest of

brevity, I address the evidence presented at trial only where relevant to the new evidence Mr. Burke presents.

### b.    New evidence that another person murdered Brandon Sample

Mr. Burke presents three affidavits, one by Cassandra Boyles and two by Lisa Cope, identifying Preston Whitacre as having confessed to killing Mr. Sample. Evidence that "another person has credibly confessed to the crime" goes towards a demonstration of actual innocence. *See Sawyer v. Whitley*, 505 U.S. 333, 340-41 (1992).

First, Ms. Boyles testified in her affidavit that Mr. Whitacre confessed to her sometime in 2017 that he assaulted and murdered Brandon Sample along with a co-conspirator, Ricky Roupe. (*See id.* at PageID 486). Ms. Boyles also recounted Mr. Whitacre telling her that "Austin Burke is the one going down for the murder." (*See id.*). Ms. Boyles added Mr. Whitacre told her the "last kid that tried to fight me got his pussy ass shot" and that the murder of Brandon Sample "was his work but that's what Austin [Burke] gets for being a pussy bitch." (*See id.*).

Second, Ms. Cope testified in two substantially similar affidavits she heard from Mary Roupe, the aunt of Ricky Roupe, who heard from her mother, Pam Roupe, that several children had been fighting at Pam Roupe's house, including Preston Whitacre, and Pam Roupe suspected one of them had killed someone. (ECF #8-1 at PageID 498). In addition to Mr. Whitacre, the group of children included the victim, Brandon Sample; Ricky Roupe, the co-conspirator Ms. Boyles identified; and Joshua White. (*Compare id.* at PageID 486 *with id.* at PageID 498).

But any claim that Mr. Whitacre murdered Mr. Sample is foreclosed by an affidavit by Rich Owen, the Director of the Trumbull County Juvenile Detention Center, submitted by the State during the state post-conviction proceedings. Director Owen testified he searched the records

of his facility in response to Ms. Boyles's affidavit and according to his records, "the juvenile that Cassandra Boyles claims stated to her that he had killed someone was in fact locked in our facility from June 6, 2017 through and including June 13, 2017." (ECF #8-1 at PageID 498). It would be impossible for him to have murdered Mr. Sample on the early morning of June 12, 2017.

While the affidavits contain multiple levels of hearsay, the court must consider all evidence without regard to admissibility, including hearsay evidence, when adjudicating an actual-innocence gateway claim. *See House*, 547 U.S. at 538. Nevertheless, Ms. Boyles's and Ms. Cope's affidavits do not clearly and convincingly establish that a jury would have reasonable doubt that Mr. Burke had murdered Mr. Sample. Director Owens's affidavit establishes that Mr. Whitacre was in juvenile detention at the time of the murder, eliminating the possibility he could be the killer. There is nothing in the record to contradict Director Owen's affidavit and Mr. Burke advances none, despite it being first presented in state post-conviction proceedings. A reasonable jury, faced with these affidavits would likely conclude that Mr. Whitacre was in juvenile detention at the time of the murder, lied to Ms. Boyles when he took credit for the murder, and Ms. Pam Roupe's suspicions were just that.

Comparing the evidence for the theory Mr. Whitacre murdered Mr. Sample to the similar testimony presented at trial implicating Mr. Burke further establishes a reasonable jury would be unlikely to find reasonable doubt. At trial, two witnesses testified that Mr. Burke told them he murdered Mr. Sample. First, Ms. Jessica Simms testified that on the day before the murder, Mr. Burke told her he was going to rob and kill someone. (*See* ECF #8-1 at PageID 401). She further testified that "after he had did it, he came back, you know, bragging about it. We thought he was just playing around. You know." (*Id.*). She went to the police after news reports began circulating

that Mr. Sample was missing and Ms. Simms inferred that on the day before the murder, Mr.

Burke was talking about robbing and killing Mr. Sample. (*See id.*).

> Second, Ms. Hayle Roupe testified Mr. Burke later admitted to the murder, stating:

> He came back to the table and he was like bribing [sic] about the situation. That he had shot somebody in the back of the head and he had taken him down Hatchet Man Road and left his body there. He told me that he got him out in the front of the car and he put him on his knees and he told us that Brandon had looked at him and said, "Please don't do this. I have a family. I have—I have a life in front of me." And he said that he couldn't—he couldn't just sit there and look at him no more, time was over, he had to do it. So he shot him. And he said that the car—he took the car from Hatchet Man Road and that it was running out of gas. He had nowhere else to put it. And that's when he had left it on the Niles bike trail.

(*Id.* at PageID 402). She also recounted that Mr. Rickey Roupe told her that he saw Mr. Burke

covered in blood the morning after the murder. (*Id.*).

A reasonable jury would be presented with evidence Mr. Burke and Mr. Whitacre

confessed to the murder. But Ms. Boyles's and Ms. Cope's accounts are contradicted by Director

Owens's affidavit that Mr. Whitacre was in juvenile detention at the time of the murder. There is

no similar contradiction of Ms. Simms's and Ms. Hayle Roupe's accounts. Thus, of the two people

who claimed credit for the murder, a reasonable jury more likely than not would believe Mr.

Burke, not Mr. Whitacre, murdered Mr. Sample.

Mr. Burke presents another alternative suspect: Joe Leamon. Ms. Jamie Sell, Mr. Burke's

mother, testified that commercial phonebook databases list the last number Mr. Sample called

before the murder as belonging to Mr. Leamon. (ECF #8-1 at PageID 513). Ms. Sell's further

research into Mr. Leamon "revealed he is a heroin dealer, and currently is awaiting sentencing in

federal court" for drug-related offenses. (*Id.*). Ms. Sell asserts the information supported a theory

that Mr. Sample was involved with a heroin dealer on the night he was killed. (*See id.*).

Presuming the commercial phonebook databases recounted in this affidavit are accurate and presuming Mr. Leamon is a heroin dealer, these facts do not establish Mr. Leamon murdered Mr. Sample. The most the affidavit could establish is that on the night in question, Mr. Sample was in contact with a heroin dealer who was not investigated by the police. A reasonable jury would not have reasonable doubt over whether Mr. Burke murdered Mr. Sample when comparing Ms. Sell's research to the multiple witnesses who testified Mr. Burke confessed to the murder.

    **c.**    **New evidence that Mr. Burke has an alibi for the murder**

Mr. Burke presents an affidavit from his younger brother, Gage Sell, which establishes Mr. Burke could not have murdered Mr. Sample because Mr. Burke was at home that night. An alibi witness's testimony goes towards affirmatively demonstrating Mr. Burke's actual innocence. *See Hubbard*, 98 F.4th at 747 ("*House* and *Schlup* to require [a] petitioner[] . . . to make a gateway showing that he didn't do the crime (which goes to actual innocence) instead of merely attacking the state's case (which could show legal innocence).").

Mr. Sell testified he saw Mr. Burke return home "just before dark on Sunday, June 11th, 2017"—before Mr. Sample was murdered in the early hours of June 12, 2017. (ECF #8-1 at PageID 503). Mr. Sell testified "[Mr. Burke] was home before I went to bed, and was home early in the morning when I woke up." (*Id.*). Mr. Sell does not specify when he went to sleep on June 11, 2017 or when he woke up on June 12. Like Ms. Boyles's and Ms. Cope's affidavits, Mr. Sell's testimony can be accepted as true and still it does not establish Mr. Burke's actual innocence. Mr. Sell does not testify when he woke up and saw Mr. Burke so he does not place Mr. Burke's location in the early morning hours of June 12, 2017 when the murder occurred. Even if a reasonable jury believed Mr. Sell's account, the jury could reasonably conclude Mr. Burke left the house after Mr. Sell fell asleep and murdered Mr. Sample, then return before Mr. Sell awoke.

Moreover, Mr. Sell's affidavit is not the sole evidence addressing Mr. Burke's whereabouts on the night of the murder. The State introduced testimony showing that on the early morning of June 12, 2017, Mr. Burke's cell phone traveled from various locations in the cities of Bristol, Niles, and Warren, Ohio, including near the vicinity of where Mr. Burke's car was found abandoned. (ECF #8-1 at PageID 414-15). Nathan Moats testified that in the early morning of June 12, 2017, Mr. Burke was at a different house with Mr. Sample from around 1:00 a.m. to 2:00 a.m. and left around 3:30 a.m. or 4:00 a.m. (*Id.* at PageID 401). Mr. Moats further testified that when Mr. Burke returned later that morning, Mr. Burke told him and Mr. Rickey Roupe that he shot Mr. Sample in the head and left him on "Hatchet Man Road," the location where Mr. Sample's body was found. (*Id.*).

Placed in context with the other evidence, Mr. Sell's affidavit would not likely leave a jury with reasonable doubt as to Mr. Burke's conviction. A reasonable jury would not likely credit Mr. Sell's affidavit over Mr. Moats's testimony and Mr. Burke's cell phone location data because, as Mr. Burke's younger brother, Mr. Sell has a close familial relationship to Mr. Burke and thus a potential motive to lie for his older brother. *See Hubbard*, 98 F.4th at 750 (discounting two alibi witnesses who have a "friendly relationship" with the petitioner where other credible evidence placing the petitioner near the scene of the crime).

### d. New evidence that Mr. Burke could not have robbed Pizza Joe's

Mr. Burke attacks his conviction for the robbery of the Pizza Joe's restaurant in two ways. First, Ms. Sell testifies in two substantially similar affidavits that it was impossible for Mr. Burke to have robbed the Pizza Joe's restaurant because (i) he did not match the descriptions of the robber given by the two Pizza Joe's employees, and (ii) the robber was recorded on surveillance footage running from the restaurant but, at the time of the robbery, Mr. Burke's shoe was missing a

27

shoelace so it would be impossible for him "to run as well as the guy in the video did, without struggling to keep his shoe on." (*See* ECF #8-1 at PageID 568-571, 580-82). Second, Ms. Sell avers that a witness to the robbery contacted her after the trial, recanted his testimony, and accused another witness to the robbery of perjury. (*See id.* at PageID 580).

Regarding the descriptions of the robber provided by the Pizza Joe's employees, Ms. Sell attached one employee's police statement that described the robber as "a mixed man" who is tall, wearing a dark hoodie, and she "thinks his eyes were green, but [she] was far away." (ECF #8-1 at PageID 570). The other employee's police statement described a "tallish skinny" man who she thought was "mixed" and wore "a black ski mask, grey sweatpants, and" she thought "a blue hoodie." (*Id.* at PageID 571). Ms. Sell testifies that Mr. Burke has a "pale complexion with brown/hazel eyes." (*Id.* at PageID 568, 581).

These statements are not new evidence that has not been presented at trial and thus cannot serve as the basis of an actual-innocence-gateway claim. *See Schlup*, 513 U.S. at 324 (holding actual-innocence-gateway claims require "new reliable evidence . . . that was not presented at trial."). The descriptions Ms. Sell refers to were provided to police officers on the night of the robbery. According to the Eleventh District, the jury heard testimony from a third Pizza Joe's employee who testified she "was not able to see much of the man's face because he was wearing a ski mask" but she "described the man as tall, wearing sweatpants and a hoodie." (*Id.* at PageID 404). The jury was also presented with the surveillance camera footage from the night of the robbery. (*Id.* at PageID 405). The jury could see Mr. Burke's complexion and eye color for themselves and judge whether he fit the descriptions. Thus, there is no new evidence not

presented at trial from the Pizza Joe's employees' statements to police officers or in Mr. Burke's complexion and eye color.

The same is true about the lack of a shoelace on one of Mr. Burke's shoes on the night of the robbery. As Ms. Sell recounts, "During cross-examination, it was asked how a robber could run that well, in high-top tennis shoes, while missing one of the shoelaces? The Assistant Prosecutor Becker said, 'I could run really well without a shoelace if I had robbed a store.'" (*Id.* at PageID 568, 580). Thus, the fact Ms. Sell raises that Mr. Burke's shoes were missing a shoelace and the inference she makes that he could not have been the robber and "run as well as the guy in the video did without struggling to keep his shoelace on" were presented at trial to the jury. That Ms. Sell allegedly found the missing shoelace in Mr. Burke's personal effects does not change that the jury heard about the missing shoelace at the trial.

Regarding a witness to the robbery recanting, Ms. Sell testifies on March 10, 2018 (the day after the verdict) Mr. Donavon Bunner contacted her "because he felt bad and knew [Mr. Burke] was not guilty of the murder or the robbery." (*Id.* at PageID 580). Ms. Sell continued that Mr. Bunner asserted another witness had lied on the stand. (*Id.*). A vacillating witness who changes his story multiple times is often presumed to be unreliable. *See Davis v. Bradshaw*, 900 F.3d 315, 330 (6th Cir. 2018) (a change in story could "make it more difficult for reasonable juror to find it reliable"). In such circumstances, a reasonable juror would likely need "corroborating evidence" to discern which version of the witness's story is true. *Id.*

The Eleventh District recounted that Mr. Bunner testified he had lost track of Mr. Burke on the night of the robbery while he, Mr. Burke, and other friends searched for a missing cat and when police officers interviewed Mr. Burke that night, he gave a false name. (*Id.* at PageID 406-07).

Mr. Bunner also authenticated a picture taken on the day of the robbery depicting Mr. Burke, wearing grey sweatpants, with Mr. Bunner and two others. (*Id.* at PageID 407). In those messages dated April 7, 2018, Mr. Bunner disputes that the picture he authenticated depicting Mr. Burke wearing grey sweatpants was taken on the day of the robbery. (*Id.* at PageID 588).

Mr. Bunner's recantation would make a reasonable jury look to corroborating evidence. Here, there was other evidence that corroborated Mr. Bunner's original testimony. Leah Smith and Stacie Cassidy (two others in the group that night) both testified they also lost track of Mr. Burke around the time of the robbery. (ECF #8-1 at PageID 407). Ms. Smith and Melanie Engle (the other two people in the photograph with Mr. Bunner and Mr. Burke) also authenticated that the photograph was taken on the night of the robbery. (*Id.*). Thus, a reasonable jury comparing Mr. Bunner's recantation with the corroborating evidence would likely conclude that Mr. Bunner's original testimony is more likely to be true.

### e. Evidence impeaching two of the State's witnesses

Mr. Burke presents multiple affidavits attacking the credibility of two of the State's witnesses who testified against him: Shawn Marx, a witness to the Pizza Joe's robbery, and Joshua White, a witness to the murder of Mr. Sample. Generally, "[l]atter-day impeachment evidence seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness's account." *Sawyer*, 505 U.S. at 334; *see also Hubbard*, 98 F.4th at 747 ("*House* and *Schlup* to require [a] petitioner[] . . . to make a gateway showing that he didn't do the crime (which goes to actual innocence) instead of merely attacking the state's case (which could show legal innocence).").

30

**Mr. Marx.** The affidavit of Ms. Donna Cottrill attacks the credibility of Mr. Marx, who witnessed the robbery of Pizza Joe's. Ms. Cottrill testified Mr. Marx was unreliable because, alongside Ms. Cottrill's sister, he is a dealer and user of crystal methamphetamine, including around the time of the Pizza Joe's robbery. (*Id.* at PageID 487). Ms. Cottrill further testifies that on the day Mr. Marx testified, "he was using crystal methamphetamine and was high at the time of his testimony." (*Id.*).

A witness with prior criminal conviction, such as for possessing or distributing illegal narcotics, would tend to be less reliable. *See* Fed. R. Evid. 609(a). The State concedes Mr. Marx was arrested for possession of drugs after the trial. (ECF #8 at PageID 77). However, the convictions Ms. Cottrill referenced occurred after his testimony, limiting their impeachment value. (*See* ECF #8-1 at PageID 488). Thus, Mr. Marx's subsequent criminal convictions would likely not change a reasonable jury's assessment of Mr. Marx's truthfulness.

Ms. Cottrill's allegation that Mr. Marx was high while testifying could bear on his credibility and potential facultative impairment. *See* 81 Am. Jur. 2d Witnesses § 781; *see also United States v. Frezzell*, 793 F.App'x 133, 136 (3d Cir. 2019). But Ms. Cottrill does not explain the basis for her belief as to Mr. Marx's alleged impairment. To the extent it is based on observing Mr. Marx's demeanor while testifying, the jury had equal opportunity to observe Mr. Marx on the stand and made its own conclusion about his credibility and facultative impairment; thus, Mr. Cottrill's opinion is not "new" evidence. *Schlup*, 513 U.S. at 324 (holding actual-innocence-gateway claims require "new reliable evidence . . . that was not presented at trial"). Moreover, Ms. Cottrill's affidavit details how she blames Mr. Marx for her sister's drug addiction. (*Id.* at PageID 487). A

reasonable jury may conclude Ms. Cottrill is not a dispassionate observer of Mr. Marx's behavior or his truthfulness and discount her accusations.

Moreover, attacks on Mr. Marx's credibility likely would have limited impact on whether a reasonable jury would have reasonable doubt whether Mr. Burke factually robbed the Pizza Joe's restaurant because other evidence presented to the jury undermined Mr. Marx's identification of Mr. Burke. Mr. Marx testified that on the night of the robbery, he was outside smoking a cigarette and saw a man run out of Pizza Joe's in his direction. (ECF #8-1 at PageID 404). Mr. Marx testified he saw the man under a streetlight approximately 20 feet away from him wearing dark clothing and with something shiny in his pocket that he assumed was a pistol. (*Id.*). In his statement to police, Mr. Marx described the man as having short dark hair, presumably wearing blue jeans because it was "something dark," tennis shoes, a red shirt, and carrying a sweatshirt. (*Id.*). Mr. Marx testified he saw the man's face when he took off some clothing before the man ran away across the street in between a building and a house. (*Id.*). At trial, Mr. Marx identified Mr. Burke as the man he saw that night. (*Id.* at PageID 405).

But the jury saw surveillance video from Pizza Joe's that the Eleventh District described as having "depicted the man running from the store, jogging across the parking lot, then walking across the street between a house and a building. He is not seen on the video removing any clothing." (*Id.* at PageID 405). AEDPA binds me to that determination of the evidence. That determination contradicts Mr. Marx's identification of Mr. Burke. He testified he saw the robber's face *after* he removed his ski mask but *before* the robber fled between a house and a building. (*Id.* at PageID 404). If so, then the surveillance footage, which recorded the robber flee between the buildings, would also record the robber taking off his ski mask. But the footage shows no such

32

thing. Because the jury had video evidence contradicting the basis for Mr. Marx's identification, it is unlikely the jury believed Mr. Marx's word and instead relied on other evidence. Thus, any further impeachment of Mr. Marx by Ms. Cottrill's testimony is unlikely to lead to reasonable doubt.

**Mr. White.** Next, two affidavits advanced by Mr. Burke attack the credibility of another witness, Joshua White. First, Mr. Gage Sell's affidavit about Mr. Burke's alibi for the murder also asserts Mr. White lied about having not seen or met Mr. Burke before the night of the murder. (ECF #8-1 at PageID 503). He does not explain exactly how he knows Mr. White lied or allege that he saw Mr. White with Mr. Burke on the day before the murder. His affidavit states that on June 11, 2017, he saw Mr. Burke "speaking to an individual taller than himself, with brown hair in front of the car," a white Chevrolet Malibu and the kind of car driven by Mr. Sample, and there was "a passenger" in the car "with dark hair." (*Id.*).

Second, Ms. Lori White asserts that Mr. White lied when he denied that both he and Mr. Sample consumed heroin. (*Id.* at PageID 555). Ms. White testified, "It is a well-known fact that Joshua White has been a heroin addict for many years. It is well known by his family, Brandon Sample's family, and anyone in the Trumbull County area." (*Id.*). Ms. White's testimony does not allege any personal knowledge about Mr. White's drug use, but rather states his reputation in the community as a drug user. (*See id.*).

Mr. Sell's and Ms. White's assertions that Mr. White lied about not knowing Mr. Burke prior to the murder or about being addicted to heroin do not suggest that Mr. White's entire testimony is untrustworthy. Ms. White's affidavit impeaching Mr. White by his reputation in the community is also not the most credible impeachment. *See Hubbard*, 98 F.4th at 749-50

33

(discounting credibility of an affidavit that the "word on the street" was that a person other than the petitioner committed the murder). Even if credited, evidence impeaching a witness in a habeas petition "seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness's account." *Sawyer*, 505 U.S. at 334. Here, the alleged lies both concern collateral issues and do not go towards the heart of Mr. White's testimony: accounting for Mr. Sample's whereabouts on the day leading up to his murder and that Mr. Sample was to meet Mr. Burke that night. (*See* ECF #8-1 at PageID 393). It is unlikely a reasonable jury would discount Mr. White's entire testimony based on Mr. Sell's and Ms. White's affidavits.

**f.    Evidence impeaching other aspects of the State's case**

Mr. Burke also advances affidavits that attack other aspects of the State's case against him for the murder of Mr. Sample: (1) that a photograph of a handgun on Mr. Burke's phone is not probative of whether he possessed a handgun, (2) that no bullets were recovered at the scene or from Mr. Sample's body, and (3) whether Mr. Sample was murdered where his body was found. (ECF #8-1 at PageID 614).

**The photograph of the handgun.** Ms. Sell's other affidavit first alleges a photograph of a handgun recovered from Mr. Burke's cell phone was sent to him by Mr. White. (*Id.* at PageID 614). Thus, she argues the photograph is not probative of whether he possessed that handgun. (*See id.*). The photograph was presented at trial so unless the fact the photograph was sent to Mr. Burke was not presented at trial, it is unclear what new evidence is offered. Other evidence corroborated that Mr. Burke had access to a firearm: the silver .22 Taurus handgun recovered by police was registered to Ms. Sell, Mr. Burke's mother, and testimony from multiple witnesses that Mr. Burke carried that kind of handgun. (*Id.* at PageID 410-11). Thus, even if the jury discounted the

34

photograph entirely, there was other evidence connecting Mr. Burke to the handgun the police recovered so a jury, after removing the photograph from evidence, would not likely find reasonable doubt. To the extent Ms. Sell's affidavit implies that Mr. White possessed a firearm, Mr. Burke does not argue that Mr. White murdered Mr. Sample.

**The lack of recovered bullets.** Ms. Sell next alleges a bullet was never recovered at the scene. (*Id.* at PageID 614). Even if true, this neither establishes Mr. Burke's innocence nor impeaches the State's case. The State told the jury that the police did not recover any slugs or shell casings from the scene and, despite there being no exit wounds on Mr. Sample's body, the forensic pathologist testified he could not recover a slug from Mr. Sample's body. (*See id.* at PageID 396-97). Thus, a jury would not likely find reasonable doubt from the lack of a recovered bullet because the jury already convicted Mr. Burke without one.

**Whether Mr. Sample was murdered where his body was found.** Third, Ms. Sell contends that the position of the body in the crime-scene photographs contradicts the State's theory that Mr. Sample was shot while on his knees. (*Id.* at PageID 614). Ms. Sell opines, based on her experience as a nurse, that "his body went into rigamortis [sic] while he was in a chair, or a car possibly." (*Id.* at PageID 614, 619). As the court must view the offered evidence without regard to its admissibility, *House*, 547 U.S. at 538, whether Ms. Sell's opinion is based on reliable scientific methods and specialized knowledge in forensic pathology is not relevant. *See* Fed. R. Evid. 702 (setting standards for opinion testimony by expert witnesses). But that does not mean the court must accord her forensic opinion credibility that it does not deserve. *See Hubbard*, 98 F.4th at 750 ("While we can consider hearsay evidence . . . we do not have to give this 'word on the street' hearsay a level of credibility that it does not deserve."). Even if Mr. Sample had been murdered

elsewhere, this fact would not likely leave a reasonable jury with reasonable doubt as to Mr.

Burke's conviction. In the State's case, one of the detectives testified "he could not say whether the

victim was killed [where the body was recovered] or transported there." (ECF #8-1 at PageID 396).

Like the lack of a bullet, the jury already convicted Mr. Burke without certainty that Mr. Sample

was killed where his body was found, so additional evidence to that fact is unlikely to cause a

different result.

> ### g.    Alleged juror misconduct and discovery violations

The remaining affidavits by Mr. Gage Sell and Ms. Jamie Sell allege juror misconduct and

discovery violations about Mr. Burke's cell phone message data. (ECF #8-1 at PageID 505, 558)

These are not allegations that Mr. Burke is factually innocent of the murder or the robbery but

raise procedural issues with the trial. Ms. Sell's suspicion of the prosecutors does not establish that

because 15 text messages were allegedly omitted from discovery, the contents must be exculpatory.

Thus, regardless of whether they are true, they have little value as to whether Mr. Burke is entitled

to equitable tolling of the statute of limitations for his habeas petition. *See Hubbard*, 98 F.4th at

747 ("*House* and *Schlup* to require [a] petitioner[] . . . to make a gateway showing that he didn't do

the crime (which goes to actual innocence) instead of merely attacking the state's case (which could

show legal innocence).").

> ### h.    The evidence, new and old, taken as a whole does not meet the
> ### extraordinary standard for the actual-innocence exception

Mr. Burke has not made the extraordinary showing required for equitable tolling of the

AEDPA statute of limitation based on the actual-innocence exception. Even if all the evidence on

which he now relies had been introduced at trial, the jurors still could have believed Mr. Burke

murdered Mr. Sample and robbed the Pizza Joe's restaurant. His alternative-suspect theories are

impossible to credit because Mr. Whitacre was held in juvenile detention at the time of the murder and there is no evidence to substantiate that Mr. Leamon murdered Mr. Sample beyond the suspicions of Mr. Burke's mother. A reasonable jury would not likely credit Mr. Burke's alleged alibi. The jury could believe Mr. Sell that Mr. Burke was at home before dark on the night of the murder, left after Mr. Sell fell asleep, committed the murder, and returned before Mr. Sell woke.

While some affidavits, if true, could cast aspersions on the credibility of some of the State's witnesses for the murder and the robbery of Pizza Joe's restaurant, undermining the State's case alone is not enough to invoke equitable tolling. *See Hubbard*, 98 F.4th at 749 ("Even if we discredit Collins's testimony from Hubbard's trial, Hubbard is left with only the lack of an incriminating witness, not the presence of an exonerating one."). The Supreme Court has stressed that the actual-innocence exception described in *Schlup v. Delo* is "demanding" and the evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 383 (quoting *Schlup*, 513 U.S. at 316). The sum total of the evidence Mr. Burke advances and the evidence presented at his trial do not meet that standard. Consequently, Mr. Burke is not entitled to equitable tolling under the actual-innocence exception.

## B.     Evidentiary hearing

In his Traverse, Mr. Burke argues that even in the absence of an actual-innocence-gateway claim, the court should hold an evidentiary hearing on the matter. (ECF #11 at PageID 2016-17). Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims. *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013). This obligation is not triggered, however, if the allegations "are contradicted by the record, inherently

incredible, or conclusions rather than statements of facts." *Id.* A habeas court must also consider the actual-innocence standard in determining whether an evidentiary hearing is appropriate. *Hubbard*, 98 F.4th at 750-51.

Here, there is no factual dispute over the affirmative evidence that would demonstrate Mr. Burke's actual innocence. Mr. Burke's alternative-suspect theory that Mr. Whitacre murdered Mr. Sample is contradicted by the record and the theory that Mr. Leamon killed Mr. Sample has no factual basis beyond Ms. Sell's suspicions. An evidentiary hearing into the veracity of Mr. Sell's alibi for Mr. Burke is unnecessary because a reasonable jury could believe Mr. Sell and still conclude Mr. Burke committed the murder. Because the evidence Mr. Burke advances could be fully credited and still be insufficient for Mr. Burke to receive equitable tolling, the habeas petition presents no issues of fact that must be adjudicated in an evidentiary hearing. As mentioned above, Mr. Burke's affidavits impeaching various witnesses and components of the State's case are not enough without affirmative evidence of his innocence. Thus, an evidentiary hearing into the impeachment evidence would not lead to Mr. Burke being entitled to habeas relief.

Consequently, I **DENY** Mr. Burke's request for an evidentiary hearing.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability (COA) and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S.

473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether (1) the petition states a valid claim of the denial of a constitutional right and (2) the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not required to grant a COA. *Miller-El*, 537 U.S. at 337.

Here, jurists of reason could not find it debatable whether Mr. Burke's evidence of innocence could justify the application of equitable tolling to excuse the untimely filing of the petition. Granted, two dissenting justices of the Supreme Court of Ohio thought an evidentiary hearing may be warranted under state law to investigate Mr. Burke's alternative-suspect theory. *See Burke*, 166 N.E.3d at 1247 (Donnelly, J., dissenting) (table). But the record before this court on federal habeas review, combined with the application of habeas standards of review under federal law, demonstrates that theory is factually impossible. Thus, an evidentiary hearing for Mr. Burke to prove that theory is unnecessary under federal law. Therefore, I recommend the District Court **DENY** Mr. Burke a COA.

### Conclusion and Recommendation

After factoring in statutory tolling, Mr. Burke's habeas petition was filed 92 days after the expiration of AEDPA's statute of limitations. Mr. Burke has not demonstrated entitlement to equitable tolling. The evidence he advances to support his claim to equitable tolling under the actual-innocence exception does not meet the demanding evidentiary standard to undermine the Court's confidence in the outcome of the trial. For these reasons, I recommend the District Court **DISMISS** Mr. Burke's habeas petition. I also **DENY** his request for an evidentiary hearing.

Dated: September 30, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).